**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. DON HANKS; STATE OF | ) | |
| CALIFORNIA ex rel. DON HANKS; STATE | ) | |
| OF ILLINOIS; ex rel. DON HANKS; STATE | ) | |
| OF INDIANA ex rel. DON HANKS; STATE | ) | **FIFTH AMENDED COMPLAINT** |
| OF LOUISIANA ex rel. DON HANKS; | ) | |
| COMMONWEALTH OF | ) | |
| MASSACHUSETTS ex rel. DON HANKS; | ) | Civil Action No. CV-08-3096 |
| STATE OF MICHIGAN ex rel. DON | ) | |
| HANKS; STATE OF NEW JERSEY ex rel. | ) | |
| DON HANKS; STATE OF NEW YORK ex | ) | (Johnson, J.) |
| rel. DON HANKS; STATE OF | ) | (Levy, M.J.) |
| OKLAHOMA ex rel. DON HANKS; STATE | ) | |
| OF TEXAS ex rel. DON HANKS; | ) | |
| COMMONWEALTH OF VIRGINIA | ) | |
| ex rel.  DON HANKS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| US ONCOLOGY SPECIALITY, LLP; | ) | |
| | ) | |
| Defendant; | ) | |
| | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| ex rel.  DON HANKS, and | ) | |
| STATE OF FLORIDA, | ) | |
| ex rel.  DON HANKS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |

ONCOLOGY ASSOCIATES;                          )
INTEGRATED COMMUNITY                          )
ONCOLOGY NETWORK, LLC.;                        )
HEMATOLOGY AND ONCOLOGY                        )
ASSOCIATES OF THE TREASURE                    )
COAST; MID FLORIDA HEMATOLOGY                  )
AND ONCOLOGY CENTERS, P.A.;                    )
PASCO HERNANDO ONCOLOGY                        )
ASSOCIATES, P.A.; REGIONAL                     )
CONSULTANTS IN HEMATOLOGY AND )
ONCOLOGY; COASTAL ONCOLOGY, PL;)
STUART ONCOLOGY ASSOCIATES, P.A.;)
AYUB, SOKOI, MATZKOWITZ AND                    )
SENNABAUM D/B/A NEW HOPE                       )
CANCER CENTER; DAVID DRESDNER,                 )
M.D.,                                          )
                                               )
              Defendants;                      )
                                               )
                                               )
                                               )
UNITED STATES OF AMERICA,                      )
ex rel.  DON HANKS, and                        )
STATE OF GEORGIA,                              )
ex rel.  DON HANKS,                            )
                                               )
              Plaintiffs,                      )
                                               )
       v.                                      )
                                               )
GEORGIA CANCER SPECIALISTS                     )
ADMINISTRATIVE ANNEX;                          )
NORTHWEST GEORGIA ONCOLOGY                     )
CENTERS; AUGUSTA ONCOLOGY                      )
ASSOCIATES; CENTRAL GEORGIA                    )
CANCER CARE; SOUTHEAST GEORGIA )
HEMATOLOGY/ONCOLOGY                            )
ASSOCIATES, P.C.;                              )
                                               )
              Defendants.                      )
_____)

**TABLE OF CONTENTS**

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Plaintiff/Relator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     FACTUAL ALLEGATIONS RELATED TO SPECIFIC DEFENDANTS . . . . . . . . . . . 9

        A.      US Oncology Specialty, LP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.      Defendant Oncology Practices in Florida and Georgia . . . . . . . . . . . . . . . . . . . .12

                Florida Oncology Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

                Georgia Oncology Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

IV.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

        A.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

        B.      Marketing Aranesp to Defendant Oncology Practices . . . . . . . . . . . . . . . . . . . .24

        C.      Overstating Costs to Increase Reimbursements . . . . . . . . . . . . . . . . . . . . . . . .39

        D.      Payments for Drugs Furnished by Physicians . . . . . . . . . . . . . . . . . . . . . . . . . .41

        E.      Rules on Acceptance of Discounts in Healthcare Services . . . . . . . . . . . . . . . . .45

        F.      Fraudulent Reporting of ASP by Defendant Oncology Practices . . . . . . . . . . . . .54

        G.      Overprescribing of the Covered Drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

i

# TABLE OF CONTENTS
## (continued)

H.    Other Illegal Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     1.    Tying the Purchase of Aranesp to the Purchase of Neupogen
         and Neulasta. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     2.    Off-Invoice discounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

     3.    Use and marketing of overfill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

     4.    Price protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

     5.    Free goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

     6.    Marketing the spread . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

     7.    Other improper financial incentives provided to oncology practices . . . . 73

     8.    Use for off-label indications due to marketing and promotion . . . . . . . . 74

     9.    Defendants' fraudulent activities have threatened public health
         and safety. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

I.    Affected Federal Health Care Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

J.    Hub and Spoke Conspiracy to Commit Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . 80


COUNT ONE
Violation of False Claims Act, 31 U.S.C. § 3729(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92


COUNT TWO
Violation of California False Claims Act, Cal. Gov. Code § 12650 *et seq*. . . . . . . . . . . . . . . . . 94


COUNT THREE
Violation of Florida False Claims Act, Fl. Stat. § 66.081 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . 96

## TABLE OF CONTENTS
### (continued)

COUNT FOUR
Violation of Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq.* . . . . . . . . . . . . 98

COUNT FIVE
Violation of Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat.
§ 173/1 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

COUNT SIX
Violation of Indiana False Claims and Whistleblower Act, In. Code 5-11-5.5 *et seq.* . . . . . . . . 101

COUNT SEVEN
Violation of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat.
§ 46: 437 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

COUNT EIGHT
Violation of Massachusetts False Claims Law, Mass. Gen. Laws Ch. 12 § 5(B) *et seq.* . . . . . . 105

COUNT NINE
Violation of Michigan Medicaid False Claims Act, M.C.L. 400.601 *et seq.* . . . . . . . . . . . . . . 106

COUNT TEN
Violation of New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.* . . . . . . . . . . . . . . . 108

COUNT ELEVEN
Violation of New York False Claims Act, N.Y. Stat. Fin. § 187 *et seq* . . . . . . . . . . . . . . . . . . 110

COUNT TWELVE
Violation of Oklahoma Medicaid False Claims Act, 63 OK. Stat. § 5053, *et seq.* . . . . . . . . . . .111

iii

**TABLE OF CONTENTS**
**(continued)**

COUNT THIRTEEN
Violation of Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002 *et seq.* . . 113

COUNT FOURTEEN
Violation of Virginia False Claims Act, Va. Code Ann. § 8.01-216.3(a) *et seq.* . . . . . . . . . . . . 115

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

DEMAND FOR A JURY TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

iv

## I.      INTRODUCTION.

1.      This is a civil action is brought by Don Hanks (the "Relator") on behalf of

himself, the United States of America and the State of California, the State of Florida, the State

of Georgia, the State of Illinois, the State of Indiana, the State of Louisiana, the Commonwealth

of Massachusetts, the State of Michigan, the State of New Jersey, the State of New York, the

State of Oklahoma, the State of Texas, and the Commonwealth of Virginia for treble damages

and civil penalties arising from defendants' false statements and fraudulent claims, in violation

of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").  This action is also

brought pursuant to the various statutes of the several state plaintiffs named above, as further

identified in this Complaint.

2.      The actions alleged to have violated the FCA all occurred during the period

September 1, 2001 to at least September 30, 2011 ("Covered Period").  The defendants in this

action, are all Oncology Practices that specialize in the treatment of cancer or the drug

purchasing organizations of such practices (together, "Oncology Practices").

3.      Amgen, Inc., a Delaware corporation headquartered in Thousand Oaks, Ventura

County, California, is a large biotechnology and drug manufacturing company.  Drugs

manufactured by Amgen are used in a number of different therapies.  The most important of

these involve supportive cancer care, renal therapy and autoimmune diseases, including

treatment of anemia caused by chemotherapy in the treatment of cancer.  In 2013, Amgen had

net income of $5.1 billion on total revenues of $18.7 billion.  Approximately 75 percent of all

Amgen sales are in the United States.

4.      On December 20, 2012, Amgen entered into a Settlement Agreement with the

United States and various states that resolved claims made against it in the original Complaint

1

filed in this action as well as in a number of related cases.  As a result of this agreement, Amgen, which was originally named as a defendant in this civil action, is no longer a defendant as to this Complaint.

5.     During the Covered Period, a substantial percentage of Amgen's U.S. sales revenues and profits were accounted for by three drugs:  Aranesp®, Neupogen® and Neulasta®. These names are registered trademarks of Amgen.  Together, the three drugs are hereinafter referred to as the "Covered Drugs."  A major use of the Covered Drugs is in supportive cancer care.  Aranesp (biologic name, darbepoetin alfa) and another Amgen drug, Epogen® (biologic name, epoetin alfa), are classified as erythropoiesis-stimulating agents ("ESAs"); they stimulate the production of red blood cells.  Neupogen (biologic name, filgrastim) and Neulasta (biologic name, pegfilgrastim), selectively stimulate the production of neutrophils (a type of white blood cell that helps the body fight infection.  Neupogen and Neulasta are granulocyte colony-stimulating agents ("GSAs").

6.     Chemotherapy treatments for cancer often deplete the supply of red blood cells in the body, leading to anemia.  Red blood cells, which are made by the bone marrow, are the principal means by which oxygen is delivered to body tissues.  Without adequate amounts of erythropoietin, red blood cell count is reduced, which, in turn, diminishes the ability of the blood to deliver sufficient amounts of oxygen to the body, leading to anemia.  Severe or long-lasting anemia can damage the heart, brain and other body organs.  In its most severe form, anemia may lead to death.  It has been theorized but not proven that one possible side effect of ESAs is that they reduce the number of white blood cells circulating in a patient's blood, contributing to, if not causing the need to administer Neupogen or Neulasta.

7.      Epogen (epoetin alfa) is "indicated," *i.e.,* is medically accepted or useful, as a treatment for anemia associated with chronic renal failure, anemia in HIV patients being treated with AZT (Zidovudine), anemia of cancer associated with treatment both for patients on dialysis and for patients not on dialysis and parasurgery.  Aranesp is indicated for the treatment of chemotherapy-induced anemia in patients with non-myeloid malignancies, meaning anemia not caused by cancer.  Neupogen and Neulasta are used to counteract the reduction in white blood cells.  This reduction in white blood cells can be caused by chemotherapy used in the treatment of cancer.  White blood cells serve as the body's primary defense against infections.  They work by destroying bacteria in the blood.  Neupogen and Neulasta stimulate the production of new white blood cells from the bone marrow.

8.      Sales of Amgen's principal products are highly dependent on the extent of coverage and reimbursement patients receive from third-party payers, including, most significantly, the federal and state governments via various government-funded healthcare programs.  Such programs are referred to herein, jointly, as "Government Healthcare Programs." The two largest and best known federal healthcare programs are Medicare and Medicaid, both of which are administered by the Centers for Medicare and Medicaid Services (hereinafter "CMS"), an agency of the U.S. Department of Health and Human Services.

9.      During the Covered Period, on information and belief, the defendant Oncology Practices were major buyers of the Covered Drugs.  For patients eligible to receive benefits under Government Healthcare Programs, such programs generally paid all or a substantial portion of the cost of the Covered Drugs when used with patients being treated for anemia of cancer.  When Government Healthcare Programs pay for all or some portion of the cost of a drug, the cost of the drug is said to have been "reimbursed" by the Government Healthcare

Program. During the Covered Period, medical services providers, such as the Oncology Practice defendants, administered drugs, including the Covered Drugs, to patients receiving benefits under Government Healthcare Programs. After providing the service, the Oncology Practice defendant would file a claim for "reimbursement" with the Government Healthcare Program responsible for coverage and, in the normal course, the claim would be paid according to program rules.

10.     As alleged further hereinafter in this Complaint, with respect to the Covered Drugs, as aided and abetted by Amgen, the Oncology Practice defendants, through a variety of means, submitted claims for and obtained "reimbursement" of the cost of the Covered Drugs that far exceeded the defendant's reimbursable cost of these drugs, in violation of the Government Healthcare Program rules.

11.     Sales of the Covered Drugs, plus Epogen – an ESA made by Amgen – accounted for the majority of Amgen's domestic revenues and profits during much of the Covered Period. Amgen's domestic revenues from the sale of the Covered Drugs and Epogen, topped $5 billion in 2004, 2005, and 2006. In addition, Amgen paid out significant rebates to the Oncology Practice defendants – accounting for billions of dollars over the Covered Period.

12.     Total sales of the Covered Drugs amounted to approximately $80 billion during the period 2001 to 2013. Amgen's ESA sales almost tripled from 2001 to 2005. Amgen's GSA sales more than quadrupled from 2001 to 2005. Amgen's annual financial reports (10-Ks), filed with the Securities and Exchange Commission, show that Amgen acknowledged spending some $17 billion on drug sales rebates from 2007 to 2011. On information and belief, Amgen did not fully disclose the rebates, discounts and other financial incentives to purchase the Covered Drugs it paid on sales of ESAs and GSAs prior to 2007. Such rebates were paid directly to the medical

services providers, including the defendant Oncology Practices, not to the ultimate third-party

payer for the drugs, *i.e.,* the Government Healthcare Program or a third-party insurer.  On

information and belief, Amgen did not report or under reported the rebates, discounts and other

financial incentives it provided to medical services providers, including the defendant Oncology

Practices, as incentives to purchase the Covered Drugs to any Government Healthcare Programs

– all of which amounted, effectively, to reductions in the cost of the Covered Drugs to the

Oncology Practice defendants.  On information and belief, none of the defendant Oncology

Practices reported any of the rebates, discounts and other financial incentives they received from

Amgen to purchase the Covered Drugs to any Government Healthcare Programs.


## II.     JURISDICTION AND VENUE.

13.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §

3732(a), which authorizes nationwide service of process.  At least one of the defendants can be

found in, resides in, or has transacted business in the Eastern District of New York and in the

State of New York.

14.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §

3732(a), which authorizes nationwide service of process.  At least one of the defendants can be

found in, resides in, or has transacted business in the State of New York.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 31

U.S.C. §§ 3730(b) and 3732(a), which specifically confer jurisdiction on this Court for actions

brought pursuant to the FCA.

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or

more defendants or previously named defendants can be found in, resides in, or has transacted

business in the Eastern District of New York, and at least some of the alleged acts occurred in this District.

17.     The material allegations of this Complaint are not based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing audit or investigation, or from the news media.

18.     The FCA provides that any person who submits a false claim to the government is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government.  The Act permits persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.  As required by 31 U.S.C. § 3730(b)(2), the complaint must be filed *in camera* and under seal, without service on the defendant.  The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action.

19.     The United States, having entered into a partial Settlement Agreement with Amgen, has nevertheless reserved its right to intervene in any portion of this action in which it initially declined to intervene, for good cause, at a later date.

## III.   THE PARTIES.

### A.   Plaintiff/Relator.

20.   Plaintiff/Relator Don Hanks ("Relator") is a resident of Jacksonville, St. Johns County, Florida.  Relator was employed by Amgen or by Amgen USA, Inc., an Amgen subsidiary as a nephrology and/or oncology sales/marketing representative from December 18, 1989 until his wrongful termination on May 23, 2007.  Through his employment with Amgen and Amgen USA, Inc., as is more fully described herein, Relator gained personal knowledge of the material allegations made in this Complaint.

21.   Relator was one of Amgen's most recognized and successful sales representatives and received numerous awards for performance.  Based on his expertise and product knowledge, Relator was assigned to some of Amgen's largest U.S. accounts.  Relator served as a large account liaison to the Integrated Oncology Network (hereinafter "ION") and to US Oncology Specialty LP (hereinafter "USOS").  As the account liaison for USOS, Relator was responsible for coordinating all Amgen contacts to the numerous practices that comprised USOS.  Relator was also regularly apprised of Amgen's sales and marketing strategies toward ICON and USOS.  Through these and other sales duties, Respondent gained direct and personal knowledge of Amgen's implementation of nationwide strategies and programs to market the Covered Drugs to the defendant Oncology Practices and other medical services providers.

22.   In the course of his career with Amgen, Relator saw Amgen change from a small biotech company with "patient centric" culture to a large biotech company with a "dollar centric" culture.  While with Amgen, Relator achieved a number of notable distinctions and recognitions.  In addition, Relator was involved in several Amgen initiatives directed toward

relationship development with physicians and product launches.  For most of his years with the company, Relator was a member of Amgen's President's Club, a distinction reserved for the top ten percent of sales performers.  He also served frequently as a trainer for new recruits to Amgen's sales force, not only in the district to which he was assigned, the Tampa district, but also in other districts.

23.     Some of these distinctions, recognitions and initiatives are noted herein below. Relator was a member of the first Neupogen Advisory Panel and Launch Committee; a multi-year member of the President's Club at Amgen; fostered and promoted great public champions for Amgen, two of which are Dr. Alan Miller (Tufts) and Dr. Gary Lee (Arizona State University); and, after a year of claims denials, convinced Medicare officials in Florida, in particular, Dr. Frank Farmer, the Medical Director, to begin paying claims for Neupogen, for which more than $500 million in claims were outstanding.

24.     Relator engaged in substantial business dealings related to the sale and purchase of the Covered Drugs with each of the defendants.

**B.     Defendants.**

25.     As previously noted, the defendants in this action are all either medical practices that provide cancer treatments to patients, or group (drug) purchasing organizations (hereinafter "GPOs") of such medical practices.  The defendants are identified with particularity in paragraphs 27 to 62 of this Complaint.

26.     In its sales and marketing to defendant Oncology Practices, Amgen differentiated between these practices based upon their levels of sales and potential sales.  One group was called "Platinum Amgen customers"; the other was called "Gold Amgen customers."  Amgen

8

used these terms to classify its customers based on their value to Amgen. Depending on the

level purchases, a practice could expect a certain percentage reduction in the cost of certain

drugs it purchased from Amgen, although these discounts varied even within customer classes.

Typically, Platinum customers received at least a 50% reduction of the invoiced charge, which

was returned to them in the form of rebates, discounts and other incentives, with many Platinum

Oncology practices receiving rebates, discounts or other incentives in the range of 60% of the

invoiced charge. Typical Gold customers received at least a 40% reduction of the invoiced

charge, which was returned to them in the form of rebates, discounts and other incentives, with

many Gold Oncology Practices receiving rebates, discounts and other incentives in the range of

50% of the invoiced charge.


**IV.    Factual Allegations Related to Specific Defendants.**

**A.    US Oncology Specialty, LP.**

27.    US Oncology Specialty, LP ("USOS") is a Delaware Limited Liability

Partnership based in Texas. USOS is a specialty distribution center service of US Oncology, Inc.

According to a press release, US Oncology, Inc. launched USOS in 2005 to "facilitate the

seamless flow of oncology pharmaceuticals directly from the pharmaceutical manufacturers to

its nationwide network of practices."

28.    During the Covered Period, USOS purchased large quantities of the Covered

Drugs from Amgen. In 2006, USOS made purchases of Amgen drugs in excess of

approximately $1 billion.

29.    During the Covered Period, USOS served as a Group Purchasing Organizing

(hereinafter "GPO") for the approximately 1,000 physicians affiliated with US Oncology, Inc.

The USOS GPO acted as the buying agent for drugs for oncology practices in each of the plaintiff States. On information and belief, during the Covered Period the USOS GPO purchased and sold to its affiliated physicians and oncology practices in the plaintiff States substantial quantities of the Covered Drugs which these physicians and practices administered to patients eligible to receive benefits under Government Healthcare Programs. Thereafter, the affiliated physicians and oncology practices sought reimbursement for the cost of those drugs from such programs without taking into account the rebates, discounts and other things of value Amgen provided as incentives to increase purchases of the Covered Drugs. The USOS GPO pooled the purchasing power of its member physicians and oncology practices in order to obtain even larger rebates for the Covered Drugs from Amgen than Amgen offered to smaller practices. The terms of the contracts between the GPO and Amgen were confidential; they were not reported to or shared with Government Healthcare Programs. Thus, the provisions in those contracts that reduced the actual cost of the Covered Drugs to the GPO, such as price protection, rebates, off-invoice discounts, overfill, honoraria, equipment donations, data management fees and other forms of discounts, were not known to Government Healthcare Programs. The actual selling price of the Covered Drugs supplied by Amgen to USOS pursuant to the confidential contracts and used with beneficiaries of Government Healthcare Programs was considerably lower than the reported selling price, taking into account the various discounts, rebates and other things of value (or "freebies") that reduced the actual cost to USOS for the Covered Drugs.

30.     The failure by Amgen and the GPO to report the actual, lower cost of the Covered Drugs paid by the GPO, taking into account the various discounts, rebates and the like, caused Government Healthcare Programs to "reimburse," or pay, the GPO more than it was entitled to receive for purchasing and administering the Covered Drugs to patients whose drug costs were

reimbursable, or reimbursable in part, under Government Healthcare Programs reimbursement rules.

