UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA ex rel.
DON HANKS, et al.

                Plaintiffs,

      -against-

U.S. ONCOLOGY SPECIALTY, LLP et al.,

                Defendants.

No. 08-cv-3096-SJ-RML

Hon. Sterling Johnson, Jr.

ORAL ARGUMENT REQUESTED

---

**REPLY IN SUPPORT OF MOTION BY DEFENDANTS FLORIDA CANCER SPECIALISTS, P.L., AYUB, SOKOL, MATZKOWITZ AND SENNABAUM, M.D.S, P.A. D/B/A NEW HOPE CANCER CENTER, COASTAL ONCOLOGY, P.L., J. PAONESSA, M.D., P.A., AND PASCO HERNANDO ONCOLOGY ASSOCIATES, P.A. ("PHYSICIAN PRACTICES") TO DISMISS THE FIFTH AMENDED COMPLAINT**

Michael P. Matthews (*pro hac vice*)
FOLEY & LARDNER LLP
100 N. Tampa Street, Suite 2700
Tampa, Florida 33602-5810
mmatthews@foley.com

Rachel E. Kramer
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
rkramer@foley.com

Lawrence M. Kraus (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199-7610
lkraus@foley.com

*Attorneys for Florida Cancer Specialists, P.L. (sued herein as Florida Cancer Specialists & Research Institute); Ayub, Sokol, Matzkowitz and Sennabaum, M.D.s, P.A. d/b/a New Hope Cancer Center; Coastal Oncology, P.L.; J. Paonessa, M.D., P.A. (sued herein as Gulfcoast Oncology Associates); and Pasco Hernando Oncology Associates, P.A.*

JOINED BY:

Philip Furgang
Armando Llorens
FURGANG & ADWAR, L.L.P.
1325 Avenue of the Americas, 28th Fl.
New York, New York 10019
philip@furgang.com
armando@furgang.com

*Attorneys for Defendant Cancer Institute of Florida, P.A.*

**TABLE OF CONTENTS**

I.      Hanks Admits That His Claims are Based on an Error of Law, and His New Theory
        that Volume-Based Discounts Are Illegal Is Also Erroneous ................................................1

II.     Hanks Fails to Satisfy Rule 9(b), and Amendment Would Not Cure the Deficiencies .......3

        A.      Hanks Cannot Point to Any Allegations Sufficient to Meet the 9(b) Standard .......3

        B.      Hanks Is Not Entitled to Leave to Amend ..............................................................8

III.    Multiple Public Disclosures Revealed the Alleged Scheme Long Before Hanks Sued,
        and He Fails to Show That He is an Original Source ........................................................10

        A.      Hanks' Claims Are Substantially Similar to Prior Public Disclosures .................10

        B.      Hanks Is Not An Original Source of the Disclosures
                or Any Material New Fact. .....................................................................................12

IV.     Hanks Concedes That His Claims Are Barred in Part by the Statute of Limitations ........13

        CONCLUSION ....................................................................................................................14

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*A-1 Ambulance Serv., Inc.* v. *Cal.*,
  202 F.3d 1238 (9th Cir. 2000) ........................................................................12

*U.S. ex rel. Banignan v. Organon USA Inc.*,
  883 F. Supp. 2d 277 (D. Mass. 2012) ....................................... 2, 3, 4, 11

*Boykin v. Key Bank N.A.*,
  521 F.3d 202 (2d Cir. 2008) ............................................................................7

*U.S. ex rel. Clausen v. Lab. Corp. of Am.*,
  290 F.3d 1301 (11th Cir. 1990) ...................................................................6, 7

*Cooper v. Blue Cross & Blue Shield of Fla., Inc.*,
  19 F.3d 562 (11th Cir. 1994) ..........................................................................12

*U.S. ex rel. Corporate Compliance Assocs. v. N.Y. Soc'y for the Relief of the Ruptured &
  Crippled, Maintaining the Hosp. for Special Surgery*,
  No. 07-292, 2014 U.S. Dist. LEXIS 109786 (S.D.N.Y. Aug. 7, 2014) ...................................6

*U.S. ex rel. Cosens v. Yale-New Haven Hosp.*
   F. Supp. 2d 319, 329 (D. Conn. 2002) ...................................................12

*U.S. ex rel. Doe v. John Doe Corp.*,
  960 F.2d 318 (2d Cir. 1992) ......................................................................10, 11

*U.S. ex rel. Fine v. Sandia Corp.*,
  70 F.3d 568, 571-72 (10th Cir. 1995) .........................................................12

*Foglia v. Renal Ventures Mgmt., LLC*,
  754 F.3d 153 (3d Cir. 2014) ..........................................................................4, 5

*U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*,
  436 F.3d 726 (7th Cir. 2006) ..........................................................................11

*Glaser v. Wound Care Consultants, Inc.*,
  570 F.3d 907 (7th Cir. 2009) ..........................................................................10

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
  130 S. Ct. 1396 (2010) ......................................................................................12

*U.S. ex rel. Harris v. Bernad*,
  275 F. Supp. 2d 1 (D.D.C. 2003) ....................................................................7

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) ......................................................................................... 7

*U.S. ex rel. Hill v. Morehouse Med. Assocs.*,
  No. 02-14429, 2003 U.S. App. LEXIS 27956 (11th Cir. Aug. 15, 2003) ................................ 7

*U.S. ex rel Johnson v. Shell Oil Co.*,
  183 F.R.D. 204 (E.D. Tex. 1998) .................................................................................... 7

*U.S. ex rel. Kester v. Novartis Pharms. Corp.*,
  2014 U.S. Dist. LEXIS 74461, at *38-39 (S.D.N.Y. May 29, 2014) ................................... 4, 5

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
  601 F.3d 94 (2d Cir. 2010), *rev'd on other* ................................................................ 10, 12

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
  985 F.2d 1148 (2d Cir. 1993) ..................................................................................... 11, 13

*LaFlamme v. Societe Air Fr.*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) ............................................................................. 9

*Mikes v. Straus*,
  274 F.3d 687 (2d Cir. 2001) ........................................................................................... 6

*Minotti v. Lensink*,
  895 F.2d 100 (2d Cir. 1990) ......................................................................................... 11

*U.S. ex rel. Mooney v. Americare, Inc.*,
  No. 06-CV-1806, 2013 U.S. Dist. LEXIS 48398 (E.D.N.Y. Apr. 3, 2013) ............................ 4

*U.S. ex rel. Moore v. GlaxoSmithKline, LLC*,
  No. 06 Civ 6047, 2013 U.S. Dist. LEXIS 165205 (E.D.N.Y. Oct. 16, 2013) ............. 4, 5, 6, 8

*N.H. Ins. Co. v. Total Tool Supply, Inc.*,
  621 F. Supp. 2d 121 (S.D.N.Y. 2009) ............................................................................ 10

*In re Natural Gas Royalties Qui Tam Litig.*,
  562 F.3d 1032 (10th Cir. 2009) .................................................................................... 12

*U.S. ex rel. Paulos v. Stryker Corp.*,
  No. 13-2509, 2014 U.S. App. LEXIS 15199 (8th Cir. Aug. 7, 2014) ................................. 10

*Payne v. United States*,
  247 F.2d 481 (8th Cir. 1957) .......................................................................................... 7

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  307 F. Supp. 2d 196 (D. Mass. 2004) ............................................................................. 7

*In re Pharm. Indus. AWP Litig.*,
    538 F. Supp. 2d 367 (D. Mass. 2008) ................................................................12

*U.S. ex rel Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*,
    238 F. Supp. 2d 258 (D.D.C. 2002) ....................................................................7

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
    No. 04-cv-0704, 2009 U.S. Dist. LEXIS 43438 (E.D.N.Y. May 22, 2009) ............................4

*Sait Commc'ns, Inc. v. Chapman*,
    No. 91-3743, 1992 U.S. Dist. LEXIS 12079 (E.D.N.Y. July 30, 1992)....................................8

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
    131 S. Ct 1885 (2011) ..............................................................................10, 12

*U.S. ex rel. Smith v. N.Y. Presbyterian Hosp.*,
    No. 06 Civ. 4056 (NRB), 2007 U.S. Dist. LEXIS 53826 (S.D.N.Y. Jul. 18, 2007) ................9

*U.S. ex rel. Smith v. Yale Univ.*,
    415 F. Supp. 2d 58 (D. Conn. 2006) ....................................................................7

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,
    14 F.3d 645, 655 (D.C. Cir. 1994) ....................................................................12

*U.S. ex rel. Stewart v. La. Clinic*,
    No. 99-1767, 2002 U.S. Dist. LEXIS 3170 (E.D. La. Feb. 21, 2002) ......................................7

*Wood ex rel. U.S. v. Applied Research Assocs.*,
    328 Fed. App'x 744 (2d Cir. 2009) ....................................................................4

*United States v. N.Y. Med. Coll.*,
    252 F.3d 118 (2d Cir. 2001) ..............................................................................13

*United States v. Dialysis Clinic, Inc.*,
    No. 09-cv-00710, 2011 U.S. Dist. LEXIS 4862 (N.D.N.Y. Jan. 19, 2011) ........................8, 9

*U.S. ex. rel. Wang v. FMC Corp.*,
    975 F.2d 1412 (9th Cir. 1992) ......................................................................12, 13

**Statutes**

31 U.S.C. § 3730(e)(4) ..............................................................................11

Fed. R. Civ. P. 8(a) ......................................................................................7

Fed. R. Civ. P. 9(b) ..................................................................................4-8

Fed. R. Civ. P. 12(b)(6) ..............................................................................3

**Other Authorities**

*Medicare and State Health Care Programs*
    64 Fed. Reg. 63,518 (Nov. 19, 1999) .......................................................................... 1

*OIG Compliance Program Guidance for Pharmaceutical Manufacturers* OIG, Adv. Op. 13-07,
    Adv. Op. 13-07 (June 24, 2013) ................................................................................ 1

Andrew Pollack, "Amgen to Pay $780 Million to Settle Suits on Its Sales,"
    *N.Y. Times*, October 24, 2011 ................................................................................ 11

I.     **Hanks Admits That His Claims are Based on an Error of Law, and His New Theory That Volume-Based Discounts Are Illegal Is Also Erroneous.**

Relator Don Hanks' Memorandum of Law in Response and Opposition ("Opp.") confirms that the government was correct in declining to intervene to sue the Defendant Physician Practices. On the case's central issue, Hanks admits that he erroneously relied on a *proposed* but never adopted Anti-Kickback Statute ("AKS") safe harbor rule, rather than the adopted *final* rule that does *not* require reporting of rebates and discounts by non-cost-reporting providers such as the Physician Practices. Opp. 4-5, 7-8. Hanks does not and cannot contend that any Defendants are cost-reporting providers, so, as a matter of law, they are not required to report discounts and rebates, period, end of story. As a result, the core of Hanks' case fails.

However, rather than pack up and go home, Hanks takes a new tack, now arguing that volume-based rebates are not made and fixed at the time of sale because successive purchases by a Defendant could "move it into a higher 'tier'" and increase the amount of rebates. Opp. 7, 11. This argument is also simply wrong as a matter of law. Instead, the law is clear that a volume-based rebate is within the safe harbor, even though the amount "may not be known until the rebate is paid" and only "after some number of successive purchases of particular goods or services." 64 Fed. Reg. 63,518, 63,529 (Nov. 19, 1999). Tiered, percentage volume rebates such as those in the Amgen Portfolio Contracts ("APC") are included within the safe harbor:

> [A] rebate program that would provide a tiered, percentage rebate … qualifies for safe harbor protection … The customer would know the types of products involved and the purchasing volume required to reach each tier of the rebate program at the time of the initial purchase. Once the total annual volume is known, the actual rebate amount would be known and then would be distributed.

OIG, Adv. Op. 13-07, at 2, 6 (June 24, 2013), attached to the Second Declaration of Rachel Kramer ("Second Kramer Decl.") as Ex. 3.

Hanks' theory of liability is that Defendants breached an implied certification of

compliance with the AKS when they submitted claims (none of which Hanks identifies) without disclosing rebates and discounts that Hanks asserts do not qualify for safe harbor protection. Opp. 12. Because they do clearly qualify as a matter of law, this theory also fails. Not only does this eliminate the element of falsity, but the Defendants could not have knowingly failed to report discounts and rebates when there was no such requirement. Hanks' only response is that he is "prepared to amend the complaint" to add more details. Opp. 23. But without a valid legal theory on which to proceed, amendment would be futile. *See infra* 8-10.[1]

Hanks' attempt to rescue his misreading of the safe harbor regulation by bootstrapping his other vague and conclusory AKS claims also fails. Opp. 7-8. Obviously, "phony" grants and honoraria would not come within the discount (or any other) safe harbor, and Defendants never argued otherwise. Those claims instead fail by application of Rule 9(b) due to Hanks' failure to allege even the most basic particularity concerning them. *See* Physician Practices' Memorandum in Support of Motion to Dismiss ("Mem.") 24-25; *infra* 3-8. That was the result in *U.S. ex rel. Banignan v. Organon USA Inc.*, 883 F. Supp. 2d 277 (D. Mass. 2012) – the only safe harbor case cited by Hanks – where the court dismissed all allegations of "collateral" kickbacks such as grants and other gifts pursuant to Rule 9(b). *Id.* at 297-98, 300. Hanks misreads *Banignan* when he argues that facially insufficient allegations of such "collateral" kickbacks can negate the application of the safe harbor as to rebates and discounts. Instead, in *Banignan* the court found

---

[1] In fact, non-cost-reporting providers like the Physician Practices have nowhere to report rebates and discounts to Medicare. As Hanks admits, they do not file cost reports. Compl. ¶ 143. They are reimbursed by listing a drug's Health Care Common Procedure Code ("HCPCS Code") in Box 24.D of the Medicare 1500 Claims Form (*available at* http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/ CMS1500.pdf), which does not have a box or any other place to report discounts or rebates. Medicare instead pays a set 106% of each drug's published Average Sales Price ("ASP"), as listed on Medicare's ASP fee schedule (*available at* http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Part-B-Drugs/McrPartBDrugAvgSalesPrice/ index.html). Compl. ¶¶ 121-124. Because physicians are paid a set amount by Medicare no matter what they do, Hanks' claim that defendants "claim[ed] reimbursement beyond that to which they were entitled" (Opp. 23) does not make sense.

that the contracts at issue did not set forth the full terms of the discounts or rebates themselves, which were "concealed in various sham collateral contracts." *Id.* at 296. Here, to the contrary, Hanks' own allegations show that the APCs revealed the tiered structure of the rebates and discounts (Compl. ¶¶ 233-35), thereby establishing the safe harbor.[2] Hanks' final gambit – that the APCs do not disclose that discounts "were made to induce purchases"– also makes no sense, and would eliminate the safe harbor. What purpose could there be for discounts other than to induce purchases, and how is that "inducement" not disclosed by the face of the APC itself?[3]

Hanks also fails to respond to the clear legal deficiency in his off-label claim. He emphasizes *Amgen*'s guilty plea as to off-label promotion, Opp. 1-3, 43, but neglects that the Physician Practices are free to prescribe off-label uses as a matter of law. Mem. 14-15. Hanks' one-sentence response is no response at all: "This allegation does not suffer from the deficiency articulated by the defendants." Opp. 43. Likewise, Hanks fails to respond to the argument that he has failed to plead any connecting "rim" to plead a "hub and spoke" conspiracy or any "agreement," and the Court should dismiss this claim as well. *See* Mem. 16-17.

## II.   Hanks Fails to Satisfy Rule 9(b), and Amendment Would Not Cure the Deficiencies.

### A.  Hanks Cannot Point to Any Allegations Sufficient to Meet the 9(b) Standard

Hanks' remaining arguments, that unidentified doctors prescribed medically unnecessary treatments to unidentified patients at unidentified times, and that there was "other consideration"

---

[2] For the same reason, Hanks' contention that a safe harbor is an affirmative defense in criminal trials has no application here. Opp. 8. By straight application of Rule 12(b)(6), Hanks' allegations, taken as true, establish the safe harbor, leaving Hanks with no plausible claim.

[3] Hanks attempts to foist a reporting obligation on Defendants that is not included in either the APCs or any applicable law. Opp. 11, n.4. But the APCs – as quoted in Hanks' Complaint – require only that the Physician Practices "shall comply with any discount reporting obligations they may have" and disclose "in a way that complies with all applicable federal, state, and local laws and regulations," including reporting to the government "upon request." Compl. ¶ 144. No such request is alleged here. Hanks also alleges that Amgen told Physician Practices that reporting "would be taken care of." Compl. ¶ 200. That is true as a matter of law—it was not Defendants' responsibility to report—and contradicts Hanks' boilerplate assertions that Defendants "knew or should have known" Amgen was not reporting.

paid such as unidentified "phony" honoraria and "other things of value" Opp. 7-8, do not come close to satisfying the "who, what, when, where and how" required by Rule 9(b). Hanks concedes that he cannot identify a single false claim submitted to the government, much less the specific details, nor can he identify a single patient or instance when medically unnecessary treatment was given.[4] Opp. 18. Hanks also ignores Defendants' argument that he is required to specify the "who" in particular, rather than relying on group pleading. Mem. 21.

Hanks ignores the weight of authority among Second Circuit courts requiring that a relator plead the details of claims actually submitted to the government, including three recent decisions of this Court granting motions to dismiss on this very basis. *See* Mem. 18-19 (discussing *Moore*, *Mooney*, and *Polansky*, by Judges Cogan, Block, and Korman, respectively). The analysis in *Moore* is especially instructive.[5] Like Hanks, the relator in *Moore* alleged that kickbacks in the form of sham honoraria and payments caused the physicians' claims and certifications of compliance with the AKS to be false. *Id*. at *2-5. The court dismissed on 9(b) grounds, with prejudice, because Moore did not and could not allege the details of any specific claims or certifications. *Id*. at *11-17. The same result is required here.

Hanks acknowledges that the Second Circuit required such a strict standard in *Wood ex rel. U.S. v. Applied Research Assocs.,* 328 Fed. App'x 744 (2d Cir. 2009), but asserts that this was before the Third Circuit took a more relaxed approach in *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153 (3d Cir. 2014), and before the decision in *U.S. ex rel. Kester v. Novartis Pharms. Corp*. Opp. 15. But the court in *Kester* actually followed the Second Circuit's strict

---

[4] Notably, in the *Banignan* case cited by Hanks, similar claims were dismissed on 9(b) grounds even though the complaint there included "representative samples" of reimbursement claims actually submitted to the government, none of which Hanks provides here. 883 F. Supp. 2d at 284-85.

[5] *U.S. ex rel. Moore v. GlaxoSmithKline, LLC,* No. 06 Civ. 6047, 2013 U.S. Dist. LEXIS 165205, at *8 (E.D.N.Y. Oct. 16, 2013). Although the Physician Practices cited *Moore* numerous times in their opening brief, Hanks fails to reference *Moore* even once in his 49-page response.

approach in *Wood, see Kester,* 2014 U.S. Dist. LEXIS 74461, at *38-39 (S.D.N.Y. May 29,

2014) (as did this Court in the three cases cited above), and so should this Court. Hanks concedes

that he cannot satisfy this strict standard, Opp. 18, which therefore requires dismissal.

In fact, Hanks' pleading falls short under any Rule 9(b) standard, even the Third Circuit's

in *Foglia. Foglia* was an overfill case in which the court had before it details of patient logs

showing that overfill was actually used, and noted that it was a "close case" on 9(b). 754 F.3d at

158. In this case, Hanks only guesses that overfill "could be" used, Opp. 32, which does not

present a close case under any Rule 9(b) standard. Even if Hanks did not need to plead details as

to "each and every" false claim he alleges, he needs at least one, or sufficient factual detail to

support which physicians billed which programs for what drugs, when, and in what amounts.

Instead, Hanks simply alleges the dollar amount of the drugs sold in a given time period (citing a

publicly available GAO report) and that a certain percentage of the covered drugs prescribed by

oncology practices was covered by Medicare. Compl. ¶ 99. This is precisely what the *Moore*

court found was insufficient to satisfy Rule 9(b). 2013 U.S. Dist. LEXIS 165205, at *11, 13-14.[6]

Hanks's inability to plead any specific claim actually submitted to the government warrants

dismissal of all of his claims, with prejudice.

Moreover, Hanks fails to allege any facts, much less the required "who what when and

where" details, as to how the Physician Practices participated in the alleged underlying fraud

scheme. He does not explain how the Physician Practices could have known how Amgen

reported its ASP to the government, he fails to allege any details about any instance where a

physician prescribed a drug that was not medically necessary, and he fails to allege facts

---

[6] Hanks also fails to plead with particularity who submitted which claims, and to whom. Instead, he lumps everyone together, alleging that every doctor billed every possible government program (even the Indian Health Service) for every drug involved over a period of ten years. Compl. ¶¶ 152, 218-229.

establishing the Physician Practices' participation in any other alleged Amgen scheme with any particularity. *See* Mem. 21-24. In his Opposition, Hanks does not, because he cannot, point to specific allegations in the Complaint to fill these gaps (in fact, the Opposition says nothing at all about his "price protection," "marketing the spread" and "sham honoraria" allegations).

In addition, Hanks' express and implied false certification claims also fail to satisfy Rule 9(b). Hanks does not identify any specific certifications signed by specific physicians, and there can therefore be no express false certification claim. *See Moore*, 2013 U.S. Dist. LEXIS 165205, at *13 (dismissing for failure to identify specific certifications signed by specific physicians). Hanks' implied false certification claims also fail, as he does not identify any specific submissions to Medicare by specific physicians that would impliedly certify compliance with the AKS. Furthermore, Hanks' implied false certification theory fails as to claims before March 23, 2010, because prior to then, the AKS did not state that compliance with it was a precondition to payment of claims submitted to federal health care programs. *See Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001); *U.S. ex rel. Corporate Compliance Assocs. v. N.Y. Soc'y for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, No. 07-292, 2014 U.S. Dist. LEXIS 109786, at *57 (S.D.N.Y. Aug. 7, 2014).