31.    The GPO did not report the discounts, rebates and other elements applied by Amgen that reduced the actual price of the drugs.  USOS acknowledged that the GPO had sought and been reimbursed by Government Healthcare Programs on the basis of the unadjusted "average selling price" of the drugs, as computed by Amgen, a figure that did not accurately factor in the discounts, rebates and other cost-reducing elements received by the GPO.  The GPO has acknowledged that it failed to report the discounts, rebates and other elements applied by Amgen that reduced the actual price of the drugs.  According to a USOS press release, USOS admited that the GPO had sought and been reimbursed by Government Healthcare Programs on the basis of the unadjusted "average selling price" of the drugs, as computed by Amgen, a figure which did not factor in the discounts, rebates and other cost-reducing elements received by the GPO.

32.    During the Covered Period, USOS supplied the Covered Drugs to USOS-affiliated practices throughout the country.  During the Covered Period, because of its large size, USOS was offered and received rebates and other discounts for its purchases of the Covered Drugs that were far greater than those generally available to other oncology practices or GPOs.  On information and belief, USOS' Portfolio Contract provided extra discounts and rebates not generally available to other oncology practices and GPOs upon the attainment of certain market share goals or milestones set by Amgen and met by the GPO.

33.    Relator met with Joe Bailes, M.D., then President of USOS, on multiple occasions regarding the sale of Aranesp, Neupogen and Neulasta (the "Covered Drugs").  Specifically, Relator met with representatives of USONC, including Dr. Bailes, at the American

Society of Hematology Annual meetings in 2003, 2005 and 2006.  Relator also met with representatives of USOS at the American Society of Community Oncologists Annual meetings in 2005.  In Relator's interactions with Dr. Bailes and other representatives of USOS, it was made clear to Relator that Aranesp would be the Erythropoiesis-Stimulating Agents ("ESA") of choice for USOS based on the "profit per patient" that USOS could achieve using by Aranesp, especially in combination with Neupogen and Neulasta.  Like Aranesp, Neupogen and Neulasta were products whose purchase in increasing amounts were rewarded by Amgen with rebates, discounts and the like pursuant to the Portfolio Contract.  In plain terms, USOS officials were made aware by Amgen of the opportunity to obtain greater reimbursement for the Covered Drugs than USOS was lawfully entitled to receive from Government Healthcare Programs. USOS thereafter took advantage of this opportunity by seeking "reimbursement" costs that overstated its actual cost of the Covered Drugs.

### B.   Defendant Oncology Practices in Florida and Georgia.

34.   During the Covered Period, Amgen used an internal, computerized database to track all forms of rebates, discounts, equipment gifts, free goods, contributions of medical education grants, data purchases, honorarium provided, and other client-oriented information. The database was known as "ACIS," for "Amgen Customer Identification System."  Each Amgen customer was assigned a unique ACIS number.  Amgen used this information to obtain leverage in getting the defendant Oncology Practices sign Amgen Portfolio Contracts and to purchase more of the Covered Drugs.  Amgen sales representatives used the data related to individual customers to "educate" customers – usually under the guise of  "business reviews." Business reviews focused on the specific financial benefits a particular oncology practice would

receive by achieving the target purchase goals for the Covered Drugs set by the defendant's Amgen Portfolio Contract.  Amgen also used these ACIS numbers to track which customers had signed an Amgen Portfolio Contract, their sales quota performance and their ability to maximize their "rebates" through such "business reviews."

## Florida Oncology Practices

35.     On information and belief, defendant Florida Cancer Specialists & Research Institute (ACIS #216205), headquartered in Fort Myers, Florida, is the largest privately owned Oncology/Hematology practice in Florida, with 46 offices throughout Florida.  On information and belief, defendant Florida Cancer Specialists & Research Institute has an office at 3840 Broadway, Fort Myers, FL 33901. On information and belief, defendant Florida Cancer Specialists & Research Institute purchased Amgen products for the following years in the dollar amounts indicated:  2004 –  $12.8 million; 2005 – $13.5 million; 2006 – $20.3 million; 2007 – $39.2 million.  As a Platinum Amgen customer, defendant Florida Cancer Specialists & Research Institute received a rebate or discount from Amgen amounting to approximately 50% of all purchases made from approximately 2004 through 2007.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.  Since the "profit" on Neupogen in Medicare patients was greater than Neulasta off-contract, defendant Florida Cancer Specialists & Research Institute only administered Neupogen to its Medicare patients; it administered Neulasta to its private pay and indemnity plan patients.

36.     On information and belief, defendant Gulfcoast Oncology Associates (ACIS #221641) has an office at 1201 5th Ave North, #505, St. Petersburg, FL 33705.  Gulfcoast Oncology Associates was an affiliate of Integrated Community Oncology Network, LLC ("ICON") On information and belief, defendant Gulfcoast Oncology Associates purchased Amgen products for the following years in the dollar amounts indicated:  2002 – $ 3.2 million; 2003 – $ 4.0 million; 2004 – $13.6 million; 2005 – $21.1 million; 2006 – $30.1 million; 2007 – $29.3 million.  As an Amgen Platinum customer, defendant Gulf Coast Oncology Associates received a rebate or discount from Amgen amounting to approximately 50% of all purchases made from during the period of approximately 2004 through 2007.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the entire Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

37.     On information and belief, defendant Integrated Community Oncology Network, LLC ("ICON") through its division Florida Oncology Associates (ACIS #11998) provides specialized care for patients with cancer and/or hematological disorders in Northeast Florida. Defendant ICON has approximately nine cancer centers in Duval, Clay, St. Johns and Putnam counties and a business address of 9143 Philips Highway, Suite 560, Jacksonville, FL 32256. On information and belief, defendant ICON made Amgen product purchases for the following years in the dollar amounts indicated:  2002 – $2.3 million; 2003 – $13.3 million; 2004 – $14.8 million; 2005 – $15.4 million; 2006 – $32.0 million; 2007 – $27.0 million.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates

for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products to the defendant.  During the Covered Period, defendant ICON had a GPO contract and a special Large Physician Practice ("LPP") contract with Amgen.

38.     During the Covered Period, defendants ICON, Florida Cancer Specialists & Research Institute and Gulf Oncology Associates were elite members of the International Oncology Network ("ION") and received even greater discounts on drug purchased from Amgen because of this affiliation.

39.     On information and belief, defendant Hematology and Oncology Associates of the Treasure Coast (ACIS #214554) has an office at 1871 S.E. Tiffany Ave, Suite 100, Port St. Lucie, FL 34952.  On information and belief, defendant Hematology and Oncology Associates of the Treasure Coast bought $2,307,809 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

40.     On information and belief, defendant Mid Florida Hematology and Oncology Centers, P.A. (ACIS #225776) has an office at 1061 Medical Center Drive, Orange City, FL 32732.  On information and belief, defendant Mid Florida Hematology and Oncology Centers bought $2,074,198 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from

15

Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

41.  On information and belief, defendant Pasco Hernando Oncology Associates, P.A. (ACIS #216704) has an office at 14529 Cortez Blvd, Brooksville, FL 34613.  On information and belief, defendant Pasco Hernando Oncology Associates, P.A. bought $1,766,348 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

42.  On information and belief, defendant Regional Consultants in Hematology and Oncology (ACIS #276635) has an office at 1235 San Marco Boulevard, Suite 3, Jacksonville, FL 32207.  On information and belief, defendant Regional Consultants in Hematology and Oncology bought $1,494,671 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received

16

reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

43.   On information and belief, defendant Cancer Institute of Florida, P.A. (ACIS #216184) has an office at 894 East Altamonte Drive, Altamonte Springs, FL 32701.  On information and belief, defendant Cancer Institute of Florida, P.A. bought $1,884,415 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a Gold Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

44.   On information and belief, defendant Coastal Oncology, PL (ACIS #1077445) has a location of business at 325 Clyde Morris Boulevard, Suite 450, Ormond Beach, FL 32174. On information and belief, defendant Coastal Oncology, PL bought $1,387,285 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a Gold Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

45.   On information and belief, defendant Stuart Oncology Associates, P.A. (ACIS

17

#214555) has an office at 501 South East Osceola Street, Suite 301, Stuart, FL 34994.  On

information and belief, defendant Stuart Oncology bought $1,223,312 of Amgen drugs in the

Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 40% of all

purchases as a Gold Amgen customer.  On information and belief, defendant made comparable

purchases of Amgen drugs and received comparable rebates for the said products during the

Covered Period and sought and received reimbursement from Government Healthcare Programs

for administration of the Covered Drugs to patients eligible to receive government-funded

healthcare benefits in amounts that exceeded the actual cost of these products.

  56. On information and belief, defendant Ayub, Sokoi, Matzkowitz and Sennabaum,

d/b/a New Hope Cancer Center (ACIS #216428) has an office at 7651 Medical Drive, Hudson,

FL 34667.  On information and belief, defendant Ayub, Sokoi, Matzkowitz and Sennabaum,

d/b/a New Hope Cancer Center bought $1,152,600 of Amgen drugs in the Fourth Quarter of

2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a

Gold Amgen customer.  On information and belief, defendant made comparable purchases of

Amgen drugs and received comparable rebates for the said products during the Covered Period

and sought and received reimbursement from Government Healthcare Programs for

administration of the Covered Drugs to patients eligible to receive government-funded

healthcare benefits in amounts that exceeded the actual cost of these products.

  57. On information and belief, defendant David Dresdner, M.D. (ACIS #307671) has

an office at 1099 5th Avenue North, Suite 120, St. Petersburg, FL 33705.  On information and

belief, defendant David Dresdner bought $1,004,961 of Amgen drugs in the Fourth Quarter of

2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a

Gold Amgen customer.  On information and belief, defendant made comparable purchases of

Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

### Georgia Oncology Practices

58.     On information and belief, defendant Georgia Cancer Specialists Administrative Annex (ACIS #226796) has an office at 60 Jesse Hill Jr Drive SE, Atlanta, GA 30303.  On information and belief, defendant Georgia Cancer Specialists Administrative Annex bought $7,139,213 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

59.     On information and belief, defendant Northwest Georgia Oncology Centers, P.C. (ACIS #226509) has an office at 340 Kennestone Hospital Boulevard, Suite 200, Marietta, GA 30060.  On information and belief, defendant Northwest Georgia Oncology Centers, P.C. bought $4,035,433 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received

19

reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

60.     On information and belief, defendant Augusta Oncology Associates (ACIS #214436) has an office at 3696 Wheeler Road, Augusta, GA 30909.  On information and belief, defendant August Oncology Associates bought $2,995,248 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

61.     On information and belief, defendant Central Georgia Cancer Care (ACIS #227676) has an office at 1062 Forsyth Street, Suite 1B, Macon, GA 31201.  On information and belief, defendant Central Georgia Cancer Center bought $1,982,152 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

62.     On information and belief, defendant Southeast Georgia Hematology/Oncology Associates, P.C. (ACIS #218644) has an office at 1111 Glynco Parkway, Suite 500, Brunswick,

GA 31525.  On information and belief, defendant Southeast Georgia Hematology/Oncology bought $1,418,135 of Amgen drugs in the Fourth Quarter of 2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a Gold Amgen customer.  On information and belief, defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual cost of these products.

## V.      FACTUAL ALLEGATIONS.

### A.      Background.

63.      Erythropoiesis is the process by which the body produces erythrocytes, or red blood cells.  Red blood cells contain hemoglobin, a protein that functions primarily to transport oxygen from the lungs to the tissues of the body.  Hemoglobin levels are expressed in grams (g) per deciliter (dL) of whole blood.  An adequate supply of red blood cells is necessary to oxygenate the body.

64.      Anemia, a condition in which the blood is deficient in red blood cells or hemoglobin, impairs the body's ability to transfer oxygen to the tissues.  Anemia has many potential causes, including an iron-poor diet, excessive bleeding, certain cancers, certain cancer treatments and kidney or liver failure.  Erythropoeitin is a hormone that stimulates red blood cell creation.  A necessary step in the erythropoietic process is the production of erythropoietin, a protein made in the kidneys that stimulates red blood cell formation.

21

65.     In 1983, Amgen claimed that its scientists had managed to isolate the human erythropoietin gene and produce the recombinant protein in hamsters.  A few years later, through the use of DNA technology, Amgen commercialized the production of erythropoietin – epoetin alfa and, later, darbepoetin alfa.  Because epoetin alfa and darbepoetin alfa, like endogenous erythropoietin, stimulate red blood cell formation, as previously noted, they are referred to as "erythropoiesis-stimulating agents" or "ESAs."

66.     In 1989, epoetin alfa was approved by the U.S. Food and Drug Administration ("FDA") as a treatment for anemia associated with chronic renal failure ("CRF"), including end-stage renal disease ("ESRD") patients and patients not on dialysis.  Prior to the discovery of this treatment, the treatment for severe cases of anemia in CRF patients had been whole blood or red cell transfusions.  Treatment with epoetin alfa (Epogen therapy) or darbepoetin alfa (Aranesp therapy) was aimed at elevating or maintaining the red blood cell level and, thus, reducing the need for transfusions in these patients.

67.     In 1985, while epoetin alfa was still in development, Amgen entered into a product license agreement ("Licensing Agreement") with a subsidiary of Johnson & Johnson Services, Inc. ("J&J Licensee" or "Licensee") pursuant to which Amgen gave the Licensee an exclusive right under its patents to market in the United States recombinant human epoetin alfa for all medical uses, called "indications," except for the treatment of anemia associated with CRF in dialysis patients.  Amgen retained the right to market epoetin alfa exclusively for this use; it did not license J&J or any other company, then or later, to market darbepoetin alfa under any of its U.S. patents for anemia associated with CRF.

68.     During the Covered Period, Amgen marketed epoetin alfa in the United States under the brand name "Epogen"; the Licensee marketed epoetin alfa in the United States through

22

certain subsidiary companies under the brand name "Procrit" – under the Licensing Agreement

with Amgen.  Epogen and Procrit are identical chemically.  At all times relevant to this

Complaint, Procrit and Epogen were manufactured by Amgen at the same manufacturing facility

in Colorado, using the same process.  The FDA-approved labels listing indications, warnings and

other information for Epogen and Procrit are identical.

69.     As the result of its own efforts, between 1991 and 1996, J&J succeeded in

obtaining FDA approval to market epoetin alfa for use –  (a) in patients with anemia as a

consequence of cancer chemotherapy treatment, (b) in patients undergoing treatment for HIV

infection with the pharmaceutical Zidovudine, (c) in treating chronic kidney diseases in pre-

dialysis patients and (d) in anemic patients scheduled to undergo elective, non-cardiac, non-

vascular surgery.

70.     Under the Licensing Agreement, Amgen could not expand its Epogen sales and

marketing efforts to take advantage of the indications for epoetin alfa obtained by J&J.  Amgen

was limited to the dialysis market for Epogen.  Given this constraint on sales, Amgen sought a

way to capture a piece of the lucrative oncology market that it had ceded to the Licensee

pursuant to the 1985 Licensing Agreement by finding a "work around" for the field of use

restrictions in the Licensing Agreement.

71.     Slightly earlier, in 1984, Amgen and Kirin Holdings Company, Limited had

organized a joint venture company, Kirin-Amgen, Inc., to conduct research into the

development, manufacture, production and sale of erythropoietin products for human therapeutic

use.  That joint venture, based in Thousand Oaks, California, had, by 1997, succeeded in

producing a new ESA, darbepoetin alfa, with a slightly different molecular structure than the

molecular structure of epoetin alfa.

72.     In 1997, the J&J Licensee filed suit against Amgen, claiming that darbepoetin alfa was covered under the Licensing Agreement.  Amgen responded that darbepoetin alfa, which it marketed under the brand name "Aranesp," was distinct enough chemically to be a new product and therefore not covered by the Licensing Agreement.  In December 1998, an arbitrator ruled that Amgen had not licensed its exclusive U.S. rights to Aranesp to J&J.  As a result, Amgen was free to market Aranesp without any of the use restrictions that applied to Epogen.  As described in a 2006 Forbes article entitled "Amgen's Enemies," with the development of this drug, Amgen "sidestepped" the 1985 Licensing Agreement to reclaim the market it had given up to J&J.

73.     Darbepoetin alfa was approved by the FDA for use in chemotherapy-induced anemia in September 2001.  Based on Aranesp's longer serum half-life and claims made by Amgen in its application for approval, the FDA approved Aranesp to be dosed on a less frequent basis than Epogen and Procrit.  Amgen began marketing darbepoetin alfa in the United States as "Aranesp" the same year.

74.     In 2002, Amgen secured a supplemental FDA approval of darbepoetin alfa as indicated for the treatment of anemia associated with cancer chemotherapy.

**B.     Marketing of Aranesp to Defendant Oncology Practices.**

75.     After the FDA approved Aranesp for treatment of chemotherapy-induced anemia, in 2002, Amgen undertook an aggressive marketing campaign for Aranesp, designed to take market share away from Procrit in the treatment of chemotherapy-induced anemia.  Amgen achieved only limited success with this campaign.  Oncology physicians were generally satisfied with Procrit and saw few reasons to switch to Aranesp.  In addition, because Aranesp did not, at

that time, have a "J Code" from CMS, which would have allowed prescriptions to be approved in an automated fashion, bills to Medicare and Medicaid had to be submitted using a "Q Code," which required manual approval by CMS staff from a paper submission and could delay or frustrate payment, or "reimbursement," approvals.  Eventually, effective on or about January 1, 2003, a "J Code" was approved for Aranesp (darbepoetin alfa).  The designated "J Code" was J1880.

76.     Given Amgen's inability to convince substantial numbers of oncologists to switch from Procrit to Aranesp based on the claim that Aranesp could be dosed less frequently than Procrit, with the same efficacy, or the pricing structure at which it offered to sell Aranesp, Amgen decided to retool and redirect its sales effort.

77.     In 2004, Amgen initiated a new sales strategy.  The new strategy was to provide the defendant Oncology Practices and other potential customers with a new, real and substantial reason to buy and use Aranesp rather than Procrit.  This new, real and substantial reason was money, or greater profitability, via rebates and off-invoice discounts that reduced the effective price of the drugs to purchases that qualified for the rebates and discounts, including, potentially, the defendant Oncology Practices.  In addition to the value of the rebates and discounts themselves, because Amgen did not include these price reductions, or concessions, in reporting it AWP or ASP to Government Healthcare Programs, the defendants stood also to gain from the over-reimbursement of charges by such programs, which would occur so long as these third-party payers were not notified that the defendant Oncology Practices had received such discounts, rebates and other price concessions from Amgen.

78.     Amgen brought its new sales plan to market as the "Amgen Portfolio Contract." The Amgen Portfolio Contract not only encouraged sales of Aranesp and the other Covered

Drugs, it encouraged larger and larger purchases of these drugs by the defendants, earning them larger and larger discounts and rebates and, so long as the Government Healthcare Programs were not made aware of the rebates and discounts the defendants were receiving from Amgen, more and more revenue from drug cost "reimbursement," or payments, from Government Healthcare Programs.  Under the Amgen Portfolio Contract, the greater the dollar value of the purchases made, the greater the value of the rebates, discounts and the like that could be earned by Amgen customers.

79.     The incentive structure of the Amgen Portfolio Contract encouraged defendant Oncology Practices to over-prescribe the Covered Drugs as a way to increase their profits.

80.     By entering into the Amgen Portfolio Contract, Amgen and each of the defendant Oncology Practices became partners in a "hub and spokes" conspiracy, with Amgen at the center and each of the defendants connected to Amgen, as separate "spoke."  The arrangement was beneficial to all parties, as it enabled Amgen to increase its sales of the Covered Drugs and, thus, presumably, its profitability, and enabled the defendants to increase their profitability via the receipt of kickbacks from Amgen in the form of rebates, discounts or other things of value that Amgen would not take into account in reporting the AWP or the ASP of the Covered Drugs, indirectly, to Government Healthcare Programs.  The scheme also allowed the defendants a second opportunity to increase profits – by not reporting value of the rebates, discounts and other things of value to Government Healthcare Programs as price reductions in which such programs, according to program reimbursement rules would have been entitled to share.  On information and belief, none of the Oncology Practice defendants ever reported these cost reductions to Government Healthcare Programs, as they were obliged to do under program rules.  The Code of Federal Regulations, 42 C.F.R. 1001.952(h), required the buyers to report fully and accurately

any discount not given at the time of sale in accordance with 42 C.F.R. 1001.952(h)(1)(ii)(C)

("The buyer must fully and accurately report the discount in the applicable cost report.")

81.     The Amgen Portfolio Contract proved successful in increasing the use of Aranesp
by the defendant Oncology Practices and others.  Amgen's marketing strategy was particularly
successful in introducing Aranesp in patients previously not receiving ESA treatment and with
oncologists previously skeptical of ESA treatment.  The incentives offered to increase sales
were, as noted, largely in the form of rebates, discounts and other price concessions that were not
visible to Government Healthcare Programs administrators and not reported to Government
Healthcare Programs.  As a result of the non-disclosure, these "kickbacks" were not taken into
account in the drug cost reimbursement calculations of such programs.  The defendant Oncology
Practices were thus able to achieve a substantial over-recovery of the cost of the Covered Drugs
from Government Healthcare Programs.

82.     Amgen heavily promoted the sale of the Covered Drugs during the Covered
Period using the Amgen Portfolio Contract.  Amgen succeeded in increasing sales of Aranesp by
inducing physicians and oncology practice administrators to substitute Aranesp for Procrit as a
treatment for cancer patients suffering from chemotherapy-induced anemia.