Finally, cases cited by Hanks for the proposition that the Rule 9(b) standard should be relaxed where a "complex scheme" is alleged or where certain facts are peculiarly within the knowledge or control of the defendant (Opp. 16-19) either rejected those precepts or are inapplicable here. Hanks quotes *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301 (11th Cir. 1990), as "recognizing that 'a more lenient pleading standard' is appropriate" when defendant uniquely controls the evidence (Opp. at 19), but the full quotation of that sentence in *Clausen* actually says, "we also reject Clausen's argument that we should apply a more lenient

pleading standard because evidence of fraud was uniquely held by the defendant." *Id.* at 1314 n.25. *Clausen* in fact rejected both of these precepts, holding that "while an insider might have an easier time obtaining information about billing practices and meeting the pleading requirements under the False Claims Act, neither the Federal Rules nor the Act offer any special leniency" to outsiders. *Id.* at 1314. And when "complex" schemes are alleged, courts permit pleading a representative sample of specific claims; they do not excuse the failure to plead *any* claims with particularity, as Hanks has failed to do. For example, Hanks cites *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 8 (D.D.C. 2003), in which the court found the government's allegations of a complex scheme sufficient where it provided evidence of twelve specific patient files and a statistical sample of false claims.[7] Even when certain facts are within a defendant's control or a complex scheme is otherwise alleged, a relator must still "set forth the *facts* on which" relator's allegations are founded; "claims of fraud may not be based on speculation or conclusory allegations." *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 65, 83, 87 (D. Conn. 2006) (dismissing FCA claim under Rule 9(b) where relator did not identify a single specific claim submitted, other than to assert that defendant "must have submitted" false claims

---

[7] The remaining cases cited are also distinguishable. In *U.S. ex rel. Hill v. Morehouse Med. Assocs.*, No. 02-14429, 2003 U.S. App. LEXIS 27956, at *14 (11th Cir. Aug. 15, 2003), relator personally observed defendants' billers altering CPT codes on actual claims submitted to the government, which she pleaded in great detail; the court distinguished relator, a corporate insider, from outsiders with no actual knowledge of the defendant's billing practices. Likewise, in *U.S. ex rel Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 268 (D.D.C. 2002), and *U.S. ex rel Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 207 (E.D. Tex. 1998), relators alleged facts concerning the details of claims actually submitted. In *In re Pharm. Indus. AWP Litig.*, 307 F. Supp. 2d 196 (D. Mass. 2004), and *Payne v. U.S.*, 247 F.2d 481 (8th Cir. 1957), there was no false claim at issue. *U.S. ex rel. Stewart v. La. Clinic*, No. 99-1767, 2002 U.S. Dist. LEXIS 3170, at *7-8 (E.D. La. Feb. 21, 2002), dismissed all FCA claims except those for which relator alleged the specifics of actual claims against specific defendants, and noted that "relaxing the requirements of Rule 9(b) in the context of a qui tam suit must not go so far as to permit a relator to bring a baseless claim in the hopes of finding fraud during the discovery process." *Boykin v. Key Bank N.A.*, 521 F.3d 202, 215 (2d Cir. 2008), noted the general principle about facts in the control of the defendant in *dicta* in a case involving a non-fraud claim evaluated under Rule 8(a). *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999), held that Rule 9(b) dismissal can be avoided where plaintiff has "substantial prediscovery evidence" supporting fraud, unlike here, and certainly not as to any claims actually submitted to the government.

given its treatment of Medicare patients); *Sait Commc'ns, Inc. v. Chapman*, No. 91-3743, 1992 U.S. Dist. LEXIS 12079, at *9 (E.D.N.Y. July 30, 1992) (Johnson, J.) (dismissing fraud claim under Rule 9(b) even where facts were within defendants' knowledge, based on absence of facts creating a strong inference of fraud). Hanks cannot satisfy Rule 9(b), which requires dismissal.

### B.  Hanks Is Not Entitled to Leave to Amend

Nor should Hanks be granted leave to amend, as any such amendment would be futile. First, he concedes that he "has no access to a record of the claims filed by defendants" and "would have no way of knowing" what claims were actually submitted to the government, when, or in what amounts. Opp. 18. At most, he can guess at the percentage of Medicare patients treated by the Physician Practices, which does not suffice. *See Moore*, 2013 U.S. Dist. LEXIS 165205, at *11-14. Hanks' inability to identify any actual claims by itself establishes the futility of re-pleading and should result in dismissal of all claims with prejudice. *Id.* at *16 (dismissing with prejudice; relator "alleged no facts that indicate[d] that he would ever be in a position to allege plausibly the fact that a false claim was submitted"); *see also U.S. v. Dialysis Clinic, Inc.*, No. 09-cv-00710, 2011 U.S. Dist. LEXIS 4862, at *63 (N.D.N.Y. Jan. 19, 2011).

Hanks' declaration presents allegations he would add if allowed to amend, but that amendment would be futile. Hanks simply repeats the same boilerplate allegations as to each Physician Practice over and over, namely that every Physician Practice "knew or should have known that the Average Wholesale Price was not being accurately reported by Amgen." *See* Declaration of Don Hanks ("Hanks Decl."), ¶¶ 4(J), 5(J), 9(F), 11(B), 13(B).[8] Even assuming, *arguendo*, that Hanks could plead particular facts to support these assertions, this would not state

---

[8] Hanks' declaration and the assertions in the Opposition that are not in the Complaint may not be considered on the motions to dismiss. *See, e.g., LaFlamme v. Societe Air Fr.*, 702 F. Supp. 2d 136, 148 n.18 (E.D.N.Y. 2010) ("[I]t is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss.") (granting motion to dismiss). They are addressed here only to show why Hanks' request for leave to amend should be denied and his suit dismissed with prejudice.

an FCA claim against the Physician Practices because they had no reporting responsibility. *See supra*, 1-3. Hanks likewise asserts that "greedy doctors" wanted maximum discounts and rebates and did not discuss the medical benefits of the drugs with Hanks (*e.g.*, Hanks Decl. ¶¶ 4(B), (C), 5(B), (C)), but even if true, such *ad hominem* allegations do not overcome Hanks' legally flawed theory of the case.[9] Because the doctors had no responsibility to report the discounts and rebates, their motives in seeking them are irrelevant. And Hanks' declaration does not identify any patient who received medically unnecessary treatment.[10]

Hanks' inability to muster sufficient factual allegations despite five prior amendments and a proposed sixth amendment in response to the Defendants' motions is dispositive. Given that Hanks has not been employed by Amgen since 2007, it is highly unlikely that he will be able to marshal any further detail, which warrants dismissal with prejudice. *See Dialysis Clinic,* 2011 U.S. Dist. LEXIS 4862, at *65 (dismissing on Rule 9(b) grounds *with prejudice* where relator's employment had ended years earlier, thereby making it "highly unlikely" he would be able to plead with particularity); *U.S. ex rel. Smith v. N.Y. Presbyterian Hosp.,* No. 06 Civ. 4056 (NRB), 2007 U.S. Dist. LEXIS 53826, at *27-28 (S.D.N.Y. Jul. 18, 2007) (same); Mem. 26.[11]  This case should be dismissed with prejudice and without leave to amend.

---

[9] Hanks' allegations that Dr. Harwin prescribed different drugs based on whether they would be reimbursed by Medicare or private insurers also fail, as he has not alleged a single specific instance in which this happened, and – more importantly – he presents no authority that such a practice is prohibited under the FCA.  It is not, as a provider is not prohibited from prescribing different drugs to different patients based on reimbursement levels. Hanks' observation, even taken as true, is irrelevant to whether any claim submitted to the government was false.

[10] With respect to defendant Florida Cancer Specialists, L.P. ("FCS"), Hanks' attempt to supplement his pleadings by declaration fails on an additional ground. Hanks claims that FCS, seeking to maximize profits, switched from Procrit to Aranesp. Hanks Decl. ¶ 4. But the exhibits to Hanks' own declaration demonstrate that, apart from $846 of Aranesp purchased in 2004, FCS did not purchase any Aranesp. *Id.*, Ex. A. Since FCS apparently was not named in Hanks suit until November 2011, any claims against FCS relating to Aranesp are barred by the FCA's six-year statute of limitations.

[11] Indeed, courts may deny leave to amend when a plaintiff "knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the

9

### III. Multiple Public Disclosures Revealed the Alleged Scheme Long Before Hanks Sued, and He Fails to Show That He Is an Original Source.

The FCA's 2010 amendments do not apply retroactively, *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct 1885, 1889 n.1 (2011), so the pre-2010 statute should apply to most of Hanks' claims. This case should be dismissed regardless of which version applies, as the only potentially relevant difference is whether the prior suits to which the government is not a party constitute disclosures. This does not matter here due to the many other prior disclosures. Hanks' allegations are based upon and substantially the same as publicly disclosed allegations and transactions, and he is not an original source of those disclosures or of any material fact.

#### A. Hanks' Claims Are Substantially Similar to Prior Public Disclosures.

The public disclosure bar precludes actions that are "based upon" (pre-2010 version) or "substantially the same as" (2010 version) public disclosures. These standards are effectively the same: courts have long construed "based upon" to mean "substantially similar." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (collecting cases, including *U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2d Cir. 1992)).[12]

The FCA lists three relevant categories of public disclosures: (i) in a criminal, civil, or administrative hearing (the 2010 version requires a *federal* hearing in which the government or an agent is a party, which includes all FCA suits, even non-intervened, *see Minotti v. Lensink*, 895 F.2d 100, 104 (2d Cir. 1990)); (ii) in a report, hearing, audit, or investigation (post-2010,

---

movant offers no excuse for the delay." *N.H. Ins. Co. v. Total Tool Supply, Inc.*, 621 F. Supp. 2d 121, 124 (S.D.N.Y. 2009) (internal quotations and citations omitted).

[12] The 2010 amendment also did not change that materials outside the pleadings may be considered on a motion to dismiss, as the post-2010 bar is still jurisdictional. *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 n.4 (2d Cir. 2010) ("[t]his provision has recently been amended to specify that in order for the *jurisdictional bar* to apply, 'substantially the same allegations or transactions' must be publicly disclosed"), *rev'd on other* grounds, 131 S. Ct. 1885 (2011); *U.S. ex rel. Paulos v. Stryker Corp.*, No. 13-2509, 2014 U.S. App. LEXIS 15199, at *18-19 (8th Cir. Aug. 7, 2014) (not error to consider matters outside the pleadings under post-2010 public disclosure bar).

they must be federal); and (iii) in the news media. 31 U.S.C. § 3730(e)(4) (1986), (2010). In this case, there were multiple pre-suit public disclosures of allegations and transactions substantially the same as Hanks' allegations, including (a) a 2007 OIG audit of Amgen's calculation of ASP for Aranesp (including rebates and discounts to providers, which is at the core of this case), (b) a *New York Times* articles alleging Amgen paid doctors to prescribe these drugs and announcing Amgen's settlement, and (c) the prior FCA suits against Amgen, including the *Westmoreland* case, which alleged that Amgen gave unreported rebates and discounts to physicians, in addition to marketing the spread, encouraging billing for overfill, honoraria, etc. *See* **Appendix A** (chart comparing selected public disclosures to Hanks' claims). Where, as here, a relator's allegations are based *in any part* on the public disclosures, the entire suit is barred. Mem. 27-28.[13]

Hanks' arguments to the contrary have no merit. The fact that the prior public disclosures name other physicians or refer only generally to physicians who contracted with Amgen, without specifically identifying the Physician Practices, is of no moment—the bar still applies. *See U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006) ("We are unpersuaded by an argument that for there to be public disclosure, the specific defendants named in the lawsuit must have been identified in the public records.").[14] The question is instead whether the previous disclosures "'set the government squarely on the trail of fraud' such that it would not have been difficult for the government to identify [the defendant] as a potential wrongdoer." *In re Pharm. Indus. AWP Litig.*, 538 F. Supp. 2d 367, 383, n. 10 (D. Mass. 2008)

---

[13] Hanks need not have actually gotten his information from the public disclosures for the bar to apply. *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993). Moreover, the public disclosures need not necessarily be accessible to any member of the public; disclosures of the government to selected individuals qualify. *Doe*, 960 F.2d at 322. In any event, the *Westmoreland* case was unsealed in 2009, before it appears that Hanks sued the Physician Practices.

[14] The authorities cited by Hanks make this clear. For example, in *Banignan* the court dismissed on the basis of the public disclosure bar even though a previously unnamed defendant had been added, because prior disclosures identified the drug, and therefore the alleged scheme. 883 F. Supp. 2d at 289.

(quoting *U.S. ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571-72 (10th Cir. 1995), distinguishing *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562 (11th Cir. 1994), where the government would have had difficulty identifying the wrongdoers).[15] Here the government was far along the trail of identifying wrongdoers when Hanks sued, including not just multiple prior FCA suits but also a government audit of Amgen's Aranesp ASP calculation in 2007, which involved reviewing Amgen contracts with providers, accounting records, and marketing materials. Kramer Decl. Ex. D. *See In re Natural Gas Royalties Qui Tam Litig.*, 562 F.3d 1032, 1042-43 (10th Cir. 2009) (where the government can identify defendants based on the government's own records, the public disclosure bar applies). In fact, it appears that the government reached the ***end*** of the "trail" before the Physician Practices were added to Hanks' suit, as its settlement with Amgen was announced in October 2011. Kramer Second Decl. Ex. 2. The government knew about the transactions at issue before Hanks came along; it just chose (correctly) not to sue these Defendants.[16] The public disclosure bar applies.

## B.  Hanks Is Not An Original Source of the Disclosures or Any Material New Fact.

Hanks is not an original source either of the information in his Complaint or of the publicly disclosed information, and the Second Circuit requires both to overcome the bar. *U.S. v.*

---

[15] Although Hanks argues that the Second Circuit does not follow the "on the trail" standard, the Second Circuit quotes that standard in *Kirk*. *Kirk*, 601 F.3d at 110 ("the FCA's jurisdictional bar is best understood as applying when the government is already, or can reasonably be expected to be, 'on the trail' of fraud") (quoting and citing *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 655 (D.C. Cir. 1994), with approval). In addition, in *U.S. ex rel. Cosens v. Yale-New Haven Hosp.*, also cited by Hanks, the court acknowledged that "the public disclosures do not need to specifically name the defendant" as long as the defendant is identifiable. 233 F. Supp. 2d 319, 329 (D. Conn. 2002).

[16] Hanks' argument that previous public disclosures amount only to "information," not "allegations or transactions," is also meritless. *See U.S. ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1418 (9th Cir. 1992) ("where the public knows of information proving an allegation, it necessarily knows of the allegation itself"); *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S. Ct. 1396 (2010) (factual disclosures in various reports, hearings, audits, and investigations are "allegations"); *A-1 Ambulance Serv., Inc. v. Cal.* 202 F.3d 1238 (9th Cir. 2000) (disclosure of "the material facts" underlying a purported FCA claim is enough to bar claim).

*N.Y. Med. Coll.*, 252 F.3d 118, 121 (2d Cir. 2001) (relator must be not only the original source of the allegations in his complaint, but also the original source of the prior public disclosures); *see also Wang*, 975 F.2d at 1418-20 (adopting the Second Circuit's position that relator who "had no hand in the original public disclosure" is barred). Hanks does not dispute, and thus concedes, that he is not the "original source" of any of the public disclosures (nor could he possibly claim that he was the source of the OIG audit report or the prior lawsuits). On this basis alone, the bar requires dismissal.

Hanks also has not satisfied either the pre-2010 version (*see* Mem. 31-33) or post-2010 version of the FCA, which require that Hanks "materially add to the publicly disclosed allegations or transactions." § 3730(e)(4)(B). Hanks' claim that he was part of the earlier Amgen settlement is irrelevant as to whether the bar applies. *Kreindler,* 985 F.2d at 1153 n.3 (relator can receive a share of settlement even if his suit was based on public disclosures). All Hanks really adds is a new and concededly incorrect legal theory – that the Physician Practices can be held liable for not reporting rebates and discounts – which does not suffice. *See* Mem. 32-33. Hanks has not carried his burden of showing that he is an original source.

**IV.    <u>Hanks Concedes That His Claims Are Barred in Part by the Statute of Limitations.</u>**

Hanks concedes that the six-year statute of limitations applies from the time each defendant was named in a particular iteration of the Complaint. Opp. 45. Defendant Ayub, Sokol, Matzkowitz and Sennabaum, M.D.s, P.A. was first named in the Second Amended Complaint (Dkt. 27) filed January 3, 2012; and therefore claims against it involving conduct prior to January 3, 2006 should be dismissed. Although the first complaint remains under seal, it appears that the remaining Physician Practices were first sued on November 30, 2011 (Dkt. 26), so all claims against them prior to November 30, 2005 should be dismissed.

## CONCLUSION

For the foregoing reasons, those set forth in the Physician Practices' opening memorandum, and those set forth in the briefs of defendants U.S. Oncology Specialty LP and Northwest Georgia Oncology Center, P.C., the Court should dismiss all of Hanks' claims, with prejudice.

Dated: New York, New York
September 15, 2014

Respectfully submitted,

FOLEY & LARDNER LLP

By:  s/Lawrence M. Kraus
Lawrence M. Kraus (*pro hac vice*)
111 Huntington Avenue, Suite 2500
Boston, MA 02199-7610
(617) 342-4070
lkraus@foley.com

Michael P. Matthews (*pro hac vice*)
FOLEY & LARDNER LLP
100 N. Tampa Street, Suite 2700
Tampa, Florida 33602-5810
(813) 225-4131
mmatthews@foley.com

Rachel E. Kramer
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
(212) 338-3545
rkramer@foley.com

*Attorneys for Florida Cancer Specialists, P.L. (sued herein as Florida Cancer Specialists & Research Institute); Ayub, Sokol, Matzkowitz and Sennabaum, M.D.s, P.A. d/b/a New Hope Cancer Center; Coastal Oncology, P.L.; J. Paonessa, M.D., P.A. (sued herein as Gulfcoast Oncology Associates); and Pasco Hernando Oncology Associates, P.A.*

14

Joining in the reply:

FURGANG & ADWAR, L.L.P.

By: _s/Armando Llorens_____
    Philip Furgang (PF 5654)
    Armando Llorens (AL1757)
1325 Avenue of the Americas, 28th Fl.
New York, New York 10019
(212) 725-1818
philip@furgang.com
armando@furgang.com

*Attorneys for Defendant Cancer Institute of Florida, P.A.*

## APPENDIX A

### Comparison of Public Disclosures to Hanks' Complaint

| Public Disclosure | Hanks' Complaint |
|---|---|
| *May 2007:*<br>Alex Berenson and Andrew Pollock, "Doctors Reap Millions for Anemia Drugs," N.Y. TIMES, May 9, 2007, *available at* http://www.nytimes.com/2007/05/09/business/09anemia.html (Kramer Decl. Ex. G)<br><br>"Two of the world's largest drug companies [Amgen and Johnson & Johnson] are paying hundreds of millions of dollars to doctors every year in return for giving their patients anemia medicines . . . ."<br><br>"Critics, including prominent cancer and kidney doctors, say the payments give physicians an incentive to prescribe the medicines at levels that might increase patients' risks of heart attacks or strokes." | ¶ 77: "[Amgen's] new strategy was to provide the defendant Oncology Practices with a new, real and substantial reason to buy and use Aranesp rather than Procrit. This new, real and substantial reason was money, or greater profitability, via rebates and off-invoice discounts that reduced the effective price of the drugs…."<br><br>¶ 162-163: "Physicians affiliated with the defendant Oncology Practices, for the reasons described, over prescribed the Covered Drugs. . . . Strokes and death did occur. . . . [P]hysicians knew or should have known that Aranesp was a very dangerous drug. . . . |
| *July 2007*<br>Dep't of Health & Human Services, Office of the Inspector General, *Audit of Amgen USA, Inc.'s Second Quarter 2005 Average Sales Price Calculation for Aranesp* (Kramer Decl. Ex. D)<br><br>OIG's audit included review of Amgen's "accounting records and source documentation, including spreadsheets; marketing materials; and contracts with wholesalers, group purchasing organizations (GPO), and hospitals, among others." (p. 3.) OIG reviewed calculation of ASP "Less Estimated Discounts" of 35.53%.<br><br>OIG found that: Amgen mostly complied overall, but improperly excluded certain price concessions. *Id.* | ¶ 233-35: Setting forth the terms of rebates and discounts from Amgen's contracts, which Hanks now contends are the basis for defendants' alleged AKS violations.<br><br>¶ 104: "On information and belief, Amgen failed to include the cost of the rebates, off-invoice discounts and things of value provided to the defendant Oncology Practices in exchange for their purchase of the Covered Drugs, in its calculation of the AWP and the ASP of the Covered Drugs." |

| Public Disclosure | Hanks' Complaint |
|---|---|
| *November 2009:*<br>Unsealing of Complaint in *United States ex rel. Westmoreland v. Amgen, Inc.*, No. 1:06-cv-10972 (D. Mass. 2006) (Kramer Second Decl. Ex. 1)[17]<br><br>"The allegations of this Complaint arise from … the unlawful practices of Defendants with respect to the drug Aranesp…." Compl. ¶ 2.<br><br>"The Defendants have violated several laws, including without limitation, the Federal and State FCAs, the Medicare and Medicaid Anti-Kickback Act . . . by engaging in numerous unlawful activities in their marketing of Aranesp from at least September 2002 through at least mid-March 2005 . . . .The Defendants' unlawful marketing activities involve various means of providing financial benefits and/or incentives to their customers (e.g., physicians, clinics, hospitals, long term care facilities) in order to induce them to purchase and use Aranesp, including without limitation:<br>(1) improperly "marketing the economics" of Aranesp to customers—i.e., detailing and emphasizing the more-lucrative profits (the "spread or margins") that customers would make…<br>(2) offering improper price discounts and/or pricing incentives for Aranesp, and, on information and belief, concealing this price information from governmental health insurance programs;<br>(3) scheming with each other and with customers to defraud the federal and state governments (and private insurers) by encouraging customers to seek reimbursement for the 'overfill' quantities of Aranesp that the customers did not pay for . . . | ¶ 104: "On information and belief, Amgen failed to include the cost of the rebates, off-invoice discounts and things of value provided to the defendant Oncology Practices in exchange for their purchase of the Covered Drugs, in its calculation of the AWP and the ASP of the Covered Drugs."<br><br>¶ 198: "The technique known as 'marketing the spread' or 'marketing to spread' presents a prospective customer with a hypothetical, but realistic, set of figures showing how specific increases in volume purchases of a drug or drugs by the customer would provide the customer with certain rebate and discount levels, allowing the customer to obtain reimbursement from the government-sponsored healthcare program . . . in excess of the customer's actual cost . . . .<br><br>¶¶ 185-189: "The overfill program was intended to, and did, allow the defendants to administer the Covered Drugs they received 'for free' to patients. The patients, or more frequently, third-party payors, principally Government Healthcare Programs and insurance companies, were then billed for the drugs based on the volume of the drug administered, not its cost, as there was no extra cost for the extra, 'overfill amount."<br><br>¶ 207: "Amgen provided the defendant Oncology Practices with numerous additional financial incentives to influence the defendants' selection and utilization of the Covered Drugs regardless of medical necessity. These incentives included, but were not limited to, sham honoraria . . . ." |