83.     In implementing its Portfolio Contract, Amgen segmented customers into classes
based on their total potential as buyers of the Covered Drugs:  "Silver" members had the
potential to make annual purchases of from $0 to $700,000; "Gold" members, from $700,000 to
$5,000,000 and "Platinum" members, more than $5,000,000.

84.     Amgen's drug sales force was provided with PowerPoint presentations and a
"Discount & Rebate Estimator" computational program to aid in marketing efforts.  The
Estimator, which accompanied the rollout of the 2004 Amgen Portfolio Contract, was essentially

27

a simple, programmable calculator.  Once assumed dollar values of the three Covered Drugs, based on quarterly purchases, were inputted into the program, the Estimator would compute the dollar value of the "off invoice" discounts and rebates, displaying the dollar value of the percentage discounts a particular medical practice could expect to earn under the Amgen Portfolio Contract based upon an assumed level of purchases.

85.     In providing the Oncology Practice defendants with actual calculations showing how they would benefit from the rebates, discounts and the like under the Amgen Portfolio Contract while downplaying the fact that these Oncology Practices would have an obligation to report the value of these cost reducers to Government Healthcare Program, Amgen acted as an aider, abettor and facilitator of the false claims submitted by the defendant Oncology Practices to Government Healthcare Programs.  Using the Estimator, the Amgen sales representative could immediately show the physician or practice manager to whom the sales pitch was directed the dollar value, in the form of rebates and discounts, the practice could earn by achieving certain dollar levels of purchases of the Covered Drugs from Amgen.

86.     The Amgen 2004/2005 Portfolio Contract rollout sales materials highlighted the rebate structure for three classes of customer:  the hypothetical $600,000 customer, the hypothetical $3,000,000 customer and the hypothetical $6,000,000 total class.  The tables reflect changes in the rebate rate structure – described as "enhanced rebates" in the case of the contract effective September 2004 through February 2006 – versus the "base rebates" effective under the previous contract, effective March 2004 through August 2004.  The rebates varied from a low of 3% for purchases in excess of $75,000 in a calendar quarter to a high of 25% for purchases in excess of $1,275,000.  Copies of the three pages from the Amgen 2004/2005 contract reflecting the rebate structure described above are attached as Exhibit No. 1 to this Complaint.

28

87.     The Amgen 2004/2005 Portfolio Contract rollout sales materials also included a table showing the discounts, as distinguished from rebates, that could be realized by a medical practice.  These so-called "off-invoice" discounts varied from a low of 3% to a high of 10% depending on the product and, in the case of Neupogen, its packaging.  A copy of this page from the Amgen 2004/2005 contract sales materials reflecting the "off-invoice" discount structure described above is attached as Exhibit No. 2 to this Complaint.

88.     In addition, Amgen offered customers who achieved or exceeded their "Volume Target" during the first six months of the contract (March 1, 2004 to August 31, 2004) an additional, permanent 5% off-invoice discount on the Covered Drugs for the remainder of the contract term (September 1, 2004 to February 28, 2005).  If the customer did not achieve its volume target, the customer would lose the additional, permanent 5% discount forever.

89.     Amgen set target volumes for its customers based upon a calculation of the customer's purchases of five drugs (Aranesp, Neupogen, Neulasta, Procrit and Leukine).  Two of these drugs, Procrit and Leukine, were not Amgen drugs.  Amgen relied on data from the July 1, 2003 through December 31, 2003 and then annualized these figures to set the target volumes using the following formula: dollar value of purchases of Aranesp + Neupogen + Neulasta divided by dollar value of purchases Aranesp + Neupogen + Neulasta + Procrit + Leukine.  Based on this calculation, Amgen set its "Amgen Portfolio Volume Target" levels at the equivalent 50%, 60%, 65%, 70%, 75%, 80% or 85% of Amgen Portfolio Market Share levels.  Historical sales levels were considered in setting the particular customer's volume target, with that level used as a baseline.  Under this scheme, as the customer's "loyalty" to Amgen products increased, its total rebates and discounts increased.

90.     During the Covered Period, Amgen revised and reissued the Amgen Portfolio Contract several times.  With each revision, as a rule, Amgen increased the required dollar value of purchases needed simply to retain the same level of financial benefits available under the previous contract.  Thus, the defendant Oncology Practices and other Amgen customers were constantly provided with significant monetary incentives to increase the dollar value of their purchases of the Covered Drugs – and thereby at least to maintain the same level of rebates and other financial benefits achieved under the previous version of the contract.

91.     Amgen specifically and with intention targeted its discounts to increase potential sales as to each defendant Oncology Practice.  Amgen provided dramatically different discount incentive to different customers to achieve market segmentation.  From an economic perspective, Amgen sought to differentiate its customers to maximize sales by differentiating the marginal sales costs for the Covered Drugs to each defendant Oncology Practice.

92.     During the period 2003 to 2006, U.S. sales of Aranesp increased by more than 300%.  Total revenues achieved by Amgen from the sale of Aranesp, Neupogen and Neulasta in the United States from 2001 to 2012 exceeded $47.8 billion.  Aranesp accounted for $15.6 billion of those sales.

93.     Aranesp obtained a dramatic increase in sales from nothing to almost $2.8 billion in annual sales within approximately five (5) years (2001 to 2006).  According to Amgen's Annual Reports and 10-K filings, Amgen's U.S. sales of Aranesp were as follows:

| 2001 | $27 million    |
|------|----------------|
| 2002 | $284.7 million |
| 2003 | $979.9 million |

30

| 2004 | $1,533 million |
| 2005 | $2,104 million |
| 2006 | $2,790 million |
| 2007 | $2,154 million |
| 2008 | $1,651 million |
| 2009 | $1,251 million |
| 2010 | $1,103 million |
| 2011 | $986 million |
| 2012 | $782 million |
| 2013 | $747 million |

94.     Significantly, as sales of Aranesp increased, Procrit sales *did not* decrease

proportionate to the growth in Aranesp's sales.  Although J&J Services, Inc. does not break out

U.S. sales from its international sales, its Annual Reports and Form 10-K filings detail the

growth and decline of its sales of epoetin alfa (Procrit) by J&J worldwide:

| 2001 | $3,426 million (for epoetin alfa internationally) * |
| 2002 | $4,269 million (for epoetin alfa internationally) |
| 2003 | $3,984 million (for epoetin alfa internationally) |
| 2004 | $3,589 million (for epoetin alfa internationally) |
| 2005 | $3,324 million (for epoetin alfa internationally) |
| 2006 | $3,180 million (for epoetin alfa internationally) |
| 2007 | $3,327 million (for epoetin alfa internationally) |
| 2008 | $2,731 million (for epoetin alfa internationally) |

| | |
|---|---|
| 2009 | $2,245 million (for epoetin alfa internationally) |
| 2010 | $1,934 million (for epoetin alfa internationally) |
| 2011 | $1,632 million (for epoetin alfa internationally) |
| 2012 | $1,462 million (for epoetin alfa internationally) |

* 2001 figure is based upon calculations due to lack of a breakdown for epoetin alfa sales in Form 10-K filing.

95.     Amgen's increased promotion of Aranesp did not erode its sales of Epogen.  U.S. sales data reflected in Amgen's Annual Reports and Form 10-K filings show that Epogen enjoyed healthy sales growth from 2001 to 2006 despite Aranesp's introduction and marketing push:

| | |
|---|---|
| 2001 | $2,108 million |
| 2002 | $2.261 million |
| 2003 | $2,435 million |
| 2004 | $2,601 million |
| 2005 | $2,455 million |
| 2006 | $2,511 million |
| 2007 | $2,489 million |
| 2008 | $2,456 million |
| 2009 | $2,569 million |
| 2010 | $2,524 million |
| 2011 | $2,040 million |
| 2012 | $1,941 million |
| 2013 | $1,953 million |

32

96.     As the data show, sales of ESAs generally have declined appreciably since their peak combined year of 2006, amid increased scrutiny of their efficacy at high dosage levels and patient safety, as well as the cost of these drugs to Government Healthcare Programs.  In 2006, total U.S. sales of Aranesp were $2.8 billion, the high water mark for the drug.  Procrit sales that year were $3.18 billion – down some $1.12 billion from Procrit's peak year of 2002.  Sales of Epogen in 2006 were $2.511 billion, down less than $100 million from Epogen's peak year of 2004.

97.     Amgen's marketing of Aranesp to the defendant Oncology Practices and other customers via the Amgen Portfolio Contract did not diminish sales of other ESAs so much as expand the market for ESAs overall.

98.     According to a 2012 report prepared for the Senate Special Committee on Aging by the Government Accountability Office ("GAO") entitled "Medicare: High-Expenditure Part B Drugs,"[1] Medicare Part B expenditures for Aranesp in 2010 were $504 million and for Neulasta in the same period – just a single year – $888 million.  In 2010, Neulasta was the sixth most expensive Medicare Part B drug; Aranesp, for non-ESRD uses, was the seventh most expensive.  These figures do not include drug costs paid by Medicaid or by state healthcare programs.

99.     According to the GAO report, spending on Medicare beneficiaries for Aranesp in chemotherapy patients in 2010 accounted for $504 million of the $755 million of total insured spending on Aranesp in this patient population – 66.7% of total expenditures.  In other words, the United States government paid for two-thirds of all Aranesp used in oncology practices in the United States.

---

[1] Part B covers certain physician, outpatient hospital, laboratory and other services.

33

100.    For Neupogen, Medicare patient purchases accounted for $171 million of the $309 million in total insurance reimbursements in 2010 – 55.5% of all insured spending on Neupogen.

101.    For Neulasta, Medicare beneficiaries accounted for 39.4% of all total insurance spending – or $888 million of $2,254 million.

102.    As the above figures show, Medicare and Medicaid have been major payers ("reimbursers") of charges associated with the cost of the Covered Drugs.  By not reporting the true (reduced) cost of the Covered Drugs to them, the defendant Oncology Practices defrauded those programs and other Government Healthcare Programs of money.  On information and belief, the combined value of the rebates, off-invoice discounts and other things of value earned by some of the defendant Oncology Practices for prescribing and administering the Covered Drugs exceeded 50% of the AWP or the ASP of the Covered Drugs, as reported by Amgen.

103.    On information and belief, the knowing submission by Amgen of false and fraudulent information as to the AWP and ASP of the Covered Drugs, by failing to account for the cost of the rebates, off-invoice discounts and other things of value provided to the defendant Oncology Practices in exchange for their purchase of the Covered Drugs, combined with the knowing submission of false and fraudulent claims for reimbursement of the cost of the Covered Drugs by the defendant Oncology Practices to Government Healthcare Programs, which also failed to account for the rebates, off-invoice discounts and other things of value the defendants received from Amgen based upon their purchase of the Covered Drugs, caused Government Healthcare Programs to "over-reimburse" the defendants for cost of the Covered Drugs, thereby diminishing the ability of these programs to provide appropriate services and benefits to U.S. citizens entitled by law to such services and benefits, and imposing an unnecessary and

34

unjustified fiscal burden upon the nation.

104.   On information and belief, Amgen failed to include the cost of the rebates, off-invoice discounts and other things of value provided to the defendant Oncology Practices in exchange for their purchase of the Covered Drugs, in its calculation of the AWP and the ASP of the Covered Drugs.  Likewise, on information and belief, the defendant Oncology Practices did not report receipt of these post-sale discounts and other things of value that had the effect of lowering their purchase costs for the Covered Drugs in their claims for reimbursement to Government Healthcare Programs.  Thus, the defendant Oncology Practices received a double benefit.  They received a reimbursement rate that was based upon a supposed cost that was substantially higher than what they actually paid for the drug; and, second, they received post-sale discounts, rebates and other things of value that lowered their actual cost for the drugs to a level substantially below the cost reported to Government Healthcare programs.  For this reason, each and every claim made by a defendant to a Government Healthcare Program for the cost of a Covered Drug was false and fraudulent, causing such programs to "reimburse" defendants for supposed costs that far exceeded their actual cost of the Covered Drugs.  Equally venal, the scheme resulted in the over-prescribing of the Covered Drugs, particularly Aranesp and Neulasta, by physicians associated with the defendant Oncology Practices and the excess use, or overdosing, of patients prescribed these drugs, with documented serious adverse health consequences in some patient populations.

105.   According to an estimate by the Institute of Medicine in 2011, Americans incur some $800 billion in unnecessary health care costs every year.  The Institute reported that since 1989 the three anti-anemia drugs (Procrit, Epogen and Aranesp) have cost the government some $60 billion.  In 2008, according to data cited by The New England Journal of Medicine, the

35

average annual cost to Medicare to maintain a patient with ESRD on dialysis was $77,506.  364

N Engl J Med 593-595 (Feb. 17, 2011).

106.    In 2007, *The New York Times* reported that physicians in the United States, as of

2002-2003, used far more ESAs, including Aranesp, in treating anemia than physicians in

Europe and in other industrialized countries where physicians had no opportunity to profit from

prescribing the drugs.  *See New York Times* (May 5, 2007),

http://www.nytimes.com/2007/05/09/business/09anemia.html?pagewanted=all (visited Apr. 27,

2013).  As noted in the *Times* story:

> Although the safety debate has heated up only recently [as of 2007], the first sign
> that the drugs might be dangerous came more than a decade ago.  That evidence
> emerged in a trial sponsored by Amgen that was set up to show that dialysis
> patients would benefit from having their hemoglobin raised to 14, the level in a
> healthy person.
>
> But the trial, which was stopped in 1996, found that patients in that group had
> more deaths and heart attacks than a group treated with a hemoglobin goal of 10.
>
> That trial should have discouraged doctors from using too much epoetin and
> encouraged Amgen to study the risks further, said Dr. Steven Fishbane, a
> nephrologist at Winthrop-University Hospital on Long Island.

107.    In one comparison patient population, ESRD patients generally served by dialysis

clinics, a report by *The Washington Post* noted that the dosages used for ESA treatment in this

patient population more than tripled from approximately 6,000 i.u. weekly of Procrit/Epogen in

1990 to more than 20,000 i.u. weekly beginning in 2004.  *See Washington Post* (July 19, 2012),

at http://www.washingtonpost.com/wp-srv/business/amgen-anemia-drugs/index.html (visited

Apr. 28, 2013).  According to the *Post* story, ESRD patients in the United States in 2002

received the highest average dose of ESAs of any of the twelve (12) countries studied, at 17,360

i.u. weekly, compared to the next highest country – Belgium with 12,312 i.u. average weekly

doses and the lowest dose country, Japan, with an average of 5,297 i.u. weekly.  *Id.*

108.    Effective January 1, 2011, Medicare revised the way it compensated medical services providers that administer drugs to ESRD patients.  The new system is described as a "bundled" reimbursement system.  Providers began receiving a single payment for each patient. This single payment was to cover almost all treatment costs associated with ESRD for the patient.  The new system was forecasted to reduce payments to ESRD facilities by 2% overall, in addition to reducing "incentives to overuse profitable, [previously] separately billable drugs,"[2] particularly ESAs, because studies showed that such overuse harms patients.[3]  This single "bundled" payment now covers all the resources used in providing outpatient dialysis treatment, including ESA drugs, supplies and equipment used to administer dialysis at the clinic or at the patient's home.  On information and belief, prescription levels for ESAs in this patient population decreased substantially once the financial incentives to physicians to prescribe the drugs were reduced.

109.    Evidence of diminished use of ESAs in the ESRD patient population provides powerful circumstantial evidence that ESAs in general were prescribed in the United States by physicians at higher dosage levels and to a greater proportion of patients than medical necessary as a consequence of the unusual opportunity to profit by prescribing increasing amounts of the drugs.  Inasmuch as the same financial incentives were present with defendant Oncology

---

[2]  *See* Fed Reg. 2010; 75:49029-49214 (Aug. 12, 2010).

[3]  Besarab A, *et al., The Effects of Normal as Compared With Low Hematocrit Values in Patients With Cardiac Disease Who Are Receiving Hemodialysis and Epoetin*, 339 N Engl J Med 584-590 (1998).

Practices, an inference can be made that these same incentives also caused increased dosages and use of ESAs, including Aranesp, by the defendant Oncology Practices not based upon medical necessity or need, but upon profit motivations.

110.    On information and belief, physicians affiliated with the defendant Oncology Practices often prescribed Aranesp for use in patients when Procrit or Epogen was the medically indicated preferred treatment option because, by using Aranesp, the practices could and did earn higher profits as a consequence of the discount and rebate structure of the Amgen Portfolio Contract and the higher reimbursement levels that could be obtained by submitting false and fraudulent claims and information to Government Healthcare Programs.

111.    One aspect of the Amgen Portfolio Contract relied upon the market power of Neupogen and Neulasta, two of the Covered Drugs to improve sales of Aranesp.  Neither Neupogen nor Neulasta faced competition from other drugs for their approved indications.  Thus, Amgen had no need to encourage sales of these drugs by extending discounts for their purchase.  Under its sales strategy, Amgen nevertheless included purchases of these drugs, as well as Aranesp, in its calculation of the level of purchases needed to advance through the various, increasing discount and rebate tiers.  On information and belief, purchases of Neupogen and Neulasta were included in the calculation as a way to boost sales of Aranesp by tying the sales of the weaker product to the two products for which there were no substitutes.[4]

---

[4] Neupogen and Neulasta are drugs with no effective substitutes for their approved uses; thus, regardless of whether a customer (in this case, a defendant Oncology Practice) preferred to use Aranesp or Procrit as its ESA, it would still need to buy Neupogen and Neulasta as white blood cell stimulating agents for patients who needed white blood cell stimulation treatment, which included a high percentage of patients being treated with ESAs.  Thus, a customer that chose to use Procrit as its preferred ESA, would not obtain any credits toward discounts, rebates or other incentives Amgen from purchasing Neupogen and Neulasta, whereas if it selected

112.     As indicated, Amgen also promoted Aranesp at higher doses and at intervals the FDA had not approved and for off-label uses not approved by the FDA.  FDA rules prohibit drug manufacturers from promoting sales of drugs for off-label uses.  On or about December 18, 2012, Amgen pleaded guilty to a criminal information in the United States District Court for the Eastern District of New York.  The information charged Amgen with a single misdemeanor count of misbranding Aranesp by promoting it in a way that was inconsistent with the dosage levels and frequency approved by the FDA, as described on the package insert.  The plea was accepted the next day.

113.     On information and belief, the pronounced increase in the use of Aranesp and, to some extent, Neulasta, after initiation of the Amgen Portfolio Contract program was due in substantial part to the financial incentives Amgen provided to Oncology Practices, including the defendants, to increase their use of the Covered Drugs by appealing to the self-interest of the defendants and others in increasing their profits through the increased use, administration and billing for the Covered Drugs, and not due to medical need or patient treatment concerns.

**C.     Overstating Costs to Increase Reimbursements.**

114.     Medical services providers that participate in Government Healthcare Programs, including the defendant Oncology Practices, are required to abide by the laws, rules and regulations that apply to those programs, including those related to payment, or

---

Aranesp as its ESA of choice, it would receive such credits.  The effect of this sales technique was to provide the defendant Oncology Practices with a huge incentive to "prefer" Aranesp to Procrit based on the financial benefit to be derived from such a choice.

"reimbursement," of the cost of drugs used to treat eligible patients.  In order to avoid overcompensating providers for such costs, the laws, rules and regulations that apply to Government Healthcare Programs attempt to ensure that actual costs are accurately described.

115.    During the Covered Period, the defendants, directly or indirectly, purchased substantial quantities of the Covered Drugs from Amgen for administration to patients eligible to receive benefits under Government Healthcare Programs.  Thereafter, the defendants sought payment, or "reimbursement," from such programs for all or a portion of the cost of the Covered Drugs administered to such patients.

116.    During the Covered Period, Amgen and the defendant Oncology Practices knowingly engaged in a systematic and extensive course of conduct, or scheme, intended to cause, and actually causing, false and fraudulent information and claims for payment, or "reimbursement," for all or a portion of the cost of the Covered Drugs administered to patients eligible to receive benefits under Government Healthcare Programs to be submitted to such programs, including Medicare and Medicaid.  Thereafter, based on such false and fraudulent information and claims, the defendant Oncology Practices were paid, or "reimbursed," for all or for a portion of the claimed cost of such drugs by such programs in amounts that exceeded the levels of reimbursement set according to program rules.

117.    As part of the scheme, the defendants knowingly submitted inaccurate data, directly or indirectly, to Government Healthcare Programs showing prices for the Covered Drugs that failed properly to account for discounts, rebates and other effective price reductions that Amgen provided to the defendant Oncology Practices under the Amgen Portfolio Contract as well as pursuant to other purchase incentive programs.  This conduct included deliberate disregard of specific regulations concerning acceptance of rebates and other discounts related to

40

the purchase of the Covered Drugs, as well as conduct designed to conceal this activity from regulatory authorities.

118.    At the time the defendants engaged in these fraudulent activities, they knew that rebates and other discounts of the nature being paid by Amgen and accepted by them would cause numerous false claims to be submitted to and paid by Government Healthcare Programs, including Medicare and Medicaid.   Had the defendant Oncology Practices not filed false and fraudulent claims seeking reimbursement of the cost of the Covered Drugs, Government Healthcare Program funds would not have been used to pay, or "reimburse," the defendants for claimed costs that were inaccurate and that overstated the actual cost of the Covered Drugs to them and that, therefore, exceeded the reimbursement levels that would have applied had the actual cost of the drugs been accurately reported.