---

[17] *Westmoreland* was unsealed in November 2009, after Hanks initiated this case, but before it appears Hanks brought any claims against the Physician Practice Defendants.  Although Defendants are still awaiting confirmation upon unsealing of the first complaint in this matter, it appears from Hanks' Opposition that the Physician Practices were first sued after November 2011.  That is why the Physician Practices have added additional post-2008, pre-November 2011 public disclosures in this reply.

| Public Disclosure | Hanks' Complaint |
|---|---|
| (4) offering and paying 'kickbacks' in various forms to physicians and others as an inducement and/or reward for their prescribing of Aranesp. . . . Compl. ¶ 2.<br><br>"The Amgen/INN seminars and retreats typically were held at vacation locations . . . with Amgen directly or indirectly paying all the travel, food, and accommodation expenses of the attendees. Furthermore, the physicians and their staff who attended the seminars and retreats typically were paid a so-called 'honorarium' . . . . " Compl. ¶ 64. | |
| *October 2011*: Andrew Pollack, *Amgen to Pay $780 Million to Settle Suits on Its Sales*, N.Y. TIMES, Oct. 24, 2011, *available at* http://www.nytimes.com/2011/10/25/health/25amgen.html (Kramer Second Decl. Ex. 2)<br><br>"The federal investigations . . . seem to involve marketing, pricing and dosing of . . . Aranesp and Epogen . . . ."<br><br>"One whistle-blower lawsuit that was unsealed accuses [Amgen] of overfilling vials of Aranesp, essentially providing doctors with free amounts of the drug to give patients and then charge to Medicare . . . . The lawsuit said that Amgen tried to persuade doctors to use Aranesp . . . by pointing to the extra profits the doctors could make by using the overfill and billing for it." | ¶¶ 185-189: "The overfill program was intended to, and did, allow the defendants to administer the Covered Drugs they received 'for free' to patients. The patients, or more frequently, third-party payors, principally Government Healthcare Programs and insurance companies, were then billed for the drugs based on the volume of the drug administered, not its cost, as there was no extra cost for the extra, 'overfill amount.'" |

Michael P. Matthews (*pro hac vice*)
FOLEY & LARDNER LLP
100 N. Tampa Street, Suite 2700
Tampa, Florida 33602-5810
(813) 225-4131
mmatthews@foley.com

Lawrence M. Kraus (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199-7610
(617) 342-4070
lkraus@foley.com

Rachel E. Kramer
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
(212) 338-3545
rkramer@foley.com

*Attorneys for Florida Cancer Specialists, P.L. (sued herein as Florida Cancer Specialists &
Research Institute); Ayub, Sokol, Matzkowitz and Sennabaum, M.D.s, P.A. d/b/a New Hope
Cancer Center; Coastal Oncology, P.L.; J. Paonessa, M.D., P.A. (sued herein as Gulfcoast
Oncology Associates); and Pasco Hernando Oncology Associates, P.A.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DON HANKS, et al.<br><br>Plaintiffs,<br><br>-against-<br><br>U.S. ONCOLOGY SPECIALTY, LLP et al.,<br><br>Defendants. | No. 08-cv-3096-SJ-RML<br><br>**SECOND DECLARATION OF RACHEL KRAMER** |

RACHEL KRAMER declares as follows under penalty of perjury:

1.      I am an attorney at Foley & Lardner LLP, counsel for defendants Florida Cancer

Specialists, P.L. (sued herein as Florida Cancer Specialists & Research Institute); Ayub, Sokol,

Matzkowitz and Sennabaum, M.D.s, P.A. d/b/a New Hope Cancer Center; Coastal Oncology,

P.L.; J. Paonessa, M.D., P.A. (sued herein as Gulfcoast Oncology Associates); and Pasco

Hernando Oncology Associates, P.A. ("Defendants").  I am familiar with the facts and

circumstances set forth herein. I make this declaration in further support of Defendants' motion

to dismiss the Fifth Amended Complaint and to place certain documents before the Court.

2.      True and correct copies of the following documents are attached hereto:

**Exhibit 1**       Complaint in *United States ex rel. Westmoreland v. Amgen, Inc.*, No.
            1:06-cv-10972 (D. Mass. 2006)

**Exhibit 2**       Andrew Pollack, *Amgen to Pay $780 Million to Settle Suits on Its Sales*,
            N.Y. TIMES, Oct. 24, 2011, *available at*
            http://www.nytimes.com/2011/10/25/health/25amgen.html

**Exhibit 3**       Dep't of Health and Human Servs., Office of Inspector General,
            Advisory Opinion 13-07 (June 24, 2013)

I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
       September 15, 2014

                                    s /Rachel E. Kramer
                                Rachel E. Kramer

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS



THE UNITED STATES OF AMERICA; and

THE STATES OF CALIFORNIA, DELAWARE,
FLORIDA, HAWAII, ILLINOIS, INDIANA,
LOUISIANA, MICHIGAN, NEVADA, NEW
HAMPSHIRE, NEW MEXICO, TENNESSEE, and
TEXAS; and

THE COMMONWEALTHS OF
MASSACHUSETTS and VIRGINIA; and

THE DISTRICT OF COLUMBIA;

*ex rel.* KASSIE WESTMORELAND,

     Plaintiffs,

v.

AMGEN INC.; INTERNATIONAL
NEPHROLOGY NETWORK;
AMERISOURCEBERGEN SPECIALTY GROUP;
ASD HEALTHCARE; and
AMERISOURCEBERGEN CORPORATION,

    Defendants.

CIVIL ACTION NO.

## 06-10972NMG

*FILED IN CAMERA*
*and UNDER SEAL*

MAGISTRATE JUDGE

RECEIPT # 72829
AMOUNT $ 350. 00
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 6-5-06

## COMPLAINT

## INTRODUCTORY STATEMENT

1.    This is an action brought on behalf of the United States of America by Plaintiff

KASSIE WESTMORELAND (hereafter referred to as "Relator") against Defendants Amgen Inc.

("Amgen"), International Nephrology Network, AmerisourceBergen Corporation,

AmerisourceBergen Specialty Group, and ASD Healthcare (collectively, "Defendants"), pursuant

to the *Qui Tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("Federal

FCA" or "FCA"), and on behalf of the above-named States under their respective State False

Claims Acts ("State FCAs") (together referred to herein as "*Qui Tam* Action"). Pursuant to 31

U.S.C. § 3730(b)(2), and comparable provisions in the State FCAs, this action is brought *in*

*camera* and under seal. Relator also alleges that Defendant Amgen has violated the anti-

retaliation provisions of the federal False Claims Act, 31 U.S.C. § 3730(h).

     2.     The Relator in this case is a current employee of Defendant Amgen. The

allegations of this Complaint arise from the Relator's first-hand knowledge of the unlawful

practices of the Defendants with respect to the drug Aranesp® (darbepoetin alfa) (hereafter

"Aranesp"), which is a prescription drug developed and manufactured by Amgen that is used to

treat various forms of anemia – especially anemia related to the treatment of certain nephrology

(kidney) and oncology (cancer) patients. As more fully described below, Aranesp is an injectable

drug that is administered by physicians (or medical staff) to patients with, among other

conditions, chronic kidney disease or cancer. The drug is administered to patients in many

different settings, including physicians' offices, outpatient clinics, hospitals and long term care

facilities. Aranesp is marketed to these providers by Defendant Amgen with assistance from

International Nephrology Network ("INN"), and ASD Healthcare. The drug is then usually

purchased directly or indirectly by these providers from entities such as INN's parent, Defendant

AmerisourceBergen Corporation and its subsidiaries, Defendants AmerisourceBergen Specialty

Group and ASD Healthcare. The provider then typically seeks reimbursement for the

administered drug from federal and state governmental health insurance programs (and/or from

private health insurance programs).

     3.     The Defendants in this case have violated several laws, including without

limitation, the Federal and State FCAs, the Medicare and Medicaid Anti-Kickback Act, and the

Federal Food, Drug, and Cosmetic Act, by engaging in numerous unlawful activities in their marketing of Aranesp from at least September 2002 through at least mid-March 2005, when Relator was actively employed by Defendant Amgen.  On information and belief, the practices complained of herein are continuing.  The Defendants' unlawful marketing activities involve various means of providing financial benefits and/or incentives to their customers (*e.g.*, physicians, clinics, hospitals, long term care facilities ) in order to induce them to purchase and use Aranesp including, without limitation:

(1)     improperly "marketing the economics" of Aranesp to customers – *i.e.*, detailing and emphasizing the more-lucrative profits ("the spread or margins") that customers would make if they prescribed Aranesp instead of competing drugs;

(2)     offering improper price discounts and/or pricing incentives for Aranesp, and, on information and belief, concealing this price information from governmental health insurance programs;

(3)     scheming with each other and with customers to defraud the federal and state governments (and private insurers) by encouraging customers to seek reimbursement for the "overfill" quantities of Aranesp that the customers did not pay for and often did not use/administer to the patient (*i.e.*, the functional equivalent of seeking reimbursement for free samples);

(4)     offering and paying "kickbacks" in various forms to physicians and others as an inducement and/or reward for their prescribing of Aranesp;

(5)     improperly targeting certain physicians and/or physician practice groups using seemingly neutral group purchasing organization(s), i.e., Defendant INN, to promote the use of Aranesp, but without disclosing the affiliation and/or financial

relationship of those groups with Defendant Amgen; and directing business to

Defendant INN and its related Defendant companies; and

(6)     "off-label" marketing of Aranesp for unapproved indications and/or dosing

regimens in order to cause Aranesp to be prescribed instead of competing drugs.

4.     The purpose of these unlawful activities was to gain market share for Aranesp

over its competitor drug Procrit® (marketed by Johnson & Johnson) (hereafter "Procrit"), and to

switch patients from Procrit and/or the drug Epogen® (hereafter "Epogen" also manufactured by

Defendant Amgen) to Aranesp – all of which was done by Defendants in order to increase

reimbursement for Aranesp from governmental (and private) health insurance programs.

Defendants' actions and omissions have caused improper and illegal billings to the federal

government and to the state governments named herein.  These unlawful practices are detailed in

the pages below, and also in Relator's Disclosure Statement served on the federal and state

plaintiffs in this matter.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action under the Federal FCA pursuant to 28

U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730, and has supplemental jurisdiction

over the State FCA claims pursuant to 28 U.S.C. § 1367.

6.     Venue is appropriate as to the Defendants in that the Defendants transact business

in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by the

Defendants in this judicial district.  Therefore, venue is proper within the meaning of 28 U.S.C.

§ 1391(b) & (c), and 31 U.S.C. § 3732(a).

7.     To Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C.

§ 3730(e):  there is no civil suit or administrative proceeding involving the allegations and

transactions herein to which the United States is a party; there has been no "public disclosure" of these allegations or transactions; and Relator is the "original source" of the information upon which these allegations are based.

## THE PARTIES

8.      Relator Kassie Westmoreland is a citizen of the United States of America.  She is a resident of California, and a current employee of Defendant Amgen.  She brings this *Qui Tam* action based upon direct and unique information obtained during the period of her active employment at Amgen from September 2002 to mid-March 2005, at which time she went on temporary disability leave.  During her 2 and ½ years of active employment at Amgen, Relator worked in both the sales and marketing departments for Amgen's drug Aranesp.  She worked in "sales" for about one and a half years as a "Professional Sales Representative" for Aranesp; and then she worked in "marketing" for approximately one year as a "Product Manager" for Aranesp.  Relator is providing an appropriate "Disclosure Statement" to the United States and to the Plaintiff States, as required by law.

9.      Defendant Amgen Inc. ("Amgen"), a Fortune 500 company, is a publicly-traded diversified, human therapeutics company in the biotechnology industry.  It conducts business throughout the United States (including Massachusetts) and in many other countries.  Its principal place of business is Thousand Oaks, California.  Amgen is traded on the NASDAQ under the symbol "AMGN."  Amgen engages in the discovery, development, manufacture, and delivery of biotherapeutics (*e.g.*, prescription drugs) for various medical needs.  The company provides products for the treatment of various human ailments, including anemia, arthritis, psoriasis, cancer treatment side effects, and side effects of dialysis.  Amgen was the original developer of the drug Aranesp® (darbepoetin alfa) ("Aranesp") approved by the United States

Food and Drug Administration in 2001 for the treatment of anemia associated with chronic renal

failure (both in patients on dialysis and those not on dialysis) and in 2002 for the treatment of

chemotherapy-induced anemia in patients with nonmyeloid malignancies.  (Aranesp is

contraindicated in patients with uncontrolled hypertension.)  United States sales to date for

Aranesp total over $5 billion.

　　　　10.　　Defendant International Nephrology Network ("INN") is a company

headquartered at World Trade Center Baltimore, 401 E. Pratt Street, 11TH Floor, Baltimore,

Maryland 21202.  INN is a "group purchasing organization" ("GPO") that focuses on nephrology

practices and physicians.  It is one of the country's largest diversified physician services networks

created for the community nephrology office.  INN originally was directed by Anthony Corrao (a

former Amgen employee with close ties to other current Amgen employees--including upper

management) and others.  Amgen started doing business with INN in 2003.  INN now is part of

Defendant AmerisourceBergen Specialty Group, the specialty pharmaceutical business arm of

Defendant AmerisourceBergen Corporation.  INN does business throughout the United States,

including in the Commonwealth of Massachusetts.

　　　　11.　　Defendant AmerisourceBergen Specialty Group ("ABSG"), headquartered in

Addison, Texas, is the specialty pharmaceutical business arm of Defendant AmerisourceBergen

Corporation ("ABC") headquartered in Chesterbrook, Pennsylvania (NYSE: ABC) (collectively

referred to herein as "AmerisourceBergen").  AmerisourceBergen is one of the largest

pharmaceutical service companies in the United States and serves both pharmaceutical

manufacturers and health care providers, including by distributing pharmaceutical products.

ABC does business through numerous subsidiaries including Defendants ABSG and ASD

Healthcare, a drug wholesaler, also headquartered in Addison, Texas.  ABC and its subsidiaries

operate and conduct business throughout the United States, including in the Commonwealth of Massachusetts.

**FEDERAL AND STATE LAWS**

**Government Health Insurance Programs**

12.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, (hereinafter "Medicare"), is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services.  Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify under the terms and conditions of the Medicare Program.  Payments made under the Medicare Program include payment for certain prescription drugs used during treatment at an appropriate medical facility and otherwise, as well as certain injectable drugs and drugs used in conjunction with the treatment of patients with end stage renal disease and/or undergoing dialysis.   Pursuant to the Medicare Prescription Drug Improvement and Modernization Act of 2003, effective January 1, 2006, Medicare Part D took effect, extending prescription drug coverage to all Medicare eligible persons who choose to participate in Part D.

13.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer revenue.  The Medicaid Program is overseen by the United States Department of Health and Human Services. Medicaid was designed to assist participating states in providing medical

services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.

14.     The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C.  §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired and deceased members. The program is administered by the Department of Defense and funded by the Federal Government.  CHAMPUS pays for, among other items and services, prescription drugs for its beneficiaries.

15.     The federal government, through its Departments of Defense and Veterans Affairs, maintains and operates medical facilities including hospitals, and receives and uses federal funds to purchase prescription drugs for patients treated at such facilities and otherwise. In addition, under the Public Health Service Act, the Section 340B Drug Pricing Program, and the Veterans Health Care Act of 1992, the federal government directly or indirectly provides funds to certain other federal agencies and to state and local facilities and programs, including to non-profit disproportionate share hospitals ("DSH").  *See generally* 38 U.S.C. § 8126.

16.     The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents.  It pays for, among other items and services, prescription drugs for its beneficiaries. (Together these programs described in paragraphs 12-16 shall be referred to as "Federal Health Care Programs" or "Government Health Care Programs").

17.     The Federal Food, Drug and Cosmetic Act ("FFDCA"), 21 U.S.C. §§ 301, *et seq.*, prohibits the distribution of new pharmaceutical drugs in interstate commerce unless the Food

and Drug Administration ("FDA") has determined that the drug is safe and effective for its intended use. 21 U.S.C. § 355 (a) and (d). An approved drug may be prescribed by doctors for uses other than those approved by the FDA, but manufacturers are prohibited from marketing or promoting the drug for such unapproved or "off label" uses. 21 U.S.C. § 331(d). If the manufacturer intends to promote the drug for a new unapproved use, an application for the proposed new use must be filed with the FDA (or an exemption therefrom must be obtained) and any promotional materials concerning unapproved uses must meet strict statutory and regulatory requirements. *See* 21 U.S.C. §§ 360aaa, *et seq.*

18.     Whether a drug is FDA-approved for a particular use determines whether a prescription of the drug is reimbursed under many, if not all, Government Health Insurance Programs, including Medicaid and the programs described in paragraph 15 above. Reimbursement under Medicaid and these other programs is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. §1396b(i)(10). Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication." *Id.* §1396r-8(k)(3). A medically accepted indication includes a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is included in a specified drug compendia. *Id.* §1396r-8(k)(6). Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid. There is a single exception: in certain circumstances Medicaid will reimburse the prescription of certain single-source or multi-source innovator drugs for an "off label" use where the individual State has determined, *inter alia*, that the drug is essential to the health of beneficiaries. 42 U.S.C. §1396r8(a)(3).

19.     The FFDCA provides criminal penalties for the dissemination of written

information to health care providers regarding the safety, effectiveness, or benefit of the use of a drug that is not described in the FDA approved labeling of the drug, if that written information fails to conform to the law's requirements.  21 U.S.C. §§ 331(z), 333(a)(1)-(2), 360aaa.  A manufacturer may disseminate information on a new use of a drug only if it meets the specific requirements set forth in 21 U.S.C. § 360aaa.  One of those requirements is that a manufacturer may disseminate written information on a new use of a drug only if the information is about a clinical investigation with respect to the drug and is contained in an article published in a scientific or medical journal, which is peer-reviewed by experts, or in a reference publication.  21 U.S.C. §360aaa-1 states in part:

    (a)    Authorized information – A manufacturer may disseminate information under section 360aaa of this title on a new use only if the information –

        (1)    is in the form of an unabridged –

            (A)    reprint or copy of an article, peer-reviewed by experts qualified by scientific training or experience to evaluate the safety or effectiveness of the drug or device involved, which were published in a scientific or medical journal (as defined in section 360aaa-5(5) of this title), which is about a clinical investigation with respect to the drug or device, and which would be considered to be scientifically sound by such experts; or

            (B)    reference publication, described in subsection (b) of this section that includes information about a clinical investigation with respect to the drug or device that would be considered to be scientifically sound by experts qualified by scientific training or experience to evaluate the safety or effectiveness of the drug or device that is the subject of such a clinical investigation . . . .

## The Federal and State False Claims Acts

    20.    The Federal FCA, 31 U.S.C. § 3729(a)(1), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law for which the United States may recover three times the amount of the

damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

21.     The Federal FCA, 31 U.S.C. § 3729(a)(2), makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

22.     The Federal FCA, 31 U.S.C. § 3729(a)(3), makes any person, who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

23.     The Federal FCA, 31 U.S.C. § 3729(a)(7), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

24.     The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

25.     As set forth below, several states have passed False Claims Act legislation, which

in most instances closely tracks the Federal FCA: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*, Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, §§ 1201 *et seq.*, District of Columbia Procurement Reform Amendment Act, D.C. Code §§ 2-308.13 *et seq.*, Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*, Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*, Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*,  Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, Louisiana Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. c. 3, § 437.1 *et seq.*, Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, §§ 5A *et seq.*, Michigan Medicaid False Claims Act, MI ST Ch. 400,  Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq,*, New Hampshire False Claims Act, N.H. RSA §§ 167:61-b, *et seq.*,  New Mexico Medicaid False Claims Act, 2004 New Mexico Laws Ch. 49 (H.B. 468), Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*, Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§ 36.001 *et seq.*, and Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.* These State False Claims Acts apply, *inter alia,* to the state portion of Medicaid fraud losses caused by false Medicaid claims to the jointly federal-state funded Medicaid program.  Each of the statutes listed above contains *qui tam* provisions governing, *inter alia*, a relator's right to claim a share of the State's recovery.