### D.    Payments for Drugs Furnished by Physicians.

119.    In order to prevent fraud on Government Healthcare Programs through the use of kickbacks, rebates and other price terms that are not disclosed to Government Healthcare Programs administrators, and constitute cost reductions not shared by Government Healthcare Programs, such programs, including Medicare and Medicaid, have strict rules governing the manner in which drug costs are calculated and paid, or "reimbursed," to physicians and physician practice groups, such as the defendant Oncology Practices.

120.    Under Medicare reimbursement rules, drugs furnished by physicians in non-institutional settings are reimbursable under one of two payment methodologies.  Until December 31, 2004, the amount reimbursed for a covered drug depended upon a determination of the AWP.

121.    From January 1, 2005 to the present, Medicare reimbursement was subject to a determination of the ASP – and reimbursement rates were set at the Average Sales Price plus a six percent (6%) markup.  This reimbursement method is known as the "ASP methodology."  Payment under this methodology is based on the manufacturer's ASP.  The manufacturer's ASP is calculated by totaling all of a manufacturer's sales to all purchasers in the United States.  From this amount, price concessions are supposed to be subtracted.  Price concessions offered on a lagged basis (not given at the time of sale) must be calculated on a rolling average basis and subtracted from total sales.

122.    Once the total sales amount for a quarter is calculated, that amount must be divided by the number of units sold in that quarter to arrive at the manufacturer's ASP.  This amount must be calculated for each national drug code ("NDC") number.  Certain sales, such as sales to specified branches of the federal government, state pharmaceutical assistance plans and other entities, are excluded from the manufacturer's ASP calculation.  Sales at nominal prices, which are defined as less than 10% of average manufacturer price, are also excluded.

123.    The manufacturer's ASP is used to calculate the payment rate for both single-source drugs and multiple-source drugs.  Multiple-source drugs are drugs that are therapeutically equivalent, pharmaceutically equivalent and bioequivalent.  Multiple-source drugs are also drugs that shared the same code on October 1, 2003.  Single-source drugs are drugs that are not multiple-source drugs, and are sold pursuant to a new drug application approved by the FDA.  All "biologicals," which category includes all of the Covered Drugs, are single-source drugs.

124.    For single-source drugs, the payment rate is equal to the weighted average of the manufacturer's ASP for all NDCs assigned to the drug's HCPCS code, plus 6%.  For multiple-source drugs, the payment rate is the weighted average of the manufacturer's ASP for all the

drugs assigned to the same HCPCS code, plus 6%.  Payments are made to the physician administering the drug.  If a physician engages in a group practice, payments are made to the medical practice rather than directly to the physician prescribing the drug.

125.    A substantial proportion of the cost of the Covered Drugs manufactured by Amgen are billed to and paid by the federal government and various state governments – including those states that are named as plaintiffs in this civil action – under Government Healthcare Programs.  Thus, one effect of the over-prescription of the Covered Drugs has been to impose unnecessary and unjustified costs on government-funded healthcare programs.

126.    In its December 19, 2012 settlement with the Amgen, the United States made a number of allegations regarding Amgen's manipulation of the ASP, knowingly designed improperly to increase the ASP of the Covered Drugs and other drugs to the benefit of its customers for these drugs:

> 5.    During the period from April 30, 2004 to January 1, 2008, Amgen knowingly reported inaccurate Average Sales Prices ("ASP") for Aranesp, Epogen, Neulasta, and Neupogen by failing to account properly for price concessions, including group purchasing organization volume discounts, prompt pay discounts, cash discounts, free goods that are contingent on any purchase requirement, chargebacks, rebates, and price concessions disguised as *bonafide* service fees, in the calculation of ASP. Amgen employees and agents were directed to explain the profitability of the inaccurate ASP.

> 6.    During the period from April 30, 2004 to September 30, 2011, Amgen knowingly reported inaccurate ASP for Aranesp, Epogen, Neulasta, and Neupogen by failing to account properly for price concessions including rebates, volume discounts and free goods that were contingent on any purchase requirement, referred to in the Complaints as "bundled pricing" and "overfill."  Amgen employees and agents were directed to explain the profitability of the inaccurate ASP.

> 7.    During the period from January 1, 2001 to September 30, 2011, Amgen knowingly reported inaccurate Best Prices and Average Manufacturer Prices for Aranesp, Enbrel, Epogen, Neulasta, Neupogen and

43

Sensipar by failing to include remuneration, specifically in the forms outlined in the Paragraph G.4 Conduct, that was paid to health care providers and that was conditioned on purchase of Amgen products in violation of the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8.

As part of the Settlement Agreement, Amgen did not admit to these allegations.

127.    During the Covered Period, the Oncology Practice defendants were buyers of the Covered Drugs and knowingly benefitted from the manipulation of the ASP of the Covered Drugs and from the inaccurately reported Best Prices and Average Manufacturer Prices of the Covered Drugs.

128.    More broadly, the effect of Amgen's drug marketing programs aided and abetted the actions of the defendant Oncology Practices in evading the requirements of Government Healthcare Programs to report to Government Healthcare Programs the true and accurate price – *taking into account all discounts, rebates and other price concessions* – at which the Covered Drugs, were sold.  Because Amgen and the defendants submitted false and fraudulent claims and information to Government Healthcare Programs, such programs were defrauded of hundreds of millions of dollars of unjustified drug cost "reimbursements" to the defendant Oncology Practices during the Covered Period.  These false and fraudulent claims were generally submitted to Government Healthcare Programs electronically using data management and payment systems such as the Medicare Administrative Contractor System.  Pursuant to such claims, the defendants sought and obtained reimbursement for the supposed cost of the Covered Drugs without accounting for the discounts, rebates, kickbacks and other valuable consideration they received from Amgen as incentives to buy the Covered Drugs, effectively lowering their actual cost of the drugs.  On information and belief, none of the defendants ever advised any Government Healthcare Program that they had obtained discounts, rebates, kickbacks and other

44

valuable consideration from Amgen as incentives to buy the Covered Drugs.  By failing to

apprise Government Healthcare Programs of these payments, the defendant Oncology Practices

obtained reimbursements from such programs that were substantially greater than their actual

cost of the Covered Drugs and substantially lower than the amount sought for reimbursement,

thereby defrauding the government sponsors of such programs, imposing unwarranted costs on

such programs and diminishing the capacity of these programs to provide drugs and medical

services to persons eligible to receive such benefits.

### E.      Rules on Acceptance of Discounts in Healthcare Services.

129.    In 1972, Congress enacted the Medicare and Medicaid Patient Protection Act,

also known as the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), to provide penalties for

certain practices which have long been regarded by professional organizations as unethical, as

well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid

programs.  H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), reprinted in 1972

U.S.C.C.A.N. 4989, 5093.

130.    In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or

paying any remuneration to induce referrals and increased the crime's severity from a

misdemeanor to a felony with a penalty of $25,000 and/or five years in jail.  *See* Social Security

Amendment of 1972, Pub. L. No. 92-603, 241(b) and (c); 42 U.S.C. § 1320a-7b.  In so doing,

Congress noted that the purpose of the Anti-Kickback Statute was to combat fraud and abuse in

medical settings that cheats taxpayers who must ultimately bear the financial burden of misuse

of funds . . . diverts from those most in need, the nation's elderly and poor, scarce program

dollars that were intended to provide vitally needed quality health services . . . [and] erodes the

financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs.  H.R. Rep. No. 95-393, pt. 2, at 37, reprinted in 1977 U.S.C.C.A.N. 3039, 3047.

131.    In 1987, Congress again strengthened the Anti-Kickback Statute, this time  to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

132.    The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program, which includes any State health program or health program funded in part by the federal government.  42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

133.    Generally speaking, discounts for health care items and services are encouraged under Government Healthcare Programs rules.  Federal healthcare program regulations specifically approve of discounts, so long as the programs themselves share in the discount where appropriate, and as appropriate, to the reimbursement methodology.  But arrangements in which federal healthcare programs get less than their proportional share of cost-savings on items or services payable by the programs are deemed "seriously abusive."  Such arrangements result in overcharges to the programs and are not protected by either the statutory exception or the regulatory safe harbor for some types of discounts.  *See* 64 Fed. Reg. 63526 (Nov. 19, 1999).

134.    In 1999, the Office of Inspector General, Department of Health and Human Services ("OIG"), provided specific guidance regarding the requirements for rebates or discounts

to qualify for "safe harbor" treatment under the federal Anti-Kickback Statute, 41 U.S.C. § 52. In its Final Rule interpreting the statute, OIG defined certain "safe harbors" for certain types of discounts.  42 C.F.R. 1001.952 (Nov. 19, 1999).  This Final Rule was in force throughout the Covered Period and applied to all federal healthcare programs.  The Final Rule also applied to state healthcare programs in virtually all circumstances.  *Id*. subpart (h).

135.    The Anti-Kickback Statute not only prohibits outright bribes and rebate schemes, but also prohibits any payment or other remuneration by a drug company to a physician or other person which has as one of its purposes the inducement of the physician to write prescriptions for the company's pharmaceutical products or the inducement of the physician to influence or recommend the prescribing of the product.

136.    Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under a Government Health Care Program, including Medicare and the state Medicaid programs.  Moreover, compliance with the Anti-Kickback Statute is a *condition of payment* for drug claims administered by physicians for which Medicare or Medicaid reimbursement is sought.

137.    Under 42 U.S.C. § 1395y(a)(1)(A), no payment may be made under the Medicare statute for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury.

138.    The United States Court of Appeals for the Second Circuit has held that, "[s]ince § 1395y(a)(1)(A) *expressly* prohibits payment if a provider fails to comply with its terms, defendants' submission of the claim forms implicitly certifies compliance with its provision." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 701 (2d Cir. 2001) (emphasis in original).

139.    Kickbacks are, by definition, not reasonable and necessary for the diagnosis or

treatment of illness or injury.

140.     FCA liability may be premised on a violation of the Anti-Kickback Statute.

141.     The rebates, discounts and other incentives offered by Amgen to certain buyers, including the defendant Oncology Practices, to purchase the Covered Drugs, as described in this Complaint, did not qualify for safe harbor treatment under the Anti-Kickback Statute.  In particular, the rebates, discounts and other incentives paid to the defendant Oncology Practices pursuant to the Amgen Portfolio Contract fell outside the safe harbor provisions of the Final Rule because they were not discounts given at the time of sale, and were, thus, required to be reported to Government Healthcare Programs, including Medicare and Medicaid, by the buyer unless the buyer was a "cost reporter," a Health Maintenance Organization ("HMO") or a Competitive Medical Plan ("CMP").

142.     As provided in OIG's Commentary on the Final Rule: "A rebate under our proposal would be defined as any discount not given at the time of sale.  Consequently, a rebate transaction would not be covered by the safe harbor if it involves a buyer that is neither a cost reporter nor a HMO or CMP, because for such buyers, all discounts must be given at the time of sale."  42 C.F.R. 1001.952(h)(1)(ii)(C); *see also* § 1001.952(h)(1)(iii).

143.     None of the defendant Oncology Practices qualified as a "cost reporter," an "HMO" or a "CMP" under the Final Rule.  Thus, 42 C.F.R. 1001.952(h) required the buyers to report fully and accurately any discount not given at the time of sale in accordance with 42 C.F.R. 1001.952(h)(1)(ii)(C) ("The buyer must fully and accurately report the discount in the applicable cost report").

144.     On information and belief, beginning in or about 2004 and continuing through in or about 2011, consistent with the requirement of 42 C.F.R. 1001.952(h)(1)(iii)(B) – as well as

other, similar provisions contained in 42 C.F.R. 1001.952(h) – that sellers and other offerors of

items or services "for which payment may be made in whole or in part" (42 C.F.R. 1001.952(h))

under Medicare, Medicaid and other Government Healthcare Program rules (here, the Covered

Drugs), apprise buyers that they were required to report discounts and rebates not qualified for

"safe harbor" treatment, the Amgen Portfolio Contract contained the following provision:

> Participating Eligible Physician Practice agrees that it will *properly
> disclose and account for any and all discounts and/or rebates earned in
> connection with the [year] Amgen Portfolio Rebate Program and through its
> participation under the Group Purchasing Agreement in a way that complies with
> all applicable federal, state, and local laws and regulations, including without
> limitation, Section 1128B(b) of the Social Security Act and its implementing
> regulations*, and shall provide, upon request by the U.S. Department of Health
> and Human Services, or a state agency any and all information furnished,
> including, but not limited to information furnished by Amgen concerning the
> amount or value of any such discount and/or rebate, on products purchased under
> the Group Purchasing Agreement.  Participating Eligible Physician Practice
> Headquarters represents and warrants that its legally affiliated physician offices
> and/or satellite clinics, if any, shall comply with any discount reporting
> obligations they may have in connection with any discounts and/or rebates
> received under the Group Purchasing Agreement.  (Emphasis added.)

145.    On information and belief, during the Covered Period, each of the defendant

Oncology Practices accepted rebates, discounts, "free" drugs (product "overfills") and other

valuable consideration from Amgen as incentives to buy the Covered Drugs, both pursuant to the

Amgen Portfolio Contract and other Amgen purchase incentive programs.  On information and

belief, none of the defendants ever advised, alerted, reported or otherwise properly disclosed and

accounted for any of the rebates, discounts and other things of value they received as a part of

the purchase and sale of the Covered Drugs from Amgen.  The rebates, discounts, product

"overfills" and other incentives earned by the defendant Oncology Practices and provided to

them by Amgen during the Covered Period substantially reduced the actual cost of the Covered

Drugs to the defendants.  The rebates, discounts, product "overfills" and other incentives earned by the defendant Oncology Practices and provided to them by Amgen during the Covered Period did not qualify for "safe harbor" treatment under Medicare, Medicaid and other Government Healthcare Program rules.

146.    As alleged herein, the post-sale rebates, discounts and other things of value earned by the defendants under their Amgen Portfolio Contracts did not qualify for "safe harbor" protection under OIG guidelines.  Even assuming that the defendants might properly receive the post-sale rebates, discounts and other things of value from Amgen, their failure, on information and belief, to report to Government Healthcare Programs that their cost of the Covered Drugs had been reduced by the value of these items earned pursuant to the Amgen Portfolio Contract and received post-sale constituted fraud.

147.    As alleged herein, Amgen provided the defendants with overfill and/or samples of Aranesp.  This had the intended and purposeful effect of reducing the cost of Aranesp to the defendants, thereby increasing their profits from administration of the drug.  The overfill of Aranesp and samples of the Covered Drugs provided to the defendant Oncology Practices by Amgen amounted to discounts or rebates falling outside the OIG guidelines for "safe harbor" treatment.  But even if permitted under the OIG "safe harbor" guidelines, if they are reported to Government Healthcare Programs as post-sale rebates or discounts and their value accounted for, on information and belief, no defendant ever made such a report to any Government Healthcare Program.

148.    The rebate and discount program defined and described by the various Amgen Portfolio Contracts with the defendants did not qualify for "safe harbor" treatment under OIG guidelines.

149.    Relator has personal knowledge that each and every Oncology Practice defendant entered into one or more Amgen Portfolio Contract and earned and received post-sale rebates and discounts from Amgen pursuant to the terms of such contract or contracts.  Each and every post-sale rebate or discount, whether in the form of money, products or other things of value earned by a defendant under an Amgen Portfolio Contract and paid to it by Amgen that was based upon the purchase of a Covered Drug during the Covered Period, if not reported to the appropriate Government Healthcare Program as income or revenue that lowered the actual cost of such drugs to a defendant violated Government Healthcare Program rules and regulations and constituted a false and fraudulent claim.

150.    Relator is personally aware that the defendant Oncology Practices were apprised how they could achieve over-reimbursement of the cost of the Covered Drugs by entering into an Amgen Portfolio Contract.  Under the scheme, Amgen agreed to provide each defendant with invoices that overstated the defendant's actual cost of the Covered Drugs.  The invoices overstated the true cost of the Covered Drugs because they failed to take into account the value of the rebates, discounts, product overfills and other things of value the defendants received for having met a purchase-increase target set by their Amgen Portfolio Contracts.  On information and belief, neither Amgen nor any individual Oncology Practice defendant ever reported or otherwise disclosed, either on a current or a lagged basis, to any Government Healthcare Program to which a defendant submitted a claim for "reimbursement" of the cost of a Covered Drug administered to a beneficiary of such program, the money or value of things it received from Amgen in the form of rebates, discounts, product overfills and the like for having met a target purchase goal set under its Amgen Portfolio Contract.

151.    Each and every claim for reimbursement filed by a defendant with a Government

51

Healthcare Program for a Covered Drug administered to a person eligible to receive benefits under any such program during the Covered Period constituted a fraud on such program and upon the United States, unless the money, products and other things of value earned by a defendant under an Amgen Portfolio Contract and paid to it by Amgen were reported to such programs as reductions in the cost of the Covered Drugs administered to such persons.

152.     On information and belief, during the Covered Period, each defendant submitted claims to Government Healthcare Programs for reimbursement of the cost of the Covered Drugs delivered to patients eligible to receive benefits under such programs.  Each such claim:

(a) was improperly filed in that (i) the claim was for a medical or other item or service, to wit, a Covered Drug, and the person making the claim knew or should have known that the claim was false or fraudulent in that it failed to report or identify the post-sale rebates, discounts and other things of value earned by the defendant under an Amgen Portfolio Contract and paid to it by Amgen, and (ii) was for a pattern of medical or other items or services, to wit, the Covered Drugs, that were known or should have been known to be not medically necessary, or not medically necessary at the dosage levels at which  administered, both in violation of 42 U.S.C. § 1320a–7a;

(b) (i) contained a false statement or representation of a material fact that was made knowing and willfully in an application for a benefit or payment under a Federal health care program (as defined in § 1320a–7a(f)), to wit, a claim that the defendant was entitled to "reimbursement" of a portion of the cost of the Covered Drugs without accounting for the post-sale rebates, discounts and other things of value earned by the defendant under an Amgen Portfolio Contract and paid to it by Amgen and (ii) contained statements or representations of material facts for use in determining rights of the defendant to such benefit or payment under a

52

Federal health care program that were knowingly and willfully false, namely, by omission, that the defendant had not received any post-sale rebates, discounts or other things of value from Amgen based upon its purchase of the Covered Drugs during the Covered Period, the effect of which was to reduce the cost to it of the Covered Drugs, in violation of 42 U.S.C. § 1320a-7b(a)(1) and (2), respectively; and

(c)     was improper as it was generated on the basis of kickbacks, bribes, rebates or other remuneration paid to and received by the defendant filing the claim for the purpose of inducing such defendant to order goods, namely, the Covered Drugs, from Amgen to be provided to persons eligible to receive benefits under a Federal health care program, in violation of 42 U.S.C. §§ 1320-7b(b)(1)(A) and 1320-7b(b)(2)(A).

153.     Each and every claim submitted by a defendant to a Government Healthcare Program for reimbursement of the cost of any Covered Drug during the Covered Period violated 20 C.F.R. § 498, *et seq*. as each such claim contained false statements or representations or omissions or otherwise withheld disclosure of a material fact, to wit: (a) the fact that the defendant was induced to purchase the Covered Drugs on the basis of kickbacks, bribes, rebates or other remuneration paid to and received by the defendant, (b) the fact that the claim failed to advise the Government Healthcare Program that the defendant was receiving post-sale rebates, discounts and other things of value from Amgen for its purchase of the Covered Drugs; and (c) the fact that the Covered Drugs that were the subject of the claim were known to be or should have been known to be not medically necessary or not medically necessary at the dosage levels administered, all such claims being relevant for use in determining a right to or amount of benefits under title II or benefits or payments under title VIII or title XVI of the Social Security Act.

53

**F.      Fraudulent Reporting of ASP by Defendant Oncology Practices.**

154.    Prior to 2005, the reimbursement rates from the Medicare Part B and Medicaid

programs for prescription drugs were based on the manufacturer's average wholesale price, the

previously defined AWP of the drug.  Since January 2005, Medicare reimbursements for drug

costs have been set by reference to the "average sale price," the previously defined ASP of the

drug, plus 6%.  Both the AWP and the ASP price averages are or were determined by reference

actual sales prices in the calendar quarter nearest in time to the quarter ended.  Thus, for

example, allowable reimbursements in the first quarter of the year, beginning in January, would

be based on prices determined by reference to transactions occurring in the third quarter of the

prior year.

155.    As a direct result of the actions of the defendants and Amgen, as described above,

Government Healthcare Programs paid out hundreds of millions of dollars in excess charges

based upon false and fraudulent claims and information and submitted by them, directly or

indirectly, to such programs.

156.    According to CMS, the payment limit for Aranesp (J code "J1880" for non-ESRD

usage) in the first quarter of 2006 was $2.989/mcg.  For the same period, the payment limit for

Neulasta (J code "J2505" for injection) was $2,093.436 for 6 mg.  For that same period, the

payment limit for Neupogen (J code "J1440" and "J1441") was $176.063 for a 300 mcg injection

and $279.354 for a 480 mcg injection.