**The Medicare and Medicaid Anti-Kickback Act**

26.    The Medicare and Medicaid Anti-Kickback Act ("AKA"), 42 U.S.C. § 1320a-7b (b),  makes it illegal to offer, pay, receive, or solicit any remuneration, kickback, bribe, or rebate, whether directly or indirectly, overtly or covertly, in cash or in kind, to or from any person in order to induce such person to purchase, lease, or order, or to arrange for or recommend the purchasing, leasing, or ordering of any good, service, or item for which payment may be made in

whole or in part under a Government Health Care Program. The AKA seeks to prohibit such activities in order to secure proper medical treatment and referrals, and to limit the possibility of a patient having to undergo unnecessary treatments or having to accept specific items or services which are based not on the needs of the patient, but on the incentives given to others, thereby limiting the patient's right to choose proper medical care and services.

## FACTS AND ALLEGATIONS

### The Relator:  Kassie Westmoreland

27.     Relator Kassie Westmoreland currently lives in Santa Monica, California.  She is a pharmacist and has a Masters in Business Administration degree.  In September 2002, she took a position with Defendant Amgen as a professional sales representative.  At the time, Amgen had its sales and marketing staff organized into separate groups that focused on specific drugs or "brands" that Amgen produced.  One such drug was Aranesp, and when Relator joined Amgen, she was assigned to be a "Professional Sales Representative" in the Aranesp sales group.

28.     Amgen's sales and marketing of Aranesp were coordinated and overseen from Amgen's corporate headquarters in Thousand Oaks, California.  Amgen employed numerous "sales reps" like Relator throughout the United States to market Aranesp, and each sales rep had his/her own geographical area and/or physician practice area.  Relator was Amgen's Aranesp sales rep for the State of Oregon who was to call on nephrology (kidney) practices. There was another rep who only called on dialysis centers in Oregon, and still four other Amgen sales reps who marketed Aranesp to oncology practices in Oregon.  Although Relator lived in Oregon at that time, she nevertheless had extensive contacts with other Aranesp sales reps from around the country through training seminars and Aranesp sales staff meetings, which included quarterly, semi-annual, and annual meetings.  She also had weekly contact with other district sales reps and

district managers as well as other reps around the country by phone, and she had extensive contacts with upper-level Aranesp sales managers and directors through these seminars and staff meetings, as well as countless telephone conferences and emails.

29.     Relator worked as an Aranesp sales rep for approximately one and a half years from September 2002 to approximately March 2004, during which time she was trained and encouraged by her Amgen superiors to engage in various improper marketing practices aimed at increasing sales of Aranesp.  Relator engaged in some, but not all, of these practices, because she was instructed to do so in order to keep her job (or did not know it was wrong at the time in some instances).

30.     Around March 2004, Relator left the Aranesp sales force and took a promotion to be a product manager for Aranesp in Amgen's home office in Thousand Oaks, California.  As a product manager for Aranesp, Relator focused more broadly on marketing and advertising of the drug, as opposed to direct sales.  In this new position, she also learned the details of Amgen's undisclosed relationship with Defendant INN and its related entities, which purports to be an independent group purchasing organization.  Amgen's relationship with INN is discussed more fully below.

31.     In early 2005, Relator began to voice concerns and raise questions with her Amgen superiors about the legitimacy of Amgen's relationship with INN.  Thereafter, Defendant Amgen reduced her responsibilities, and falsely accused her of having misused her company expense account. Amgen's unlawful retaliation against Relator is discussed more fully below. The resulting stress and anxiety caused Relator to go on temporary disability leave from Amgen in mid-March 2005.  She remained on disability leave from that time until the end of March

2006, although she did not receive full disability pay. At present, Relator is receiving no pay at all, but is receiving medical insurance from Amgen.

**The Drug at Issue: Aranesp**

32.     Aranesp (darbepoetin alfa) is a prescription drug developed and manufactured by Defendant Amgen that is used to treat various forms of anemia – especially anemia related to the treatment of certain nephrology and oncology patients. Patients with kidney disease and/or cancer often have decreased levels of red blood cells, which are essential to transporting oxygen throughout the body. The absence and/or decreased levels of red blood cells can cause anemia in such patients. Aranesp stimulates the production of red blood cells, thereby lowering the risk of anemia.

33.     Treatment of anemia is a vital and integral part of the medical care of nephrology and cancer patients. Indeed, left untreated in such patients, anemia can undermine the efficacy of a medical treatment plan, and/or it can lead to severe health consequences for the patient, including death.

34.     In 2001, the FDA approved Aranesp for use in the United States for the treatment of anemia associated with chronic renal failure (both in patients on dialysis and those not on dialysis). In 2002, the FDA approved the drug for the treatment of chemotherapy-induced anemia in patients with nonmyeloid malignancies. Safety and efficacy have *not* been established in other conditions and Aranesp is not approved for other uses, or in dosages different from those approved in the label. There are several National Drug Code ("NDC") numbers for Aranesp depending on the dosage; these NDCs are included in the Disclosure Statement. The dosage of Aranesp varies somewhat according to the patient's weight and condition, but a typical dosage

would be 25-40 mcg for a weekly injection, or 60 mcg for an injection every two weeks for pre-

dialysis patients. These dosages, and frequency of injection, are consistent with the approved use

of the drug. As discussed more fully below, however, some physicians have been encouraged "to

push the dose out" to provide injections to patients on a less frequent basis, for example, on a

monthly basis at a dosage level averaging 150 mcg, and these practices are not approved by the

FDA. In addition, Amgen recently (in March 2006) announced that the data from one of its

studies showed that treating anemia with Aranesp in patients with symptomatic heart failure was

well-tolerated, effectively raised hemoglobin and improved patients' symptoms. Aranesp is not

approved for that indication at this time.

35.    Since its introduction to the prescription drug marketplace in 2001, United States

sales of Aranesp have been extraordinary and substantial. According to Amgen's public filings,

aggregate (2001-2005) United States revenues for Aranesp totaled almost *$5 billion* over the past

five years. Moreover, since the drug was first introduced, Aranesp sales in the United States

have increased steadily and dramatically year-after-year: from $27 million in its first year, 2001;

to $285 million in 2002; to $980 million in 2003; to $1.533 billion in 2004; to $2.104 billion in

2005. For the first quarter of 2006, Amgen's U.S. sales of Aranesp totaled $596 million for an

increase of 33% over the same quarter in 2005. During this same five-year time period (2001-

2005), Aranesp has had additional international sales totaling $2.818 billion. Thus, the total

worldwide sales for Aranesp from 2001-2005 has amounted to almost $8 billion.

**The Competing Drugs: Procrit and Epogen**

36.    Prior to becoming the Fortune 500 company that it currently is, Amgen was a

fledgling biotech company struggling to finance the development of its drugs. One such drug

under development was "epoetin alfa" ("EPO") – a drug that would treat anemia in certain

16

patients by stimulating the production of red blood cells.

37.    During the 1980's, Amgen contracted with Johnson & Johnson ("J&J") for

financial and technical assistance in completing the development of, and FDA approval for, EPO.

Among other things, Amgen and J&J agreed that Amgen would have exclusive rights to market

EPO in the United States for use with dialysis patients; and J&J would have exclusive rights to

market EPO for all other uses in the United States, including non-dialysis kidney patients.  J&J

also would have exclusive rights to market EPO outside of the United States (excepting China

and Japan) for all uses.  Amgen would market EPO under the name "Epogen," and J&J would

market EPO under the name "Procrit."  (J&J markets EPO under the name Procrit in the United

States; but J&J markets EPO under different names internationally.)

38.    When Amgen made its deal with J&J, EPO was primarily used to treat anemia in

dialysis patients, which under the agreement would be Amgen's market.  Thereafter, EPO was

approved for many other uses, however, including the treatment of anemia suffered by cancer

patients.  This oncology market for EPO was (and is) substantial indeed, but this market under

the agreement belonged to J&J, selling EPO as the cancer drug Procrit.

39.    Given this lucrative (but contractually barred) oncology anemia market, Amgen

developed Aranesp which was approved in 2001 as a new anemia drug that it could market for

use with oncology patients (and non-dialysis kidney patients), without violating its agreement

with J&J.  Since then, Amgen has aggressively and successfully marketed Aranesp to

physicians/practices/hospitals/long term care facilities as an alternative to Procrit –in an effort to

increase sales and market share of Aranesp, and recapture the lost Procrit market.  In certain

situations, Amgen also has marketed Aranesp as an alternative to its own drug Epogen – *i.e.*,

cannibalizing its own Epogen sales – to lay the groundwork for future reimbursement changes

that could make Aranesp more profitable to providers than Epogen.

**The Defendants' Unlawful Marketing and Pricing Practices**

40.     The Defendants in this case have violated several laws, including without limitation, the Federal and State FCAs, the Medicare and Medicaid Anti-Kickback Act, and the Federal Food, Drug, and Cosmetic Act, by engaging in numerous unlawful activities in their marketing and pricing of Aranesp from at least September 2002 to at least mid-March 2005.  The Defendants' unlawful activities involve various means of providing financial benefits and/or incentives to their customers (*e.g.*, physicians, clinics, hospitals, long term care facilities) in order to induce them to purchase and use Aranesp, and off-label marketing, all as more fully described hereafter.

A.     **Defendants' Improper "Marketing the Economics" of Aranesp**

41.     Throughout the time that Relator was actively employed by Amgen – *i.e.*, September 2002 through mid-March 2005 – she witnessed and/or was instructed to participate in Amgen's efforts to sell Aranesp to customers by openly and vigorously "marketing the economics" of the drug.  In particular, through its Aranesp sales and marketing managers, Amgen expressly instructed, trained, and directed its sales reps and product managers to market Aranesp to customers by detailing and emphasizing the more-lucrative profits that could be made by customers if they prescribed Aranesp to their patients instead of competing drugs, such as Procrit and Epogen.   These marketing and training practices of Amgen are evidenced in numerous PowerPoint presentations made to Amgen's sales and marketing staffs, and also in countless spreadsheets that Amgen encouraged to be prepared and disseminated among the sales and marketing staffs.

42.     This practice of marketing the greater profits to be earned on a drug (such as

Aranesp) is commonly referred to as "marketing the spread" or "margin." The "spread" or "margin" is the difference between the customer's purchase cost for a drug and the reimbursement amount that is received by the customer from Government Health Care Programs (and/or private health insurance programs). Because the reimbursement amount for a drug almost always is higher (indeed sometimes far higher) than the purchase cost, the "spread" invariably equates to profit made by the customer each time the drug is prescribed.

43.     In the case of Aranesp, the "spread" was significant, especially as compared to the smaller "spread" for the competing drugs Procrit and Epogen. Thus, customers could reap far greater profits by prescribing Aranesp than they could if they prescribed Procrit or Epogen. Defendant Amgen (and the other Defendants as discussed below) could influence the purchaser's choice of drug by "marketing the economics", and they could also influence the "spread" in two ways: first through the purchase price offered for the drug to a given customer, e.g., offering of discounts, rebates, etc.; and second, by providing sales and pricing data to Government Health Care Programs that could affect Average Wholesale Price (which was used, e.g., by Medicare until January 1, 2005 to set the reimbursement for Aranesp and its competitor drugs) and/or Average Selling Price (which was used, e.g., by Medicare as of January 1, 2005 to set the reimbursement for Aranesp and its competitor drugs) or another reimbursement methodology. Amgen routinely empowered its sales reps to offer large discounts on Aranesp to customers, thereby lowering the customer's acquisition cost for the drug. Such discounts had the direct and immediate effect of increasing the reimbursement "spread"—i.e. profit—that the customers would benefit from if they prescribed Aranesp.

44.     During the time period 2002 thru 2004, governmental reimbursement for prescription drugs under "Medicare Part B" was based on a formula that typically reimbursed the

physician an amount equal to 95% of the "average wholesale price" ("AWP") for the drug. The
AWP for a drug was set by Medicare based on sales and cost data provided by the manufacturer
of the drug, in this case, Amgen. Relator is not aware of any Aranesp customer who ever paid
more than the AWP for Aranesp during the two and a half years that she worked at Amgen. On
the other hand, Relator is aware of numerous Aranesp customers that paid less than the AWP for
Aranesp based on the discounts that were routinely provided. Accordingly, if there were no
Aranesp customers paying more than AWP to balance out the huge number of Aranesp
customers paying less than AWP, then the AWP for Aranesp would be inflated and inaccurate –
*i.e.*, the AWP for Aranesp was not the true "average wholesale price" for the drug.

45.     Beginning on January 1, 2005, Medicare Part B reimbursement for Aranesp in the
physician clinic setting was based on a new formula calculated as "average selling price"
("ASP") plus six percent – *i.e.*, ASP + 6%. The first ASP was set before Relator left Amgen and
was based on data Amgen submitted in 2004. ASP is recalculated on a quarterly basis thereafter,
to try to more accurately reflect the actual selling price.

46.     From the outset of Relator's initial hiring as an Aranesp sales rep in September
2002, she was expressly instructed, trained, and directed by her Amgen superiors to market the
favorable reimbursement economics (margins/spreads) of Aranesp to her customers. (Relator
also had numerous conversations with Amgen superiors and/or other Aranesp sales reps which
confirmed that "marketing the economics" of Aranesp was company policy and practice even
prior to Relator's joining Amgen.) Among other things, she was extensively trained and
encouraged to advise her customers (physicians and physician groups) about the greater profits
that could be earned if Aranesp was prescribed in place of competing drugs like Procrit or
Epogen. Relator was given access to numerous spreadsheets that compared the reimbursement

amounts of Aranesp versus Procrit, and that expressly quantified the greater profits to be earned by customers if Aranesp were prescribed. Such spreadsheets were routinely used by the Aranesp sales reps, and Relator's superiors were aware of these spreadsheets and encouraged their creation and dissemination by and among the sales reps. Relator's superiors also were aware that their sales reps were showing customers the "Aranesp vs. Procrit" profit spreadsheets in connection with their marketing activities and/or customer office visits. Indeed, Aranesp managers higher in rank than Relator were actively involved in the creation, fine-tuning and distribution of these spreadsheets.

47. Moreover, Amgen was aware that "marketing the spread" for Aranesp was unlawful, but nevertheless did it even at upper levels of the company in concert with the other Defendants. Relator's superiors counseled her and other sales reps to be discreet when they discussed the favorable economics of Aranesp with customers. Relator's superiors would also stress to their sales reps the importance of learning the Aranesp reimbursement and profit economics by heart so that the sales reps could explain those economics to their customers verbally, without leaving paperwork behind. For example, managers told sales reps that they should be able to write the economics down on a napkin in front of the customer if they had to, then get rid of the napkin if possible. If the physician took the napkin, the rep was to make sure Amgen's name was no where on the napkin. Relator (and other sales reps) were told this in new hire training presented by the marketing department (Alex Roubanis) when they first started with Amgen.

48. Amgen would also, from time to time, have internal presentations in which sales reps were advised not to talk to customers about Aranesp economics or compare the potential Aranesp reimbursement profits to those of Procrit. On some occasions, Amgen even had

representatives from its legal department participate in such presentations in order to explain and to purportedly warn about the serious legal ramifications for unlawful drug marketing. These presentations were, however, universally understood by Aranesp sales reps and their superiors to be lip service, and the sales reps were not expected to abide those warnings; rather, the sales reps merely were being reminded indirectly of the importance of being discreet when they discussed Aranesp economics with their customers. The sales reps understood the legal presentations to be in the nature of "wink-wink-nod-nod". Indeed, the aforementioned legal presentations did nothing at all to limit or to change the continuing practice of Aranesp managers to encourage their sales reps to create and to disseminate spreadsheets that compared the profits to be made on Aranesp versus Procrit (or Epogen). Moreover, not only did Aranesp managers encourage the creation of such spreadsheets, they often directly participated in their creation by consulting with sales reps about them, or in some cases, by actually creating the spreadsheets themselves and then providing them to the sales reps. Furthermore, the sales reps knew that Amgen upper management would go on what they called "customer blitz's" where they would take the Amgen private jet to see the largest customers in the country that Amgen was in fear of losing. They would push economics at every one of these meetings. In addition, the other Defendants would assist Amgen in marketing the economics, as discussed below. Thus, Relator and her colleagues came to know that "marketing the economics" was the way their bosses expected Aranesp to be sold.

### B.   Unlawful Discounts on Aranesp

49.     In order to increase the "spread" on Aranesp – and thereby increase the incentive for prescribing the drug – Amgen routinely provided various types of discounts to its customers, including significant off-invoice discounts on Aranesp to certain of its customers, market-share

based discounts, and Amgen paid Defendant INN an "administrative fee" so INN could then pass on part of that fee to the customer as an upfront discount on Aranesp if necessary to get the business. Amgen did not provide uniform discounts on Aranesp to its customers; rather, Amgen provided or authorized other Defendants to provide greater discounts for some customers or potential customers, especially ones who would prescribe in high-volume. For example, Amgen offered a big customer, Mid-Atlantic Nephrology Associates, P.A. ("MANA"), a so called "one-off" contract that was not offered to all customers in the country. Amgen was very concerned about losing this big account because Procrit was offering them better pricing. Defendant INN told Amgen about this and then Amgen had a special contract made up for MANA. Relator was told to keep this very quiet, e.g., not mention it to any of the reps, because Amgen did not want to give this pricing to all accounts (or even the big accounts that would also be able to qualify for it, but that were willing to pay more for Aranesp). Amgen also authorized progressively-higher discounts on Aranesp if the customer prescribed more Aranesp than the competing drugs (Procrit and Epogen) – *i.e.*, a market-share-based discount (as opposed to a simple volume discount), which intentionally had the effect of influencing the customer's prescription decision based on financial reasons instead of medical ones.

**C.** **Scheme Relating to Unlawful Reimbursement for "Overfill"**

**1. The Clinical Use of Aranesp**

50.      Aranesp is an injectable drug that typically is administered by a physician or his/her staff at the physician's office or clinic. It may also be administered to patients in a hospital or long term care setting. Aranesp is distributed by Amgen in single dose vials and single dose pre-filled syringes containing liquid solution with a predetermined concentration of the drug. However, not all patients require the same amount of Aranesp. For example, oncology

patients typically require a larger dose of Aranesp than do nephrology patients.  In order to accommodate the different clinical uses for Aranesp, Amgen distributes the drug in vials or syringes that contain different amounts of the drug – *e.g.*, 25 mcg (micrograms), 40 mcg, 60 mcg, 100 mcg, 150 mcg, 200 mcg, 300 mcg, or 500 mcg.  Aranesp is generally dosed according to the patient's weight.  For nephrology patients, the starting dose is 0.45 mcg/kg once weekly and for oncology patients the starting dose is 2.25 mcg/kg once weekly or 500 mcg every three weeks. Approved nephrology dosing is once every two weeks for patients who have already been on EPO once weekly and are getting converted to Aranesp,  and once a week for new patients. In each case, the volume of liquid solution to be administered to the patient is roughly the same – usually 1.0 ml (milliliter) for the vials or 0.3-0.6 ml for the syringes – but the amount of Aranesp administered to the patient (*i.e.*, the total micrograms of medicine) varies depending on the drug concentration.

51.     Although single-dose vials of Aranesp contemplate that a 1.0 ml injection will be administered to the patient, the actual volume of liquid solution in the vial *exceeds* 1.0 ml by almost 17%.  In particular, each vial of Aranesp contains excess solution of approximately 0.168 ml that is commonly referred to as "overfill."  Amgen ostensibly provides this overfill for two reasons:  (1) to ensure that there is enough solution in the vial to allow slightly more than 1.0 ml of solution to be drawn up easily into a syringe; and (2) to account for the slight loss of solution that typically occurs as an incident to preparing the injection for administration to the patient – *e.g.*, the routine (and minimal) pre-injection discharge of solution from the syringe to ensure that the injection does not contain air bubbles.

52.     A single-dose 60-mcg vial of Aranesp has a concentration of 6 mcg of drug per 0.10 ml of the contemplated 1.0 ml injection.  Thus, the 0.168 ml of overfill in a 60-mcg vial

contains an extra 10.08 mcg of drug, *i.e.*, 6 (mcg per 0.10 ml) x 1.68. By comparison, the overfill in a 300 mcg vial would contain an extra 50.4 mcg of drug because of the far-higher drug concentration – *i.e.*, 30 (mcg per 0.10 ml) x 1.68.

53.     Aranesp purchasers are charged for the drug based upon the concentration and dosage. Purchasers are *not* charged for the overfill that they receive – *i.e.*, they are not charged for the extra micrograms of drug that are present in the overfill. For example, if a physician buys a 1.0 ml single-dose vial containing a 60-mcg concentration of Aranesp, then the physician only pays Amgen (and/or a third-party drug provider) for 60 mcg worth of the drug. The physician would not pay for the additional 10.08 mcg of Aranesp that would be present in the 0.168 ml of overfill for that particular 60-mcg vial. Likewise, a physician purchasing a 300-mcg vial of Aranesp would not pay for the extra 50.4 mcg of drug in the overfill for that vial.

54.     Aranesp is expensive. Typically, physicians bill Government Health Insurance Programs directly for the administration of Aranesp. These bills, which are usually on a HCFA/CMS 1500 form, may include billing components for: an office visit, an injection fee, a drug fee (reimbursing for the "cost" of the drug), and sometimes a nursing fee.

## 2.     Unlawful Billing for "Overfill"

55.     As stated above, Aranesp usually is purchased by physicians/clinics/hospitals/long term care facilities for use in treating their patients; and after Aranesp is administered by injection to a patient, the provider typically seeks reimbursement for the administered drug from Government Health Insurance Programs – *e.g.*, Medicare and Medicaid – and/or from private health insurance programs. Such reimbursement is provided based on the number of micrograms of Aranesp that were actually administered to the patient; or, in some cases, based on the number

of micrograms of Aranesp in the single-dose vial or prefilled syringe that were paid for (even if
not all of the micrograms were administered).  However,  Amgen and the other Defendants have
conspired with each other, with providers and others to defraud both governmental (federal and
state) and private health insurance programs by encouraging Aranesp purchasers to seek
reimbursement for the additional micrograms of Aranesp contained in the overfill.  This
overbilling is improper for two reasons:  first, the Aranesp purchasers did not actually pay for the
"overfill micrograms" of drug, and second, the Aranesp purchasers do not usually administer the
"overfill micrograms" of drug to their patients.  For both reasons, Defendants' marketing of the
overfill causes providers to seek the additional reimbursement which constitutes false and
fraudulent billing.