157.    According to CMS, the payment limit for Aranesp was $3.327/mcg (J code

"J1880" for non-ESRD usage) in the first quarter of 2013.  For the same period, the payment

limit for Neulasta (J code "J2505" for injection) was $2,921.116 for 6 mg.  For that same period,

the payment limit for Neupogen (J code "J1440" and "J1441" for injection) was $275.685 for a

300 mcg injection and $435.921 for a 480 mcg injection.

158.    According to CMS, the payment limit for Aranesp was $3.334/mcg (J code

"J1880" for non-ESRD usage) in the second quarter of 2013.  For the same period, the payment

limit for Neulasta (J code "J2505" for injection) was $2,940.196 for 6 mg.  For the same period,

the payment limit for Neupogen (J code "J1440" and "J1441" for injection) was $277.248 for a

300 mcg injection and $439.903 for a 480 mcg injection.

159.    In the seven-year period between January 1, 2006 and January 1, 2013, the

maximum reimbursement by CMS for Aranesp increased by 11.3 % (from $2.989 to $3.327).

During the same period, the maximum reimbursement by CMS for Neulasta increased by 39.5%

(from 2,093.436 to $2,921.116) and by 56% for Neupogen (from $176.063 to $275.685 for the

300 mcg injection and from $279.354 to $435.921 for the 480 mcg injection).  As is apparent,

the maximum reimbursement rate for Aranesp did not increase as rapidly did the maximum

reimbursement rate for Neulasta and Neupogen.  Nevertheless, by prescribing Aranesp to be

administered at dosing levels that exceeded the levels described in the package insert, oncology

practices, including the defendant Oncology Practices, could increase the revenue they received

from Government Healthcare Programs, as reimbursements were not limited to a fixed dosage.

On information and belief, physicians affiliated with the defendant Oncology Practices

prescribed Aranesp at levels that exceeded the recommended levels in order to maintain the high

level of discounts they were receiving from Amgen and to continue receiving "reimbursements"

of drug costs from Government Healthcare Programs in excess of the those they would have

been entitled to receive had transaction prices included the value of the rebates, discounts and

other monetary and non-monetary inducements the defendants received to over-prescribe the

Covered Drugs.

160.    Some physicians were surprisingly candid in speaking to Amgen representatives about the purchase incentive programs Amgen sponsored and their motivation for buying and administering large quantities of the Covered Drugs.  The following are examples culled from statements that Relator heard directly or from notes made by Amgen executives and sales representatives who called upon the physicians identified:

> Dr. Danielle Montgomery and Jack Montgomery (ICON, Jacksonville, FL) (from Relator's direct knowledge):  "We are using our Amgen rebates to build our new beach house."

> Dr. Abe Cheung (Southeast Georgia Hematology & Oncology, Brunswick, GA): "These rebates are like crack cocaine."

> Dr. Antonio Moran (Southeast Georgia Hematology & Oncology, Brunswick, GA):  "Amgen rebates keep my Porsche running."

> Dr. Wayne Keiser (Redwood Regional Oncology in Santa Rosa, CA) (Jim Daly Notes):  "They don't count rebates in deciding if a drug is viable."

> Dr. Lon Smith (South Texas Oncology Hematology, San Antonio, TX) (Jim Daly Notes):  "Will need to float any drug 'loss' until rebates are paid 6-9 months later. Anything Amgen can do to accelerate rebate payments would be well received."

> Dr. Tom Marsland (ICON, Orange Park, FL) (Jim Daly Notes):  "My rebates go to my account in the Caymans."

> Dr. Bruce Feinberg (Georgia Cancer Specialists, Atlanta, GA) (Jim Daly Notes): "Don't anticipate big changes in first two quarters of 2005.  Overall, don't anticipate a huge change in practices since, 'docs can still make a great living at a 20% reduction in income, as long as this new level is sustainable.'"

161.    Amgen also provided incentives directly to physicians to encourage them to prescribe these Covered Drugs for their Medicare- and Medicaid-eligible patients, effectively lowering the price that they paid for these drugs.  These incentives included the same sort of off-invoice discounts, price protection, provision of free goods including product "samples," drug overfill in vials and an extensive rebate program as described throughout this Complaint.

56

### G.   Overprescribing of the Covered Drugs.

162.   Physicians affiliated with the defendant Oncology Practices, for the reasons described, over-prescribed the Covered Drugs.  The result of such over-prescribing was not always benign.  Strokes and death could and did occur.  These costs, unlike the financial costs imposed on the nation's healthcare systems, cannot be measured in dollars and cents.  They may, however, be measured in negative patient outcomes, which were not uncommon.  While individual physicians were making literally millions of dollars from overprescribing and overusing the Covered Drugs to climb higher and higher into the Amgen Portfolio Contract tier structure to earn greater rebates, desperate and vulnerable patients were harmed.  At best, patients did not receive a medical benefit justifying the use of these Covered Drugs at the doses patients often received.

163.   At least as early as 2005, physicians knew or should have known that Aranesp was a very dangerous drug and that it performed less well in important treatment criteria than Procrit.  In that year, a study by Dr. Roger Waltzman, St. Vincent's Comprehensive Cancer Center (New York), and others, comparing the efficacy of epoetin alfa to darbepoetin alfa in anemic patients with cancer receiving chemotherapy, concluded that epoetin alfa was preferable to darbepoetin alfa for two reasons: first, epoetin alfa (Procrit) showed an earlier hemotologic response than darbepoetin alfa (Aranesp) and, second, blood transfusion intensity, although not frequency, was significantly lower for patients being treated with epoetin alfa (Procrit) at the dosage levels tested, which were consistent with those most commonly used in clinical practice and with recommendations in published guidelines regarding use of these agents.  In other words, with respect to the first measure, Procrit worked faster in increasing red blood cells circulating in the patient's blood stream than Aranesp, the median time for Procrit to get a

57

significant response being 35 days to Aranesp's 46 days; and, with respect to the second measure, Procrit patients did not need as much blood to be transfused, on average, as patients on Aranesp in the study period: only 2.6 units vs. 3.9 units for patients on Aranesp.

164.    On or about December 16, 2006, Amgen advised the FDA of the results of the so-called "DAHANCA 10" clinical trial.  The trial had been stopped prematurely in approximately October 2006 – two months before Amgen's letter.  The preliminary data released to the FDA from this study showed a significantly greater number of adverse events, up to and including death, for those on Aranesp versus the control placebo group.

165.    On January 26, 2007, Amgen sent a "dear physician" letter to the oncology medical community advising that a large, multicenter, randomized, placebo-controlled study showed that Aranesp was ineffective in reducing red blood cell transfusions or fatigue in patients with cancer who had anemia not due to concurrent chemotherapy.  The letter also stated that the study showed higher mortality in patients receiving Aranesp than the placebo group.

166.    On February 16, 2007, the FDA notified healthcare professionals of the results from a large clinical trial evaluating use of darbepoetin alfa to treat anemia in cancer patients not receiving chemotherapy.  In this study, patients received either Aranesp (darbepoetin alfa), according to the approved dosing regimen or a placebo.  Patients treated with Aranesp had a higher death rate and no reduction in the need for transfusions compared to those treated with the placebo.  The FDA announcement also noted that the findings in the Aranesp study may apply to other ESAs.  Additionally, the findings showed that treating anemic cancer patients not currently on chemotherapy with an ESA may offer no benefit and may cause serious harm.

167.    In an update to its February 16 warning, on March 9, 2007, the FDA notified healthcare professionals of new safety information for Aranesp (darbepoetin alfa), Epogen

58

(epoetin alfa) and Procrit (epoetin alfa).  The FDA advised that four new studies in patients with cancer found a higher chance of serious and life-threatening side effects or death with the use of ESAs.  The research studies were evaluating an unapproved dosing regimen, a patient population for which ESAs were not approved, or a new unapproved ESA.  FDA advised that it had required changes in the full prescribing information for Aranesp, Epogen and Procrit to include a new boxed warning, updated warnings and a change to the dosage and administration sections for all ESAs.

168.    The March 2007 FDA advisory recommended caution in using ESAs in cancer patients whether or not they were receiving chemotherapy; it also indicated a lack of clinical evidence to support improvements in quality of life or transfusion requirements in patients being administered these drugs – claims that had been made by Amgen for Aranesp and Epogen.

169.    The March 2007 FDA advisory further cautioned physicians that ESAs should be administered at the lowest possible dose needed to bring red blood cell counts up to a level just within the limit necessary to avoid transfusions.  As previously alleged, ESAs in general were prescribed in the United States by physicians at higher dosage levels and to a greater proportion of patients than medical necessary as a consequence of the unusual opportunity to profit by prescribing increasing amounts of the drugs.  Amgen's tiered rewards system encouraged physicians to dose patients at the highest levels they could tolerate.

170.    In November 2007, additional "black box" warnings were included on the label for Aranesp at the request of the FDA.  The FDA's black box warning was prompted by linkages between Aranesp and cardiovascular incidents and between Aranesp and faster tumor growth. The new labeling emphasized "that there are no data from controlled trials demonstrating that ESAs improve symptoms of anemia, quality of life, fatigue, or patient well-being for patients

with cancer or for patients with HIV undergoing AZT therapy."

171.    In December 2008, the FDA posted on its Web site, an advisory notice as a medication guide regarding the use of ESAs.  The advisory noted that use of ESAs can lead to serious side effects "which may result in death" and that some of these side effects are more likely to happen if the patient has cancer or CRF.  In patients with all types of cancer for which ESA use is approved, the advisory warned (a) that "the tumor may grow faster and the patient may die sooner when ESA treatment is used," (b) that "ESAs have not been shown to improve the symptoms of anemia, quality of life, fatigue, or well-being for patients with cancer," and, for that reason, "should be used only to reduce the chance that a patient with low red blood counts (anemia) will get a blood transfusion" and, finally, (c) that "[t]reatment with an ESA should be stopped when chemotherapy treatment is finished."

172.    A physician has an ethical duty not to prescribe a drug for a patient unless use of the drug is warranted by medical necessity.  Under Medicare and Medicaid definitions, medical necessity means "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member . . . ."  42 U.S.C. § 1395y.

173.    On information and belief, physicians affiliated with the defendant Oncology Practices as agents, employees or owners prescribed Aranesp and Neulasta at levels that exceeded medical necessity.  Relator recalls hearing Dr. Abe Cheung of Southeast Georgia Hematology & Oncology, Brunswick, GA telling another physician at American Society of Clinical Oncologists (ASCO) meeting in approximately 2004: "All my patients get Aranesp and Neulasta and some of them actually need it."

174.    On information and belief, physicians affiliated with the defendant Oncology Practices often prescribed Aranesp and Neulasta not because of the medical needs or comfort of

their patients, but for business and financial reasons, *i.e.,* to earn increased revenues and higher profits from the discounts, rebates and other monetary and non-monetary benefits they could obtain from Amgen, as well as the higher reimbursement levels they could receive for prescribing these drugs to patients entitled to receive benefits under Government Healthcare Programs and then failing to report the discounts, rebates and other monetary and non-monetary benefits they received from Amgen to Medicare, Medicaid and other Government Healthcare Programs so as to avoid having the reimbursement levels of these drugs reduced.

175.    Aranesp had potentially serious side effects.  At too high a dosage, Aranesp could lead to serious adverse consequences, including stroke and even death.  Because oncology patients treated with the Covered Drugs are often considered to be terminal, on information and belief, the true effects of administration of the Covered Drugs at the off-label doses prescribed by some physicians was masked because of an expectation of high mortality rates in such patients.

176.    On information and belief, the defendant Oncology Practices have information in their possession, custody or control that would show that increased dosing of some patients with Aranesp and Neulasta was not done for reasons of medical necessity, but to improve the financial bottom lines of the defendant Oncology Practices, *i.e.,* to increase their profits.  On information and belief, each of the defendants has in its possession, custody or control records and other information that would show that it switched patients who were being treated for chemotherapy-induced anemia from Procrit to Aranesp virtually overnight, *i.e.,* shortly after the defendant entered into an agreement with Amgen to prescribe these drugs as part of an incentive buying program.

177.    On information and belief, each of the defendants has in its possession, custody or

control records and other information that would show that, shortly after patients being treated for chemotherapy-induced anemia were converted from Procrit to Aranesp, they were placed on larger equivalent doses of Aranesp, with the result that the defendant's revenues and profits from its treatment of such patients increased.  The increase in revenues and profits was largely accounted for by three interrelated factors: (a) higher sales revenues from increased dosing, (b) lower purchase costs due to the rebates, discounts and other consideration received from Amgen and (c) higher reimbursement rates from Government Healthcare Programs due to the failure to report the rebates, discounts and other consideration received from Amgen.

178.    As an example of the kind of change described above, Relator is familiar with the case of Dr. Joel Stone, a principal in defendant ICON.  As of approximately 2001, ICON spent about $1 million per year to buy Procrit and Neupogen.  By 2006, having entered into the Amgen Portfolio Contract, ICON spent about $32 million annually for Aranesp and Neupogen.  This 32-fold increase in purchases came at a time when cancer death rates were decreasing, according to the American Cancer Society,[5] and at a time when ICON had realized no significant change in its patient population.

179.    Relator is also familiar with the case of Dr. William Harwin, a Florida oncologist and principal of Florida Cancer Specialists.  In or about 2006, Dr. Harwin, responding to the

_____

[5] Cancer deaths were falling: "Cancer death rates decreased by 1.8% per year in males and by 1.5% per year in females during the most recent 5 years of data (2005-2009).  These declines have been consistent since 2001 and 2002 in men and women, respectively, and are larger in magnitude than those occurring in the previous decade (Table 5).  Death rates peaked in men in 1990 (279.8 per 100,000), in women in 1991 (175.3 per 100,000), and overall in 1991 (215.1 per 100,000).  Between 1990/1991 and 2009, cancer death rates decreased 24% in men, 16% in women, and 20% overall."  *See* Trends in Cancer Mortality, American Cancer Society (2013), http://onlinelibrary.wiley.com/doi/10.3322/caac.21166/pdf (visited Aug. 26, 2013).

profit incentive provided by Amgen's purchase incentive scheme, began to administer Neupogen to his Medicare patients because the Neupogen vials contained a large amount of overfill which could be administered to additional patients, thus allowing his oncology practice the opportunity for greater cost "recoupment."  The recoupment was greater for two reasons: (a) the vials of Neupogen contained overfill that could be recovered, administered to patients and billed to Government Healthcare Programs or other third-party payers and (b) because Neupogen had a higher reimbursement rate than Neulasta.  At the same time, Dr. Harwin kept his private insurance patients on Neulasta, rather than Neupogen, because of Neulasta's greater efficacy and the typically lower private insurance company reimbursement rates for Neupogen.

### H.    Other Illegal Practices.

#### 1.    Tying the Purchase of Aranesp to the Purchase of Neupogen and Neulasta.

180.    Under the Amgen Portfolio Contract, purchases of Neupogen and Neulasta, in addition to purchases of Aranesp, counted toward the dollar total of a customer's "qualified" purchases necessary to achieve a higher tier in the Amgen discount and rebate structure.  By including Neupogen and Neulasta in the discount and rebate scheme, Amgen extended its power in one the market – the market for white blood cell stimulation agents, which it had because of Neupogen and Neulasta – to an ESA, Aranesp, known to be inferior to Procrit in the treatment of chemotherapy-induced anemia, contrary to U.S. antitrust law.  15 U.S.C. § 1.  *See Ortho Biotech Products, LP. v. Amgen, Inc.,* Case No. 2:05-cv-04850-SRC-MAS (D.N.J. filed Oct. 11, 2005). In this case, the plaintiff, Ortho Biotech Products, LP ("Ortho"), a J&J subsidiary, sought a preliminary injunction enjoining Amgen from offering discounts to oncology clinics on

63

Neupogen, Neulasta and Aranesp based on the volume of these products purchased.  Ortho also sought a permanent injunction against such discounts, as well as money damages.  The case was finally settled by a $200 million payment from Amgen to Ortho, as announced by Amgen in a press release issued on or about July 11, 2008.

### 2.    Off-Invoice Discounts.

181.    Beginning in or about 2003, Amgen offered customers, including the defendant Oncology Practices, lower bottom-line prices for the Covered Drugs and, by reducing the cost of these drugs through the use of a post-sale, "off-invoice" discount, which provided a way for the defendants to increase their revenues and profits simply by failing to account for these discounts in their submission of claims for payment, or "reimbursement," of the cost of the Covered Drugs used to treat patients eligible for benefits under Government Healthcare Programs.

182.    By providing the defendants with invoices that did not represent the actual cost of the Covered Drugs, Amgen facilitated, and intended to facilitate, their submission of claims for payment, or "reimbursement," to Government Healthcare Programs that were based upon the invoice amount, even though the invoice price did not represent the actual cost of the drugs to the defendants.  Because the scheme included the presentation by Amgen of a physical invoice that misstated the actual cost of the Covered Drugs to the defendants, or to their GPOs, the scheme provided defendants with a false indicator of the price they paid for the drugs in the event of an audit.

183.    On information and belief, the defendant Oncology Practices filed false and fraudulent claims for reimbursement to Government Healthcare Programs based upon invoices supplied by Amgen for the Covered Drugs that overstated the actual cost of these drugs to them and, based on these false and fraudulent claims, the defendants obtained excess "reimbursement" of the actual cost of the Covered Drugs used to treat eligible patients from Government Healthcare Programs.

184.    In March 2008, Amgen and number of other drug companies settled litigation brought against them by a variety of consumers and insurance companies.  The lawsuits accused the drug companies of fraudulently inflating published average wholesale drug prices.  *See In re: Pharmaceutical Industry Average Wholesale Price Litigation*, M.D.L. No. 1456, No. 01-12257 (D. Mass).  In the litigation, consumers and insurance companies accused the companies of fraudulently inflating published average wholesale drug prices.  Those wholesale prices led to higher consumer and insurance company payments for branded and generic drugs used to treat serious illnesses like cancer and HIV.

### 3.    Use of overfill.

185.    "Overfill" means the provision of extra product to the customer.  When a product is delivered in a vial, as was true in the case of the Covered Drugs, the vial is filled beyond the amount shown on the invoice.  The significance of having an "extra" amount of the drug to a physician, a medical services provider or other buyer that administers the drug is that the extra, unaccounted-for amount of the drug can be administered to a patient and the patient or a third-party payer, including a Government Healthcare Program, charged for the amount of the drug administered, even if the drug was provided to the medical services provider free of charge.

65

186.    Beginning with the approval of Aranesp for treatment of CRF in 2001, Amgen, to increase physician preferences for the Covered Drugs, and thereby to increase sales of these drugs, began providing customers with extra quantities of Aranesp at no charge. This practice of providing extra quantities of Aranesp in vials for no charge continued with the approval of Aranesp for chemotherapy-induced anemia for the oncology market in 2002. This practice of overfilling vials was also used by Amgen for Neupogen, beginning with its launch in February 1991.

187.    By providing customers with amounts of the Covered Drugs greater than reflected on invoices, Amgen intended to encourage customers to prefer Amgen products over potential substitute products, in the case of Aranesp, and to increase the quantities of the Covered Drugs sold to customers.

188.    The "overfill" program benefitted the defendant Oncology Practices by reducing the effective cost of the Covered Drugs to them in a way that could not readily be detected by Government Healthcare Program administrators. This facilitated their ability to avoid reporting this financially valuable but non-monetary discount to government-funded healthcare programs, yet provided them with the opportunity to earn greater profits from the purchase of the Covered Drugs.

189.    The overfill program was intended to, and did, allow the defendants to administer the Covered Drugs they received "for free" to patients. The patients or, more frequently, third-party payers, principally Government Healthcare Programs and insurance companies, were then billed for the drugs based on the volume of the drug administered, not its cost, as there was no cost for the extra, "overfill" amount. The claims filed by the defendant Oncology Practices to Government Healthcare Programs for the Covered Drugs exceeded the actual cost of the drugs to

them, inasmuch as delivering extra, unaccounted-for drugs with a drug order effectively lowered the cost of the drugs on a per-unit basis.

190.    On information and belief, the defendant Oncology Practices benefitted substantially from the overfill program, while costing Government Healthcare Programs additional money.  For example, assume the case of a hypothetical 500mcg vial of Aranesp in 2006 – the size of vial which accounted for a substantial percentage of Aranesp sales.  Assuming a 20% overfill, which is consistent with marketing materials the Relator received from Amgen's marketing department as to the average amount of overfill in Amgen-supplied vials of the Covered Drugs, the vial would contain approximately 100mcg of "overfill."  This 100mcg of Aranesp would then be available to a defendant to administer to patients, providing the defendant with an opportunity to earn an extra $298.90, the amount a practice would earn in Medicare-billable profit from a single administration of the drug to a single patient, according to the CMS advisory on the maximum billing allowed in the first quarter of 2006.  Further, of course, as the maximum reimbursement rate for Aranesp increased over time, so did the profit a defendant could earn in billing Medicare, Medicaid or other Government Healthcare Programs for the overfill.

191.    By way of further explanation, assuming the same 500mcg vial and that each of five patients was administered a single 100mcg dose of Aranesp, each patient or her third-party payer, such as a Government Healthcare Program, would be billed for one-fifth of the cost of the vial.  But since, in this example, the vial actually contained 600mcg, a sixth 100mcg dose could be administered to a sixth patient and billed to that patient or his third-party payer.  Since the medical services provider would have paid nothing for the extra 100mcg dose, the income collected on the sixth dose would be pure profit.