     56.   In particular, during the time that Relator was employed by Amgen, she learned
that Amgen sales reps would advocate to customers the increased profits that could be made if
the customers were to seek reimbursement for the "overfill micrograms" of Aranesp in the
single-dose vials that they had purchased.  The Relator has spreadsheets which are examples of
how the overfill was calculated and advocated by reps and management.  She is aware of other
reps and INN employees discussing with customers/providers how to fill out the HCFA/CMS
1500 form---they told the  customer to simply write down the dose "they gave" which would
include the overfill, on the 1500 form.  Although Relator never engaged in this marketing
practice, she had numerous communications with other sales reps confirming that the practice
existed and that other Amgen sales reps engaged in the practice.  Moreover, Relator is aware that
some Aranesp customers did, in fact, engage in "overfill billing."  Furthermore, upper
management of Amgen – including the National Sales Director ("NSD") for Aranesp and the
Director of Marketing for Aranesp – were aware of the practice of advocating "overfill billing" to

customers and did nothing to prevent it.  Indeed, the Regional Sales Director (who reports to the NSD) authored some spreadsheets that included overfill, and Relator witnessed conversations in meetings regarding overfill with the NSD and Marketing Director (among other management). The reps would often complain about overfill  because they said J&J was actively marketing Procrit with such promotional materials and the Amgen reps wanted some similar materials to market Aranesp overfill.  Management would always say Amgen could not come out with official company materials, but instead to talk about it in private with customers and to let Defendant INN discuss it with customers that were not loyal Amgen customers.

57.     In order to have some materials, some Aranesp sales reps prepared detailed spreadsheets (ostensibly labeled "For Information Only") that expressly calculated the additional (and significant) revenue/profit that could be made by customers if they sought reimbursement for the "overfill micrograms" of Aranesp.  They showed these spreadsheets to their customers during their office visits to market Aranesp – and, in particular, to market the greater profits that could be made on Aranesp as compared to the competing drug Procrit.  As such, the "overfill spreadsheets" typically would compare the reimbursement amounts and spreads for Aranesp + overfill to the reimbursement amounts and spreads for Procrit + overfill.

58.     This practice of advocating "overfill billing" to Amgen's customers constituted a form of free drug sample or "liquid kickback" in every vial.  Yet, unlike traditional free drug samples which are heavily regulated – *i.e.*, they must be carefully accounted for by drug companies and cannot be the basis for governmental reimbursement – the free amounts of overfill found in every Aranesp vial were provided by Amgen without any reporting requirement.  When Amgen advocated to, and conspired with other Defendants and their customers to engage in "overfill billing," however, the unlawful effect was no different than it would be had Amgen

provided its customers with free Aranesp samples and then encouraged them to seek reimbursement for them.

59.     Amgen's intention to exploit "overfill billing" as a means of gaining new customers and market share is further evidenced by the unusually large quantity of overfill found in the Aranesp vials.  The 0.168 ml of overfill present in the 1.0 ml vials likely was excessive, especially given that the United States Pharmacopeia ("USP") guidelines recommended a mere 0.10 of overfill for a 1.0 ml vial and 0.15 ml of overfill for a 2.0 ml vial.  One internal Amgen document reveals that Amgen was well aware of USP's overfill guidelines, but Amgen nevertheless provided a far larger overfill amount – *i.e.*, overfill of 0.168 ml instead of the 0.10 ml recommended by the USP guidelines.  Moreover, in comparison, Epogen 1.0 ml single use *and* multi-use vials contain only 0.111 ml of overfill, which is *less* than the 0.168 ml of overfill in the 1.0 ml single use vials of Aranesp.  If anything, one would reasonably expect there to be more overfill in a multi-use vial than in a single use vial  because with multiple injections there presumably is some risk of greater spillage, wastage, etc.

60.     Defendant INN also improperly advocated and encouraged its/Amgen's customers to seek reimbursement for Aranesp overfill.  For example, on March 26-27, 2004 Relator attended a weekend seminar in Carmel, CA that was put on by INN at which the INN representatives openly pushed physicians and office managers to bill for overfill when seeking reimbursement.  The INN representatives advised the seminar attendees that as long as the overfill quantities were included on the patients' charts as having been administered – even though they were *not* administered – then the overfill reimbursement supposedly would pass an audit.

61.     The unlawful "overfill billing" discussed above with respect to Aranesp should be distinguished from how the issue arises with respect to the competing drug Procrit of which Amgen's sales reps were complaining. Specifically, whereas Aranesp is marketed in single-dose vials, Procrit is marketed in multi-dose vials which contemplate that more than one dose will be drawn from the vial. Procrit vials typically have about fourteen percent of overfill to ensure that the vial will have enough solution for the multiple injections to be drawn from the vial – *i.e.*, the overfill is provided to offset the loss of solution attendant to each injection and to ensure that there is enough solution for the expected number of injections to be drawn from the vial. Significantly, J&J (through its subsidiary Ortho Biotech Products, L.P.) has touted to its customers the ability to bill for this overfill – *i.e.*, J&J tells Procrit customers that they are entitled to seek reimbursement for every unit of Procrit that is administered to their patients, *and* that they are entitled to administer the entire contents of the Procrit vial. As such, depending on how careful the customer is when drawing the multiple Procrit injections, the customer ultimately can receive reimbursement for some (if not most) of the Procrit overfill. Amgen was aware of the ability of Procrit customers to benefit from administering and billing for the overfill in the multi-dose Procrit vials. And to combat this perceived unfair advantage, Amgen improperly condoned and/or encouraged its Aranesp sales force to market the overfill found in the single-dose vials of Aranesp, as explained above.

62.     Defendant Amgen was aware that "marketing the overfill" of Aranesp was unlawful. For example, Relator attended various internal presentations at Amgen where the issue of overfill billing for Aranesp was discussed. At one such presentation, the related issue of Procrit overfill billing also was discussed. Moreover, during that same PowerPoint presentation in early 2005, the Amgen sales force attendees were cautioned about overfill as follows: "This is

a highly sensitive issue that you should not proactively discuss with customers." The sales reps

further were advised: "If the customer inquires whether it is okay to bill for the entire contents of

the [Aranesp] vial, refer them to the applicable payor." However, like the other admonishments

that were made at such presentations, the sales reps and their superiors understood these

warnings to be superficial in light of spreadsheets presented by Amgen management,

conversations Relator participated in, and email traffic. The practice of "marketing the overfill"

by many Aranesp sales reps continued unabated and with the full knowledge and approval of the

upper management for Aranesp sales and marketing including at least the NSD, RSD, district

managers, marketing associate director, and the marketing director.

### D.  Other Illegal Inducements and/or "Kickbacks"

63.     In addition to the conduct alleged above which operated as illegal inducements or

kickbacks, during the time that Relator worked for Defendant Amgen, she was also exposed to,

and/or required to participate in, various other types of kickback activity, including, without

limitation, "seminars" and "retreats" for physicians (and/or their office staff) that were hosted or

funded by Amgen and/or Defendant INN. These seminars and retreats ostensibly were done to

provide neutral, educational information to the attendees – *e.g.*, information concerning various

competing drugs, and/or concerning billing practices. In fact, however, the seminars and retreats

often were little more than thinly-disguised commercial presentations for Aranesp.

64.     The Amgen/INN seminars and retreats typically were held at vacation locations

such as Carmel, California (the location of one such event attended by Relator in March 26-27,

2004), with Amgen directly or indirectly paying all the travel, food, and accommodation

expenses of the attendees. Furthermore, the physicians and their staff who attended the seminars

and retreats typically were paid a so-called "honorarium" of anywhere from $500 to $3,000 –

a highly sensitive issue that you should not proactively discuss with customers." The sales reps

further were advised: "If the customer inquires whether it is okay to bill for the entire contents of

the [Aranesp] vial, refer them to the applicable payor." However, like the other admonishments

that were made at such presentations, the sales reps and their superiors understood these

warnings to be superficial in light of spreadsheets presented by Amgen management,

conversations Relator participated in, and email traffic. The practice of "marketing the overfill"

by many Aranesp sales reps continued unabated and with the full knowledge and approval of the

upper management for Aranesp sales and marketing including at least the NSD, RSD, district

managers, marketing associate director, and the marketing director.

### D.      Other Illegal Inducements and/or "Kickbacks"

63.      In addition to the conduct alleged above which operated as illegal inducements or

kickbacks, during the time that Relator worked for Defendant Amgen, she was also exposed to,

and/or required to participate in, various other types of kickback activity, including, without

limitation, "seminars" and "retreats" for physicians (and/or their office staff) that were hosted or

funded by Amgen and/or Defendant INN. These seminars and retreats ostensibly were done to

provide neutral, educational information to the attendees – *e.g.*, information concerning various

competing drugs, and/or concerning billing practices. In fact, however, the seminars and retreats

often were little more than thinly-disguised commercial presentations for Aranesp.

64.      The Amgen/INN seminars and retreats typically were held at vacation locations

such as Carmel, California (the location of one such event attended by Relator in March 26-27,

2004), with Amgen directly or indirectly paying all the travel, food, and accommodation

expenses of the attendees. Furthermore, the physicians and their staff who attended the seminars

and retreats typically were paid a so-called "honorarium" of anywhere from $500 to $3,000 –

such amounts being paid even in cases where an attendee did not make a speech or otherwise

make a presentation.    Amgen footed the bill for these expensive seminars and retreats – and

paid sizeable "honoraria" to the attendees – all with the express and knowing intention of

inducing, and/or rewarding, the attendees for prescribing Aranesp.

65.      Amgen also used the aforementioned seminars and retreats as a means of

recruiting the office administrators/managers/billers of physicians or physician groups.  In

particular, Amgen encouraged office administrators/managers/billers who had attended an

Amgen seminar/retreat, or who came from offices with a good track record of writing Aranesp

prescriptions,  to contact their counterparts at other physician offices in order to tout the financial

benefits of prescribing Aranesp.  Such secondary contacts sometimes were referred to as

"reimbursement roundtables," and the individuals who arranged and performed these contacts

were paid an additional "honorarium" of $250 to $1,500 for doing so.    Amgen described this

practice on internal documents as being its "Speakers Bureau Program."    Moreover, Amgen

required its Aranesp sales reps to contact office administrators/managers of their physician

customers for the purpose of encouraging them to do "reimbursement roundtables," and budgeted

reps' expense accounts to include for such fees.    Amgen even established a goal/requirement

called a Plan of Action ("POA") that each Aranesp sales rep ensure that at least two such

"reimbursement roundtables" were done per half-year.

66.      Amgen held a reimbursement advisory board and speaker training from Friday

October 18-Saturday October 19, 2002 at the Ritz Carlton Hotel Marina Del Rey in Los Angeles,

California.  Amgen paid all the expenses of some 100 invitees (and each was allowed to bring

one guest provided they paid for their own airfare) as well as a $400 honorarium per invitee.  The

invitees were mostly office and billing managers and according to Amgen's invitation, "The

objective of this meeting is to solicit your input and recommendations on the development of educational materials based on your billing expertise for Aranesp."

67.     Amgen's internal documents show, and Relator knows from first hand experience, that Amgen had several programs for so-called "medical education" including without limitation, speaker programs, educational grants/fellowships, advisory boards, focus groups, consulting services and preceptorships. Some nephrologists received substantial amounts of money from Amgen, with INN's knowledge, to be "consultants"; in fact, they did little if any consulting work, and the payments were in reality tied to their continued practice of writing substantial volumes of Aranesp prescriptions.

### E.    Unlawful "Off-Label" Marketing of Aranesp

68.     While physicians are allowed to prescribe medications "off label," if deemed medically necessary, it is a violation of the FFDCA for drug companies to market their products "off label," except in narrowly prescribed categories. In violation of that prohibition, Amgen sales reps, with the knowledge and support of management, routinely promoted dosages of Aranesp that were off-label, and they also promoted off label uses in the inpatient/hospital setting (which Aranesp is not indicated for except in dialysis patients), and for heart failure patients. Some of Amgen's Regional Medical Liaisons ("RML's") basically acted like sales people by assisting the reps who were trying to convert the hospital to Aranesp. Other RML's refused to do this because they knew Aranesp was not indicated for use in the inpatient setting (except dialysis). When RML's refused to help, reps, district managers, regional managers, and marketing would all be upset.

69.     Some physicians have profited substantially from the writing of Aranesp, and Amgen employees have often coached physicians and their employees on ways in which to

prescribe doses, including off-label doses, to maximize reimbursement and/or revenues to the physician.  In particular, reps were encouraged to take advantage of, and did take advantage of the fact that Aranesp had a longer half-life than Procrit to promote an off label regimen of monthly injections of Aranesp (instead of every two weeks) for nephrology patients already on Aransesp or EPO and of every two weeks (instead of weekly) for patients taking Aranesp or EPO for the first time. The reason for this off-label promotion was economic:  by marketing the drug for injection on less frequent basis, even though not approved, Amgen sought to capture additional market share.  It did so by advocating that less frequent  injections were more attractive to patients, *and* by graphically showing physicians and other customers that their profits would be higher using the less frequent higher dosage because it would save physicians and staff time, and therefore they could see more new patients and charge a "new patient" office visit fee.  By seeking to distinguish Aranesp from its competitors in this manner, Amgen sought to drive market share, but did so through the improper means of off-label promotion of unapproved dosage(s) of the drug.

70.    Indeed, in approximately April 2003, Amgen created unapproved posters that touted the alleged benefits of monthly dosing of Aranesp, and others that touted the every other week dosing for EPO naïve patients, and Amgen provided and distributed those posters to its sales reps for use in marketing Aranesp to the drug's customers.  This blatant off-label marketing of Aranesp resulted in additional (and improper) revenues for Amgen because some customers switched to Aranesp based solely (or largely) on the perceived benefits of off-label once/month dosing of Aranesp and some physicians switched their patients because of the additional revenue that could be made.  Relator and the other sales reps were also given numerous spreadsheets to illustrate monthly dosing calculations.  One spreadsheet entitled "Aranesp Freedom Time" was

created by sales rep Shaun Fitzmorris (later promoted to district manager) who was given high praises for the spreadsheet (among other totally "homemade bread" marketing items) made and distributed around the country that hypothetically illustrates how much time a physician and staff can save by giving monthly injections, which time equates to seeing more patients and making higher profits. Sales and marketing management were aware of this spreadsheet being used. In addition, Amgen undertook a campaign referred to as the "Anemia Counts" campaign to try to expand the patients eligible for treatment with Aranesp to those with heart failure. Amgen reps were given copies of studies in this regard to help sell proactively for this indication when Relator was a rep. Later, when Relator was in marketing, Amgen put these studies into a "reactive use only" "Proof Source Book" ("PSB"), however, reps were still being instructed to, and were, using this PSB proactively to sell Aranesp for use in heart failure patients.

### F.  Amgen's Unlawful Relationship with INN

71.     In March 2004, Relator was promoted to "Product Manager" for Aranesp and relocated to Amgen's "home office" in Thousand Oaks, California. As a Product Manager for Aranesp, Relator no longer was involved in direct sales, but rather, her job duties and responsibilities focused more broadly on the marketing and advertising of Aranesp. As part of her new position, Relator was assigned responsibility for Amgen's relationship with Defendant INN (a Group Purchasing Organization), which Relator had been led to believe was an independent entity that focused on nephrology practices and physicians. As alleged above, INN originally was directed by Anthony Corrao (a former Amgen employee with close ties to other current Amgen employees--including upper management) and others.

72.     Several months after Relator's promotion, Relator became privy to certain

information and documentation that caused Relator to understand and believe that INN was not an independent GPO, but rather, was an entity that essentially functioned as a de facto marketing arm for Amgen and for Aranesp while Amgen funneled business to Defendants INN and ASD instead of other Aranesp distributors.  Specifically, Relator learned that INN shared highly confidential information with Amgen concerning INN's business operations, including detailed information regarding certain nephrologists and nephrology practices, including revenues and finances and how many "untreated" chronic kidney disease patients an office had.  In turn, Amgen provided INN with "target lists" that included the names and addresses of its nephrology customers that both purchased Aranesp and/or purchased competing drugs.  Basically, Defendants Amgen and INN would trade any and all information back and forth that would help either or both of them get more business.

73.    At the same time, INN's related entity, wholesaler Defendant ASD (which is part of Defendants ABC and ABSG) was knowingly helping Amgen reps and INN get customers and vice versa. For example, the ASD rep would "buddy up" with the Amgen rep and tell the Amgen rep that he would give a big customer a better price on Aranesp. The Amgen rep would then make an economic spreadsheet or relay the economics in whatever way they did it, to let this big customer know that if they switched to ASD, they would get a better price on Aranesp. This could pertain to a customer who was already using Aranesp but buying it from another wholesaler (not ASD) or it could be a customer who was using all Procrit and the rep (and INN) were trying to get to convert their office to Aranesp. (The customer may have been buying Procrit from ASD or another wholesaler). Sometimes ASD would even offer a customer a slight discount on Procrit just to lure them in to ASD, with the main objective being to then convert the account to Aranesp once the customer had switched to ASD.   Defendant ASD was using

35

Aranesp as a "loss leader" for getting the business it really wanted—oncology drugs. One ASD
rep told Relator that he quoted pricing to customers based on "how important of a customer they
were to Amgen." Basically, the Defendants were triangulating customers: ASD, Amgen and
INN were all targeting the customer from slightly different angles and the customer had no idea
that the different reps were talking to each other and sharing information, and that each company
was attempting to direct business to the other(s).

74.     Relator also learned that Amgen was funneling large amounts of money to INN
ostensibly identified as "administrative fees", when in fact the money was being used to arrange
and subsidize all expenses paid "retreats" or "educational seminars" for "targeted" physicians
(the names of which Amgen provided to INN), and/or to provide extra discounts to
customers/target accounts. These target accounts are high dollar volume accounts and/or
accounts that have important political ties to influential nephrology associations in the country
that have ties to the government and setting the reimbursement rate for Amgen drugs. INN
marketed and led the programs like they were INN meetings, but in fact, all funding came from
Amgen. At these "retreats" and "educational seminars," INN and Amgen representatives would
lead "informational" sessions that placed heavy emphasis on Aranesp, to the exclusion of any
competing drugs, and which placed heavy emphasis on the economic benefit that the physicians
could realize if they purchased and administered Aranesp instead of competing drugs.

75.     By Amgen directing business to INN, and INN targeting and converting these
accounts, it has cost the government millions of dollars because the majority of these patients are
Medicare/Medicaid patients and Aranesp had a higher reimbursement rate with a bigger margin
of profit. INN sold this "spread' to physicians, along with help from Amgen reps. INN and
Amgen reps also sold overfill, which is illegal, as well as converting Epogen dialysis business to

Aranesp, which made the physicians a much bigger margin since an Aranesp dialysis reimbursement rate had not been set yet.

76.    At or about the same time, Relator also learned that INN representatives were not disclosing INN's direct relationship with Amgen to its customers, and instead were conveying the impression that INN was a wholly independent organization, with no affiliation with or ties to Amgen. In fact, INN is not independent of Amgen, and functions as a marketing arm of Amgen, engaging in practices on Amgen's behalf that Amgen fully supports and condones. Nevertheless, INN reps would go into doctor's offices and meet with doctors, billing managers, office managers, etc., ostensibly to help them find billing errors or ways to increase reimbursement and revenue, or to offer or promote ancillary services that would improve office efficiency and economics. INN would prepare Physician Assessment Forms and then, unbeknownst to the physician, would share the results with Amgen and the Defendants would formulate a plan to get the doctor to switch to Aranesp. In addition, Amgen employees and INN reps would do "chart audits" of patient records/charts in offices and clinics.

**Damages to Government Health Care Programs**

77.    The above described practices by Defendants have caused the submission of false and fraudulent claims to Government Health Care Programs for reimbursement of Aranesp prescriptions. Claims related to Aranesp filed with the Government Health Care Programs have contained false and fraudulent statements and material omissions. Defendants have marketed Aranesp in a way that has compromised physicians' independent medical judgment and threatened patient safety through use of kickbacks and off-label promotion.

78.    As noted above, overall United States revenues for Aranesp have totaled over some $5 billion since the drug was launched in 2001. By Defendant Amgen directing business to

Defendants INN and ASD, and INN and ASD helping Amgen identify and convert target accounts, Government Health Care Programs have been damaged significantly because the majority of the patients who use Aranesp are Medicare or Medicaid beneficiaries and Aranesp had a higher Government reimbursement rate with a bigger margin of profit than did Procrit or Epogen.

### Defendant Amgen's Unlawful Retaliation Against Relator

79.     When Relator discovered the truth regarding the INN-Amgen-ASD relationship, described above, she began to express within Amgen her concern about Amgen's overly-close and undisclosed relationship with INN.  Among others, she expressed her concerns and/or discussed the issue with her superiors.

80.     Immediately after Relator began to voice concerns and raise questions with her superiors about the legitimacy of Amgen's relationship with INN, Relator's superiors drastically reduced her responsibilities vis-à-vis the Amgen-INN relationship, and they also falsely accused her of having misused her expense account.

81.     The stress and anxiety resulting from  the series of  confrontations with her superiors, among other issues, caused Relator to go on temporary disability leave from Amgen in mid-March 2005.  She remained on disability leave from that time until the end of March, 2006.