67

192.    Similarly, with respect to Neupogen, in a hypothetical case, a physician might dose an average size person (70kg or 154 lbs) with a 350mcg dose, but, because of the limited number of dispenser sizes, would need to draw this dose from a 480mcg vial.  Since a 480mcg vial would actually contain 530mcg of Neupogen, however, after administering the 350mcg dose, the physician or the medical services provider would still have 180mcg (480 – 350 + 50) of the drug left.  That 180mcg could then be administered to another patient and billed to a third-party payer without any additional cost.

### 4.    Price protection.

193.    During the Covered Period, Amgen generally initiated one or two price increases per year on most products.  These increases were usually in the range of 5%.  But, in order to increase sales, Amgen allowed current customers, including the defendant Oncology Practices, to continue purchasing the Covered Drugs and other products at the "old" price until the date of next price increase.

193.    Price protection had at least two specific benefits for Amgen customers who had entered in to the Amgen Portfolio Contract.  First, it allowed customers, including the defendant Oncology Practices, to purchase certain drugs, including the Covered Drugs, at the "old" price longer after a price increase had been announced and implemented.  Second, it increased the size and value of drug cost "reimbursements" defendants could realize from Government Healthcare Programs.  This effect stemmed from the fact that, as Amgen's ASP increased, the reimbursement rates of Government Healthcare Programs also increased, to adjust for the higher supposed higher ASP, whereas the actual cost of the Covered Drugs to the defendants did not increase.

68

194.    Amgen took steps to ensure that its price increase announcement would be published in industry publications, such as the Red Book – which tracked all drug industry price changes and which Amgen knew was relied on by Government Healthcare Programs for drug pricing data.  Through the Red Book, and via other means, Amgen began reporting a new, higher ASP for the Covered Drugs to Government Healthcare Programs, based on the price increase, even though only a small fraction, if any, of its drug sales were made at that price.  Knowing that Amgen's reported ASP did not accurately reflect the actual selling price of the Covered Drugs, the defendants nevertheless submitted claims for payment, or "reimbursement," of their drug costs, to Government Healthcare Programs that failed to account for the fact that Amgen's claimed ASP did not accurately reflect the price paid and, therefore, were false and fraudulent.

### 5.    Free goods.

195.    Amgen supplied free goods and samples to the defendant Oncology Practices and other customers as a way to drive sales and to reduce the effective cost of the Covered Drugs to the defendants.  Each Amgen sales representative had $50,000 in free goods to use to promote the sale of each drug within his/her portfolio.  More than that amount of money was usually readily available to the sales representative from Amgen, upon request.  The sales force was encouraged by Amgen to dole out "free samples" of Amgen drugs to customers.  Physicians and practice groups that received these "gifts" were then free to administer the drugs to patients, charging the patient or a third-party payer, such as a Government Healthcare Program, the full, ordinary (claimed) cost of the drug, with the revenue derived from such sales being pure profit.

196.    These free goods, or spoils, reduced the effective price of the Covered Drugs and other drugs to the defendants.  On information and belief, the defendants did not, in submitting

69

claims for payment, or "reimbursement," of drug costs to Government Healthcare Programs, report that these drugs had been supplied to them at no cost or accounted for the fact that they had paid nothing for the drugs to reduce their average cost of that drug during a calendar quarter or any other relevant period of time.

### 6. Marketing the spread.

197.     Rebates and discounts under the Amgen sales program varied depending upon customer-specific increases in purchase volumes of the Covered Drugs.  The greater the increase in the customer's purchases of the Covered Drugs, the greater the level of discounts and rebates the customer (here, a particular Oncology Practice defendant) would receive.  Relator used a calculation tool provided by Amgen to show the total value of the discounts and rebates under certain assumptions compared to the actual cost of the Covered Drugs to the customer once the reimbursement the customer could receive from Medicare or other Government Healthcare Program.  Generally speaking, such Government Healthcare Programs were set up to cover 80% of the medical services provider's costs with the patient providing a 20% co-pay.

198.     The technique known as "marketing the spread" or "marketing to spread" presents a prospective customer a with hypothetical, but realistic, set of figures showing how specific increases in the volume of purchases of a drug or drugs by the customer would result provide the customer with certain rebate and discount levels, allowing the customer to obtain reimbursement from the government-sponsored healthcare program, when such rebates and discounts are taken into account, in excess of the customer's actual cost.  A medical practice that is reimbursed for more than the percentage of the charge to which it would be entitled under program rules is said to have been "over-reimbursed."  Amgen representatives used this term or

70

the term "over-reimbursement" when marketing the spread to each of the Oncology Practice defendants, advising them that, as they achieved, certain target levels of purchases, they would be able to obtain over-reimbursement of their actual costs.

199.    In marketing the Covered Drugs to the Oncology Practice defendants, Relator followed the instructions he was given by Amgen management, in particular, by Joe Turgeon, Cynthia Schwalm, George Morrow, Jim Daly, Bobby Fralin, and others.

200.    None of the Oncology Practice defendants to which Relator marketed the Covered Drugs ever inquired of Relator whether they had a obligation under their Amgen Portfolio Contracts to report value of the rebates, discounts and other things of value they earned and received by increasing their purchases of the Covered Drugs to the Government Healthcare Programs from which they sought reimbursement of the "cost" of such drugs as a reduction in such cost pursuant to the provision in their Amgen Portfolio Contracts, as reflected in paragraph 144 of this Complaint and repeated below:

> Participating Eligible Physician Practice agrees that it will *properly disclose and account for any and all discounts and/or rebates earned in connection with the [year] Amgen Portfolio Rebate Program and through its participation under the Group Purchasing Agreement in a way that complies with all applicable federal, state, and local laws and regulations, including without limitation, Section 1128B(b) of the Social Security Act and its implementing regulations*, and shall provide, upon request by the U.S. Department of Health and Human Services, or a state agency any and all information furnished, including, but not limited to information furnished by Amgen concerning the amount or value of any such discount and/or rebate, on products purchased under the Group Purchasing Agreement.  Participating Eligible Physician Practice Headquarters represents and warrants that its legally affiliated physician offices and/or satellite clinics, if any, shall comply with any discount reporting obligations they may have in connection with any discounts and/or rebates received under the Group Purchasing Agreement.  (Emphasis added.)

In fact, Amgen sales representatives were instructed to inform Oncology Practices that such reporting "would be taken care of" despite the express provision of the Amgen Portfolio Contract reflected above.

201.   Several defendants were particularly highly motivated to purchase the Covered Drugs based not upon their efficacy in general or for a specific patient, but based upon the revenue that could be generated from administering the drug to a patient.

202.   Based on statements made to Relator by representatives of the defendants listed below, the drug purchasing decisions of these entities were heavily influenced by Amgen's practice of "marketing the spread" and by the profit opportunities afforded by the Amgen Portfolio Contract: USOS; Integrated Community Oncology Network, LLC ("ICON"); Florida Oncology Associates (ICON); Gulfcoast Oncology Associates (ICON); Florida Cancer Specialists; Regional Consultants in Hematology and Oncology; and Georgia Cancer Specialists.

203.   A defendant could be "over-reimbursed" for its cost of a Covered Drug under a Goverment Healthcare Program only by failing to report the rebates, discounts, kickbacks and other remuneration received as incentives to buy the drug.  On information and belief, the defendant Oncology Practices would not have increased their purchases of the Covered Drugs in so dramatic a fashion as they did had the physicians who made the prescribing and dosing decisions not understood the profit-making rationale for such decisions.

204.   On information and belief, the defendant Oncology Practices knew that, at the levels ordered and administered, Aranesp was not medically necessary, and was indeed potentially harmful, to patients.

205.   The "free" goods, drug "overfills," sham honoraria, fraudulent "roundtable discussions" at which relevant medical topics were not discussed, fraudulent "reimbursement

roundtables" at which issues related to reimbursement were not discussed, rebates, discounts, price protection and things of value provided by Amgen to the defendants, and that were tied to their purchase of the Covered Drugs during the Covered Period, constituted improper and fraudulent kickbacks to induce the defendants to purchase the Covered Drugs, in violation of the federal anti-kickback statute.  42 U.S.C. § 1320a-7b.

206.    The practice of "marketing the spread," coupled with the false and fraudulent claims filed by the defendants, caused Government Healthcare Programs to pay out substantial sums of money to the defendants as drug cost "reimbursements" that exceeded the amounts that should properly have been paid out pursuant to laws, rules and regulations covering reimbursement rates for Government Healthcare Programs.

### 7.    Other improper financial incentives provided to oncology practices.

207.    During the Covered Period, Amgen provided the defendant Oncology Practices with numerous additional financial incentives to influence the defendants' selection and utilization of the Covered Drugs regardless of medical necessity.  These incentives included, but were not limited to, sham honoraria constituting improper and fraudulent kickbacks to the defendants or to their owners, employees or agents.

207.    One incentive Amgen offered was a free dinner for the physician and his/her family, plus an honorarium to the physician for attending the event.  Although billed as "roundtable discussions" at which medical issues were discussed, it was often the case that no medical discussions took place.  In that event, Relator or another Amgen sales representative would deliver a check of up to $1,000 to the physician for simply showing up.  Physicians affiliated with defendants Florida Cancer Specialists, Gulfcoast Oncology Associates and ICON

73

all accepted sham honoraria, in particular such sham honoraria were provided to and accepted by Dr. Jeffrey Paonessa, Dr. Joel Stone and Dr. Thomas Marsland, of the three referenced defendant Oncology Practices, respectively.

208.    Amgen also marketed the Covered Drugs by arranging for employees of medical services providers, including employees of the defendant Oncology Practices, to attend "reimbursement roundtables."  Often, these events did not involve discussion of "reimbursement" procedures.  Instead, their sole purpose was for members of Amgen's sales staff to ingratiate themselves with the staff of a medical services provider.  These roundtables often featured meals with minimal discussion, if any at all, of how to bill for Amgen products.

209.    The defendant Oncology Practices failed to disclose these improper financial incentives to Government Healthcare Programs that provided payment, or "reimbursement," of the cost of the Covered Drugs administered to eligible patients, even though the effect of the honoraria was to decrease the effective prices these defendants paid for the Covered Products.

210.    The defendant Oncology Practices had an obligation not to allow financial inducements to affect patient treatment decisions.  On information and belief, the honoraria and other financial inducements did just so:  Patients who relied on their physicians to exercise their best medical judgment regarding treatments to improve their health were not treated as human beings to whom the physicians owed an ethical duty of care, but as objects through which the defendant Oncology Practices could fatten their financial bottom lines.

### 8.    Use for off-label indications due to marketing and promotion.

211.    During the Covered Period, in order to increase sales, Amgen promoted the off-label sale and use of Aranesp to the defendant Oncology Practices.  For oncology purposes,

Aranesp was approved by the FDA only for the treatment of chemotherapy-induced anemia. Other ESAs, including Procrit and Epogen, had other FDA-approved non-oncology indications. The fact that Aranesp had only the one approved indication for oncology limited its potential markets. To overcome this limitation, Amgen management directed and supported the off-label use of Aranesp, including for treatment of anemia in Zidovudine-treated HIV patients, reduction of allogeneic blood transfusions in surgery patients, anemia of cancer and myelodysplastic syndromes. Amgen provided oncology sales representatives a "proof source book" that included extensive "off label" marketing materials for a range of different uses. Although numerous warnings stated that the book was for "information purposes only," the purpose of the book was to enable Amgen's sales representatives to market Aranesp "off label" and thereby to encourage doctors to prescribe and use Aranesp for a host of medical indications for which FDA approval had not been given.

212.    On information and belief, the defendant Oncology Practices, based, in part, on Amgen's illegal and fraudulent off-label promotion of Aranesp, purchased and administered Aranesp for non-approved uses based, not on appropriate treatment concerns and medical efficacy, but based principally on the increased profits they could earn from higher Government Healthcare Program payments and higher Amgen rebates, discounts and the like under the Amgen Portfolio Contract.

## 9.    Defendants' fraudulent activities have threatened public health and safety.

213.    As alleged herein, studies have linked the use of anti-anemia drugs, such as Aranesp and Epogen to cardiovascular incidents, including death and faster tumor growth. This

Complaint also alleges that, in 2007, the FDA added a black box warning cautioning about the use of erythropoeisis-stimulating agents in cancer patients receiving chemotherapy or not receiving chemotherapy and advising that the medications should be administered at the lowest dose possible in order to bring red blood cell counts to a level just below the level at which blood transfusions would not be recommended.

214.    During the Covered Period, the defendant Oncology Practices accepted rebates, discounts and other incentives, including kickbacks, from Amgen to purchase the Covered Drugs.  On information and belief, acceptance of those incentives caused the defendants to search for and find reasons to buy these drugs and to administer them to patients, despite their being medically unnecessary and even dangerous to patient health.

215.    As alleged herein, one physician affiliated with defendant Southeast Georgia Hematology & Oncology who regularly accepted financial incentives from Amgen in return for purchasing the Covered Drugs, Dr. Abe Cheung, stated in a conversation overheard by Relator: "Yes, we use Aranesp and Neulasta and some of our patients actually need it."  Another physician affiliated with defendant ICON who routinely accepted financial incentives from Amgen in return for purchasing the Covered Drugs, Dr. Joel Stone, stated in a conversation overheard by Relator:  "Yes, the patient only has six more months to live, and that's six more months we can bill Medicare."

216.    In 2012, *The Washington Post* detailed the story of Jim Lenox, a 54-year-old cancer patient who allegedly died as the result of unnecessary ESA injections.  *Washington Post* (July 19, 2012), at http://www.washingtonpost.com/wp-srv/business/amgen-anemia-drugs/index.html (visited Apr. 28, 2013).  *The Post* also reported that, from 2006 to 2011, Amgen spent more than $10 million a year on lobbying efforts in Washington.  *Id.*

76

217.    Amgen's political influence is well known in Washington.  *The New York Times*

reported in an article from January 2013 that Amgen has 74 lobbyists on staff.  As an example of

Amgen's political influence, press reports have noted that buried in the "fiscal cliff" negotiations

that were concluded in early January 2013, Amgen was able to obtain a two-year delay a set of

Medicare price restraints for a class of drugs, including its Sensipar drug, used by kidney dialysis

patients.  This two-year delay – achieved on top of a previous two-year delay – is expected to

cost Medicare $500 million. *New York Times* Jan. 28, 2013) at

http://www.nytimes.com/2013/01/20/us/medicare-pricing-delay-is-political-win-for-amgen-

drug-maker.html (visited Apr. 30, 2013) ("Just two weeks after pleading guilty in a major federal

fraud case, Amgen, the world's largest biotechnology firm, scored a largely unnoticed coup on

Capitol Hill: Lawmakers inserted a paragraph into the 'fiscal cliff' bill that did not mention the

company by name but strongly favored one of its drugs.")


**I.      Affected federal and state health care programs.**

218.    The United States provides medical insurance for indigent or poor persons

through Title XIX of the Social Security Act, 42 U.S.C. § 1396–1, *et seq.*, a program commonly

referred to as Medicaid.  Medicaid is a program funded by the federal government and various

state governments.  The various states named as plaintiffs in this Complaint have, as a result of

the activities described throughout this Complaint, been required to pay reimbursements to the

defendant Oncology Practices in excess of the amounts they were eligible to receive under

governing regulations.  Therefore, these state governments are properly named as plaintiffs in

this lawsuit by virtue of their respective state fraud recovery statutes.

219.    Although Medicaid is administered at the state level, each state is required to

adhere to federal guidelines.  Federal statutes and regulations limit the drugs that the federal government will pay for through its funding of state Medicaid programs.  Federal statutes and regulations restrict the uses for which the federal government will pay for approved drugs: even an approved drug is not eligible for cost reimbursement if the use for which it was prescribed is not a proper indication.

220.    Generally, a medically accepted indication, or use, must be present before Medicaid will reimburse a medical services provider, such as the defendants in this case, or a pharmacy for a drug that is prescribed or administered to an individual covered by Medicaid.  In knowingly submitting false fraudulent information and claims for reimbursement under the Medicaid program, Amgen and the defendant Oncology Practices defrauded Government Healthcare Programs of money.

221.    The federal government provides medical insurance for retirees and persons who are disabled through Title XVIII of the Social Security Act, 42 U.S.C. § 1395h*, et seq.,* a program commonly referred to as Medicare.  Medicare is a health insurance program also administered by the federal government by the Department of Health and Human Services, Centers for Medicare & Medicaid Services, Center for Medicare.

222.    Medicare has, since the implementation of the Medicare Prescription Drug Improvement and Modernization Act of 2003 paid for a substantial portion of outpatient prescription drugs for covered individuals.  Medicare Part D, which provides beneficiaries with a level of coverage for the cost of prescription drugs, requires providers to adhere to the same laws and regulations as apply to providers under the Medicaid program.

223.    In knowingly submitting false and fraudulent information and claims for reimbursement to Medicare, Amgen and the defendant Oncology Practices defrauded the United

States of money, in violation of laws and regulations applicable to such claims.  In addition to defrauding Medicaid and Medicare, the defendant Oncology Practices also defrauded other healthcare programs funded by the federal government.  The programs identified in succeeding paragraphs of this subpart of the Complaint.

224.    The Federal Employees Health Benefits ("FEHB") Program, a program that provides medical benefits to United States government employees.  It is administered by the Office of Personnel Management.  This program and federal healthcare programs generally are administered pursuant to 5 U.S.C. § 8901, *et seq.*

225.    The Civilian Health and Medical Program of the Department of Veterans Affairs, a program that provides medical benefits to eligible veterans.

226.    TRICARE, a program that provides medical benefits to eligible uniformed military personnel and related individuals through civilian facilities.  TRICARE is managed by TRICARE Management Activity, a field activity under the policy guidance and direction of the Assistant Secretary of Defense (Health Affairs), Department of Defense.

227.    The Indian Health Service ("IHS"), an agency of the Department of Health and Human Services that provides comprehensive medical care to eligible American Indians and Alaska Natives.   The IHS is administered pursuant to 42 U.S.C. § 2002, *et seq.*

228.    The Railroad Retirement Medicare, a program is authorized by the Railroad Retirement Act of 1974.  45 U.S.C. § 231, *et seq.*  The program is administered though the United States Railroad Retirement Board.

229.    For each of these programs named herein, the fraud perpetrated upon them by Amgen and the defendant Oncology Practices resulted in improper and fraudulent payments or overpayments for drugs.  The fraudulent submission for reimbursement for non-approved or

medically unnecessary uses and other purposes as described herein caused direct harm to the United States government and to the governments of the affected states by the payment or overpayment to the requested entities that should not have been "reimbursed," or paid.  In addition, the failure by the defendant Oncology Practices to identify the rebates and other things of value received by the defendant Oncology Practices resulted in overpayment of reimbursements to these entities.

**J.      Hub and Spoke Conspiracy to Commit Fraud.**

230.    With the FDA approval of Aranesp for chemotherapy-induced anemia in 2002, Amgen, began a process of seeking to persuade the Defendant Oncology Practices to use Aranesp.  This sales effort accelerated with the introduction of the Amgen Portfolio Contracts in approximately March, 2004.

231.    Although some of Amgen's focus in its marketing efforts for Aranesp was to induce medical providers to replace Procrit with Aranesp, Amgen's basic marketing strategy was to increase the sales of Aranesp by expanding the market, both in terms of increased dosing of Aranesp and the use of Aranesp in a broader patient population.  In particular, Amgen offered its rebates to customers based upon the growth in sales rather than a straightforward rebate based upon the volume of total purchases.  Instead of providing the highest rebates to its largest volume customers, Amgen structured its rebate program to emphasize sales growth, with the highest level of rebates going to customers that showed the greatest increase in purchases of Amgen products.

232.    Upon information and belief, Amgen entered into agreements with each of the Defendant Oncology Practices.  One of the agreements that Relator is best informed about is the

agreement that Amgen and Gulf Coast Oncology Associates of St. Petersburg, Florida entered

into, known as an Amgen Portfolio Rebate Program Letter Agreement that offered the following

rebate schedule from March 1, 2004 through August 31, 2004:

| VOLUME TIERS | Participating Eligible Physician Practice's Aggregate Combined Gross Purchases of Aranesp,® NEUPOGEN® and Neulasta® during he applicable Quarterly Measurement Period | Aranesp® Rebate Percent | NEUPOGEN ® and Neulasta® Rebate Percent |
|---|---|---|---|
| Tier 1 | $1,051,771 - $1,262,124 | 5.0% | 5.0% |
| Tier 2 | $1,262,125 - $1,367,301 | 11.5% | 7.5% |
| Tier 3 | $1,367,302 - $1,472,478 | 13.5% | 10.5% |
| Tier 4 | $1,472,479 - $1,577,655 | 14.5% | 11.5% |
| Tier 5 | $1,577,656 - $1,682,832 | 18.5% | 13.5% |
| Tier 6 | $1,682,833 - $1,788,009 | 20.0% | 20.0% |
| Tier 7 | $\geq$ $1,788,010 | 25.0% | 25.0% |

233.    Another example is the agreement between Amgen and Florida Oncology

Associates of Jacksonville, Florida entitled Amgen Portfolio Rebate Program Letter Agreement,

that offered the following rebate schedule from March 1, 2004 through August 31, 2004:

| VOLUME TIERS | Participating Eligible Physician Practice's Aggregate Combined Gross Purchases of Aranesp,® NEUPOGEN® and Neulasta® during he applicable Quarterly Measurement Period | Aranesp® Rebate Percent | NEUPOGEN ® and Neulasta® Rebate Percent |
|---|---|---|---|
| Tier 1 | $2,025,630 - $2,430,755 | 5.0% | 5.0% |
| Tier 2 | $2,430,756 - $2,633,318 | 11.5% | 7.5% |
| Tier 3 | $2,633,319 - $2,835,881 | 13.5% | 10.5% |
| Tier 4 | $2,835,882 - $3,038, 444 | 14.5% | 11.5% |
| Tier 5 | $3,038,445 - $3,241,007 | 18.5% | 13.5% |
| Tier 6 | $3,241,008 - $3,443,570 | 20.0% | 20.0% |
| Tier 7 | $\geq$ $3,443,571 | 25.0% | 25.0% |

A comparison of these two contracts clearly shows that Florida Oncology Associates had to purchase almost twice the volume of Covered Drugs to get the same percentage rebate as Gulf Coast Oncology Associates.