82.     As required by law, Relator is serving a detailed Disclosure Statement upon the United States and the State parties to this action.  The Disclosure Statement provides additional details concerning the Defendants' conduct and Relator's basis of knowledge.

- 38 -

## LEGAL CLAIMS FOR RELIEF

83.     Relator alleges that Defendants' conduct detailed above violates the False Claims
Act ("FCA") of the United States, 31 U.S.C. §§ 3729-3733, as amended (Counts One through
Four), and the False Claims Acts of the Plaintiff States and the District of Columbia (Counts Five
through Fifty-Six).  She brings these claims on behalf of the federal and state Plaintiffs as well as
on her own behalf.  In addition, she brings a personal claim against Defendant Amgen for
retaliating against her in violation of 31 U.S.C. § 3730(h) (Count Fifty-Seven).

## COUNT ONE

### [False and/or Fraudulent Claims, 31 U.S.C. § 3729 (a)(1)]

84.     Relator restates and realleges the allegations in paragraphs 1 through 83 above as
if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

85.     This is a claim for treble damages and monetary penalties pursuant to the False
Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

86.     Through the above-described acts and omissions, and from at least on or before
September, 2002 to the present, the Defendants knowingly caused to be presented for payment
and approval false and/or fraudulent claims to officers of the United States Government, in that
they  caused to be presented claims to obtain reimbursement for Aranesp when the Defendants
knew such items were not eligible for reimbursement or not eligible in part.  Aranesp
prescriptions would not have been presented but for the unlawful promotional activities made by
Defendants and the kickback activity and resulted in claims which failed to disclose the material
violations of the AKA and other laws.  As a result of this illegal activity, these claims were
improper in whole pursuant to 31 U.S.C. § 3729(a)(1).

39

87.     Federal Health Care Program officials, their contractors, carriers, intermediaries and agents, paid and approved claims for payment for Aranesp that should not have been paid or approved.

88.     The Defendants, through the means described above, deliberately and intentionally concealed the false and fraudulent nature of the claims from officials with Government Health Care Programs, and other Government officials, their contractors, carriers, intermediaries and agents, in order to induce payment of the false and fraudulent claims.

89.     Government Health Care Program officials and their contractors, carriers, intermediaries and agents, would not have paid the claims for Aranesp had they known the truth.

90.     By reason of the above-described presentment of false and fraudulent claims, the United States has suffered significant losses in an amount to be determined.

## COUNT TWO

### [False Records and Statements, 31 U.S.C. § 3729 (a)(2)]

91.     Relator restates and realleges the allegations in paragraphs 1 through 90 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

92.     This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

93.     Through the above-described acts and omissions, and from on or before at least September 2002 to the present, the Defendants knowingly made and used, and caused to be made and used, false records and statements for the purpose of having false and fraudulent claims for Aranesp paid and approved by Federal Health Care Program officials, their contractors, carriers, intermediaries and agents. Aranesp prescriptions would not have been presented but for the

40

unlawful promotional activities made by Defendants and the kickback activity. As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a)(2).

94.     By reason of the above-described presentment of false records and statements, the United States has suffered significant losses in an amount to be determined.

<b><u>COUNT THREE</u></b>

<b>[Conspiracy to Defraud, 31 U.S.C. § 3729 (a)(3)]</b>

95.     Relator restates and realleges the allegations in paragraphs 1 through 94 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

96.     This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

97.     Through the above-described acts and omissions, and from on or before at least September 2002 to the present, the Defendants, with each other and with persons known and unknown, knowingly agreed and conspired to defraud the federal and state governments by having false and fraudulent claims for Aranesp paid and approved by Federal Health Care Program officials, their contractors, carriers, intermediaries and agents. Aranesp prescriptions would not have been presented but for the unlawful promotional activities made by Defendants and the kickback activity. As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a)(1)-(2).

98.     By reason of the above-described unlawful conspiracy, the United States has suffered significant losses in an amount to be determined.

## COUNT FOUR

### [False Statements to Conceal Obligations, 31 U.S.C. § 3729(a)(7)]

99.      Relator restates and realleges the allegations in paragraphs 1 through 98 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

100.      This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

101.      Through the above-described acts and omissions, the Defendants knowingly made and used, and/or caused to be made and used, false records and statements regarding the drug Aranesp in order to conceal, avoid and/or decrease the Defendants' obligations to pay or transmit rebate monies or to offer certain prices to Government Health Care Programs to the United States.  In addition, these claims were monetarily excessive because they were improperly inflated by Defendants' illegal marketing and promotional activities. Claims to Government Health Care Programs as described above were false or fraudulent and the statements and records were false because they were monetarily excessive.

102.      By reason of the above-described false records and statements, the United States has suffered significant losses in an amount to be determined.

## COUNT FIVE

### VIOLATIONS OF THE CALIFORNIA FCA
### Cal. Gov't Code § 12651(a)(1)

103.      Relator restates and realleges the allegations in paragraphs 1 through 102 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

104.    The California False Claims Act, Cal. Gov't Code § 12651(a)(1), specifically provides, in part:

(a)  Any person who commits any of the following acts shall be liable to the state . . . for three times the amount of damages which the state . . . sustains because of the act of that person.  A person who commits any of the following acts shall also be liable to the state . . . for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

(1)    Knowingly presents or causes to be presented to an officer or employee of the state . . . a false claim for payment or approval.

105.    Defendants knowingly presented or caused to be presented to the California Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Cal. Gov't Code § 12651(a)(1).

106.    The State of California paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SIX

### VIOLATIONS OF THE CALIFORNIA FCA
### Cal. Gov't Code § 12651(a)(2)

107.    Relator restates and realleges the allegations in paragraphs 1 through 106 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

108.    The California False Claims Act, Cal. Gov't Code § 12651(a)(2), specifically

provides:

(a)  Any person who commits any of the following acts shall be liable to the state . . . for

three times the amount of damages which the state . . . sustains because of the act of that

person.  A person who commits any of the following acts shall also be liable to the

state… for the costs of a civil action brought to recover any of those penalties or

damages, and may be liable to the state . . . for a civil penalty of up to ten thousand

($10,000) for each false claim:

(2)  Knowingly makes, uses, or causes to be made or used a false record or statement to

get a false claim paid or approved by the state . . . .

109.    Defendants knowingly made, used and/or caused to be made or used false records
and statements to get false and fraudulent claims paid and approved by the California Medicaid
program, in violation of Cal. Gov't Code § 12651(a)(2).

110.    The State of California paid said claims and has sustained damages because of
these acts by the Defendants.

## COUNT SEVEN

## VIOLATIONS OF THE CALIFORNIA FCA
## Cal. Gov't Code § 12651(a)(3)

111.    Relator restates and realleges the allegations in paragraphs 1 through 110 above as
if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

112.    The California False Claims Act, Cal. Gov't Code § 12651(a)(3), specifically
provides:

(a)  Any person who commits any of the following acts shall be liable to the state . . . for

44

three times the amount of damages which the state . . . sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state . . . for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

(3) Conspires to defraud the state . . . by getting a false claim allowed or paid by the state . . .

113. Defendants conspired to defraud the State of California by getting false and fraudulent claims allowed and paid, in violation of Cal. Gov't Code § 12651(a)(3).

114. The State of California paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHT

## VIOLATIONS OF THE CALIFORNIA FCA
### Cal. Gov't Code § 12651(a)(7)

115. Relator restates and realleges the allegations in paragraphs 1 through 114 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

116. The California False Claims Act, Cal. Gov't Code § 12651(a)(7), specifically provides:

(a) Any person who commits any of the following acts shall be liable to the state . . . for three times the amount of damages which the state . . . sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state . . . for the costs of a civil action brought to recover any of those penalties or damages, and

45

may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

(7)     Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state . . . .

117.     Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Cal. Gov't Code § 12651(a)(7).

118.     The State of California paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT NINE

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
## Del. Code Ann. tit. 6, § 1201(a)(1)

119.     Relator restates and realleges the allegations in paragraphs 1 through 118 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

120.     The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201(a)(1), specifically provides, in part, that any person who:

(a)(1) Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval; shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of actual damages which the Government sustains because of the act of that person.

46

121.     Defendants knowingly presented or caused to be presented, directly and indirectly, to the Delaware Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

122.     The State of Delaware paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TEN

### VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### Del. Code Ann. tit. 6, § 1201(a)(2)

123.     Relator restates and realleges the allegations in paragraphs 1 through 122 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

124.     The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201(a)(2), specifically provides, in part, that any person who:

(a)(2) Knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of actual damages which the Government sustains because of the act of that person.

125.     Defendants knowingly made, used and caused to be made and used, directly and indirectly, false records and statements to get false and fraudulent claims paid and approved by the State of Delaware, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

126.     The State of Delaware paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT ELEVEN

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### Del. Code Ann. tit. 6, § 1201(a)(3)

127.    Relator restates and realleges the allegations in paragraphs 1 through 126 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

128.    The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201(a)(3), specifically provides, in part, that any person who:

(a)(3) Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of actual damages which the Government sustains because of the act of that person.

129.    Defendants conspired to defraud the State of Delaware by getting false and fraudulent claims allowed and paid, in violation of Del. Code Ann. tit. 6, § 1201(a)(3).

130.    The State of Delaware paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWELVE

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### Del. Code Ann. tit. 6, § 1201(a)(7)

131.    Relator restates and realleges the allegations in paragraphs 1 through 130 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

48

132.     The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §

1201(a)(7), specifically provides, in part, that any person who:

(a)(7) Knowingly makes, uses or causes to be made or used a false record or statement to

conceal, avoid, increase, or decrease an obligation to pay or transmit money to or from

the government; shall be liable to the Government for a civil penalty of not less than

$5,500 and not more than $11,000 for each act constituting a violation of this section,

plus 3 times the amount of actual damages which the Government sustains because of the

act of that person.

133.     Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money

to the state, in violation of Del. Code Ann. tit. 6, § 1201(a)(7).

134.     The State of Delaware paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT THIRTEEN

## VIOLATIONS OF THE DISTRICT OF COLUMBIA
## PROCUREMENT REFORM AMENDMENT ACT
## D.C. Code § 2-308.14(a)(1)

135.     Relator restates and realleges the allegations in paragraphs 1 through 134 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

136.     The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-

308.14(a)(1), specifically provides, in part:

(a)  Any person who commits any of the following acts shall be liable to the District for 3

times the amount of damages which the District sustains because of the act of that person.

A person who commits any of the following acts shall also be liable to the District for the costs of a civil action brought to recover penalties or damages, and may be liable to the District for a civil penalty of not less than $5,000, and not more than $10,000, for each false claim for which the person:

(1)     Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval.

137.    Defendants knowingly caused to be presented to the District of Columbia Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of D.C. Code § 2-308.14(a)(1).

138.    The District of Columbia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FOURTEEN

### VIOLATIONS OF THE DISTRICT OF THE COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(2)

139.    Relator restates and realleges the allegations in paragraphs 1 through 138 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

140.    The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.14(a)(2), specifically provides, in part:

(a) Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for the

50

costs of a civil action brought to recover penalties or damages, and may be liable to the

District for a civil penalty of not less than $5,000, and not more than $10,000, for each

false claim for which the person:

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement

        to get a false claim paid or approved by the District;

141.    Defendants knowingly made, used and caused to be made and used, directly and

indirectly, false records and statements to get false and fraudulent claims paid and approved by

the District of Columbia, in violation of D.C. Code § 2-308.14(a)(2).

142.    The District of Columbia paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT FIFTEEN

### VIOLATIONS OF THE DISTRICT OF THE COLUMBIA
### PROCUREMENT REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(3)

143.    Relator restates and realleges the allegations in paragraphs 1 through 142 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

144.    The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-

308.14(a)(3), specifically provides:

(a)  Any person who commits any of the following acts shall be liable to the District for 3

times the amount of damages which the District sustains because of the act of that person.

A person who commits any of the following acts shall also be liable to the District for the

costs of a civil action brought to recover penalties or damages, and may be liable to the

District for a civil penalty of not less than $5,000, and not more than $10,000, for each

false claim for which the person:

(3)     Conspires to defraud the District by getting a false claim allowed or paid by the

District;

145.    Defendants conspired to defraud the District of Columbia by getting false and

fraudulent claims allowed and paid, in violation of D.C. Code § 2-308.14(a)(3).

146.    The District of Columbia paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT SIXTEEN

## VIOLATIONS OF THE DISTRICT OF COLUMBIA
## PROCUREMENT REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(7)

147.    Relator restates and realleges the allegations in paragraphs 1 through 146 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

148.    The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-

308.14(a)(7), specifically provides, in part:

(a)     Any person who commits any of the following acts shall be liable to the District

for 3 times the amount of damages which the District sustains because of the act of that

person.  A person who commits any of the following acts shall also be liable to the

District for the costs of a civil action brought to recover penalties or damages, and may be

liable to the District for a civil penalty of not less than $5,000, and not more than

$10,000, for each false claim for which the person:

(7)     Knowingly makes, uses or causes to be made or used a false record or statement to

conceal, avoid, increase, or decrease an obligation to pay or transmit money to or from

the government;

149.     Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money

to the state, in violation of D.C. Code § 2-308.14(a)(7).

150.     The District of Columbia paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT SEVENTEEN

## VIOLATIONS OF THE FLORIDA FCA
## Fla. Stat. § 68.082(2)(a)

151.     Relator restates and realleges the allegations in paragraphs 1 through 150 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

152.     The Florida False Claims Act, Fla. Stat. § 68.082(2)(a), specifically provides, in

part, that any person who:

(a)     Knowingly presents or causes to be presented to an officer or employee of an

agency a false claim for payment or approval; …is liable to the state for a civil penalty of

not less than $5,000 and not more than $10,000 and for treble the amount of damages the

agency sustains because of the act or omission of that person.

153.     Defendants knowingly presented or caused to be presented to the Florida

Medicaid program false claims for payment and approval, claims which failed to disclose the

material violations of the AKA and other laws, in violation of Fla. Stat. § 68.082(2)(a).

154.     The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHTEEN

## VIOLATIONS OF THE FLORIDA FCA
## Fla. Stat. § 68.082(2)(b)

155.     Relator restates and realleges the allegations in paragraphs 1 through 154 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

156.     The Florida False Claims Act, Fla. Stat. § 68.082(2)(b), specifically provides, in part, that any person who:

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; …

is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

157.     Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Florida, in violation of Fla. Stat. § 68.082(2)(b).

158.     The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT NINETEEN

## VIOLATIONS OF THE FLORIDA FCA
## Fla. Stat. § 68.082(2)(c)

159.     Relator restates and realleges the allegations in paragraphs 1 through 158 above as

if each were stated herein in their entirety and said allegations are incorporated herein by reference.

160.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(c), specifically provides, in part, that any person who:

(c)    Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid;. . .is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

161.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Federal/Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Fla. Stat. § 680.82(2)(c).

162.    The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY

## VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(g)

163.    Relator restates and realleges the allegations in paragraphs 1 through 162 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

164.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(g), specifically provides, in part, that any person who:

(g) Knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an

agency. . .is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

165.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Fla. Stat. § 680.82(2)(g).

166.    The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-ONE

## VIOLATIONS OF THE HAWAII FCA
## Haw. Rev. Stat. § 661-21(a)(1)

167.    Relator restates and realleges the allegations in paragraphs 1 through 166 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

168.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(1), specifically provides, in part, that any person who:

(1)    Knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

169.    Defendants knowingly presented or caused to be presented to the Hawaii

Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Haw. Rev. Stat. § 661-21(a)(1).

170.   The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-TWO

## VIOLATIONS OF THE HAWAII FCA
## Haw. Rev. Stat. § 661-21(a)(2)

171.   Relator restates and realleges the allegations in paragraphs 1 through 170 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

172.   The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(2), specifically provides, in part, that any person who:

(2)   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

173.   Defendants knowingly made, used and caused to be made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the State of Hawaii, in violation of Haw. Rev. Stat. § 661-21(a)(2).

174.   The State of Hawaii paid said claims and has sustained damages because of these

acts by the Defendants.

## COUNT TWENTY-THREE

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(3)

175.    Relator restates and realleges the allegations in paragraphs 1 through 174 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

176.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(3), specifically provides, in part, that any person who:

(3)    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

177.    Defendants conspired to defraud the State of Hawaii by getting false and fraudulent claims allowed and paid, in violation of Haw. Rev. Stat. § 661-21(a)(3).

178.    The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-FOUR

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(7)

179.    Relator restates and realleges the allegations in paragraphs 1 through 178 above as if each were stated herein in their entirety and said allegations are incorporated herein by

58

reference.

180.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(7), specifically provides, in part, that any person who:

(7)    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state.

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

181.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Haw. Rev. Stat. § 661-21(a)(7).

182.    The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-FIVE

### VIOLATIONS OF THE ILLINOIS
### WHISTLEBLOWERREWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. § 175/3 (a)(1)

183.    Relator restates and realleges the allegations in paragraphs 1 through 182 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

184.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(1), specifically provides, in part, that any person who:

(1)    knowingly presents, or causes to be presented, to an officer or employee of the State or member of the Guard a false or fraudulent claim for payment or approval;

. . .

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the State sustains because of the act of that person.

185.    Defendants knowingly caused to be presented to the Illinois Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1).

186.    The State of Illinois paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-SIX

### VIOLATIONS OF THE ILLINOIS
### WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. § 175/3(a)(2)

187.    Relator restates and realleges the allegations in paragraphs 1 through 186 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

188.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(2), specifically provides, in part, that any person who:

(2)    knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

60

. . .

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the State sustains because of the act of that person.

189.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the State of Illinois, in violation of 740 Ill. Comp. Stat. § 175/3(a)(2).

190.    The State of Illinois paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-SEVEN

### VIOLATIONS OF THE ILLINOIS
### WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. § 175/3(a)(3)

191.    Relator restates and realleges the allegations in paragraphs 1 through 190 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

192.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(3), specifically provides, in part, that any person who:

(3)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

. . .

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the State sustains because of the act of that person.

193.    Defendants conspired to defraud the State of Illinois by getting false and fraudulent claims allowed and paid, in violation of 740 Ill. Comp. Stat. § 175/3(a)(3).

194.    The State of Illinois paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-EIGHT

## VIOLATIONS OF THE ILLINOIS
## WHISTLEBLOWER REWARD AND PROTECTION ACT
## 740 Ill. Comp. Stat. § 175/3(a)(7)

195.    Relator restates and realleges the allegations in paragraphs 1 through 194 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

196.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(7), specifically provides, in part, that any person who:

(7)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State

. . .

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the State sustains because of the act of that person.

197.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of 740 Ill. Comp. Stat. § 175/3(a)(7).

198.    The State of Illinois paid said claims and has sustained damages because of these

acts by the Defendants.

## COUNT TWENTY-NINE

## VIOLATIONS OF THE LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### 46 La. Rev. Stat. c. 3 § 438.3A

199.    Relator restates and realleges the allegations in paragraphs 1 through 198 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

200.    The Louisiana False Claims Act/Medical Assistance Programs Integrity Law ("Louisiana FCA"), 46 La. Rev. Stat. c. 3 § 438.3A, specifically provides, in part, that: "No person shall knowingly present or cause to be presented a false or fraudulent claim".

201.    Defendants knowingly presented or caused to be presented to the Louisiana Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of 46 La. Rev. Stat. c. 3 § 438.3A.

202.    The State of Louisiana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY

## VIOLATIONS OF THE LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### 46 La. Rev. Stat. c. 3 § 438.3B

203.    Relator restates and realleges the allegations in paragraphs 1 through 202 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

204.    The Louisiana FCA, 46 La. Rev. Stat. c. 3 § 438.3B, specifically provides, in part,

that:

No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain,

payment from medical assistance programs funds.

205.    Defendants knowingly engaged in misrepresentation and made, used and caused

to be made and used, false records and statements to obtain or attempt to obtain payment from or

get false and fraudulent claims paid and approved by the State of Illinois, in violation of 46 La.

Rev. Stat. c. 3 § 438.3B.

206.    The State of Louisiana paid said claims and has sustained damages because of

these acts by the Defendants.

**COUNT THIRTY-ONE**

**VIOLATIONS OF THE LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE
PROGRAMS INTEGRITY LAW
46 La. Rev. Stat. c. 3 § 438.3C**

207.    Relator restates and realleges the allegations in paragraphs 1 through 206 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

208.    The Louisiana FCA, 46 La. Rev. Stat. c. 3 § 438.3C, specifically provides, in part,

that:

No person shall conspire to defraud, or attempt to defraud, the medical assistance

programs through misrepresentation or by obtaining, or attempting to obtain, payment for

a false or fraudulent claim.

209.    Defendants conspired to defraud the State of Louisiana by getting false and

fraudulent claims allowed and paid, in violation of 46 La. Rev. Stat. c. 3 § 438.3C.

210.    The State of Louisiana paid said claims and has sustained damages because of

64

these acts by the Defendants.

## COUNT THIRTY-TWO

## VIOLATIONS OF THE LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### 46 La. Rev. Stat. c. 3 § 438.2A(1)

211.     Relator restates and realleges the allegations in paragraphs 1 through 210 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

212.    Louisiana FCA, 46 La. Rev. Stat. c. 3 § 438.2A(1), specifically provides that:

No person shall solicit, receive, offer or pay any remuneration, including but not limited to kickbacks, bribes, rebates, or … payments, directly or indirectly, overtly or covertly, in cash or in kind, for the following . ..

(1)     In return for referring an individual to a health care provider, …for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs.

213.    In addition, the Louisiana FCA, supra, section 438.3 provides that:

"No person shall knowingly present of cause to be presented a false or fraudulent claim…shall knowingly engage in misrepresentation to obtain, or attempt to obtain payment from medical assistance program funds…shall conspire to defraud, or attempt to defraud, the medical assistance programs… ."