234.     Another example is the Amgen Portfolio Rebate Program Letter Agreement beginning in March 1, 2004, entered into by Southeast Georgia Hematology Oncology and Amgen.  This agreement offered Southeast Georgia Hematology Oncology the following base rebate schedule from March 1, 2004 through August 31, 2004:

| VOLUME TIERS | Participating Eligible Physician Practice's Aggregate Combined Gross Purchases of Aranesp,® NEUPOGEN® and Neulasta® during he applicable Quarterly Measurement Period | Aranesp® Rebate Percent | NEUPOGEN ® and Neulasta® Rebate Percent |
|---|---|---|---|
| Tier 1 | $446,493 - $535,791 | 4.0% | 4.0% |
| Tier 2 | $535,792 - $580,440 | 10.5% | 6.5% |
| Tier 3 | $580,441 - $625,090 | 12.5% | 9.5% |
| Tier 4 | $625,091 - $669,739 | 13.5% | 10.5% |
| Tier 5 | $669,740 - $714,388 | 16.5% | 12.5% |
| Tier 6 | $714,389-$759,037 | 18.0% | 16.0% |
| Tier 7 | ≥ $759,038 | 20.0% | 21.0% |

Southeast Georgia Hematology Oncology was able to obtain a 20 percent Aranesp discount by purchasing approximately one-third as much of the Covered Drugs as Florida Oncology Associates.

235.    For Southeast Georgia Hematology Oncology, the 2006 Amgen Portfolio Contract increased the amount of purchases of Covered Drugs required to obtain *any* rebate at all:

| **LEVEL** | Participating Eligible Physician Practice's aggregate combined Gross Purchases of the Products **plus** Retail Prescriptions during the applicable Quarterly Measurement Period | Aranesp® Rebate Percent | Neulasta® Rebate Percent | NEUPOGEN ® Rebate Percent |
|---|---|---|---|---|
| Base | $897,059 - $941,911 | 18.0% | 14.0% | 10.0% |
| Five | $941,912 - $986,764 | 18.5% | 14.5% | 11.0% |
| Ten | $986,765 - $1,076,470 | 19.0% | 15.0% | 12.0% |
| Twenty | $1,076,471 - $1,166,175 | 19.5% | 15.5% | 13.0% |
| Thirty | $1,166,176 - $1,255,881 | 20.0% | 16.0% | 14.0% |
| Forty | $1,255,882 - $1,345,587 | 20.5% | 16.5% | 15.0% |
| Fifty | ≥ $1,345,588 | 21.0% | 17.0% | 16.0% |

In order to obtain any rebate at all from Amgen, Southeast Georgia Hematology Oncology had to more than double its purchases of the Covered Drugs from 2004 to and 2006.  Amgen, in fact, provided substantial economic incentives for the Defendant Oncology Practices to increase their purchases of the Covered Drugs as with successive Amgen Portfolio Contracts, each of the Defendant Oncology Practices had to increase Covered Drug purchases to obtain rebates at the same level or even any rebate at all.  This, in turn, resulted, in a dramatic increase in the use of these Covered Drugs in oncology patients and in the billing for this use to Government Healthcare Programs by the Defendant Oncology Practices.  This dramatic increase in billings for the Covered Drugs to Government Healthcare Programs cannot be explained by medical

84

necessity.  Instead, this increase in the use of the Covered Drugs was the result of the economic

incentives that were offered by Amgen and accepted by the Defendant Oncology Practices.

236.    Amgen falsely claimed in promotional materials that it provided its "best prices"

to its "best customers" in the form of the higher rebates.  Amgen sought to portray these Amgen

Portfolio Contracts as a way for Amgen to reward its biggest volume purchasers with the lowest

prices for the Covered Drugs.  But, this was not the case.  On information and belief, Amgen

sought to mislead the public, government officials, and even its customers as to the true intention

behind these Amgen Portfolio Contracts.  The true purpose of these contracts was to increase

sales of the Covered Drugs during the Covered Period without regard to clinical efficacy or

medical necessity.  The Defendant Oncology Practices were provided with individually tailored

rebate programs designed to encourage, in exchange for money, as much use of the Covered

Drugs as each practice could, theoretically, prescribe in specific patient populations, whether

these patient populations would benefit from the use of these Covered Drugs or not.

237.    The Settlement Agreement entered into by Amgen and the United States in

December 2012 specifically excluded from the release provided to Amgen: "Claims that Amgen

unlawfully marketed the spread for its products; that is, that Amgen promoted the profit margins

between the prices at which its products were sold to Amgen's customers and the higher

Medicare and/or Medicaid reimbursement prices for those products, knowing that the prices it

reported to drug pricing compendia (such as First Data Bank) – specifically, AWP and

Wholesale Acquisition Costs ("WAC") – were higher than they should have been, that those

reported higher prices would be used and/or relied upon by state Medicaid programs to set

reimbursement rates, and that the difference between Amgen's reported prices and the actual

sales prices to its customers created substantial profit margins for pharmacists and medical

85

providers as a result of state Medicaid programs' reimbursement methodologies." Settlement Agreement, ¶ Preamble (G)(8)(b).

238.    Amgen's sales force's office visits with the Defendant Oncology Practices reflected its sales goals.  First, Amgen, in direct contravention of FDA guidelines and regulations, marketed the Covered Drugs to the Defendant Oncology Practices by "marketing to spread."  Amgen sought to convince the Defendant Oncology Practices to purchase the Covered Drugs by emphasizing how much money the Defendant Oncology Practices could make per patient by prescribing and administering the Covered Drugs.  As described herein, the term "spread" means the difference between what the Government Healthcare Programs paid the Defendant Oncology Practices what defendants were actually charged for the Covered Drugs, after taking account of the rebates, other discounts, overfill, and free product samples Amgen provided to the Defendant Oncology Practices in exchange for their purchases of the Covered Drugs.  The Defendant Oncology Practices that qualified for the highest rebates could receive from Amgen a rebate of up to half of the reimbursement amounts that the practices received from the Government Healthcare Programs.

239.    Amgen's sales force touted this spread as an advantage that the Covered Drugs had over Procrit and competing therapies.  By marketing the spread, Amgen demonstrated to the Defendant Oncology Practices the large sums of money that could be made by prescribing and administering the Covered Drugs to patients regardless of the clinical benefit to the patient. Given that many of cancer patients were terminal and desperate for any and all medical interventions, this patient population was uniquely vulnerable to receiving unnecessary medical care with no clinical benefit from Defendant Oncology Practices.

240.    Over time, Amgen increased the level of purchases required of the Defendant

Oncology Practices to receive a constant level of discounts, rebates, and other inducements to buy the Covered Drugs from Amgen. Amgen based the rebates it paid to the Defendant Oncology Practices not on the total amount of Covered Drugs these practices purchases, but, rather, on the potential for increased purchases from each practice. The Defendant Oncology Practices with the highest percentage increase in purchases received the highest rebate rates from Amgen, up to 50% of the costs of the drugs that the practice billed to the Government Healthcare Programs. Over time, Amgen raise the purchase level increases that the practices had to meet to receive the highest rebates. These increases in the amount of the Covered Drugs that had to be purchased to obtain the same level of rebate were significantly greater than the actual growth in the oncology patient population. Because the patient population was increasing at a much slower rate, the Defendant Oncology Practices that desired to continue to receive these significant rebates had to find some means to increase their use of the Covered Drugs. In short, Amgen provided financial inducements to Defendant Oncology Practices to increase the amount of Covered Drugs – particularly Aranesp – used in by the Defendant Oncology Practices. How this specific increase was achieved by each Defendant Oncology Practice was different for each practice. Patients of the Defendant Oncology Practices experiencing anemia associated with chemotherapy treatment for cancer were provided higher doses of Aranesp. Other Covered Drugs were also used at a higher rate for those patients for whom there was an FDA-approved indication. Also, the Defendant Oncology Practices expanded the patient population for using these Covered Drugs – including non-FDA approved uses – or "off-label" uses – of the Covered Drugs.

241.    Amgen stood at the center of this scheme, providing billions of dollars in rebates to the Defendant Oncology Practices and other community oncology practices wherein these

practices had already received full reimbursement for these Covered Drugs through Government

Healthcare Programs.  The Defendant Oncology Practices did their part to further the scheme by

prescribing more and more Aranesp and other Covered Drugs to more and more patients, not on

the basis of clinical benefit or medical necessity, but based upon the profits that were being made

by the Defendant Oncology Practices in using these Covered Drugs.  As alleged elsewhere in

this Complaint, the Defendant Oncology Practices did not report these rebates, discounts and

other things of value received from Amgen to the Government Healthcare Programs and did not

reimburse the Government Healthcare Programs for the "double reimbursement" the Defendant

Oncology Practices received for prescribing and administering the Covered Drugs.

242.    Amgen initiated the conspiracy and was at its center, serving as the "hub."  Each

of the Defendant Oncology Practice was connected to the conspiracy through Amgen, as a

"spoke."  Amgen's primary goal for the conspiracy was to increase its sales of the Covered

Drugs, and, hence, its revenues and profits.

243.     In undertaking the actions described herein, Amgen and the Defendant Oncology

Practices became participants in and the primary beneficiaries of the conspiracy to defraud

Government Healthcare Programs of money.

244.    Amgen's actions, as alleged, in combination with those of the Defendant

Oncology Practices, constituted a conspiracy to defraud third-party payers, including

Government Healthcare Programs of money by failing to disclose the discounted, actual charge

for the Covered Drugs paid by the Defendant Oncology Practices.  By failing to disclose to

Government Healthcare Program the rebates, discounts and other things of value the Defendant

Oncology Practices received as an agreed term governing their purchases of the Covered Drugs

under their Amgen Portfolio Contracts, the defendants caused Government Healthcare Programs

to over-reimburse the Defendant Oncology Practices, hence defrauding them of money.

245. The rebates and other inducements by Amgen to the Defendant Oncology Practices to generate greater and greater purchases of the Covered Drugs made the reimbursements obtained by the Defendant Oncology Practices from Government Healthcare Programs fraudulent wherein these reimbursements were for a higher dosing of the Covered Drugs in patients without clinical benefit and/or the use of these Covered Drugs was in patients without any clinical benefit or medical need.

246. The primary goal the Defendant Oncology Practices sought from their participation in the conspiracy was increased revenues and profits.  The Defendant Oncology Practices achieved that goal, in part, by obtaining rebates, discounts, overfill, and samples from Amgen, thereby reducing the cost of the Covered Drugs.

247. Under the Amgen Portfolio Contract, to the extent the Defendant Oncology Practices were able to achieve higher levels of use of the Covered Drugs, their cost to purchase these drugs from Amgen decreased, providing them with increased revenues and increase per-unit profits; the Defendant Oncology Practices were also able to increase their revenues and profits from prescriptions they wrote and drugs they administered for patients receiving benefits under Government Healthcare Programs by failing to disclose to program administrators the rebates, discounts and other things of value they were being paid by Amgen for writing prescriptions and administering the Covered Drugs, all of which lowered the effective cost of the Covered Drugs to them, such disclosure being required by program rules and by provisions in their Amgen Portfolio Contracts as described in this complaint herein.  The Defendant Oncology Practices therefore received far more in reimbursements for the Covered Drugs from Government Healthcare Programs than they in fact had paid for the Covered Drugs and were

lawfully entitled to receive.

248.    The rapid growth in purchases and administration of the Covered Drugs during the Covered Period by the Defendant Oncology Practices cannot be justified based upon clinical benefit or medical need.  The administration of the Covered Drugs by the Defendant Oncology Practices during the Covered Period increased at a rate far higher than any increase in the incidence of applicable cancer or the treatment of cancer by the Defendant Oncology Practices

249.    Amgen and the defendant Oncology Practices worked together to effectuate Amgen's scheme of increasing its profits on the Covered Drugs and increasing the practices' profits by obtaining excess payments for the drugs they administered to their patients.  Amgen sold the Covered Drugs to the defendant Oncology Practices for a price listed on an invoice.  The Defendant Oncology Practices administered the drugs to their patients and submitted the invoices to the Government Healthcare Programs to obtain reimbursement.  When the Defendant Oncology Practices presented these claims to the Government, they knew they were false.  They knew the claims for reimbursement were false because they knew that Amgen would soon pay them a rebate of as much as 50% of the fake price listed on the invoice.  The Defendant Oncology Practices also knew that Amgen wanted to increase it sales of Aranesp, especially at the expense of Procrit.  They knew that to continue to receive the highest rebates, they had to increase the growth of the amount of Aranesp they prescribed at ever increasing rates.  They knew that they had to prescribe Aranesp to more and more patients for more and more reasons at higher and higher doses.  By encouraging the Defendant Oncology Practices to submit false claims to Government Healthcare Programs, Amgen recruited the Defendant Oncology Practices into an overarching, massive, billion-dollar scheme to defraud federal- and state-sponsored healthcare programs.  Although the scheme had hundreds of participants, there was a single,

90

overarching goal:  increasing Amgen's revenues and profits and increasing the revenues and profits of the Defendant Oncology Practices by fraudulently causing payments to be made by Government Healthcare Programs to Defendant Oncology Practices.  Amgen could not have achieved its objectives without the participation of hundreds of the Defendant Oncology Practices, and the Defendant Oncology Practices could not have achieved their goals without Amgen.  Amgen was therefore at the center of a massive conspiracy to defraud the Federal Government and each of the Defendant Oncology Practices were part of that conspiracy.   Each of the Defendant Oncology Practices is jointly and severally liable for the losses the Government Healthcare Programs suffered as a result of the scheme.

250.    Amgen and the Defendant Oncology Practice engaged in a scheme to defraud the Government Healthcare Programs, the United States Government, and the governments of several States, as herein described.  The actions that Amgen and the Defendant Oncology Practices took in furtherance of that scheme, as described with particularity above, were both legal and illegal, and included:

a.    Violating the False Claims Act by knowingly presenting false claims for reimbursement to Government Healthcare Programs in violation of 31 U.S.C. §§ 3729 *et seq.*;

b.    Defrauding the US Government in violation of 18 U.S.C. § 371;

c.    Using mail and interstate wire communication to commit a fraud, in violation of 18 U.S.C. §§ 1341 & 1343;

d.    Prescribing and administering medications that were not medically indicated at all or at doses that were higher than medically indicated, in violation of various state statutes and state standards of medical ethics;

     e.     Falsely reporting its prices for Aranesp and other drugs to drug pricing

          compendia (such as First Data Bank) – specifically, AWP and Wholesale

          Acquisition Costs ("WAC");

     f.     Running a criminal enterprise in violation of 15 U.S.C. § 1961 by

          engaging in a pattern of illegal activities included major fraud, mail fraud,

          and wire fraud

251.    The hub and spoke conspiracy between Amgen on the one hand and the

Defendant Oncology Practices on the other resulting in the defrauding of Government

Healthcare Programs by the submission of false claims for payment and knowledge that these

claims were false.

252.    All of the Defendant Oncology Practices who participated in the scheme are

jointly and severally with each other for the full amount of the fraud.  Given Amgen's conduct

described herein, Amgen could be jointly and severally liable, but as Amgen has not been named

as a defendant, there is no claim for liability as to Amgen in this complaint.

## COUNT ONE

### Violation of False Claims Act, 31 U.S.C. § 3729(a)
### as to Defendant Oncology Practices as Specified Herein

253.    Relator realleges and incorporates by reference the allegations of paragraphs 1-

229 of this Complaint.

231.    This count sets forth claims for treble damages and forfeitures under the federal

False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

232.    As described above, the defendant Oncology Practices, and each of them named and specified herein, have engaged in fraudulent activities including but not limited to purchasing the Covered Drugs and submitting claims to Government Healthcare Programs for payment, or "reimbursement," for these drugs in order to receive rebates, discounts and other financial incentives to purchase the Covered Drugs from Amgen.  The defendant Oncology Practices have, furthermore, prescribed and submitted claims payment, or "reimbursement," of the cost of the Covered Drugs purchased from Amgen to Government Healthcare Programs that failed to account for the rebates, discounts, drug "overfills," kickbacks and other financial incentives received from Amgen under various purchase incentive programs that were tied to the level, or volume, of such purchases.  The defendant Oncology Practices have, furthermore, prescribed and submitted claims payment, or "reimbursement," of the cost of the Covered Drugs purchased from Amgen to Government Healthcare Programs for the Covered Drugs that were administered to patients when not medically necessary or, while medically necessary, were administered in an amount greater than medically necessary for the patient or in an amount greater than necessary to obtain the medical benefit for the patient.

233.    The defendants have knowingly violated:

a.    31 U.S.C. § 3729(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

b.    31 U.S.C. § 3729(a)(2) by knowingly making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government; and/or

93

c.      31 U.S.C. § 3729(a)(3) by conspiring to defraud the United States

Government by getting a false or fraudulent claim allowed or paid.

234.    By reason of the defendants' false and fraudulent activities, the United States has

been damaged, and may continue to be damaged.

## COUNT TWO

### Violation of California False Claims Act, Cal. Gov. Code § 12650 *et seq.*

### as to Defendant US Oncology Specialty, LP

235.    Relator realleges and incorporates by reference the allegations of paragraphs 1-

234 of this Complaint.

236.    This is a claim for treble damages and penalties under the California False Claims

Act.

237.    At all relevant times herein, defendant US Oncology Specialty, LP did business in

the State of California.

238.    As described above, the defendant US Oncology Specialty, LP has engaged in

false and fraudulent activities including but not limited to purchasing the Covered Drugs and

submitting to the State of California claims for reimbursement of the cost of these drugs that did

not disclose to the State of California the fact that the defendant US Oncology Specialty, LP

received discounts, rebates, drug "overfills," kickbacks and other things of value from Amgen

for buying the Covered Drugs that were not properly disclosed to the State of California nor was

the State of California provided its proportionate share of the discounts, rebates, kickbacks and

other things of value received from Amgen.

94

239.    As described above, the defendant US Oncology Specialty, LP has engaged in false and fraudulent activities, including but not limited to, purchasing the Covered Drugs and submitting claims to the State of California for "reimbursement," or payment, for the cost of these drugs.  The defendant US Oncology Specialty, LP prescribed and administered the Covered Drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of California for these improperly and fraudulently prescribed and administered drugs.

240.    As described herein, defendant US Oncology Specialty, LP has knowingly violated California's False Claims Act by submitting these false claims and omitting material information such that the State of California, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not have been paid but for the illegal acts of defendant US Oncology Specialty, LP.

241.    By reason of the acts described herein, the State of California has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

242.    The State of California is, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the defendant US Oncology Specialty, LP.

## COUNT THREE

**Violation of Florida False Claims Act, Fl. Stat. § 66.081 *et seq*.**

**as to Defendants US Oncology Specialty, LLP, Florida Cancer Specialists and Research Institute, Gulfcoast Oncology Associates, Integrated Community Oncology Network, LLC, Hematology and Oncology Associates of the Treasure Coast, Mid Florida Hematology and Oncology Centers, P.A., Pasco Hernando Oncology Associates, P.A., Regional Consultants in Hematology and Oncology, Coastal Oncology, PL, Stuart Oncology Associates, P.A., Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center, and David Dresdner, M.D.**

**("Florida Oncology Practices")**

243.    Relator realleges and incorporates by reference the allegations of paragraphs 1-242 of this Complaint.

244.    This is a claim for treble damages and penalties under the Florida False Claims Act.

245.    At all relevant times herein, defendants US Oncology Specialty, LLP, Florida Cancer Specialists and Research Institut, Gulfcoast Oncology Associates, Integrated Community Oncology Network, LLC, Hematology and Oncology Associates of the Treasure Coast, Mid Florida Hematology and Oncology Centers, P.A., Pasco Hernando Oncology Associates, P.A., Regional Consultants in Hematology and Oncology, Coastal Oncology, PL, Stuart Oncology Associates, P.A., Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center, and David Dresdner, M.D. ("Florida Oncology Practices") did business in the State of Florida.

96

246.     As described above, the defendant Florida Oncology Practices have engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Florida for reimbursement for these drugs.  The defendant Florida Oncology Practices received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Florida nor was the State of Florida provided its proportionate share of any discount received.