214.    Furthermore, the Louisiana FCA, supra, section 438.4 provides that:

"No person shall knowingly make, use or cause to be made or used a false, fictitious, or misleading statement on any form used for the purpose of certifying or qualifying any person for eligibility … to receive any good, service, or supply under the medical assistance programs

which that person is not eligible to receive."

215.     Defendants solicited, received, offered and/or paid remuneration, including but not limited to kickbacks, bribes, and gifts, directly or indirectly, overtly or covertly, in cash or in kind, in return for prescribing or arranging the prescribing of drugs which are paid for by the Louisiana Medicaid program, in violation of 46 La. Rev. Stat. c. 3 § 438.2A(1).

216.     The State of Louisiana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY-THREE

## VIOLATIONS OF THE MASSACHUSETTS FCA
### Mass. Gen. Laws Ch. 12, § 5B(1)

217.     Relator restates and realleges the allegations in paragraphs 1 through 216 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

218.     The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(1), specifically provides, in part, that any person who:

(1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

. . .

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

219.     Defendants knowingly presented or caused to be presented to the Massachusetts

Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Mass. Gen. Laws Ch. 12, § 5B(1).

220.    The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY-FOUR

### VIOLATIONS OF THE MASSACHUSETTS FCA
### Mass. Gen. Laws Ch. 12, § 5B(2)

221.    Relator restates and realleges the allegations in paragraphs 1 through 220 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

222.    The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(2), specifically provides, in part, that any person who:

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

. . .

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

223.    Defendants knowingly made, used and caused to be made and used, false records and statements to obtain payment and approval of claim by the Commonwealth of

Massachusetts, in violation of Mass. Gen. Laws Ch. 12, § 5B(2).

224.    The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY-FIVE

### VIOLATIONS OF THE MASSACHUSETTS FCA
### Mass. Gen. Laws Ch. 12, § 5B(3)

225.    Relator restates and realleges the allegations in paragraphs 1 through 224 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

226.    The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(3), specifically provides, in part, that any person who:

(3)    conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

. . .

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

227.    Defendants conspired to defraud the Commonwealth of Massachusetts through the allowance and payment of fraudulent claims in violation of Mass. Gen. Laws Ch. 12, § 5B(3).

228.    The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY-SIX

## VIOLATIONS OF THE MASSACHUSETTS FCA
### Mass. Gen. Laws Ch. 12, § 5B(8)

229.    Relator restates and realleges the allegations in paragraphs 1 through 228 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

230.    The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(8), specifically provides, in part, that any person who:

(8)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or to transmit money or property to the commonwealth;

. . .

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

231.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Mass. Gen. Laws Ch. 12, § 5B(8).

232.    The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY-SEVEN

## VIOLATIONS OF THE NEVADA FCA
### Nev. Rev. Stat. § 357.040(1)(a)

233.    Relator restates and realleges the allegations in paragraphs 1 through 232 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

234.    The Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(a), specifically provides, in part, that a person who:

With or without specific intent to defraud, does any of the following listed acts is liable to the state or a political subdivision, whichever is affected, for three times the amount of damages sustained by the state or political subdivision because of the act of that person, for the costs of a civil action brought to recover those damages and for a civil penalty of not less than $2,000 or more than $10,000 for each act:

(a) Knowingly presents or causes to be presented a false claim for payment or approval.

235.    Defendants knowingly presented or caused to be presented to the Nevada Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Nev. Rev. Stat. § 357.040(1)(a).

236.    The State of Nevada paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY-EIGHT

## VIOLATIONS OF THE NEVADA FCA
### Nev. Rev. Stat. § 357.040(1)(b)

237.    Relator restates and realleges the allegations in paragraphs 1 through 236 above as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

238.    The Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(b), specifically

provides, in part, that a person who:

> With or without specific intent to defraud, does any of the following listed acts is liable to
>
> the state or a political subdivision, whichever is affected, for three times the amount of
>
> damages sustained by the state or political subdivision because of the act of that person,
>
> for the costs of a civil action brought to recover those damages and for a civil penalty of
>
> not less than $2,000 or more than $10,000 for each act:
>
> . . .
>
> (b)    Knowingly makes or uses, or causes to be made or used, a false record or
>
>        statement to obtain payment or approval of a false claim.

239.    Defendants knowingly made, used and caused to be made and used, false records

and statements to obtain payment and approval of false claims, in violation of Nev. Rev. Stat. §

357.040(1)(b).

240.    The State of Nevada paid said claims and has sustained damages because of these

acts by the Defendants.

## COUNT THIRTY-NINE

## VIOLATIONS OF THE NEVADA FCA
## Nev. Rev. Stat. 357.040(1)(c)

241.    Relator restates and realleges the allegations in paragraphs 1 through 240 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

242.    The Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(c), specifically

provides, in part, that a person who:

> With or without specific intent to defraud, does any of the following listed acts is liable to the state or a political subdivision, whichever is affected, for three times the amount of damages sustained by the state or political subdivision because of the act of that person, for the costs of a civil action brought to recover those damages and for a civil penalty of not less than $2,000 or more than $10,000 for each act:
>
> . . .
>
> (c)    Conspires to defraud by obtaining allowance or payment of a false claim.

243.    Defendants conspired to defraud the State of Nevada by obtaining allowance and payment of false claims, in violation of Nev. Rev. Stat. 357.040(1)(c).

244.    The State of Nevada paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY

## VIOLATIONS OF THE NEVADA FCA
### Nev. Rev. Stat. 357.040(1)(g)

245.    Relator restates and realleges the allegations in paragraphs 1 through 244 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

246.    The Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(g), specifically provides, in part, that a person who:

> With or without specific intent to defraud, does any of the following listed acts is liable to the state or a political subdivision, whichever is affected, for three times the amount of damages sustained by the state or political subdivision because of the act of that person,

for the costs of a civil action brought to recover those damages and for a civil penalty of

not less than $2,000 or more than $10,000 for each act:

. . .

(g)      knowingly makes or uses, or causes to be made or used, a false record or

statement to conceal, avoid or decrease an obligation to pay or transmit money or

property to the state….

247.      Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money

to the state, in violation of Nev. Rev. Stat. 357.040(1)(g).

248.      The State of Nevada paid said claims and has sustained damages because of these

acts by the Defendants.

**COUNT FORTY-ONE**

**VIOLATIONS OF THE NEW MEXICO FCA**
**N.M. LEGIS 49 (2004) CHAPTER 4**

249.      Relator restates and realleges the allegations in paragraphs 1 through 248 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

250.      The New Mexico Medicaid False Claims Act, N.M. Legis 49 (2004) Chapter 4,

specifically provides, in part, that by certain acts "a person commits an unlawful act and shall be

liable to the state for three times the amount of damages that the state sustains because of the act

if that person [including]:

4A. presents, or causes to be presented, to the state a claim for payment under the

Medicaid program knowing that such claims is false or fraudulent claim;

4B. presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

4C. makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

4D. conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent; [and/or]

4E. makes, uses, or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false...."

251. Defendants knowingly violated these provisions of law by presenting or causing to be presented to the New Mexico Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws; it knowingly made, used or caused to be made or used a false record or statement to support such claims and/or to conceal its actions and to avoid or decrease an obligation to pay or transmit money to the state, and it conspired to defraud the state Medicaid program, all in violation of N.M. Legis 49 (2004) Chapter 4A-E.

252. The State of New Mexico paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY-TWO

### VIOLATIONS OF THE TENNESSEE MEDICAID FCA
### Tenn. Code Ann. § 71-5-182(a)(1)(A)

253.    Relator restates and realleges the allegations in paragraphs 1 through 252 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

254.    The Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A), specifically provides, in part, that any person who:

(A)     Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

. . .

is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages which the state sustains because of the act of that person.

255.    Defendants knowingly presented or caused to be presented to the Tennessee Medicaid program claims for payment under the Medicaid program knowing such claims were false and fraudulent, claims which failed to disclose the material violations of the AKA and other laws, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

256.    The State of Tennessee paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FORTY-THREE

### VIOLATIONS OF THE TENNESSEE MEDICAID FCA
### Tenn. Code Ann. § 71-5-182(a)(1)(B)

257.    Relator restates and realleges the allegations in paragraphs 1 through 256 above as

75

if each were stated herein in their entirety and said allegations are incorporated herein by reference.

258.    The Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B), specifically provides, in part, that any person who:

(B)    Makes, uses, or causes to made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

. . .

is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages which the state sustains because of the act of that person.

259.    Defendants made, used and caused to be made and used, records and statements to get false and fraudulent claims under the Medicaid program paid and approved by the State of Tennessee knowing such records and statements were false, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

260.    The State of Tennessee paid said claims and has sustained damages because of these acts by the Defendants.

**COUNT FORTY-FOUR**

**VIOLATIONS OF THE TENNESSEE MEDICAID FCA**
**Tenn. Code Ann. § 71-5-182(a)(1)(C)**

261.    Relator restates and realleges the allegations in paragraphs 1 through 260 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

76

262.     The Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(C),

specifically provides, in part, that any person who:

(C)     Conspires to defraud the state by getting a claim allowed or paid under the

Medicaid program knowing such claim is false or fraudulent;

. . .

is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and

not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages

which the state sustains because of the act of that person.

263.     Defendants conspired to defraud the State of Tennessee by getting claims allowed

and paid under the Medicaid program knowing such claims were false and fraudulent, in

violation of Tenn. Code Ann. § 71-5-182(a)(1)(C).

264.     The State of Tennessee paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT FORTY-FIVE

## VIOLATIONS OF THE TENNESSEE MEDICAID FCA
### Tenn. Code Ann. § 71-5-182(a)(1)(D)

265.     Relator restates and realleges the allegations in paragraphs 1 through 264 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

266.     The Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-

182(a)(1)(D), specifically provides, in part, that any person who:

(D)     Makes, uses, or causes to be made or sued, a record or statement to conceal,

avoid, or decrease an obligation to pay or transmit money or property to the state, relative

77

to the Medicaid program knowing such record or statement is false;

. . .

is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages which the state sustains because of the act of that person.

267.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

268.    The State of Tennessee paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY-SIX

## VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(1)-(2)

269.    Relator restates and realleges the allegations in paragraphs 1 through 268 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

270.    The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001(1), specifically provides, in part, that a person commits an unlawful act if the person:

(1)    knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

(A)    on an application for a contract, benefit, or payment under the Medicaid program; or

(B)    that is intended to be used to determine a person's eligibility for a benefit or

payment under the Medicaid program.

271.    The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001(2)(B), specifically provides, in part, that a person commits an unlawful act if the person:

(2)    knowingly or intentionally conceals or fails to disclose an event: (B) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized... ."

272.    Defendants knowingly and intentionally caused to be made false statements and misrepresentations of material facts on applications for payment under the Texas Medicaid program, claims which failed to disclose the material violations of the AKA and other laws, in violation of Tex. Hum. Res. Code § 36.002 (1)-(2).

273.    The State of Texas paid said claims and has sustained damages, to the extent of its portion of Medicaid losses from Medicaid claims filed in Texas, because of these acts by the Defendants.

## COUNT FORTY-SEVEN

## VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(4)(B)

274.    Relator restates and realleges the allegations in paragraphs 1 through 273 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

275.    The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002(4)(B), specifically provides, in part, that a person commits an unlawful act if the person:

(4)    knowingly or intentionally makes, causes to be made, induces, or seeks to induce the

making of a false statement or misrepresentation of material fact concerning:

. . .

(B)    Information required to be provided by a federal or state law, rule, regulation, or

provider agreement pertaining to the Medicaid program;

276.    Defendants by knowingly and intentionally causing to be made, inducing, and

seeking to induce the making of false statements and misrepresentations of material facts

concerning information required to be provided by state and federal law, rule, regulation and

provider agreements pertaining to the Medicaid program, are in violation of Tex. Hum. Res.

Code § 36.002(4)(B).

277.    The State of Texas paid said claims and has sustained damages because of these acts

by the Defendants.

## COUNT FORTY-EIGHT

## VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(5)

278.    Relator restates and realleges the allegations in paragraphs 1 through 277 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

279.    The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002(5),

specifically provides, in part, that a person commits an unlawful act if the person:

(5)    except as authorized under the Medicaid program, knowingly or intentionally

charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid

program, a gift, money, a donation, or other consideration as a condition to the provision

of a service or continued service to a Medicaid recipient if the cost of the service to the

Medicaid recipient is paid for, in whole or in part, under the Medicaid program . . . .

280.    Defendants knowingly and intentionally paid and received kickbacks, gifts, money, or other consideration as a condition of service to a Medicaid recipient, in violation of Tex. Hum. Res. Code §36.002(5).

281.    The State of Texas paid said claims and has sustained damages because of these acts by the Defendants.

**COUNT FORTY-NINE**

**VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW**
**Tex. Hum. Res. Code § 36.002(9)**

282.    Relator restates and realleges the allegations in paragraphs 1 through 281 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

283.    The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002(9), specifically provides, in part, that a person commits an unlawful act if the person:

(9)    knowingly or intentionally enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program . . . .

284.    Defendants knowingly and intentionally conspired to defraud the State of Texas by aiding another person in obtaining an unauthorized payment from the Medicaid program, in violation of Tex. Hum. Res. Code §36.002(9).

285.    The State of Texas paid said claims and has sustained damages, to the extent of its portion of Medicaid losses from Medicaid claims filed in Texas, because of these acts by the Defendants.

## COUNT FIFTY

### VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(1)

286.    Relator restates and realleges the allegations in paragraphs 1 through 285 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

287.    The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(1), specifically provides, in part, that any person who:

1.    Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

. . .

shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the Commonwealth.

288.    Defendants knowingly presented or caused to be presented, to the Virginia Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

289.    The Commonwealth of Virginia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIFTY-ONE

### VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(2)

290.    Relator restates and realleges the allegations in paragraphs 1 through 289 above as

if each were stated herein in their entirety and said allegations are incorporated herein by reference.

291. The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(2), specifically provides, in part, that any person who:

2. Knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth;

. . .

shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the Commonwealth.

292. Defendants knowingly made, used and caused to made and used, false records and statements to get false and fraudulent claims paid and approved by the Commonwealth of Virginia, in violation of Va. Code Ann. §8.01-216.3(A)(2).

293. The Commonwealth of Virginia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIFTY-TWO

## VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(3)

294. Relator restates and realleges the allegations in paragraphs 1 through 293 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

295. The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(3), specifically provides, in part, that any person who:

3.      Conspires to defraud the Commonwealth by getting a false or fraudulent claim

allowed or paid;

. . .

shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not

more than $10,000, plus three times the amount of damages sustained by the

Commonwealth.

296.    Defendants conspired to defraud the Commonwealth of Virginia by getting false

and fraudulent claims allowed and paid, in violation of Va. Code Ann. § 8.01-216.3(A)(3).

297.    The Commonwealth of Virginia paid said claims and has sustained damages

because of these acts by the Defendants.

## COUNT FIFTY-THREE

## VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
## Va. Code Ann. § 8.01-216.3(A)(7)

298.    Relator restates and realleges the allegations in paragraphs 1 through 297 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

299.    The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(7),

specifically provides, in part, that any person who:

knowingly makes, uses, or causes to be made or used, a false record or statement to

conceal, avoid, or decrease an obligation to pay or transmit money or property to the

Commonwealth;

. . .

shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not

more than $10,000, plus three times the amount of damages sustained by the

Commonwealth.

300.    Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money

to the state, in violation of Va. Code Ann.§ 8.01-216.3(A)(7).

301.    The Commonwealth of Virginia paid said claims and has sustained damages

because of these acts by the Defendants.

## COUNT FIFTY-FOUR

## VIOLATIONS OF THE STATE OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT IC 5-11-5.5

302.    Relator restates and realleges the allegations in paragraphs 1 through 301 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

303.    The Indiana False Claims and Whistleblower Protection Act,  IC 5-11-5.5-2(b)

(2005), specifically provides, in part, that by certain acts a person commits an unlawful act and

shall be liable to the state for civil penalties and three times the amount of damages that the state

sustains because of the act of that person [including]:

> (1) presents a false claim to the state for payment or approval;
> (2) makes or uses a false record or statement to obtain payment or approval of a
>    false claims from the state;…
> (6) makes or uses a false record or statement to avoid an obligation to pay or
> transmit property to the state;
> (7) conspires with another person to perform an act described above; or
> (8) causes or induces another person to perform an act described above.

304.    Defendants knowingly violated these provisions of law by presenting or causing

to be presented to the Indiana Medicaid program false and/or fraudulent claims for payment and

approval, claims which failed to disclose the material violations of the law;  knowingly made, used or caused to be made or used a false record or statement to support such claims and/or to conceal its actions and to avoid or decrease an obligation to pay or transmit money to the state, and conspired to defraud the state Medicaid program, and caused others to violate the Indiana Act, all in violation of  IC 5-11-5.5-2.

305.    The State of Indiana paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FIFTY-FIVE

### VIOLATIONS OF THE NEW HAMPSHIRE FCA

### N.H. RSA  §§ 167:61-b *et seq.*

306.    Relator restates and realleges the allegations in paragraphs 1 through 305 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

307.    The New Hampshire Medicaid False Claims Act,  N.H. RSA §§ 167:61-b *et seq.* (2005), specifically provides, in part, that by certain acts a person commits an unlawful act and shall be liable to the state for a civil penalty and three times the amount of damages that the state sustains because of the act if that person:

> (a) presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent claim;
>
> (b) makes, uses or causes to be made or used a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;
>
> (c)  conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent; [and/or]
>
> (e) makes, uses, or causes to be made or used a record or statement to conceal,

avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false...."

308.     Defendants knowingly violated these provisions of law by presenting or causing to be presented to the New Hampshire Medicaid program false and/or fraudulent claims for payment and approval, claims which failed to disclose the material violations of the law; knowingly made, used or caused to be made or used a false record or statement to support such claims and/or to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, and they conspired to defraud the state Medicaid program, all in violation of N.H. RSA § 167:61-b I. (a)-(c) and (e).

309.     The State of New Hampshire paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIFTY-SIX

## VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT, MI ST Ch. 400

310.     Relator restates and realleges the allegations in paragraphs 1 through 309 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

311.     The Michigan Medicaid False Claims Act, MI ST Ch. 400, provides, *inter alia*: as follows:

(1) In section 400.603, that "A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits... [or] for use in determining rights to a Medicaid benefit." It further provides that "A person, having knowledge of the occurrence of an event affecting ...[the] initial or continued right of any other person on whose behalf he has applied...shall not conceal or fail to disclose

that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled."

(2) In section 400.606, that "A person shall not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim... ."

(3) In section 400.607, that "A person shall not make or present or cause to be made or presented to an employee or officer [of the state] a claim...upon or against the state, knowing the claim to be false... ." and that " A person shall not make or present or cause to be made or presented a claim ...which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary ... ."

(4) In section 400.604, that a person is prohibited from soliciting, offering, making or receiving a kickback or bribe or rebate of any kind.

312.    Under section 400.612, "A person who receives a benefit which the person is not entitled to receive by reason of fraud or making a fraudulent statement or knowingly concealing a material fact shall forfeit and pay to the state a civil penalty equal to the full amount received plus triple the amount of damages suffered by the state as a result of the conduct by the person".

313.    Defendants have violated these provisions of the Michigan FCA and caused damage to the State of Michigan.

## **COUNT FIFTY-SEVEN**

### **[Defendant Amgen's Unlawful  Retaliation Against Relator: 31 U.S.C. section 3730(h)]**

314.    Relator restates and realleges the allegations in paragraphs 1 through 313 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

315.     Amgen threatened, harassed and otherwise discriminated against Plaintiff/Relator Westmoreland because of her lawful acts involving a potential violation(s) of the False Claims Act by her employer, Amgen.  By these actions, Amgen violated the False Claims Act, 31 U.S.C. section 3730(h).

316.     Plaintiff/Relator has been damaged as a direct result of these illegal actions.  She has suffered great economic harm, loss of income, and emotional injury.

## PRAYERS FOR RELIEF

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America and the State Plaintiffs, and on her own behalf, demands and prays that judgment be entered as follows against the Defendants under the Federal FCA Counts and under supplemental State FCA Counts as follows:

(a)     In favor of the United States against the Defendants jointly and severally for treble the amount of damages to Government Health Care Programs from the marketing, selling, prescribing, pricing and billing of Aranesp, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

(b)     In favor of the United States against the Defendants for disgorgement of the profits earned by Defendants as a result of their illegal scheme;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees and costs incurred by Relator;

(d)     For all costs of the Federal FCA civil action;

(e)     In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable;

(f)     In favor of the Relator and the named State Plaintiffs against Defendants jointly
and severally in an amount equal to three times the amount of damages that
California, Delaware, District of Columbia, Florida, Hawaii, Indiana, Illinois,
Louisiana, Massachusetts, Nevada, New Hampshire, New Mexico, Tennessee,
and Virginia have sustained, respectively, as a result of the Defendants' actions, as
well as a civil penalty against the Defendants of a statutory maximum for each
violation of each State's FCA: Cal. Gov't Code § 12651; Del. Code Ann. Tit. 6, §
1201; D.C. Code § 2-308.14; Fla. Stat. § 68.082; Haw. Rev. Stat. § 661-21; 740
Ill. Comp. Stat. § 175/3; IC 5-11-5.5; 46 La. Rev. Stat. c. 3, § 437.1 et seq.; Mass.
Gen. Laws Ch. 12, § 5B; Nev. Rev. Stat. § 357.040; N.H. RSA §§ 167:61-b;
Tenn. Code Ann. § 71-5-182; and Va. Code Ann. § 8.01-216.3;

(g)     In favor of the Relator and the Plaintiff State of Texas against Defendants jointly
and severally in an amount equal to two times the amount of damages that Texas
has sustained as a result of the Defendants' actions, as well as a civil penalty
against the Defendants of a statutory maximum for each violation of Tex. Hum.
Res. Code § 36.002;

(h)     In favor of the Relator and the State of Michigan against the Defendants jointly
and severally for a civil penalty equal to one time the loss caused to the Michigan
Medicaid program as a result of the Defendants' actions, plus damages equal to
three times such loss;

(i)      In favor of the Relator for the maximum amount allowed as a Relator's share
pursuant to the State FCAs as follows: Cal. Gov't Code 12652(g); Del. Code Ann.
Tit. 6, § 1205; D.C. Code § 2-308.14(f); Fla. Stat. § 68.085; Haw. Rev. Stat. §

661-27; 740 Ill. Comp. Stat. § 175/4(d); IC 5-11-5.5; 46 La. Rev. Stat. c. 3,

§ 437.1 et seq., IC 5-11-5.5; Mass. Gen. Laws Ch. 12, § 5F; Nev. Rev. Stat. §§

357.210, 357.220, MI ST Ch. 400;  N.H. RSA  §§ 167:61-b; N.M. Legis 49

(2004) Chapter 4, Tenn. Code Ann. § 71-5-183(c); Tex. Hum. Res. Code §

36.110, and Va. Code Ann. § 8.01-216.7;

(j)  In favor of the Relator for all costs and expenses associated with the supplemental
State claims, including attorney's fees and costs;

(k)  In favor of the State Plaintiffs and the Relator for all such other relief as the Court
deems just and proper; and

(l)   In favor of Relator Westmoreland against Defendant Amgen under Count Fifty-Seven
for all available damages and relief under 31 U.S.C. section 3730(h), including, without
limitation, two times back pay plus interest (and prejudgment interest), reinstatement or
in lieu thereof front pay, and compensation for any special damages, and litigation costs,
and attorneys' fees.

PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

Dated:   June 5, 2006                    Respectfully submitted,

*Robert M. Thomas, Jr. / s→D*

Robert M. Thomas, Jr.
(Mass. BBO #645600)
Rory H. Delaney
(Mass. BBO #655666)
*THOMAS & ASSOCIATES*
Federal Reserve Building
600 Atlantic Avenue, 12th Floor
Boston, MA 02210
(617) 371-1072
Fax: (617) 371-1037

*Suzanne E. Durrell*

Suzanne E. Durrell
(Mass. BBO #139280)
*DURRELL LAW OFFICE*
180 Williams Avenue
Milton, Massachusetts 02186
(617) 333-9681
Fax: (617) 333-0014

*Charles F. Kester / s→D*

Charles F. Kester
(CA Bar #157763)
Lawrence M. Isenberg
(CA Bar. #137339)
*KESTER & ISENBERG*
Encino Financial Center
16133 Ventura Boulevard, Second Floor
Encino, California 91436
(818) 728-3300
Fax: (818) 728-3311

# EXHIBIT 2

Case 1:08-cv-03096-SJ-RML   Document 151   Filed 09/15/14   Page 122 of 134 PageID #: 3089

**The New York Times**

Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



October 24, 2011

# Amgen to Pay $780 Million to Settle Suits on Its Sales

By **ANDREW POLLACK**

Amgen said Monday that it had set aside $780 million to settle various federal and state investigations and whistle-blower lawsuits accusing it of illegal sales and marketing tactics.

Amgen said it had reached an agreement in principle to settle criminal and civil investigations that had been under way for several years by the United States attorney offices in Brooklyn and Seattle.

The company said a settlement, which it expected to be concluded in three to four months, would also resolve state Medicaid investigations and 10 whistle-blower lawsuits. It is not clear if the company will plead guilty to any criminal charges.

Most of the whistle-blower lawsuits remain under seal, but Amgen has said in regulatory filings that the lawsuits "allege that Amgen engaged in a wide variety of illegal marketing practices."

The federal investigations, according to Amgen, seem to involve marketing, pricing and dosing of its anemia drugs, Aranesp and Epogen, and its dissemination of information about clinical trials on the safety and efficacy of those drugs. Numerous current and former executives have received civil and grand jury subpoenas, the company has said.

One whistle-blower lawsuit that was unsealed accuses the company of overfilling vials of Aranesp, essentially providing doctors with free amounts of the drug to give patients and then charge to Medicare, Medicaid or private insurers.

The lawsuit said that Amgen tried to persuade doctors to use Aranesp, rather than Procrit, a rival drug sold by Johnson & Johnson, by pointing to the extra profits the doctors could make by using the overfill and billing for it.

The lawsuit was filed by Kassie Westmoreland, a former Amgen sales representative and Aranesp product manager. The federal government declined to join the lawsuit, but more

Case 1:08-cv-03096-SJ-RML   Document 151   Filed 09/15/14   Page 123 of 134 PageID #: 3090

than a dozen states did join, including New York and California. Ms. Westmoreland would be entitled to part of any settlement under whistle-blower statutes.

In the past, Amgen has said the accusations were without merit.

During depositions in the case, five former Amgen executives invoked the Fifth Amendment against self-incrimination, according to court documents.

That case was scheduled to go to trial in the United States District Court in Boston on Oct. 17, but the trial was then called off, apparently because a settlement was near.

"We are very encouraged by the agreement in principle and will comment further at the appropriate time," lawyers for Ms. Westmoreland said.

Amgen, the world's largest biotechnology company, revealed the agreement in its earnings announcement for the third quarter. It said the charge for the settlement reduced its third-quarter earnings by 77 cents a share after taxes.

The settlement and the charge did not seem to interest investors. In the company's conference call on Monday, no analyst asked a question about it.

Excluding the legal charge and some other special items, Amgen reported that earnings for the quarter increased 3 percent, to $1.40 a share, compared with the third quarter of 2010. Revenue also increased 3 percent, to $3.94 billion.

The company slightly raised its guidance for both revenue and earnings for 2011 as a whole. And it said it would increase its buyback of shares.

Sales of most Amgen products rose in the quarter. But sales of its anemia drugs, Aranesp and Epogen, continued to fall, in part because the Food and Drug Administration issued new safety warnings about the drugs in June. Over the last few years, studies have shown that high doses of the drugs can raise the risk of heart attacks and other problems.

Sales of Aranesp fell 4 percent in the quarter to $600 million. Sales of Epogen, which is used only by dialysis clinics, fell 27 percent, to $476 million. Medicare has changed the way it pays for dialysis to remove what had been a profit incentive for dialysis clinics to overuse Epogen.

Case 1:08-cv-03096-SJ-RML   Document 151   Filed 09/15/14   Page 124 of 134 PageID #: 3091

EXHIBIT 3



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC 20201



[*We redact certain identifying information and certain potentially privileged, confidential, or proprietary information associated with the individual or entity, unless otherwise approved by the requestor.*]

**Issued:**       June 24, 2013

**Posted:**       July 1, 2013

[Name and address redacted]

### Re:  OIG Advisory Opinion No. 13-07

Dear [Name redacted]:

We are writing in response to your request for an advisory opinion regarding a tiered rebate program in which the rebate tiers would be reached based on the combination of purchases of both Federally reimbursable products and non-Federally reimbursable products (the "Proposed Arrangement").  Specifically, you have inquired whether the Proposed Arrangement would constitute grounds for the imposition of sanctions under the exclusion authority at section 1128(b)(7) of the Social Security Act (the "Act"), or the civil monetary penalty provision at section 1128A(a)(7) of the Act, as those sections relate to the commission of acts described in section 1128B(b) of the Act, the Federal anti-kickback statute.

You have certified that all of the information provided in your request, including all supplemental submissions, is true and correct and constitutes a complete description of the relevant facts and agreements among the parties.

In issuing this opinion, we have relied solely on the facts and information presented to us. We have not undertaken an independent investigation of such information.  This opinion is limited to the facts presented.  If material facts have not been disclosed or have been misrepresented, this opinion is without force and effect.

Page 2 – OIG Advisory Opinion No. 13-07

Based on the facts certified in your request for an advisory opinion and supplemental submissions, we conclude that the Proposed Arrangement would not generate prohibited remuneration under the anti-kickback statute.  Accordingly, the Office of Inspector General ("OIG") would not impose administrative sanctions on [name redacted] under sections 1128(b)(7) or 1128A(a)(7) of the Act (as those sections relate to the commission of acts described in section 1128B(b) of the Act) in connection with the Proposed Arrangement. This opinion is limited to the Proposed Arrangement and, therefore, we express no opinion about any ancillary agreements or arrangements disclosed or referenced in your request for an advisory opinion or supplemental submissions.

This opinion may not be relied on by any persons other than [name redacted], the requestor of this opinion, and is further qualified as set out in Part IV below and in 42 C.F.R. Part 1008.

## I.      FACTUAL BACKGROUND

[Name redacted] (the "Requestor") is a corporation that manufactures products used to treat ophthalmologic disorders and to improve vision, including pharmaceutical products, surgical equipment, vision aids, and related products.  Some, but not all, of the Requestor's products are reimbursable directly or indirectly by Federal health care programs.

Under the Proposed Arrangement, the Requestor would establish a rebate program that would provide a tiered, percentage rebate based on purchases of surgical supplies and devices[1] ("Surgical Products").  The rebate would be calculated based on a customer's total annual purchases of Surgical Products, regardless of whether those Surgical Products are reimbursable by Federal health care programs.  Thus, for example, a customer who purchases $X of Surgical Products during a calendar year would receive a 5% rebate, a customer who purchases $2X of Surgical Products would receive a 10% rebate, and a customer who purchases $4X of Surgical Products would receive a 20% rebate.

The Requestor certified that the rebate amount would not vary based on the number of Federally reimbursable products a customer purchases.  Thus, a customer who purchases $X of Surgical Products would receive a 5% rebate regardless of whether all of those Surgical Products were reimbursable by Federal health care programs, half were reimbursable by Federal health care programs, or none were reimbursable by Federal health care programs.

The Requestor certified that it would notify all customers receiving rebates of their obligation to report any rebates received based on sales of Federally reimbursable Surgical

---

[1] All of the Requestor's surgical supplies and devices would be included in the Proposed Arrangement, but capital equipment (e.g., lasers) would not be included.

Page 3 – OIG Advisory Opinion No. 13-07

Products.  The Requestor would present this notification in three formats.  First, the contract that the parties would execute prior to the initial qualifying purchase would include a description of the program.  This program description would set forth the products or product categories that would be included in the rebate program, the methodology or formula that would be used to calculate the percentage of the customer's total qualifying purchases to be reflected by the rebate, an explanation of how to calculate the portion of the rebate applicable to any specific products that might be reimbursed by Federal health care programs, and a notification that the buyer may have obligations under the discount safe harbor to report the portion of the rebate applicable to Federally reimbursed products.  Second, the invoices that the Requestor would send to participating customers would state that items included on the invoice may be subject to a later rebate and thus may trigger reporting obligations to Federal health care programs.  Finally, at the end of each calendar year, the Requestor would give each participating customer a year-end report that would include a summary of the customer's total qualifying purchases, an explanation of the rebate program tier for which the customer qualified, and a calculation of the total rebate to which the customer is entitled.  Thus, the statement would provide those customers with the information necessary to report the rebate amounts on products that are reimbursed by Federal health care programs.  Finally, the Requestor certified that it would refrain from doing anything that would impede the buyer from meeting its obligations under the discount safe harbor.

## II.    LEGAL ANALYSIS

### A.    Law

The anti-kickback statute makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a Federal health care program.  See section 1128B(b) of the Act.  Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated.  By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction.  For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.

The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. See, e.g., United States v. Borrasi, 639 F.3d 774 (7th Cir. 2011); United States v. McClatchey, 217 F.3d 823 (10th Cir. 2000); United States v. Davis, 132 F.3d 1092 (5th Cir. 1998); United States v. Kats, 871 F.2d 105 (9th Cir. 1989); United States v. Greber, 760 F.2d 68 (3d Cir. 1985), cert. denied, 474 U.S. 988 (1985).  Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five

Page 4 – OIG Advisory Opinion No. 13-07

years, or both. Conviction will also lead to automatic exclusion from Federal health care programs, including Medicare and Medicaid. Where a party commits an act described in section 1128B(b) of the Act, the OIG may initiate administrative proceedings to impose civil monetary penalties on such party under section 1128A(a)(7) of the Act. The OIG may also initiate administrative proceedings to exclude such party from the Federal health care programs under section 1128(b)(7) of the Act.

The Department of Health and Human Services has promulgated safe harbor regulations that define practices that are not subject to the anti-kickback statute because such practices would be unlikely to result in fraud or abuse. See 42 C.F.R. § 1001.952. The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is afforded only to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

Initially created by statute, the safe harbor for discounts potentially applies to the Proposed Arrangement. This safe harbor interprets the statutory exception, which protects "a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program." Section 1128B(b)(3)(A) of the Act. This discount exception reflects Congress' intent to encourage price competition that benefits the Federal health care programs. The requirements of the safe harbor are further enumerated at 42 C.F.R. § 1001.952(h). The discount safe harbor contains different requirements for sellers, buyers, and offerors of discounted items and services. For the remuneration offered under the Proposed Arrangement to be protected under the discount safe harbor, the Requestor would have to comply with the requirements for sellers. See 42 C.F.R. § 1001.952(h)(2).

### B.    Analysis

Determining whether the Proposed Arrangement would qualify for protection under the safe harbor requires a multi-part analysis. First, we must determine whether the proposed rebate program involves a "discount" as defined in the safe harbor. Then we must determine whether the Requestor would meet the requirements of a seller under the safe harbor. As described further below, based on the Requestor's certifications, we believe that the Proposed Arrangement qualifies for safe harbor protection.

Page 5 – OIG Advisory Opinion No. 13-07

### 1.    Discounts

Under the safe harbor, the term "discount" is defined as "a reduction in the amount a buyer…is charged for an item or service based on an arms-length transaction."  42 C.F.R. § 1001.952(h)(5).  This definition includes certain caveats.  Most relevant to the Proposed Arrangement, a discount does not include:

> [s]upplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology.

We have expressed concerns about discounts on bundled items for multiple reasons.  Such discounts can shift costs among reimbursement systems and distort the true cost of items.  See 64 Fed. Reg. 63,518, 63,530 (Nov. 19, 1999) ("1999 Final Rule").  For example, a company might offer a discount to a hospital on items reimbursable under Part A to induce the purchase of items reimbursable under Part B.  Not only would the cost be shifted among reimbursement systems, but it would be difficult to determine the net price of any item for reporting purposes.  We noted in the preamble to the 1999 Final Rule, however, that "discounts offered on one good or service to induce the purchase of a different good or service where the net value can be properly reported do not pose a risk of program abuse and may benefit the programs through lower costs or charges achieved through volume purchasing and other economies of scale."  Id.  That particular statement was made to support the concept of allowing bundled discounts when the goods and services are reimbursed by the same payment methodology.  However, the principle also applies to the Proposed Arrangement.

Under the Proposed Arrangement, the Requestor would offer a tiered discount program.  All purchases of Surgical Products—whether or not reimbursable by Federal health care programs—would be aggregated to determine the percentage amount of the rebate.  For purposes of illustration only, assume a customer would receive a 10% rebate if the annual purchasing volume reached $1,000,000.  Thus, a customer spending $1,100,000 would receive a rebate in the amount of $110,000.  The customer would know that the net price of any item that cost $100 would actually be $90.  This structure is distinguishable from a bundled discount where a customer might receive a free surgical pack if the customer purchased five surgical devices.[2]  Because of the difficulties inherent in accurately

---

[2] The Proposed Arrangement is also distinguishable from prohibited arrangements in which an entity might offer a "reward," such as a computer or travel vouchers, in return for a

Page 6 – OIG Advisory Opinion No. 13-07

allocating and reporting such a discount, a bundled discount could be protected under the safe harbor only if the items are reimbursed under the same methodology.  The Surgical Products in the Proposed Arrangement are not necessarily reimbursable under the same methodology.  However, that is not essential here because the Proposed Arrangement does not involve a "bundle."  Not only would a discount on one product not be contingent on the purchase of another product, the discount also would be readily attributable to each item purchased.  Therefore, we deem the rebates offered under the Proposed Arrangement to meet the definition of "discount" under the safe harbor.

A second definition relevant to the Proposed Arrangement is the term "rebate."  The safe harbor defines a "rebate" as "any discount the terms of which are fixed and disclosed in writing to the buyer at the time of the initial purchase to which the discount applies, but which is not given at the time of sale."  42 C.F.R. § 1001.952(h)(4).  The rebates offered in the Proposed Arrangement meet this definition.  The program description that the Requestor would provide to customers in the program contract would explain the terms of the rebate program.  The customer would know the types of products involved and the purchasing volume required to reach each tier of the rebate program at the time of the initial purchase.  Once the total annual volume is known, the actual rebate amount would be known and then would be distributed.  Thus, the Proposed Arrangement's rebates would meet the terms of the definition.

## 2.    Sellers' Obligations

To meet the requirements of the safe harbor, sellers have certain notification requirements, depending on the type of buyer.  See 42 C.F.R. § 1001.952(h)(2).  In general, the seller must provide the buyer with sufficient information to meet the buyer's reporting requirements.  With respect to cost-reporting buyers, when the value of the discount is not known at the time of sale, the seller must fully and accurately report the existence of a discount program on the invoice and inform the buyer of its obligation to report such discount and to provide information in accordance with the buyer's requirements set forth at 42 C.F.R. § 1001.952(h)(1).  When the amount of the discount is known, the seller must provide the buyer with documentation of the calculation, identifying the specific goods and services to which the discount will be applied, and refrain from doing anything that would impede the buyer's obligations.  See 42 C.F.R. § 1001.952(h)(2)(ii).  The requirements for sellers are

---

certain purchasing volume.  See, e.g., 56 Fed. Reg. 35,952, 35,978 (July 29, 1991):  "One of the most common features of a serious kickback violation exists when a seller offers a valuable good, for example a car or a trip, in return for that person's participation in an activity prohibited under the statute, for example, referral of business payable by the Medicare and Medicaid programs."

similar under 42 C.F.R. § 1001.952(h)(2)(iii)(B) with respect to discounts offered to other types of buyers.

The Requestor certified it would meet all of the obligations of a seller under the safe harbor. Specifically, the Requestor would provide a program description to customers describing the terms of the rebate program and a notification that the customer may have obligations under the discount safe harbor to report the portion of the rebate applicable to Federally reimbursed products.  Next, the Requestor would provide invoices to customers participating in the program that would state that items included on the invoice may be subject to a later rebate and thus may trigger reporting obligations to Federal health care programs.  Finally, at the end of each calendar year, the Requestor would send each participating customer a year-end report that would include a summary of the customer's total qualifying purchases, an explanation of the rebate program tier for which the customer qualified, and a calculation of the total rebate to which the customer is entitled.  In addition, the Requestor certified that it would refrain from doing anything that would impede the customer from meeting its obligations under the discount safe harbor.

Based on the Requestor's certifications, the Proposed Arrangement would meet the requirements of the discount safe harbor.  The Requestor has committed to meet the seller's requirements as specified in 42 C.F.R. § 1001.952(h)(2).

## III.    CONCLUSION

Based on the facts certified in your request for an advisory opinion and supplemental submissions, we conclude that the Proposed Arrangement would not generate prohibited remuneration under the anti-kickback statute.  Accordingly, the OIG would not impose administrative sanctions on [name redacted] under sections 1128(b)(7) or 1128A(a)(7) of the Act (as those sections relate to the commission of acts described in section 1128B(b) of the Act) in connection with the Proposed Arrangement.  This opinion is limited to the Proposed Arrangement and, therefore, we express no opinion about any ancillary agreements or arrangements disclosed or referenced in your request for an advisory opinion or supplemental submissions.

Page 8 – OIG Advisory Opinion No. 13-07

## IV.   LIMITATIONS

The limitations applicable to this opinion include the following:

- This advisory opinion is issued only to [name redacted], the requestor of this opinion.  This advisory opinion has no application to, and cannot be relied upon by, any other individual or entity.

- This advisory opinion may not be introduced into evidence by a person or entity other than [name redacted] to prove that the person or entity did not violate the provisions of sections 1128, 1128A, or 1128B of the Act or any other law.

- This advisory opinion is applicable only to the statutory provisions specifically noted above.  No opinion is expressed or implied herein with respect to the application of any other Federal, state, or local statute, rule, regulation, ordinance, or other law that may be applicable to the Proposed Arrangement, including, without limitation, the physician self-referral law, section 1877 of the Act (or that provision's application to the Medicaid program at section 1903(s) of the Act).

- This advisory opinion will not bind or obligate any agency other than the U.S. Department of Health and Human Services.

- This advisory opinion is limited in scope to the specific arrangement described in this letter and has no applicability to other arrangements, even those which appear similar in nature or scope.

- No opinion is expressed herein regarding the liability of any party under the False Claims Act or other legal authorities for any improper billing, claims submission, cost reporting, or related conduct.

This opinion is also subject to any additional limitations set forth at 42 C.F.R. Part 1008.

The OIG will not proceed against [name redacted] with respect to any action that is part of the Proposed Arrangement taken in good faith reliance upon this advisory opinion, as long as all of the material facts have been fully, completely, and accurately presented, and the Proposed Arrangement in practice comports with the information provided.  The OIG reserves the right to reconsider the questions and issues raised in this advisory opinion and, where the public interest requires, to rescind, modify, or terminate this opinion.  In the event that this advisory opinion is modified or terminated, the OIG will not proceed against [name

Page 9 – OIG Advisory Opinion No. 13-07

redacted] with respect to any action that is part of the Proposed Arrangement taken in good faith reliance upon this advisory opinion, where all of the relevant facts were fully, completely, and accurately presented and where such action was promptly discontinued upon notification of the modification or termination of this advisory opinion.  An advisory opinion may be rescinded only if the relevant and material facts have not been fully, completely, and accurately disclosed to the OIG.

Sincerely,

/Gregory E. Demske/

Gregory E. Demske
Chief Counsel to the Inspector General