247.     As described above, the defendant Florida Oncology Practices have engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Florida for reimbursement for these drugs.  The defendant Florida Oncology Practices prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, the defendant Florida Oncology Practices then sought reimbursement from the State of Florida for these improperly and fraudulently prescribed and administered drugs.

248.     As described herein, defendants have knowingly violated Florida's False Claims Act by submitting these false claims and omitting material information such that the State of Florida, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of the defendant Florida Oncology Practices.

249.     By reason of the acts described herein, the State of Florida has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

250.     The State of Florida, is, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant Florida Oncology Practices.

## COUNT FOUR

**Violation of Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq*.**

**as to Defendants US Oncology Specialty, LLP, Georgia Cancer Specialists Administrative Annex, Northwest Georgia Oncology Centers, P.C., Augusta Oncology Associates, Central Georgia Cancer Care, Southeast Georgia Hematology/Oncology Associates, P.C.**

**("Georgia Oncology Practices")**

251.     Relator realleges and incorporates by reference the allegations of paragraphs 1-250 of this Complaint.

252.     This is a claim for damages and penalties under the Georgia False Medicaid Claims Act.

253.     At all relevant times herein, defendants US Oncology Specialty, LLP, Georgia Cancer Specialists Administrative Annex, Northwest Georgia Oncology Centers, P.C., Augusta Oncology Associates, Central Georgia Cancer Care, Southeast Georgia Hematology/Oncology Associates, P.C. ("Georgia Oncology Practices") did business in the State of Georgia.

254.     As described above, the defendant Georgia Oncology Practices have engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and

submitting claims to the State of Geogia for reimbursement for these drugs.  The defendant

Georgia Oncology Practices received financial incentives and kickbacks from Amgen that were

not properly disclosed to the State of Georgia nor was the State of Georgia provided its

proportionate share of any discount received.

255.    As described above, the defendant Georgia Oncology Practices have engaged in

fraudulent activities including but not limited to selling and purchasing the Covered Drugs and

submitting claims to the State of Georgia for reimbursement for these drugs.  The defendant

Georgia Oncology Practices prescribed and administered these drugs to patients without medical

necessity or in amount greater than medically necessary for a patient or in an amount greater

than necessary to obtain the medical benefit for the patient.  Despite administering these drugs

without medical benefit or necessity or in excess of what would be required to obtain the

medical benefit or necessity, the defendant Georgia Oncology Practices then sought

reimbursement from the State of Georgia for these improperly and fraudulently prescribed and

administered drugs.

256.    As described herein, defendants have knowingly violated Georgia False Medicaid

Claims Act by submitting these false claims and omitting material information such that the

State of Georgia, not knowing that these claims were false and not aware of the omitted

information, paid these claims that would not be paid but for the illegal acts of defendant

Georgia Oncology Practices.

257.    By reason of the acts described herein, the State of Georgia has been damaged

and continues to be damaged in an amount to be fully calculated and stated at trial.

258.    The State of Georgia, is, furthermore, entitled to the maximum penalty for each

99

and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant Georgia Oncology Practices.

## COUNT FIVE

**Violation of Illinois Whistleblower Reward and Protection Act,**

**740 Ill. Comp. Stat. § 173/1 *et seq*. as to Defendant US Oncology Specialty, LP**

259. Relator realleges and incorporates by reference the allegations of paragraphs 1-258 of this Complaint.

260. This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

261. At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Illinois.

262. As described above, defendant Illinois US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Illinois for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Illinois nor was the State of Illinois provided its proportionate share of any discount received.

263. As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Illinois for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in

100

amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Illinois for these improperly and fraudulently prescribed and administered drugs.

264.    As described herein, defendant US Oncology Specialty, LP has knowingly violated Illinois Whistleblower Reward and Protection Act by submitting these false claims and omitting material information such that the State of Illinois, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

265.    By reason of the acts described herein, the State of Illinois has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

266.    The State of Illinois, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

**COUNT SIX**

**Violation of Indiana False Claims and Whistleblower Act, In. Code 5-11-5.5 *et seq*.**

**as to Defendant US Oncology Specialty, LP**

267.    Relator realleges and incorporates by reference the allegations of paragraphs 1-266 of this Complaint.

268.    This is a claim for treble damages and penalties under the Indiana False Claims

and Whistleblower Act.

269.    At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Indiana.

270.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Indiana for reimbursement for these drugs.  Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Indiana nor was the State of Indiana provided its proportionate share of any discount received.

271.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Indiana for reimbursement for these drugs.  Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Indiana for these improperly and fraudulently prescribed and administered drugs.

272.    As described herein, Defendant US Oncology Specialty, LP has knowingly violated Indiana False Claims and Whistleblower Act by submitting these false claims and omitting material information such that the State of Indiana, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for

the illegal acts of defendant Indiana Oncology Practices.

273.    By reason of the acts described herein, the State of Indiana has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

274.    The State of Indiana, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant Indiana Oncology Practices.

### COUNT SEVEN

**Violation of Louisiana Medical Assistance Programs Integrity Law,**

**La. Rev. Stat. § 46: 437 *et seq*. as to Defendant US Oncology Specialty, LP**

275.    Relator realleges and incorporates by reference the allegations of paragraphs 1-274 of this Complaint.

276.    This is a claim for damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

277.    At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Louisiana.

278.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Louisiana for reimbursement for these drugs.  Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Louisiana nor was the State of Louisiana provided its proportionate share of any discount received.

279.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Louisiana for reimbursement for these drugs.  Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Louisiana for these improperly and fraudulently prescribed and administered drugs.

280.     As described herein, defendant US Oncology Specialty, LP has knowingly violated Louisiana's Medical Assistance Programs Integrity Law by submitting these false claims and omitting material information such that the State of Louisiana, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

281.     By reason of the acts described herein, the State of Louisiana has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

282.     The State of Louisiana, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant US Oncology Specialty, LP.

## COUNT EIGHT

## Violation of Massachusetts False Claims Law, Mass. Gen. Laws Ch. 12 § 5(B) *et seq.* as to Defendant US Oncology Specialty, LP

283.     Relator realleges and incorporates by reference the allegations of paragraphs 1-282 of this Complaint.

284.     This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

285.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the Commonwealth of Massachusetts.

286.     As described above, defendant US Oncology Specialty, LP has engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Massachusetts for reimbursement for these drugs.  The defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the Commonwealth of Massachusetts nor was the Commonwealth of Massachusetts provided its proportionate share of any discount received.

287.     As described above, defendant US Oncology Specialty, LP has engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the Commonwealth of Massachusetts for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be

required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the Commonwealth of Massachusetts for these improperly and fraudulently prescribed and administered drugs.

288.    As described herein, defendant US Oncology Specialty, LP has knowingly violated the Massachusetts False Claims Law by submitting these false claims and omitting material information such that the Commonwealth of Massachusetts, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

289.    By reason of the acts described herein, the Commonwealth of Massachusetts has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

290.    The Commonwealth of Massachusetts, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

## COUNT NINE

### Violation of Michigan Medicaid False Claims Act, M.C.L. 400.601 *et seq*.
### as to Defendant US Oncology Specialty, LP

291.    Relator realleges and incorporates by reference the allegations of paragraphs 1-290 of this Complaint.

292.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

293.    At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Michigan.

294.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Michigan for reimbursement for these drugs.  Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Michigan nor was the State of Michigan provided its proportionate share of any discount received.

295.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Michigan for reimbursement for these drugs.  Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Michigan for these improperly and fraudulently prescribed and administered drugs.

296.    As described herein, defendant US Oncology Specialty, LP knowingly violated the Michigan Medicaid False Claims Act by submitting these false claims and omitting material information such that the State of Michigan, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

107

297.     By reason of the acts described herein, the State of Michigan has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

298.     The State of Michigan, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

## COUNT TEN

### Violation of New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq*.
### as to Defendant US Oncology Specialty, LP

299.     Relator realleges and incorporates by reference the allegations of paragraphs 1-298 of this Complaint.

300.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

301.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of New Jersey.

302.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of New Jersey for reimbursement for these drugs.  Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of New Jersey nor was the State of New Jersey provided its proportionate share of any discount received.

303.     As described above, defendant US Oncology Specialty, LP have engaged in

fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of New Jersey for reimbursement for these drugs.  Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of New Jersey for these improperly and fraudulently prescribed and administered drugs.

304.   As described herein, defendant US Oncology Specialty, LP knowingly violated the New Jersey False Claims Act by submitting these false claims and omitting material information such that the State of New Jersey, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

305.   By reason of the acts described herein, the State of New Jersey has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

306.   The State of New Jersey, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

**COUNT ELEVEN**

**Violation of New York False Claims Act, N.Y. Stat. Fin. § 187 *et seq*.**

**as to Defendant US Oncology Specialty, LP**

307.    Relator realleges and incorporates by reference the allegations of paragraphs 1-306 of this Complaint.

308.    This is a claim for treble damages and penalties under the New York False Claims Act.

309.    At all relevant times herein, Defendant US Oncology Specialty, LP did business in the State of New York.

310.    As described above, defendant US Oncology Specialty, LPengaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of New York for reimbursement for these drugs.  Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of New York nor was the State of New York provided its proportionate share of any discount received.

311.    As described above, defendant US Oncology Specialty, LPengaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of New York for reimbursement for these drugs.  Defendant US Oncology Specialty, LPprescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or

110

necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of New York for these improperly and fraudulently prescribed and administered drugs.

312.     As described herein, defendant US Oncology Specialty, LP knowingly violated the New York False Claims Act by submitting these false claims and omitting material information such that the State of New York, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

313.     By reason of the acts described herein, the State of New York has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

314.     The State of New York, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant US Oncology Specialty, LP.

## COUNT TWELVE

### Violation of Oklahoma Medicaid False Claims Act, 63 OK. Stat. § 5053, *et seq*.
### as to Defendant US Oncology Specialty, LP

315.     Relator realleges and incorporates by reference the allegations of paragraphs 1-314 of this Complaint.

315.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

316.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Oklahoma.

317.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Oklahoma for reimbursement for these drugs.  Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Oklahoma nor was the State of Oklahoma  provided its proportionate share of any discount received.

318.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Oklahoma for reimbursement for these drugs.  The defendant Oklahoma Oncology Practices prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Oklahoma for these improperly and fraudulently prescribed and administered drugs.

319.    As described herein, defendant US Oncology Specialty, LP knowingly violated the Oklahoma Medicaid False Claims Act by submitting these false claims and omitting material information such that the State of Oklahoma, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

320.    By reason of the acts described herein, the State of Oklahoma has been damaged

112

and continues to be damaged in an amount to be fully calculated and stated at trial.

321.     The State of Oklahoma furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.


## COUNT THIRTEEN

**Violation of Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002 *et seq*. as to Defendant US Oncology Specialty, LP.**

322.     Relator realleges and incorporates by reference the allegations of paragraphs 1-321 of this Complaint.

323.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

324.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Texas.

325.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Texas for reimbursement for these drugs.  Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Texas nor was the State of Texas provided its proportionate share of any discount received.

326.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting

claims to the State of Texas for reimbursement for these drugs.  Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Texas for these improperly and fraudulently prescribed and administered drugs.

327.    As described herein, defendant US Oncology Specialty, LP knowingly violated the Texas Medicaid False Claims Act by submitting these false claims and omitting material information such that the State of Texas, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

328.    By reason of the acts described herein, the State of Texas has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

329.    The State of Texas, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant US Oncology Specialty, LP.

## COUNT FOURTEEN

**Violation of Virginia False Claims Act, Va. Code Ann. § 8.01-216.3(a) *et seq*.**

**as to Defendant US Oncology Specialty, LP**

330.     Relator realleges and incorporates by reference the allegations of paragraphs 1-329 of this Complaint.

331.     This is a claim for treble damages and penalties under the Virginia False Claims Act.

332.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the Commonwealth of Virginia.

333.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the Commonwealth of Virginia for reimbursement for these drugs.  Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the Commonwealth of Virginia nor was the Commonwealth of Virginia its proportionate share of any discount received.

334.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the Commonwealth of Virginia for reimbursement for these drugs.  Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient.  Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the

medical benefit or necessity, defendant US Oncology Specialty, LP sought reimbursement from the Commonwealth of Virginia for these improperly and fraudulently prescribed and administered drugs.

335.   As described herein, defendant US Oncology Specialty, LP knowingly violated the Virginia False Claims Act by submitting these false claims and omitting material information such that the Commonwealth of Virginia, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

336.   By reason of the acts described herein, the Commonwealth of Virginia has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

337.   The Commonwealth of Virginia, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against defendants, ordering that:

a.   Defendants pay an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty against defendants of not less than $5,500, and not more than $11,000 for each violation of 31 U.S.C. § 729;

b.   Defendants pay an amount equal to three times the amount of damages the State of California has sustained because of defendants' actions, plus all applicable civil penalties for each violation of California Government Code § 12650(a);

116

c.        Defendants pay an amount equal to three times the amount of damages the State of Florida has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Florida Statute § 66.082;

d.        Defendants pay an amount equal to three times the amount of damages the State of Georgia has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Georgia Statute § 49-4-168, *et seq.*;

e.        Defendants pay an amount equal to three times the amount of damages the State of Illinois has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Illinois Comp. Statute § 175/3(a);

f.        Defendants pay an amount equal to three times the amount of damages the State of Indiana has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Indiana Code 5-11-5.5, *et seq.*;

g.        Defendants pay an amount equal to three times the amount of damages the State of Louisiana has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Louisiana Revised Statute § 437, *et seq.*;

h.        Defendants pay an amount equal to three times the amount of damages the State of Massachusetts has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Massachusetts General Laws Chapter 12 § 5B;

i.        Defendants pay an amount equal to three times the amount of damages the State of Michigan has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Michigan C.L. 400.601, *et seq.*;

j.        Defendants pay an amount equal to three times the amount of damages the State

117

of New Jersey has sustained because of defendants' actions, plus all applicable civil penalties for each violation of N.J. Sat. § 2A:32C-1, *et seq.*;

k.       Defendants pay an amount equal to three times the amount of damages the State of New York has sustained because of defendants' actions, plus all applicable civil penalties for each violation of New York State Fin. § 187, *et seq.*;

l.       Defendants pay an amount equal to three times the amount of damages the State of Oklahoma has sustained because of defendants' actions, plus all applicable civil penalties for each violation of 63 Oklahoma Statute § 5053, *et seq.*;

m.       Defendants pay an amount equal to three times the amount of damages the State of Texas has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Texas Hum. Res. Code § 36.002;

n.       Defendants pay an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of defendants' actions, plus all applicable civil penalties for each violation of Va. Code Ann. § 8.01-216.3(a), *et seq.*;

o.       Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

p.       Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §3729, *et seq.*

q.       Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and all other applicable statutes including the False Claims Acts of the various states identified herein; and

118

r.      The United States and Relator be granted all such other relief as the Court deems just and proper.

Dated: April 28, 2014

/ s /

_____
Rob Hennig
California Bar No. 174646
Law Offices of Rob Hennig
1875 Century Park E., Suite 1770
Los Angeles, CA 90067
rob@robhennig.com
(310) 843-0020 Phone
(310) 843-9150 Fax
Admitted *Pro Hac Vice*
Attorney for Plaintiff/*Qui Tam* Relator

/ s /

_____
Hays Gorey, Jr.
D.C. Bar No. 330415
GeyerGorey LLP
1776 "Eye" Street, N.W., Suite 900
Washington, DC 20006
hays.gorey@geyergorey.com
(202) 644-8732 Phone
(703) 255-3848 Fax
Admitted *Pro Hac Vice*
Attorney for Plaintiff/*Qui Tam* Relator

119

**DEMAND FOR JURY TRIAL**

A trial by jury is requested in this case.

Dated: April 28, 2014

/ s /

_____

Rob Hennig
California Bar No. 174646
Law Offices of Rob Hennig
1875 Century Park E., Suite 1770
Los Angeles, CA 90067
rob@robhennig.com
(310) 843-0020 Phone
(310) 843-9150 Fax
Admitted *Pro Hac Vice*
Attorney for Plaintiff/*Qui Tam* Relator

/ s /

_____

Hays Gorey, Jr.
D.C. Bar No. 330415
GeyerGorey LLP
1776 "Eye" Street, N.W., Suite 900
Washington, DC 20006
hays.gorey@geyergorey.com
(202) 644-8732 Phone
(703) 255-3848 Fax
Admitted *Pro Hac Vice*
Attorney for Plaintiff/*Qui Tam* Relator

# EXHIBIT 1

# Amgen Portfolio Contract 2004/2005

## Rebate Schedules Example: $6M Total Class

| Quarterly Amgen Portfolio Volume | Base Rebates 3/1/2004 - 8/31/2004 | | Enhanced Rebates 9/1/2004 - 2/28/2006* | |
|---|---|---|---|---|
| | Aranesp® | Neupogen® / Neulasta® | Aranesp® | Neupogen® / Neulasta® |
| Tier 1 $750K | 5.0% | 5.0% | 5.0% | 5.0% |
| Tier 2 $900K | 11.5% | 7.5% | 11.5% | 7.5% |
| Tier 3 $975K | 13.5% | 10.5% | 18.5% | 10.5% |
| Tier 4 $1,050K | 14.5% | 11.5% | 19.5% | 11.5% |
| Tier 5 $1,125K | 17.5% | 13.5% | 22.5% | 13.5% |
| Tier 6 $1,200K | 18.0% | 20.0% | 23.0% | 20.0% |
| Tier 7 $1,275K | 23.0% | 25.0% | 28.0% | 25.0% |

* Quarterly Amgen Portfolio Volume target = Aranesp® + Neulasta® + Neupogen®.

For Internal Amgen Use Only



AMGEN®
Corporate Accounts

# Amgen Portfolio Contract 2004/2005

## Rebate Schedule Example: $3M Customer

Corporate Accounts

AMGEN®

| Quarterly Amgen Portfolio Volume | Base Rebates 3/1/2004 - 8/31/2004 | | Enhanced Rebates 9/1/2004 - 2/28/2006* | |
|---|---|---|---|---|
| | Aranesp® | Neupogen® / Neulasta® | Aranesp® | Neupogen® / Neulasta® |
| Tier 1 | $375K | 4.0% | 4.0% | 4.0% | 4.0% |
| Tier 2 | $450K | 10.5% | 6.5% | 10.5% | 6.5% |
| Tier 3 | $488K | 12.5% | 9.5% | 17.5% | 9.5% |
| Tier 4 | $525K | 13.5% | 10.5% | 18.5% | 10.5% |
| Tier 5 | $563K | 15.5% | 12.5% | 20.5% | 12.5% |
| Tier 6 | $600K | 16.0% | 16.0% | 21.0% | 16.0% |
| Tier 7 | $638K | 18.0% | 21.0% | 23.0% | 21.0% |

* Quarterly Amgen Portfolio Volume target = Aranesp® + Neulasta® + Neupogen®.

For Internal Amgen Use Only

# Amgen Portfolio Contract 2004/2005

## Rebate Schedule Example: $600K Customer



Corporate Accounts

| | Quarterly Amgen Portfolio Volume | Base Rebates 3/1/2004 - 8/31/2004 | | Enhanced Rebates 9/1/2004 - 2/28/2006* | |
|---|---|---|---|---|---|
| | | Aranesp® | Neupogen® / Neulasta® | Aranesp® | Neupogen® / Neulasta® |
| Tier 1 | $75K | 3.0% | 3.0% | 3.0% | 3.0% |
| Tier 2 | $90K | 8.5% | 5.5% | 8.5% | 5.5% |
| Tier 3 | $98K | 10.0% | 8.5% | 15.0% | 8.5% |
| Tier 4 | $105K | 11.0% | 9.5% | 16.0% | 9.5% |
| Tier 5 | $113K | 12.0% | 11.5% | 17.0% | 11.5% |
| Tier 6 | $120K | 13.0% | 14.0% | 18.0% | 14.0% |
| Tier 7 | $128K | 15.0% | 16.0% | 20.0% | 16.0% |

* Quarterly Amgen Portfolio Volume target = Aranesp® + Neulasta® + Neupogen® .

For Internal Amgen Use Only

# EXHIBIT 2

# Amgen Portfolio Contract 2004/2005

**AMGEN**

*Corporate Accounts*

## Contract Terms – Off-invoice Discount

| | Current Off-Invoice Discount | Special 6 Month Incremental Discount * | Total Off-Invoice Discount |
|---|---|---|---|
| Aranesp® (Darbepoetin alfa) | 5.0% | 5.0% | 10.0% |
| Neulasta® (pegfilgrastim) | 5.0% | | 5.0% |
| NEUPOGEN® (Filgrastim) | 3.0% | | 3.0% |
| NEUPOGEN® SingleJect® ** | 10.7% | | 10.7% |

\* Incremental Off-invoice discounts will be in effect March 1, 2004, through August 31, 2004.

\*\* Neupogen® SingleJect® on a net cost basis is 1% more expensive than vials.

- Incremental 5% Off-invoice discount effective 3/1/04 – 8/31/04. Beginning 9/1/04, incremental off-invoice discounts for Aranesp® will be added to product rebate tiers for eligible customers with an Amgen Portfolio Volume at the Tier 3 or higher level.

For Internal Amgen Use Only