# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA ex rel. DON HANKS; STATE OF CALIFORNIA ex rel. DON HANKS; STATE OF ILLINOIS ex rel DON HANKS; STATE OF INDIANA ex rel. DON HANKS; STATE OF LOUISIANA ex rel DON HANKS; COMMONWEALTH OF MASSACHUSETTS ex rel DON HANKS; STATE OF MICHIGAN ex rel. DON HANKS; STATE OF NEW JERSEY ex rel. DON HANKS; STATE OF NEW YORK ex rel. DON HANKS; STATE OF OKLAHOMA ex rel. DON HANKS; STATE OF TEXAS ex rel. DON HANKS; COMMONWEALTH OF VIRGINIA ex rel. DON HANKS,

               Plaintiffs,

    v.

U.S. ONCOLOGY SPECIALITY, LLP;

               Defendant;


UNITED STATES OF AMERICA ex rel. DON HANKS, and STATE OF FLORIDA ex rel. DON HANKS,

               Plaintiffs,

    v.

ONCOLOGY ASSOCIATES; INTEGRATED COMMUNITY ONCOLOGY NETWORK, LLC; HEMATOLOGY AND ONCOLOGY ASSOCIATES OF THE TREASURE COAST; MID FLORIDA HEMATOLOGY AND ONCOLOGY CENTERS, P.A.; PASO HERNANDO ONCOLOGY ASSOCIATES, P.A.; REGIONAL CONSULTANTS IN

**SEVENTH AMENDED COMPLAINT**

Case No. CV-08-3096-SJ (RML)

1

HEMATOLOGY AND ONCOLOGY;
COASTAL ONCOLOGY, PL; STUART
ONCOLOGY ASSOCIATES, P.A.; AYUB,
SOKOI, MATZKOWITZ AND
SENNABAUM D/B/A/ NEW HOPE
CANCER CENTER; DAVID DRESDNER,
M.D.,

     Defendants;


UNITED STATES OF AMERICA ex rel.
DON HANKS, and STATE OF GEORGIA
ex rel. DON HANKS,

     Plaintiffs,
  v.

GEORGIA CANCER SPECIALISTS
ADMINISTRATIVE ANNEX;
NORTHWEST GEORGIA ONCOLOGY
CENTERS; AUGUSTA ONCOLOGY
ASSOCIATES; CENTRAL GEORGIA
CANCER CARE; SOUTHEAST GEORGIA
HEMATOLOGY/ONCOLOGY
ASSOCIATES, P.C.;

     Defendants;

**TABLE OF CONTENTS**

I.      INTRODUCTION. ................................................................................................ 6

II.     JURISDICTION AND VENUE................................................................................ 11

III.    THE PARTIES. ....................................................................................................... 12

    A.    Plaintiff/Relator. ................................................................................................ 12

    B.    Defendants. ......................................................................................................... 15

    C.    Factual Allegations Related to Specific Defendants. ................................. 15

IV.     FACTUAL ALLEGATIONS.................................................................................. 32

    A.    Background.......................................................................................................... 32

    B.    United States Marketing Campaign for Aranesp.......................................... 35

    C.    Overstating Drug Costs to Increase Government Healthcare Program
          Reimbursements. ............................................................................................... 51

    D.    Payments for Drugs Furnished by Physicians. ............................................. 53

    E.    Rules on Acceptance of Discounts in Healthcare Services. ........................ 56

    F.    Fraudulent Reporting of ASP by Defendant Oncology Practices. ............. 65

    G.    Defendant Oncology Practices Knew that, by Purchasing the Covered Drugs, they
          Could Turn a Profit from Submitting False Claims for Over-Reimbursements from
          Government Healthcare Programs.................................................................. 68

    I.    Defendants' overprescribing the Covered Drugs and fraudulent reporting to ..............
          Government Healthcare Programs.................................................................. 84

    J.    Hub and Spoke Conspiracy to Commit Fraud............................................. 131

    K.    Affected Federal and State Government Healthcare Programs................. 143

**COUNT ONE**

Violation of False Claims Act, 31 U.S.C. § 3729(a) ................................................................. 150

**COUNT TWO**

Violation of California False Claims Act, Cal. Gov. Code § 12650 *et seq*. .............................. 151

**COUNT THREE**

Violation of Florida False Claims Act, Fl. Stat. § 66.081 *et seq*. ............................................... 153

**COUNT FOUR**

Violation of Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq*. ...................... 155

**COUNT FIVE**

Violation of IL Whistleblower Reward & Protection Act, 740 Ill. Comp. Stat. § 173/1 *et seq*. 156

**COUNT SIX**

Violation of Indiana False Claims & Whistleblower Act, In. Code 5-11-5.5 *et seq*. ................. 158

**COUNT SEVEN**

Violation of LA Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46: 437 *et seq*. 159

**COUNT EIGHT**

Violation of Massachusetts False Claims Law, Mass. Gen. Laws Ch. 12 § 5(B) *et seq*. ........... 160

**COUNT NINE**

Violation of Michigan Medicaid False Claims Act, M.C.L. 400.601 *et seq*. ............................. 162

**COUNT TEN**

Violation of New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq*. ................................. 163

**COUNT ELEVEN**

Violation of New York False Claims Act, N.Y. Stat. Fin. § 187 *et seq*. .................................... 165

**COUNT TWELVE**

Violation of Oklahoma Medicaid False Claims Act, 63 OK. Stat. § 5053, *et seq*..................... 166

**COUNT THIRTEEN**

Violation of Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002 *et seq*.... 168

**COUNT FOURTEEN**

Violation of Virginia False Claims Act, Va. Code Ann. § 8.01-216.3(a) *et seq.* ....................... 169

PRAYER FOR RELIEF ........................................................................................... 171

DEMAND FOR JURY TRIAL ................................................................................. 174

## I.   INTRODUCTION.

1.     This is a civil action is brought by Don Hanks (the "Relator") on behalf of himself, the United States of America, and the State of California, the State of Florida, the State of Georgia, the State of Illinois, the State of Indiana, the State of Louisiana, the Commonwealth of Massachusetts, the State of Michigan, the State of New Jersey, the State of New York, the State of Oklahoma, the State of Texas, and the Commonwealth of Virginia for treble damages and civil penalties arising from Defendants' false statements and fraudulent claims, in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").   This action is also brought pursuant to the various statutes of the several state Plaintiffs named above, as further identified in this Complaint.

2.     The actions alleged to have violated the FCA all occurred during the period September 1, 2001 to at least November 30, 2020 ("Covered Period").   The Defendants in this action are Oncology Practices that specialize in the treatment of cancer or are the drug purchasing organizations of such practices (together, "Defendant Oncology Practices").    As fully alleged below, each of the Defendant Oncology practices prioritized profits over their patients.   Tempted by seeming endless means to line their own pockets, the Defendant Oncology Practices purchased inordinate amounts of drugs, that had little to no medical benefit, and resulting in billions of dollars of federal fraud, as fully alleged below.

3.     Amgen, Inc., a Delaware corporation headquartered in Thousand Oaks, Ventura County, California, is one of the largest bio-technology and drug manufacturing companies in the world.   Drugs manufactured by Amgen are used in a number of different therapies – the most relevant of which involve supportive cancer care, renal therapy, and autoimmune diseases, including treatment of anemia caused by chemotherapy in the treatment of cancer.   In 2013, Amgen had a net income of $5.1 billion on total revenues of $18.7 billion.   In 2019, Amgen had

a net income of $7.8 billion on total revenues of $23.4 billion.   Approximately 75 percent of all

Amgen sales are in the United States.

4.      On or about December 20, 2012, Amgen entered into an agreement with the

United States and various individual States that resolved claims made against Amgen in the

original complaint filed in this action, as well as in a number of related cases.   As a result of this

settlement agreement, Amgen, who was originally named as a Defendant in this civil action, is

no longer a Defendant as to this Complaint.

5.      During the Covered Period, a substantial percentage of Amgen's U.S. sales,

revenues, and profits were accounted for by three drugs: Aranesp®, Neupogen®, and Neulasta®.

These names are registered trademarks of Amgen.   Aranesp (biologic name, darbepoetin alfa) is

classified as an erythropoiesis-stimulating agent ("ESA"), i.e. it stimulates the production of red

blood cells.   Neupogen (biologic name, filgrastim) and Neulasta (biologic name, pegfilgrastim)

are classified as granulocyte colony-stimulating agents ("GSAs"), and they selectively stimulate

the production of neutrophils, *i.e.* a type of white blood cell that helps the body fight infection.

Together, the three drugs are hereinafter referred to as the "Covered Drugs."   The Covered

Drugs are primarily used in as part of a regiment for supportive cancer care.

6.      Aranesp is indicated (*i.e.,* is medically accepted or useful) for the treatment of

chemotherapy-induced anemia in patients with non-myeloid malignancies, meaning anemia not

caused by cancer.   Neupogen and Neulasta are used to counteract the reduction in white blood

cells.   This reduction in white blood cells can be caused by chemotherapy used in the treatment

of cancer.   White blood cells serve as the body's primary defense against infections.   They

work by destroying bacteria in the blood.   Neupogen and Neulasta stimulate the production of

new white blood cells from the bone marrow.

7.      Chemotherapy treatments for cancer patients often deplete their bodies of red

blood cells, leading to severe and potentially fatal consequences.   Red blood cells are the principal means by which oxygen is delivered to throughout the body and supplied to tissues. Red blood cell counts begin to fall without adequate amounts of erythropoietin.   Without a healthy red blood cell count, the body is unable to deliver sufficient amounts of oxygen throughout the body, ultimately inducing anemia.   Severe or long-lasting anemia can damage the heart, brain, and other organs in the body.   In its most severe form, anemia may lead to death.   It has been theorized, but not proven, that one possible side effect of ESAs treatment is the reduction of white blood cells.   To combat this side effect and to increase the number of white blood cells, essential to the efficacy of body's immune system and ability to fight infection, many practices believe it necessary to administer Neupogen or Neulasta.   As a result, Amgen's marketing strategy aimed to have their customers, including the Defendant Oncology Practices, purchasing a one-to-one ratio of Aranesp to Neupogen or Neulasta, ensuring dependence on each of the Covered Drugs (in addition to the extraordinary amounts of kickbacks and other financial incentives, as alleged below).

8.     The Defendant Oncology Practices' purchases of the Covered Drugs have been and, on information and belief, continue to be highly dependent on the extent of coverage and reimbursement patients receive from third-party payers, including the Federal and State governments through various government-funded healthcare programs (jointly referred to as "Government Healthcare Programs").   The two largest Federal healthcare programs are Medicare and Medicaid, both of which are administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services.

9.     During the Covered Period, the Defendant Oncology Practices were and, on information and belief, continue to be major purchasers and administrators of the Covered Drugs.   The costs of treatment and medications for cancer patients with chemotherapy-induced

anemia ("CIA") who are eligible to receive benefits under Government Healthcare Programs were paid for in whole or in significant part by the Government Healthcare Programs.   When Government Healthcare Programs pay for all or some portion of the cost of a drug, the cost of the drug is said to have been "reimbursed" by the Government Healthcare Program.   During the Covered Period, the Defendant Oncology Practices administered the Covered Drugs to patients receiving benefits under Government Healthcare Programs.   After providing the service, the Defendant Oncology Practices would file claims for "reimbursement" with the Government Healthcare Program providing coverage to the patient and, in the normal course, the claims would be paid according to program rules.

10.     As alleged further hereinafter in this Complaint, the Oncology Practice Defendants, submitted claims for and obtained "reimbursement" of the cost of the Covered Drugs that far exceeded the Defendants' reimbursable cost of the drugs, in violation of the Government Healthcare Program rules.   ***For the years 2004 through 2011 alone, the Defendant Oncology Practices received over-reimbursements from Government Healthcare Programs in excess of $4,000,000,000.***   On information and belief, since 2011, the Defendant Oncology Practices have continued to defraud the government through receiving over-reimbursements for the Covered Drugs.

11.     Sales of the Covered Drugs – as well as Epogen, an ESA made by Amgen – accounted for the majority of Amgen's domestic revenues and profits during the Covered Period. Amgen's domestic revenues from the sale of the Covered Drugs and Epogen exponentially grew during the covered period, topping in at $5 billion in 2004, 2005, and 2006.   The term "ESA Sales" includes just Epogen in 2001.   In the remainder of the period, this term covers sales of both Aranesp and Epogen.   The term "GSA Sales" includes just Neupogen in 2001.   In addition, Amgen paid out significant rebates to the Oncology Practice Defendants, accounting

for billions of dollars over the Covered Period.

12.     Total sales of the Covered Drugs amounted to approximately $80 billion during the period 2001 to 2013.   Amgen's ESA sales almost *tripled* in an alarmingly short time-frame, between 2001 to 2005.   Amgen's GSA sales more than *quadrupled* in that same alarmingly short time, from 2001 to 2005.   Amgen's annual financial reports (10-Ks), filed with the Securities and Exchange Commission, show that Amgen acknowledged spending some $17 billion on drug sales rebates from 2007 to 2011.   Amgen did not fully disclose the rebates, discounts, and other financial incentives to purchase the Covered Drugs it paid on the sales of ESAs and GSAs prior to 2007.   *Such rebates were paid directly to the Oncology Practice Defendants*, not to the ultimate third-party payer for the drugs, *i.e.,* the Government Healthcare Programs or third-party insurers.   Amgen did not report or under reported the rebates, discounts, and other financial incentives it provided to medical service providers, including the Oncology Practice Defendants, as incentives to purchase the Covered Drugs to any Government Healthcare Program – all of which amounted to reductions in the cost of the Covered Drugs to the Oncology Practice Defendants.   On information and belief, Amgen has failed to report any financial incentives provided to the Defendant Oncology Practices from 2011 to November 30, 2020. None of the Oncology Practice Defendants reported any of the rebates, discounts, and other financial incentives they received from Amgen to purchase the Covered Drugs to any Government Healthcare Program.   On information and belief, none of the Defendant Oncology Practices reported any financial incentives they received from Amgen from 2011 to November 30, 2020.   *As a result of the fraudulent conduct of the Defendant Oncology Practices during the Covered Period, Government Healthcare Programs have been defrauded of <u>more than $4,000,000,000</u>.*

## II.   JURISDICTION AND VENUE.

13.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process.   At least one of the Defendants can be found in, resides in, or has transacted business in the Eastern District of New York and in the State of New York.

14.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process.   At least one of the Defendants can be found in, resides in, or has transacted business in the State of New York.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§ 3730(b) and 3732(a), which specifically confer jurisdiction on this Court for actions brought pursuant to the FCA.

16.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or more Defendants can be found in, resides in, or has transacted business in the Eastern District of New York, and at least some of the alleged acts occurred in this District.

17.    The material allegations of this Complaint are based on Relator's individual knowledge, obtained through the course and scope of twenty years of employment with Amgen as a Sales Representative and direct contact with the Defendant Oncology Practices.   The material allegations of this Complaint are not based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing audit or investigation, or from the news media.

18.    The FCA provides that any person who submits a false claim to the government is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government.   The Act permits persons having information regarding a false or fraudulent claim against the government to bring an action on

11

behalf of the government and to share in any recovery.   As required by 31 U.S.C. § 3730(b)(2), the complaint must be filed *in camera* and under seal, without service on the defendant.   The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action.

19.     The United States, having entered into a partial Settlement Agreement with Amgen, has nevertheless reserved its right to intervene in any portion of this action in which it initially declined to intervene, for good cause, at a later date.

## III.    THE PARTIES.

### A.    Relator.

20.     Relator Don Hanks ("Relator") was a resident of Jacksonville, St. Johns County, Florida, and is currently a resident of the State of California.   Relator was employed by Amgen or by Amgen USA, Inc., an Amgen subsidiary, as a nephrology and/or oncology sales and marketing representative from on or about December 18, 1989 until his wrongful termination on or about May 23, 2007.   Relator was a founding member and sales leader with Amgen and became a well-established and widely-known figure in both the nephrology and oncology markets.   Over the course of his nearly two-decade long employment with Amgen and Amgen USA, Inc., Relator gained personal knowledge of the material allegations made in this Complaint.   As more fully described herein, Relator was one of the primary architects of Amgen's sales strategy for the Covered Drugs, and directly interacted with each of the Defendant Oncology Practices.

21.     Relator was one of Amgen's most recognized and successful sales representatives.   Based on his expertise and product knowledge, Relator was assigned to some of Amgen's largest U.S. accounts.   Relator served as a large account liaison to the Integrated

Oncology Network (hereinafter "ION") and to US Oncology Specialty, LP (hereinafter

"USOS").   As the account liaison for USOS, Relator was responsible for coordinating all

Amgen contacts to the numerous practices that comprised USOS.   Relator was also regularly

apprised of Amgen's sales and marketing strategies toward ION and USOS.   Through these and

other sales duties, Relator gained direct and personal knowledge of Amgen's implementation of

nationwide strategies and programs to market the Covered Drugs to the Defendant Oncology

Practices.

22.     In the course of his career with Amgen, Relator saw Amgen change from a small

biotech company with a "patient-centric" culture to a large biotech company with a "dollar-

centric" focus.   While employed by Amgen, Relator was involved in several Amgen initiatives

directed toward relationship development with physicians and product launches, with the

ultimate goal of competitively increasing sales of the Covered Drugs.   Specifically, Relator was

one of the primary architects of Amgen's major sales initiative – Amgen Portfolio Contracts

(hereinafter "APC").   To design and effectuate an effective sales strategy, Relator was apprised

of all updates in drug indications and Medicare/Medicaid reimbursement rules for the Covered

Drugs.   Given his vast knowledge and experience marketing the Covered Drugs, Relator served

frequently as a trainer for new recruits to Amgen's sales force, not only in the district to which

he was assigned, the Tampa district, but also in other districts.

23.     In addition, Relator achieved a number of notable distinctions and recognitions.

Some of these distinctions, recognitions and initiatives are noted herein below.   For most of his

years with the company, Relator was a member of Amgen's President's Club, a distinction

reserved for the top ten percent of sales performers.   Relator was a member of the first

Neupogen Advisory Panel and Launch Committee; fostered and promoted great public

champions for Amgen, two of which are Dr. Alan Miller (Tufts University) and Dr. Gary Lee

(Arizona State University); and, after a year of claims denials, convinced Medicare officials in Florida, in particular, Dr. Frank Farmer, the Medical Director, to begin paying claims for Neupogen, for which more than $500 million in claims were outstanding.   Relator's prolific accomplishments and reputation earned him the nickname "the Amgen franchise" by Joe Turgeon, the Amgen National Director of Sales.

24.     Relator engaged in substantial and regular business dealings related to the sale and purchase of the Covered Drugs with each of the Defendant Oncology Practices.   Relator was either the direct contact for the Defendant Oncology Practices, or was regularly apprised of their activities, interests, and concerns through regular status reports from Relators colleagues on the Amgen sales and marketing team.   Further, Relator was one of the founding members of the Oncology Managers of Florida (hereinafter "OMF"), a professional organization of oncology practitioners providing information and educational support to each other in the State of California.   As an OMF founding member, Relator had direct access to all of the oncology practice administrators in Florida, and was instrumental in forming similar professional organizations in Georgia and South Carolina.   Relator was continually apprised of their concerns, interests, and activities through OMF meetings and engagements.

25.     Relator, through the course and scope of his employment with Amgen, independently reviewed and complied years of sales data concerning the Defendant Oncology Practices.   Specifically, from 2004 through 2007, Relator himself complied sales data regarding the Defendant Oncology Practices APCs, whether the Defendant signed onto an APC, the date the APC was signed, and the dollar amounts of Defendants' purchases of the Covered Drugs. Relator also compiled data regarding whether the Defendant Oncology Practices received their rebates and other kickbacks by mail or electronic transmission.   The APC sales data was not available to anyone outside of four Amgen sales and marketing representatives – Kevin Sharer,

Jim Daly, Joe Turgeon, and Relator himself.   A true and correct copy of the Amgen APC sales data, with each of the Defendant Oncology Practices highlighted, is attached hereto and incorporated herein *Exhibit 1*.

      **B.**    **Defendants.**

26.    The Defendants in this action are medical practices specializing in cancer treatments, or are group (drug) purchasing organizations (hereinafter "GPOs") for such oncology practices.   The Defendants are identified with particularity in paragraphs 27 to 53 of this Complaint.

27.    In its sale and marketing to Defendant Oncology Practices, Amgen differentiated between the practices based upon their levels of sales and potential sales.   One group was called "Platinum Amgen customers" and another was called "Gold Amgen customers."   Amgen used these terms to classify its customers based on their value to Amgen.   Depending on the level of purchases, a practice could expect a certain percentage reduction in the cost of certain drugs that it purchased from Amgen – although these discounts varied even within customer classes. Typically, Platinum customers received at least a 50% reduction of the invoiced charge, which was returned to them in the form of rebates, discounts, and other incentives, with many Platinum Oncology practices receiving rebates, discounts or other incentives in the range of 60% of the invoiced charge.   Typical Gold customers received at least a 40% reduction of the invoiced charge, which was returned to them in the form of rebates, discounts, and other incentives, with many Gold Oncology Practices receiving rebates, discounts and other incentives in the range of 50% of the invoiced charge.

      **C.  Factual Allegations Related to Specific Defendants.**

      i.    <u>US Oncology Specialty, L.P.</u>

28.    US Oncology Specialty, L.P. ("USOS") is a Delaware Limited Partnership based

in Texas.   USOS is a specialty distribution center service of US Oncology, Inc.   According to a press release, US Oncology, Inc. launched USOS in 2005 to "facilitate the seamless flow of oncology pharmaceuticals directly from the pharmaceutical manufacturers to its nationwide network of practices."

29.     During the Covered Period, USOS purchased large quantities of the Covered Drugs from Amgen.   According to sales manager/representative report taken in or around 2000 regarding the USOS account plan, the top priority of the doctors, nurses, and administrators at USOS was "money, making money, [and] not losing money."   In 2006 alone, USOS made purchases of Amgen drugs in excess of approximately $1 billion.   Through its purchases alone, USOS expanded the ESA and GSA markets by more than $777 billion after executing special contracts with Amgen.

30.     During the Covered Period, USOS served as a GPO for the approximately 1,000 physicians affiliated with US Oncology, Inc.   From September 1, 2001 to 2011 and, on information and belief, continuing to November 30, 2020, the USOS GPO purchased and sold to its affiliate physicians and oncology practices in the Plaintiff States substantial quantities of the Covered Drugs, which these physicians and oncology practices administered to patients eligible to receive benefits under Government Healthcare Programs.   Thereafter, the affiliated physicians and oncology practices sought reimbursement for the costs of those drugs from such Government Healthcare Programs without taking into account the rebates, discounts, and other things of financial value that Amgen provided as incentives to increase purchases of the Covered Drugs.   The USOS GPO pooled the purchasing power of its member physicians and oncology practices in order to obtain even larger rebates for the Covered Drugs from Amgen than Amgen offered to smaller practices.   The terms of the contracts between the USOS GPO and Amgen were confidential, *i.e.,* the terms were not reported to or shared with the Government Healthcare

16

Programs.   Thus, the provisions in those contracts that reduced the actual cost of the Covered

Drugs to the USOS GPO, such as price protection, rebates, equipment donations, data

management fees and other forms of discounts, were not known to Government Healthcare

Programs.   The actual selling price of the Covered Drugs supplied by Amgen to USOS pursuant

to the confidential contracts and used by beneficiaries of Government Healthcare Programs

which was considerably lower than the reported selling price, taking into account the various

discounts, rebates, and other incentivizing things of value or "freebies" that reduced the actual

cost to USOS for the Covered Drugs.

   31.  The failure by Amgen and USOS GPO to report the actual lower cost of the

Covered Drugs purchased by USOS GPO, taking into account the various discounts, rebates, and

the like, caused Government Healthcare Programs to "reimburse" or pay the USOS GPO more

than it was entitled to receive for purchasing and administering the Covered Drugs to patients

whose drug costs were reimbursable, or reimbursable in part, under Government Healthcare

Programs reimbursement rules.

   32.  The USOS GPO did not report the discounts, rebates, and other financial

incentives applied by Amgen that reduced the actual price of the purchased Covered Drugs to

Government Healthcare Programs.   In a USOS press release, USOS admitted that the GPO had

sought and been reimbursed by Government Healthcare Programs on the basis of the unadjusted

"average selling price" of the Covered Drugs, as computed by Amgen – a figure that did not

accurately factor in the discounts, rebates, and other cost-reducing incentives that were actually

received by the GPO.   The GPO failed to report the discounts, rebates, and other financial

incentives it received from Amgen to the Government Healthcare Programs.   Otherwise stated,

the USOS GPO failed to report the actual price that it paid for the Covered Drugs.

   33.  During the Covered Period, USOS supplied the Covered Drugs to USOS-

affiliated practices throughout the United States.   During the Covered Period, because of its large size, USOS was offered and received rebates and other discounts for its purchases of the Covered Drugs that were far greater than those generally available to other oncology practices or GPOs.   USOS' APC provided extra discounts and rebates not generally available to other oncology practices and GPOs upon the attainment of certain market share goals or milestones set by Amgen and met by the USOS GPO.

34.     During the Covered Period, Relator had several meetings with Joe Bailes, M.D, the former CEO of Physicians Referral Network and then-current President of USOS, regarding the sale and purchase of the Covered Drugs.   Relator met with Dr. Bailes and other representatives of USOS at the American Society of Hematology Annual Meetings in 2003, 2005, and 2006.   Relator also met with representatives of USOS at the American Society of Community Oncologists Annual Meeting in 2005.   In Relator's interactions with Dr. Bailes and other representatives of USOS, including USOS Executive, William Thames, Pharm.D., they made clear to Realtor that USOS would use Aranesp as its ESA of choice based solely on the "profit per patient" that USOS could achieve through the use of Aranesp, especially in combination with the use of Neupogen and Neulasta.   In plain terms, USOS officials were made aware by Amgen of the opportunity to obtain greater reimbursement for the Covered Drugs than USOS was lawfully entitled to receive from the Government Healthcare Programs as a result of the rebates, discounts, and other financial incentives USOS received from Amgen.   USOS thereafter took advantage of the unlawful opportunity by seeking "reimbursement" for overstated costs of the Covered Drugs.   Specifically, USOS overbilled Medicare more than $427 million per year. ***From 2004 through 2011, USOS overbilled Medicare, and thereby defrauded the federal government, by more than $3,000,000,000.***

      ii.    <u>Defendant Oncology Practices by in Florida and Georgia.</u>

35.    During the Covered Period, Amgen used an internal computerized database to track all forms of rebates, discounts, equipment gifts, free goods, contributions of medical education grants, data purchases, honorarium provided, and other client information.   The database was known as the "Amgen Customer Identification System" or "ACIS."   Each Amgen customer was assigned a unique ACIS number.   Amgen used this information to obtain leverage in convincing each of the Defendant Oncology Practices to sign Amgen Portfolio Contracts ("APC") and to purchase increasingly more quantities of the Covered Drugs.   Amgen sales representatives used the data related to individual customers to "educate" customers – usually under the guise of "business reviews" that focused on the specific financial benefits that a practice would receive by achieving target purchase goals for the Covered Drugs, as set by the APC.   Amgen also used these ACIS numbers to track which customers had signed an APC, their sales quota performance, and their ability to maximize their "rebates" through such "business reviews."

**Florida Oncology Practices**

36.    **Defendant Florida Cancer Specialists & Research Institute (ACIS #216205)**, headquartered in Fort Myers, Florida, is the largest privately owned Oncology/Hemotology practice in Florida, with approximately 90 offices throughout Florida.   Defendant Florida Cancer Specialists & Research Institute has an office at 3840 Broadway, Fort Meyers, Florida 33901.   In 2002, Defendant Florida Cancer Specialists & Research Institute purchased just over $2 million worth of the Covered Drugs.   After signing the APC, Defendant Florida Cancer Specialists & Research Institute purchased Amgen products for the following years in the dollar amounts indicated: 2004 – $12.8 million; 2005 – $13.5 million; 2006 – $20.3 million; 2007 – $39.2 million.   As a Platinum Amgen customer, Defendant Florida Cancer Specialists &

Research Institute received a rebate or discount from Amgen amounting to approximately 50% of all purchases made from approximately 2004 through 2007.   From September 1, 2001 to 2011 and, on information and belief, continuing to November 30, 2020, Defendant made comparable purchases of the Covered Drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs in amounts that exceeded the actual cost of these products.   Because the use of Neupogen among Medicare patients was more profitable than administering Neulasta off-contract, Defendant Florida Cancer Specialists & Research Institute chose to administer exclusively Neupogen to its Medicare patients.   It administered Neulasta to its private pay and indemnity plan patients.   Defendant had no clinical or patient-based reasoning for deciding which patients received Neupogen and which patients received Neulasta – the treatment decision was purely based on the profitability of administering the two different Covered Drugs, as enabled by rebates and financial incentives from Amgen, and full reimbursements from Government Healthcare Programs.   As a result of its fraudulent practices, between 2004 and 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of ***$107.2 million***.

37.   Defendant **Integrated Community Oncology Network, LLC ("ICON")** through its division Florida Oncology Associates (ACIS #11998) provides specialized care for patients with cancer and/or hematological disorders in Northeast Florida.   Defendant ICON has approximately nine cancer centers in Duval, Clay, St. Johns and Putnam Counties and a business address of 9143 Philips Highway, Suite 560, Jacksonville, FL 32256.   In 2002, Defendant ICON did not purchase the Covered Drugs.   In 2002, Defendant ICON purchased just $2.3 million worth of the Covered Drugs.   Defendant ICON made Amgen product purchases for the following years in the dollar amounts indicated: 2002 – $2.3 million; 2003 – $13.3 million; 2004

– $14.8 million; 2005 – $15.4 million; 2006 – $30.2 million; 2007 – $27.0 million.   In the last

quarter of 2006 alone, ICON purchased $7.4 million of the Covered Drugs.   From September 1,

2001 to 2011 and, on information and belief continuing to November 30, 2020, Defendant made

comparable purchases of Amgen drugs and received comparable rebates for the said products

during the Covered Period and sought and received reimbursement from Government Healthcare

Programs for administration of the Covered Drugs to patients eligible to receive government-

funded healthcare benefits in amounts that exceeded the actual cost of these products to the

Defendant.  *As a result of its fraudulent activities, from 2004 through 2011, Defendant ICON*

*collected over-reimbursements from Government Healthcare Programs in excess of $165*

*million.*   During the Covered Period, defendant ICON had a GPO contract and a special Large

Physician Practice ("LPP") contract with Amgen.

      38.     Defendant **Gulfcoast Oncology Associates (ACIS #221641)** is an affiliate of

Integrated Community Oncology Network, LLC ("ICON").   Defendant Gulfcoast Oncology

Associates has an office at 1201 5th Ave North, #505, St. Petersburg, FL 33705.   Defendant

Gulfcoast Oncology Associates purchased Amgen products for the following years in the dollar

amounts indicated: 2002 – $ 1.0 million; 2003 – $ 4.0 million; 2004 – $13.6 million; 2005 –

$21.1 million; 2006 – $31.0 million; 2007 – $29.3 million.   As an Amgen Platinum customer,

Defendant Gulf Coast Oncology Associates received a rebate or discount from Amgen

amounting to approximately 50% of all purchases made from during the period of approximately

2004 through 2007.   From September 1, 2001 to 2011 and, on information and belief,

continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and

received comparable rebates for the said products during the entire Covered Period and sought

and received reimbursement from Government Healthcare Programs for administration of the

Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts

that exceeded the actual amount paid for the Covered Drugs.  *As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of $178 million.*

39.     During the Covered Period, **Defendants Florida Cancer Specialists & Research Institute**, **ICON**, and **Gulf Oncology Associates**, were elite members of the International Oncology Network ("ION") and received even greater discounts on drug purchased from Amgen because of this affiliation.

40.     Defendant **Hematology and Oncology Associates of the Treasure Coast (ACIS #214554)**, a Platinum Amgen customer, purchased millions of dollars-worth of the Covered Drugs.  Defendant Hematology and Oncology Associates of the Treasure Coast has an office at 1871 S.E. Tiffany Ave, Suite 100, Port St. Lucie, FL 34952.   In 2002, prior to signing an APC, Defendant Hematology and Oncology Associates of the Treasure Coast purchased only $787,886 worth of the Covered Drugs.   After signing an APC, Defendant Hematology and Oncology Associates of the Treasure Coast bought $2,307,809 of Amgen drugs in the Fourth Quarter of 2006, or $9.2 million in 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.   In the First Quarter of 2007, Defendant purchased $2.6 million of the Covered Drugs.   First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $10.6 million of the Covered Drugs, demonstrating consistent increase in its purchases.   From September 1, 2001 to 2011 and, on information and belief continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid

22

for the Covered Drugs. *As a result of its fraudulent conduct, from 2004 through 2011 alone,*
*Defendant collected over-reimbursements from Government Healthcare Programs in excess of*
*$50 million.*

41.     Defendant **Mid Florida Hematology and Oncology Centers, P.A. (ACIS**
**#225776)**, a Platinum Amgen customer, purchased millions of dollars-worth of the Covered
Drugs.   Defendant Mid Florida Hematology and Oncology Centers, P.A. has an office at 1061
Medical Center Drive, Orange City, FL 32732.   In 2002, prior to signing an APC, Defendant
purchased only $56,002 worth of the Covered Drugs.   Defendant Mid Florida Hematology and
Oncology Centers bought $2,074,198 of Amgen drugs in the Fourth Quarter of 2006, or $8.3
million in 2006 – receiving a rebate from Amgen amounting to approximately 50% of all
purchases as a Platinum Amgen customer.   In the First Quarter of 2007, Defendant purchased
$2.1 million of the Covered Drugs.   First Quarter sales data usually always reflects the most
conservative purchases, thus Defendant likely purchased significantly more than $8.5 million of
the Covered Drugs, demonstrating consistent increase in its purchases.   From September 1, 2001
to 2011 and, on information and belief, continuing to November 30, 2020, Defendant made
comparable purchases of Amgen drugs and received comparable rebates for the said products
during the Covered Period and sought and received reimbursement from Government Healthcare
Programs for administration of the Covered Drugs to patients eligible to receive government-
funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered
Drugs. *As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant*
*collected over-reimbursements from Government Healthcare Programs in excess of $48.9*
*million.*

42.     Defendant **Pasco Hernando Oncology Associates, P.A. (ACIS #216704)** has an
office at 14529 Cortez Blvd, Brooksville, FL 34613.   In 2002, prior to signing an APC,

Defendant purchased only $524,740 worth of the Covered Drugs.   In the Second Quarter of 2005, Defendant purchased $359,897 of the Covered Drugs.   Defendant Pasco Hernando Oncology Associates, P.A. bought $1,766,348 of Amgen drugs in the Fourth Quarter of 2006, or $7.1 million in 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.   In the First Quarter of 2007, Defendant purchased $1.6 million of the Covered Drugs.   First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $6.4 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered Drugs.   *As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of $38.8 million.*

43.   Defendant **Regional Consultants in Hematology and Oncology (ACIS #276635)** has an office at 1235 San Marco Boulevard, Suite 3, Jacksonville, FL 32207.   In 2002, prior to signing an APC, Defendant purchased only $129,265 worth of the Covered Drugs.   In the Second Quarter of 2005, Defendant purchased $1.4 million of the Covered Drugs, demonstrating an exponential increase.   Defendant Regional Consultants in Hematology and Oncology bought $1,494,671 of Amgen drugs in the Fourth Quarter of 2006, or almost $6 million in 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.   In the First Quarter of 2007, Defendant purchased $1.3 million of the Covered Drugs.   First Quarter sales data usually always reflects the most

conservative purchases, thus Defendant likely purchased significantly more than $5.2 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief, continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered Drugs.   *As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of $34.7 million.*

44.     Defendant **Cancer Institute of Florida, P.A. (ACIS #216184)** has an office at 894 East Altamonte Drive, Altamonte Springs, FL 32701.   In 2002, prior to signing an APC, Defendant purchased only $225,211 worth of the Covered Drugs.   Defendant Cancer Institute of Florida, P.A. bought $1,884,415 of Amgen drugs in the Fourth Quarter of 2006, or $7.5 million in 2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a Gold Amgen customer.    In the First Quarter of 2007, Defendant purchased $1.8 million of the Covered Drugs.   First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $7.4 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered Drugs.   *As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare*

*Programs in excess of $43.4 million.*

45.     Defendant **Coastal Oncology, PL (ACIS #1077445)** has a location of business at 325 Clyde Morris Boulevard, Suite 450, Ormond Beach, FL 32174.   In 2002, prior to signing an APC, Defendant had made no purchases of the Covered Drugs.   In the Second Quarter of 2005, Defendant purchased $132,908 of the Covered Drugs.   Defendant Coastal Oncology, PL bought $1,387,285 of Amgen drugs in the Fourth Quarter of 2006, or $5.5 million in 2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a Gold Amgen customer.   In the First Quarter of 2007, Defendant purchased $1.3 million of the Covered Drugs. First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $5.2 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief, continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered Drugs.   *As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of $32.9 million.*

46.     Defendant **Stuart Oncology Associates, P.A. (ACIS #214555)** has an office at 501 South East Osceola Street, Suite 301, Stuart, FL 34994.   In 2002, prior to signing an APC, Defendant purchased only $102,181 worth of the Covered Drugs.   Defendant Stuart Oncology bought $1,223,312 of Amgen drugs in the Fourth Quarter of 2006, or $4.9 million in 2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a Gold Amgen customer.   In the First Quarter of 2007, Defendant purchased $1.2 million of the

Covered Drugs.   First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $4.9 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief, continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered Drugs.   ***As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of $28.4 million.***

47.   Defendant **Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center (ACIS #216428)** has an office at 7651 Medical Drive, Hudson, FL 34667. Defendant Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center bought just $118,233 of the Covered Drugs in 2002.   In the Second Quarter of 2005, Defendant purchased $352,900 of the Covered Drugs.   After signing an APC, Defendant purchased $1,152,600 of Amgen drugs in the Fourth Quarter of 2006, or $4.6 million in 2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a Gold Amgen customer.   In the First Quarter of 2007, Defendant purchased $1.1 million of the Covered Drugs. First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $4.4 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief, continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-

27

funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered

Drugs.  ***As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant***

***collected over-reimbursements from Government Healthcare Programs in excess of $26.6***

***million.***

48.    Defendant **David Dresdner, M.D. (ACIS #307671)** has an office at 1099 5th

Avenue North, Suite 120, St. Petersburg, FL 33705.   In 2002, prior to signing an APC,

Defendant purchased only $25,210 worth of the Covered Drugs.   In the Second Quarter of 2005,

Defendant purchased $862,476 of the Covered Drugs.   After signing an APC, Defendant

Dresdner bought $1,004,961 of Amgen drugs in the Fourth Quarter of 2006, or $4 million in

2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a

Gold Amgen customer.   In the First Quarter of 2007, Defendant purchased $1.0 million of the

Covered Drugs.   First Quarter sales data usually always reflects the most conservative

purchases, thus Defendant likely purchased significantly more than $4 million of the Covered

Drugs.   From September 1, 2001 to 2011 and, on information and belief continuing to

November 30, 2020, Defendant made comparable purchases of Amgen drugs and received

comparable rebates for the said products during the Covered Period and sought and received

reimbursement from Government Healthcare Programs for administration of the Covered Drugs

to patients eligible to receive government-funded healthcare benefits in amounts that exceeded

the actual amount paid for the Covered Drugs.  ***As a result of its fraudulent conduct, from 2004***

***through 2011 alone, Defendant collected over-reimbursements from Government Healthcare***

***Programs in excess of $23.7 million.***

### Georgia Oncology Practices

49.    Defendant **Georgia Cancer Specialists Administrative Annex (ACIS #226796)**

has an office at 60 Jesse Hill Jr Drive SE, Atlanta, GA 30303.   In 2002, prior to signing an APC,

Defendant purchased only $1.9 million worth of the Covered Drugs.   After signing an APC, Defendant Georgia Cancer Specialists Administrative Annex bought $7,139,213 of Amgen drugs in the Fourth Quarter of 2006, or $28.6 million in 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.   In the First Quarter of 2007, Defendant purchased $5.6 million of the Covered Drugs.   First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $22.5 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered Drugs.   *As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of $158 million.*

50.     Defendant **Northwest Georgia Oncology Centers, P.C. (ACIS #226509)** has an office at 340 Kennestone Hospital Boulevard, Suite 200, Marietta, GA 30060.   In 2002, prior to signing an APC, Defendant purchased only $385,859 worth of the Covered Drugs.   Defendant Northwest Georgia Oncology Centers, P.C. bought $4,035,433 of Amgen drugs in the Fourth Quarter of 2006, or $16.1 million in 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.   In the First Quarter of 2007, Defendant purchased $3.8 million of the Covered Drugs.   First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $15.3 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief continuing to November 30, 2020, Defendant made comparable purchases

of Amgen drugs and received comparable rebates for the said products during the Covered

Period and sought and received reimbursement from Government Healthcare Programs for

administration of the Covered Drugs to patients eligible to receive government-funded healthcare

benefits in amounts that exceeded the actual amount paid for the Covered Drugs.  *As a result of*

*its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-*

*reimbursements from Government Healthcare Programs in excess of $93.5 million.*

51.     Defendant **Augusta Oncology Associates (ACIS #214436)** has an office at 3696

Wheeler Road, Augusta, GA 30909.   In 2002, prior to signing an APC, Defendant purchased

only $318,116 worth of the Covered Drugs.   Defendant August Oncology Associates bought

$2,995,248 of Amgen drugs in the Fourth Quarter of 2006, or almost $12 million in 2006 –

receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum

Amgen customer.   In the First Quarter of 2007, Defendant purchased $2.4 million of the

Covered Drugs.   First Quarter sales data usually always reflects the most conservative

purchases, thus Defendant likely purchased significantly more than $9.8 million of the Covered

Drugs.   From September 1, 2001 to 2011 and, on information and belief continuing to

November 30, 2020, Defendant made comparable purchases of Amgen drugs and received

comparable rebates for the said products during the Covered Period and sought and received

reimbursement from Government Healthcare Programs for administration of the Covered Drugs

to patients eligible to receive government-funded healthcare benefits in amounts that exceeded

the actual amount paid for the Covered Drugs.  *As a result of its fraudulent conduct, from 2004*

*through 2011 alone, Defendant collected over-reimbursements from Government Healthcare*

*Programs in excess of $69.2 million.*

52.     Defendant **Central Georgia Cancer Care (ACIS #227676)** has an office at 1062

Forsyth Street, Suite 1B, Macon, GA 31201.   In 2002, prior to signing an APC, Defendant

purchased only $119,929 worth of the Covered Drugs.   Defendant Central Georgia Cancer Center bought $1,982,152 of Amgen drugs in the Fourth Quarter of 2006, or $7.9 million in 2006 – receiving a rebate from Amgen amounting to approximately 50% of all purchases as a Platinum Amgen customer.   In the First Quarter of 2007, Defendant purchased $1.67 million of the Covered Drugs.   First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $6.9 million of the Covered Drugs.   From September 1, 2001 to 2011 and, on information and belief continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered Drugs.   ***As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of $46.4 million.***

53.     Defendant **Southeast Georgia Hematology/Oncology Associates, P.C. (ACIS #218644)** has an office at 1111 Glynco Parkway, Suite 500, Brunswick, GA 31525.   In 2002, prior to signing an APC, Defendant purchased only $426,424 worth of the Covered Drugs.   In the Second Quarter of 2005, Defendant purchased $1.2 million of the Covered Drugs, demonstrating an exponential increase.   Defendant Southeast Georgia Hematology/Oncology bought $1,418,135 of Amgen drugs in the Fourth Quarter of 2006, or $5.7 million in 2006 – receiving a rebate from Amgen amounting to approximately 40% of all purchases as a Gold Amgen customer.   In the First Quarter of 2007, Defendant purchased $1.2 million of the Covered Drugs.   First Quarter sales data usually always reflects the most conservative purchases, thus Defendant likely purchased significantly more than $4.7 million of the Covered

Drugs.   From September 1, 2001 to 2011 and, on information and belief continuing to November 30, 2020, Defendant made comparable purchases of Amgen drugs and received comparable rebates for the said products during the Covered Period and sought and received reimbursement from Government Healthcare Programs for administration of the Covered Drugs to patients eligible to receive government-funded healthcare benefits in amounts that exceeded the actual amount paid for the Covered Drugs.   ***As a result of its fraudulent conduct, from 2004 through 2011 alone, Defendant collected over-reimbursements from Government Healthcare Programs in excess of $31.1 million.***

## IV.   FACTUAL ALLEGATIONS.

### A.   Background.

54.   Erythropoiesis is the process by which the body produces erythrocytes, or red blood cells.   Erythropoietin is a hormone that stimulates red blood cell creation.   A necessary step in the erythropoietic process is the production of erythropoietin, a protein made in the kidneys that stimulates red blood cell formation.

55.   Red blood cells contain hemoglobin, a protein that functions primarily to transport oxygen from the lungs to the tissues of the body.   Hemoglobin levels are expressed in grams (g) per deciliter (dL) of whole blood.   An adequate supply of red blood cells is necessary to oxygenate the body.

56.   Anemia is a condition in which an individual's blood is deficient in red blood cells or hemoglobin.   Anemia impairs the body's ability to transfer necessary oxygen to tissues throughout the body.   Anemia has many potential causes including an iron-poor diet, excessive bleeding, certain cancers, certain cancer treatments, and kidney or liver failure.

57.   In or about 1983, Amgen claimed that its scientists had managed to isolate the

human erythropoietin gene and produce the recombinant protein in hamsters.   A few years later,

through the use of DNA technology, Amgen commercialized the production of erythropoietin –

epoetin alfa and darbepoetin alfa.   Because epoetin alfa and darbepoetin alfa, like endogenous

erythropoietin, stimulate red blood cell formation they are referred to as "erythropoiesis-

stimulating agents" or "ESAs."

57.      58.      In or about 1989, epoetin alfa was approved by the U.S. Food and Drug

Administration ("FDA") as a treatment for patients with anemia associated with chronic renal

failure ("CRF"), including end stage renal disease ("ESRD"), and for patients not currently on

dialysis.   Prior to the discovery of ESA treatment, the severe cases of anemia in CRF patients

had been managed with whole blood or red blood cell transfusions.   Treatment with epoetin alfa

(Epogen therapy) or darbepoetin alfa (Aranesp therapy) aimed at elevating or maintaining red

blood cell levels and, thus, reducing the need for blood transfusions among these patients.

59.      In 1985, while epoetin alfa was still in development, Amgen entered into a

product license agreement ("Licensing Agreement") with a subsidiary of Johnson & Johnson

Services, Inc. ("J&J Licensee" or "Licensee").   Pursuant to the Licensing Agreement, Amgen

granted the Licensee an exclusive right under its patents to market recombinant human epoetin

alfa for all medical uses – except for the treatment of anemia associated with CRF in dialysis

patients – in the United States.   Amgen retained the right to market epoetin alfa exclusively for

treatment of anemia associated with CRF in dialysis patients.   Amgen did not license the right to

market darbepoetin alfa under any of its U.S. patents for anemia associated with CRF to the J&J

Licensee or any other entity.

60.      During the Covered Period, Amgen marketed epoetin alfa in the United States

under the brand name "Epogen."   The J&J Licensee marketed epoetin alfa in the United States

through subsidiary companies under the brand name "Procrit," pursuant to its Licensing

33

Agreement with Amgen.   Epogen and Procrit are chemically identical.   At all times relevant to this Complaint, Procrit and Epogen were manufactured by Amgen at the same manufacturing facility in Colorado through the same manufacturing process.   The FDA-approved labels listing approved medical uses (*i.e.* indications), warnings, and other important information for Epogen and Procrit are identical.   Between 1991 and 1996, J&J worked to and succeeded in obtaining FDA approval to market epoetin alfa for use (a) among patients with anemia as a consequence of cancer chemotherapy treatment, (b) among patients undergoing treatment for HIV infection with the pharmaceutical Zidovudine, (c) to treat chronic kidney diseases in pre-dialysis patients, and (d) among patients with anemia who are scheduled to undergo elective, non-cardiac, nonvascular surgery.

61.     Under the Licensing Agreement, Amgen was prohibited from expanding its Epogen sales and marketing efforts to conform to the broadened FDA-approval for epoetin alfa uses that had been obtained by J&J.   Amgen was limited to marketing Epogen to only the dialysis market.   Given this self-inflicted constraint, Amgen sought a way to capture a piece of the lucrative oncology market that it had ceded to the J&J Licensee pursuant to the 1985 Licensing Agreement by finding a way to "work around" the FDA use restrictions in order to expand the entire ESA market (*i.e.* have the Defendant Oncology Practices maintain its current purchase levels of Procrit from J&J while purchasing ***additional*** ESAs and GSAs from Amgen).

62.     Slightly earlier, in or about 1984, Amgen and Kirin Holdings Company, Ltd. organized Kirin-Amgen, Inc., a joint venture company based in Thousand Oaks, California, to conduct research into the development, manufacture, production and sale of erythropoietin products for human therapeutic use.   By 1997, Kirin-Amgen, Inc. succeeded in producing a new ESA with a slightly different molecular structure than the molecular structure of epoetin alfa – darbepoetin alfa.

34

63.     In 1997, the J&J Licensee filed suit against Amgen, claiming that darbepoetin alfa was covered under the Licensing Agreement and could not be marketed for non-dialysis use. Amgen responded that darbepoetin alfa, marketed under the brand name "Aranesp," had a sufficiently distinct chemical structure from Epogen to be considered a new product and, therefore, was not covered by the Licensing Agreement restrictions.   In December 1998, an arbitrator ruled that Amgen had not licensed its exclusive U.S. marketing rights concerning Aranesp to the J&J Licensee.   As a result, Amgen was free to market Aranesp without any of the use restrictions that applied to Epogen.   As described in a 2006 Forbes article entitled "Amgen's Enemies," with the development of this drug, Amgen "sidestepped" the 1985 Licensing Agreement to reclaim and expand the market it had given up to the J&J Licensee.

64.     Initially, darbepoetin alfa was approved by the FDA only for ESRD and nephrology patenients and Amgen endeavored to get FDA approval to use darbepoetin alfa to treat chemotherapy-induced anemia.   In or around September 2001, Amgen got FDA approval. Based on its longer serum half-life and other claims made by Amgen in its application for FDA approval, the FDA approved darbepoetin alfa for less frequent dosing than required for Epogen and Procrit.   That same year, Amgen began marketing darbepoetin alfa in the United States market as "Aranesp."

65.     In 2002, Amgen secured supplemental FDA approval to use darbepoetin alfa to treat patients with anemia associated with cancer chemotherapy treatments.

**B.     United States Marketing Campaign for Aranesp.**

66.     Beginning in 2002, Amgen undertook an aggressive marketing campaign for Aranesp, which was designed to seize market share from Procrit in the treatment of chemotherapy-induced anemia.   Amgen achieved only limited success with its campaign. Oncology physicians were generally satisfied with Procrit and saw few reasons to switch to

Aranesp.   In addition, because Aranesp did not have a "J Code" from CMS, which would have allowed prescriptions to be approved in an automated fashion, bills to Medicare and Medicaid had to be submitted using a "Q Code," which required manual approval by CMS staff from a paper submission and could delay or frustrate payment, or "reimbursement," approvals.

67.     Effective on or about January 1, 2003, a "J Code" was approved for Aranesp (darbepoetin alfa).   The designated "J Code" was J1880.

68.     Given Amgen's inability to convince substantial numbers of oncologists to switch from Procrit to Aranesp based on the claim that Aranesp could be dosed less frequently than Procrit with the same efficacy, or based on its current pricing structure, Amgen decided to retool and redirect its sales effort, with Relator at the helm of the new sales initiative.

69.     In or around 2003, the Amgen sales and marketing team convinced numerous oncology clinics and physicians to increase their ESA purchases, and thus to *expand* the ESA market, to include Aranesp through offering sales rebates, discounts, and other financial incentives.   The Defendant Oncology Practices, specifically those in Florida, questioned Amgen sales representatives regarding the legality of the rebates.   Nevertheless, the Defendant Oncology Practices quickly set aside their hesitations and jumped on the opportunity to turn a profit from reimbursements from Government Healthcare Programs.

66.     Through Amgen's Physician Office Agreements (hereinafter "POA"), the Defendant Oncology Practices earned rebates based on the amount of the Covered Drugs they purchased over a specified period of time.   For example, Relator worked to structure the 2002 POA Contract for ION, and also worked on what was internally known as the "ION Pull Through Strategy."   The ION Pull Through Strategy aimed at securing ION as a loyal Amgen customer by creating opportunities for ION to earn higher rebates through increased purchases of the Covered Drugs and by stocking their member practices with the Covered Drugs – *i.e.* achieve

36

an increase in the volume of the Covered Drugs purchased and spread of the use of the Covered Drugs among numerous providers.

67.     In or about 2003, Aranesp sales among oncology clinics increased by 350%.

68.     In or about 2004, Amgen initiated a newly rebranded sales strategy, spearheaded largely by Relator.   The strategy aimed at giving the Defendant Oncology Practices a new and substantial reason to buy and use Aranesp in addition to Procrit.   This new and substantial reason was greater profitability – money – through quarterly rebates and off-invoice discounts to reduce the effective price of Aranesp and the other Covered Drugs.   Amgen did not report these price reductions or concessions to third-party payers including Government Healthcare Programs.   As a result, the Defendant Oncology Practices additionally stood to profit from reimbursements from third-party payers of the full-price of the Covered Drugs, instead of the actual discounted price actually paid by the Defendant Oncology Practices.

69.     Amgen brought its new sales plan to market as the "Amgen Portfolio Contract" or "APC."   The APC not only encouraged sales of Aranesp and the other Covered Drugs, it also encouraged the Defendant Oncology Practices to make increasingly larger purchases of the Covered Drugs.   By making increasingly larger purchases, the Defendant Oncology Practices could earn increasingly larger discounts and rebates.   ***So long as the Government Healthcare Programs were not made aware of the rebates and discounts, the Defendant Oncology Practices would make increasingly more revenue from "reimbursements" or payments from third-party payers, including Government Healthcare Programs.***   Under the APC, the greater the dollar value of the purchases made, the greater the value of the rebates, discounts and other economic incentives that the Defendant Oncology Practices could earn.

70.     The APC incentive structure encouraged the Defendant Oncology Practices to over-prescribe the Covered Drugs solely to increase their profits.   The Defendant Oncology

Practices had no clinical or patient-driven reason to switch medication or to change treatment plans to include the Covered Drugs.

71.     By entering into an APC, Amgen and each of the Defendant Oncology Practices became partners in an open and mutually-beneficial conspiracy, or "hub and spokes" conspiracy. Amgen, the "hub" at the center, was able to increase it sales of the Covered Drugs and to out-sell its competitors, presumably increasing its overall profitability and reputation in the pharmaceutical market.   Each of the Defendant Oncology Practices were separate "spokes," that were able to increase their own individual profitability through the receipt of kickbacks and over-reimbursements from Government Healthcare Programs.    From September 1, 2001 to 2011 and, on information and belief continuing to November 30, 2020, none of the Defendant Oncology Practices ever reported the kickbacks they received from Amgen to the Government Healthcare Programs, as they were obligated to under program rules.   The Code of Federal Regulations, 42 C.F.R. 1001.952(h), required the buyers to report fully and accurately any discount not given at the time of sale in accordance with 42 C.F.R. 1001.952(h)(1)(ii)(c) ("The buyer must fully and accurately report the discount in the applicable cost report.").   Each and every Defendant Oncology Practice, by failing to report the true lower cost of the Covered Drugs to the Government Healthcare Programs and by accepting reimbursement payments for the higher cost of the Covered Drugs, committed fraud against each of the Plaintiff States and the United States.

72.     During the Covered Period, specifically from 2001 to 2011 alone, Amgen, through its sales and marketing team efforts, paid out approximately $27 billion in rebates to Defendant Oncology Practices and other medical providers.   This means that approximately $27 billion dollars that was not reported to Government Healthcare Programs.

73. The APC strategy succeeded in increasing the use of Aranesp by the Defendant Oncology Practices. Amgen's marketing efforts were particularly successful in introducing Aranesp among patients who had previously not received any ESA treatment, among oncologists who had previously been skeptical of the efficacy and safety of ESA treatment. Defendant Oncology Practices were incentivized with kickbacks in the form or rebates, discounts, and other prices concessions that were not reported to or known by Government Healthcare Programs. As a result of the Defendant Oncology Practices' nondisclosure, these kickbacks were not considered in the Government Healthcare Programs' drug cost reimbursement calculations. The Defendant Oncology Practices were reimbursed for the full cost of the Covered Drugs, instead of the reduced price actually paid.

74. Through its APCs, Amgen succeeded in drastically increasing its sales of Aranesp. Amgen used financial kickbacks to entice the Defendant Oncology Practices to substitute Aranesp for Procrit to treat cancer patients suffering from chemotherapy-induced anemia.

75. Among its APC customers, Amgen segmented the practices and physicians into different classes based on their total potential as buyers of the Covered Drugs. "Silver" members had the potential to make annual purchases from $0 to $700,000. "Gold" members had the potential to make annual purchases from $700,000 to $5,000,000. "Platinum" members had the potential to make annual purchases of more than $5,000,000.

76. Amgen's sales and marketing team, including Relator, was provided with PowerPoint presentations and a "Discount & Rebate Estimator" or "Estimator" computational program to aid in marketing efforts. The Estimator, which accompanied the rollout of the 2004 APC, was essentially a simple and programmable calculator. Once the assumed dollar values of the Covered Drugs based on quarterly purchases were inputted into the program, the Estimator

would compute the dollar value of the "off-invoice" discounts and rebates, displaying the dollar value of the percentage discounts a particular medical practice could expect to earn under the APC based upon an assumed level of purchases. Amgen sales representatives had the ability to immediately provide physicians or practice managers the dollar value in the form of rebates and discounts the practice could earn by achieving certain dollar levels of purchases of the Covered Drugs from Amgen.

77.     In providing the Oncology Practice Defendants with actual calculations showing how they would benefit from the rebates, discounts, and other economic incentives under the APC – while downplaying or entirely neglecting the fact that the Defendant Oncology Practices would have an obligation to report the value of these cost-reductions to the Government Healthcare Programs – Amgen aided, abetted, and facilitated each of the false claims submitted by the Defendant Oncology Practices to Government Health Care Programs.

78.     The Estimator was a successful Amgen sales and marketing tool because it enabled Relator and other Amgen sales and marketing representatives to illustrate in real time to the Defendant Oncology Practices the lucrative profits they could make from accepting Amgen kickbacks and subsequently submitting false claims to Government Healthcare Programs for over-reimbursements.

79.     The 2004/2005 APC rollout sales materials highlighted the rebate structure for three classes of customer: the hypothetical $600,000 customer, the hypothetical $3,000,000 customer, and the hypothetical $6,000,000 total class.   The tables reflect changes in the rebate rate structure – described as "enhanced rebates" in the case of the contract effective September 2004 through February 2006 – versus the "base rebates" effective under the previous contract effective March 2004 through August 2004.   The rebates varied from a low of 3% for purchases in excess of $75,000 in a calendar quarter to a high of 25% for purchases in excess of

$1,275,000.   Copies of the three pages from the Amgen 2004/2005 contract reflecting the rebate structure described above are attached as ***Exhibit 2*** to this Complaint.

80.     The 2004/2005 APC rollout sales materials also included a table illustrating the discounts, as distinguished from rebates, that a medical practice could earn.   These so-called "off-invoice" discounts varied from a low of 3% to a high of 10% depending on the product and, in the case of Neupogen, its packaging.   Off-invoice discounts, which were used throughout the entire Covered Period, were given to the Defendant Oncology Practices at the time of purchase. A copy of this page from the Amgen 2004/2005 contract sales materials reflecting the "off-invoice" discount structure described above is attached as ***Exhibit 3*** to this Complaint.

81.     In addition, Amgen offered customers that achieved or exceeded their "Volume Target" during the first six months of the contract (March 1, 2004 to August 31, 2004) an additional permanent 5% off-invoice discount on the Covered Drugs for the remainder of the contract term (September 1, 2004 to February 28, 2005).   If the customer did not achieve its volume target, the customer would lose the additional, permanent 5% discount forever.

82.     The Amgen sales and marketing team set target volumes for its customers based upon a calculation of the customer's purchases of five drugs – the Covered Drugs as well as Procrit and Leukine.   Procrit and Leukine, were not Amgen drugs.   Amgen relied on data from the July 1, 2003 through December 31, 2003 and then annualized these figures to set the target volumes using the following formula:

> **Dollar value of purchases of Aranesp + Neupogen + Neulasta divided by
> dollar value of purchases Aranesp + Neupogen + Neulasta + Procrit + Leukine.**

Based on this calculation, Amgen set its "Amgen Portfolio Volume Target" levels at the equivalent 50%, 60%, 65%, 70%, 75%, 80% or 85% of Amgen Portfolio Market Share levels. Historical sales levels were considered in setting the particular customer's volume target, with

that level used as a baseline.   Under this scheme, as the customer's "loyalty" to Amgen products increased, so did its total rebates and discounts.

83.     During the Covered Period, the Amgen sales and marketing team revised and reissued the APC several times.   Relator was privity to each of these revisions and has intimate and direct knowledge of the changes and reasons for the changes made.   With each revision, as a rule, Amgen increased the required dollar value of purchases needed simply to retain the same level of financial benefits available under the previous contract.   Thus, the Defendant Oncology Practices were constantly provided with significant monetary incentives to increase the dollar value of their purchases of the Covered Drugs to maintain the same level of rebates and other financial benefits achieved under the previous APC.

84.     The Amgen marketing and sales team specifically targeted its discounts to increase potential sales as to each of the Defendant Oncology Practice.   Amgen provided dramatically different discount incentives to different customers to achieve effective market segmentation.   From an economic perspective, Amgen sought to differentiate its customers to maximize sales by differentiating the marginal sales costs for the Covered Drugs to each Defendant Oncology Practice.

85.     During the period 2003 to 2006, U.S. sales of Aranesp increased by more than 300%.   Total revenues achieved by Amgen from the sales of the Covered Drugs in the United States from 2001 to 2012 exceeded $47.8 billion.   Aranesp accounted for $15.6 billion of those sales.

86.     Aranesp obtained a dramatic increase in sales from nothing to almost $2.8 billion in annual sales within approximately five (5) years (2001 to 2006).   According to Amgen's Annual Reports and 10-K filings, Amgen's U.S. sales of Aranesp were as follows:

2001          $27 million

42

| 2002 | $284.7 million |
| 2003 | $979.9 million |
| 2004 | $1,533 million |
| 2005 | $2,104 million |
| 2006 | $2,790 million |
| 2007 | $2,154 million |
| 2008 | $1,651 million |
| 2009 | $1,251 million |
| 2010 | $1,103 million |
| 2011 | $986 million |

87.     Significantly, as sales of Aranesp increased, Procrit sales *did not* decrease proportionate to the growth in Aranesp's sales.   Although J&J Services, Inc. does not break out U.S. sales from its international sales, its Annual Reports and Form 10-K filings detail the growth and decline of its sales of epoetin alfa (Procrit) by J&J worldwide:

| 2001 | $3,426 million (for epoetin alfa internationally) * |
| 2002 | $4,269 million (for epoetin alfa internationally) |
| 2003 | $3,984 million (for epoetin alfa internationally) |
| 2004 | $3,589 million (for epoetin alfa internationally) |
| 2005 | $3,324 million (for epoetin alfa internationally) |
| 2006 | $3,180 million (for epoetin alfa internationally) |
| 2007 | $3,327 million (for epoetin alfa internationally) |
| 2008 | $2,731 million (for epoetin alfa internationally) |
| 2009 | $2,245 million (for epoetin alfa internationally) |
| 2010 | $1,934 million (for epoetin alfa internationally) |

43

2011                $1,632 million (for epoetin alfa internationally)

* 2001 figure is based upon calculations due to lack of a breakdown for epoetin alfa sales in Form 10-K filing.

88.     Amgen's increased promotion of Aranesp did not erode its sales of Epogen.   U.S. sales data reflected in Amgen's Annual Reports and Form 10-K filings show that Epogen enjoyed healthy sales growth from 2001 to 2006 despite Aranesp's introduction and marketing push:

2001                $2,108 million

2002                $2,261 million

2003                $2,435 million

2004                $2,601 million

2005                $2,455 million

2006                $2,511 million

2007                $2,489 million

2008                $2,456 million

2009                $2,569 million

2010                $2,524 million

2011                $2,040 million

89.     As the data show, sales of ESAs generally have declined appreciably since their peak combined year of 2006, amid increased scrutiny of their efficacy at high dosage levels and patient safety, as well as the cost of these drugs to Government Healthcare Programs.   In 2006, total U.S. sales of Aranesp were $2.8 billion, the high watermark for the drug.   Procrit sales that year were $3.18 billion – down some $1.12 billion from Procrit's peak year of 2002.   Sales of

44

Epogen in 2006 were $2.511 billion, down less than $100 million from Epogen's peak year of 2004.

90.     Amgen's marketing of Aranesp to the Defendant Oncology Practices through the APC did not diminish sales of other ESAs so much as expand the market for ESAs overall.

91.     According to a 2012 report prepared for the Senate Special Committee on Aging by the Government Accountability Office ("GAO") entitled "Medicare: High-Expenditure Part B Drugs,"[1] Medicare Part B expenditures for Aranesp in 2010 were $504 million and for Neulasta in the same period – just a single year – $888 million.    In 2010, Neulasta was the sixth most expensive Medicare Part B drug; Aranesp, for non-ESRD uses, was the seventh most expensive. These figures do not include drug costs paid by Medicaid or by state healthcare programs.

92.     According to the 2012 GAO report, spending on Medicare beneficiaries for Aranesp in chemotherapy patients in 2010 accounted for $504 million of the $755 million of total insured spending on Aranesp in this patient population – 66.7% of total expenditures.    In other words, the United States government paid for two-thirds of all Aranesp used in oncology practices in the United States.

93.     For Neupogen, Medicare patient purchases accounted for $171 million of the $309 million in total insurance reimbursements in 2010 – 55.5% of all insured spending on Neupogen.

94.     For Neulasta, Medicare beneficiaries accounted for 39.4% of all total insurance spending – or $888 million of $2,254 million.

95.     As these figures show, Medicare and Medicaid have been major payers ("reimburses") of charges associated with the cost of the Covered Drugs.   By not reporting the

---

[1] Part B covers certain physician, outpatient hospital, laboratory and other services.

actual reduced cost of the Covered Drugs to the Government Healthcare Programs, including Medicare and Medicaid, the Defendant Oncology Practices defrauded the Government Healthcare Programs of significant money with each and every claim for reimbursement they submitted.   On information and belief, the combined value of the rebates, off-invoice discounts, and other things of value earned by some of the Defendant Oncology Practices for prescribing and administering the Covered Drugs exceeded 50% of the reported average wholesale price ("AWP") or the average selling price ("ASP") of the Covered Drugs as reported by Amgen.

96.     The knowing submission by Amgen of false and fraudulent information as to the AWP and ASP of the Covered Drugs, by failing to account for the cost of rebates, off-invoice discounts, and other things of value provided by Amgen to the Defendant Oncology Practices in exchange for their continued and increasing purchases of the Covered Drugs, combined with their own knowing submission of false and fraudulent claims for reimbursement of the cost of the Covered Drugs by the Defendant Oncology Practices to Government Healthcare Programs, which also failed to account for the rebates, off-invoice discounts and other things of value that the Defendant Oncology Practices received from Amgen based upon their purchase of the Covered Drugs, caused Government Healthcare Programs to "over-reimburse" the Defendant Oncology Practices for the cost of the Covered Drugs, thereby diminishing the ability of these programs to provide appropriate services and benefits to U.S. citizens who are entitled by law to such services and benefits, and imposing an unnecessary and unjustified fiscal burden upon the nation.   From 2004 to 2011 alone, the Defendant Oncology Practices submitted claims for and received over-reimbursements from Government Healthcare Programs in excess of $4,000,000,000.

97.     From 2001 through 2011 and, on information and belief, continuing to 2020, Amgen failed to include the cost of the rebates, off-invoice discounts, and other economic

incentives provided to the Defendant Oncology Practices in exchange for their purchase of the Covered Drugs, in its calculation of the AWP and the ASP of the Covered Drugs.   Likewise, from 2001 through 2011 and, on information and belief, continuing to 2020, the Defendant Oncology Practices did not report receipt of any post-sale discounts and other things of value that had the effect of lowering their purchase costs for the Covered Drugs in their claims for reimbursement to Government Healthcare Programs.   Thus, the Defendant Oncology Practices received a double benefit: (1) a reimbursement rate that was based upon a supposed cost that was substantially higher than what they actually paid for the drugs, and (2) post-sale discounts, rebates, and other financial incentives and things of value that lowered the actual cost of the drugs to a level substantially below the cost reported to Government Healthcare Programs.   For this reason, each and every claim made by a Defendant Oncology Practice to a Government Healthcare Program for the cost of a Covered Drug was false and fraudulent, causing such programs to "reimburse" Defendants for supposed costs that far exceeded their actual paid cost of the Covered Drugs.   Equally venal, the scheme resulted in the over-prescribing of the Covered Drugs – particularly Aranesp and Neulasta – by physicians associated with the Defendant Oncology Practices and the excess use or overdosing of patients prescribed these drugs despite documented serious adverse side-effects in some patient populations.

98.     According to an estimate by the Institute of Medicine in 2011, Americans incur some $800 billion in unnecessary health care costs every year.   The Institute reported that the three anti-anemia drugs (Procrit, Epogen and Aranesp) have cost the government some $60 billion since 1989.   In 2008, according to data cited by The New England Journal of Medicine, the average annual cost to Medicare to maintain a patient with ESRD on dialysis was $77,506. 364 N. Engl. J. Med. 593-95 (Feb. 17, 2011).

99.     In 2007, *The New York Times* reported that physicians in the United States, as of 2002-2003, used far more ESAs, including Aranesp, in treating anemia than physicians in Europe and in other industrialized countries where physicians had no opportunity to profit from prescribing the drugs.   *See* Berenson, Alex and Andrew Pollack, *Doctors Reap Millions for Anemia Drugs*, N.Y. TIMES (May 9, 2007), http://www.nytimes.com/2007/05/09/business/09anemia.html?pagewanted=all (last visited Sept. 10, 2020).   As noted in the *Times* story:

> Although the safety debate has heated up only recently [as of 2007], the first sign that the drugs might be dangerous came more than a decade ago.   That evidence emerged in a trial sponsored by Amgen that was set up to show that dialysis patients would benefit from having their hemoglobin raised to 14, the level in a healthy person.

> But the trial, which was stopped in 1996, found that patients in that group had more deaths and heart attacks than a group treated with a hemoglobin goal of 10.

> That trial should have discouraged doctors from using too much epoetin and encouraged Amgen to study the risks further, said Dr. Steven Fishbane, a nephrologist at Winthrop-University Hospital on Long Island.

100.    In one comparison patient population, ESRD patients generally served by dialysis clinics, a report by *The Washington Post* noted that the dosages used for ESA treatment in this patient population more than tripled from approximately 6,000 i.u. weekly of Procrit/Epogen in 1990 to more than 20,000 i.u. weekly beginning in 2004.   *See Washington Post* (July 19, 2012), at http://www.washingtonpost.com/wp-srv/business/amgen-anemia-drugs/index.html (last visited Sept. 8, 2020).   According to the *Post* story, ESRD patients in the United States in 2002 received the highest average dose of ESAs of any of the twelve countries studied, at 17,360 i.u. weekly, compared to the next highest country – Belgium with 12,312 i.u. average weekly doses and the lowest dose country, Japan, with an average of 5,297 i.u. weekly. *Id.*

101.    Effective January 1, 2011, Medicare revised the way it compensated medical services providers that administer drugs to ESRD patients.   The new system is described as a

"bundled" reimbursement system.   Providers began receiving a single payment for each patient.
This single payment was to cover almost all treatment costs associated with ESRD for the
patient.   The new system was forecasted to reduce payments to ESRD facilities by 2% overall,
in addition to reducing "incentives to overuse profitable, [previously] separately billable drugs,"[2]
particularly ESAs, because studies showed that such overuse harms patients.[3]   This single
"bundled" payment now covers all the resources used in providing outpatient dialysis treatment,
including ESA drugs, supplies, and equipment used to administer dialysis at the clinic or at the
patient's home.   On information and belief, prescription levels for ESAs in this patient
population decreased substantially once the financial incentives to physicians to prescribe the
drugs were reduced.   Evidence of diminished use of ESAs in the ESRD patient population
provides powerful circumstantial evidence that ESAs in general were prescribed in the United
States by physicians at higher dosage levels and in a greater proportion of patients than medical
necessary as a consequence of the unusual opportunity to individually profit by prescribing
increasing amounts of the drugs.   Inasmuch as the same financial incentives were present with
Defendant Oncology Practices, an inference can be made that these same incentives also caused
increased dosages and use of ESAs, including Aranesp, by the Defendant Oncology Practices not
based upon medical need, but upon profit motivations.

102.   Physicians affiliated with the Defendant Oncology Practices often prescribed
Aranesp for use in patients when Procrit or Epogen was the medically indicated preferred
treatment option because, by using Aranesp, the practices could and did earn higher profits as a
consequence of the discount and rebate structure of the APC and the higher reimbursement levels

---

[2] *See* Fed Reg. 2010; 75:49029-49214 (Aug. 12, 2010).

[3] Besarab A, *et al., "The Effects of Normal as Compared with Low Hematocrit Values in Patients with Cardiac Disease Who Are Receiving Hemodialysis and Epoetin,"* 339 N. Engl. J. Med. 584-90 (1998).

49

that could be obtained by submitting false and fraudulent claims and information to Government Healthcare Programs.

103.    One aspect of the APC relied upon the market power of Neupogen and Neulasta, two of the Covered Drugs to improve sales of Aranesp.   Neither Neupogen nor Neulasta faced competition from other drugs for their approved indications, thus, Amgen had no need to encourage sales of these drugs by extending discounts for their purchase.   Amgen nevertheless included purchases of these drugs, as well as Aranesp, in its calculation of the level of purchases needed to advance through the various, increasing discount and rebate tiers.   Purchases of Neupogen and Neulasta were included in the calculation as a way to boost sales of Aranesp by tying the sales of the weaker product to the two products for which there were no substitutes.[4] Amgen aimed to have all its customers, including the Defendant Oncology Practices, purchasing a one-to-one ratio of Aranesp to Neupogen or Neulasta.   By creating this relationship, Amgen created interdependence necessitating continued purchases of the Covered Drugs – in addition to enormous financial incentives – to solidify customer loyalty.

104.    FDA rules prohibit drug manufacturers from promoting sales of drugs for off-label uses.   Nevertheless, as previously indicated, Amgen promoted Aranesp at higher doses and at intervals different than that approved by the FDA, and for off-label uses that had not been approved by the FDA.   On or about December 18, 2012, Amgen pleaded guilty to a criminal

---

4 Neupogen and Neulasta are drugs with no effective substitutes for their approved uses: thus, regardless of whether a customer (in this case, a Defendant Oncology Practice) preferred to use Aranesp or Procrit as its ESA, it would still need to buy Neupogen and Neulasta as white blood cell stimulating agents for patients who needed white blood cell stimulation treatment, which included a high percentage of patients being treated with ESAs.   Thus, a customer that chose to use Procrit as its preferred ESA would not obtain any credits toward discounts, rebates, or other incentives from purchasing Neupogen and Neulasta, whereas if it selected Aranesp as its ESA of choice, it would receive such credits.   The effect of this sales technique was to provide the Defendant Oncology Practices with a huge incentive to "prefer" Aranesp to Procrit based on the financial benefit to be derived from such a choice.

indictment in the United States District Court for the Eastern District of New York.   Amgen was charged with a single misdemeanor count of misbranding Aranesp by promoting it in a way that was inconsistent with the dosage levels and frequency approved by the FDA, as described on the package insert.   The plea was accepted the next day.

105.     From 2001 through 2011 and, on information and belief, continuing to 2020, the pronounced increase in the use of Aranesp and, to some extent, Neulasta after initiation of the APC program was due to the financial kickbacks and incentives Amgen provided to the Defendant Oncology Practices as part of a "hub and spokes" conspiracy.   Through the conspiracy, Amgen and the Defendant Oncology Practices were able to increasing their profits through the increased purchase, use, administration, and billing for the Covered Drugs.   The increased purchase and use of the Covered Drugs were entirely motivated by profit, and had no bearing on medical need or patient-driven concerns what so ever.

### C.     Overstating Drug Costs to Increase Government Healthcare Program Reimbursements.

106.     Medical services providers that participate in Government Healthcare Programs – including the Defendant Oncology Practices – are required to abide by the laws, rules, and regulations that apply to those programs, including those related to payment or "reimbursement" of the cost of drugs used to treat eligible patients.   In order to avoid overcompensating providers for such costs, the laws, rules, and regulations that apply to Government Healthcare Programs to ensure that actual costs are accurately described.

107.     During the Covered Period, the Defendants directly or indirectly purchased substantial quantities of the Covered Drugs from Amgen for administration to patients eligible to receive benefits under Government Healthcare Programs.   Thereafter, the Defendants sought payment or "reimbursement" from such programs for all or a portion of the cost of the Covered Drugs administered to its covered patients.

108.     During the Covered Period, Amgen and the Defendant Oncology Practices knowing engaged in a mutually-beneficial "hub and spokes" conspiracy intended to cause, and actually causing, false and fraudulent information and claims for payment or "reimbursement" for all or a portion of the cost of the Covered Drugs administered to patients eligible to receive benefits under Government Healthcare Programs to be submitted to such programs, including Medicare and Medicaid.   Thereafter, based on such false and fraudulent information and claims, the Defendant Oncology Practices were paid or "reimbursed" for all or for a portion of the claimed costs of such drugs by such programs in amounts that exceeded the levels of reimbursement set according to the program rules.

109.     As part of the "hub and spokes" scheme, the Defendants knowingly submitted inaccurate data, directly or indirectly, to Government Healthcare Programs showing prices for the Covered Drugs that failed properly to account for discounts, rebates, and other effective price reductions that Amgen provided to the Defendant Oncology Practices under the APC as well as pursuant to other purchase incentive programs.   This conduct included deliberate disregard of specific regulations concerning acceptance of rebates and other discounts related to the purchase of the Covered Drugs, as well as conduct designed to conceal this activity from regulatory authorities.

110.     At the time the Defendant Oncology Practices engaged in these fraudulent activities, they knew that rebates and other discounts and financial incentives paid by Amgen and accepted by them would cause numerous false claims to be submitted to and paid by Government Healthcare Programs, including Medicare and Medicaid.   Had the Defendant Oncology Practices not filed false and fraudulent claims seeking reimbursement of the cost of the Covered Drugs, Government Healthcare Program funds would not have been used to pay, or "reimburse," the Defendant Oncology Practices for the claimed costs that overstated the actual

cost of the Covered Drugs and that, therefore, exceeded the reimbursement levels that would have applied had the actual cost of the drugs been accurately reported.

**D.     Payments for Drugs Furnished by Physicians.**

111.    In order to prevent fraud through the use of undisclosed kickbacks that constitute cost reductions, the Government Healthcare Programs, including Medicare and Medicaid, have strict rules governing the manner in which drug costs are calculated and paid, or "reimbursed," to physicians and physician practice groups, such as the Defendant Oncology Practices.

112.    Under Medicare reimbursement rules, drugs furnished by physicians in noninstitutional settings are reimbursable under one of two payment methodologies.   Until December 31, 2004, the amount reimbursed for a covered drug depended upon a determination of the AWP.

113.    From January 1, 2005 to the present, Medicare reimbursement was subject to a determination of the ASP – and reimbursement rates were set at the Average Sales Price plus a six percent (6%) markup.   This reimbursement method is known as the "ASP methodology." Payment under this methodology is based on the manufacturer's ASP.   The manufacturer's ASP is calculated by totaling all of a manufacturer's sales to all purchasers in the United States. From this amount, price concessions are supposed to be subtracted.   Price concessions offered on a lagged basis (not given at the time of sale) must be calculated on a rolling average basis and subtracted from total sales.

114.    Once the total sales amount for a quarter is calculated, that amount must be divided by the number of units sold in that quarter to arrive at the manufacturer's ASP. This amount must be calculated for each national drug code ("NDC") number.   Certain sales, such as sales to specified branches of the federal government, state pharmaceutical assistance plans and

other entities, are excluded from the manufacturer's ASP calculation.   Sales at nominal prices, which are defined as less than 10% of average manufacturer price, are also excluded.

115.    The manufacturer's ASP is used to calculate the payment rate for both single-source drugs and multiple-source drugs.   Multiple-source drugs are drugs that are therapeutically equivalent, pharmaceutically equivalent and bioequivalent.   Multiple-source drugs are also drugs that shared the same code on October 1, 2003.   Single-source drugs are drugs that are not multiple-source drugs, and are sold pursuant to a new drug application approved by the FDA.   All "biologicals," which category includes all of the Covered Drugs, are single-source drugs.

116.    For single-source drugs, the payment rate is equal to the weighted average of the manufacturer's ASP for all NDCs assigned to the drug's HCPCS code, plus 6%.   For multiple source drugs, the payment rate is the weighted average of the manufacturer's ASP for all the drugs assigned to the same HCPCS code, plus 6%.   Payments are made to the physician administering the drug.   If a physician engages in a group practice, payments are made to the medical practice rather than directly to the physician prescribing the drug.

117.    A substantial proportion of the cost of the Covered Drugs manufactured by Amgen are billed to and paid by the federal government and various state governments – including those States that are named as plaintiffs in this civil action – under Government Healthcare Programs.   Thus, one effect of the over-prescription of the Covered Drugs has been to impose unnecessary and unjustified costs on Government Healthcare Programs.

118.    In the December 19, 2012 Settlement Agreement between the United States and Amgen, the United States made a number of allegations regarding Amgen's manipulation of the ASP.   Specifically, the United States alleged that Amgen knowingly and improperly desired to increase the ASP of the Covered Drugs to financially benefit of its customers:

5.      During the period from April 30, 2004 to January 1, 2008, Amgen knowingly reported inaccurate Average Sales Prices ("ASP") for Aranesp, Epogen, Neulasta, and Neupogen by failing to account properly for price concessions, including group purchasing organization volume discounts, prompt pay discounts, cash discounts, free goods that are contingent on any purchase requirement, chargebacks, rebates, and price concessions disguised as *bona fide* service fees, in the calculation of ASP. Amgen employees and agents were directed to explain the profitability of the inaccurate ASP.

6.      During the period from April 30, 2004 to September 30, 2011, Amgen knowingly reported inaccurate ASP for Aranesp, Epogen, Neulasta, and Neupogen by failing to account properly for price concessions including rebates, volume discounts and free goods that were contingent on any purchase requirement, referred to in the Complaints as "bundled pricing" and "overfill." Amgen employees and agents were directed to explain the profitability of the inaccurate ASP.

7.      During the period from January 1, 2001 to September 30, 2011, Amgen knowingly reported inaccurate Best Prices and Average Manufacturer Prices for Aranesp, Enbrel, Epogen, Neulasta, Neupogen and Sensipar by failing to include remuneration, specifically in the forms outlined in the Paragraph G.4 Conduct, that was paid to health care providers and that was conditioned on purchase of Amgen products in violation of the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8.

As part of the Settlement Agreement, Amgen did not admit to these allegations.

119.    During the Covered Period, the Defendant Oncology Practice were buyers of the Covered Drugs from Amgen and knowingly benefitted from Amgen's manipulation of the ASP and from the inaccurately reported Best Prices and Average Manufacturer Prices.

120.    More broadly, the effect of Amgen's drug marketing programs aided and abetted the actions of the Defendant Oncology Practices in evading the requirements of Government Healthcare Programs to report to Government Healthcare Programs the true and accurate price – *taking into account all discounts, rebates and other price concessions* – at which the Covered Drugs, were sold.   Because the Defendant Oncology Practices submitted false and fraudulent claims and information to Government Healthcare Programs, such Programs were defrauded of hundreds of millions of dollars of unjustified drug cost "reimbursements" to the Defendant Oncology Practices during the Covered Period.   The Defendant Oncology Practices' false and

fraudulent claims were usually submitted to Government Healthcare Programs electronically using data management and payment systems such as the Medicare Administrative Contractor System.   Through the reimbursement claims, the Defendant Oncology Practices sought and obtained reimbursement for the full cost of the Covered Drugs without accounting for the kickbacks and other financial considerations they received from Amgen as incentives to buy the Covered Drugs that lowered their actual cost of the drugs.   From 2001 through 2011 and, on information and belief, continuing to 2020, none of the Defendant Oncology Practices ever apprised any Government Healthcare Program of the fact that they had obtained discounts, rebates, kickbacks and other valuable consideration from Amgen as incentives to purchase the Covered Drugs.   By failing to inform Government Healthcare Programs of these payments, the Defendant Oncology Practices obtained reimbursements from such programs that were substantially greater than their actual cost of the Covered Drugs (and substantially lower than the amount sought for reimbursement) thereby defrauding the Government Healthcare Programs, imposing unwarranted costs on such programs and diminishing the capacity of these programs to provide drugs and medical services to persons eligible to receive such benefits.   *As a result, the Defendants defrauded the Government Healthcare Programs of more than $4 billion dollars from 2004 through 2011 alone.*

> **E.   Rules on Acceptance of Discounts in Healthcare Services.**

121.   In or about 1972, Congress enacted the Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b), also known as the "Anti-Kickback Statute," to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs.   H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

122.    In or about 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying any remuneration to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail.   *See* Social Security Amendment of 1972, Pub. L. No. 92-603, 241(b) and (c); 42 U.S.C. § 1320a-7b.   In so doing, Congress noted that the purpose of the Anti-Kickback Statute was to combat fraud and abuse in medical settings that cheats taxpayers who must ultimately bear the financial burden of misuse of funds . . . diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and] erodes the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs.   H.R. Rep. No. 95-393, pt. 2, at 37, reprinted in 1977 U.S.C.C.A.N. 3039, 3047.

123.    In or about 1987, Congress again strengthened the Anti-Kickback Statute, this time to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

124.    The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program, which includes any State health program or health program funded in part by the federal government.   42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

125.    Generally speaking, discounts for health care items and services are encouraged under Government Healthcare Programs rules.   Federal healthcare program regulations specifically approve of discounts, so long as the programs themselves share in the discount

where appropriate, and as appropriate, to the reimbursement methodology.   But arrangements in which federal healthcare programs get less than their proportional share of cost-savings on items or services payable by the programs are deemed "seriously abusive."   Such arrangements result in overcharges to the programs and are not protected by either the statutory exception or the regulatory safe harbor for some types of discounts.   *See* 64 Fed. Reg. 63526 (Nov. 19, 1999).

126.    In or about 1999, the Office of Inspector General of the Department of Health and Human Services ("OIG"), provided specific guidance regarding the requirements for rebates or discounts to qualify for "safe harbor" treatment under the federal Anti-Kickback Statute, 41 U.S.C. § 52.   In its Final Rule interpreting the statute, OIG defined certain "safe harbors" for certain types of discounts.   42 C.F.R. 1001.952 (Nov. 19, 1999).   The Final Rule also applied to state healthcare programs in virtually all circumstances.   *Id*. subpart (h).   The Final Rule was in force throughout the Covered Period and applied to all federal healthcare programs.

127.    The Anti-Kickback Statute not only prohibits outright bribes and rebate schemes, but also prohibits any payment or other remuneration by a drug company to a physician or other person which has as one of its purposes the inducement of the physician to write prescriptions for the company's pharmaceutical products or the inducement of the physician to influence or recommend the prescribing of the product.

128.    Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under a Government Health Care Program, including Medicare and the state Medicaid programs.   Moreover, compliance with the Anti-Kickback Statute is a *condition of payment* for drug claims administered by physicians for which Medicare or Medicaid reimbursement is sought.

129.    Under 42 U.S.C. § 1395y(a)(1)(A), no payment may be made under the Medicare statute for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury.

130.    The United States Court of Appeals for the Second Circuit has held that, "[s]ince § 1395y(a)(1)(A) *expressly* prohibits payment if a provider fails to comply with its terms, defendants' submission of the claim forms implicitly certifies compliance with its provision." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 701 (2d Cir. 2001) (emphasis in original).

131.    Kickbacks are, by definition, not reasonable and necessary for the diagnosis or treatment of illness or injury.

132.    FCA liability may be premised on a violation of the Anti-Kickback Statute.

133.    The rebates, discounts and other incentives offered by Amgen to certain buyers, including the defendant Oncology Practices, to purchase the Covered Drugs, as described in this Complaint, did not qualify for safe harbor treatment under the Anti-Kickback Statute.   In particular, the rebates, discounts and other incentives paid to the defendant Oncology Practices pursuant to the Amgen Portfolio Contract fell outside the safe harbor provisions of the Final Rule because they were not discounts given at the time of sale, and were, thus, required to be reported to Government Healthcare Programs, including Medicare and Medicaid, by the buyer unless the buyer was a "cost reporter," a Health Maintenance Organization ("HMO") or a Competitive Medical Plan ("CMP").

134.    As provided in OIG's Commentary on the Final Rule: "A rebate under our proposal would be defined as any discount not given at the time of sale.   Consequently, a rebate transaction would not be covered by the safe harbor if it involves a buyer that is neither a cost reporter nor a HMO or CMP, because for such buyers, all discounts must be given at the time of sale."   42 C.F.R. 1001.952(h)(1)(ii)(C); *see also* § 1001.952(h)(1)(iii).

135.    None of the Defendant Oncology Practices (except for US Oncology) qualified as a "cost reporter," an "HMO" or a "CMP" under the Final Rule.   Thus, 42 C.F.R. 1001.952(h) required the buyers to report fully and accurately any discount not given at the time of sale in accordance with 42 C.F.R. 1001.952(h)(1)(ii)(C) ("The buyer must fully and accurately report the discount in the applicable cost report").

136.    The 42 C.F.R. 1001.952(h)(1)(iii)(B) and other similar provisions contained in 42 C.F.R. 1001.952(h) required that sellers and other offerors of items or services "for which payment may be made in whole or in part" (42 C.F.R. 1001.952(h)) under Medicare, Medicaid, and other Government Healthcare Program rules (here, the Covered Drugs), to apprise buyers of discounts and rebates not qualified for "safe harbor" treatment

137.    On information and belief, beginning in or about 2004 and continuing through in or about 2011, the APC contained the following provision:

> Participating Eligible Physician Practice agrees that it will *properly disclose and account for any and all discounts and/or rebates earned in connection with the [year] Amgen Portfolio Rebate Program and through its participation under the Group Purchasing Agreement in a way that complies with all applicable federal, state, and local laws and regulations, including without limitation, Section 1128B(b) of the Social Security Act and its implementing regulations*, and shall provide, upon request by the U.S. Department of Health and Human Services, or a state agency any and all information furnished, including, but not limited to information furnished by Amgen concerning the amount or value of any such discount and/or rebate, on products purchased under the Group Purchasing Agreement. Participating Eligible Physician Practice Headquarters represents and warrants that its legally affiliated physician offices and/or satellite clinics, if any, shall comply with any discount reporting obligations they may have in connection with any discounts and/or rebates received under the Group Purchasing Agreement.

(emphasis added.)

138.    During the Covered Period, each of the Defendant Oncology Practices accepted rebates, discounts, free drugs (product "overfills") and other valuable consideration from Amgen as incentives to buy the Covered Drugs, pursuant to the APC and other Amgen purchase

incentive programs.   From 2001 through 2011 and, on information and belief, continuing to 2020, none of the defendants ever advised, alerted, reported, or otherwise properly disclosed and accounted for any of the rebates, discounts, and other things of value they received as a part of the purchase and sale of the Covered Drugs from Amgen.   The rebates, discounts, product overfills and other incentives earned by the defendant Oncology Practices and provided to them by Amgen during the Covered Period substantially reduced the actual cost of the Covered Drugs to the Defendant Oncology Practices.   The rebates, discounts, product overfills, and other incentives earned by the defendant Oncology Practices and provided to them by Amgen during the Covered Period did not qualify for "safe harbor" treatment under Medicare, Medicaid, and other Government Healthcare Program rules.

139.    As defined by the APCs entered into by the Defendant Oncology Practices with Amgen, the post-sale rebates, discounts, and other things of value earned by the Defendant Oncology Practices under their respective APCs did not qualify for "safe harbor" protection under OIG guidelines.

140.    However, even assuming that the Defendant Oncology Practices might properly receive the post-sale rebates, discounts, and other things of value from Amgen, they failed to report the financial incentives to the Government Healthcare Programs and that the cost of the Covered Drugs had been reduced, thus also constituting fraud from 2001 through 2011 and, on information and belief, continuing to 2020.

141.    Amgen provided the Defendant Oncology Practices with overfill, replacement product, and/or samples of Aranesp.   These overfills provided additional amounts of the Covered Drugs to the Defendant Oncology Practices for the same cost.   Each of the overfills was documented with an "overfill letter" sent by Amgen to the Defendant Oncology Practice, to provide the purchaser documentation in the event of an Occupational Safety and Health

Administration inspection or audit.   The overfills had the intended and purposeful effect of reducing the cost of Aranesp to the Defendant Oncology Practices, thereby increasing the profits they earned from administering Aranesp instead of market alternative Procrit.

142.   The overfill of Aranesp and samples of the other Covered Drugs accepted by the Defendant Oncology Practices amounted to discounts or rebates that fell outside the OIG guidelines for "safe harbor" treatment.   But even if permitted under the OIG "safe harbor" guidelines, on information and belief, none of the Defendant Oncology Practices ever reported the financial incentives, and the value thereof, to Government Healthcare Programs.

143.   Relator has personal knowledge that each and every one of the Defendant Oncology Practices entered into one or more APCs and that, through the APCs, the Defendant Oncology Practices received post-sale rebates and discounts.   Each and every post-sale rebate or discount, whether in the form of money, products, or other things of value earned by the Defendant Oncology Practices under an APC was based upon the purchase of a Covered Drug during the Covered Period.   From 2001 through 2011 and, on information and belief, continuing to 2020, none of the Defendant Oncology Practices or Amgen reported the actual cost of the Covered Drugs during the Covered Period to the appropriate Government Healthcare Program, thus violating the Government Healthcare Program rules and regulations, thereby constituting tens of thousands of false and fraudulent claims.

144.   Relator has personal knowledge that each of the Defendant Oncology Practices were fully apprised of how they could achieve over-reimbursement of the costs of the Covered Drugs from Government Healthcare Programs by entering into an APC with Amgen.   Under the mutually-beneficial "hub and spokes" scheme, Amgen agreed to provide each of the Defendant Oncology Practices with invoices that fraudulently overstated the Defendant Oncology Practices' actual paid cost for the Covered Drugs.   The invoices overstated the true cost of the Covered

Drugs because they failed to take into account the value of the rebates, discounts, product overfills, and other things of financial value that the Defendant Oncology Practices received for meeting their APC purchase-increase targets.   From 2001 through 2011 and, on information and belief, continuing to 2020, neither Amgen nor any individual Defendant Oncology Practice ever reported or otherwise disclosed, either on a current or a lagged basis, to any Government Healthcare Program to which a defendant submitted a claim for "reimbursement" of the cost of a Covered Drug administered to a beneficiary of such program, the money or value of things it received from Amgen in the form of rebates, discounts, product overfills and the like for having met a target purchase goal set under its APC.

145.   Each and every claim for reimbursement filed by a Defendant Oncology Practice with a Government Healthcare Program for a Covered Drug administered to a person eligible to receive benefits under any such program during the Covered Period constituted a fraud on such program and upon the United States.   Such a claim would not constitute fraud only if the money, products, and other things of value earned by a Defendant Oncology Practice under an APC and paid to it by Amgen were reported to the appropriate Government Healthcare Programs as reductions in the cost of the Covered Drugs administered to such persons.

146.   From 2001 through 2011 and, on information and belief, continuing to 2020, during the Covered Period, each Defendant Oncology Practice submitted claims to Government Healthcare Programs for reimbursement of the cost of the Covered Drugs delivered to patients eligible to receive benefits under such programs.   Each such claim:

(a) was improperly filed in that (i) the claim was for a medical or other item or service, to wit, a Covered Drug, and the person making the claim knew or should have known that the claim was false or fraudulent in that it failed to report or identify the post-sale rebates, discounts and other things of value earned by the defendant under an APC

63

and paid to it by Amgen, and (ii) was for a pattern of medical or other items or services, to wit, the Covered Drugs, that were known or should have been known to be not medically necessary, or not medically necessary at the dosage levels at which administered, both in violation of 42 U.S.C. § 1320a–7a;

(b) (i) contained a false statement or representation of a material fact that was made knowing and willfully in an application for a benefit or payment under a Federal health care program (as defined in § 1320a–7a(f)), to wit, a claim that the defendant was entitled to "reimbursement" of a portion of the cost of the Covered Drugs without accounting for the post-sale rebates, discounts and other things of value earned by the defendant under an APC and paid to it by Amgen and (ii) contained statements or representations of material facts for use in determining rights of the defendant to such benefit or payment under a Federal health care program that were knowingly and willfully false, namely, by omission, that the defendant had not received any post-sale rebates, discounts or other things of value from Amgen based upon its purchase of the Covered Drugs during the Covered Period, the effect of which was to reduce the cost to it of the Covered Drugs, in violation of 42 U.S.C. § 1320a- 7b(a)(1) and (2), respectively; and

(c) was improper as it was generated on the basis of kickbacks, bribes, rebates or other remuneration paid to and received by the defendant filing the claim for the purpose of inducing such defendant to order goods, namely, the Covered Drugs, from Amgen to be provided to persons eligible to receive benefits under a Federal health care program, in violation of 42 U.S.C. §§ 1320-7b(b)(1)(A) and 1320-7b(b)(2)(A).

147.    Each and every claim submitted by each of the Defendant Oncology Practices to a Government Healthcare Program for reimbursement of the cost of any Covered Drug during the

Covered Period violated 20 C.F.R. § 498, *et seq*. as each such claim contained false statements or representations or omissions or otherwise withheld disclosure of a material fact: (a) the fact that the defendant was induced to purchase the Covered Drugs on the basis of kickbacks, bribes, rebates or other remuneration paid to and received by the defendant, (b) the fact that the claim failed to advise the Government Healthcare Program that the defendant was receiving post-sale rebates, discounts and other things of value from Amgen for its purchase of the Covered Drugs; and (c) the fact that the Covered Drugs that were the subject of the claim were known to be or should have been known to be not medically necessary or not medically necessary at the dosage levels administered, all such claims being relevant for use in determining a right to or amount of benefits under title II or benefits or payments under title VIII or title XVI of the Social Security Act.

### F.     Fraudulent Reporting of ASP by Defendant Oncology Practices.

148.     Prior to 2005, the reimbursement rates from the Medicare Part B and Medicaid programs for prescription drugs were based on the manufacturer's average wholesale price, the previously defined AWP of the drug.   Since in or about January 2005, Medicare reimbursements for drug costs have been set by reference to the "average sale price," the previously defined ASP of the drug, plus 6%.   Both the AWP and the ASP price averages are or were determined by reference actual sales prices in the calendar quarter nearest in time to the quarter ended.   Thus, for example, allowable reimbursements in the first quarter of the year, beginning in January, would be based on prices determined by reference to transactions occurring in the third quarter of the prior year.

149.     As a direct result of the actions of the Defendant Oncology Practices, as described above, Government Healthcare Programs paid out hundreds of millions of dollars in excess

charges based upon false and fraudulent information and submitted by them, directly or indirectly, to such programs.

150.    According to CMS, the payment limit for Aranesp (J code "J1880" for non-ESRD usage) in the first quarter of 2006 was $2.989/mcg.   For the same period, the payment limit for Neulasta (J code "J2505" for injection) was $2,093.436 for 6 mg.   For that same period, the payment limit for Neupogen (J code "J1440" and "J1441") was $176.063 for a 300 mcg injection and $279.354 for a 480 mcg injection.

151.    According to CMS, the payment limit for Aranesp (J code "J1880" for non-ESRD usage) in the first quarter of 2013 was $3.327/mcg.   For the same period, the payment limit for Neulasta (J code "J2505" for injection) was $2,921.116 for 6 mg.   For that same period, the payment limit for Neupogen (J code "J1440" and "J1441" for injection) was $275.685 for a 300 mcg injection and $435.921 for a 480 mcg injection.

152.    According to CMS, the payment limit for Aranesp (J code "J1880" for non-ESRD usage) in the second quarter of 2013 was $3.334/mcg.   For the same period, the payment limit for Neulasta (J code "J2505" for injection) was $2,940.196 for 6 mg.   For the same period, the payment limit for Neupogen (J code "J1440" and "J1441" for injection) was $277.248 for a 300 mcg injection and $439.903 for a 480 mcg injection.

153.    During the Covered Period, specifically within the seven-year period between January 1, 2006 and January 1, 2013, the maximum reimbursement by CMS for Aranesp increased by 11.3 % (from $2.989 to $3.327).   During the same period, the maximum reimbursement by CMS for Neulasta increased by 39.5% (from 2,093.436 to $2,921.116) and by 56% for Neupogen (from $176.063 to $275.685 for the 300 mcg injection and from $279.354 to

154.    The maximum reimbursement rate for Aranesp did not increase as rapidly as the maximum reimbursement rate for Neulasta and Neupogen.   Nevertheless, by prescribing

Aranesp to be administered at dosing levels that exceeded the levels described in the package insert, the Defendant Oncology Practices increased the revenue they received from Government Healthcare Programs because their reimbursements were not limited to a fixed dosage. From 2001 through 2011 and, on information and belief, continuing to 2020, physicians affiliated with the Defendant Oncology Practices prescribed Aranesp at levels that exceeded the recommended levels in order to maintain the high level of rebates they were receiving from Amgen and to continue receiving "reimbursements" of drug costs from Government Healthcare Programs in excess of the those they would have been entitled to receive had transaction prices included the value of the rebates, discounts, and other monetary and non-monetary inducements that the Defendant Oncology Practices received to over-prescribe the Covered Drugs.

155. Some physicians were surprisingly candid in speaking to Amgen representatives about the purchase incentive programs Amgen sponsored and their motivation for buying and administering large quantities of the Covered Drugs. The following are examples culled from statements that Relator heard directly, or read from notes made by Amgen sales representatives who called upon the physicians, identified:

> Dr. Danielle Montgomery and Jack Montgomery (ICON, Jacksonville, FL) (heard directly by Relator): "We are using our Amgen rebates to build our new beach house."

> Jack Montgomery (ICON, Jacksonville, FL): "Amgen rebates are like Christmas four times per year."

> Dr. Abe Cheung (Southeast Georgia Hematology & Oncology, Brunswick, GA): "The rebates are like crack cocaine."

> Dr. Antonio Moran (Southeast Georgia Hematology & Oncology, Brunswick, GA): "Amgen rebates keep my Porsche running."

> Dr. Wayne Keiser (Redwood Regional Oncology in Santa Rosa, CA) (Jim Daly Notes): "They don't count rebates in deciding if a drug is viable."

Dr. Lon Smith (South Texas Oncology Hematology, San Antonio, TX) (Jim Daly Notes): "Will need to float any drug 'loss' until rebates are paid 6-9 months later. Anything Amgen can do to accelerate rebate payments would be well received."

Dr. Tom Marsland (ICON, Orange Park, FL) (Jim Daly Notes): "My rebates go to my account in the Caymans. How do you [Amgen] expect us to make any money without hefty rebates."

Dr. Jeffrey Paonessa (Gulfcoast Oncology Associates, St. Petersburg, FL) (heard by Adriane Lugo): "How do you expect I pay for my yacht?"

Dr. Bruce Feinburg (Georgia Cancer Specialists, Atlanta, GA) (Jim Daly Notes): "Don't anticipate big changes in first two quarters of 2005.   Overall, don't anticipate a huge change in practices since, 'docs can still make a great living at a 20% reduction in income, as long as this new level is sustainable.'"

156.    Amgen sales and marketing representatives also provided incentives directly to physicians to encourage them to prescribe these Covered Drugs for their Medicare-eligible and Medicaid-eligible patients, effectively lowering the price that they paid for these drugs.   These incentives included the same sort of off-invoice discounts, price protection, provision of free goods including product "samples," drug overfill in vials and an extensive rebate program as described throughout this Complaint.

> **G.    Defendant Oncology Practices Knew that, by Purchasing the Covered Drugs, they Could Turn a Profit from Submitting False Claims for Over-Reimbursements from Government Healthcare Programs.**

157.    Relator, as a leading sales representative and major architect of the APC strategy, is fully apprised based on his own personal knowledge of the following sales strategies and kickbacks offered to and accepted by the Defendant Oncology Practices.

158.    Relator, as a member of the Amgen sales and marketing team, entered data and had access to data entered by other Amgen employees regarding the rebates, discounts, and other financial incentives offered to and accepted by the Defendant Oncology Practices in Amgen's ACIS reporting system.

i.      Tying the purchase of Aranesp to the purchase of Neupogen and Neulasta.

159.    Under the APC, purchases of Neupogen and Neulasta, in addition to purchases of Aranesp, counted toward the dollar total of a customer's "qualified" purchases necessary to achieve a higher tier in the Amgen discount and rebate structure.   By including Neupogen and Neulasta in the discount and rebate scheme, Amgen extended its power in the market for white blood cell stimulating agents, which it had because of Neupogen and Neulasta, to an ESA, Aranesp, known to be inferior to Procrit in the treatment of chemotherapy-induced anemia, contrary to U.S. antitrust law.   15 U.S.C. § 1.   *See Ortho Biotech Products, L.P. v. Amgen, Inc.,* Case No. 2:05-cv-04850-SRC-MAS (D.N.J. filed Oct. 11, 2005).   Ortho Biotech Products, LP ("Ortho"), a J&J subsidiary, sought a preliminary injunction enjoining Amgen from offering discounts to oncology clinics on the Covered Drugs based on the volume of the products that the oncology clinic purchased.   Ortho also sought a permanent injunction enjoining Amgen from offering such discounts at all, and sought money damages.   The case was settled by a $200 million payment from Amgen to Ortho, as announced by Amgen in a press release issued on or about July 11, 2008.

ii.      Off-Invoice Discounts.

160.     Beginning in or about 2003, Amgen offered customers, including the Defendant Oncology Practices, lower bottom-line prices for the Covered Drugs and, by reducing the cost of these drugs through the use of a post-sale, "off-invoice" discount, which provided a way for the Defendants to increase their revenues and profits simply by failing to account for these discounts in their submission of claims for payment, or "reimbursement," of the cost of the Covered Drugs used to treat patients eligible for benefits under Government Healthcare Programs.

161.     By providing the Defendants with invoices that did not represent the actual cost of the Covered Drugs, Amgen facilitated Defendants' submission of fraudulent reimbursement

claims to Government Healthcare Programs that were based upon the invoice amount, not the actual cost of the Covered Drugs.   Amgen provided Defendants with physical invoices that intentionally misstated the actual cost of the Covered Drugs, solely to provide Defendants with a false indicator of the price they paid for the drugs in the event of an audit.

162.    From 2001 through 2011 and, on information and belief, continuing to 2020, the Defendant Oncology Practices filed false and fraudulent claims for reimbursement to Government Healthcare Programs based upon invoices supplied by Amgen for the Covered Drugs that overstated the actual cost of these drugs to them and, based on these false and fraudulent claims, the defendants obtained excess "reimbursement" of the actual cost of the Covered Drugs used to treat eligible patients from Government Healthcare Programs.

163.    In or about March 2008, Amgen and a number of other drug companies settled litigation brought against them by a variety of consumers and insurance companies.   *See In re: Pharmaceutical Industry Average Wholesale Price Litigation*, M.D.L. No. 1456 No. 01-12257 (D. Mass).   Consumers and insurance companies alleged that the drug companies were fraudulently inflating published average wholesale drug prices.   Those wholesale prices led to higher consumer and insurance company payments for branded and generic drugs used to treat serious illnesses like cancer and HIV.

iii.    <u>Use of overfill.</u>

164.    "Overfill" is the provision of extra product to the customer.   When a product is delivered in a vial, as was true in the case of the Covered Drugs, the vial is filled beyond the amount shown on the invoice.   The significance of having an "extra" amount of the drug to a physician, a medical services provider or other buyer that administers the drug is that the extra, unaccounted-for amount of the drug can be administered to a patient and the patient or a third-

party payer, including a Government Healthcare Program, charged for the amount of the drug administered, even if the drug was provided to the medical services provider free of charge.

165.    Beginning with the approval of Aranesp for treatment of CRF in 2001, the Amgen sales and marketing team, to increase physician preferences for the Covered Drugs, and thereby to increase sales of these drugs, began providing customers with extra quantities of Aranesp at no charge.   This practice of providing extra quantities of Aranesp in vials for no charge continued with the approval of Aranesp for chemotherapy-induced anemia for the oncology market in 2002.   This practice of overfilling vials was also used by Amgen for Neupogen, beginning with its launch in February 1991.

166.    By providing customers with amounts of the Covered Drugs greater than reflected on invoices, the Amgen sales and marketing team intended to encourage customers to prefer Amgen products over potential substitute products, in the case of Aranesp, and to increase the quantities of the Covered Drugs sold to customers.

167.    The "overfill" program benefitted the Defendant Oncology Practices by reducing the effective cost of the Covered Drugs to them in a way that could not readily be detected by Government Healthcare Program administrators.   This facilitated their ability to avoid reporting this financially valuable but non-monetary discount to government-funded healthcare programs, yet provided them with the opportunity to earn greater profits from the purchase of the Covered Drugs.

168.    The "overfill" program benefitted the Defendant Oncology Practices by reducing the effective cost of the Covered Drugs to them in a way that could not readily be detected by Government Healthcare Program administrators.   This facilitated their ability to avoid reporting this financially valuable but non-monetary discount to government-funded healthcare programs,

yet provided them with the opportunity to earn greater profits from the purchase of the Covered Drugs.

169.    The "overfill" program was intended to, and did, allow the Defendants to administer the Covered Drugs they received "for free" to patients.   The patients or, more frequently, third-party payers, principally Government Healthcare Programs and insurance companies, were then billed for the drugs based on the volume of the drug administered, not its cost, as there was no cost for the extra "overfill" amount.   The claims filed by the Defendant Oncology Practices to Government Healthcare Programs for the Covered Drugs exceeded the actual cost of the drugs to them, inasmuch as delivering extra, unaccounted-for drugs with a drug order effectively lowered the cost of the drugs on a per-unit basis.

170.    From 2001 through 2011 and, on information and belief, continuing to 2020, Defendant Oncology Practices benefitted substantially from the overfill program, while costing Government Healthcare Programs additional money.   For example, assume the case of a hypothetical 500 mcg vial of Aranesp in 2006 – the size of vial which accounted for a substantial percentage of Aranesp sales.   Assuming a 20% overfill, which is consistent with marketing materials the Relator received from Amgen's marketing department as to the average amount of overfill in Amgen-supplied vials of the Covered Drugs, the vial would contain approximately 100 mcg of "overfill."   This 100 mcg of Aranesp would then be available to a defendant to administer to patients, providing the defendant with an opportunity to earn an extra $298.90, the amount a practice would earn in Medicare-billable profit from a single administration of the drug to a single patient, according to the CMS advisory on the maximum billing allowed in the first quarter of 2006.   Further, of course, as the maximum reimbursement rate for Aranesp increased over time, so did the profit a defendant could earn in billing Medicare, Medicaid or other Government Healthcare Programs for the overfill.

72

171.    By way of further explanation, assuming the same 500 mcg vial and that each of five patients was administered a single 100 mcg dose of Aranesp, each patient or her third-party payer, such as a Government Healthcare Program, would be billed for one-fifth of the cost of the vial.   But because, in this example, the vial actually contained 600 mcg, a sixth 100 mcg dose could be administered to a sixth patient and billed to that patient or his third-party payer.   The medical services provider would have paid nothing for the extra 100mcg dose and, as a result, the income collected on the sixth dose would be pure profit.

172.    Similarly, with respect to Neupogen, in a hypothetical case, a physician might dose an average size person (70 kg or 154 lbs.) with a 350 mcg dose, but, because of the limited number of dispenser sizes, would need to draw this dose from a 480 mcg vial.   Since a 480 mcg vial would actually contain 530 mcg of Neupogen, however, after administering the 350 mcg dose, the physician or the medical services provider would still have 180 mcg (480 – 350 + 50) of the drug left.   That 180 mcg could then be administered to another patient and billed to a third-party payer without any additional cost.

<div align="center">iv.    Price protection.</div>

173.    During the Covered Period, Amgen generally initiated one or two price increases per year on most products.   These increases were usually in the range of 5%.   But, in order to increase sales, the Amgen sales and marketing team allowed current customers, including the defendant Oncology Practices, to continue purchasing the Covered Drugs and other products at the "old" price until the date of next price increase.

174.    Price protection had at least two specific benefits for Amgen customers who had entered in to APCs.   First, it allowed customers, including the defendant Oncology Practices, to purchase certain drugs, including the Covered Drugs, at the "old" price longer after a price increase had been announced and implemented.   Second, it increased the size and value of drug

cost "reimbursements" defendants could realize from Government Healthcare Programs.   This effect stemmed from the fact that, as Amgen's ASP increased, the reimbursement rates of Government Healthcare Programs also increased, to adjust for the higher supposed higher ASP, whereas the actual cost of the Covered Drugs to the defendants did not increase.

175.    The Amgen sales and marketing team took steps to ensure that its price increase announcement would be published in industry publications, such as the Red Book – which tracked all drug industry price changes and which Amgen knew was relied on by Government Healthcare Programs for drug pricing data.   Through the Red Book, and via other means, Amgen began reporting a new, higher ASP for the Covered Drugs to Government Healthcare Programs, based on the price increase, even though only a small fraction, if any, of its drug sales were made at that price.   Knowing that Amgen's reported ASP did not accurately reflect the actual selling price of the Covered Drugs, the defendants nevertheless submitted claims for payment, or "reimbursement," of their drug costs, to Government Healthcare Programs that failed to account for the fact that Amgen's claimed ASP did not accurately reflect the price paid and, therefore, were false and fraudulent.

v.    Free goods.

176.    Amgen supplied free goods and samples to the defendant Oncology Practices and other customers as a way to drive sales and to reduce the effective cost of the Covered Drugs to the Defendant Oncology Practices.   Each Amgen sales representative, including Relator, had $50,000 in free goods to use to promote the sale of each drug within his/her portfolio.   More than that amount of money was usually readily available to the sales representative from Amgen, upon request.   The sales force was encouraged by Amgen to dole out "free samples" of Amgen drugs to customers.   Physicians and practice groups that received these "gifts" were then free to administer the drugs to patients, charging the patient or a third-party payer, such as a

Government Healthcare Program, the full, ordinary (claimed) cost of the drug, with the revenue derived from such sales being pure profit.

177.    These free goods, or spoils, reduced the effective price of the Covered Drugs and other drugs to the defendants.   Relator is informed through his direct communications with Defendants and other members of the Amgen sales and marketing team, and believes, and thereon alleges that the Defendants did not, in submitting claims for payment, or "reimbursement," of drug costs to Government Healthcare Programs, report that these drugs had been supplied to them at no cost or used the fact that they had no cost in reducing their average cost of a drug during a calendar quarter or any other relevant period of time.

vi.    <u>Marketing the spread.</u>

178.    Rebates and discounts under the Amgen sales program varied depending upon customer-specific increases in purchase volumes of the Covered Drugs.   The greater the increase in the purchases of the Covered Drugs, the greater the level of kickbacks the customer – *i.e.* each of the Defendant Oncology Practices – would directly receive.    Each of the Defendant Oncology Practices directly received and pocketed the endless kickbacks as described above.

179.    Since in or around 2004, Relator and the whole Amgen sales and marketing team used the "Discount & Rebate Estimator" or "Estimator," a calculation tool provided by Amgen, to show customers the total value of the discounts, rebates, and kickbacks under certain assumptions compared to the actual cost of the Covered Drugs to the customer once the reimbursement the customer could receive from Medicare or other Government Healthcare Program.   Generally speaking, such Government Healthcare Programs were set up to cover 80% of the medical services provider's costs with the patient providing a 20% co-pay.   Relator was part of designing and pioneering the technique known as "marketing the spread" or "marketing to spread," which presents a prospective customer a with hypothetical, but realistic, set of figures

showing how specific increases in the volume of purchases of a drug or drugs by the customer would result provide the customer with certain rebate, discount, and kickback levels, allowing the customer to obtain reimbursement from the government-sponsored healthcare program, when such rebates and discounts are taken into account, in excess of the customer's actual cost.   A medical practice that is reimbursed for more than the percentage of the charge to which it would be entitled under program rules is said to have been "over-reimbursed."

180.    Amgen representatives used the term "over-reimbursement" when marketing the spread to each of the Oncology Practice Defendants, advising them that, as they achieved, certain target levels of purchases, they would be able to obtain over-reimbursement of their actual costs from Government Healthcare Programs – thus making a profit.   From 2004 through 2011 alone, the Defendant Oncology Practices received more than $4,000,000,000 in over-reimbursements from Government Healthcare Programs as a result of nothing else but raising their bottom lines – *i.e.* profit.

181.    In marketing the Covered Drugs to the Oncology Practice defendants, Relator followed the instructions he was given by Amgen management, in particular, by Joe Turgeon, Cynthia Schwalm, George Morrow, Jim Daly, Bobby Fralin, and others.

182.    None of the Defendant Oncology Practice to whom Relator marketed the Covered Drugs ever asked Relator whether they had an obligation under their APC to report value of the rebates, discounts, and other things of value they earned and received by increasing their purchases of the Covered Drugs to the Government Healthcare Programs from which they sought reimbursement of the "cost" of such drugs as a reduction in such cost pursuant to the provision in their APC, as reflected in paragraph 137 of this Complaint and repeated below:

> Participating Eligible Physician Practice agrees that it will *properly disclose and account for any and all discounts and/or rebates earned in connection with the [year] Amgen Portfolio Rebate Program and through its participation under the Group Purchasing Agreement in a way that complies with all applicable federal, state, and local*

76

*laws and regulations, including without limitation, Section 1128B(b) of the Social Security Act and its implementing regulations*, and shall provide, upon request by the U.S. Department of Health and Human Services, or a state agency any and all information furnished, including, but not limited to information furnished by Amgen concerning the amount or value of any such discount and/or rebate, on products purchased under the Group Purchasing Agreement. Participating Eligible Physician Practice Headquarters represents and warrants that its legally affiliated physician offices and/or satellite clinics, if any, shall comply with any discount reporting obligations they may have in connection with any discounts and/or rebates received under the Group Purchasing Agreement.

(Emphasis added.)

Amgen sales representatives were instructed to inform Oncology Practices that such reporting "would be taken care of" despite the express provision of the APC reflected above.

183.    As discussed below, through each of Relator's interactions with the Defendant Oncology Practices, they were all highly motivated to purchase the Covered Drugs based not upon their efficacy in general or for a specific patient, but based solely upon the profit that could be generated from administering the drug to a patient and obtaining over-reimbursements from Government Healthcare Programs.

184.    Based on statements made to Relator by representatives of the Defendant Oncology Practices, the drug purchasing decisions of these entities were heavily influenced by Amgen's practice of "marketing the spread" and by the profit opportunities afforded by the APC: USOS; Integrated Community Oncology Network, LLC ("ICON"); Florida Oncology Associates (ICON); Gulfcoast Oncology Associates (ICON); Florida Cancer Specialists; Regional Consultants in Hematology and Oncology; and Georgia Cancer Specialists.

185.    Each of the Defendant Oncology Practices could be "over-reimbursed" for its cost of a Covered Drug under a Government Healthcare Program only by failing to report the rebates, discounts, kickbacks, and other remuneration received as incentives to purchase the Covered Drugs in increasing amounts.

186.    The Defendant Oncology Practices would not have rapidly increased their purchases of the Covered Drugs had the prescribing physicians not understood the profit-making rationale and potential of administering the Covered Drugs.   Differently stated, the Defendant Oncology Practices made exponentially larger purchases of the Covered Drugs over a very short time period because they knew they would be making a profit from the Amgen kickbacks and Government Healthcare Program over-reimbursements.

187.    The Defendant Oncology Practices knew that, at the levels ordered and administered, Aranesp was not medically necessary.   Defendant Oncology Practices knew or should have known that Aranesp had dangerous and potentially lethal side effects.

188.    The practice of "marketing the spread," coupled with the false and fraudulent claims filed by the Defendant Oncology Practices, caused Government Healthcare Programs to pay out substantial sums of money to the defendants as drug cost "reimbursements" that exceeded the amounts that should properly have been paid out pursuant to laws, rules and regulations covering reimbursement rates for Government Healthcare Programs.

189.    In or about October 2004, the Amgen sales and marketing team launched an aggressive campaign, named after one of the lead sales representatives – the George Marrow Blitz.   The Blitz was a crucial marketing effort to enroll as many oncology practices as possible on APCs.   The primary purpose of the Blitz was to get feedback from Amgen's largest and most influential customers – including many of the Defendant Oncology Practices – to see how best illustrate for practitioners that their continued purchases of larger quantities of the Covered Drugs would also allow them to see greater profits for their own practices.   Amgen sales and marketing representatives met with oncology practices around the country – including each of the Defendant Oncology Practices – and presented them with strong financial incentives, in the form of kickbacks and promises of future profitability, to prescribe their patients on Aranesp

whether they needed it or not.   The primary take-away from the Blitz was that the Defendant Oncology Practices wanted more rebates and quicker.

190.    The Defendant Oncology Practices knew that the more they prescribed Aranesp, the more lucrative rebates and discounts they could receive, and thus the more profit they could turn from Government Healthcare Program reimbursements.   The APC contracts offered to the Defendant Oncology Practices bundled Aranesp with Neulasta or Neupogen.   During the Blitz, the Defendant Oncology Practices universally focused on the subjects of on rebates, discounts, kickbacks, and the potential to make a profit from Government Healthcare Program reimbursements – i.e. the lucrative profit-making ability of buying the Covered Drugs for a discounted price and submitting fraudulent claims for reimbursements for the full-cost.

191.    Though his own participation in the Blitz, Relator learned that the Defendant Oncology Practices viewed the rebates and discounts as an extra incentive, "frosting on the cake," to sign on to an APC.   The Defendant Oncology Practices were already making a significant profit from reimbursement checks, which they received every two weeks.    Even without the rebates and discounts, the Defendant Oncology Practices had a 20% return on their money every fourteen days.   Some oncology practices earned 70% of its total gross revenues from administering the Covered Drugs.   They could then earn an additional 60% return on their purchases of the Covered Drugs every forty-five days that the practice did not report to the Government Healthcare Program.   From 2004 through 2011 alone, the Defendant Oncology Practices received more than $4,000,000,000 in over-reimbursements from Government Healthcare Programs.

    vii. <u>Other improper financial incentives provided to oncology practices.</u>

192.    During the Covered Period, Amgen provided the Defendant Oncology Practices with numerous additional financial incentives to influence the Defendant Oncology Practices'

selection and utilization of the Covered Drugs regardless of medical necessity.   These incentives

included, but were not limited to, sham honoraria constituting improper and fraudulent kickbacks

to the defendants or to their owners, employees or agents.

193.    One incentive Amgen offered was free dinners for the physician and his/her

family, plus an honorarium to the physician for attending the event.   Relator organized, or was

apprised of the organization of, these events for the Defendant Oncology Practices to attend.

Although billed as "roundtable discussions" at which medical issues were discussed, it was often

the case that no medical discussions took place.   At these roundtable discussions, the physician

received a check from the Amgen sales and marketing team of up to $1,000 for simply showing

up.

194.    Physicians affiliated with Defendants Florida Cancer Specialists, Gulfcoast

Oncology Associates and ICON all accepted sham honoraria.   Specifically, sham honoraria

were provided to and accepted by Dr. Jeffrey Paonessa, Dr. Joel Stone and Dr. Thomas

Marsland, of the three referenced Defendant Oncology Practices, respectively.   The sham

honoraria enticed practitioners and their practice groups to engage in collusion with Amgen and

to begin accepting kickbacks in earnest.

195.    Amgen also marketed the Covered Drugs by arranging for employees of medical

services providers, including employees of the Defendant Oncology Practices, to attend

"reimbursement roundtables."   Members of the Amgen sales and marketing team, including

Relator, organized the roundtables for their assigned customers, sent out invitations for and

attended the roundtables.   These events did not involve discussion of "reimbursement"

procedures.   Instead, the sole purpose was for members of Amgen's sales staff to ingratiate

themselves with the staff of the Defendant Oncology Practices.   These roundtables often

featured meals with minimal discussion, if any at all, of how to bill for Amgen products.

196.    The Defendant Oncology Practices failed to disclose these improper financial incentives to Government Healthcare Programs that provided payment, or "reimbursement," of the cost of the Covered Drugs administered to eligible patients, even though the effect of the honoraria was to decrease the effective prices these Defendant Oncology Practices paid for the Covered Products.

197.    The Defendant Oncology Practices had an obligation not to allow financial inducements to affect patient treatment decisions.   From 2001 through 2011 and, on information and belief, continuing to 2020, the honoraria and other financial inducements did just so: Patients who relied on their physicians to exercise their best medical judgment regarding treatments to improve their health were not treated as human beings to whom the physicians owed an ethical duty of care, but as objects through which the Defendant Oncology Practices could fatten their financial bottom lines.

198.    The "free" goods, drug "overfills," sham honoraria, fraudulent "roundtable discussions" at which relevant medical topics were not discussed, fraudulent "reimbursement roundtables" at which issues related to reimbursement were not discussed, rebates, discounts, price protection and things of value provided by Amgen to the Defendant Oncology Practices, and that were tied to their purchase of the Covered Drugs during the Covered Period, constituted improper and fraudulent kickbacks to induce the Defendant Oncology Practices to purchase the Covered Drugs, in violation of the federal anti-kickback statute. 42 U.S.C. § 1320a-7b.

                    viii.    Use for off-label indications due to marketing and promotion.

199.    During the Covered Period, in order to increase sales, Amgen promoted the off-label sale and use of Aranesp to the Defendant Oncology Practices.   For oncology purposes, Aranesp was approved by the FDA only for the treatment of chemotherapy-induced anemia. Other ESAs, including Procrit and Epogen, had other FDA-approved non-oncology indications.

200.     Aranesp had only the one approved indication for oncology, which limited its

potential customer markets.   To overcome this limitation, Amgen management directed and

supported the off-label use of Aranesp, including for treatment of anemia in Zidovudine-treated

HIV patients, reduction of allogeneic blood transfusions in surgery patients, anemia of cancer

and myelodysplastic syndromes.

201.     Amgen provided oncology sales representatives a "proof source book" that

included extensive "off label" marketing materials for a range of different uses. Although

numerous warnings stated that the book was for "information purposes only," the purpose of the

book was to enable Amgen's sales representatives to market Aranesp "off label" and thereby to

encourage doctors to prescribe and use Aranesp for a host of medical indications for which FDA

approval had not been given.

202.     From 2001 through 2011 and, on information and belief, continuing to 2020, the

Defendant Oncology Practices, based in part on Amgen's illegal and fraudulent off-label

promotion of Aranesp, purchased and administered Aranesp for non-approved uses.   Defendant

Oncology Practices used Aranesp not out of appropriate treatment concerns and or beliefs of

medical efficacy.   Instead, Defendant Oncology Practices used Aranesp principally because of

Amgen rebates and discounts they could receive pursuant to the APCs and the profits they could

earn from over-reimbursements from Government Healthcare Programs.

ix.     Defendants' fraudulent activities have threatened public health and
safety.

203.     As alleged herein, studies have linked the use of anti-anemia drugs, such as

Aranesp and Epogen to cardiovascular incidents, including death and faster tumor growth.   This

Complaint also alleges that, in 2007, the FDA added a black box warning cautioning about the

use of erythropoiesis-stimulating agents in cancer patients receiving chemotherapy or not

receiving chemotherapy and advising that the medications should be administered at the lowest

dose possible in order to bring red blood cell counts to a level just below the level at which blood transfusions would not be recommended.

204.    During the Covered Period, the Defendant Oncology Practices accepted rebates, discounts and other incentives, including kickbacks, from Amgen to purchase the Covered Drugs.   Acceptance of those incentives caused the Defendant Oncology Practices to search for and find reasons to buy these drugs and to administer them to patients, despite their being medically unnecessary and even dangerous to patient health.

205.    Dr. Abe Cheung, a physician affiliated with Defendant Southeast Georgia Hematology & Oncology who regularly accepted financial incentives from Amgen in return for purchasing the Covered Drugs, stated in a conversation overheard by Relator: "Yes, we use Aranesp and Neulasta and some of our patients actually need it."

206.    Dr. Joel Stone, a physician affiliated with Defendant ICON who routinely accepted financial incentives from Amgen in return for purchasing the Covered Drugs, stated in a conversation overheard by Relator: "Yes, the patient only has six more months to live, and that's six more months we can bill Medicare."

207.    In 2012, *The Washington Post* detailed the story of Jim Lenox, a 54-year-old cancer patient who allegedly died as the result of unnecessary ESA injections. Whoriskey, Peter, *Anemia drug made billions, but at what cost?*, WASHINGTON POST (July 19, 2012), at https://www.washingtonpost.com/business/economy/anemia-drug-made-billions-but-at-what-cost/2012/07/19/gJQAX5yqwW_story.html (last visited Sept. 8, 2020). *The Post* also reported that, from 2006 to 2011, Amgen spent more than $10 million a year on lobbying efforts in Washington. *Id.*

208.    Amgen's political influence is well known in Washington. *The New York Times* reported in an article from January 2013 that Amgen has 74 lobbyists on staff. As an example of

Amgen's political influence, press reports have noted that buried in the "fiscal cliff" negotiations that were concluded in early January 2013, Amgen was able to obtain a two-year delay for a set of Medicare price restraints for a class of drugs, including its Sensipar drug, used by kidney dialysis patients. This two-year delay – achieved on top of a previous two-year delay – was expected to cost Medicare $500 million. Lipton, Eric and Kevin Sack, *Fiscal Footnote: Big Senate Gift to Drug Maker,* N.Y. TIMES (Jan. 19, 2013) at

https://www.nytimes.com/2013/01/20/us/medicare-pricing-delay-is-political-win-for-amgen-drug-maker.html (last visited Sept. 8, 2020) ("Just two weeks after pleading guilty in a major federal fraud case, Amgen, the world's largest biotechnology firm, scored a largely unnoticed coup on Capitol Hill: Lawmakers inserted a paragraph into the 'fiscal cliff' bill that did not mention the company by name but strongly favored one of its drugs.")

I.      **Defendants' overprescribing the Covered Drugs and fraudulent reporting to Government Healthcare Programs.**

209.    Physicians affiliated with the Defendant Oncology Practices, for the reasons described, over-prescribed the Covered Drugs.   As evidenced by raw sales data available to Relator in the course and scope of his employment with Amgen, the Defendant Oncology Practices purchased exponentially increasing amounts of the Covered Drugs over the duration of the Covered Period, in some cases increasing by more than thirty times over five years.   All the while, the rate of cancer diagnoses in the United States increase at a rate of only 2% *per annem*. By prescribing the Covered Drugs to their patients, the Defendant Oncology Practices received reimbursements from Medicare every fourteen days.

210.    The result of such over-prescribing was not always benign.   Strokes and death could and did occur.   These costs, unlike the financial costs imposed on the nation's healthcare systems, cannot be measured in dollars and cents.   They may, however, be measured in negative patient outcomes, which were not uncommon.   While individual physicians were making

literally millions of dollars from overprescribing and overusing the Covered Drugs to climb higher and higher into the Amgen Portfolio Contract tier structure to earn greater rebates, desperate and vulnerable patients were harmed.   At best, patients did not receive a medical benefit justifying the use of these Covered Drugs at the doses patients often received.

211.    At least as early as 2005, physicians knew or should have known that Aranesp was a very dangerous drug and that it performed less well in important treatment criteria than Procrit.   In that year, a study by Dr. Roger Waltzman, St. Vincent's Comprehensive Cancer Center (New York), and others, comparing the efficacy of epoetin alfa to darbepoetin alfa in anemic patients with cancer receiving chemotherapy, concluded that epoetin alfa was preferable to darbepoetin alfa for two reasons: (1) epoetin alfa (Procrit) showed an earlier hematologic response than darbepoetin alfa (Aranesp) and; (2) blood transfusion intensity, although not frequency, was significantly lower for patients being treated with epoetin alfa (Procrit) at the dosage levels tested, which were consistent with those most commonly used in clinical practice and with recommendations in published guidelines regarding use of these agents.   In other words, with respect to the first measure, Procrit worked faster in increasing red blood cells circulating in the patient's blood stream than Aranesp, the median time for Procrit to get a significant response being 35 days to Aranesp's 46 days; and, with respect to the second measure, Procrit patients did not need as much blood to be transfused, on average, as patients on Aranesp in the study period: only 2.6 units vs. 3.9 units for patients on Aranesp.

212.    On or about December 16, 2006, Amgen advised the FDA of the results of the so-called "DAHANCA 10" clinical trial.   The trial had been stopped prematurely in approximately October 2006.   The preliminary data released to the FDA from this study showed a significantly greater number of adverse events, up to and including death, for those on Aranesp versus the control placebo group.

213.   On or about January 26, 2007, Amgen sent a "dear physician" letter to the oncology medical community advising that a large, multicenter, randomized, placebo-controlled study showed that use of Aranesp was ineffective in reducing the number of red blood cell transfusions or the level of fatigue in patients with cancer who had anemia not due to concurrent chemotherapy.   The letter also stated that the study showed higher mortality in patients receiving Aranesp tan in the placebo group.

214.   On February 16, 2007, the FDA notified healthcare professionals of the results from a large clinical trial evaluating use of darbepoetin alfa to treat anemia in cancer patients not receiving chemotherapy.   In this study, patients received either Aranesp (darbepoetin alfa), according to the approved dosing regimen or a placebo. Patients treated with Aranesp had a higher death rate and no reduction in the need for transfusions compared to those treated with the placebo.   The FDA announcement also noted that the findings in the Aranesp study may apply to other ESAs. Additionally, the findings showed that treating anemic cancer patients not currently on chemotherapy with an ESA may offer no benefit and may cause serious harm.

215.   In an update to its February 16 warning, on March 9, 2007, the FDA notified healthcare professionals of new safety information for Aranesp (darbepoetin alfa), Epogen (epoetin alfa) and Procrit (epoetin alfa).   The FDA advised that four new studies in patients with cancer found a higher chance of serious and life-threatening side effects or death with the use of ESAs. The research studies were evaluating an unapproved dosing regimen, a patient population for which ESAs were not approved, or a new unapproved ESA.   FDA advised that it had required changes in the full prescribing information for Aranesp, Epogen and Procrit to include a new boxed warning, updated warnings and a change to the dosage and administration sections for all ESAs.

216.    The March 2007 FDA advisory recommended caution in using ESAs in cancer patients whether or not they were receiving chemotherapy; it also indicated a lack of clinical evidence to support improvements in quality of life or transfusion requirements in patients being administered these drugs – claims that had been made by Amgen for Aranesp and Epogen.

217.    The March 2007 FDA advisory further cautioned physicians that ESAs should be administered at the lowest possible dose needed to bring red blood cell counts up to a level just within the limit necessary to avoid transfusions.   As previously alleged, ESAs in general were prescribed in the United States by physicians at higher dosage levels and to a greater proportion of patients than medical necessary as a consequence of the unusual opportunity to profit by prescribing increasing amounts of the drugs.   Amgen's tiered rewards system encouraged physicians to dose patients at the highest levels they could tolerate.

218.    In November 2007, additional "black box" warnings were included on the label for Aranesp at the request of the FDA.   The FDA's black box warning was prompted by linkages between Aranesp and cardiovascular incidents and between Aranesp and faster tumor growth.   The new labeling emphasized "that there are no data from controlled trials demonstrating that ESAs improve symptoms of anemia, quality of life, fatigue, or patient well-being for patients with cancer or for patients with HIV undergoing AZT therapy."

219.    In December 2008, the FDA posted on its Website, an advisory notice as a medication guide regarding the use of ESAs.   The advisory noted that use of ESAs can lead to serious side effects "which may result in death" and that some of these side effects are more likely to happen if the patient has cancer or CRF.   In patients with all types of cancer for which ESA use is approved, the advisory warned (a) that "the tumor may grow faster and the patient may die sooner when ESA treatment is used," (b) that "ESAs have not been shown to improve the symptoms of anemia, quality of life, fatigue, or well-being for patients with cancer," and, for

that reason, "should be used only to reduce the chance that a patient with low red blood counts (anemia) will get a blood transfusion" and, finally, (c) that "[t]reatment with an ESA should be stopped when chemotherapy treatment is finished."

220.   A physician has an ethical duty not to prescribe a drug for a patient unless use of the drug is warranted by medical necessity.   Under Medicare and Medicaid definitions, medical necessity means "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member . . .."   42 U.S.C. § 1395y.

221.   From 2001 through 2011 and, on information and belief, continuing to 2020, physicians affiliated with the defendant Oncology Practices as agents, employees, or owners prescribed Aranesp and Neulasta at levels that exceeded medical necessity.   Relator recalls hearing Dr. Abe Cheung of Southeast Georgia Hematology & Oncology, Brunswick, GA telling another physician at American Society of Clinical Oncologists (ASCO) meeting in approximately 2004: "All my patients get Aranesp and Neulasta and some of them actually need it."

222.   From 2001 through 2011 and, on information and belief, continuing to 2020, physicians affiliated with the Defendant Oncology Practices often prescribed Aranesp and Neulasta not because of the medical needs or comfort of their patients, but for business and financial reasons, *i.e.,* to earn increased revenues and higher profits from the discounts, rebates and other monetary and non-monetary benefits they could obtain from Amgen, as well as the higher reimbursement levels they could receive for prescribing these drugs to patients entitled to receive benefits under Government Healthcare Programs and then failing to report the discounts, rebates, and other monetary and non-monetary benefits they received from Amgen to Medicare, Medicaid, and other Government Healthcare Programs so as to avoid having the reimbursement levels of these drugs reduced.

223.     Aranesp has potentially serious side effects.   At too high a dosage, Aranesp can lead to serious adverse consequences, including stroke and even death.   Because oncology patients treated with the Covered Drugs are often considered to be terminal, on information and belief, the true effects of administration of the Covered Drugs at the off-label doses prescribed by some physicians was masked because of an expectation of high mortality rates in such patients. The Defendant Oncology Practices disregarded these serious side effects and the well-being of their patients battling terminal illnesses all so that they could make enormous profits from Amgen kickbacks and Government Healthcare Program over-reimbursements.

224.     The defendant Oncology Practices have information in their possession, custody, or control that would show that increased dosing with Aranesp and Neulasta was not done for reasons of medical necessity, but to improve the financial bottom lines of the Defendant Oncology Practices, *i.e.,* exponentially increasing profits.

225.     Each of the Defendants has in its possession, custody, or control records and other information that would show that it switched patients who were being treated for chemotherapy-induced anemia from Procrit to Aranesp virtually overnight, *i.e.,* shortly after the defendant entered into an agreement with Amgen to prescribe these drugs as part of an incentive buying program.

226.     Each of the Defendants has in its possession, custody, or control records and other information that would show that, shortly after patients being treated for chemotherapy-induced anemia were converted from Procrit to Aranesp, they were placed on larger equivalent doses of Aranesp, with the result that the defendant's revenues and profits from its treatment of such patients increased.   The increase in revenues and profits was largely accounted for by three interrelated factors: (a) higher sales revenues from increased dosing, (b) lower purchase costs due to the rebates, discounts and other consideration received from Amgen and (c) higher

reimbursement rates from Government Healthcare Programs due to the failure to report the

rebates, discounts and other consideration received from Amgen.

227.    As an example of the kind of change described above, Relator is familiar with the

case of Dr. Joel Stone, a principal in defendant ICON.   As of approximately 2001, ICON spent

about $1 million per year to buy Procrit and Neupogen.   By 2006, having entered into the

Amgen Portfolio Contract, ICON spent about $32 million annually for the Covered Drugs.   This

32-fold increase in purchases came at a time when, according to the American Cancer Society,

cancer mortality rates were decreasing and at a time when ICON had realized no significant

change in its patient population.[5]

228.    Relator is also familiar with the case of Dr. William Harwin, a Florida oncologist

and principal of Florida Cancer Specialists:

a.    Through Relator's countless interactions with other Amgen sales

representatives and employees between the years 2003 and 2007 during and in the course

of his employment, Relator learned that numerous Amgen sales representatives made

sales calls on Dr. Harwin, who was then the principal doctor of the Florida Cancer

Specialists.   These other Amgen employees included, but are not limited to: Amgen

District Manager Jay Lamba, Amgen Regional Manager Bobby Fralin, Amgen Regional

Account Manager Pat Fetizanan, National Sales Director of the Oncology Business Unit

Joe Turgeon, and Amgen senior executives Jim Daley and Cynthia Schwalm.   The

---

[5] Cancer deaths were falling: "Cancer death rates decreased by 1.8% per year in males and by 1.5% per year in females during the most recent 5 years of data (2005-2009).   These declines have been consistent since 2001 and 2002 in men and women, respectively, and are larger in magnitude than those occurring in the previous decade (Table 5).   Mortality rates peaked in men in 1990 (279.8 per 100,000), in women in 1991 (175.3 per 100,000), and overall, in 1991 (215.1 per 100,000).   Between 1990/1991 and 2009, cancer death rates decreased in 24% in men, 16% in women, and 20% overall."   *See* Trends in Cancer Mortality, American Cancer Society (2013), http://onlinelibrary.wiley.com/doi/10.3322/caac.21166/pdf (last visited September 8, 2020).

purpose of their sales calls was to offer Florida Cancer Specialists a special and exclusive "one-off" APC that applied to only Florida Cancer Specialists and contained extremely favorable terms based upon the specific circumstances of the practice.   At this time, Florida Cancer Specialists primarily used Procrit, and just enough Aranesp to meet its Amgen APC minimum requirements.   Dr. Harwin claimed that Ortho Biotech was giving him a discount of more than 60% on Procrit AWP, and that the discount was a straight "off-invoice discount" with no purchase quotas.   After one meeting around this time between Dr. Harwin and Amgen sales representatives were able to persuade Dr. Harwin that larger purchases of Aranesp was financially beneficial to Florida Cancer Specialists.   The discussions were completely devoid of any clinical benefits of the use of Aranesp versus Procrit, and Dr. Harwin gave no indication that the clinical merits of either drug were factors in his consideration of Florida Cancer Specialists' use of either drug.   Dr. Harwin was aware, or should have been aware, from past Amgen presentations that the APC for his practice was quarterly, and that he could maximize the non-legal rebates offered pursuant to the APC given the vastly expanded use of ESAs and reimbursement of the drugs by Government Healthcare Programs.   The Amgen sales team discussed the Florida Cancer Specialists account among themselves and at regional strategy meetings, in which Relator was privy.

b.     Along with the use of ESAs, both Aranesp and Procrit, Florida Cancer Specialists needed to purchase white blood cell stimulating agents – either Neupogen or Neulasta – to counter the side-effects of chemotherapy induced neutropenia, for which ESA was used as supportive cancer treatment.   Amgen was the only provider of these counterpart drugs.   Florida Cancer Specialists, by and through Dr. Harwin, elected to use Neupogen for patients covered by Medicare and other Government Healthcare Programs,

91

and Neulasta for private and commercial payers.   Dr. Harwin's use of different drugs, based upon the insurance provider, demonstrates that Dr. Harwin's decisions were based entirely on profit rather than clinical necessity or maximized patient outcomes.

c.      On or about February 8, 2005, in Miami, Florida at a meeting between Amgen and ION LLP, Relator met with Dr. Harwin and Tondra Gargano.   Relator and Dr. Harwin discussed the new federal healthcare program reimbursement policies, which provided reimbursements based on the Average Selling Price plus 6 percent ("ASP+6").   ASP+6 had gone into effect on January 1, 2005.   The specific subject of the conversation between Relator and Dr. Harwin focused on ways to maximize the size of rebates that the Florida Cancer Specialists could receive from Amgen pursuant to the new Amgen Portfolio Contract, in light of the new federal reimbursement rules that applied to healthcare programs including Medicare and Medicaid.   Dr. Harwin clearly expressed that his goal was to maximize profits for his practice, Florida Cancer Specialists, by obtaining as large a rebate as possible from Amgen.

d.      On or around May 15, 2005 through May 17, 2005, Relator attended an American Society of Clinical Oncology ("ASCO") conference in Orlando, Florida. Relator and another Amgen sales representative, Bob Dorchack, met with Dr. Harwin at the Peabody Hotel.   At the time, Florida Cancer Specialists was the nation's largest user of Procrit, making purchases of approximately $60 million per year.   Dr. Harwin disclosed that he decided to use Aranesp if and only if Amgen could provide him and Florida Cancer Specialists with a lucrative contract or sales price that would allow him to make more money than he currently was making by using Procrit.

e.      In or about 2006, Dr. Harwin, responding to the profit incentive provided by Amgen's purchase incentive scheme, began to administer Neupogen to his Medicare

patients because the Neupogen vials contained a large amount of overfill which could be administered to additional patients, thus allowing his oncology practice the opportunity for greater cost "recoupment."   The recoupment was greater for two reasons: (a) the vials of Neupogen contained overfill that could be recovered, administered to patients and billed to Government Healthcare Programs or other third-party payers, and (b) because Neupogen had a higher reimbursement rate than Neulasta.   At the same time, Dr. Harwin kept his private insurance patients on Neulasta, rather than Neupogen, because of Neulasta's greater efficacy and the typically lower private insurance company reimbursement rates for Neupogen.

   f. On or about January 17, 2007 at the Amgen National Sales Meeting in Atlanta, Georgia and on or about March 15, 2007 at the Amgen Emergency ESA Meeting in Orlando, Florida, Relator had discussions with Jessee Hollingsworth, Jay Lamba, Diego Naranjo, Anne Cloutier, Sarah, King, Bobby Fralin, and Tam Costar (Amgen's Medicaid and Private Payer Manager) regarding Amgen's intentional misrepresentation of the ASP of the Covered Drugs to the federal and state governments.   Relator informed the individuals that Amgen did not include within the ASP all of the discounts, rebates, and other things of value that purchasers of the Covered Drugs received – thus, not accurately reflecting the actual ASP of the Covered Drugs.   Relator indicated that Amgen's conduct substantially benefits Florida Cancer Specialists and other Defendant Oncology Practices because they would receive higher rates of reimbursement based upon the fraudulent ASP than the practice was legally entitled to actually receive. Florida Cancer Specialist representatives also understood that Amgen was providing inaccurate ASP to the federal and state governments as a way for the practice to obtain a higher reimbursement rate than it was entitled to receive by law.

g.      Relator, through his own independent review of Amgen documents and files, became apprised of the fact that Florida Care Specialists purchased $2.2 million of the Covered Drugs in 2001/2002, and rapidly increased to purchasing $29.2 million of the Covered Drugs in 2007.   Relator, through his own independent review of Amgen documents and files, became apprised of the fact that Florida Care Specialist, by and through Dr. Harwin, was purchasing increasingly larger amounts of the Covered Drugs pursuant to its APC in excess of $100 million for the Covered Period.

h.      Relator, through his own independent review of Amgen documents and files, became aware that Florida Cancer Specialists had a "payer mix" of at least 60% Medicare and Medicaid during the Covered Period.   A "payer mix" is the percentage of private third-party insurance carries relative to the percentage of government healthcare programs (specifically Medicare and Medicaid.   The "payer mix" was an important part of Amgen's consideration in where to focus its marketing efforts among oncology practices because the relative percentages determined the profits that the oncology practice – in this case Florida Cancer Specialists – would make from federal healthcare payments they received.   Florida Cancer Specialists received reimbursements from CMS based upon ASP, and approximately 97% of its Medicare patients had Medicare co-pay insurance that reimbursed Florida Cancer Specialists for expenses and deductibles that were not covered by Medicare.   If the patient did not have a Medicare co-pay, and was also covered by Medicaid, Medicaid would also pay the amount not reimbursed by Medicare.

i.      Florida Cancer Specialists sought reimbursement from Government Healthcare Programs for approximately 60% of its purchases from Amgen of the Covered Drugs during the Covered Period.   Indeed, that was the entire purpose of the Florida

Cancer Specialist purchasing from Amgen: The drugs could be administered to patients who were covered by Government Healthcare Programs and private insurance carriers billed for these treatments including the costs of the drugs as well as its administration.

j.      During the Covered Period, Florida Cancer Specialists knew, or should have known, based on numerous communications with the Amgen sales team that Amgen was not accurately reporting the AWP or ASP to Government Healthcare Programs. The AWP and SP were significantly higher than to be expected, given the actual cost for the Covered Drugs that Florida Cancer Specialists was paying for its actual purchase.

k.      Dr. Hawin billed CMS for 19,362 injections of Epoetin alfa for an average payment of $7.69 each – totaling approximately $148,893.78.   This figure represents Florida Cancer Specialists' excessive use of ESAs during the Covered Period, in relation to other similar oncology practices.   Florida Cancer Specialists billed CMS for 16 injections of Filgrastim at 300 mgc for an average Medicare payment of $210.32, and 24 injections of Filgrastim at 480 mcg for an average Medicare payment of $331.87.   Dr. Harwin used a significant portion of his Amgen purchases for administration among Medicare patients, and subsequently billed Medicare and other Government Healthcare Programs for these injections.

229.    Relator is also familiar with the case of Gulfcoast Oncology Associates:

a.      In or about October 2003, Relator communicated with Steve Burnett, another Amgen sales representative, to market the financial profitability of using Aranesp and Neulasta to Jeffrey Paonessa, M.D., the CEO and president of Gulfcoast Oncology Associates.   At the time, Dr. Paonessa exclusively used Procrit and GulfCoast Oncology Associates was one of the nation's largest single users of Leukine.

b.      In or about March 2004, Dr. Paonessa switched all of his patients from their formerly prescribed medications to the Covered Drugs.   Dr. Paonessa's purchases of the Covered Drugs increased significantly in 2004.   In March 2004, Gulfcoast Oncology Associates purchased $639,054 worth of Aranesp.   In July 2004 and August 2004, Gulfcoast Oncology Associates purchased $863,901 and $702,974 worth of Aranesp, respectively.   From March 2004 through August 2004, Gulfcoast Oncology Associates purchased $4,244,993 worth of Aranesp, and $6,576,217 worth of the Covered Drugs.

c.      On or about October 27, 2004, as part of the George Marrow Blitz, Gulfcoast Oncology Associates met with Amgen sales and marketing representatives. Gulfcoast Oncology Associates, specifically, Dr. Paonessa, John Peterson, M.D., Andrew Hano, M.D., Marliyn Frystack, and Jay Jones, expressed an interest in having more frequent rebates to assist with their cash flow concerns for the following year.   Moving forward with its continued purchases of the Covered Drugs, Gulfcoast Oncology Associates expressed a strong interest in clinical trial opportunities, and MDS coverage.

d.      On or about February 8, 2005, in Miami, Florida at an Amgen/ION LLP meeting, Relator met with Cindy Acker Towne, M.D., of Gulfcoast Oncology Associates to discuss the new ASP+6 reimbursement by CMS that went into effect in or about January 2005 to maximize the profitability of the Amgen and ION LLP contracts.

e.      ION LPP members elected to have Dr. Paonessa and Dr. Jeffrey Patton, of Tennessee Oncology Clinics, to monitor the ION LPP members and coach others to get on board with the Amgen/ION LPP contract so that they would meet the contract requirement of 80% of market shares for all of the practices, to begin receiving an additional 2% of gross annual sales rebates for the years 2005, 2006 and 2007.

f.        On or about June 23, 2005 through June 25, 2005, Relator met with Dr. Paonessa, Dr. Acker Towne, and Marilyn Frystak the Chief Operating Officer of Gulfcoast Oncology, at the ION LLP meeting in San Diego, California.   At the time, Dr. Towne and Ms. Frystak were re-evaluating the use of Procrit instead of Aranesp for chemotherapy induced anemia patients in their oncology practice.   The financial benefits of Aranesp and APC were emphasized, with no discussion of the relative clinical benefits of the drugs.

g.        On or about March 2005, Jay Jones, R.Ph, an oncology pharmacist, made a presentation at an Amgen Tampa Sales District meeting concerning the increase in profits that Gulfcoast Oncology Associates had made with the advent of the APC Contracts and the use of "overfill" to obtain even higher profits.   The Amgen meeting celebrated ION making obtaining an 85% market share and became entitled to even greater kickbacks and financial incentives from making purchases of the Covered Drugs. Dr. Jones informed Relator that Gulfcoast Oncology Associates was still using "over-fill."   Dr. Jones asked specifically about the Vectibix reimbursement, whether there was any profit to be made, and whether Amgen intended to add Vectibix to the APC contract.

h.        Relator was privy to discussions concerning the Gulfcoast Oncology Associates account with Amgen Sales Representatives Steve Burnette, Adrienne Longo, Kathy Ballash; Amgen District Managers Mark McLaughlin and Jessee Hollingsworth; and Amgen Medicaid and Payer Mix Manager for Florida Tam Costar Amgen; Amgen Regional Account Manager Pat Fetizanan; Amgen Regional Manager Bobby Fralin; and Amgen National Sales Manager for the Oncology Business Unit Joe Turgeon during the period from 2003, 2004, 2005, and specifically on or about July 13, 2006 and on or about April 15, 2007. These discussions focused on strategies to convince Gulfcoast Oncology

Associates and Dr. Paonessa to switch to using more Amgen products and to maintain a secure and loyal business relationship.   The decision of Gulfcoast Oncology Associates to use Aranesp for anemia patients instead of Procrit was driven by the potential for the practice to make financial profit – and not for any clinical benefit or patient-driven concern.

       i.      Relator, through his own independent review of Amgen documents and files, became aware that Gulfcoast Oncology Associates made purchases of the Covered Drugs of $1 million in 2001/2002, and rapidly increased to purchases of the Covered Drugs of $29.3 million in 2007.   Relator, through his own independent review of Amgen documents and files, became aware that Gulfcoast Oncology Associates was purchasing the Covered Drugs pursuant to their APC in excess of $100 million during the Covered Period.

       j.      Relator, through his own independent review of Amgen documents and files, became aware that that Gulfcoast Oncology Associates had a "payer mix" of 60% Medicare during the Covered Period. On information and belief, Gulfcoast Oncology Associates sought reimbursement from government healthcare programs of approximately 60% percent of its purchases from Amgen of the Covered Drugs.

       k.      During the Covered Period, Gulfcoast Oncology Associates knew or should have known that the AWP was not being accurately reported by Amgen.   This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Gulfcoast Oncology Associates was actually paying.

       l.      During the Covered Period, Gulfcoast Oncology Associates knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for

Aranesp, Neulasta, and Neupogen that Gulfcoast Oncology Associates was paying to

purchase these products from its supplier.

m.      Gulfcoast Oncology Associates filed claims for reimbursement to

Government Healthcare Programs each time it administered a Covered Drug to a patient

covered by a Government Healthcare Program, with the knowledge that the

reimbursement price sought was greater than the actual price Gulfcoast Oncology

Associates actually paid for the Covered Drugs.   At no time did Gulfcoast Oncology

Associates report the rebates, discounts, and other financial incentives it received from

Amgen to the appropriate Government Healthcare Programs as required by law.

230.    Relator is also familiar with the case of Integrated Community Oncology

Network, LLC ("ICON"), through its division Florida Oncology Associates ("FOA"):

a.      Over a period of approximately twenty years, Relator met with principles

of FOA/ICON and personally participated in numerous discussions and other

communications.

b.      On or about October 23, 2003, FOA ordered an initial purchase of

Aranesp in the amount of $1.9 million.   With the advent of the APC contracts in or about

March 2004, FOA/ICON substantially increased its purchases of Amgen products,

specifically the Covered Drugs.

c.      Bob Phelan, the practice administrator of FOA/ICON, expressed his

concern to Relator that Medicare would audit FOA/ICON because of the practice's rapid

increase in Aranesp and Neulasta billings that could not be supported by any medical

reason or patient care.   Mr. Phelan informed Relator that FOA/ICON's dramatic increase

in Aranesp and Neulasta purchases from Amgen, use in patients, and billing of Medicare

was a direct result of the illegal APC rebates and FOA/ICON's desire to get even greater

revenues.   FOA/ICON's increased use of the Covered Drugs had no clinical or medical basis.

d.      Thomas Marsland, M.D., a principle doctor at FOA/ICON, was also a Medicare Florida Carrier Advisory Committee member.   Each state is required to have a Carrier Advisory Committee to assist in coverage determinations, among other things. On Florida's Medicare Carrier Advisory Committee, Dr. Marsland actively supported Medicare reimbursements for use of Aranesp for CIA and for myelodysplastic syndrome ("MDS") – despite the fact that the FDA had not approved the use of Aranesp to treat either of these conditions.   Increased use of Aranesp allowed doctors and oncology practices, like FOA/ICON, to receive bigger rebate checks.

e.      On or about October 14, 2003, FOA received an Amgen rebate payment of almost $10,000 to offset future payments or to be reimbursed by check in the event of no future purchase.

f.      After 2003, Relator had numerous conversations with Dr. Marsland and/or Joel Stone, M.D., another FOA/ICON principle, about their business model and the enormous profitability of treating cancer patients.   FOA/ICON acquired other oncology practices including Coastal Oncology (with Tom Gaddis, M.D. as one of its principles), Montgomery and Associates (including Danielle Montgomery, M.D.), and North Florida Cancer Center (involving Marc Warmuth, M.D.).

g.      On or about October 27, 2004, as part of the George Marrow Blitz, Relator learned that FOA/ICON requested more frequent rebates, to assist with their business' cashflow problems in the following year.   Moving forward with its continued purchase of the Covered Drugs, FOA/ICON expressed strong interest in clinical trial opportunities, and MDS coverage.

h.      On or about February 8, 2005 at an Amgen/ION LLP meeting in Miami, Florida, Relator, Mr. Phelan, and Leanne Fox, M.D., discussed the new ASP+6 reimbursement of CMA that went into effect in 2005, and how to maximize the rebates from the Amgen/ION LLP contracts.

i.      On or about October 23, 2002, Mr. Phelan, Dr Marsland, Dr. Stone, Relator and others discussed the financial benefits of Aranesp relative to Procrit.   At that time, Mr. Phelan at the direction of Dr. Marsland, Dr. Stone, and Suneel Mahajen, M.D., made a commitment to switch FOA/ICON from using Procrit to Aranesp.   During the discussion, it was clear that FOA/ICON's decision to use Aranesp for anemia patients instead of Procrit was driven entirely by the potential for the practice to make more money and not by any clinical benefits or outcomes.

j.      Relator, through his own independent review of Amgen documents and files, became aware that ICON purchased only $315,598 worth of the Covered Drugs in 2001/2002.   In 2007, ICON purchased $32 million worth of the Covered Drugs. Relator, through his own independent review of Amgen documents and files, became aware that FOA/ICON was purchased the Covered Drugs pursuant to its APC of more than $100 million worth of the Covered Drugs during the Covered Period.

k.      Relator, through his own independent review of Amgen documents and files, became aware that FOA/ICON had a "payer mix" of 65% during this time period. FOA/ICON sought reimbursement from government healthcare programs for approximately 65% percent of its purchases from Amgen of the Covered Drugs.

l.      During the Covered Period, FOA/ICON knew or should have known that the AWP was not being accurately reported by Amgen.   This is so because the AWP was

significantly higher than to be expected given the actual cost for the Covered Drugs that FOA/ICON was paying to purchase these products from its supplier.

      m.      During the Covered Period, FOA/ICON knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for Aranesp, Neulasta, and Neupogen that FOA/ICON was paying to purchase these products from its supplier.

      n.      Dr. Marsland, as a Florida Medicare CAC member, cooperated with Amgen in obtaining Medicare reimbursement approval of Aranesp for CIA and MDS. Medicare reimbursement approval made it financially beneficial for FOA/ICON and other Defendant Oncology Practices to make larger purchases of the Covered Drugs and to simultaneously obtain greater rebates from Amgen.   Dr. Marsland's assistance with the approval of Medicare reimbursement for these two medical uses or indication that were not approved by the FDA also meant that Dr. Marsland stood to benefit financially as FOA/ICON's rebates increased significantly in being able to purchase greater quantities of Aranesp to administer to patients who would now newly qualify for Medicare reimbursement.

      o.      FOA/ICON filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price FOA/ICON actually paid for the Covered Drugs. At no time did FOA/ICON report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

231.    Relator is also familiar with the case of Hematology and Oncology Associates of the Treasure Coast:

a.    On or about October, 2005, Hematology and Oncology Associates of the Treasure Coast, by and through Michael Weirtheim, M.D., Paul Swanson, M.D., and Seth Rosen, M.D., made a commitment to switch its business from Procrit to Aranesp consistent with its status as a "platinum" account under the APC.   Through the course and scope of his employment at Amgen, Relator learned of the Hematology and Oncology Associates of the Treasure Coast's APC through Bard Cole, Amgen's sales representative for this customer account.   Before Mr. Cole's termination in 2005, Relator and Mr. Cole met on a regular basis in Vero Beach, Florida to discuss this account and other accounts in the Treasure Coast area of Florida.   The decision of Hematology and Oncology Associates of the Treasure Coast to switch to using Aranesp for its anemia patients, instead of Procrit, was driven entirely by the potential for the practice to make more money and not by any clinical benefits or outcomes.

b.    Relator, through his own independent review of Amgen documents and files, became aware that Hematology and Oncology Associates of the Treasure Coast purchased $2,307,809 worth of the Covered Drugs in in the Fourth Quarter of 2006, or approximately $9,231,236 worth of the covered drugs in 2006 alone.   Relator, through his own independent review of Amgen documents and files, became aware that Hematology and Oncology Associates of the Treasure Coast was purchasing the Covered Drugs pursuant to their APC from 2004 through 2011 of approximately $73.8 million.

c.    Relator, through his own independent review of Amgen documents and files, became aware that Hematology and Oncology Associates of the Treasure Coast had a "payer mix" of 70% during this time period.   Hematology and Oncology Associates of

the Treasure Coast sought reimbursement from government healthcare programs for approximately 70% percent of its purchases of the Covered Drugs.

d.      During the Covered Period, Hematology and Oncology Associates of the Treasure Coast knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Hematology and Oncology Associates of the Treasure Coast was paying to purchase these products from its supplier.

e.      During the Covered Period, Hematology and Oncology Associates of the Treasure Coast knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Hematology and Oncology Associates of the Treasure Coast was paying to purchase these products from its supplier.

f.      Relator and Mimi Koerner, the practice administrator of Hematology and Oncology Associates of the Treasure Coast, conversed during one of the Oncology Managers of Florida ("OMF") bi-annual meetings.   In or about 1991, Relator was part of forming OMF and served on its board of directors until 1998 in order to facilitate Amgen's business and marketing efforts among oncology practice managers.   Relator and Ms. Koerner discussions usually concerned the way Hematology and Oncology Associates of the Treasure Coast could maximize its profits through the purchase and use of Amgen products including the Covered Drugs during the Covered Period.

g.      Hematology and Oncology Associates of the Treasure Coast filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price

Hematology and Oncology Associates of the Treasure Coast actually paid for the Covered Drugs.   At no time did Hematology and Oncology Associates of the Treasure Coast report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

232.    Relator is also familiar with the case of Mid Florida Hematology and Oncology Centers, P.A.:

a.      Through the scope and course of his employment with Amgen, Relator participated in numerous discussions regarding the Mid Florida Hematology and Oncology Centers with other Amgen sales employees.

b.      On or about October 16, 2005, Mid Florida Hematology and Oncology Centers, by and through Neeraj Sharma, M.D. and Gregory L. Ortega, M.D., committed to the APC contract at the "platinum" level.   Mid Florida Hematology and Oncology Centers made a further commitment to completely switch from using Procrit to using Aranesp in the practice.   Mid Florida Hematology and Oncology Centers' decision to use Aranesp for anemia patients instead of Procrit was entirely driven by the potential for the practice to make more money and not by any clinical benefits or outcomes.

c.      Relator, through his own independent review of Amgen documents and files, became aware that Mid Florida Hematology and Oncology purchased $2,074,198 worth of the Covered Drugs in the Fourth Quarter of 2006, and $8,296,792 for the year 2006 alone.   Relator, through his own independent review of Amgen documents and files, became aware that Mid Florida Hematology and Oncology Centers purchased the Covered Drugs pursuant to its APC from 2004-2011 of approximately $66.4 million.

d.      Relator, through his own independent review of Amgen documents and files, became aware that Mid Florida Hematology and Oncology Centers had a "payer

mix" of 60% during this time period. On information and belief, Mid Florida Hematology and Oncology Centers sought reimbursement from government healthcare programs for approximately 60 percent of its purchases from Amgen of the Covered Drugs.

e.   During the Covered Period, Mid Florida Hematology and Oncology Centers knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Mid Florida Hematology and Oncology Centers was paying to purchase these products from its supplier.

f.   During the Covered Period, Mid Florida Hematology and Oncology Centers knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Mid Florida Hematology and Oncology Centers was paying to purchase these products from its supplier.

g.   Mid Florida Hematology and Oncology Centers filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Mid Florida Hematology and Oncology Centers actually paid for the Covered Drugs.   At no time did Mid Florida Hematology and Oncology Centers report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

233.   Relator is also familiar with the case of Pasco Hernando Oncology Associates, P.A.:

a.      On or about December 2004, Relator and Roberto Araujo, M.D. met at an ION meeting at ASH.   Dr. Araujo expressed keen interest the potential profit per patient that could be made using Aranesp and Neulasta, and openly conveyed his enthusiasm for greater profits for his practice.   There was no discussion of or consideration given to the relative clinical benefits of the Covered Drugs or of any competitor drugs.

b.      Through the scope and course of his employment with Amgen, Relator participated in numerous discussions regarding the Pasco Hernando Oncology Associates, P.A. with other Amgen sales employees, including Vip Patel, Tiffany Lang, Mark McLaughlin, Jessee Hollingsworth, Pat Fetizanan, Reggie Thigpen, Tam Costar, Mark Urban, Mike DeMaggio, Nancy Hayes, and Bobby Fralin from approximately 2003 through 2006.   The discussions focused on the financial advantages and profitability of the practice's use of Aranesp as opposed to Procrit.   Vip Patel was the lead Amgen Professional Sales Representative the account.

c.      Pasco Hernando Oncology Associates, P.A. signed the APC and became a "platinum" account.   Around that time, Pasco Hernando Oncology Associates, P.A. committed to switch its business from Procrit to Aranesp.   Pasco Hernando Oncology Associates, P.A.'s decision to use Aranesp for anemia patients instead of Procrit was driven entirely by the potential for the practice to make more money and not by any clinical benefits or outcomes.

d.      Relator, through his own independent review of Amgen documents and files, became aware that Pasco Hernando Oncology Associates purchased $1,766,348 worth of the Covered Drugs in the Fourth Quarter of 2006, and $7.1 million for the year 2006 alone.   Relator, through his own independent review of Amgen documents and files, became aware that Pasco Hernando Oncology Associates purchased the Covered

Drugs pursuant to its APC from 2004 to 2011 of approximately $46 million as an Amgen Platinum Customer.

e.      Relator, through his own independent review of Amgen documents and files, became aware that Pasco Hernando Oncology Associates had a "payer mix" of 70% during this time period.   On information and belief, Pasco Hernando Oncology Associates sought reimbursement from government healthcare programs of approximately 70 percent of its purchases from Amgen of the Covered Drugs.

f.      During the Covered Period, Pasco Hernando Oncology Associates knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Pasco Hernando Oncology Associates was paying to purchase these products from its supplier.

g.      During the Covered Period, Pasco Hernando Oncology Associates knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Pasco Hernando Oncology Associates was paying to purchase these products from its supplier.

h.      Pasco Hernando Oncology Associates filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Pasco Hernando Oncology Associates actually paid for the Covered Drugs.   At no time did Pasco Hernando Oncology Associates report the rebates, discounts, and other financial incentives it

received from Amgen to the appropriate Government Healthcare Programs as required by law.

234.    Relator is also familiar with the case of Regional Consultants in Hematology and Oncology:

a.    Through the course and scope of his employment with Amgen, Relator became well-acquainted with Ron Dobson, practice administrator for Regional Consultants in Hematology and Oncology, Alan Marks, M.D., Chief Executive Officer, and Robert Joyce, M.D., Chief Financial Officer.

b.    On or about October 19, 2006, Mr. Dobson met with Relator and other Amgen sales representatives, including Mr. Hollingsworth, and Mr. Fetizanan.   Mr. Dobson expressed his concern that the APC contracts were illegal because the APCs forced the oncology practice to purchase and use increasingly more of the Covered Drugs each year to obtain the same pricing level as the year before.   Mr. Dobson made clear his disdain for Amgen's marketing tactics and their illegal nature.   Nevertheless, in consideration of its own financial interests and potential profitability, Regional Consultants in Hematology and Oncology renewed its APC at the end of the meeting.

c.    During the Covered Period, specifically from 2002 through 2007, Relator, Dr. Marks, and Dr. Joyce had numerous discussions regarding the financial benefits of purchasing and administering Aranesp relative to Procrit.   Mr. Dobson and Regional Consultants in Hematology and Oncology renewed the APC again on April 15, 2007.

d.    Regional Consultants in Hematology and Oncology completely switched to purchasing and administering Aranesp from Procrit.   Regional Consultants in Hematology and Oncology Associates' decision to using Aranesp for anemia patients

instead of Procrit was driven by the potential for the practice to make more money and not by any clinical benefits or outcomes.

e.      Relator, through his own independent review of Amgen documents and files, became aware that Regional Consultants in Hematology and Oncology was purchasing the Covered Drugs pursuant to its APC in excess of $36 million during the Covered Period.

f.      Relator, through his own independent review of Amgen documents and files, became aware that Regional Consultants in Hematology and Oncology had a "payer mix" of 70% during this time period.   On information and belief, Regional Consultants in Hematology and Oncology sought reimbursement from government healthcare programs of approximately 70 percent of its purchases from Amgen of the Covered Drugs.

g.      During the Covered Period, Regional Consultants in Hematology and Oncology knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Regional Consultants in Hematology and Oncology was paying to purchase these products from its supplier.

h.      During the Covered Period, Regional Consultants in Hematology and Oncology knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Regional Consultants in Hematology and Oncology was paying to purchase these products from its supplier.

i.      Regional Consultants in Hematology and Oncology filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered

110

Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Regional Consultants in Hematology and Oncology actually paid for the Covered Drugs.   On information and belief, at no time did Regional Consultants in Hematology and Oncology report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

235.   Relator is also familiar with the case of Coastal Oncology, PL:

a.   Coastal Oncology, PL was a customer in Relator's Florida region and district for part of Relator's employment with Amgen.   Relator is personally apprised of Amgen's sales and marketing efforts directed at Coastal Oncology.   Through the course and scope of his employment with Amgen, Relator gained personal knowledge of Coastal Oncology's purchases of the Covered Drugs under the APC.

b.   During the Covered Period, Coastal Oncology, PL knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Coastal Oncology, PL was paying to purchase these products from its supplier.

c.   During the Covered Period, Coastal Oncology, PL knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Coastal Oncology, PL was paying to purchase these products from its supplier.

d.   Coastal Oncology, PL filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a

Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Coastal Oncology, PL actually paid for the Covered Drugs.   At no time did Coastal Oncology, PL report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.   Coastal Oncology, PL's purchases of the Covered Drugs exponentially increased from $0 to more than $5.5 million in 2006, resulting in over-reimbursements of $32.9 million from 2004 through 2011.

236.    Relator is also familiar with the case of Stuart Oncology:

a.    Stuart Oncology was a customer in Relator's Florida region and district for part of Relator's employment with Amgen.   Relator is personally apprised of Amgen's sales and marketing efforts directed at Stuart Oncology.   Through the course and scope of his employment with Amgen, Relator gained personal knowledge of Stuart Oncology's purchases of the Covered Drugs under the APC.

b.    During the Covered Period, Stuart Oncology knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Stuart Oncology was paying to purchase these products from its supplier.

c.    During the Covered Period, Stuart Oncology knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Stuart Oncology was paying to purchase these products from its supplier.

d.    Stuart Oncology filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price

sought was greater than the actual price Stuart Oncology actually paid for the Covered Drugs.   On information and belief, at no time did Stuart Oncology report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

e.      Relator, through his own independent review of Amgen documents and files, became aware that Stuart Oncology purchased $1,223,312 worth of the Covered Drugs in the Fourth Quarter of 2006, and of $4,893,248 in the year 2006 alone.   From 2004 to 2011, pursuant to its APC, Stuart Oncology purchased approximately $38.1 million worth of the Covered Drugs.

237.    Relator is also familiar with the case of Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center:

a.      Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center was a customer in Relator's Florida region and district for part of Relator's employment with Amgen.   Relator is personally apprised of Amgen's sales and marketing efforts directed at Stuart Oncology.

b.      Through the course and scope of his employment with Amgen, Relator gained personal knowledge of Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center's purchases of the Covered Drugs under the APC. Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center first enrolled in an APC on or about March 1, 2004.   From March 2004 through August 2004, Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center purchased $111,680 of Aranesp, and $483,769 of the Covered Drugs. Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center's Aranesp purchases increased exponentially to $1,152,600 in the Fourth Quarter of 2006, and $4,610,400 in the year 2006 alone.

c.      During the Covered Period, Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center was paying to purchase these products from its supplier.

d.      During the Covered Period, Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center was paying to purchase these products from its supplier.

e.      Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center actually paid for the Covered Drugs.   At no time did Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

238.    Relator is also familiar with the case of David Dresdner, M.D.:

a.      In or about 2004, Relator and David Dresdner, M.D. met at a professional meeting in Orlando, Florida.   Dr. Dresdner expressed that Aranesp was not his drug of choice for the large MDS patient population – approximately 70% – seeking treatment at his practice. Even still, Dr. Dresdner purchased $983,934 worth of Aranesp, and $1,715,314 worth of the Covered Drubs from March 2004 through July 2004.

b.      In or about 2005, Dr. Dresdner both attended the ASCO meeting in Orlando, Florida.   By that time, Dr. Dresdner had switched the medication and treatment plans for all his patents to Aranesp and Neulasta.   Dr. Dresdner had also given an audioconference to the Tampa District regarding methods to illegally alter the Medicare Diagnosis code from MDS to CIA.   At the ASCO meeting, Amgen Regional Manager Bobby Fralin invited Dr. Dresdner, along with his wife and children, to attend complimentary dinner at Morton's as a way to express gratitude and to build customer loyalty.

c.      Mr. Fralin authorized a special "one-off contract" for Dr. Dresdner.   On or about June 5, 2005, despite the fact that Dr. Dresdner's practice did not qualify for the Amgen "Gold" customer contract status, Mr. Fralin signed Dr. Dresdner up for an APC.

d.      Relator, through his own independent review of Amgen documents and files, became aware that Dr. Dresdner purchased $25,210 worth of the Covered Drugs in 2001/2002.   In the Fourth Quarter of 2006, Dr. Dresdner's purchases of the Covered Drugs skyrocketed to $1,004,961, and $4,019,844 for the year 2006.   Relator, through his own independent review of Amgen documents and files, became aware that Dr. Dresdner purchased more than $30 million worth of the Covered Drugs from 2004 through 2011 pursuant to the APC.

e. Relator, through his own independent review of Amgen documents and files, became aware that Dr. Dresdner had a payer mix of about 70% Medicare, with about 40% of those patients initially diagnosed with MDS. Dr. Dresdner changed the diagnosis of these patients, however, to CIA in order for Medicare to reimburse administration of Aranesp during an office visit. On information and belief, Regional Consultants in Hematology and Oncology sought reimbursement from government healthcare programs of approximately 70 percent of its purchases from Amgen of the Covered Drugs.

f. During the Covered Period, Dr. Dresdner knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for Covered Drugs that Dr. Dresdner was paying to purchase these products from its supplier.

g. During the Covered Period, Dr. Dresdner knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for Covered Drugs that Dr. Dresdner was paying to purchase these products from its supplier.

h. Dr. Dresdner filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Dr. Dresdner actually paid for the Covered Drugs. On information and belief, at no time did Dr. Dresdner report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

239. Relator is also familiar with the case of Cancer Institute of Florida, P.A.:

a.      Cancer Institute of Florida, P.A. was a customer in Relator's Florida region and district for part of Relator's employment with Amgen.   Relator is personally apprised of Amgen's sales and marketing efforts directed at Cancer Institute of Florida P.A.   Through the course and scope of his employment with Amgen, Relator gained personal knowledge of Cancer Institute of Florida P.A.'s purchases of the Covered Drugs under the APC.

b.      During the Covered Period, Cancer Institute of Florida, P.A. knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Cancer Institute of Florida, P.A. was paying to purchase these products from its supplier.

c.      During the Covered Period, Cancer Institute of Florida, P.A. knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Cancer Institute of Florida, P.A. was paying to purchase these products from its supplier.

d.      Cancer Institute of Florida, P.A. filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Cancer Institute of Florida, P.A. actually paid for the Covered Drugs.   On information and belief, at no time did Cancer Institute of Florida, P.A. report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

117

e.      Relator, through his own independent review of Amgen documents and files, became aware that Cancer Institute of Florida, P.A. purchased $1,884,415 worth of the Covered Drugs in the Fourth Quarter of 2006, and $7,537,6600 in the year 2006 alone.      The Cancer Institute of Florida, P.A., purchased more than $60 million dollars-worth of the Covered Drugs from 2004 to 2011 pursuant to its APC.

240.      Relator is also familiar with the case of Georgia Cancer Specialists Administrative Annex:

a.      On or about June 2003, Relator became aquatinted with the principles of Georgia Cancer Specialists Administrative Annex, including Bruce Feinburg, M.D.   Dr. Feinburg informed Relator that, in his opinion, he did not believe that Aranesp was as good of a product as Procrit.   Dr. Feinburg further preferred Procrit over Aranesp because Procrit had a "J" code while Aranesp did not.   Practically, this meant that requests for reimbursement to CMS could be done automatically for Procrit, but not for Aranesp.

b.      Dr. Feinburg later participated in the George Morrow Blitz on or about October 28, 2004.   During his Blitz meeting, Dr. Feinburg expressed that Amgen's rebates and discounts were absolutely essential factors in Georgia Cancer Specialists Administrative Annex's decision to switch from using Procrit to Aranesp.   Dr. Feinburg, on behalf of Georgia Cancer Specialists Administrative Annex, did not express any concern or consideration for clinical factors or patient-need.   Ron Flemming, the Chief Financial Officer of Georgia Cancer Specialists, requested accelerated rebate payments so that the fourth quarter rebates could come in time to help them pay their taxes. Additional, Mr. Flemming requested Amgen to provide additional incentive tiers, so that they could earn even higher rebates.   Georgia Cancer Specialists expressed significant

interest in being part of future clinical studies.   Georgia Cancer Specialists also noted for Amgen that, given the high costs of combining therapies for cancer patients undergoing chemotherapy, the third-party payers (including Government Healthcare Programs) would more carefully evaluate the benefits of the therapies, and discussed the concept of "cost of hope."

c.   On or about February 8, 2005 at an Amgen/ION LLP meeting in Miami, Florida, Relator and Dr. Feinburg had a meeting regarding the new ASP+6 reimbursement policy and how to use it to maximize profits.   Dr. Feinburg wanted Amgen to increase the rebates for the Georgia Cancer Specialists Administrative Annex and lower the amount of Amgen drugs the practice was required to purchase to obtain the higher tiers of rebates.   Dr. Feinburg's interests and concerns were purely profit-driven.

d.   On or about November 1, 2006, (in the midst of Amgen's historic peak Aranesp sales) Amgen arraigned a special meeting for ION's LLP at the Keystone Ski Resort in Keystone, Colorado.   The major themes of the meeting were: (1) the celebration of ION making their 85% market share; and (2) Amgen providing an additional level of illegal rebates.   At this special meeting, Relator conferred with Georgia Cancer Specialists Administrative Annex, by and through James Gilmore, Pharm.D.   Dr. Gilmore stated that Georgia Cancer Specialists Administrative Annex was using the Aranesp "over-fills" to obtain greater profits.   Dr. Gilmore asked Relator about whether Amgen was considering adding the drug Vectibix to its APC contract, and where there was any potential to profit from Vectibix reimbursements.   Additionally, at the meeting, Dr. Feinburg expressed serious concerns about the Georgia Cancer Specialists Administrative Annex getting "audited" by CAHABA, the Medicare Carrier for Georgia. Dr. Feinburg was worried that CAHABA had caught on to the Georgia Cancer Specialists

Administrative Annex practice of overprescribing the Covered Drugs, purely for profit and not for any medical need.   Dr. Feinburg was getting feedback from private third-party payers, like United Healthcare, that they were tired of paying for the "overpriced" Covered Drugs and changes in their reimbursement formulas were forthcoming.

e.     On or about April 17, 2007, at an Amgen/ION meeting in Miami Beach, Florida, Relator met with John Manfredi, M.D. and Genna Vols-Redd, M.D.   The meeting was arraigned for Amgen to conduct "damage control" among its customers, to address the fall out of the FDA's decision to require "black box" warnings for Aranesp. Amgen used the meeting to announce that it was unilaterally reducing the ION contract purchase quotas by 10%.   Dr. Manfredi and Dr. Vols-Redd were extremely concerned that Government Healthcare Programs would begin to drop Aranesp for any and all indications and that they could no longer collect reimbursements for administering Aranesp.

f.     Relator, through his own independent review of Amgen documents and files, became aware that Georgia Cancer Specialists Administrative Annex made a commitment to switch from Procrit to Aranesp.   Georgia Cancer Specialists Administrative Annex's decision was driven by the potential for the practice to make more money and not by any clinical benefits or outcomes.

g.     Relator, through his own independent review of Amgen documents and files, became aware that Georgia Cancer Specialists Administrative Annex purchased $7,139,213 million worth of the Covered Drugs in the Fourth Quarter of 2006, and $28,556,852 worth of the Covered Drugs in the year 2006 alone.   Relator, through his own independent review of Amgen documents and files, became aware that Georgia Cancer Specialists Administrative Annex purchased the Covered Drugs pursuant to its

120

APC in excess of $228 million during from 2004 through 2011 as an Amgen Platinum Account Customer.

h.      Relator, through his own independent review of Amgen documents and files, became aware that Georgia Cancer Specialists Administrative Annex had a "payer mix" of 55% with approximately 80% of these patients with a Medicare co-pay and approximately <1% had Medicaid only during this time period.   On information and belief, Georgia Cancer Specialist Administrative Annex referred full Medicaid and indigent patients to either Emory or Georgia Baptist for treatment.   The payer mix is the percentage of private third-party insurance carriers relative to government health care programs – specifically Medicare and Medicaid.   The payer mix was an important consideration in our marketing efforts to Oncology Practices because it gave Amgen benchmarks to determine how profitable the APC could be to a particular practice.

i.      Georgia Cancer Specialists Administrative Annex sought reimbursement from government healthcare programs of approximately 75 percent of its purchases from Amgen of the Covered Drugs. Indeed, that was the entire point of Oncology Practices purchasing these drugs from Amgen: So that the drugs could be administered to patients with government healthcare programs and private insurance carriers billed for these treatments including the cost of the drug as well as its administration.

j.      During the Covered Period, Georgia Cancer Specialists Administrative Annex knew or should have known that the AWP was not being accurately reported by Amgen.   This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Georgia Cancer Specialists Administrative Annex was paying to purchase these products from its supplier.

121

      k.     During the Covered Period, Georgia Cancer Specialists Administrative Annex knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Georgia Cancer Specialists Administrative Annex was paying to purchase these products from its supplier.

      l.     Georgia Cancer Specialist Administrative Annex informed George Morrow, Amgen Vice President for Global Sales and Marketing that, in 2004, it had established a retail pharmacy outlet so the practice could capture profits created by CMS under the Medicare Part D and Medicaid programs.   Its physicians would prescribe the Amgen supportive care injectables, with the patient filling the drug at its pharmacy, with the pharmacy billing Medicare Part D/Medicaid and obtaining profits for the practice.

      m.     Georgia Cancer Specialists Administrative Annex filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Georgia Cancer Specialists Administrative Annex actually paid for the Covered Drugs.   At no time did Georgia Cancer Specialists Administrative Annex report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

241.    Relator is also familiar with the case of Northwest Georgia Oncology Centers, P.C. (ACIS #226509):

      a.     Through the course and scope of his employment, Relator was privy to numerous meetings and discussions between the Amgen sales and marketing team and

Northwest Georgia Oncology Centers, P.C. regarding the lucrative financial advantages of purchasing, administering, and seeking reimbursements for Aranesp instead of Procrit.

b.      In approximately 2004, Northwest Georgia Oncology Centers, P.C. made a commitment to switch its business from Procrit to Aranesp.   In discussions between the Amgen sales and marketing team and Northwest Georgia Oncology Centers, P.C., the practice made clear that its decision to use Aranesp for anemia patients instead of Procrit was driven by the potential for the practice to make more money and not by any clinical benefits or outcomes.

c.      In or about 2004, Relator met with Hillary Hahn, M.D., a principle at Northwest Georgia Oncology Centers at the ASH meeting in Orlando, Florida.   Dr. Hahn stated that she was very pleased with the "margins" and "bonuses" that the practice was making from administering and seeking reimbursements for Aranesp and Neulasta.

d.      On or February 8, 2005, Relator met with Bruce Gould, M.D. and Scott Parker, M.D at an Amgen/ION LLP meeting in Miami, Florida to discuss the new ASP+6 reimbursement policy instituted by CMS and way to maximize profitability.

e.      Relator, through his own independent review of Amgen documents and files, became aware that Northwest Georgia Oncology Centers, P.C. was purchasing the Covered Drugs pursuant to its APC in excess of $100 million of the Covered Drugs during the Covered Period as an Amgen Platinum Customer.

f.      Relator, through his own independent review of Amgen documents and files, became aware that Northwest Georgia Oncology Centers, P.C. had a "payer mix" of 63% during this time period.   On information and belief, Northwest Georgia Oncology Centers, P.C. sought reimbursement from government healthcare programs of approximately 63 percent of its purchases from Amgen of the Covered Drugs.

123

g.     During the Covered Period, Northwest Georgia Oncology Centers, P.C. knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Northwest Georgia Oncology Centers, P.C. was paying to purchase these products from its supplier.

h.     During the Covered Period, Northwest Georgia Oncology Centers, P.C. knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Northwest Georgia Oncology Centers, P.C. was paying to purchase these products from its supplier.

i.     Northwest Georgia Oncology Centers, P.C. filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Northwest Georgia Oncology Centers, P.C. actually paid for the Covered Drugs.   At no time did Northwest Georgia Oncology Centers, P.C. report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

242.   Relator is also familiar with the case of Augusta Oncology Associates (ACIS #214436):

a.     On or about February 8, 2005, at an Amgen/ION Large Physician Practice meeting held in in Miami, Florida, Relator and Rob Zeyfang, M.D. of Augusta Oncology Associates discussed the new ASP+6 CMS reimbursement policy and ways to maximize profits.

124

b.      At the Amgen/ION LPP meeting in Keystone, Colorado, Relator and Miriam Atkins, M.D. of Augusta Oncology Associates discussed the APC contracts and the maximum dosing of Aranesp in patients to facilitate greater use of Amgen products and, as a result, higher rebates and profits.

c.      Augusta Oncology Associates filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Augusta Oncology Associates actually paid for the Covered Drugs.   On information and belief, at no time did Augusta Oncology Associates report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

243.    Relator is also familiar with the case of Central Georgia Cancer Care (ACIS #227676):

a.      In or about 2003 or 2004, Relator and Tim Curlee, an Amgen sales and marketing employee, communicated with Central Georgia Cancer Care and ultimately convinced the practice to exclusively use Aranesp.

b.      At an ION Large Physician Practice meeting in San Diego, California, Relator, June Carroll, M.D., and Linda Hendricks, M.D. discussed the money-making potential for using Aranesp – i.e. through Amgen kickbacks and over-reimbursements from Government Healthcare Programs.

c.      In or about March 2004 Central Georgia Cancer Care signed an APC contract as an Amgen platinum customer.   On or about October 1, 2005, Central Georgia Cancer Care renewed its APC contract as an Amgen platinum customer.   Dr. James

125

Smith, Jr. M.D. committed to switching Central Georgia Cancer Care from Procrit to Aranesp.   Central Georgia Cancer Care's decision to use Aranesp for anemia patients instead of Procrit was driven by the potential for the practice to make more money and not by any clinical benefits or outcomes.

d.      Relator, through his own independent review of Amgen documents and files, became aware that Central Georgia Cancer Care was purchasing $1,982,152 worth of the Covered Drugs in the Fourth Quarter of 2006, and of $7,928,608 for the year 2006 alone.   Relator, through his own independent review of Amgen documents and files, became aware that Central Georgia Cancer Care was purchasing Aranesp and other Covered Drugs pursuant to its APC in excess of $63 million as an Amgen Platinum Customer from 2004 through 2011.

e.      Relator, through his own independent review of Amgen documents and files, became aware that Central Georgia Cancer Care had a "payer mix" of 65% during this time period. Central Georgia Cancer Care sought reimbursement from government healthcare programs of approximately 65 percent of its purchases from Amgen of the Covered Drugs.

f.      During the Covered Period, Central Georgia Cancer Care knew or should have known that the AWP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that Central Georgia Cancer Care was paying to purchase these products from its supplier.

g.      During the Covered Period, Central Georgia Cancer Care knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for

the Covered Drugs that Central Georgia Cancer Care was paying to purchase these products from its supplier.

   h. Central Georgia Cancer Care filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Central Georgia Cancer Care actually paid for the Covered Drugs.   At no time did Central Georgia Cancer Care report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

244. Relator is also familiar with the case of: Southeast Georgia Hematology/Oncology:

   a. In the scope and through the course of his employment at Amgen, Relator established a twenty-year relationship with Antonio Moran, M.D., a principal of Southeast Georgia Hematology/Oncology.   Southeast Georgia Hematology/Oncology was an early adopter of Aranesp for among patients with anemia.   Dr. Moran used high doses of Aranesp (300-500mcg weekly) and Neulasta (first cycle weekly and biweekly chemotherapy regimens).

   b. In or about April 2006, Dr. Moran called Relator to inform him that the Georgia Medicare Audit Team was at Southeast Georgia Hematology/Oncology and was asking him why all of his patients were on Aranesp.

   c. Abraham Cheong, M.D., a doctor with Southeast Georgia Hematology/Oncology stated to Relator, "All my patients get Aranesp and Neulasta and some of them actually need it," or words to that effect.

d.      Through 2002 to 2007, in the course and scope of his employment at Amgen, Relator regularly spoke with Dr. Moran, Dr. Cheong, and Duane Moores, M.D. about the financial benefits and profitability of Aranesp over Procrit with during the years.   Southeast Georgia Hematology/Oncology signed an APC in or about March 2004.   Southeast Georgia Hematology/Oncology was one of the first clinics in the United States to fully switch from administering Procrit to exclusively using Aranesp for its anemia patients.   The practice's purchases were so large that they alarmed State authorities and prompted Georgia Medicare (CAHABA) to begin conducting audits of practices and their use of certain drugs.   Dr. Moran, on behalf of Southeast Georgia Hematology/Oncology, decided to use Aranesp for anemia patients instead of Procrit was driven by the potential for the practice to make more money and not by any clinical benefits or outcomes.

e.      Relator, through his own independent review of Amgen documents and files, became aware that Southeast Georgia Hematology/Oncology purchased the Covered Drugs pursuant to their APC in excess of $45 million during from 2004 through 2011.

f.      Relator, through his own independent review of Amgen documents and files, became aware that Southeast Georgia Hematology/Oncology had a "payer mix" of 70% -- a large percent of its patients on Medicare as well as a large Medicaid population during this time period.   Southeast Georgia Hematology/Oncology sought reimbursement from Government Healthcare Programs of approximately 70 percent of its purchases from Amgen of the Covered Drugs.

g.      During the Covered Period, with Southeast Georgia Hematology/Oncology knew or should have known that the AWP was not being

accurately reported by Amgen.   This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that with Southeast Georgia Hematology/Oncology was paying to purchase these products from its supplier.

      h.     During the Covered Period, with Southeast Georgia Hematology/Oncology knew or should have known that the ASP was not being accurately reported by Amgen. This is so because the AWP was significantly higher than to be expected given the actual cost for the Covered Drugs that with Southeast Georgia Hematology/Oncology was paying to purchase these products from its supplier.

      i.     Southeast Georgia Hematology/Oncology filed claims for reimbursement to Government Healthcare Programs each time it administered a Covered Drug to a patient covered by a Government Healthcare Program, with the knowledge that the reimbursement price sought was greater than the actual price Southeast Georgia Hematology/Oncology actually paid for the Covered Drugs.   At no time did Southeast Georgia Hematology/Oncology report the rebates, discounts, and other financial incentives it received from Amgen to the appropriate Government Healthcare Programs as required by law.

245.    Relator is also familiar with the case of ION members:

      a.     Defendants Florida Cancer Specialists, Gulfcoast Oncology Associates, Integrated Community Oncology Network, LLC and Florida Oncology Associates, Georgia Cancer Specialists Administrative Annex, Northwest Georgia Oncology Centers, P.C., Augusta Oncology Associates, and Central Georgia Cancer Care were all members of ION and had representatives attend ION Large Physician Practice meetings.

      b.     On or about November 1, 2006, in the midst of peak Aranesp sales, Relator attended an ION Large Physician Practice meeting at the Keystone Ski Resort in

Keystone, Colorado.   The meeting celebrated ION obtaining an 85% market share for Aranesp for all of the practices as a whole, thus earning ION practices with an extra 2% rebate from Amgen of all qualified purchases.   Amgen announced that it intended to provide an even greater kickback than the 2 % rebate previously stated.   The special ION rebate applied at the end of the year, only after the attainment of certain goals including for market share.

c.      The special ION rebate was an illegal kickback that does not qualify for any of the safe harbor exceptions.

d.      Pursuant to the instruction of Ms. Myers and Mr. Turgeon and other Amgen representatives, Relator emphasized to the Defendant ION practices that the extra year-end 2% "rebate" would disappear if ION members could not increase their purchases of Procrit to the point that Amgen had less than an 80% total market share of ESAs from ION.

e.      Relator met with Dr. Brian Berry, MD and Mr. Tondra Garagano of Florida Cancer Specialists at an ION meeting in San Diego, California.   At the direction of Amgen sales and marketing leadership, Relator emphasized the "profit opportunities" available under the APC compared with any economic advantages of Procrit purchases from Ortho Biotech.   At the time, Dr. Berry and Mr. Garagano advised that they were considering whether to continue using Aranesp over Procrit, but were considering the potential profitability of switching to Aranesp.

f.      Amgen offered the Defendant Oncology Practices a "quota relief."   Quota relief is meant that a practice would be provided a rebate greater than its sales would normally provide under the written terms of its APC.

g.      On information and belief, after the DAHANCA report was released,

Amgen renegotiated its APC with many of the Defendant Oncology Practices to allow

each of them to obtain higher rebate percentages based upon a smaller increase in

purchases of Amgen products.   In other words, Amgen engaged in wholesale "quota

relief" based upon the negative publicity surrounding the use of Aranesp in a clinical trial

leading to increased risk of stroke and death.

246.    Relator, by and through the course and scope of his employment, reviewed

Amgen documents and files, including the sales data as to the Covered Drugs for each of the

Defendant Oncology Practices.   Attached hereto and incorporated herein are true and correct

copies of Amgen sales data that was supplied to Relator in the form of Microsoft Excel

spreadsheets during the course and scope of his employment as *Exhibit 4*, and summary thereof

created by Relator attached hereto and incorporated herein as *Exhibit 5*.

247.    Throughout the course and scope of his employment at Amgen, Relator also

received regular updates regarding purchases made by the Defendant Oncology Practices of the

Covered Drugs.

**J.      Hub and Spoke Conspiracy to Commit Fraud.**

248.    With the FDA approval of Aranesp for treatment of CIA in 2002, Amgen

endeavored to persuade the Defendant Oncology Practices to purchase and administer Aranesp

instead of Procrit. This sales effort accelerated with the introduction of the APC sales strategy in

approximately March 2004.

249.    Beginning in or around March 2004, with the launch of the APC sales strategy,

Amgen aimed to increase the sales of Aranesp by expanding the market, both in terms of

increased dosing and use among a broader patient pool.   To do so, Amgen offered rebates,

discounts, and other financial incentives to customers, including the Defendant Oncology

Practices, based upon the growth in sales rather than a straightforward rebate based upon the volume of total purchases.   Instead of providing the highest rebates to its largest volume customers, Amgen structured its rebate program to emphasize sales growth, with the highest level of rebates going to customers that showed the *greatest increase* in purchases of Amgen products.

250.    The Amgen sales and marketing team, including Relator, facilitated the APCs for each of the Defendant Oncology Practices.   One of the APCs that Relator is best informed about, based on personal experience and communications, is the agreement with the Gulf Coast Oncology Associates of St. Petersburg, Florida, known as an Amgen Portfolio Rebate Program Letter Agreement that offered the following rebate schedule from March 1, 2004 through August 31, 2004:

| VOLUME TIERS | Participating Eligible Physician Practice's Aggregate Combined Gross Purchases of Aranesp®, NEUPOGEN®, and Neulasta® during the applicable Quarterly Measurement Period | Aranesp® Rebate Percent | NEUPOGEN® and Neulasta® Rebate Percent |
|---|---|---|---|
| Tier 1 | $1,051,771 - $1,262,124 | 5.0% | 5.0% |
| Tier 2 | $1,262,125 - $1,367,301 | 11.5% | 7.5% |
| Tier 3 | $1,367,302 - $1,472,478 | 13.5% | 10.5% |
| Tier 4 | $1,472,479 - $1,577,655 | 14.5% | 11.5% |
| Tier 5 | $1,577,656 - $1,682,832 | 18.5% | 13.5% |
| Tier 6 | $1,682,833 - $1,799,009 | 20.0% | 20.0% |
| Tier 7 | $\geq$ $1,788,010 | 25.0% | 25.0% |

251.    Another example that Relator has knowledge of based on his personal experience and communications is the APC with Florida Oncology Associates of Jacksonville, Florida

entitled Amgen Portfolio Rebate Program Letter Agreement, that offered the following rebate

schedule from March 1, 2004 through August 31, 2004:

| VOLUME TIERS | Participating Eligible Physician Practice's Aggregate Combined Gross Purchases of Aranesp®, NEUPOGEN®, and Neulasta® during the applicable Quarterly Measurement Period | Aranesp® Rebate Percent | NEUPOGEN® and Neulasta® Rebate Percent |
|---|---|---|---|
| Tier 1 | $2,025,630 - $2,430,755 | 5.0% | 5.0% |
| Tier 2 | $2,430,756 - $2,633,318 | 11.5% | 7.5% |
| Tier 3 | $2,633,319 - $2,835,881 | 13.5% | 10.5% |
| Tier 4 | $2,835,882 - $3,038,444 | 14.5% | 11.5% |
| Tier 5 | $3,038,445 - $3,241,007 | 18.5% | 13.5% |
| Tier 6 | $3,241,008 - $3,443,570 | 20.0% | 20.0% |
| Tier 7 | $\geq$ $3,443,571 | 25.0% | 25.0% |

A comparison of these two contracts clearly shows that Florida Oncology Associates had to

purchase almost twice the volume of Covered Drugs to get the same percentage rebate as Gulf

Coast Oncology Associates.

252.    Another example is the Amgen Portfolio Rebate Program Letter Agreement

beginning in March 1, 2004, entered into by Southeast Georgia Hematology Oncology.   This

agreement offered Southeast Georgia Hematology Oncology the following base rebate schedule

from March 1, 2004 through August 31, 2004:

| VOLUME TIERS | Participating Eligible Physician Practice's Aggregate Combined Gross Purchases of Aranesp®, NEUPOGEN®, and Neulasta® during the applicable Quarterly Measurement Period | Aranesp® Rebate Percent | NEUPOGEN® and Neulasta® Rebate Percent |
|---|---|---|---|

133

| Tier 1 | $446,493 - $535,791 | 4.0% | 4.0% |
| Tier 2 | $535,792 - $580,440 | 10.5% | 6.5% |
| Tier 3 | $580,441 - $625,090 | 12.5% | 9.5% |
| Tier 4 | $625,091 - $669,739 | 13.5% | 10.5% |
| Tier 5 | $669,740 - $714,388 | 16.5% | 12.5% |
| Tier 6 | $714,389-$759,037 | 18.0% | 16.0% |
| Tier 7 | ≥ $759,038 | 20.0% | 21.0% |

Southeast Georgia Hematology Oncology was able to obtain a 20 percent Aranesp discount by purchasing approximately one-third as much of the Covered Drugs as Florida Oncology Associates.

253.    For Southeast Georgia Hematology Oncology, the 2006 Amgen Portfolio Contract increased the amount of purchases of Covered Drugs required to obtain *any* rebate at all:

| **LEVEL** | Participating Eligible Physician Practice's Aggregate Combined Gross Purchases of the Covered Drugs **PLUS** Retail Prescriptions during the Applicable Quarterly Measurement Period | Aranesp® Rebate Percent | Neulasta® Rebate Percent | NEUPOGEN® Rebate Percent |
| --- | --- | --- | --- | --- |
| Base | $897,059 - $941,911 | 18.0% | 14.0% | 10.0% |
| Five | $941,912 - $986,764 | 18.5% | 14.5% | 11.0% |
| Ten | $986,765 - $1,076,470 | 19.0% | 15.0% | 12.0% |
| Twenty | $1,076,471 - $1,166,175 | 19.5% | 15.5% | 13.0% |
| Thirty | $1,166,176 - $1,255,881 | 20.0% | 16.0% | 14.0% |

| Forty | $1,255,882 - $1,345,587 | 20.5% | 16.5% | 15.0% |
| Fifty | $\geq$ $1,345,588 | 21.0% | 17.0% | 16.0% |

In order to obtain any rebate at all from Amgen, Southeast Georgia Hematology Oncology had to more than double its purchases of the Covered Drugs from 2004 to and 2006.   Amgen, in fact, provided substantial economic incentives for the Defendant Oncology Practices to increase their purchases of the Covered Drugs as with successive APCs, each of the Defendant Oncology Practices had to increase Covered Drug purchases to obtain rebates at the same level or even any rebate at all.   This, in turn, resulted, in a dramatic increase in the use of these Covered Drugs in oncology patients and in the billing for this use to Government Healthcare Programs by the Defendant Oncology Practices.   This dramatic increase in billings for the Covered Drugs to Government Healthcare Programs cannot be explained by medical necessity.   Instead, this increase in the use of the Covered Drugs was the result of the economic incentives that were offered by Amgen and accepted by the Defendant Oncology Practices.

254.    Amgen falsely claimed in promotional materials that it provided its "best prices" to its "best customers" in the form of the higher rebates.   Amgen sought to portray these Amgen Portfolio Contracts as a way for Amgen to reward its biggest volume purchasers with the lowest prices for the Covered Drugs.   But this was not the case.   Amgen sought to mislead the public, government officials, and even its customers as to the true intention behind the APCs.   *The true purpose of these contracts was to increase sales of the Covered Drugs during the Covered Period without regard to clinical efficacy or medical necessity.   The Defendant Oncology Practices were provided with individually tailored rebate programs designed to encourage, in exchange for money, as much use of the Covered Drugs as each practice could, theoretically, prescribe in specific patient populations, whether these patient populations would benefit from*

135

*the use of these Covered Drugs or not.   The Defendant Oncology Practices knowingly and enthusiastically participated in this conspiracy in exchange for large sums of money. Defendant Oncology Practices committed fraud against Government Healthcare Practices in exchange for significant financial rewards.*

255.    The Settlement Agreement entered into by Amgen and the United States in December 2012 specifically excluded from the release provided to Amgen: "Claims that Amgen unlawfully marketed the spread for its products; that is, that Amgen promoted the profit margins between the prices at which its products were sold to Amgen's customers and the higher Medicare and/or Medicaid reimbursement prices for those products, knowing that the prices it reported to drug pricing compendia (such as First Data Bank) – specifically, AWP and Wholesale Acquisition Costs ("WAC") – were higher than they should have been, that those reported higher prices would be used and/or relied upon by state Medicaid programs to set reimbursement rates, and that the difference between Amgen's reported prices and the actual sales prices to its customers created substantial profit margins for pharmacists and medical providers as a result of state Medicaid programs' reimbursement methodologies." Settlement Agreement, ¶ Preamble (G)(8)(b).

256.    Amgen's sales force's office visits with the Defendant Oncology Practices reflected its sales goals. First, Amgen, in direct contravention of FDA guidelines and regulations, marketed the Covered Drugs to the Defendant Oncology Practices by "marketing to spread." Amgen sought to convince the Defendant Oncology Practices to purchase the Covered Drugs by emphasizing how much money the Defendant Oncology Practices could make per patient by prescribing and administering the Covered Drugs.   As described herein, the term "spread" means the difference between what the Government Healthcare Programs paid the Defendant Oncology Practices what defendants were actually charged for the Covered Drugs, after taking

account of the rebates, other discounts, overfill, and free product samples Amgen provided to the Defendant Oncology Practices in exchange for their purchases of the Covered Drugs.   The Defendant Oncology Practices that qualified for the highest rebates could receive from Amgen a rebate of up to half of the reimbursement amounts that the practices received from the Government Healthcare Programs.

257.    Amgen's sales force touted this spread as an advantage that the Covered Drugs had over Procrit and competing therapies.   By marketing the spread, Amgen demonstrated to the Defendant Oncology Practices the large sums of money that could be made by prescribing and administering the Covered Drugs to patients regardless of the clinical benefit to the patient. Given that many of cancer patients were terminal and desperate for any and all medical interventions, this patient population was uniquely vulnerable to receiving unnecessary medical care with no clinical benefit from Defendant Oncology Practices.

258.    Over time, Amgen increased the level of purchases required of the Defendant Oncology Practices to receive a constant level of discounts, rebates, and other inducements to buy the Covered Drugs from Amgen.   Amgen based the rebates it paid to the Defendant Oncology Practices not on the total amount of Covered Drugs these practices purchases, but. rather, on the potential for increased purchases from each practice.   The Defendant Oncology Practices with the highest percentage increase in purchases received the highest rebate rates from Amgen, up to 50% of the costs of the drugs that the practice billed to the Government Healthcare Programs.   Over time, Amgen raise the purchase level increases that the practices had to meet to receive the highest rebates.   These increases in the amount of the Covered Drugs that had to be purchased to obtain the same level of rebate were significantly greater than the actual growth in the oncology patient population.   Because the patient population was increasing at a much slower rate, the Defendant Oncology Practices that desired to continue to receive these

significant rebates had to find some means to increase their use of the Covered Drugs.   In short, Amgen provided financial inducements to Defendant Oncology Practices to increase the number of Covered Drugs – particularly Aranesp – used in by the Defendant Oncology Practices.   How this specific increase was achieved by each Defendant Oncology Practice was different for each practice.   Patients of the Defendant Oncology Practices experiencing anemia associated with chemotherapy treatment for cancer were provided higher doses of Aranesp.   Other Covered Drugs were also used at a higher rate for those patients for whom there was an FDA-approved indication.   Also, the Defendant Oncology Practices expanded the patient population for using these Covered Drugs – including non-FDA approved uses – or "off-label" uses – of the Covered Drugs.

259.    Amgen stood at the center of this scheme, providing billions of dollars paid directly to the Defendant Oncology Practices and other community oncology practices wherein these practices had already received full reimbursement for these Covered Drugs through Government Healthcare Programs.   The Defendant Oncology Practices did their part to further the scheme by prescribing more and more Aranesp and other Covered Drugs to more and more patients, not on the basis of clinical benefit or medical necessity, but based upon the profits that were being made by the Defendant Oncology Practices in using these Covered Drugs.   As alleged elsewhere in this Complaint, the Defendant Oncology Practices did not report these rebates, discounts and other things of value received from Amgen to the Government Healthcare Programs and did not reimburse the Government Healthcare Programs for the "double reimbursement" the Defendant Oncology Practices received for prescribing and administering the Covered Drugs.

260.    Amgen initiated the conspiracy and was at its center, serving as the "hub."   Each of the Defendant Oncology Practice was connected to the conspiracy through Amgen, as a

"spoke."   Amgen's primary goal for the conspiracy was to increase its sales of the Covered

Drugs, and, hence, its revenues and profits.

261.    In undertaking the actions described herein, Amgen and the Defendant Oncology

Practices became participants in and the primary beneficiaries of the conspiracy to defraud

Government Healthcare Programs of money.

262.    Amgen's actions, as alleged, in combination with those of the Defendant

Oncology Practices, constituted a conspiracy to defraud third-party payers, including

Government Healthcare Programs of money by failing to disclose the discounted, actual charge

for the Covered Drugs paid by the Defendant Oncology Practices.   By failing to disclose to

Government Healthcare Program the rebates, discounts and other things of value the Defendant

Oncology Practices received as an agreed term governing their purchases of the Covered Drugs

under their Amgen Portfolio Contracts, the defendants caused Government Healthcare Programs

to over-reimburse the Defendant Oncology Practices, hence defrauding them of money.

263.    The rebates and other inducements by Amgen to the Defendant Oncology

Practices to generate greater and greater purchases of the Covered Drugs made the

reimbursements obtained by the Defendant Oncology Practices from Government Healthcare

Programs fraudulent wherein these reimbursements were for a higher dosing of the Covered

Drugs in patients without clinical benefit and/or the use of these Covered Drugs was in patients

without any clinical benefit or medical need.

264.    The primary goal the Defendant Oncology Practices sought from their

participation in the conspiracy was increased revenues and profits.   The Defendant Oncology

Practices achieved that goal, in part, by obtaining rebates, discounts, overfill, and samples from

Amgen, thereby reducing the cost of the Covered Drugs.

265.     Under the Amgen Portfolio Contract, to the extent the Defendant Oncology

Practices were able to achieve higher levels of use of the Covered Drugs, their cost to purchase

these drugs from Amgen decreased, providing them with increased revenues and increase per

unit profits; the Defendant Oncology Practices were also able to increase their revenues and

profits from prescriptions they wrote and drugs they administered for patients receiving benefits

under Government Healthcare Programs by failing to disclose to program administrators the

rebates, discounts and other things of value they were being paid by Amgen for writing

prescriptions and administering the Covered Drugs, all of which lowered the effective cost of the

Covered Drugs to them, such disclosure being required by program rules and by provisions in

their Amgen Portfolio Contracts as described in this complaint herein.   The Defendant

Oncology Practices therefore received far more in reimbursements for the Covered Drugs from

Government Healthcare Programs than they in fact had paid for the Covered Drugs and were

lawfully entitled to receive.

266.     The rapid growth in purchases and administration of the Covered Drugs during

the Covered Period by the Defendant Oncology Practices cannot be justified based upon clinical

benefit or medical need.   The administration of the Covered Drugs by the Defendant Oncology

Practices during the Covered Period increased at a rate far higher than any increase in the

incidence of applicable cancer or the treatment of cancer by the Defendant Oncology Practices

267.     Amgen and the defendant Oncology Practices worked together to effectuate

Amgen's scheme of increasing its profits on the Covered Drugs and increasing the practices'

profits by obtaining excess payments for the drugs they administered to their patients.   Amgen

sold the Covered Drugs to the defendant Oncology Practices for a price listed on an invoice.

The Defendant Oncology Practices administered the drugs to their patients and submitted the

invoices to the Government Healthcare Programs to obtain reimbursement.   When the

Defendant Oncology Practices presented these claims to the Government, they knew they were false.   They knew the claims for reimbursement were false because they knew that Amgen would soon pay them a rebate of as much as 50% of the fake price listed on the invoice.   The Defendant Oncology Practices also knew that Amgen wanted to increase it sales of Aranesp and Neulasta, especially at the expense of Procrit.   They knew that to continue to receive the highest rebates, they had to increase the growth of the amount of Aranesp they prescribed at ever increasing rates.   They knew that they had to prescribe Aranesp to more and more patients for more and more reasons at higher and higher doses.   By encouraging the Defendant Oncology Practices to submit false claims to Government Healthcare Programs, Amgen recruited the Defendant Oncology Practices into an overarching, massive, billion-dollar scheme to defraud federal- and state-sponsored healthcare programs.   Although the scheme had hundreds of participants, there was a single, overarching goal: increasing Amgen's revenues and profits and increasing the revenues and profits of the Defendant Oncology Practices by fraudulently causing payments to be made by Government Healthcare Programs to Defendant Oncology Practices. Amgen could not have achieved its objectives without the participation of hundreds of the Defendant Oncology Practices, and the Defendant Oncology Practices could not have achieved their goals without Amgen.   Amgen was therefore at the center of a massive conspiracy to defraud the Federal Government and each of the Defendant Oncology Practices were part of that conspiracy.   Each of the Defendant Oncology Practices is jointly and severally liable for the losses the Government Healthcare Programs suffered as a result of the scheme.

268.   Amgen and the Defendant Oncology Practice engaged in a scheme to defraud the Government Healthcare Programs, the United States Government, and the governments of several States, as herein described.   The actions that Amgen and the Defendant Oncology

Practices took in furtherance of that scheme, as described with particularity above, were both legal and illegal, and included:

     a.     Violating the False Claims Act by knowingly presenting false claims for reimbursement to Government Healthcare Programs in violation of 31 U.S.C. §§ 3729 *et seq.*;

     b.     Defrauding the US Government in violation of 18 U.S.C. § 371;

     c.     Using mail and interstate wire communication to commit a fraud, in violation of 18 U.S.C. §§ 1341 & 1343;

     d.     Prescribing and administering medications that were not medically indicated at all or at doses that were higher than medically indicated, in violation of various state statutes and state standards of medical ethics;

     e.     Falsely reporting its prices for Aranesp and other drugs to drug pricing compendia (such as First Data Bank) – specifically, AWP and Wholesale Acquisition Costs ("WAC");

     f.     Running a criminal enterprise in violation of 15 U.S.C. § 1961 by engaging in a pattern of illegal activities included major fraud, mail fraud, and wire fraud

269.    The hub and spoke conspiracy between Amgen on the one hand and the Defendant Oncology Practices on the other resulting in the defrauding of Government Healthcare Programs by the submission of false claims for payment and knowledge that these claims were false.

270.    All of the Defendant Oncology Practices who participated in the scheme are jointly and severally with each other for the full amount of the fraud.   Given Amgen's conduct

described herein, Amgen could be jointly and severally liable, but as Amgen has not been named as a defendant, there is no claim for liability as to Amgen in this complaint.

### K.     Affected Federal and State Government Healthcare Programs.

271.     The United States provides medical insurance for indigent or poor persons through Title XIX of the Social Security Act, 42 U.S.C. § 1396–1, *et seq.*, a program commonly referred to as Medicaid.   Medicaid is a program funded by the federal government and various state governments.   The various states named as plaintiffs in this Complaint have, as a result of the activities described throughout this Complaint, been required to pay reimbursements to the defendant Oncology Practices in excess of the amounts they were eligible to receive under governing regulations.   Therefore, these State governments are properly named as Plaintiffs in this lawsuit by virtue of their respective state fraud recovery statutes.

272.     Although Medicaid is administered at the state level, each state is required to adhere to federal guidelines.   Federal statutes and regulations limit the drugs that the federal government will pay for through its funding of state Medicaid programs.   Federal statutes and regulations restrict the uses for which the federal government will pay for approved drugs: even an approved drug is not eligible for cost reimbursement if the use for which it was prescribed is not a proper indication.

273.     Generally, a medically accepted indication, or use, must be present before Medicaid will reimburse a medical services provider, such as the defendants in this case, or a pharmacy for a drug that is prescribed or administered to an individual covered by Medicaid.   In knowingly submitting false fraudulent information and claims for reimbursement under the Medicaid program, Amgen and the Defendant Oncology Practices defrauded Government Healthcare Programs of money.

274.    The federal government provides medical insurance for retirees and persons who are disabled through Title XVIII of the Social Security Act, 42 U.S.C. § 1395h, *et seq., a* program commonly referred to as Medicare.   Medicare is a health insurance program also administered by the federal government by the Department of Health and Human Services, Centers for Medicare & Medicaid Services, Center for Medicare.

275.    Medicare has, since the implementation of the Medicare Prescription Drug Improvement and Modernization Act of 2003 paid for a substantial portion of outpatient prescription drugs for covered individuals. Medicare Part D, which provides beneficiaries with a level of coverage for the cost of prescription drugs, requires providers to adhere to the same laws and regulations as apply to providers under the Medicaid program.

276.    In knowingly submitting false and fraudulent information and claims for reimbursement to Medicare, Amgen and the defendant Oncology Practices defrauded the United States of money, in violation of laws and regulations applicable to such claims.   In addition to defrauding Medicaid and Medicare, the defendant Oncology Practices also defrauded other healthcare programs funded by the federal government.   The programs identified in succeeding paragraphs of this subpart of the Complaint.

277.    The Federal Employees Health Benefits ("FEHB") Program, a program that provides medical benefits to United States government employees.   It is administered by the Office of Personnel Management.   This program and federal healthcare programs generally are administered pursuant to 5 U.S.C. § 8901, *et seq.*

278.    The Civilian Health and Medical Program of the Department of Veterans Affairs, a program that provides medical benefits to eligible veterans.

279.    TRICARE, a program that provides medical benefits to eligible uniformed military personnel and related individuals through civilian facilities.   TRICARE is managed by

TRICARE Management Activity, a field activity under the policy guidance and direction of the Assistant Secretary of Defense (Health Affairs), Department of Defense.

280.    The Indian Health Service ("IHS"), an agency of the Department of Health and Human Services that provides comprehensive medical care to eligible American Indians and Alaska Natives.   The IHS is administered pursuant to 42 U.S.C. § 2002, *et seq.*

281.    The Railroad Retirement Medicare, a program is authorized by the Railroad Retirement Act of 1974. 45 U.S.C. § 231, *et seq.*   The program is administered though the United States Railroad Retirement Board.

282.    For each of these programs named herein, the fraud perpetrated upon them by Amgen and the defendant Oncology Practices resulted in improper and fraudulent payments or overpayments for drugs.   The fraudulent submission for reimbursement for non-approved or medically unnecessary uses and other purposes as described herein caused direct harm to the United States government and to the governments of the affected states by the payment or overpayment to the requested entities that should not have been "reimbursed," or paid.   In addition, the failure by the defendant Oncology Practices to identify the rebates and other things of value received by the defendant Oncology Practices resulted in overpayment of reimbursements to these entities.

283.    Specifically, based on the drastic increase in purchases of the Covered Drugs, the Government Healthcare Providers were fraudulently induced to over-reimburse the Defendant Oncology Practices millions of dollars. The Defendant Oncology Practices' increased purchases of the Covered Drugs, resulting from the Amgen APCs, kickbacks, off-label uses, overfills, and other unlawful incentives, directly correlates to the reimbursements made and received by the Defendant Oncology Practices.

284.     Pursuant to sales data collected in 2002 (before the APCs were launched) and in 2006 (after the APCs were launched and executed by each Defendant), the Defendant Oncology Practices purchased the following dollar amount worth of the Covered Drugs. A true and correct copy of the sales report for purchases made from April 2001 through August 2002 by for the Defendant Oncology Practices is attached hereto and incorporated herein as ***Exhibit 6. See also Exhibit 1.***[6]

| Defendant | ACIS # | 2002 Annual Sales of Covered Drugs[7] | 2006 Annual Sales of Covered Drugs[8] |
|---|---|---|---|
| Florida Cancer Specialists and Research Institute | 216205 | $2,210,962.00 | $20,271,344.00 |
| Integrated Community Oncology Network LLC | 11998 | $2,300,000.00 | $30,177,616.00 |
| Gulfcoast Oncology Associates | 221641 | $1,007,374.00 | $31,019,664.00 |
| Hematology and Oncology Associates of The Treasure Coast | 214554 | $787,886.00 | $9,231,236.00 |
| Mid Florida Hematology and Oncology Centers P.A. | 225776 | $56,002.00 | $8,296,792.00 |
| Pacso Hernando Oncology Associates P.A. | 216704 | $524,740.00 | $7,065,392.00 |
| Regional Consultants in Hematology And Oncology | 276635 | $129,265.00 | $5,978,684.00 |
| Cancer Institute of Florida, P.A. | 216184 | $225,211.00 | $7,537,660.00 |
| Coastal Oncology, PL | 1077445 | $0.00 | $5,549,140.00 |
| Stuart Oncology Associates P.A. | 214555 | $102,181.00 | $4,893,248.00 |
| Ayub, Sokoi, Matzkowitz and Sennabaum D/B/A New Hope Cancer Center | 216428 | $118,233.00 | $4,610,400.00 |
| David Dresdner, M.D. | 307671 | $25,210.00 | $4,019,844.00 |

---

6 ICON sales in 2002 were listed under FOA, which later became ICON. FOA's purchases of the Covered Drugs prior to the APC launch was approximately $1.2 million.
7 The value for the 2002 Annual Sales of Covered Drugs is derived from taking the 2002 Fourth Quarter sales data and multiplying the value by four, to determine an approximation of the 2002 annual sales.
8 The value for the 2006 Annual Sales of Covered Drugs is derived from the "Total Amgen Family" sales data for the year 2006, as reflected in ***Exhibit 1.***

| | | | |
|---|---|---|---|
| Georgia Cancer Specialists Administrative Annex | 226796 | $1,931,457.00 | $28,556,852.00 |
| Northwest Georgia Oncology Centers | 226509 | $385,859.00 | $16,141,732.00 |
| Augusta Oncology Associates | 214436 | $318,116.00 | $11,980,992.00 |
| Central Georgia Care Center | 227676 | $119,729.00 | $7,928,608.00 |
| Southeast Georgia Hematology/Oncology Associates P.C. | 218644 | $426,424.00 | $5,672,540.00 |

285.    The Defendant Oncology Practices purchases of the Covered Drugs increased by

the following amounts after executing the APCs and receiving the illicit kickbacks and other

incentives:

| Defendant | ACIS # | Increase in Purchases of Covered Drugs After APC[9] |
|---|---|---|
| Florida Cancer Specialists and Research Institute | 216205 | $18,060,382.00 |
| Integrated Community Oncology Network LLC | 11998 | $27,877,616.00 |
| Gulfcoast Oncology Associates | 221641 | $30,012,290.00 |
| Hematology and Oncology Associates of The Treasure Coast | 214554 | $8,443,350.00 |
| Mid Florida Hematology and Oncology Centers P.A. | 225776 | $8,240,790.00 |
| Pacso Hernando Oncology Associates P.A. | 216704 | $6,540,652.00 |
| Regional Consultants in Hematology and Oncology | 276635 | $5,849,419.00 |
| Cancer Institute of Florida, P.A. | 216184 | $7,312,449.00 |
| Coastal Oncology, PL | 1077445 | $5,549,140.00 |
| Stuart Oncology Associates P.A. | 214555 | $4,791,067.00 |
| Ayub, Sokoi, Matzkowitz and Sennabaum D/B/A New Hope Cancer Center | 216428 | $4,492,167.00 |

---

9 The value for the Increase in Purchases of Covered Drugs after the APC is calculated by subtracting the 2002 annual sales from the 2006 annual sales.

| | | |
|---|---|---|
| David Dresdner, M.D. | 307671 | $3,994,634.00 |
| Georgia Cancer Specialists Administrative Annex | 226796 | $26,625,395.00 |
| Northwest Georgia Oncology Centers | 226509 | $15,755,873.00 |
| Augusta Oncology Associates | 214436 | $11,662,876.00 |
| Central Georgia Care Center | 227676 | $7,808,879.00 |
| Southeast Georgia Hematology/Oncology Associates P.C. | 218644 | $5,246,116.00 |

286.     Considering that each of the Defendant Oncology Practices had a payer mix of approximately 70% patients supported by other Government Healthcare Programs, which reimbursed the cost of medications at a rate of ASP + 6%, the Government Healthcare Programs over-reimbursed the following dollar amounts as a result of the Defendant Oncology Practices' fraudulent practices from 2004 through 2011:

| Defendant | ACIS # | 70% Government Healthcare Program Payer Mix | Amount of Over-Reimbursements from 2004-2011 (ASP + 6%) |
|---|---|---|---|
| Florida Cancer Specialists and Research Institute | 216205 | $12,642,267.40 | **$107,206,427.55** |
| Integrated Community Oncology Network LLC | 11998 | $21,124,331.20 | **$165,481,258.58** |
| Gulfcoast Oncology Associates | 221641 | $21,008,603.00 | **$178,152,953.44** |
| Hematology and Oncology Associates of The Treasure Coast | 214554 | $5,910,345.00 | **$50,119,725.60** |
| Mid Florida Hematology and Oncology Centers P.A. | 225776 | $5,768,553.00 | **$48,917,329.44** |
| Pacso Hernando Oncology Associates P.A. | 216704 | $4,578,456.40 | **$38,825,310.27** |
| Regional Consultants in Hematology And Oncology | 276635 | $4,094,593.30 | **$34,722,151.18** |
| Cancer Institute of Florida, P.A. | 216184 | $5,118,714.30 | **$43,406,697.26** |
| Coastal Oncology, PL | 1077445 | $3,884,398.00 | **$32,939,695.04** |

| | | | |
|---|---|---|---|
| Stuart Oncology Associates P.A. | 214555 | $3,353,746.90 | **$28,439,773.71** |
| Ayub, Sokoi, Matzkowitz and Sennabaum D/B/A New Hope Cancer Center | 216428 | $3,144,516.90 | **$26,665,503.31** |
| David Dresdner, M.D. | 307671 | $2,796,243.80 | **$23,712,147.42** |
| Georgia Cancer Specialists Administrative Annex | 226796 | $18,637,776.50 | **$158,048,344.72** |
| Northwest Georgia Oncology Centers | 226509 | $11,029,111.10 | **$93,526,862.13** |
| Augusta Oncology Associates | 214436 | $8,164,013.20 | **$69,230,831.94** |
| Central Georgia Care Center | 227676 | $5,466,215.30 | **$46,353,505.74** |
| Southeast Georgia Hematology/Oncology Associates P.C. | 218644 | $3,672,281.20 | **$31,140,944.58** |
| **TOTAL** | | | **$1,176,889,731.92** |

287.     USOS alone expanded the GSA and ESA Markets by $777,485,006.00 after executing its own special APCs with Amgen. Medicare was responsible for covering 55% of USOS's patients. Thus, reimbursing at the ACP + 6% rate, USOS alone overbilled Medicare by $427,485,006 per year, or **$3,419,880,050.00** from 2004 through 2011.   A true and correct copy of the Neupogen sales data for USOS from January 1999 through January 2001 is attached hereto and incorporated herein as *Exhibit 7*, and reflects that USOS purchased $25,340,000 of Neupogen.   A true and correct copy of Aranesp sales and market share data for USOS for 2004 is attached hereto and incorporated herein as *Exhibit 8*, which reflects that USOS purchased $53,496,476 of EPO (Procrit) prior to the APC, and a market expansion of an additional $374,544,495 purchase of ESAs after the APC and kickback scheme.

288.     Driven by illicit financial incentives provided through the Amgen APCs, a conservative estimate of the amount that the Defendant Oncology Practices defrauded Government Healthcare Programs out is **$4,596,769,781.92.**

## COUNT ONE

### Violation of False Claims Act, 31 U.S.C. § 3729(a)
### as to Defendant Oncology Practices as Specified Herein

289.     Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

290.     This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

291.     As described above, the defendant Oncology Practices, and each of them named and specified herein, have engaged in fraudulent activities including but not limited to purchasing the Covered Drugs and submitting claims to Government Healthcare Programs for payment, or "reimbursement," for these drugs in order to receive rebates, discounts and other financial incentives to purchase the Covered Drugs from Amgen. The defendant Oncology Practices have, furthermore, prescribed and submitted claims payment, or "reimbursement," of the cost of the Covered Drugs purchased from Amgen to Government Healthcare Programs that failed to account for the rebates, discounts, drug "overfills," kickbacks and other financial incentives received from Amgen under various purchase incentive programs that were tied to the level, or volume, of such purchases. The defendant Oncology Practices have, furthermore, prescribed and submitted claims payment, or "reimbursement," of the cost of the Covered Drugs purchased from Amgen to Government Healthcare Programs for the Covered Drugs that were administered to patients when not medically necessary or, while medically necessary, were

administered in an amount greater than medically necessary for the patient or in an amount greater than necessary to obtain the medical benefit for the patient.

292.    The defendants have knowingly violated:

a.    31 U.S.C. § 3729(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

b.    31 U.S.C. § 3729(a)(2) by knowingly making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government; and/or

c.    31 U.S.C. § 3729(a)(3) by conspiring to defraud the United States Government by getting a false or fraudulent claim allowed or paid.

293.    By reason of the defendants' false and fraudulent activities, the United States has been damaged, and may continue to be damaged.

## COUNT TWO

### Violation of California False Claims Act, Cal. Gov. Code § 12650 *et seq.* as to Defendant US Oncology Specialty, LP

294.    Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

295.    This is a claim for treble damages and penalties under the California False Claims Act.

296.    At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of California.

297.    As described above, the defendant US Oncology Specialty, LP has engaged in false and fraudulent activities including but not limited to purchasing the Covered Drugs and

submitting to the State of California claims for reimbursement of the cost of these drugs that did not disclose to the State of California the fact that the defendant US Oncology Specialty, LP received discounts, rebates, drug "overfills," kickbacks and other things of value from Amgen for buying the Covered Drugs that were not properly disclosed to the State of California nor was the State of California provided its proportionate share of the discounts, rebates, kickbacks and other things of value received from Amgen.

298.    As described above, the defendant US Oncology Specialty, LP has engaged in false and fraudulent activities, including but not limited to, purchasing the Covered Drugs and submitting claims to the State of California for "reimbursement," or payment, for the cost of these drugs. The defendant US Oncology Specialty, LP prescribed and administered the Covered Drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of California for these improperly and fraudulently prescribed and administered drugs.

299.    As described herein, defendant US Oncology Specialty, LP has knowingly violated California's False Claims Act by submitting these false claims and omitting material information such that the State of California, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not have been paid but for the illegal acts of defendant US Oncology Specialty, LP.

300.    By reason of the acts described herein, the State of California has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

301.    The State of California is, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the defendant US Oncology Specialty, LP.

## COUNT THREE

**Violation of Florida False Claims Act, Fl. Stat. § 66.081 *et seq*.**
**as to Defendants US Oncology Specialty, LLP, Florida Cancer Specialists and Research Institute, Gulfcoast Oncology Associates, Integrated Community Oncology Network, LLC, Hematology and Oncology Associates of the Treasure Coast, Mid Florida Hematology and Oncology Centers, P.A., Pasco Hernando Oncology Associates, P.A., Regional Consultants in Hematology and Oncology, Coastal Oncology, PL, Stuart Oncology Associates, P.A., Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center, and David Dresdner, M.D.**
**("Florida Oncology Practices")**

302.    Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

303.    This is a claim for treble damages and penalties under the Florida False Claims Act.

304.    At all relevant times herein, defendants US Oncology Specialty, LLP, Florida Cancer Specialists and Research Institute, Gulfcoast Oncology Associates, Integrated Community Oncology Network, LLC, Hematology and Oncology Associates of the Treasure Coast, Mid Florida Hematology and Oncology Centers, P.A., Pasco Hernando Oncology Associates, P.A., Regional Consultants in Hematology and Oncology, Coastal Oncology, PL, Stuart Oncology Associates, P.A., Ayub, Sokoi, Matzkowitz and Sennabaum, d/b/a New Hope Cancer Center, and David Dresdner, M.D. ("Florida Oncology Practices") did business in the State of Florida.

305.    As described above, the defendant Florida Oncology Practices have engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Florida for reimbursement for these drugs. The defendant

Florida Oncology Practices received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Florida nor was the State of Florida provided its proportionate share of any discount received.

306.    As described above, the defendant Florida Oncology Practices have engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Florida for reimbursement for these drugs. The defendant Florida Oncology Practices prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, the defendant Florida Oncology Practices then sought reimbursement from the State of Florida for these improperly and fraudulently prescribed and administered drugs.

307.    As described herein, defendants have knowingly violated Florida's False Claims Act by submitting these false claims and omitting material information such that the State of Florida, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of the defendant Florida Oncology Practices.

308.    By reason of the acts described herein, the State of Florida has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

309.    The State of Florida, is, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant Florida Oncology Practices.

## COUNT FOUR

**Violation of Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq*.
as to Defendants US Oncology Specialty, LLP, Georgia Cancer Specialists Administrative
Annex, Northwest Georgia Oncology Centers, P.C., Augusta Oncology Associates, Central
Georgia Cancer Care, Southeast Georgia Hematology/Oncology Associates, P.C.
("Georgia Oncology Practices")**

310.    Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

311.    This is a claim for damages and penalties under the Georgia False Medicaid Claims Act.

312.    At all relevant times herein, defendants US Oncology Specialty, LLP, Georgia Cancer Specialists Administrative Annex, Northwest Georgia Oncology Centers, P.C., Augusta Oncology Associates, Central Georgia Cancer Care, Southeast Georgia Hematology/Oncology Associates, P.C. ("Georgia Oncology Practices") did business in the State of Georgia.

313.    As described above, the defendant Georgia Oncology Practices have engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Georgia for reimbursement for these drugs. The defendant Georgia Oncology Practices received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Georgia nor was the State of Georgia provided its proportionate share of any discount received.

314.    As described above, the defendant Georgia Oncology Practices have engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Georgia for reimbursement for these drugs. The defendant Georgia Oncology Practices prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without

155

medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, the defendant Georgia Oncology Practices then sought reimbursement from the State of Georgia for these improperly and fraudulently prescribed and administered drugs.

315.    As described herein, defendants have knowingly violated Georgia False Medicaid Claims Act by submitting these false claims and omitting material information such that the State of Georgia, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant Georgia Oncology Practices.

316.    By reason of the acts described herein, the State of Georgia has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

317.    The State of Georgia, is, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant Georgia Oncology Practices.

## COUNT FIVE

**Violation of Illinois Whistleblower Reward and Protection Act,**
**740 Ill. Comp. Stat. § 173/1 *et seq*.**
**as to Defendant US Oncology Specialty, LP**

318.    Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

319.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

320.    At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Illinois.

321.    As described above, defendant Illinois US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and

submitting claims to the State of Illinois for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Illinois nor was the State of Illinois provided its proportionate share of any discount received.

322.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Illinois for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Illinois for these improperly and fraudulently prescribed and administered drugs.

323.    As described herein, defendant US Oncology Specialty, LP has knowingly violated Illinois Whistleblower Reward and Protection Act by submitting these false claims and omitting material information such that the State of Illinois, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

324.    By reason of the acts described herein, the State of Illinois has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

325.    The State of Illinois, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

**COUNT SIX**

**Violation of Indiana False Claims and Whistleblower Act, In. Code 5-11-5.5 *et seq*.
as to Defendant US Oncology Specialty, LP**

326.     Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

327.     This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Act.

328.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Indiana.

329.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Indiana for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Indiana nor was the State of Indiana provided its proportionate share of any discount received.

330.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Indiana for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Indiana for these improperly and fraudulently prescribed and administered drugs.

331.     As described herein, Defendant US Oncology Specialty, LP has knowingly

violated Indiana False Claims and Whistleblower Act by submitting these false claims and

omitting material information such that the State of Indiana, not knowing that these claims were

false and not aware of the omitted information, paid these claims that would not be paid but for

the illegal acts of defendant Indiana Oncology Practices.

332.     By reason of the acts described herein, the State of Indiana has been damaged and

continues to be damaged in an amount to be fully calculated and stated at trial.

333.     The State of Indiana, furthermore, entitled to the maximum penalty for each and

every false or fraudulent claim, record or statement made, used, presented, or caused to be made,

used, or presented by the defendant Indiana Oncology Practices.


## COUNT SEVEN

**Violation of Louisiana Medical Assistance Programs Integrity Law,**
**La. Rev. Stat. § 46: 437 *et seq*.**
**as to Defendant US Oncology Specialty, LP**

334.     Relator realleges and incorporates by reference the allegations of paragraphs 1-

278 of this Complaint.

335.     This is a claim for damages and penalties under the Louisiana Medical Assistance

Programs Integrity Law.

336.     At all relevant times herein, defendant US Oncology Specialty, LP did business in

the State of Louisiana.

337.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent

activities including but not limited to selling and purchasing the Covered Drugs and submitting

claims to the State of Louisiana for reimbursement for these drugs. Defendant US Oncology

Specialty, LP received financial incentives and kickbacks from Amgen that were not properly

disclosed to the State of Louisiana nor was the State of Louisiana provided its proportionate share of any discount received.

338.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Louisiana for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Louisiana for these improperly and fraudulently prescribed and administered drugs.

339.    As described herein, defendant US Oncology Specialty, LP has knowingly violated Louisiana's Medical Assistance Programs Integrity Law by submitting these false claims and omitting material information such that the State of Louisiana, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

340.    By reason of the acts described herein, the State of Louisiana has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

341.    The State of Louisiana, furthermore, entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant US Oncology Specialty, LP.

## **COUNT EIGHT**

**Violation of Massachusetts False Claims Law, Mass. Gen. Laws Ch. 12 § 5(B) *et seq.*
as to Defendant US Oncology Specialty, LP**

342.     Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

343.     This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

344.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the Commonwealth of Massachusetts.

345.     As described above, defendant US Oncology Specialty, LP has engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Massachusetts for reimbursement for these drugs. The defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the Commonwealth of Massachusetts nor was the Commonwealth of Massachusetts provided its proportionate share of any discount received.

346.     As described above, defendant US Oncology Specialty, LP has engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the Commonwealth of Massachusetts for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the Commonwealth of Massachusetts for these improperly and fraudulently prescribed and administered drugs.

347.     As described herein, defendant US Oncology Specialty, LP has knowingly violated the Massachusetts False Claims Law by submitting these false claims and omitting

material information such that the Commonwealth of Massachusetts, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

348.     By reason of the acts described herein, the Commonwealth of Massachusetts has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

349.     The Commonwealth of Massachusetts, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

## COUNT NINE

**Violation of Michigan Medicaid False Claims Act, M.C.L. 400.601 *et seq*.
as to Defendant US Oncology Specialty, LP**

350.     Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

351.     This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

352.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Michigan.

353.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Michigan for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly

disclosed to the State of Michigan nor was the State of Michigan provided its proportionate share of any discount received.

354.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Michigan for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Michigan for these improperly and fraudulently prescribed and administered drugs.

355.    As described herein, defendant US Oncology Specialty, LP knowingly violated the Michigan Medicaid False Claims Act by submitting these false claims and omitting material information such that the State of Michigan, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

356.    By reason of the acts described herein, the State of Michigan has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

357.    The State of Michigan, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

## <u>COUNT TEN</u>

**Violation of New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq*.
as to Defendant US Oncology Specialty, LP**

358.     Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

359.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

360.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of New Jersey.

361.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of New Jersey for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of New Jersey nor was the State of New Jersey provided its proportionate share of any discount received.

362.     As described above, defendant US Oncology Specialty, LP have engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of New Jersey for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of New Jersey for these improperly and fraudulently prescribed and administered drugs.

363.     As described herein, defendant US Oncology Specialty, LP knowingly violated the New Jersey False Claims Act by submitting these false claims and omitting material information such that the State of New Jersey, not knowing that these claims were false and not

aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

364.    By reason of the acts described herein, the State of New Jersey has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

365.    The State of New Jersey, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

## COUNT ELEVEN

**Violation of New York False Claims Act, N.Y. Stat. Fin. § 187 *et seq*.
as to Defendant US Oncology Specialty, LP**

366.    Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

367.    This is a claim for treble damages and penalties under the New York False Claims Act.

368.    At all relevant times herein, Defendant US Oncology Specialty, LP did business in the State of New York.

369.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of New York for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of New York nor was the State of New York provided its proportionate share of any discount received.

370.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of New York for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of New York for these improperly and fraudulently prescribed and administered drugs.

371.    As described herein, defendant US Oncology Specialty, LP knowingly violated the New York False Claims Act by submitting these false claims and omitting material information such that the State of New York, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

372.    By reason of the acts described herein, the State of New York has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

373.    The State of New York, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant US Oncology Specialty, LP.

## COUNT TWELVE

**Violation of Oklahoma Medicaid False Claims Act, 63 OK. Stat. § 5053, *et seq*.
as to Defendant US Oncology Specialty, LP**

374.    Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

375.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

376.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Oklahoma.

377.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Oklahoma for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Oklahoma nor was the State of Oklahoma provided its proportionate share of any discount received.

378.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Oklahoma for reimbursement for these drugs. The defendant Oklahoma Oncology Practices prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Oklahoma for these improperly and fraudulently prescribed and administered drugs.

379.     As described herein, defendant US Oncology Specialty, LP knowingly violated the Oklahoma Medicaid False Claims Act by submitting these false claims and omitting material information such that the State of Oklahoma, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

380.    By reason of the acts described herein, the State of Oklahoma has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

381.    The State of Oklahoma furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

## COUNT THIRTEEN

**Violation of Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002 *et seq*. as to Defendant US Oncology Specialty, LP.**

382.    Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

383.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

384.    At all relevant times herein, defendant US Oncology Specialty, LP did business in the State of Texas.

385.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Texas for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the State of Texas nor was the State of Texas provided its proportionate share of any discount received.

386.    As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the State of Texas for reimbursement for these drugs. Defendant US Oncology

168

Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP then sought reimbursement from the State of Texas for these improperly and fraudulently prescribed and administered drugs.

387.    As described herein, defendant US Oncology Specialty, LP knowingly violated the Texas Medicaid False Claims Act by submitting these false claims and omitting material information such that the State of Texas, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

388.    By reason of the acts described herein, the State of Texas has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

389.    The State of Texas, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by the defendant US Oncology Specialty, LP.

## COUNT FOURTEEN

**Violation of Virginia False Claims Act, Va. Code Ann. § 8.01-216.3(a)** *et seq.*
**as to Defendant US Oncology Specialty, LP**

390.    Relator realleges and incorporates by reference the allegations of paragraphs 1-278 of this Complaint.

391.    This is a claim for treble damages and penalties under the Virginia False Claims Act.

392.     At all relevant times herein, defendant US Oncology Specialty, LP did business in the Commonwealth of Virginia.

393.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the Commonwealth of Virginia for reimbursement for these drugs. Defendant US Oncology Specialty, LP received financial incentives and kickbacks from Amgen that were not properly disclosed to the Commonwealth of Virginia nor was the Commonwealth of Virginia its proportionate share of any discount received.

394.     As described above, defendant US Oncology Specialty, LP engaged in fraudulent activities including but not limited to selling and purchasing the Covered Drugs and submitting claims to the Commonwealth of Virginia for reimbursement for these drugs. Defendant US Oncology Specialty, LP prescribed and administered these drugs to patients without medical necessity or in amount greater than medically necessary for a patient or in an amount greater than necessary to obtain the medical benefit for the patient. Despite administering these drugs without medical benefit or necessity or in excess of what would be required to obtain the medical benefit or necessity, defendant US Oncology Specialty, LP sought reimbursement from the Commonwealth of Virginia for these improperly and fraudulently prescribed and administered drugs.

395.     As described herein, defendant US Oncology Specialty, LP knowingly violated the Virginia False Claims Act by submitting these false claims and omitting material information such that the Commonwealth of Virginia, not knowing that these claims were false and not aware of the omitted information, paid these claims that would not be paid but for the illegal acts of defendant US Oncology Specialty, LP.

396.     By reason of the acts described herein, the Commonwealth of Virginia has been damaged and continues to be damaged in an amount to be fully calculated and stated at trial.

397.     The Commonwealth of Virginia, furthermore, is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by defendant US Oncology Specialty, LP.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a.     Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500, and not more than $11,000 for each violation of 31 U.S.C. § 729;

b.     Defendants pay an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of California Government Code § 12650(a);

c.     Defendants pay an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Florida Statute § 66.082;

d.     Defendants pay an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Georgia Statute § 49-4-168, *et seq.*;

e.     Defendants pay an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Illinois Comp. Statute § 175/3(a);

f.      Defendants pay an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Indiana Code 5-11-5.5, *et seq*.;

g.      Defendants pay an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Louisiana Revised Statute § 437, *et seq*.;

h.      Defendants pay an amount equal to three times the amount of damages the State of Massachusetts has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Massachusetts General Laws Chapter 12 § 5B;

i.      Defendants pay an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Michigan C.L. 400.601, *et seq*.;

j.      Defendants pay an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of N.J. Sat. § 2A:32C-1, *et seq*.;

k.      Defendants pay an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of New York State Fin. § 187, *et seq*.;

l.      Defendants pay an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of 63 Oklahoma Statute § 5053, *et seq*.;

m.      Defendants pay an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Texas Hum. Res. Code § 36.002;

172

n.      Defendants pay an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of Defendants' actions, plus all applicable civil penalties for each violation of Va. Code Ann. § 8.01-216.3(a), *et seq.*;

o.      Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

p.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §3729, *et seq*.

q.      Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and all other applicable statutes including the False Claims Acts of the various states identified herein; and

r.      The United States and Relator be granted all such other relief as the Court deems just and proper.


Dated: November 30, 2020


                                    _____/s/ Rob Hennig_____
                                    Rob Hennig
                                    California Bar No. 174646
                                    Hennig Ruiz & Singh P.C.
                                    3600 Wilshire Blvd., Suite 1908
                                    Los Angeles, CA 90010
                                    rob@robhennig.com
                                    (213) 310-8301 Phone
                                    Admitted *Pro Hac Vice*
                                    Attorney for Plaintiff/*Qui Tam* Relator

## DEMAND FOR JURY TRIAL

A trial by jury is requested in this case.


Dated: November 30, 2020


                                       /s/ Rob Hennig

                                    Rob Hennig
                                    California Bar No. 174646
                                    Hennig Ruiz & Singh P.C.
                                    3600 Wilshire Blvd., Suite 1908
                                    Los Angeles, CA 90010
                                    rob@robhennig.com
                                    (213) 310-8301 Phone
                                    Admitted *Pro Hac Vice*
                                    Attorney for Plaintiff/*Qui Tam* Relator

# Exhibit 1



# Exhibit 2

# Amgen Portfolio Contract 2004/2005

## Rebate Schedules Example: $6M Total Class

AMGEN
Corporate Accounts



| Tier | Quarterly Amgen Portfolio Volume | Base Rebates 3/1/2004 - 8/31/2004 | | Enhanced Rebates 9/1/2004 - 2/28/2006* | |
|---|---|---|---|---|---|
| | | Aranesp® | Neupogen® / Neulasta® | Aranesp® | Neupogen® / Neulasta® |
| Tier 1 | $750K | 5.0% | 5.0% | 5.0% | 5.0% |
| Tier 2 | $900K | 11.5% | 7.5% | 11.5% | 7.5% |
| Tier 3 | $975K | 13.5% | 10.5% | 18.5% | 10.5% |
| Tier 4 | $1,050K | 14.5% | 11.5% | 19.5% | 11.5% |
| Tier 5 | $1,125K | 17.5% | 13.5% | 22.5% | 13.5% |
| Tier 6 | $1,200K | 18.0% | 20.0% | 23.0% | 20.0% |
| Tier 7 | $1,275K | 23.0% | 25.0% | 28.0% | 25.0% |

* Quarterly Amgen Portfolio Volume target = Aranesp® + Neulasta® + Neupogen®.

For Internal Amgen Use Only

# Amgen Portfolio Contract 2004/2005

Corporate Accounts

**AMGEN**

## Rebate Schedule Example: $3M Customer

| Quarterly Amgen Portfolio Volume | Base Rebates 3/1/2004 - 8/31/2004 | | Enhanced Rebates 9/1/2004 - 2/28/2006* | |
|---|---|---|---|---|
| | Aranesp® | Neupogen® / Neulasta® | Aranesp® | Neupogen® / Neulasta® |
| Tier 1 | $375K | 4.0% | 4.0% | 4.0% | 4.0% |
| Tier 2 | $450K | 10.5% | 6.5% | 10.5% | 6.5% |
| Tier 3 | $488K | 12.5% | 9.5% | 17.5% | 9.5% |
| Tier 4 | $525K | 13.5% | 10.5% | 18.5% | 10.5% |
| Tier 5 | $563K | 15.5% | 12.5% | 20.5% | 12.5% |
| Tier 6 | $600K | 16.0% | 16.0% | 21.0% | 16.0% |
| Tier 7 | $638K | 18.0% | 21.0% | 23.0% | 21.0% |

*Note: the first two data columns of each row correspond to the "Quarterly Amgen Portfolio Volume" header followed by Tier label.*

* Quarterly Amgen Portfolio Volume target = Aranesp® + Neulasta® + Neupogen®.

For Internal Amgen Use Only

# Amgen Portfolio Contract 2004/2005



Corporate Accounts

## Rebate Schedule Example: $600K Customer

| Quarterly Amgen Portfolio Volume | Base Rebates 3/1/2004 - 8/31/2004 | | Enhanced Rebates 9/1/2004 - 2/28/2006* | |
|---|---|---|---|---|
| | Aranesp® | Neupogen® / Neulasta® | Aranesp® | Neupogen® / Neulasta® |
| Tier 1  $75K | 3.0% | 3.0% | 3.0% | 3.0% |
| Tier 2  $90K | 8.5% | 5.5% | 8.5% | 5.5% |
| Tier 3  $98K | 10.0% | 8.5% | 15.0% | 8.5% |
| Tier 4  $105K | 11.0% | 9.5% | 16.0% | 9.5% |
| Tier 5  $113K | 12.0% | 11.5% | 17.0% | 11.5% |
| Tier 6  $120K | 13.0% | 14.0% | 18.0% | 14.0% |
| Tier 7  $128K | 15.0% | 16.0% | 20.0% | 16.0% |

* Quarterly Amgen Portfolio Volume target = Aranesp® + Neulasta® + Neupogen® .

For Internal Amgen Use Only

# Exhibit 3

**AMGEN®**

Corporate Accounts

# Amgen Portfolio Contract 2004/2005

## Contract Terms – Off-invoice Discount

| | Current Off-Invoice Discount | Special 6 Month Incremental Discount * | Total Off-Invoice Discount |
|---|---|---|---|
| **Aranesp® (Darbepoetin alfa)** | 5.0% | 5.0% | 10.0% |
| **Neulasta® (pegfilgrastim)** | 5.0% | | 5.0% |
| **NEUPOGEN® (Filgrastim)** | 3.0% | | 3.0% |
| **NEUPOGEN® SingleJect® **** | 10.7% | | 10.7% |

\* Incremental Off-invoice discounts will be in effect March 1, 2004, through August 31, 2004.

\*\* Neupogen® SingleJect® on a net cost basis is 1% more expensive than vials.

- Incremental 5% Off-invoice discount effective 3/1/04 – 8/31/04. Beginning 9/1/04, incremental off-invoice discounts for Aranesp® will be added to product rebate tiers for eligible customers with an Amgen Portfolio Volume at the Tier 3 or higher level.

For Internal Amgen Use Only

# Exhibit 4

2004 PURCHASES BY DEFENDANT ONCOLOGY PRACTICES

| ACIS | | Contracted | Enrollment Date | Program Type | Contract Name | Address | City State Zip | Territory | Gross Purchases (March - June) PPM AFFL | Aranesp | Neulasta | Neupogen | Total Amgen Family | Enhanced Rebate Goal | Variance to Enhanced Rebate Goal | Variance to Tiers (March - June) Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 5 | Tier 6 | Tier 7 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | | SIGNED | 1-Mar-04 | Platinum | Augusta Oncology Associates | 2101 Central Avenue | Augusta GA 30904 | 82203 | International Oncology Network | 239,161 | 245,440 | 36,720 | 521,321 | 2,169,736 | (1,648,415) | (313,193) | (480,096) | (563,547) | (646,999) | (730,450) | (813,901) | (897,353) | 1 |
| 216428 | | SIGNED | 1-Mar-04 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer | 7651 Medical Drive | Hudson FL 34667 | 83705 | Oncology Associates | 9,576 | 33,040 | 19,865 | 62,481 | 589,768 | (527,287) | (164,353) | (209,720) | (232,403) | (255,087) | (277,770) | (300,453) | (323,137) | 2 |
| 1077445 | | SIGNED | 1-Mar-04 | Gold | Coastal Oncology, Pl | 325 Clyde Morris Boulevard, Suite 450 | Ormond Beach FL 32174 | 83101 | International Oncology Network | 83,790 | 44,840 | 10,270 | 138,900 | 376,769 | (237,869) | (6,011) | (34,993) | (49,484) | (63,975) | (78,467) | (92,958) | (107,449) | 3 |
| 307671 | | SIGNED | 1-Mar-04 | Gold | David Dresdner, M.D. | 1099 5th Avenue North, Suite 120 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 55,062 | 75,520 | 0 | 130,582 | 1,507,519 | (1,376,937) | (449,233) | (565,196) | (623,178) | (681,159) | (739,141) | (797,122) | (855,104) | 5 |
| 216205 | | SIGNED | 1-Mar-04 | Platinum | Florida Cancer Specialists | 3840 Broadway | Fort Myers FL 33901 | 83201 | International Oncology Network | 0 | 849,600 | 148,960 | 998,560 | 7,447,172 | (6,448,612) | (1,865,737) | (2,438,596) | (2,725,026) | (3,011,456) | (3,297,886) | (3,584,315) | (3,870,745) | 6 |
| 226796 | | SIGNED | 1-Mar-04 | Platinum | Georgia Cancer Specialists Administrative Annex | 1872 Montreal Road | Tucker GA 30084 | 83602 | International Oncology Network | 1,037,161 | 795,320 | 71,105 | 1,903,586 | 8,820,802 | (6,917,216) | (1,489,030) | (2,167,553) | (2,506,815) | (2,846,076) | (3,185,338) | (3,524,600) | (3,863,861) | 7 |
| 221641 | | SIGNED | 1-Mar-04 | Platinum | Gulf Coast Oncology Associates | 1201 5th Avenue North, Suite 505 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 461,723 | 283,200 | 52,955 | 797,878 | 2,734,605 | (1,936,727) | (253,893) | (464,247) | (569,424) | (674,601) | (779,779) | (884,956) | (990,133) | 8 |
| 214554 | | SIGNED | 1-Mar-04 | Gold | Hematology and Oncology Associates of the Treasure Coast | 1801 Southeast Hillmoor Drive, Suite B101 | Port St. Lucie FL 34952 | 83103 | National Oncology Alliance, Inc. | 273,874 | 94,400 | 13,086 | 381,360 | 1,342,203 | (960,843) | (134,872) | (238,118) | (289,742) | (341,365) | (392,988) | (444,611) | (496,234) | 9 |
| 225776 | | UNSIGNED | | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 819 East First Street, Suite 5 | Sanford FL 32771 | 83102 | International Oncology Network | 27,132 | 35,400 | 178,620 | 241,152 | 2,422,035 | (2,180,883) | (690,400) | (876,710) | (969,866) | (1,063,021) | (1,156,176) | (1,249,331) | (1,342,486) | 10 |
| 226509 | | SIGNED | 1-Mar-04 | Platinum | Northwest Georgia Oncology Centers, P.C. | 55 Witcher Street, Suite 300 | Marietta GA 30060 | 83601 | International Oncology Network | 2,394 | 151,040 | 675 | 154,109 | 3,160,121 | (3,006,012) | (1,061,322) | (1,304,408) | (1,425,951) | (1,547,494) | (1,669,038) | (1,790,581) | (1,912,124) | 11 |
| 216704 | | UNSIGNED | | Gold | Pasco Hernando Oncology Associates, P.A. | 5802 State Road 54 | New Port Richey FL 34652 | 83705 | International Oncology Network | 5,586 | 73,160 | 9,285 | 88,031 | 1,268,839 | (1,180,808) | (399,984) | (497,587) | (546,389) | (595,190) | (643,992) | (692,793) | (741,595) | 12 |
| 276635 | | SIGNED | 1-Mar-04 | Gold | Regional Consultants in Hematology and Oncology | 1235 San Marco Boulevard, Suite 3 | Jacksonville FL 32207 | 83703 | International Oncology Network | 155,849 | 139,240 | 5,290 | 300,379 | 1,510,153 | (1,209,774) | (280,449) | (396,615) | (454,697) | (512,780) | (570,863) | (628,946) | (687,029) | 13 |
| 218644 | | SIGNED | 1-Mar-04 | Gold | Southeast Georgia Hematology/Oncology | 1111 Glynco Jetport Parkway, Suite 500 | Brunswick GA 31525 | 83703 | National Oncology Alliance, Inc. | 184,737 | 75,520 | 15,558 | 275,815 | 1,160,882 | (885,067) | (170,678) | (259,977) | (304,626) | (349,275) | (393,925) | (438,574) | (483,223) | 14 |

FROM APC_STATUS_04_02_04.XLS

| ACIS | Fence Sitter Target | Contracted | Enrollment Date | Program Type | Contract Name | Address | City State Zip | Territory | PPM AFFL | Gross Purchases (Jul - Sep) Aranesp | Neulasta | Neupogen | Total Amgen | Enhanced Rebate Goal | Variance to Enhanced | Variance to Tiers (Jul - Sep) Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 5 | Tier 6 | Tier 7 | Last Invoice | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | No | SIGNED | 1-Mar-04 | Platinum | Augusta Oncology Associates | 2101 Central Avenue | Augusta GA 30904 | 82203 | International Oncology Network | 429,937 | 300,240 | 14,736 | 744,913 | 2,169,736 | 827,102 | (89,601) | (256,504) | (339,955) | (423,407) | (506,858) | (590,309) | (673,761) | 8/3/2004 | 1 |
| 216428 | No | SIGNED | 1-Mar-04 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer | 7651 Medical Drive | Hudson FL 34667 | 83705 | Oncology Associates | 32,994 | 62,550 | 15,780 | 111,324 | 589,768 | (136,618) | (115,510) | (160,877) | (183,560) | (206,244) | (228,927) | (251,610) | (274,294) | 7/29/2004 | 2 |
| 274920 | No | SIGNED | 1-Mar-04 | Gold | Central Care Cancer Center | 730 Medical Center Drive | Newton KS 67114 | 84701 | International Oncology Network | 28,764 | 35,028 | 3,075 | 66,867 | 257,923 | 123,555 | (32,334) | (52,174) | (62,094) | (72,014) | (81,935) | (91,855) | (101,775) | 8/3/2004 | 3 |
| 1077445 | No | SIGNED | 1-Mar-04 | Gold | Coastal Oncology, Pl | 325 Clyde Morris Boulevard, Suite 450 | Ormond Beach FL 32174 | 83101 | National Oncology Alliance, Inc. | 104,481 | 72,558 | 0 | 177,039 | 376,769 | 393,129 | 32,128 | 3,146 | (11,345) | (25,836) | (40,328) | (54,819) | (69,310) | 8/4/2004 | 4 |
| 307671 | Yes | SIGNED | 1-Jun-04 | | David Dresdner, M.D. | 1099 5th Avenue North, Suite 120 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 12,690 | 0 | 0 | 12,690 | 1,067,758 | 437,099 | (397,986) | (480,121) | (521,189) | (562,256) | (603,324) | (644,392) | (685,459) | 7/13/2004 | 5 |
| 216205 | No | SIGNED | 1-Mar-04 | Platinum | Florida Cancer Specialists | 3840 Broadway | Fort Myers FL 33901 | 83201 | International Oncology Network | 0 | 0 | 4,564 | 4,564 | 7,447,172 | 527,076 | (2,859,733) | (3,432,592) | (3,719,022) | (4,005,452) | (4,291,882) | (4,578,311) | (4,864,741) | 7/28/2004 | 6 |
| 216539 | No | SIGNED | 1-Mar-04 | Platinum | Florida Cancer Specialists | 1970 Golf Street | Sarasota FL 34236 | 83201 | Select Plus Oncology, LLC | 0 | 0 | 0 | 0 | 1,733,254 | (928,897) | (666,636) | (799,963) | (866,627) | (933,290) | (999,954) | (1,066,618) | (1,133,281) | 6/29/2004 | 7 |
| 226796 | No | SIGNED | 1-Mar-04 | Platinum | Georgia Cancer Specialists Administrative Annex | 1872 Montreal Road | Tucker GA 30084 | 83602 | International Oncology Network | 1,440,992 | 1,073,358 | 160,216 | 2,674,566 | 8,820,802 | 2,938,285 | (718,050) | (1,396,573) | (1,735,835) | (2,075,096) | (2,414,358) | (2,753,620) | (3,092,881) | 8/3/2004 | 8 |
| 221641 | No | SIGNED | 1-Mar-04 | Platinum | Gulf Coast Oncology Associates | 1201 5th Avenue North, Suite 505 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 1,156,990 | 400,320 | 61,032 | 1,618,342 | 2,734,605 | 3,461,082 | 566,571 | 356,217 | 251,040 | 145,863 | 40,686 | (64,492) | (169,669) | 8/3/2004 | 9 |
| 214554 | No | SIGNED | 1-Mar-04 | Gold | Hematology and Oncology Associates of the Treasure Coast | 1801 Southeast Hillmoor Drive, Suite B101 | Port St. Lucie FL 34952 | 83103 | National Oncology Alliance, Inc. | 301,599 | 142,614 | 12,814 | 457,027 | 1,342,203 | 800,241 | (59,205) | (162,451) | (214,075) | (265,698) | (317,321) | (368,944) | (420,567) | 8/4/2004 | 10 |
| 225776 | No | SIGNED | 1-Apr-04 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 2100 West 1st Street | Sanford FL 32771 | 83102 | International Oncology Network | 14,382 | 25,020 | 166,272 | 205,674 | 2,422,035 | (1,311,045) | (725,878) | (912,188) | (1,005,344) | (1,098,499) | (1,191,654) | (1,284,809) | (1,377,964) | 8/4/2004 | 11 |
| 226509 | Yes | SIGNED | 1-Mar-04 | Platinum | Northwest Georgia Oncology Centers, P.C. | 55 Whitcher Street, Suite 300 | Marietta GA 30060 | 83601 | International Oncology Network | 697,104 | 387,810 | 12,648 | 1,097,562 | 3,160,121 | 388,778 | (117,869) | (360,955) | (482,498) | (604,041) | (725,585) | (847,128) | (968,671) | 8/3/2004 | 12 |
| 216704 | No | UNSIGNED | | Gold | Pasco Hernando Oncology Associates, P.A. | 5802 State Road 54 | New Port Richey FL 34652 | 83705 | International Oncology Network | 13,536 | 42,534 | 8,084 | 64,154 | 1,268,839 | (793,602) | (423,861) | (521,464) | (570,266) | (619,067) | (667,869) | (716,670) | (765,472) | 8/2/2004 | 13 |
| 276635 | No | SIGNED | 1-Mar-04 | Gold | Regional Consultants in Hematology and Oncology | 1235 San Marco Boulevard, Suite 3 | Jacksonville FL 32207 | 83703 | International Oncology Network | 195,764 | 157,626 | 17,540 | 370,930 | 1,510,153 | 305,550 | (209,898) | (326,064) | (384,146) | (442,229) | (500,312) | (558,395) | (616,478) | 8/3/2004 | 14 |
| 218644 | No | SIGNED | 1-Mar-04 | Gold | Southeast Georgia Hematology/Oncology | 1111 Glynco Jetport Parkway, Suite 500 | Brunswick GA 31525 | 83703 | National Oncology Alliance, Inc. | 268,182 | 85,068 | 25,276 | 378,526 | 1,160,882 | 796,788 | (67,967) | (157,266) | (201,915) | (246,564) | (291,214) | (335,863) | (380,512) | 8/4/2004 | 15 |
| 214555 | No | SIGNED | 1-Mar-04 | Gold | Stuart Oncology | 501 South East Osceola Street, Suite 301 | Stuart FL 34994 | 83103 | International Oncology Network | 117,509 | 55,044 | 39,256 | 211,809 | 426,072 | 621,531 | 47,935 | 15,160 | (1,227) | (17,615) | (34,002) | (50,389) | (66,777) | 7/29/2004 | 16 |

FROM APC_STATUS_08_06_04_104522.XLS

| ACIS | Fence Sitter | Contracted | Enrollment Date | Program Type | Contract Name | Address | City State Zip | Territory | PPM AFFL | Gross Purchases (Jul - Sep) Aranesp | Neulasta | Neupogen | March-Aug Amgen | Rebate Goal | Enhanced | Variance to Tiers (Jul - Sep) Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 5 | Tier 6 | Tier 7 | Last Invoice Date | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | No | SIGNED | 1-Mar-04 | Platinum | Augusta Oncology Associates | 2101 Central Avenue | Augusta GA 30904 | 82203 | International Oncology Network | 1,170,695 | 965,772 | 51,904 | 2,188,371 | 2,169,736 | 1,596,801 | 1,353,857 | 1,186,954 | 1,103,503 | 1,020,051 | 936,600 | 853,149 | 769,697 | 9/30/2004 | 1 |
| 216428 | No | SIGNED | 1-Mar-04 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer | 7651 Medical Drive | Hudson FL 34667 | 83705 | Oncology Associates | 113,787 | 185,148 | 39,972 | 338,907 | 589,768 | (65,345) | 112,073 | 66,706 | 44,023 | 21,339 | (1,344) | (24,027) | (46,711) | 9/30/2004 | 2 |
| 1077445 | No | SIGNED | 1-Mar-04 | Gold | Coastal Oncology, Pl | 325 Clyde Morris Boulevard, Suite 450 | Ormond Beach FL 32174 | 83101 | National Oncology Alliance, Inc. | 308,790 | 232,686 | 0 | 541,476 | 376,769 | 566,748 | 396,565 | 367,583 | 353,092 | 338,601 | 324,110 | 309,618 | 295,127 | 9/30/2004 | 3 |
| 307671 | Yes | SIGNED | 1-Jun-04 | Gold | David Dresdner, M.D. | 1099 5th Avenue North, Suite 120 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 306,252 | 440,352 | 0 | 746,604 | 1,067,758 | 877,451 | 335,928 | 253,793 | 212,725 | 171,658 | 130,590 | 89,522 | 48,455 | 9/29/2004 | 4 |
| 216205 | No | SIGNED | 1-Mar-04 | Platinum | Florida Cancer Specialists | 3840 Broadway | Fort Myers FL 33901 | 83201 | International Oncology Network | 846 | 15,012 | 193,388 | 209,246 | 7,447,172 | 731,335 | (2,655,051) | (3,227,910) | (3,514,340) | (3,800,770) | (4,087,200) | (4,373,629) | (4,660,059) | 9/15/2004 | 5 |
| 216539 | No | SIGNED | 1-Mar-04 | Platinum | Florida Cancer Specialists | 1970 Golf Street | Sarasota FL 34236 | 83201 | Select Plus Oncology, LLC | 0 | 0 | 0 | 0 | 1,733,254 | (928,897) | (666,636) | (799,963) | (866,627) | (933,290) | (999,954) | (1,066,618) | (1,133,281) | | 6 |
| 229579 | No | UNSIGNED | | Silver | Florida Cancer Specialists | 1100 Goodlette Road | Naples FL 34102 | 83201 | Oncology Associates | 0 | 0 | 0 | 0 | 69,410 | (69,410) | (26,696) | (32,035) | (34,705) | (37,374) | (40,044) | (42,714) | (45,383) | | 7 |
| 11998 | No | SIGNED | 1-Jul-04 | Platinum | Florida Oncology Associates | 9143 Philips Highway, Suite 560 | Jacksonville FL 32256 | 83703 | International Oncology Network | 2,435,380 | 1,606,284 | 93,057 | 4,134,721 | 4,876,639 | 3,137,697 | 2,259,091 | 1,883,965 | 1,696,402 | 1,508,839 | 1,321,276 | 1,133,713 | 946,149 | 9/30/2004 | 8 |
| 226796 | No | SIGNED | 1-Mar-04 | Platinum | Georgia Cancer Specialists Administrative Annex | 1872 Montreal Road | Tucker GA 30084 | 83602 | International Oncology Network | 3,897,945 | 2,907,324 | 450,580 | 7,255,849 | 8,820,802 | 5,395,612 | 3,863,233 | 3,184,710 | 2,845,448 | 2,506,187 | 2,166,925 | 1,827,663 | 1,488,402 | 9/30/2004 | 9 |
| 221641 | No | SIGNED | 1-Mar-04 | Platinum | Gulf Coast Oncology Associates | 1201 5th Avenue North, Suite 505 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 2,676,744 | 995,796 | 198,548 | 3,871,088 | 2,734,605 | 4,592,571 | 2,819,317 | 2,608,963 | 2,503,786 | 2,398,609 | 2,293,432 | 2,188,254 | 2,083,077 | 9/29/2004 | 10 |
| 214554 | No | SIGNED | 1-Mar-04 | Gold | Hematology and Oncology Associates of the Treasure Coast | 1801 Southeast Hillmoor Drive, Suite B101 | Port St. Lucie FL 34952 | 83103 | National Oncology Alliance, Inc. | 702,180 | 365,292 | 22,039 | 1,089,511 | 1,342,203 | 1,138,497 | 573,279 | 470,033 | 418,409 | 366,786 | 315,163 | 263,540 | 211,917 | 9/30/2004 | 11 |
| 225776 | No | SIGNED | 1-Apr-04 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 2100 West 1st Street | Sanford FL 32771 | 83102 | International Oncology Network | 22,842 | 385,308 | 1,469,688 | 1,877,838 | 2,422,035 | 359,427 | 946,286 | 759,976 | 666,820 | 573,665 | 480,510 | 387,355 | 294,200 | 9/16/2004 | 12 |
| 226509 | Yes | SIGNED | 1-Mar-04 | Platinum | Northwest Georgia Oncology Centers, P.C. | 55 Whitcher Street, Suite 300 | Marietta GA 30060 | 83601 | International Oncology Network | 1,923,804 | 1,205,964 | 32,992 | 3,162,760 | 3,160,121 | 1,348,692 | 1,947,329 | 1,704,243 | 1,582,700 | 1,461,157 | 1,339,614 | 1,218,070 | 1,096,527 | 9/30/2004 | 13 |
| 216704 | No | SIGNED | 1-Sep-04 | Gold | Pasco Hernando Oncology Associates, P.A. | 5802 State Road 54 | New Port Richey FL 34652 | 83705 | International Oncology Network | 42,977 | 137,610 | 9,844 | 190,431 | 1,268,839 | (710,046) | (297,584) | (395,187) | (443,989) | (492,790) | (541,592) | (590,393) | (639,195) | 9/29/2004 | 14 |
| 276635 | No | SIGNED | 1-Mar-04 | Gold | Regional Consultants in Hematology and Oncology | 1235 San Marco Boulevard, Suite 3 | Jacksonville FL 32207 | 83703 | International Oncology Network | 678,323 | 447,858 | 56,856 | 1,183,037 | 1,510,153 | 628,652 | 602,209 | 486,043 | 427,961 | 369,878 | 311,795 | 253,712 | 195,629 | 9/29/2004 | 15 |
| 218644 | No | SIGNED | 1-Mar-04 | Gold | Southeast Georgia Hematology/Oncology | 1111 Glynco Jetport Parkway, Suite 500 | Brunswick GA 31525 | 83703 | National Oncology Alliance, Inc. | 641,522 | 457,866 | 59,308 | 1,158,696 | 1,160,882 | 1,331,652 | 712,203 | 622,904 | 578,255 | 533,606 | 488,957 | 444,307 | 399,658 | 9/27/2004 | 16 |
| 214555 | No | SIGNED | 1-Mar-04 | Gold | Stuart Oncology | 501 South East Osceola Street, Suite 301 | Stuart FL 34994 | 83103 | International Oncology Network | 292,124 | 185,148 | 84,120 | 561,392 | 426,072 | 803,428 | 397,518 | 364,743 | 348,356 | 331,968 | 315,581 | 299,194 | 282,806 | 9/21/2004 | 17 |

FROM APC_STATUS_10_15_04_Q#_04_FINAL.XLS

| ACIS | Fence Sitter | Contracted | Enrollment Date | Program Type | Contract Name | Address | City State Zip | Territory | PPM AFFL | Gross Purchases (Jul - Sep) Aranesp | Neulasta | Neupogen | Total Amgen | Enhanced Rebate Goal | Variance to Enhanced | Variance to Tiers (Jul - Sep) Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 5 | Tier 6 | Tier 7 | Last Invoice |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 282967 | No | SIGNED | 1-Mar-04 | Silver | Coastal Oncology Group | 1375 Roberts Drive, Suite 100 | Jacksonville Beach FL 32250 | 83703 | International Oncology Network | 112,941 | 85,068 | 4,564 | 202,573 | 210,634 | 308,073 | 121,560 | 105,357 | 97,256 | 89,155 | 81,054 | 72,952 | 64,851 | 9/7/2004 |
| 11998 | No | SIGNED | 1-Jul-04 | Platinum | Florida Oncology Associates | 9143 Philips Highway, Suite 560 | Jacksonville FL 32256 | 83703 | International Oncology Network | 2,199,769 | 1,471,176 | 95,861 | 3,766,806 | 4,876,639 | 3,217,971 | 1,891,176 | 1,516,050 | 1,328,487 | 1,140,924 | 953,361 | 765,798 | 578,234 | 9/16/2004 |
| 276635 | No | SIGNED | 1-Mar-04 | Gold | Regional Consultants in Hematology and Oncology | 1235 San Marco Boulevard, Suite 3 | Jacksonville FL 32207 | 83703 | International Oncology Network | 528,496 | 320,256 | 35,796 | 884,548 | 1,510,153 | 628,652 | 303,720 | 187,554 | 129,472 | 71,389 | 13,306 | (44,777) | (102,860) | 9/9/2004 |
| 218644 | No | SIGNED | 1-Mar-04 | Gold | Southeast Georgia Hematology/Oncology | 1111 Glynco Jetport Parkway, Suite 500 | Brunswick GA 31525 | 83703 | National Oncology Alliance, Inc. | 552,692 | 457,866 | 51,770 | 1,062,328 | 1,160,882 | 1,331,652 | 615,835 | 526,536 | 481,887 | 437,238 | 392,589 | 347,939 | 303,290 | 9/14/2004 |

FROM APC8.9.4-83703.XLS

| ACIS | Contracted | Fence Sitter | Enrollment Date | Program Type | Contract Name | Address | City State Zip | Territory | PPM AFFL | Gross Purchases (Oct - Dec) Aranesp | Neulasta | Neupogen | Total Amgen Family | Enhanced Rebate Goal | Variance to Enhanced Rebate Goal | Variance to Tiers (Oct - Dec) Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 5 | Tier 6 | Tier 7 | Last Invoice Date | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | SIGNED | No | 1-Mar-04 | Platinum | Augusta Oncology Associates | 2101 Central Avenue | Augusta GA 30904 | 82203 | International Oncology Network | 277,657 | 277,722 | 20,344 | 575,723 | 2,169,736 | 1,596,801 | (258,791) | (425,694) | (509,145) | (592,597) | (676,048) | (759,499) | (842,951) | 10/27/2004 | 1 |
| 216428 | SIGNED | No | 1-Mar-04 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer | 7651 Medical Drive | Hudson FL 34667 | 83705 | Oncology Associates | 36,378 | 67,554 | 12,102 | 116,034 | 589,768 | (65,345) | (110,800) | (156,167) | (178,850) | (201,534) | (224,217) | (246,900) | (269,584) | 10/21/2004 | 2 |
| 1077445 | SIGNED | No | 1-Mar-04 | Gold | Coastal Oncology, Pl | 325 Clyde Morris Boulevard, Suite 450 | Ormond Beach FL 32174 | 83101 | National Oncology Alliance, Inc. | 98,559 | 70,056 | 0 | 168,615 | 376,769 | 566,748 | 23,704 | (5,278) | (19,769) | (34,260) | (48,752) | (63,243) | (77,734) | 10/27/2004 | 3 |
| 307671 | SIGNED | Yes | 1-Jun-04 | Gold | David Dresdner, M.D. | 1099 5th Avenue North, Suite 120 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 0 | 0 | 0 | 0 | 1,067,758 | 877,451 | (410,676) | (492,811) | (533,879) | (574,946) | (616,014) | (657,082) | (698,149) | | 4 |
| 216205 | SIGNED | No | 1-Mar-04 | Platinum | Florida Cancer Specialists | 3840 Broadway | Fort Myers FL 33901 | 83201 | International Oncology Network | 0 | 490,392 | 74,664 | 565,056 | 7,447,172 | 731,335 | (2,299,241) | (2,872,100) | (3,158,530) | (3,444,960) | (3,731,390) | (4,017,819) | (4,304,249) | 10/27/2004 | 5 |
| 216539 | SIGNED | No | 1-Mar-04 | Platinum | Florida Cancer Specialists | 1970 Golf Street | Sarasota FL 34236 | 83201 | Select Plus Oncology, LLC | 0 | 0 | 0 | 0 | 1,733,254 | (928,897) | (666,636) | (799,963) | (866,627) | (933,290) | (999,954) | (1,066,618) | (1,133,281) | | 6 |
| 229579 | UNSIGNED | No | | Silver | Florida Cancer Specialists | 1100 Goodlette Road | Naples FL 34102 | 83201 | Oncology Associates | 0 | 0 | 0 | 0 | 69,410 | (69,410) | (26,696) | (32,035) | (34,705) | (37,374) | (40,044) | (42,714) | (45,383) | | 7 |
| 11998 | SIGNED | No | 1-Jul-04 | Platinum | Florida Oncology Associates | 9143 Philips Highway, Suite 560 | Jacksonville FL 32256 | 83703 | International Oncology Network | 769,437 | 367,794 | 22,375 | 1,159,606 | 4,876,639 | 3,137,697 | (716,024) | (1,091,150) | (1,278,713) | (1,466,276) | (1,653,839) | (1,841,402) | (2,028,966) | 10/27/2004 | 8 |
| 226796 | SIGNED | No | 1-Mar-04 | Platinum | Georgia Cancer Specialists Administrative Annex | 1872 Montreal Road | Tucker GA 30084 | 83602 | International Oncology Network | 1,048,363 | 753,102 | 116,396 | 1,917,861 | 8,820,802 | 5,395,612 | (1,474,755) | (2,153,278) | (2,492,540) | (2,831,801) | (3,171,063) | (3,510,325) | (3,849,586) | 10/27/2004 | 9 |
| 221641 | SIGNED | No | 1-Mar-04 | Platinum | Gulf Coast Oncology Associates | 1201 5th Avenue North, Suite 505 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 645,329 | 300,240 | 80,332 | 1,025,901 | 2,734,605 | 4,592,571 | (25,870) | (236,224) | (341,401) | (446,578) | (551,756) | (656,933) | (762,110) | 10/27/2004 | 10 |
| 214554 | SIGNED | No | 1-Mar-04 | Gold | Hematology and Oncology Associates of the Treasure Coast | 1801 Southeast Hillmoor Drive, Suite B101 | Port St. Lucie FL 34952 | 83103 | National Oncology Alliance, Inc. | 246,355 | 77,562 | 8,080 | 331,997 | 1,342,203 | 1,138,497 | (184,235) | (287,481) | (339,105) | (390,728) | (442,351) | (493,974) | (545,597) | 10/27/2004 | 11 |
| 225776 | SIGNED | No | 1-Apr-04 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 2100 West 1st Street | Sanford FL 32771 | 83102 | International Oncology Network | 4,230 | 0 | 0 | 4,230 | 2,422,035 | 359,427 | (927,322) | (1,113,632) | (1,206,788) | (1,299,943) | (1,393,098) | (1,486,253) | (1,579,408) | 10/27/2004 | 12 |
| 226509 | SIGNED | Yes | 1-Mar-04 | Platinum | Northwest Georgia Oncology Centers, P.C. | 55 Whitcher Street, Suite 300 | Marietta GA 30060 | 83601 | International Oncology Network | 346,014 | 302,742 | 2,804 | 651,560 | 3,160,121 | 1,348,692 | (563,871) | (806,957) | (928,500) | (1,050,043) | (1,171,587) | (1,293,130) | (1,414,673) | 10/27/2004 | 13 |
| 216704 | SIGNED | No | 1-Sep-04 | Gold | Pasco Hernando Oncology Associates, P.A. | 5802 State Road 54 | New Port Richey FL 34652 | 83705 | International Oncology Network | 8,883 | 77,562 | 8,084 | 94,529 | 1,268,839 | (710,046) | (393,486) | (491,089) | (539,891) | (588,692) | (637,494) | (686,295) | (735,097) | 10/27/2004 | 14 |

| ACIS | Contracted | Enrollment Date | Program Type | Contract Name | Address | City State Zip | Territory | PPM AFFL | Aranesp | Neulasta | Neupogen | Total Amgen Family | Enhanced Rebate Goal | Variance to Enhanced Rebate Goal | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 5 | Tier 6 | Tier 7 | Last Invoice Date | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 276635 | SIGNED | No | 1-Mar-04 | Gold | Regional Consultants in Hematology and Oncology | 1235 San Marco Boulevard, Suite 3 | Jacksonville FL 32207 | 83703 | International Oncology Network | 40,946 | 60,048 | 9,128 | 110,122 | 1,510,153 | 628,652 | (470,706) | (586,872) | (644,954) | (703,037) | (761,120) | (819,203) | (877,286) | 10/26/2004 | 15 |
| 285669 | SIGNED | No | 1-Mar-04 | Gold | Southeast Gynecologic Oncology Associates, P.A. | 1801 Barrs Street, Suite 720 | Jacksonville FL 32204 | 83703 | National Oncology Alliance, Inc. | 0 | 0 | 0 | 0 | 651,576 | 615,293 | (250,606) | (300,727) | (325,788) | (350,848) | (375,909) | (400,970) | (426,030) | | 16 |
| 214555 | SIGNED | No | 1-Mar-04 | Gold | Stuart Oncology | 501 South East Osceola Street, Suite 301 | Stuart FL 34994 | 83103 | International Oncology Network | 67,426 | 80,064 | 26,996 | 174,486 | 426,072 | 803,428 | 10,612 | (22,163) | (38,550) | (54,938) | (71,325) | (87,712) | (104,100) | 10/27/2004 | 17 |

FROM APC_STATUS_10_29_04.XLS

| | | | | | | | | | Gross Purchases (Oct - Dec) | | | March-Aug | | Variance to Tiers (Oct - Dec) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACIS | Contracted | Enrollment Date | Program Type | Contract Name | Address | City State Zip | Territory | PPM AFFL | Aranesp | Neulasta | Neupogen | Total Amgen Family | Enhanced Rebate Goal | Variance to Enhanced Rebate Goal | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 5 | Tier 6 | Tier 7 | Last Invoice Date | |
| 216428 | SIGNED | 1-Mar-04 | Gold | Ayub, Sokol, Matzkowitz and Sennabaum, dba New Hope Cancer | 7651 Medical Drive | Hudson FL 34667 | 83705 | Oncology Associates | 161,101 | 236,138 | 43,481 | 440,720 | 589,768 | (65,345) | 213,886 | 168,519 | 145,836 | 123,152 | 100,469 | 77,786 | 55,102 | 12/15/2004 | 1 |
| 216184 | SIGNED | 1-Mar-04 | Gold | Cancer Institute of Florida, P.A. | 661 East Altamonte Drive, Suite 312 | Altamonte Springs FL 32701 | 83101 | Amgen Inc. | 213,883 | 281,224 | 47,892 | 542,999 | 512,595 | 1,005,123 | 345,847 | 306,417 | 286,701 | 266,986 | 247,271 | 227,556 | 207,841 | 12/10/2004 | 2 |
| 1077445 | SIGNED | 1-Mar-04 | Gold | Coastal Oncology, PI | 325 Clyde Morris Boulevard, Suite 450 | Ormond Beach FL 32174 | 83101 | National Oncology Alliance, Inc. | 254,626 | 240,992 | 8,468 | 504,086 | 376,769 | 566,748 | 359,175 | 330,193 | 315,702 | 301,211 | 286,720 | 272,228 | 257,737 | 12/15/2004 | 3 |
| 307671 | SIGNED | 1-Jun-04 | Gold | David Dresdner, M.D. | 1099 5th Avenue North, Suite 120 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 0 | 0 | 0 | 0 | 1,067,758 | 877,451 | (410,676) | (492,611) | (533,670) | (574,946) | (616,014) | (657,082) | (698,149) | | 4 |
| 216205 | SIGNED | 1-Mar-04 | Platinum | Florida Cancer Specialists | 3840 Broadway | Fort Myers FL 33901 | 83201 | International Oncology Network | 0 | 2,917,962 | 281,330 | 3,199,292 | 7,447,172 | 731,335 | 334,995 | (237,864) | (524,294) | (810,724) | (1,097,154) | (1,383,583) | (1,670,013) | 12/21/2004 | 5 |
| 216539 | SIGNED | 1-Mar-04 | Platinum | Florida Cancer Specialists | 1970 Golf Street | Sarasota FL 34236 | 83201 | Select Plus Oncology, LLC | 0 | 0 | 0 | 0 | 1,733,254 | (928,897) | (866,636) | (769,963) | (866,627) | (933,290) | (999,954) | (1,066,618) | (1,133,281) | | 6 |
| 229579 | UNSIGNED | 1-Mar-04 | Silver | Florida Cancer Specialists | 1100 Goodlette Road | Naples FL 34102 | 83201 | Oncology Associates | 0 | 0 | 0 | 0 | 69,410 | (69,410) | (26,696) | (32,035) | (34,705) | (37,374) | (40,044) | (42,714) | (45,383) | | 7 |
| 11998 | SIGNED | 1-Jul-04 | Platinum | Florida Oncology Associates | 9143 Philips Highway, Suite 560 | Jacksonville FL 32256 | 83703 | International Oncology Network | 2,363,882 | 1,281,620 | 50,038 | 3,695,540 | 4,876,639 | 3,137,697 | 1,819,910 | 1,444,784 | 1,257,221 | 1,069,658 | 882,095 | 694,532 | 506,968 | 12/20/2004 | 8 |
| 226796 | SIGNED | 1-Mar-04 | Platinum | Georgia Cancer Specialists Administrative Annex | 1872 Montreal Road | Tucker GA 30084 | 83602 | International Oncology Network | 3,154,201 | 2,417,674 | 324,584 | 5,896,459 | 8,620,802 | 5,395,612 | 2,503,843 | 1,825,320 | 1,486,058 | 1,146,797 | 807,535 | 468,273 | 129,012 | 12/20/2004 | 9 |
| 221641 | SIGNED | 1-Mar-04 | Platinum | Gulf Coast Oncology Associates | 1201 5th Avenue North, Suite 505 | St. Petersburg FL 33705 | 83705 | International Oncology Network | 2,238,957 | 934,544 | 216,715 | 3,390,216 | 2,734,605 | 4,592,571 | 2,338,445 | 2,128,091 | 2,022,914 | 1,917,737 | 1,812,560 | 1,707,382 | 1,602,205 | 12/20/2004 | 10 |
| 214554 | SIGNED | 1-Mar-04 | Gold | Hematology and Oncology Associates of the Treasure Coast | 1801 Southeast Hillmoor Drive, Suite B101 | Port St. Lucie FL 34952 | 83103 | National Oncology Alliance, Inc. | 704,979 | 392,212 | 32,167 | 1,129,358 | 1,342,203 | 1,138,497 | 613,126 | 509,880 | 458,256 | 406,633 | 355,010 | 303,387 | 251,764 | 12/15/2004 | 11 |
| 226776 | SIGNED | 1-Apr-04 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 2100 West 1st Street | Sanford FL 32771 | 83102 | International Oncology Network | 15,739 | 0 | 0 | 15,739 | 2,422,035 | 359,427 | (915,813) | (1,102,123) | (1,195,279) | (1,288,434) | (1,381,589) | (1,474,744) | (1,567,899) | 12/21/2004 | 12 |
| 226509 | SIGNED | 1-Mar-04 | Platinum | Northwest Georgia Oncology Centers, P.C. | 55 Whitcher Street, Suite 300 | Marietta GA 30060 | 83601 | International Oncology Network | 1,306,181 | 1,009,554 | 17,766 | 2,333,501 | 3,160,121 | 1,348,692 | 1,118,070 | 874,984 | 753,441 | 631,898 | 510,355 | 388,811 | 267,268 | 12/20/2004 | 13 |
| 216704 | SIGNED | 1-Sep-04 | Gold | Pasco Hernando Oncology Associates, P.A. | 5802 State Road 54 | New Port Richey FL 34652 | 83705 | International Oncology Network | 22,453 | 223,778 | 22,304 | 268,535 | 1,268,839 | (710,046) | (219,480) | (317,083) | (365,885) | (414,686) | (463,488) | (512,289) | (561,091) | 12/20/2004 | 14 |
| 276635 | SIGNED | 1-Mar-04 | Gold | Regional Consultants in Hematology and Oncology | 1235 San Marco Boulevard, Suite 3 | Jacksonville FL 32207 | 83703 | International Oncology Network | 728,569 | 487,586 | 52,240 | 1,268,395 | 1,510,153 | 628,652 | 687,567 | 571,401 | 513,319 | 455,236 | 397,153 | 339,070 | 280,987 | 12/14/2004 | 15 |
| 216644 | SIGNED | 1-Mar-04 | Gold | Southeast Georgia Hematology/Oncology | 1111 Glynco Jetport Parkway, Suite 500 | Brunswick GA 31525 | 83703 | National Oncology Alliance, Inc. | 749,908 | 50,040 | 36,666 | 836,614 | 1,160,882 | 1,331,652 | 390,121 | 300,822 | 256,173 | 211,524 | 166,875 | 122,225 | 77,576 | 12/15/2004 | 16 |
| 214555 | SIGNED | 1-Mar-04 | Gold | Stuart Oncology | 501 South East Osceola Street, Suite 301 | Stuart FL 34994 | 83103 | International Oncology Network | 234,032 | 201,560 | 89,515 | 525,107 | 426,072 | 803,428 | 361,233 | 328,458 | 312,071 | 295,683 | 279,296 | 262,909 | 246,521 | 12/20/2004 | 17 |
| 214436 | SIGNED | 1-Mar-04 | Platinum | Augusta Oncology Associates | 2101 Central Avenue | Augusta GA 30904 | 82203 | International Oncology Network | 872,713 | 922,634 | 49,303 | 1,844,650 | 2,169,736 | 1,596,801 | 1,010,136 | 843,233 | 759,782 | 676,330 | 592,879 | 509,428 | 425,976 | 12/20/2004 | 18 |
| 227676 | SIGNED | 1-Mar-04 | Gold | Central Georgia Hematology Oncology Associates | 1062 Forsyth Street | Macon GA 31201 | 83604 | International Oncology Network | 521,026 | 510,106 | 4,870 | 1,036,002 | 1,230,237 | 504,072 | 562,834 | 468,200 | 420,884 | 373,567 | 326,250 | 278,933 | 231,616 | 12/17/2004 | 19 |

FROM APC_STATUS_12_23_04.XLS

2006 PURCHASES BY DEFENDANT ONCOLOGY PRACTICES

| ACIS | Program Type | Customer Name | Region | District | Territory | Last Invoice Date | Aranesp | Neulasta | Neupogen | Amgen Family | % of Period Elapsed | Projected Portfolio Sales | Projected Aranesp Sales | Projected to Meet Aranesp MIN? | Projected To Achieve Aranesp Bonus? | Projected NL/NP Sales | Projected NL Sales | Projected NP Sales | Projected to Meet NL/NP MIN? | Projected to Exceed NL MAX? | Projected to Exceed NP MAX? | Projected to Meet BOTH MINs? | Projected Level Attainment | ION LPP? 1=Yes | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 82000 | 82200 | 82203 | 9/12/2006 | 1,207,267 | 667,340 | 58,128 | 1,502,735 | 80% | 2,409,300 | 1,504,949 | Yes | Yes | 831,330 | 831,890 | 72,461 | Yes | No | Yes | Yes | 50 | 1 | 1 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Ca | 83000 | 83700 | 83705 | 9/7/2006 | 421,481 | 246,150 | 71,656 | 739,287 | 75% | 989,340 | 564,041 | Yes | Yes | 425,299 | 329,407 | 95,893 | Yes | No | No | Yes | 40 | #N/A | 2 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | 83000 | 83100 | 83101 | 9/7/2006 | 663,521 | 612,640 | 111,776 | 1,387,936 | 75% | 1,812,476 | 887,947 | Yes | Yes | 898,074 | 819,856 | 149,583 | Yes | No | Yes | Yes | 50 | #N/A | 3 |
| 227676 | Platinum | Central Georgia Cancer Care | 83000 | 83600 | 83604 | 9/13/2006 | 1,007,641 | 820,500 | 26,854 | 1,854,995 | 81% | 2,277,191 | 1,239,126 | Yes | Yes | 1,032,634 | 1,008,993 | 33,023 | Yes | No | Yes | Yes | 50 | 1 | 4 |
| 1077445 | Gold | Coastal Oncology, PI | 83000 | 83100 | 83101 | 9/13/2006 | 657,563 | 191,450 | 19,354 | 868,367 | 81% | 1,067,857 | 808,625 | Yes | Yes | 255,432 | 235,432 | 23,800 | Yes | No | Yes | Yes | 50 | #N/A | 5 |
| 307671 | Gold | David Dresdner, M.D. | 83000 | 83700 | 83705 | 9/8/2006 | 622,440 | | 95,914 | 718,354 | 76% | 937,941 | 820,899 | Yes | Yes | 98,746 | | 126,495 | No | No | Yes | No | 30 | #N/A | 6 |
| 216205 | Platinum | Florida Cancer Specialists | 83000 | 83200 | 83201 | 9/12/2006 | | 4,094,295 | 654,614 | 4,748,909 | 80% | 5,919,873 | | No | No | 5,919,873 | 5,103,847 | 816,026 | Yes | No | No | No | Default | 1 | 7 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 83000 | 83600 | 83602 | 9/13/2006 | 78,338 | 1,742,195 | 463,608 | 2,284,141 | 81% | 2,705,177 | 96,335 | No | No | 2,521,710 | 2,142,429 | 570,113 | No | No | Yes | No | Default | 1 | 8 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 83000 | 83600 | 83602 | 9/13/2006 | 78,338 | 1,742,195 | 463,608 | 2,284,141 | 81% | 2,768,780 | 96,335 | No | No | 2,573,431 | 2,142,429 | 570,113 | No | No | Yes | No | Default | 1 | 9 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 83000 | 83700 | 83705 | 9/13/2006 | 4,310,748 | 1,359,295 | 372,696 | 6,042,739 | 81% | 7,430,936 | 5,301,055 | Yes | Yes | 2,072,697 | 1,671,565 | 458,315 | Yes | No | Yes | Yes | 50 | 1 | 10 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 83000 | 83700 | 83705 | 9/13/2006 | 4,310,748 | 1,359,295 | 372,696 | 6,042,739 | 81% | 7,342,931 | 5,301,055 | Yes | Yes | 1,972,697 | 1,671,565 | 458,315 | Yes | No | Yes | Yes | 50 | 1 | 11 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 83000 | 83100 | 83103 | 9/6/2006 | 1,201,220 | 391,105 | 35,491 | 1,627,816 | 74% | 2,210,914 | 1,631,508 | Yes | Yes | 579,407 | 531,202 | 48,204 | Yes | No | No | Yes | 40 | #N/A | 12 |
| 11998 | Platinum | Integrated Community Oncology Network | 83000 | 83700 | 83703 | 9/13/2006 | 3,115,667 | 1,613,650 | 151,287 | 4,880,604 | 81% | 5,936,815 | 3,831,428 | Yes | Yes | 2,082,776 | 1,984,353 | 186,042 | Yes | No | Yes | Yes | 20 | 1 | 13 |
| 225776 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 83000 | 83100 | 83102 | 9/12/2006 | 28,010 | 79,315 | 342,974 | 450,299 | 80% | 286,009 | 34,917 | No | No | 220,983 | 98,872 | 427,543 | No | No | Yes | No | Default | #N/A | 14 |
| 226509 | Platinum | Northwest Georgia Oncology Centers, P.C. | 83000 | 83600 | 83601 | 9/13/2006 | 2,214,106 | 1,135,025 | 18,202 | 3,367,335 | 81% | 4,140,912 | 2,722,754 | Yes | Yes | 1,416,158 | 1,395,774 | 22,384 | Yes | No | Yes | Yes | 50 | 1 | 15 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 83000 | 83700 | 83705 | 9/13/2006 | 1,125,104 | 71,110 | 46,180 | 1,242,394 | 81% | 1,523,258 | 1,383,574 | Yes | Yes | 129,925 | 87,446 | 56,789 | No | No | Yes | No | 40 | #N/A | 16 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 83000 | 83700 | 83703 | 9/12/2006 | 142,005 | 478,625 | 46,838 | 667,468 | 80% | 832,049 | 177,020 | No | No | 655,029 | 596,642 | 58,387 | Yes | No | No | No | Default | #N/A | 17 |
| 318644 | Gold | Southeast Georgia Hematology/Oncology | 83000 | 83700 | 83703 | 9/13/2006 | 641,024 | 98,460 | 37,128 | 776,612 | 81% | 955,023 | 788,286 | Yes | Yes | 166,737 | 121,078 | 45,657 | No | No | No | No | 05 | #N/A | 18 |
| 214555 | Gold | Stuart Oncology | 83000 | 83100 | 83103 | 9/12/2006 | 338,874 | 262,560 | 52,598 | 654,032 | 80% | 815,300 | 422,432 | Yes | No | 392,868 | 327,301 | 65,567 | Yes | No | No | No | Default | #N/A | 19 |

FROM APC Status Report 20060915 values only.xls

| ACIS | Program Type | Customer Name | Region | District | Territory | Last Invoice Date | Aranesp | Neulasta | Neupogen | Amgen Family | % of Period Elapsed | Projected Portfolio Sales | Projected Aranesp Sales | Projected to Meet Aranesp MIN? | Projected To Achieve Aranesp Bonus? | Projected NL/NP Sales | Projected NL Sales | Projected NP Sales | Projected to Meet NL/NP MIN? | Projected to Exceed NL MAX? | Projected to Exceed NP MAX? | Projected to Meet BOTH MINs? | Projected Level Attainment | ION LPP? 1=Yes | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 82000 | 82200 | 82203 | 12/5/2006 | 1,247,992 | 828,705 | 85,184 | 2,161,881 | 71% | 2,990,592 | 1,747,189 | Yes | Yes | 1,219,627 | 1,160,187 | 119,258 | Yes | No | Yes | Yes | 50 | 1 | 1 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Ca | 83000 | 83700 | 83705 | 12/5/2006 | 473,944 | 306,320 | 52,302 | 832,566 | 71% | 1,165,592 | 663,522 | Yes | Yes | 502,071 | 428,848 | 73,223 | Yes | Yes | No | Yes | 50 | #N/A | 2 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | 83000 | 83100 | 83101 | 12/1/2006 | 605,189 | 525,120 | 110,039 | 1,240,348 | 67% | 1,802,885 | 902,623 | Yes | Yes | 861,594 | 783,376 | 164,157 | Yes | No | Yes | Yes | 50 | #N/A | 3 |
| 227676 | Platinum | Central Georgia Cancer Care | 83000 | 83600 | 83604 | 12/5/2006 | 660,053 | 681,015 | 20,554 | 1,361,622 | 71% | 1,906,271 | 924,074 | Yes | Yes | 977,062 | 953,421 | 28,776 | Yes | No | Yes | Yes | 50 | 1 | 4 |
| 1077445 | Gold | Coastal Oncology, PI | 83000 | 83100 | 83101 | 12/6/2006 | 747,373 | 303,585 | 11,224 | 1,062,182 | 73% | 1,464,524 | 1,030,469 | Yes | Yes | 434,055 | 418,579 | 15,476 | Yes | No | No | Yes | 50 | #N/A | 5 |
| 307671 | Gold | David Dresdner, M.D. | 83000 | 83700 | 83705 | 11/2/2006 | 622,440 | | | 622,440 | 95% | 1,770,064 | 1,770,064 | Yes | Yes | | | | No | No | No | No | 50 | #N/A | 6 |
| 216205 | Platinum | Florida Cancer Specialists | 83000 | 83200 | 83201 | 12/5/2006 | | 1,999,285 | 1,717,440 | 3,716,725 | 71% | 4,338,999 | | No | No | 3,898,999 | 2,798,999 | 2,404,416 | No | No | Yes | No | Default | 1 | 7 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 83000 | 83600 | 83602 | 12/5/2006 | 1,751,456 | 1,848,860 | 565,045 | 4,165,361 | 71% | 5,571,436 | 2,452,038 | No | No | 2,967,685 | 2,588,404 | 791,063 | No | No | Yes | No | Default | 1 | 8 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 83000 | 83700 | 83705 | 12/4/2006 | 4,087,826 | 1,192,460 | 492,342 | 5,772,628 | 70% | 8,078,266 | 5,812,378 | Yes | Yes | 2,266,661 | 1,695,529 | 700,049 | Yes | No | Yes | Yes | 50 | 1 | 9 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 83000 | 83100 | 83103 | 12/6/2006 | 1,160,228 | 552,470 | 33,549 | 1,746,247 | 73% | 2,407,704 | 1,599,708 | Yes | Yes | 807,996 | 761,739 | 46,257 | Yes | No | No | Yes | 50 | #N/A | 10 |
| 11998 | Platinum | Integrated Community Oncology Network | 83000 | 83700 | 83703 | 12/5/2006 | 3,106,330 | 1,233,685 | 101,822 | 4,441,637 | 71% | 6,213,533 | 4,348,862 | Yes | Yes | 1,825,302 | 1,726,879 | 142,551 | No | No | Yes | No | 30 | 1 | 11 |
| 225776 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 83000 | 83100 | 83102 | 12/1/2006 | 959,980 | 292,645 | 202,098 | 1,454,723 | 67% | 2,050,836 | 1,432,101 | Yes | Yes | 558,680 | 436,569 | 301,490 | Yes | Yes | Yes | Yes | 50 | #N/A | 12 |
| 225776 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 83000 | 83100 | 83102 | 12/1/2006 | 959,980 | 292,645 | 202,098 | 1,454,723 | 67% | 2,170,161 | 1,432,101 | Yes | Yes | 682,131 | 436,569 | 301,490 | Yes | Yes | Yes | Yes | 50 | #N/A | 13 |
| 226509 | Platinum | Northwest Georgia Oncology Centers, P.C. | 83000 | 83600 | 83601 | 12/5/2006 | 1,974,878 | 1,011,950 | 31,368 | 2,918,196 | 71% | 4,085,474 | 2,624,829 | Yes | Yes | 1,452,417 | 1,416,730 | 43,915 | Yes | No | Yes | Yes | 50 | 1 | 14 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 83000 | 83700 | 83705 | 12/6/2006 | 1,123,415 | 87,520 | 38,774 | 1,249,709 | 73% | 1,723,084 | 1,548,951 | Yes | Yes | 163,151 | 120,672 | 53,461 | No | No | Yes | No | 50 | #N/A | 15 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 83000 | 83700 | 83703 | 12/5/2006 | 190,022 | 574,350 | 89,002 | 853,374 | 71% | 1,180,827 | 266,031 | No | No | 883,166 | 804,090 | 124,603 | Yes | No | Yes | No | Default | #N/A | 16 |
| 318644 | Gold | Southeast Georgia Hematology/Oncology | 83000 | 83700 | 83705 | 12/8/2006 | 886,177 | 142,220 | 28,636 | 1,057,033 | 71% | 1,457,424 | 1,221,850 | Yes | Yes | 235,574 | 196,091 | 39,483 | No | No | No | No | 50 | #N/A | 17 |
| 214555 | Gold | Stuart Oncology | 83000 | 83100 | 83103 | 12/5/2006 | 413,122 | 421,190 | 68,068 | 902,380 | 71% | 1,263,332 | 578,371 | Yes | Yes | 684,961 | 589,666 | 95,295 | Yes | Yes | No | Yes | 50 | #N/A | 18 |

FROM APC Status Report 20061208 values only.xls

| ACIS | Program Type | Customer Name | Region | District | Territory | Last Invoice Date | Aranesp | Neulasta | Neupogen | Amgen Family | % of Period Elapsed | Projected Portfolio Sales | Projected Aranesp Sales | Projected to Meet Aranesp MIN? | Projected To Achieve Aranesp Bonus? | Projected NL/NP Sales | Projected NL Sales | Projected NP Sales | Projected to Meet NL/NP MIN? | Projected to Exceed NL MAX? | Projected to Exceed NP MAX? | Projected to Meet BOTH MINs? | Projected Level Attainment | ION LPP? 1=Yes | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 82000 | 82200 | 82203 | 1/18/2007 | 1,778,283 | 1,118,615 | 98,350 | 2,995,248 | 100% | 2,995,248 | 1,778,283 | Yes | Yes | 1,178,055 | 1,118,615 | 98,350 | Yes | No | Yes | Yes | 50 | 1 | 1 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Ca | 83000 | 83700 | 83705 | 1/18/2007 | 689,842 | 388,370 | 74,388 | 1,152,600 | 100% | 1,152,600 | 689,842 | Yes | Yes | 462,758 | 388,370 | 74,388 | Yes | No | No | Yes | 50 | #N/A | 2 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | 83000 | 83100 | 83101 | 1/18/2007 | 948,813 | 760,330 | 175,272 | 1,884,415 | 100% | 1,787,361 | 948,813 | Yes | Yes | 838,548 | 760,330 | 175,272 | Yes | No | Yes | Yes | 50 | #N/A | 3 |
| 227676 | Platinum | Central Georgia Cancer Care | 83000 | 83600 | 83604 | 1/18/2007 | 956,515 | 1,001,010 | 24,627 | 1,982,152 | 100% | 1,981,166 | 956,515 | Yes | Yes | 1,024,651 | 1,001,010 | 24,627 | Yes | No | Yes | Yes | 50 | 1 | 4 |
| 1077445 | Gold | Coastal Oncology, PI | 83000 | 83100 | 83101 | 1/17/2007 | 978,050 | 385,635 | 23,600 | 1,387,285 | 100% | 1,387,285 | 978,050 | Yes | Yes | 409,235 | 385,635 | 23,600 | Yes | No | No | Yes | 50 | #N/A | 5 |
| 307671 | Gold | David Dresdner, M.D. | 83000 | 83700 | 83705 | 1/18/2007 | 754,229 | 164,100 | 86,632 | 1,004,961 | 100% | 1,004,961 | 754,229 | Yes | Yes | 250,732 | 164,100 | 86,632 | Yes | No | No | Yes | 50 | #N/A | 6 |
| 216205 | Platinum | Florida Cancer Specialists | 83000 | 83200 | 83201 | 1/18/2007 | | 2,691,240 | 2,376,596 | 5,067,836 | 100% | 3,791,240 | | No | No | 3,791,240 | 2,691,240 | 2,376,596 | No | No | Yes | No | Default | 1 | 7 |
| 220768 | Silver | Florida Cancer Specialists | 83000 | 83200 | 83201 | 6/27/2006 | | | | n/a | | | | | | | | | | | | | | | |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 83000 | 83600 | 83602 | 1/18/2007 | 3,663,244 | 2,702,180 | 773,789 | 7,139,213 | 100% | 6,744,705 | 3,663,244 | Yes | Yes | 3,081,461 | 2,702,180 | 773,789 | No | No | Yes | No | 10 | 1 | 8 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 83000 | 83700 | 83705 | 1/17/2007 | 5,509,494 | 1,586,300 | 659,122 | 7,754,916 | 100% | 7,496,926 | 5,509,494 | Yes | Yes | 1,987,432 | 1,586,300 | 659,122 | Yes | No | Yes | Yes | 50 | 1 | 9 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 83000 | 83100 | 83103 | 1/17/2007 | 1,629,661 | 716,570 | 58,178 | 2,307,609 | 100% | 2,298,696 | 1,629,661 | Yes | Yes | 765,635 | 716,570 | 58,178 | Yes | No | No | Yes | 50 | #N/A | 10 |
| 11998 | Platinum | Integrated Community Oncology Network | 83000 | 83700 | 83703 | 1/18/2007 | 5,305,392 | 2,095,020 | 144,002 | 7,544,404 | 100% | 7,498,625 | 5,305,392 | Yes | Yes | 2,193,433 | 2,095,010 | 144,002 | Yes | No | Yes | Yes | 20 | 1 | 11 |
| 225776 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 83000 | 83100 | 83102 | 1/18/2007 | 1,358,748 | 421,190 | 294,260 | 2,074,198 | 100% | 2,006,500 | 1,358,748 | Yes | Yes | 646,752 | 421,190 | 294,260 | Yes | Yes | Yes | Yes | 50 | #N/A | 12 |
| 226509 | Platinum | Northwest Georgia Oncology Centers, P.C. | 83000 | 83600 | 83601 | 1/18/2007 | 2,608,931 | 1,383,910 | 42,592 | 4,035,433 | 100% | 4,028,528 | 2,608,931 | Yes | Yes | 1,426,502 | 1,383,910 | 42,592 | Yes | No | Yes | Yes | 50 | 1 | 13 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 83000 | 83700 | 83705 | 1/17/2007 | 1,600,954 | 169,570 | 55,824 | 1,766,348 | 100% | 1,703,003 | 1,540,954 | Yes | Yes | 212,049 | 169,570 | 55,824 | No | No | Yes | No | 50 | #N/A | 14 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 83000 | 83700 | 83703 | 1/18/2007 | 608,406 | 784,945 | 103,320 | 1,494,671 | 100% | 1,470,427 | 606,406 | No | No | 864,021 | 784,945 | 103,320 | Yes | No | Yes | No | 26 | #N/A | 15 |
| 318644 | Gold | Southeast Georgia Hematology/Oncology | 83000 | 83700 | 83705 | 1/17/2007 | 1,094,589 | 299,790 | 31,380 | 1,425,759 | 100% | 1,418,135 | 1,094,589 | Yes | Yes | 331,170 | 299,790 | 31,380 | No | No | No | No | 50 | #N/A | 16 |
| 214555 | Gold | Stuart Oncology | 83000 | 83100 | 83103 | 1/18/2007 | 545,202 | 585,290 | 96,820 | 1,223,312 | 100% | 1,223,312 | 545,202 | Yes | Yes | 678,110 | 585,290 | 96,820 | Yes | No | No | Yes | 40 | #N/A | 17 |

FROM APC Status Report Q4 Final 20070122 values only.xls

2007 PURCHASES BY DEFENDANT ONCOLOGY PRACTICES

**Table 1 — FROM APC Status Report 070105 values only.xls**

| ACIS | Program Type | Customer Name | Region | District | Territory | Last Invoice Date | Aranesp | Neulasta | Neupogen | Amgen Family | % of Period Elapsed | Projected Portfolio Sales | Projected Aranesp Meet MIN? | Projected To Achieve Aranesp Bonus? | Projected NLNP Sales | Projected NL Sales | Projected NP Sales | Projected to Meet NLNP MIN? | Projected to Exceed NL MAX? | Projected to Exceed NP MAX? | Projected to Meet BOTH MINs? | Projected Level Attainment | ION LPP? 1=Yes | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 82000 | 82200 | 82203 | 1/3/2007 | 1,776,283 | 1,118,615 | 98,350 | 2,995,248 | 100% | 2,956,338 | 1,776,283 | Yes | Yes | 1,178,055 | 1,118,615 | 98,350 | Yes | No | No | Yes | 50 | 1 | 1 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Ca | 83000 | 83705 | 1/3/2007 | 689,842 | 388,370 | 74,388 | 1,152,600 | 100% | 1,152,600 | 689,842 | Yes | Yes | 462,758 | 388,370 | 74,388 | Yes | No | No | Yes | 50 | #N/A | 2 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | 83000 | 83100 | 83101 | 1/4/2007 | 937,830 | 743,920 | 175,272 | 1,857,022 | 100% | 1,759,968 | 937,830 | Yes | Yes | 822,138 | 743,920 | 175,272 | Yes | No | Yes | Yes | 50 | #N/A | 3 |
| 227676 | Platinum | Central Georgia Cancer Care | 83000 | 83600 | 83604 | 1/3/2007 | 956,515 | 1,001,010 | 24,627 | 1,982,152 | 100% | 1,981,166 | 956,515 | Yes | Yes | 1,024,651 | 1,001,010 | 24,627 | Yes | No | No | Yes | 50 | 1 | 4 |
| 1077445 | Gold | Coastal Oncology, Pt. | 83000 | 83100 | 83101 | 1/2/2007 | 978,050 | 385,635 | 23,600 | 1,387,285 | 100% | 1,383,685 | 978,050 | Yes | Yes | 405,635 | 385,635 | 23,600 | Yes | No | No | Yes | 50 | #N/A | 5 |
| 307671 | Gold | David Dresdner, M.D. | 83000 | 83700 | 83705 | 12/20/2006 | 754,229 | 164,100 | 86,632 | 1,004,961 | 88% | 1,143,143 | 857,935 | Yes | Yes | 275,410 | 186,664 | 98,544 | Yes | No | No | Yes | 50 | #N/A | 6 |
| 216205 | Platinum | Florida Cancer Specialists | 83000 | 83200 | 83201 | 1/3/2007 | | 2,691,240 | 2,376,596 | 5,067,836 | 100% | 5,067,240 | | No | No | 5,067,240 | 2,691,240 | 2,376,596 | No | No | Yes | No | Default | 1 | 7 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 83000 | 83600 | 83602 | 1/3/2007 | 3,663,244 | 2,702,180 | 773,789 | 7,139,213 | 100% | 6,744,705 | 3,663,244 | Yes | Yes | 3,081,461 | 2,702,180 | 773,789 | Yes | No | No | Yes | 10 | 1 | 8 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 83000 | 83700 | 83705 | 1/3/2007 | 5,509,494 | 1,586,300 | 659,122 | 7,754,916 | 100% | 7,496,926 | 5,509,494 | Yes | Yes | 1,987,432 | 1,586,300 | 659,122 | Yes | No | No | Yes | 50 | 1 | 9 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 83000 | 83100 | 83103 | 1/3/2007 | 1,533,061 | 716,570 | 58,178 | 2,307,809 | 100% | 2,298,696 | 1,533,061 | Yes | Yes | 765,635 | 716,570 | 58,178 | Yes | No | No | Yes | 50 | #N/A | 10 |
| 11998 | Platinum | Integrated Community Oncology Network | 83000 | 83700 | 83703 | 1/3/2007 | 5,305,392 | 2,095,010 | 144,002 | 7,544,404 | 100% | 7,498,625 | 5,305,392 | Yes | Yes | 2,193,433 | 2,095,010 | 144,002 | Yes | No | No | Yes | 50 | 1 | 11 |
| 225776 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 83000 | 83102 | 1/3/2007 | 1,358,748 | 421,190 | 294,260 | 2,074,198 | 100% | 2,005,500 | 1,358,748 | Yes | Yes | 646,752 | 421,190 | 294,260 | Yes | No | Yes | Yes | 50 | #N/A | 12 |
| 225776 | Gold | Mid Florida Hematology and Oncology Centers, P.A. | 83000 | 83100 | 83102 | 1/3/2007 | 1,358,748 | 421,190 | 294,260 | 2,074,198 | 100% | 1,902,049 | 1,358,748 | Yes | Yes | 543,301 | 421,190 | 294,260 | Yes | Yes | Yes | Yes | 50 | #N/A | 13 |
| 226509 | Platinum | Northwest Georgia Oncology Centers, P.C. | 83000 | 83600 | 83601 | 1/3/2007 | 2,608,931 | 1,383,910 | 42,592 | 4,035,433 | 100% | 4,028,528 | 2,608,931 | Yes | Yes | 1,419,597 | 1,383,910 | 42,592 | Yes | No | No | Yes | 50 | 1 | 14 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 83000 | 83700 | 83705 | 1/3/2007 | 1,540,954 | 169,570 | 55,824 | 1,766,348 | 100% | 1,753,003 | 1,540,954 | Yes | Yes | 212,049 | 169,570 | 55,824 | Yes | No | No | Yes | 50 | #N/A | 15 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 83000 | 83700 | 83703 | 1/2/2007 | 606,406 | 784,945 | 103,320 | 1,494,671 | 100% | 1,470,427 | 606,406 | Yes | No | 864,021 | 784,945 | 103,320 | Yes | Yes | Yes | Yes | 20 | #N/A | 16 |
| 218644 | Gold | Southeast Georgia Hematology/Oncology | 83000 | 83700 | 83703 | 1/3/2007 | 1,094,553 | 289,910 | 33,672 | 1,418,135 | 100% | 1,418,135 | 1,094,553 | Yes | Yes | 323,582 | 289,910 | 33,672 | Yes | No | No | Yes | 50 | #N/A | 17 |
| 218644 | Gold | Southeast Georgia Hematology/Oncology | 83000 | 83700 | 83703 | 1/3/2007 | 1,094,553 | 289,910 | 33,672 | 1,418,135 | 100% | 1,418,135 | 1,094,553 | Yes | Yes | 323,582 | 289,910 | 33,672 | Yes | No | No | Yes | 50 | #N/A | 18 |
| 214555 | Gold | Stuart Oncology | 83000 | 83100 | 83103 | 1/2/2007 | 545,202 | 585,290 | 92,820 | 1,223,312 | 100% | 1,223,312 | 545,202 | Yes | Yes | 678,110 | 585,290 | 92,820 | Yes | Yes | No | Yes | 50 | #N/A | 19 |

**Table 2 — FROM APC Status Report 070207 all values only.xls** (header row as above)

| ACIS | Program Type | Customer Name | Region | District | Territory | Last Invoice Date | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 82000 | 82200 | 82203 | 1/31/2007 | 552,506 | 302,280 | 31,002 | 885,788 | 34% | 2,627,838 | 1,639,101 | Yes | Yes | 956,204 | 896,764 | 91,973 | Yes | No | No | Yes | 50 | 1 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Ca | 83000 | 83705 | 1/31/2007 | 263,578 | 93,430 | 12,843 | 369,851 | 34% | 1,097,225 | 791,948 | Yes | Yes | 315,277 | 277,176 | 38,101 | Yes | No | No | Yes | 50 | #N/A | 2 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | 83000 | 83100 | 83101 | 1/31/2007 | 330,570 | 259,825 | 64,846 | 655,241 | 34% | 1,943,882 | 980,691 | Yes | Yes | 849,032 | 770,814 | 192,376 | Yes | No | Yes | Yes | 50 | #N/A | 3 |
| 227676 | Platinum | Central Georgia Cancer Care | 83000 | 83600 | 83604 | 1/31/2007 | 283,695 | 254,740 | 8,189 | 546,624 | 34% | 1,622,245 | 842,222 | Yes | Yes | 779,370 | 755,729 | 24,294 | Yes | No | Yes | Yes | 30 | 1 | 4 |
| 1077445 | Gold | Coastal Oncology, Pt. | 83000 | 83100 | 83101 | 1/31/2007 | 372,486 | 164,980 | 15,594 | 553,060 | 34% | 1,640,745 | 1,105,042 | Yes | Yes | 509,441 | 489,441 | 46,262 | Yes | No | No | Yes | 50 | #N/A | 5 |
| 307671 | Gold | David Dresdner, M.D. | 83000 | 83700 | 83705 | 1/30/2007 | 150,093 | | | 150,093 | 33% | 460,630 | 460,630 | Yes | No | | | | No | No | No | No | Default | #N/A | 6 |
| 216205 | Platinum | Florida Cancer Specialists | 83000 | 83200 | 83201 | 1/31/2007 | | 963,505 | 952,318 | 1,915,823 | 34% | 5,683,808 | | No | No | 5,683,808 | 2,858,398 | 2,825,210 | No | No | Yes | No | Default | 1 | 7 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 83000 | 83600 | 83602 | | | 6,312 | 6,312 | 33% | 19,371 | | No | No | 19,371 | | 19,371 | No | No | No | No | Default | #N/A | 8 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 83000 | 83600 | 83602 | 1/31/2007 | 266,780 | 1,112,295 | 239,060 | 1,618,135 | 34% | 4,800,467 | 791,447 | No | No | 3,079,619 | 3,299,809 | 709,211 | Yes | No | Yes | No | Default | 1 | 9 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 83000 | 83700 | 83705 | 1/31/2007 | 1,908,007 | 577,210 | 269,711 | 2,754,928 | 34% | 8,172,953 | 5,660,421 | Yes | Yes | 2,113,522 | 1,712,390 | 800,143 | Yes | No | No | Yes | 50 | 1 | 10 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 83000 | 83100 | 83103 | 1/31/2007 | 708,090 | 318,250 | 13,646 | 1,039,986 | 34% | 3,085,292 | 2,100,687 | Yes | Yes | 984,625 | 944,142 | 40,483 | Yes | No | No | Yes | 50 | #N/A | 11 |
| 11998 | Platinum | Integrated Community Oncology Network | 83000 | 83700 | 83703 | 1/31/2007 | 1,265,629 | 919,965 | 95,297 | 2,280,891 | 34% | 6,766,643 | 3,754,699 | Yes | Yes | 2,827,653 | 2,729,230 | 282,714 | Yes | No | No | Yes | 50 | 1 | 12 |
| 225776 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 83000 | 83100 | 83102 | 1/31/2007 | 517,911 | 93,705 | 101,482 | 713,098 | 34% | 2,115,524 | 1,536,469 | Yes | Yes | 503,554 | 277,992 | 301,063 | Yes | No | Yes | Yes | 50 | #N/A | 13 |
| 214433 | Gold | Northeast Georgia Cancer Care | 83000 | 83600 | 83602 | 1/31/2007 | 398,570 | 268,745 | 16,577 | 683,891 | 34% | 1,999,026 | 1,182,424 | Yes | Yes | 803,792 | 797,277 | 49,178 | Yes | No | No | Yes | 50 | 1 | 14 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 83000 | 83700 | 83705 | 1/31/2007 | 472,975 | 95,945 | 12,843 | 581,763 | 34% | 1,725,897 | 1,403,159 | Yes | Yes | 322,738 | 284,637 | 38,101 | Yes | No | No | Yes | 50 | #N/A | 15 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 83000 | 83700 | 83703 | 1/30/2007 | 72,301 | 348,830 | 19,494 | 440,625 | 33% | 1,352,263 | 221,889 | Yes | No | 1,130,374 | 1,070,647 | 59,826 | Yes | No | No | Yes | 10 | #N/A | 16 |
| 218644 | Gold | Southeast Georgia Hematology/Oncology | 83000 | 83700 | 83703 | 1/31/2007 | 366,355 | 62,905 | 11,224 | 440,484 | 34% | 1,306,769 | 1,086,853 | Yes | Yes | 219,916 | 186,618 | 33,298 | Yes | No | No | Yes | 40 | #N/A | 17 |
| 214555 | Gold | Stuart Oncology | 83000 | 83100 | 83103 | 1/29/2007 | 273,096 | 164,100 | 25,053 | 462,248 | 31% | 1,469,288 | 868,055 | Yes | Yes | 601,236 | 521,604 | 79,633 | Yes | No | No | Yes | 50 | #N/A | 18 |

**Table 3 — FROM APC Status Report 070302 values only.xls** (header row as above)

| ACIS | Type | Customer Name | Region | District | Territory | Last Invoice Date | Aranesp | Neulasta | Neupogen | Amgen Family | % of Period Elapsed | Projected Portfolio Sales | Projected Meet Aranesp MIN? | Projected Achieve Aranesp Bonus? | NLNP Sales | NL Sales | NP Sales | Meet NLNP MIN? | Exceed NL MAX? | Exceed NP MAX? | Meet BOTH MINs? | Level | 1=Yes | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 82000 | 82200 | 82203 | 2/28/2007 | 1,072,340 | 553,380 | 62,562 | 1,688,282 | 65% | 2,585,849 | 1,645,487 | Yes | Yes | 908,592 | 849,152 | 96,000 | Yes | No | No | Yes | 50 | 1 | 1 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Ca | 83000 | 83705 | 2/28/2007 | 557,357 | 188,290 | 52,764 | 798,411 | 65% | 1,225,148 | 855,255 | Yes | Yes | 369,893 | 288,928 | 80,965 | Yes | No | No | Yes | 50 | #N/A | 2 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | 83000 | 83101 | 2/28/2007 | 617,668 | 533,245 | 124,191 | 1,275,104 | 65% | 1,881,080 | 947,801 | Yes | Yes | 896,473 | 818,255 | 190,569 | Yes | No | Yes | Yes | 50 | #N/A | 3 |
| 227676 | Platinum | Central Georgia Cancer Care | 83000 | 83604 | 2/28/2007 | 543,537 | 556,060 | 17,481 | 1,117,078 | 65% | 1,714,137 | 834,048 | Yes | Yes | 876,905 | 853,264 | 26,824 | Yes | No | Yes | Yes | 40 | 1 | 4 |
| 1077445 | Gold | Coastal Oncology, Pt. | 83000 | 83101 | 2/28/2007 | 666,266 | 268,210 | 25,062 | 959,538 | 65% | 1,464,627 | 1,022,374 | Yes | Yes | 431,564 | 411,564 | 38,457 | Yes | No | No | Yes | 50 | #N/A | 5 |
| 307671 | Gold | David Dresdner, M.D. | 83000 | 83705 | 2/28/2007 | 582,067 | | | 582,067 | 65% | 893,172 | 893,172 | Yes | No | | | | No | No | No | No | Default | #N/A | 6 |
| 216205 | Platinum | Florida Cancer Specialists | 83000 | 83201 | 2/28/2007 | | 1,744,705 | 1,745,999 | 3,490,704 | 65% | 4,365,151 | | No | No | 5,377,220 | 2,677,220 | 2,723,008 | No | No | Yes | No | Default | 1 | 7 |
| 216205 | Platinum | Florida Cancer Specialists | 83000 | 83201 | 2/28/2007 | | 1,744,705 | 1,745,999 | 3,490,704 | 65% | 4,365,151 | | No | No | 5,377,220 | 2,677,220 | 2,970,205 | No | No | No | No | Default | 1 | 8 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 83000 | 83602 | 2/28/2007 | 1,073,895 | 2,270,145 | 436,946 | 3,780,986 | 65% | 5,713,272 | 1,647,873 | No | No | 3,862,779 | 3,483,485 | 670,486 | Yes | No | Yes | No | Default | 1 | 10 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 83000 | 83705 | 2/28/2007 | 3,767,255 | 1,168,690 | 445,340 | 5,381,285 | 65% | 8,250,053 | 5,780,757 | Yes | Yes | 2,194,467 | 1,793,335 | 683,367 | Yes | No | No | Yes | 50 | 1 | 11 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 83000 | 83103 | 2/28/2007 | 1,348,821 | 597,820 | 26,820 | 1,973,461 | 65% | 3,029,126 | 2,058,621 | Yes | Yes | 966,745 | 909,925 | 54,199 | Yes | No | No | Yes | 50 | #N/A | 12 |
| 11998 | Platinum | Integrated Community Oncology Network | 83000 | 83703 | 2/28/2007 | 2,450,227 | 1,807,640 | 162,447 | 4,420,314 | 65% | 6,789,419 | 3,780,041 | Yes | Yes | 3,020,478 | 2,862,955 | 257,522 | Yes | No | No | Yes | 50 | 1 | 13 |
| 225776 | Platinum | Mid Florida Hematology and Oncology Centers, P.A. | 83000 | 83102 | 2/28/2007 | 1,041,352 | 195,170 | 195,826 | 1,432,348 | 65% | 2,199,867 | 1,602,019 | Yes | Yes | 622,748 | 299,921 | 298,879 | Yes | No | Yes | Yes | 50 | #N/A | 14 |
| 214433 | Gold | Northeast Georgia Cancer Care | 83000 | 83602 | 2/28/2007 | 734,980 | 496,365 | 33,289 | 1,264,634 | 65% | 1,941,256 | 1,165,977 | Yes | Yes | 798,657 | 781,962 | 51,134 | Yes | No | No | Yes | 50 | 1 | 15 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 83000 | 83705 | 2/28/2007 | 895,572 | 176,610 | 24,238 | 1,096,420 | 65% | 1,684,486 | 1,543,670 | Yes | Yes | 314,263 | 271,162 | 43,100 | Yes | No | No | Yes | 50 | #N/A | 16 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 83000 | 83703 | 2/28/2007 | 146,292 | 644,320 | 40,179 | 830,791 | 65% | 1,273,065 | 224,658 | Yes | No | 1,048,406 | 988,679 | 70,548 | Yes | No | No | Yes | 10 | #N/A | 17 |
| 218644 | Gold | Southeast Georgia Hematology/Oncology | 83000 | 83703 | 2/28/2007 | 693,690 | 140,545 | 26,645 | 860,880 | 65% | 1,321,961 | 1,065,742 | Yes | Yes | 256,219 | 222,921 | 37,831 | Yes | No | No | Yes | 50 | #N/A | 18 |
| 214555 | Gold | Stuart Oncology | 83000 | 83103 | 2/28/2007 | 499,699 | 340,360 | 49,237 | 934,916 | 63% | 1,484,259 | 792,045 | Yes | Yes | 690,214 | 580,058 | 110,037 | Yes | No | No | Yes | 50 | #N/A | 19 |

**Table 4 — FROM APC Status Report 070327 all.xls** (header row as above)

| ACIS | Program Type | Customer Name | Region | District | Territory | Last Invoice Date | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 82000 | 82200 | 82203 | 3/29/2007 | 1,496,077 | 854,830 | 92,947 | 2,443,854 | 92% | 2,648,263 | 1,623,426 | Yes | Yes | 951,825 | 931,735 | 101,213 | Yes | No | No | Yes | 50 | 1 |

(Remaining rows of Table 4 are of the same structure as preceding tables; values not individually legible at this resolution.)

# Exhibit 5

COVERED DRUG PURCHASES DURING THE COVERED PERIOD

| ACIS | Program Type | Customer Name | Q2 2004 Aranesp | Q3 2004 Aranesp | Q4 2004 Aranesp | Q2 2005 Aranesp | Q3 2006 Aranesp | Q4 2006 Aranesp | Q1 2007 Aranesp |
|------|------|------|------|------|------|------|------|------|------|
| 214436 | Platinum | Augusta Oncology Associates | 239,161 | | 872,713 | | 1,207,267 | 1,778,283 | 1,496,077 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer Center | 9,576 | | 161,101 | | 421,481 | 689,842 | 768,768 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | | | 213,883 | | 663,521 | 948,813 | 864,315 |
| 227676 | Platinum | Central Georgia Cancer Care | | | 521,026 | | 1,007,641 | 956,515 | 832,741 |
| 1077445 | Gold | Coastal Oncology, PI | 83,790 | 112,941 | 254,626 | | 657,563 | 978,050 | 909,709 |
| 307671 | Gold | David Dresdner, M.D. | 55,062 | | 0 | | 622,440 | 754,229 | 755,955 |
| 216205 | Platinum | Florida Cancer Specialists | 0 | | 0 | | - | - | - |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 1,037,161 | | 3,154,201 | | 78,338 | 3,663,244 | 1,852,364 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 461,723 | | 2,238,957 | | 4,310,748 | 5,509,494 | 5,156,233 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 273,874 | | 704,979 | | 1,201,220 | 1,533,061 | 1,877,990 |
| 11998 | Platinum | Integrated Community Oncology Network | | 2,199,769 | 2,363,882 | 3,365,726 | 3,115,667 | 5,305,392 | 4,264,098 |
| 225776 | Gold | Mid Florida Hematology and Oncology Centers, P.A. | 27,132 | | 15,739 | | 28,010 | 1,358,748 | 1,512,276 |
| 226509 | Platinum | Northwest Georgia Oncology Centers, P.C. | 2,394 | | 1,306,181 | | 2,214,108 | 2,608,931 | 2,349,776 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 5,586 | | 22,453 | | 1,125,104 | 1,540,954 | 1,345,160 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 155,849 | 528,496 | 728,569 | 550,577 | 142,005 | 606,406 | 378,252 |
| 218644 | Gold | Southeast Georgia Hematology/Oncology | 184,737 | 552,692 | 749,908 | 821,720 | 641,024 | 1,094,553 | 908,245 |
| 214555 | Gold | Stuart Oncology | | | 234,032 | | 338,874 | 545,202 | 649,792 |

| ACIS | Program Type | Customer Name | Q2 2004 Neulasta | Q3 2004 Neulasta | Q4 2004 Neulasta | Q2 2005 Neulasta | Q3 2006 Neulasta | Q4 2006 Neulasta | Q1 2007 Neulasta |
|------|------|------|------|------|------|------|------|------|------|
| 214436 | Platinum | Augusta Oncology Associates | 245,440 | | 922,634 | | 667,340 | 1,118,615 | 854,700 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer Center | 33,040 | | 236,138 | | 246,150 | 388,370 | 260,830 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | | | 281,224 | | 612,640 | 760,330 | 801,085 |
| 227676 | Platinum | Central Georgia Cancer Care | | | 510,106 | | 820,500 | 1,001,010 | 862,960 |
| 1077445 | Gold | Coastal Oncology, PI | 44,840 | 85,068 | 240,992 | | 191,450 | 385,635 | 351,910 |
| 307671 | Gold | David Dresdner, M.D. | 75,520 | | 0 | | - | 164,100 | 156,240 |
| 216205 | Platinum | Florida Cancer Specialists | 849,600 | | 2,917,962 | | 4,094,295 | 2,691,240 | 2,400,355 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 795,320 | | 2,417,674 | | 1,742,195 | 2,702,180 | 3,146,205 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 283,200 | | 934,544 | | 1,359,295 | 1,586,300 | 1,573,240 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 94,400 | | 392,212 | | 391,105 | 716,570 | 689,320 |
| 11998 | Platinum | Integrated Community Oncology Network | | 1,471,176 | 1,281,620 | 1,691,352 | 1,613,650 | 2,095,010 | 2,490,735 |
| 225776 | Gold | Mid Florida Hematology and Oncology Centers, P.A. | 35,400 | | 0 | | 79,315 | 421,190 | 302,955 |
| 226509 | Platinum | Northwest Georgia Oncology Centers, P.C. | 151,040 | | 1,009,554 | | 1,135,025 | 1,383,910 | 1,436,145 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 73,160 | | 223,778 | | 71,110 | 169,570 | 224,285 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 139,240 | 320,256 | 487,586 | 735,588 | 478,625 | 784,945 | 859,400 |
| 218644 | Gold | Southeast Georgia Hematology/Oncology | 75,520 | 457,866 | 50,040 | 290,232 | 98,460 | 289,910 | 233,095 |
| 214555 | Gold | Stuart Oncology | | | 201,560 | | 262,560 | 585,290 | 487,740 |

| ACIS | Program Type | Customer Name | Q2 2004 Neupogen | Q3 2004 Neupogen | Q4 2004 Neupogen | Q2 2005 Neupogen | Q3 2006 Neupogen | Q4 2006 Neupogen | Q1 2007 Neupogen |
|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 36,720 | | 49,303 | | 58,128 | 98,350 | 92,947 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer Center | 19,865 | | 43,481 | | 71,656 | 74,388 | 75,293 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | | | 47,892 | | 111,776 | 175,272 | 182,650 |
| 227676 | Platinum | Central Georgia Cancer Care | | | 4,870 | | 26,854 | 24,627 | 27,080 |
| 1077445 | Gold | Coastal Oncology, PI | 10,270 | 4,564 | 8,468 | | 19,354 | 23,600 | 31,374 |
| 307671 | Gold | David Dresdner, M.D. | 0 | | 0 | | 95,914 | 86,632 | 91,524 |
| 216205 | Platinum | Florida Cancer Specialists | 148,960 | | 281,330 | | 654,614 | 2,376,596 | 2,469,607 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 71,105 | | 324,584 | | 463,608 | 773,789 | 634,672 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 52,955 | | 216,715 | | 372,696 | 659,122 | 605,995 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 13,086 | | 32,167 | | 35,491 | 58,178 | 75,568 |
| 11998 | Platinum | Integrated Community Oncology Network | | 95,861 | 50,038 | 84,143 | 151,287 | 144,002 | 220,515 |
| 225776 | Gold | Mid Florida Hematology and Oncology Centers, P.A. | 178,620 | | 0 | | 342,974 | 294,260 | 272,848 |
| 226509 | Platinum | Northwest Georgia Oncology Centers, P.C. | 675 | | 17,766 | | 18,202 | 42,592 | 43,681 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 9,285 | | 22,304 | | 46,180 | 55,824 | 42,121 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 5,290 | 35,796 | 52,240 | 85,284 | 46,838 | 103,320 | 65,727 |
| 218644 | Gold | Southeast Georgia Hematology/Oncology | 15,558 | 51,770 | 36,666 | 52,098 | 37,128 | 33,672 | 38,084 |
| 214555 | Gold | Stuart Oncology | | | 89,515 | | 52,598 | 92,820 | 97,641 |

| ACIS | Program Type | Customer Name | Q2 2004 Totals | Q3 2004 Totals | Q4 2004 Totals | Q2 2005 Totals | Q3 2006 Totals | Q4 2006 Totals | Q1 2007 Totals |
|---|---|---|---|---|---|---|---|---|---|
| 214436 | Platinum | Augusta Oncology Associates | 521,321 | | 1,844,650 | | 1,932,735 | 2,995,248 | 2,443,724 |
| 216428 | Gold | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer Center | 62,481 | | 440,720 | | 739,287 | 1,152,600 | 1,104,891 |
| 216184 | Gold | Cancer Institute of Florida, P.A. | | | 542,999 | | 1,387,936 | 1,884,415 | 1,848,050 |
| 227676 | Platinum | Central Georgia Cancer Care | | | 1,036,002 | | 1,854,995 | 1,982,152 | 1,722,780 |
| 1077445 | Gold | Coastal Oncology, PI | 138,900 | 202,573 | 504,086 | | 868,367 | 1,387,285 | 1,292,993 |
| 307671 | Gold | David Dresdner, M.D. | 130,582 | | 0 | | 718,354 | 1,004,961 | 1,003,719 |
| 216205 | Platinum | Florida Cancer Specialists | 998,560 | | 3,199,292 | | 4,748,909 | 5,067,836 | 4,869,962 |
| 226796 | Platinum | Georgia Cancer Specialists Administrative Annex | 1,903,586 | | 5,896,459 | | 2,284,141 | 7,139,213 | 5,633,241 |
| 221641 | Platinum | Gulf Coast Oncology Associates | 797,878 | | 3,390,216 | | 6,042,739 | 7,754,916 | 7,335,468 |
| 214554 | Platinum | Hematology and Oncology Associates of the Treasure Coast | 381,360 | | 1,129,358 | | 1,627,816 | 2,307,809 | 2,642,878 |
| 11998 | Platinum | Integrated Community Oncology Network | | 3,766,806 | 3,695,540 | 5,141,221 | 4,880,604 | 7,544,404 | 6,975,348 |
| 225776 | Gold | Mid Florida Hematology and Oncology Centers, P.A. | 241,152 | | 15,739 | | 450,299 | 2,074,198 | 2,088,079 |
| 226509 | Platinum | Northwest Georgia Oncology Centers, P.C. | 154,109 | | 2,333,501 | | 3,367,335 | 4,035,433 | 3,829,602 |
| 216704 | Platinum | Pasco Hernando Oncology Associates, P.A. | 88,031 | | 268,535 | | 1,242,394 | 1,766,348 | 1,611,566 |
| 276635 | Platinum | Regional Consultants in Hematology and Oncology | 300,379 | 884,548 | 1,268,395 | 1,371,449 | 667,468 | 1,494,671 | 1,303,379 |
| 218644 | Gold | Southeast Georgia Hematology/Oncology | 275,815 | 1,062,328 | 836,614 | 1,164,050 | 776,612 | 1,418,135 | 1,179,424 |
| 214555 | Gold | Stuart Oncology | | | 525,107 | | 654,032 | 1,223,312 | 1,235,172 |
| | | TOTAL PURCHASES FOR EXAMINED QUARTERS BY DEFENDANTS PRACTICES | 5,994,154 | 5916255 | 26,927,213 | 7676720 | 34,244,023 | 52,232,936 | 48,120,276 |

# Exhibit 6

| Contract # | ACIS | Name | Street | City/State/Zip | Terr Num | Gross Base Sales |
|---|---|---|---|---|---|---|
| 200201790 | 216184 | Rebecca L. Moroose, Robert Reynolds, and Raul Castillo, M.D.s, P.A. | 661 East Altamonte Drive, Suite 312 | Altamonte Springs, FL 32701 | 83101 | 225,211 |
| 200201790 | 278853 | Neil Finkler and Robert Holloway, M.D.S. | 2501 North Orange Avenue, Suite 689 | Orlando, FL 32804 | 83101 | 116,345 |
| 200201790 | 285885 | Lourdes Mathew, M.D. | 732 North 3rd Street | Leesburg, FL 34748 | 83101 | 0 |
| 20010094 | 217132 | Florida Hematology Oncology Specialists | 2501 North Orange Avenue, Suite 201 | Orlando, FL 32804 | 83101 | 614,313 |
| 20010121 | 214461 | Hematology and Oncology Consultants | 2501 North Orange Avenue, Suite 381 | Orlando, FL 32804 | 83101 | 434,689 |
| 20010121 | 230775 | Daytona Radiation Oncology | 1620 Mason Avenue, Suite E. | Daytona Beach, FL 32117 | 83101 | 718,996 |
| 20010121 | 233547 | Memorial Medical Oncology Center | 873 Sterthaus Avenue, Suite 104 | Ormond Beach, FL 32174 | 83101 | 274,025 |
| 20010121 | 312467 | Flagler Oncology Center | 26-C Office Park Drive | Palm Coast, FL 32137 | 83101 | 100,840 |
| 200201790 | 217740 | M D Anderson Cancer Center Orlando | 85 West Miller Street | Orlando, FL 32806 | 83101 | 191,852 |
| 200201790 | 225776 | Ortega and Selassie, M.D.s | 819 East Third Street, Suite 8 | Sanford, FL 32771 | 83102 | 1,416,415 |
| 20010094 | 217133 | Hematology - Oncology Associates of Central Brevard | 107 Longwood Avenue | Rockledge, FL 32955 | 83102 | 155,902 |
| 20010094 | 222614 | Space Coast Medical Association | 225 Cone Road | Merritt Island, FL 32952 | 83102 | 315,481 |
| 20010094 | 230783 | Osler Medical | 930 South Harbor City Boulevard | Melbourne, FL 32901 | 83102 | 154,054 |
| 20010094 | 232378 | Geethanjali K. Akula, M.D. | 930 South Orange Avenue | Orlando, FL 32806 | 83102 | 3,090 |
| 20010094 | 317483 | Melbourne Internal Med | 2100 N. Wickham Rd | Melbourne, FL 32935 | 83102 | 0 |
| 20010109 | 214468 | Melbourne Internal Medicine Associates | 200 East Sheridan Road, Suites A-I | Melbourne, FL 32901 | 83102 | 35,530 |
| 20010109 | 281765 | Joseph Myers, M.D. | 6300 North Wickham Road, Suite 117 | Melbourne, FL 32940 | 83102 | 0 |
| 20010109 | 281766 | Hugo Hernandez, M.D. | 6300 North Wickham Road, Suite 117 | Melbourne, FL 32940 | 83102 | 0 |
| 20010121 | 214462 | Thomas J. Katta, M.D. | 922 Lucerne Terrace | Orlando, FL 32806 | 83102 | 22,453 |
| 20010121 | 216705 | Osceola Cancer Center | 1300 West Oak Street | Kissimmee, FL 34741 | 83102 | 92,105 |
| 20010121 | 226119 | Vasu Iyengar, M.D. | 10000 West Colonial Drive, Suite 186 | Ocoee, FL 34761 | 83102 | 29,466 |
| 200201892 | 216691 | Omni Healthcare | 95 Bulldog Boulevard, Suite 100 | Melbourne, FL 32901 | 83102 | 82,772 |
| 200201892 | 219381 | Noor M. Merchant, M.D. | 13060 Us Highway #1, Suite A | Sebastian, FL 32958 | 83102 | 153,416 |
| 200201892 | 235854 | Mid Florida Hematology and Oncology Centers, P.A. | 1061 Medical Center Drive, Suite 110 | Orange City, FL 32763 | 83102 | 56,002 |
| 200201790 | 221753 | Lawrence A Tepper and Allen Schlutz, D.O.'s | 2051 45th Street, Suite 107 | West Palm Beach, FL 33407 | 83103 | 5,685 |
| 200201790 | 222247 | Coastal Oncology and Hematology | 501 East Osceola Street, Suite 300 | Stuart, FL 34994 | 83103 | 91,743 |
| 200201790 | 228868 | Hematology Oncology At Jupiter | 1025 Military Trail, Suite 209 | Jupiter, FL 33458 | 83103 | 335,417 |
| 20010094 | 214517 | Joshua and Joshua, M.D. | 3918 Via Poinciana Drive, Suite 1 | Lake Worth, FL 33467 | 83103 | 0 |
| 20010094 | 214555 | Stuart Oncology | 501 East Osceola Street, Suite 301 | Stuart, FL 34994 | 83103 | 102,181 |
| 20010094 | 221980 | Michaela G. Scott, M.D. and Fredrick M. Weeks, M.D. | 1460 36th Street | Vero Beach, FL 32960 | 83103 | 57,576 |
| 20010094 | 274977 | Hematology and Oncology Associates | 12983 Southern Boulevard, Building 4, | Loxahatchee, FL 33470 | 83103 | 0 |
| 20010094 | 278719 | Treasure Coast Cancer Care Center | 1700 Southeast Hillmoor Drive, Suite 3 | Port St. Lucie, FL 34952 | 83103 | 149,254 |
| 20010094 | 314826 | Metcare Port St. Lucie | 8942 South Us Highway 1 | Port St. Lucie, FL 34952 | 83103 | 0 |
| 20010121 | 214554 | Hematology and Oncology Associates of the Treasure Coast | 1801 Southeast Hillmoor Drive, Suite B | Port St. Lucie, FL 34952 | 83103 | 787,886 |
| 20010121 | 225278 | Geffen Cancer Center and Research Institute | 981 37th Place | Vero Beach, FL 32960 | 83103 | 361,966 |
| 20010121 | 235953 | Treasure Coast Impact Center | 1801 Southeast Hillmoor Drive, Suite E | Port St. Lucie, FL 34952 | 83103 | 0 |
| 20010121 | 316769 | Vero Beach Hematology Oncology, P.A. | 787 37th Street, Suite G | Vero Beach, FL 32960 | 83103 | 54,278 |
| 200201892 | 219140 | Sanjiv Walia, M.D. | 2215 Nebraska Avenue, Suite 1-F-2 | Fort Pierce, FL 34950 | 83103 | 0 |
| 200201790 | 223880 | Victor Koo, M.D., P.A. | 2828 South Seacrest Boulevard, Suite | Boynton Beach, FL 33435 | 83104 | 10,535 |
| 20010094 | 216421 | Hematology and Oncology Associates | 4685 South Congress Avenue, Suite 21 | West Palm Beach, FL 33461 | 83104 | 602,782 |
| 20010094 | 236021 | The Center for Hematology/Oncology | 1001 Northwest 13th Street, Suite 201 | Boca Raton, FL 33486 | 83104 | 928,789 |
| 20010094 | 280445 | Hematology and Medical Oncology of Southern Palm Beach County | 2623 South Seacrest Boulevard, Suite 1 | Boynton Beach, FL 33435 | 83104 | 274,521 |
| 20010109 | 216974 | South County Hematology Oncology Associates, P.A. | 5210 Linton Boulevard, Suite 204 | Delray Beach, FL 33484 | 83104 | 3,164 |
| 20010121 | 230395 | Karl Enselberg, M.D. | 875 Meadows Road, Suite 331 | Boca Raton, FL 33486 | 83104 | 16,884 |
| 200201892 | 223824 | Sunil Patel, M.D. | 9980 Central Park Boulevard North, Sui | Boca Raton, FL 33428 | 83104 | 80,628 |
| 200201790 | 216539 | Oncology-Hematology Consultants, P.A. | 3131 South Tamiami Trail, Suite 205 | Sarasota, FL 34239 | 83201 | 953,507 |
| 200201790 | 226251 | Antonio L. Gabarda, M.D. | 2525 Harbor Boulevard, Suite D | Port Charlotte, FL 33952 | 83201 | 146,786 |
| 200201790 | 229579 | Lillian J. Love, M.D. | 680 2nd Avenue North, Suite 203 | Naples, FL 34102 | 83201 | 61,869 |
| 20010094 | 214540 | Charles Eytel, M.D. | 400 8th Street North | Naples, FL 34102 | 83201 | 47,534 |
| 20010094 | 216205 | Florida Cancer Specialists | 3840 Broadway | Fort Myers, FL 33901 | 83201 | 2,210,962 |
| 20010094 | 220768 | Cancer Care Center | 401 Manatee Avenue, Suite B. | Bradenton, FL 34208 | 83201 | 196,825 |
| 20010094 | 223512 | Justino Silvestere, M.D. | 3524 Tamiami Trail | Port Charlotte, FL 33952 | 83201 | 10,926 |
| 20010094 | 227018 | Daniel J. Morris, M.D. | 400 Eighth Street North | Naples, FL 33940 | 83201 | 18,741 |
| 20010094 | 228382 | Albert L. Kerns, M.D., P.A. | 400 8th Street North | Naples, FL 34102 | 83201 | 24,738 |
| 20010094 | 277145 | Hubert W. Gerry, M.D. | 1921 Waldemere Street, Suite 403 | Sarasota, FL 34239 | 83201 | 0 |
| 20010094 | 282057 | Naples Medical Center - Brian Walker, M.D. | 11121 Health Park Boulevard, Suite 90 | Naples, FL 34110 | 83201 | 10,609 |
| 20010094 | 306530 | Lee Cancer Clinic | 4755 Summerlin Road, Suite 7 | Fort Myers, FL 33919 | 83201 | 0 |
| 20010094 | 319030 | Charlotte Blood and Cancer Treatment Center | 2400 Harbor Boulevard, Suite 4 | Port Charlotte, FL 33952 | 83201 | 0 |
| 20010109 | 235430 | American Medical Clinic of Charlotte County | 2343 Aaron Street | Port Charlotte, FL 33952 | 83201 | 0 |
| 20010109 | 281381 | American Medic of Charlotte County #2 | 21198 Olean Boulevard | Port Charlotte, FL 33952 | 83201 | 0 |
| 20010109 | 285896 | American Medic of Charlotte County | 1649 Tamiami Trail | Murdock, FL 33949 | 83201 | 0 |
| 200201892 | 285832 | Associates in Cancer Care | 6100 Winkler Road, Suite D | Fort Myers, FL 33919 | 83201 | 0 |
| 200201790 | 214500 | Cleveland Clinic of Florida | 3000 West Cypress Creek Road | Fort Lauderdale, FL 33309 | 83202 | 0 |
| 200201790 | 216885 | Holy Cross Medical Group | 4725 North Federal Highway, Bienes C | Fort Lauderdale, FL 33308 | 83202 | 86,967 |
| 200201790 | 282026 | Charles L. Vogel, M.D. | 350 Nw 84th Avenue | Fort Lauderdale, FL 33324 | 83202 | 83,418 |
| 20010094 | 214497 | Southeast Florida Hematology and Oncology | 5700 North Federal Highway, Suite 5 | Fort Lauderdale, FL 33308 | 83202 | 271,882 |
| 20010094 | 225710 | Medical Specialist of Fort Lauderdale | 3444 North University Drive | Sunrise, FL 33351 | 83202 | 63,717 |
| 20010094 | 319499 | Northwest Oncology and Hematology Associates | 8170 Royal Palm Boulevard | Coral Springs, FL 33065 | 83202 | 0 |
| 20010094 | 216158 | Oncology Associates of Southern Florida | 3700 Washington Street, Suite 501 | Hollywood, FL 33021 | 83203 | 38,229 |
| 20010094 | 222362 | South Florida Oncology Hematology | 801 North Flamingo Road, Suite 12 | Pembroke Pines, FL 33028 | 83203 | 153,487 |
| 20010094 | 275551 | Marvin Diaz-Lacayo, M.D., P.A. | 21150 Biscayne Boulevard, Suite 101 | Aventura, FL 33180 | 83203 | 119,410 |
| 20010109 | 216327 | South Florida Comprehensive Cancer Center | 100 Northwest 170th Street, Suite 101 | North Miami Beach, FL 33160 | 83203 | 0 |
| 20010109 | 285119 | Access Medical Center | 16401 Northwest 2nd Avenue, Suite 20 | Miami, FL 33169 | 83203 | 0 |
| 20010121 | 230799 | Michael Kutell, M.D. | 7100 West 20th Avenue, Suite 210 | Hialeah, FL 33016 | 83203 | 34,184 |
| 20010121 | 281732 | Gynecologic Oncology Associates, Inc. | 3341 Johnson Street | Hollywood, FL 33021 | 83203 | 81,530 |
| 20010121 | 307699 | Luis Diaz-Rangel, M.D. | 777 East 25th Street #411 | Hialeah, FL 33013 | 83203 | 0 |
| 200201790 | 214484 | Oncology Hematology Group of South Florida | 8940 North Kendall Drive, #300 East | Miami, FL 33176 | 83204 | 2,503,726 |
| 20010094 | 219878 | Oncology and Radiation Associates, P.A. | 1321 Northwest 14th Street, Suite 207 | Miami, FL 33125 | 83204 | 332,563 |
| 20010109 | 214491 | Comprehensive Cancer Care Center of Kendall Oaks | 11040 North Kendall Drive | Miami, FL 33176 | 83204 | 0 |
| 20010109 | 280924 | Suburban Medical Center | 17615 Southwest 97th Avenue | Miami, FL 33157 | 83204 | 0 |
| 20010121 | 217134 | Eduardo Acle, M.D. | 701 Northwest 57th Avenue, Suite 150 | Miami, FL 33126 | 83204 | 0 |
| 20010121 | 317829 | Gynecologic Oncology of South Florida, P.A. | 6701 Sunset Drive, Suite 200b | Miami, FL 33143 | 83204 | 1,582 |
| 200201892 | 228928 | Raben and Feldman, M.D.'s and Associates | 7000 Southwest 62nd Avenue, Suite 40 | South Miami, FL 33143 | 83204 | 46,424 |
| 200201892 | 232144 | Sarkis Anac, M.D. | 2601 Southwest 37th Avenue, Suite 50 | Miami, FL 33133 | 83204 | 0 |
| 200201790 | 232882 | Jose A. Marques-Bibiloni, M.D. | Manuel Pavia Street, Edificio Chinea 6 | Santurce, PR 00909 | 83205 | 369,712 |
| 200201892 | 222015 | Hato Rey Hematology-Oncology Associates | 735 Ponce De Leon, Suite 701-705 | Hato Rey, PR 00917 | 83205 | 66,911 |
| 200201892 | 281128 | Instituto De Hema-Onco Ashford, Raul Morales-Borges, M.D. | Ashford Medical Center, Suite 104, Ash | San Juan, PR 00907 | 83205 | 0 |
| 20010094 | 231830 | Fergueson Medical Group | 1012 North Main | Sikeston, MO 63801 | 83301 | 0 |
| 20010094 | 11024 | Midwest Cancer Care L.L.C. | 1836 Lackland Hill Parkway | St. Louis, MO 63146 | 83301 | 1,454,848 |
| 20010094 | 216453 | Cape Girardeau Physician Associates | 3250 Gordonville Road | Cape Girardeau, MO 63703 | 83301 | 34,975 |
| 20010094 | 219561 | County Oncologists | 11125 Dunn Road, Suite 108 - Physicia | St. Louis, MO 63136 | 83301 | 173,362 |
| 20010094 | 228831 | Specialists in Oncology/Hematology | 226 South Woods Mill Road, Suite 35w | Chesterfield, MO 63017 | 83301 | 158,756 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 20010094 | 235519 | Hematology / Oncology Associates | 60 Doctors' Park Suite 102 | Cape Girardeau, MO 63703 | 83301 | 190,610 |
| 20010094 | 276675 | Mercy Arch Medical Group | 851 East 5th Street, Suite 308 | Washington, MO 63090 | 83301 | 143,625 |
| 20010094 | 307670 | Suburban Surgical Associates Inc. | 3023 North Ballas Road, Building D, Su | St. Louis, MO 63131 | 83301 | 0 |
| 20010094 | 318703 | Wa Univ Schl of Med Well | 3015 N. Ballas Rd | St. Louis, MO 63131 | 83301 | 0 |
| 20010115 | 231034 | Albert Van Amburg Iii, M.D. | 226 South Woods Mill Road, Suite 49-A | Chesterfield, MO 63017 | 83301 | 92,787 |
| 20010121 | 281230 | West County Gynecologic Oncology and Gynecology | 621 South New Ballas, Suite 382a | St. Louis, MO 63141 | 83301 | 51,322 |
| 200201790 | 220987 | Carbondale Clinic | 2601 West Main Street | Carbondale, IL 62901 | 83302 | 0 |
| 200201790 | 276156 | Mahnaz Lary, M.D. | 305 West Jackson, Suite 304 | Carbondale, IL 62901 | 83302 | 161,000 |
| 20010094 | 214843 | Yagnesh Oza, M.D. - Oncology-Hematology | 4110 North Water Tower Place | Mount Vernon, IL 62864 | 83302 | 271,104 |
| 20010094 | 216758 | Siteman Cancer Center At Washington University | 4921 Parkview Place, Seventh Floor | St. Louis, MO 63110 | 83302 | 392,933 |
| 20010094 | 229608 | Hematology-Oncology | 2044 Madison Avenue, Suite 28 | Granite City, IL 62040 | 83302 | 100,883 |
| 20010094 | 286064 | Illinois Oncology, Ltd. | 33 Bronze Point, Suite 150 | Belleville, IL 62226 | 83302 | 0 |
| 20010115 | 227307 | Univeristy Hematology Oncology | 1 Barnes Hospital Plaza, Suite 16312 | St. Louis, MO 63110 | 83302 | 5,042 |
| 20010115 | 288609 | St. Louis University Medical Group, Dba: Slucare | 3655 Vista Avenue, 2nd Floor, West Pa | St. Louis, MO 63110 | 83302 | 57,724 |
| 20010121 | 214837 | Oncology Care Center | 4000 North Illinois Street | Belleville, IL 62226 | 83302 | 310,685 |
| 20010121 | 275246 | Washington University School of Medicine - Hepatology Section | 4570 Children's Place, Storz Building | St. Louis, MO 63110 | 83302 | 0 |
| 20010121 | 277171 | Southern Illinois Oncology and Hematology | 808 West Prarie Street | Marion, IL 62959 | 83302 | 225,383 |
| 20010121 | 317778 | Medical Oncology, Llc | 626 North 38th Street | Belleville, IL 62226 | 83302 | 20,515 |
| 200201790 | 216171 | Central Illinois Hematology/Oncology Center | 319 East Madison, Suite F. | Springfield, IL 62701 | 83303 | 145,366 |
| 200201790 | 223117 | Christie Clinic | 101 West University Avenue | Champaign, IL 61820 | 83303 | 345,532 |
| 20010094 | 223395 | Carle Clinic | 602 West University Avenue | Urbana, IL 61801 | 83303 | 155,164 |
| 200201790 | 227504 | Quincy Medical Group | 1025 Maine Street | Quincy, IL 62301 | 83303 | 21,158 |
| 200201790 | 229444 | Prairie Oncology Management Services, Llc; dba Cancer Care Specialists o | 2880 North Monroe Street | Decatur, IL 62526 | 83303 | 1,210,770 |
| 200201790 | 282094 | Medical and Surgical Specialists, L.L.C. | 695 North Kellogg Street, C-1 Wing | Galesburg, IL 61401 | 83303 | 276,280 |
| 20010094 | 216754 | Mid Illinois Hematology Oncology | 407 East Vernon Avenue, Suite 104 | Normal, IL 61761 | 83303 | 209,047 |
| 20010121 | 219518 | Oncology-Hematology Associates of Central Illinois | 900 Main Street, Suite 780 | Peoria, IL 61602 | 83303 | 259,965 |
| 200201892 | 293070 | Muhammad Zafar, M.D. | 122 South Main Street | Flanagan, IL 61740 | 83303 | 0 |
| 20010094 | 214629 | Graves and Gilbert Clinic | 201 Park Street | Bowling Green, KY 42101 | 83304 | 142,122 |
| 20010094 | 222380 | Ec Green Cancer Center | 1717 High Street, Suite 1a | Hopkinsville, KY 42240 | 83304 | 40,959 |
| 20010094 | 226922 | Murray Oncology | 204 South 9th Street | Murray, KY 42071 | 83304 | 37,302 |
| 20010109 | 234993 | Associates in Physicians Services | 1325 Andrea Street | Bowling Green, KY 42104 | 83304 | 1,508 |
| 20010115 | 216905 | Purchase Cancer Group | 100 Kiana Court | Paducah, KY 42001 | 83304 | 223,019 |
| 20010121 | 225992 | Oncology Associates of West Kentucky | 2603 Kentucky Avenue, Suite 403 | Paducah, KY 42003 | 83304 | 292,871 |
| 20010121 | 221559 | Owensboro Cancer Center | 1200 Breckenridge Street Suite 201 | Owensboro, KY 42303 | 83304 | 80,947 |
| 200201892 | 216721 | West Kentucky Hematology-Oncology | 225 Medical Center Drive, Suite 301 | Paducah, KY 42003 | 83304 | 177,972 |
| 200201892 | 227587 | Pravin C. Mehta, M.D. | 110 North Water Street | Henderson, KY 42420 | 83304 | 14,659 |
| 200201892 | 320072 | Fairfield Internal Medicine | 301 Northwest 11th Street, Suite 103 | Fairfield, IL 62837 | 83304 | 0 |
| 200201790 | 219475 | University Hematology Oncology Center | 920 Madison Avenue, Suite 400 | Memphis, TN 38103 | 83401 | 0 |
| 200201790 | 227213 | Tennessee Valley Blood and Cancer Center | 201 Alcorn Drive | Corinth, MS 38834 | 83401 | 14,830 |
| 20010094 | 214588 | West Cancer Clinic | 100 North Humphreys Boulevard | Memphis, TN 38120 | 83401 | 457,257 |
| 20010094 | 214590 | Boston Baskin Cancer Group - University of Tennessee Oncology and Hem | 6005 Park Avenue, Suite 225b | Memphis, TN 38119 | 83401 | 975,012 |
| 20010094 | 219513 | Memphis Cancer Center | 1068 Cresthaven, Suites 200 and 500 | Memphis, TN 38119 | 83401 | 72,196 |
| 20010094 | 261129 | The Family Cancer Center | 6005 Park Avenue, Suite 725b | Memphis, TN 38119 | 83401 | 147,226 |
| 20010094 | 275373 | C. Michael Jones, M.D., P.C. | 7710 Wolf River Circle | Germantown, TN 38138 | 83401 | 65,073 |
| 20010094 | 278271 | Walsh Cancer Clinic | 3980 New Covington Pike, Suite 108 | Memphis, TN 38128 | 83401 | 18,341 |
| 20010094 | 318277 | Oxford Cancer Center | 2301 S. Lamar | Oxford, MS 38655 | 83401 | 0 |
| 20010115 | 276249 | The Cancer Center | 581 Medical Center Drive | Clarksdale, MS 38614 | 83401 | 29,898 |
| 200201790 | 221273 | Impact Center of Middle Tennessee | 220 25th Avenue North, Suite 103 | Nashville, TN 37203 | 83402 | 0 |
| 200201790 | 223578 | Jackson Clinic | 616 West Forest Avenue | Jackson, TN 38301 | 83402 | 331,361 |
| 20010094 | 233080 | West Tennessee Medical Specialty Clinic | 27 Medical Center Drive | Jackson, TN 38301 | 83402 | 0 |
| 20010094 | 278220 | Nashville Oncology Associates | 2011 Church Street, Plaza 1, Suite 701 | Nashville, TN 37203 | 83402 | 289,823 |
| 20010121 | 216437 | Columbia Oncology | 1222 Trotwood, Suite 603 | Columbia, TN 38401 | 83402 | 53,762 |
| 20010121 | 216711 | Tennessee Oncology, P.C. | 300 20th Avenue North, Suite 301 | Nashville, TN 37203 | 83402 | 592,840 |
| 20010121 | 225956 | Consultant Group | 4230 Harding Road, Suite 707 | Nashville, TN 37205 | 83402 | 87,548 |
| 200201790 | 11083 | Community Medical Practices of America | 1630 Church Street, Suite 107 | Murfreesboro, TN 37130 | 83403 | 360,640 |
| 200201790 | 216192 | Blue Ridge Medical Oncology - Sylvia Krueger, M.D. | 353 Worth Street Northwest | Cleveland, TN 37311 | 83403 | 150,588 |
| 20010094 | 230402 | Gynecologic Oncology Associates | 2021 Church Street, Suite 402 | Nashville, TN 37203 | 83403 | 1,582 |
| 20010094 | 281147 | Tennessee Cancer Center | 322 South Main Street, Suite 101 | Crossville, TN 38555 | 83403 | 64,418 |
| 20010121 | 216533 | Chattanooga Oncology Hematology Associates | 605 Glenwood Drive, Suite 200 | Chattanooga, TN 37404 | 83403 | 290,017 |
| 20010121 | 225879 | Mid-State Oncology and Hematology | 222 22nd Avenue North, Suite 503 | Nashville, TN 37203 | 83403 | 32,937 |
| 20010121 | 231057 | North River Hematology Oncology | 2051 Hamill Road, Suite 104 | Hixson, TN 37343 | 83403 | 33,120 |
| 20010121 | 233531 | University Oncology | 979 East 3rd Street, Suite 5000 | Chattanooga, TN 37403 | 83403 | 159,304 |
| 20010121 | 317777 | Chattanooga Gyn-Oncology | 2341 Mccallie Avenue, Suite 301 | Chattanooga, TN 37404 | 83403 | 5,685 |
| 20010094 | 214578 | Knoxville Cancer Center | 1114 Weisgarber Road, Suite C | Knoxville, TN 37909 | 83404 | 463,520 |
| 20010094 | 216164 | Mcleod Cancer and Blood Center | 310 State of Franklin Road, Suite 401 | Johnson City, TN 37604 | 83404 | 131,847 |
| 20010094 | 216263 | East Tennessee Oncology/Hematology, P.C. | 101 Blount Avenue, Baptist Medical Tow | Knoxville, TN 37920 | 83404 | 676,904 |
| 20010094 | 219360 | Cancer Care of East Tennessee | 930 East Emerald Avenue, Suite 720 | Knoxville, TN 37917 | 83404 | 395,610 |
| 20010094 | 228823 | Hematology-Oncology of Knoxville | 1114 Weisgarber Road, Suite A | Knoxville, TN 37909 | 83404 | 94,026 |
| 20010094 | 231263 | Greeneville Hematology Oncology | 1406 Tusculum Boulevard, Suite 2000 | Greeneville, TN 37745 | 83404 | 757,245 |
| 20010094 | 276947 | Forrest Swan, M.D., P.C. | 103 Bristol E. Road | Bristol, VA 24202 | 83404 | 79,544 |
| 20010121 | 216716 | Cumberland Oncology and Hematology | 102 Vermont Avenue, Suite 200 | Oak Ridge, TN 37830 | 83404 | 156,869 |
| 20010121 | 219552 | Thompson Oncology Group | 1915 White Avenue | Knoxville, TN 37916 | 83404 | 107,360 |
| 20010121 | 221174 | Wahid T. Hanna, M.D. | 1924 Alcoa Highway, 4th Floor Northwe | Knoxville, TN 37920 | 83404 | 30,769 |
| 20010121 | 231694 | Thomas Mcdonald, M.D. | 220 Fort Sanders West Boulevard, Suit | Knoxville, TN 37922 | 83404 | 0 |
| 20010121 | 282224 | Blueridge Medical Specialists | 271 Medical Park Boulevard | Bristol, TN 37620 | 83404 | 21,801 |
| 20010121 | 319717 | University Cancer Specialists | 1924 Alcoa Highway, 6 South, Box 92 | Knoxville, TN 37920 | 83404 | 0 |
| 200201790 | 216708 | Northwest Alabama Cancer Center | 101 Dr. W.H. Blake Jr. Drive | Muscle Shoals, AL 35661 | 83405 | 1,062,713 |
| 200201790 | 278842 | Baptist Cancer Center | 3500 East Highway 78 | Jasper, AL 35501 | 83405 | 0 |
| 20010094 | 214564 | Comprehensive Cancer Center Institute | 201 Sivley Road Southeast, Suite 200 | Huntsville, AL 35801 | 83405 | 875,051 |
| 20010094 | 216208 | Blood and Cancer Center | 202 East Doctor Hicks Boulevard | Florence, AL 35630 | 83405 | 94,086 |
| 20010094 | 217136 | Ellen Spremulli, M.D. | 901 Leighton Avenue, Suite 306 | Anniston, AL 36207 | 83405 | 236,007 |
| 20010094 | 226352 | Dinesh C Parmar, M.D. | 355 South 2nd Street | Gadsden, AL 35901 | 83405 | 0 |
| 20010094 | 260830 | Southeast Cancer Network | 1400 Afflink Place, Suite 100 | Tuscaloosa, AL 35406 | 83405 | 619,912 |
| 20010115 | 233194 | Cullman Oncology and Hematology | 1912 Alabama Highway 157 | Cullman, AL 35058 | 83405 | 15,776 |
| 20010115 | 233667 | Center for Cancer Care | 1 Hospital Drive, Suite 100 | Huntsville, AL 35801 | 83405 | 118,279 |
| 20010115 | 320093 | North Alabama Cancer Center, P.C. | 610 Airport Road, Suite 204 | Huntsville, AL 35802 | 83405 | 0 |
| 200201790 | 231362 | University of Alabama Southern Gyn-Oncology | 1016 18th Street South #A | Birmingham, AL 35205 | 83501 | 0 |
| 200201790 | 233071 | Luis Pineda, M.D. | 1909 Laurel Road | Birmingham, AL 35216 | 83501 | 1,582 |
| 200201790 | 318384 | Kirklin Oncology Clinic - Pharmacy | 2000 6th Avenue Sout Building | Birmingham, AL 35233 | 83501 | 4,103 |
| 20010094 | 216431 | Montgomery Cancer Center | 4145 Carmichael Road | Montgomery, AL 36106 | 83501 | 768,905 |
| 20010094 | 216514 | Brookwood Oncology-Hematology | 2022 Brookwood Medical Center Drive, | Birmingham, AL 35209 | 83501 | 131,010 |
| 20010094 | 216709 | Dothan Hematology and Oncology | 1118 Ross Clark Circle, Suite 301 | Dothan, AL 36301 | 83501 | 36,462 |
| 20010094 | 219680 | Dothan Hematology and Oncology | 4300 West Main Street, Suite 405 | Dothan, AL 36305 | 83501 | 60,437 |
| 20010094 | 220943 | Internal Medicine Associates, P.C. | 121 North 20th Street, Building 6 and 7 | Opelika, AL 36801 | 83501 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 20010094 | 224098 | Southern Hematology and Oncology | 2022 Brookwood Medical Center Drive, Birmingham, AL 35209 | 83501 | 139,781 |
| 20010115 | 232384 | Simon-Williamson Clinic, Pc | 833 Princeton Avenue, Southwest | Birmingham, AL 35211 | 83501 | 46,955 |
| 20010109 | 275828 | Natchez Oncology Clinic | 150 Jefferson Davis Boulevard, Suite 1 | Natchez, MS 39120 | 83502 | 85,242 |
| 20010115 | 214607 | Hattiesburg Clinic | 415 South 28th Avenue | Hattiesburg, MS 39401 | 83502 | 216,474 |
| 20010115 | 216438 | Jackson Oncology Associates | 1227 North State Street, Suite 101 | Jackson, MS 39202 | 83502 | 163,526 |
| 20010115 | 225901 | William J. Gibson, Junior, M.D. Dba: Breast and Thyroid Clinic | 1405 North State Street, Suite 302 | Jackson, MS 39202 | 83502 | 0 |
| 20010115 | 226340 | Hematology and Oncology | 103 Asbury Circle | Hattiesburg, MS 39402 | 83502 | 117,210 |
| 20010115 | 232718 | North Central Mississippi Regional Cancer Center | 1401 River Road | Greenwood, MS 38930 | 83502 | 15,376 |
| 20010115 | 233790 | Jefferson Medical Associates | 1203 Jefferson Street | Laurel, MS 39440 | 83502 | 76,027 |
| 20010115 | 285689 | Greenville Cancer Center | 1514 East Union Street | Greenville, MS 38701 | 83502 | 15,126 |
| 20010115 | 289848 | Rush Medical Group Rad Cl | 1800 12th Street-Med Bl | Meridian, MS 39301 | 83502 | 46,669 |
| 20010121 | 281480 | Meridian Oncology Associates, Pllc | 1200 16th Avenue | Meridian, MS 39301 | 83502 | 4,752 |
| 20010121 | 307625 | Thigpen and Vance Division of Oncology | 2500 North State Street, Room L-504 | Jackson, MS 39216 | 83502 | 0 |
| 200201790 | 217588 | Jayne Gurtler, M.D. | 3939 Houma Boulevard, Building 2, Sui | Metairie, LA 70006 | 83503 | 218,888 |
| 200201790 | 226402 | R. Dale Leblanc, M.D. | 105 Medical Center Drive, Suite 205 | Slidell, LA 70461 | 83503 | 228,254 |
| 200201790 | 226638 | Img Healthcare | 10001 Lake Forest Boulevard, Suite 10 | New Orleans, LA 70127 | 83503 | 500,000 |
| 20010094 | 224783 | Coast Oncology Hematology, Pllc | 147 Reynoir Street, Suite 101 | Biloxi, MS 39530 | 83503 | 1,508 |
| 20010094 | 226330 | Hematology Oncology Services | 4224 Houma Boulevard, Suite 300 | Metairie, LA 70006 | 83503 | 2,832,329 |
| 20010106 | 216807 | Browne-Mcharg Clinic | 4315 Houma Boulevard | Metairie, LA 70006 | 83503 | 0 |
| 20010115 | 228189 | Medical Oncology Group | 1110 Broad Avenue, Suite 500 | Gulfport, MS 39501 | 83503 | 192,086 |
| 20010121 | 223670 | Lee Roy Morgan, M.D. and Karl Tornyos, M.D. | 4200 Canal Street, Suite A | New Orleans, LA 70119 | 83503 | 61,729 |
| 20010121 | 316216 | Ruben Vargas, M.D. | 5640 Read Boulevard, Messino Building | New Orleans, LA 70127 | 83503 | 63,595 |
| 200201931 | 231450 | Ochsner Hematology Oncology Clinic | 1514 Jefferson Highway, Atrium Tower | New Orleans, LA 70121 | 83503 | 23,466 |
| 200201790 | 216776 | Hematology-Oncology Clinic | 7777 Hennessy Boulevard, Suite 501 | Baton Rouge, LA 70808 | 83504 | 220,012 |
| 20010094 | 233605 | Bayou Oncology Specialists | 608 North Acadia | Thibodaux, LA 70301 | 83504 | 0 |
| 20010094 | 318347 | Savoy Cancer Center | 803 Poinciana Avenue | Mamou, LA 70554 | 83504 | 0 |
| 20010115 | 214898 | Louisiana Oncology Associates | 601 West St. Mary, Suite 200 | Lafayette, LA 70506 | 83504 | 241,438 |
| 20010115 | 225966 | Cancer Care Specialists | 8120 Main Street, Suite 103 | Houma, LA 70360 | 83504 | 267,803 |
| 20010115 | 226828 | Southwest Oncology Associates, Ltd. | 443 Heymann Boulevard, Suite A | Lafayette, LA 70503 | 83504 | 249,365 |
| 20010115 | 229326 | Louisiana Hematology Oncology Associates | 4950 Essen Lane, 5th Floor | Baton Rouge, LA 70809 | 83504 | 281,100 |
| 20010115 | 278272 | Paulette Blanchet, M.D. | 443 Heymann Boulevard, Suite B. | Lafayette, LA 70503 | 83504 | 248,299 |
| 20010115 | 315051 | Acadiana Oncology | 602 North Lewis Street, Suite 600 | New Iberia, LA 70563 | 83504 | 13,248 |
| 20010121 | 216456 | Faruqui Medical Corporation | 7434 Picardy Avenue Suite 1 | Baton Rouge, LA 70808 | 83504 | 157,524 |
| 20010121 | 261128 | Medical Oncology L.L.C. | 8119 Picardy Avenue | Baton Rouge, LA 70809 | 83504 | 205,231 |
| 20010094 | 219412 | Northwest Georgia Hematology-Oncology | 1504 Chattanooga Road, Suite 102 | Dalton, GA 30720 | 83601 | 53,223 |
| 20010094 | 221462 | Suburban Hematology-Oncology A. Landis, A. Freedman, A. Saker, M.D.s | 600 Professional Drive, Suite 210 | Lawrenceville, GA 30045 | 83601 | 303,995 |
| 20010094 | 226509 | Northwest Georgia Oncology Centers, P.C. | 55 Witcher Street, Suite 300 | Marietta, GA 30060 | 83601 | 385,859 |
| 20010094 | 228825 | Atlanta Cancer Care | 1100 Lake Hearn Drive, Suite 500 | Atlanta, GA 30342 | 83601 | 523,883 |
| 20010094 | 319912 | Calhoun Internal Medicine | 102 Hospital Court | Calhoun, GA 30701 | 83601 | 0 |
| 20010121 | 261157 | Blood and Marrow Transplant Group of Georgia | 960 Johnson Ferry Road, Northeast, Su | Atlanta, GA 30342 | 83601 | 94,327 |
| 200201892 | 216686 | William H. Whaley, M.D., P.C. | 5671 Peachtree Dunwoody Road, Suite | Atlanta, GA 30342 | 83601 | 227,580 |
| 200201892 | 291661 | Dalton Cancer Clinic, P.C. | 1503 Professional Court, Suite 101 | Dalton, GA 30720 | 83601 | 0 |
| 200201790 | 214431 | Northeast Georgia Diagnostic Clinic | 1240 Jesse Jewell Parkway, Suite 500 | Gainesville, GA 30501 | 83602 | 30,266 |
| 200201790 | 227515 | Atlanta Oncology Associates Pc/ Northside Hospital Alpharetta | 3400 Old Milton Park Way | Alpharetta, GA 30005 | 83602 | 0 |
| 200201790 | 228100 | Medical Oncology | 478 Peachtree Street Northeast, Suite | Atlanta, GA 30308 | 83602 | 7,563 |
| 20010094 | 214433 | Hematology and Oncology of N.E. Georgia, P.C. | 820 Prince Avenue | Athens, GA 30606 | 83602 | 7,563 |
| 20010094 | 226796 | Georgia Cancer Specialists Administrative Annex | 1872 Montreal Road | Tucker, GA 30084 | 83602 | 1,931,457 |
| 20010094 | 281299 | Atlanta Oncology Associates | 465 Winn Way, Suite 231 | Decatur, GA 30030 | 83602 | 27,286 |
| 20010094 | 312472 | North Georgia Oncology Hematology | 1240 Jesse Jewell Parkway, Suite 600 | Gainesville, GA 30501 | 83602 | 27,782 |
| 20010109 | 282126 | The Longstreet Clinic, Pc | 200 South Enota Drive, Suite 430 | Gainesville, GA 30501 | 83602 | 64,901 |
| 20010121 | 216685 | Atlanta Hematology and Oncology | 105 Collier Road Northwest, Suite 3040 | Atlanta, GA 30309 | 83602 | 12,894 |
| 20010121 | 223369 | Peachtree Hematology and Oncology Consultants | 95 Collier Road Northwest, Suite 5015 | Atlanta, GA 30309 | 83602 | 307,044 |
| 20010121 | 232559 | Southeastern Gynecologic Oncology | 980 Johnson Ferry Road, Suite 900 | Atlanta, GA 30342 | 83602 | 758,217 |
| 20010094 | 214424 | Clark - Holder Clinic | 303 Smith Street | La Grange, GA 30240 | 83603 | 16,567 |
| 20010094 | 216665 | Spaulding Oncology Services | 230-D West College Street | Griffin, GA 30224 | 83603 | 32,704 |
| 20010094 | 225729 | Harbin Clinic-Rome Hematology Oncology Specialists | 318 West 5th Street | Rome, GA 30165 | 83603 | 806,128 |
| 20010094 | 275002 | Metro Hematology / Oncology Center, P.C. | 777 Cleveland Avenue, Suite 204 | Atlanta, GA 30315 | 83603 | 22,568 |
| 20010094 | 288674 | Columbus Medical Group | 2121 Warm Springs Road, Suite A | Columbus, GA 31904 | 83603 | 130,544 |
| 20010094 | 318688 | Larry Gynther, M.D. | 15 Cavander Street | Newnan, GA 30263 | 83603 | 0 |
| 20010094 | 319006 | Atlanta Oncology Associates | 285 Boulevard Northeast, Suite 430 | Atlanta, GA 30312 | 83603 | 0 |
| 20010115 | 217131 | South Atlanta Hematology-Oncology | 253 Upper Riverdale Road, Suite C | Riverdale, GA 30274 | 83603 | 49,342 |
| 200201892 | 226916 | Price Walker Jr, M.D. | 1013 Talbotton Road | Columbus, GA 31904 | 83603 | 0 |
| 200201892 | 231863 | Columbus Clinic | 610 19th Street | Columbus, GA 31901 | 83603 | 0 |
| 200201892 | 280719 | Georgia Cancer Treatment Center | 483 Upper Riverdale Road, Suite E. | Riverdale, GA 30274 | 83603 | 35,294 |
| 20010094 | 214442 | Phoebe Cancer Center | 425 3rd Avenue, Suite 100 | Albany, GA 31701 | 83604 | 140,553 |
| 20010094 | 218652 | Affinity Health Group | 2225 Highway 41 North | Tifton, GA 31794 | 83604 | 40,320 |
| 20010094 | 226238 | Satilla Regional Cancer Treatment Center | 410 Zachary Street | Waycross, GA 31501 | 83604 | 28,471 |
| 20010094 | 227676 | Central Georgia Hematology Oncology Associates | 682 Hemlock Street, Suite 100 | Macon, GA 31201 | 83604 | 119,729 |
| 20010094 | 276948 | Dublin Hematology and Oncology Care, P.C. | 111 Fairview Park Drive | Dublin, GA 31021 | 83604 | 48,345 |
| 20010094 | 280721 | Douglas Hem Onc Assoc | 209 Pendleton Dr | Valdosta, GA 31602 | 83604 | 71,691 |
| 20010094 | 281811 | Douglas Hematology/Oncology Associates P.C. | 200 Doctors Drive, Suite 102 | Douglas, GA 31533 | 83604 | 2,765 |
| 20010094 | 306377 | Central Georgia Radiation | 770 Pine Street Suite L-20 | Macon, GA 31201 | 83604 | 0 |
| 20010115 | 278341 | South Georgia Oncology and Hematology | 1706 Alice Street | Waycross, GA 31501 | 83604 | 56,777 |
| 200201892 | 234971 | Houston Cancer Center | 212 Hospital Drive, Suite G. | Warner Robins, GA 31088 | 83604 | 5,685 |
| 200201790 | 220438 | Medical Center Clinic, P.A. | 8333 North Davis Highway | Pensacola, FL 32514 | 83701 | 168,245 |
| 20010094 | 218655 | Emerald Coast Oncology Hematology Associates, P.A. | 918 Mar Walt Drive | Fort Walton Beach, FL 32547 | 83701 | 152,236 |
| 20010094 | 220048 | Gulf Coast Oncology | 3 Mobile Infirmary Circle, Suite 301 | Mobile, AL 36607 | 83701 | 194,905 |
| 20010094 | 225700 | Gulf Coast Cancer Treatment Center | 2100 State Avenue | Panama City, FL 32405 | 83701 | 29,318 |
| 20010094 | 229142 | Oncology Center | 188 Hospital Drive, Suite 400 | Fairhope, AL 36532 | 83701 | 115,950 |
| 20010094 | 285221 | Panhandle Cancer Center | 2202 State Avenue Suite 111 | Panama City, FL 32405 | 83701 | 169,293 |
| 20010094 | 286068 | Radiaton Therapy Oncology P.C. | 3719 Dauphin Street, Suite 100 | Mobile, AL 36608 | 83701 | 19,637 |
| 20010121 | 214451 | Bay Oncology Center | 2614 Jenks Avenue | Panama City, FL 32405 | 83701 | 14,274 |
| 20010121 | 214452 | Hematology and Oncology Associates | 1717 North E. Street, Suite 231 | Pensacola, FL 32501 | 83701 | 301,897 |
| 20010094 | 226240 | Marion Medical Associates, P.A. | 1040 Southwest 2nd Avenue | Ocala, FL 34474 | 83702 | 208,850 |
| 20010094 | 216418 | C.L. Cusumano, M.D. | 6831 Northwest 11th Place, Suite 1 | Gainesville, FL 32605 | 83702 | 37,343 |
| 20010094 | 216690 | Cancer and Blood Disease Center | 521 North Lecanto Highway | Lecanto, FL 34461 | 83702 | 78,103 |
| 20010094 | 220925 | Hematology Oncology Associates of Northwest Florida | 1632 Riggins Road | Tallahassee, FL 32308 | 83702 | 21,091 |
| 20010094 | 225878 | Gainesville Hematology/Oncology Associates | 6605 Northwest 9th Boulevard, Suite B. | Gainesville, FL 32605 | 83702 | 127,113 |
| 20010094 | 226002 | M K Kamal, M.D. | 2820 Southwest 3rd Court, Suite 2 | Ocala, FL 34471 | 83702 | 20,640 |
| 20010094 | 276302 | Rakesh Manghani, M.D. | 321 Southeast 29th Place, Suite 102 | Ocala, FL 34471 | 83702 | 0 |
| 20010094 | 279105 | Southeast Region Cancer Center | 2003 Centre Point Boulevard | Tallahassee, FL 32308 | 83702 | 0 |
| 20010121 | 222791 | Citrus Hematology and Oncology Center | 770 Southeast 5th Terrace | Crystal River, FL 34429 | 83702 | 188,001 |
| 20010121 | 315245 | Robert Carroll, M.D. | 6400 West Newberry Road, Suite 206 | Gainsville, FL 32605 | 83702 | 0 |
| 200201790 | 218644 | Southeast Georgia Hematology/Oncology | 1111 Glynco Jetport Parkway | Brunswick, GA 31525 | 83703 | 426,424 |

| | | | | | |
|---|---|---|---|---|---|
| 200201790 | 222922 | Jacksonville Oncology | 6629 Beach Boulevard | Jacksonville, FL 32216 | 83703 | 119,710 |
| 200201790 | 276635 | Baptist Regional Cancer Institute | 1235 San Marco Boulevard, 3rd Floor | Jacksonville, FL 32207 | 83703 | 129,265 |
| 20010094 | 216194 | North Florida Hematology and Oncology Associates | 1801 Barrs Street, Suite 800 | Jacksonville, FL 32204 | 83703 | 315,598 |
| 20010094 | 230154 | Montgomery and Associates, M.D., P.A. | 300 Health Park, Suite 1006 | St. Augustine, FL 32086 | 83703 | 413,058 |
| 20010094 | 282256 | Gainsville Hematology Oncology Associates | 4201 South Highway 47 #3 | Lake City, FL 32025 | 83703 | 4,746 |
| 20010094 | 285643 | North Florida Cancer Center | 67 South Dixie Highway | St. Augustine, FL 32084 | 83703 | 34,644 |
| 20010094 | 285669 | Southeast Gynecologic Oncology Associates, P.A. | 1801 Barrs Street, Suite 720 | Jacksonville, FL 32204 | 83703 | 17,293 |
| 20010109 | 282967 | Coastal Oncology Group | 1375 Roberts Drive, Suite 100 | Jacksonville Beach, FL 32250 | 83703 | 173,830 |
| 20010115 | 221108 | Oncology Medical Center | 3226-G Hampton Avenue | Brunswick, GA 31520 | 83703 | 22,453 |
| 20010115 | 288748 | Coastal Georgia Oncology Hematology, Llc | 2301 Parkwood Drive | Brunswick, GA 31520 | 83703 | 45,947 |
| 200201790 | 214537 | Bond Clinic | 500 East Central Avenue | Winter Haven, FL 33880 | 83704 | 141,337 |
| 200201790 | 214538 | Gessler Clinic | 635 1st Street North | Winter Haven, FL 33881 | 83704 | 140,174 |
| 20010094 | 216696 | Ram Prakash Batra, M.D. | 38172 Medical Center Drive | Zephyrhills, FL 33540 | 83704 | 5,042 |
| 20010094 | 216697 | Bay Area Oncology | 4301 North Habana Avenue, Suite 1 | Tampa, FL 33607 | 83704 | 78,348 |
| 20010094 | 219440 | Antonio Trindade, M.D., Kamal Haider, M.D. and Clark and Daughtrey Medi | 130 Pablo Street | Lakeland, FL 33803 | 83704 | 150,916 |
| 20010094 | 225854 | Hematology/Oncology Consultants | 1414 Swann Avenue | Tampa, FL 33606 | 83704 | 105,514 |
| 20010094 | 230120 | Rafael J. Leon, M.D. | 6712 Dairy Road | Zephyrhills, FL 33540 | 83704 | 1,582 |
| 20010094 | 275868 | University Hematology and Oncology | 3000 East Fletcher Avenue, Suite #240 | Tampa, FL 33613 | 83704 | 9,966 |
| 20010094 | 276703 | Susan Ross, M.D., P.A. | 2243 N. Blvd. W. | Davenport, FL 33837 | 83704 | 30,134 |
| 20010109 | 235428 | Ramesh K. Shah, M.D. | 4910 North Armenia Avenue | Tampa, FL 33603 | 83704 | 2,521 |
| 20010121 | 214536 | Watson Clinic | 1600 Lakeland Hills Boulevard | Lakeland, FL 33805 | 83704 | 154,169 |
| 20010121 | 228340 | Ron Schiff, M.D. | 13601 Bruce B. Downs Boulevard, Suit | Tampa, FL 33613 | 83704 | 101,591 |
| 20010121 | 314873 | Oncology and Hematology Specialists | 4710 North Habana Avenue, Suite 303 | Tampa, FL 33614 | 83704 | 15,126 |
| 20010121 | 316036 | Egberto J. Zayas, M.D., P.A. | 13601 Bruce B. Downs Boulevard, Suit | Tampa, FL 33613 | 83704 | 0 |
| 20010121 | 320126 | Maria D. Bazzini, Do P.A. | 508 South Habana Avenue, Suite 350 | Tampa, FL 33609 | 83704 | 0 |
| 200201892 | 216699 | Amit Shah, M.D. | 6801 Us Highway 27 North, Suite A2 | Sebring, FL 33870 | 83704 | 60,266 |
| 200201892 | 231226 | Joseph Sinkovics, M.D. | 4600 North Habana Avenue, Suites 9 a | Tampa, FL 33614 | 83704 | 109,310 |
| 200201790 | 214545 | Diagnostic Clinic | 1551 West Bay Drive | Largo, FL 33770 | 83705 | 8,206 |
| 200201790 | 216428 | Ayub, Sokoi, Matzkowitz and Sennabaum, dba New Hope Cancer Center | 7651 Medical Drive | Hudson, FL 34667 | 83705 | 118,233 |
| 200201790 | 219289 | Mclaughlin and Marte, M.D.S, Llp | 3850 Tampa Road, Building B, 2nd Flor | Palm Harbor, FL 34684 | 83705 | 297,338 |
| 200201790 | 219679 | Gastroenterology and Oncology Associates | 5767 49th Street North | St. Petersburg, FL 33709 | 83705 | 344,214 |
| 200201790 | 233047 | Ameridrug Pharmacy | 4757-4759 Us Highway 19 | New P0rt Richey, FL 34652 | 83705 | 0 |
| 20010094 | 216704 | Pasco Hernando Oncology Associates, P.A. | 5802 State Road 54 | New Port Richey, FL 34652 | 83705 | 524,740 |
| 20010094 | 219677 | Roberto Araujo, M.D. | 5347 Main Street, Suite 203 | New Port Richey, FL 34652 | 83705 | 33,171 |
| 20010094 | 221513 | Suncoast Internal Medicine Consultants | 13644 Walsingham Road | Largo, FL 33774 | 83705 | 2,403 |
| 20010094 | 221641 | Gulf Coast Oncology Associates | 1201 5th Avenue North, Suite 505 | St. Petersburg, FL 33705 | 83705 | 1,007,374 |
| 20010094 | 226631 | Pasco-Pinellas Cancer Center | 3000 Us 19th | Holiday, FL 34691 | 83705 | 0 |
| 20010094 | 231665 | Roberto Araujo, M.D. | 1744 Alternate 19 South | Tarpon Springs, FL 34689 | 83705 | 10,357 |
| 20010094 | 307671 | David Dresdner, M.D. | 1099 5th Avenue North, Suite 120 | St. Petersburg, FL 33705 | 83705 | 25,210 |
| 20010094 | 318302 | Digestive Disease and Cancer Institute | 34653 Us Highway 19 North | Palm Harbor, FL 34684 | 83705 | 0 |
| 20010109 | 229134 | David Flick, M.D., P.A. | 1260 South Greenwood Avenue, Suite | Clearwater, FL 33756 | 83705 | 65,091 |
| 20010109 | 281706 | Pasadena Physicians Group #2 | 6450 38th Avenue North #300 | St. Petersburg, FL 33710 | 83705 | 45,780 |
| 20010109 | 285827 | Rafael Rocha, M.D. | 640 Tyrone Boulevard North | St. Petersburg, FL 33710 | 83705 | 7,563 |
| 20010121 | 225857 | Pinnellas Hematology and Oncology, P.A. | 1609 Pasadena Avenue South, Suite 21 | St. Petersburg, FL 33707 | 83705 | 0 |
| 200201892 | 226593 | Bay Area Cancer Consultants, P.A. | 3850 Tampa Road, Building A, 2nd Flor | Palm Harbor, FL 34684 | 83705 | 117,240 |
| 200201892 | 231831 | Joseph M. Defelice, M.D. | 303 Pinellas Street, Suite 320, Powell C | Clearwater, FL 33756 | 83705 | 116,862 |
| 200201892 | 232069 | Sneh Lata Gupta, M.D. | 5340 Gulf Drive, Suite 105 | New Port Richey, FL 34652 | 83705 | 63,347 |
| 200201892 | 277093 | Clearwater Hematology Oncology Associates | 303 Pinellas Street, Suite 330 | Clearwater, FL 34616 | 83705 | 0 |

20010094   214436   Augusta Oncology Associates          2101 Central Avenue          Augusta, GA 30904       82203     318,116

# Exhibit 7



US Oncology Contract Status Report
Monthly NET Neupogen®
Chargeback and Direct Sales

**Note:** Sales are NET Sales through 1/31/01.
*Represents Linear Regression Growth Rate.
f/n: US Oncology 1_01.xls, ChartNet

Data Source: Chargeback + Direct Sales

2/8/2001
B.Hazelton



## US Oncology Contract Status Report
## Monthly Gross Neupogen®
## Chargeback and Direct Sales

**Note: Sales are NET Sales through 1/31/01.**
*Represents Linear Regression Growth Rate.
f/n: US Oncology 1_01.xls, ChartGross

Data Source: Chargeback + Direct Sales

2/8/2001
B.Hazelton

## US Oncology Contracted Customer Sales
By Region

| Region | Name | Net Chargeback and Direct Sales | | | | Gross Chargeback and Direct Sales | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2000 Total | 2000 YTD* | 2001 YTD* | Growth** | 2000 Total | 2000 YTD* | 2001 YTD* | Growth** |
| 81000 | Northeast | $  1,089,590 | $  73,904 | $  108,953 | 47% | $  1,291,025 | $  87,460 | $  126,489 | 45% |
| 82000 | Central | 11,203,027 | 707,144 | 954,709 | 35% | 13,273,710 | 837,107 | 1,138,457 | 36% |
| 83000 | Western | 4,788,638 | 329,245 | 543,589 | 65% | 5,673,460 | 389,388 | 651,004 | 67% |
| 84000 | Southeast | 4,932,104 | 379,609 | 445,977 | 17% | 5,839,995 | 448,991 | 534,103 | 19% |
| 85000 | Great Lakes | 3,421,141 | 241,759 | 263,906 | 9% | 4,053,932 | 286,104 | 314,780 | 10% |
| | TOTAL | $25,434,501 | $1,731,660 | $2,317,134 | 34% | $30,132,122 | $2,049,050 | $2,764,833 | 35% |

*YTD Sales are sales through Jan. 31.
**Growth is 2001 YTD sales versus 2000 YTD sales.
f/n: US Oncology 1_01.xls, ByRegion

Data Source: Chargeback + Direct Sales

2/9/2001
B. Hazelton



**US Oncology Contracted Customers**
**Neupogen® Product Mix**
**(480 mcg % of Business)**

*Represents Linear Regression Vial Mix.
f/n: US Oncology 1_01.xls, VialMix

Data Source: Chargeback + Direct Sales

2/9/2001
B.Hazelton

# US Oncology Contracted Customers

## Net Chargeback and Direct Sales

By ACIS

| ACIS | Account Name | Terr# | PSR Name | Q100 | Q200 | Q300 | Q400 | 2000 TOTAL | 2000 YTD* | 2001 YTD* | Growth** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 214237 | Capital District Hematology-Oncology Asso | 81501 | Abrahamson, Janet | 7,771 | 10,705 | 13,371 | 10,249 | 42,096 | 1,943 | 2,518 | 30% |
| 214239 | Quinmed, Inc., Dba: Riverview Cancer Care | 81501 | Abrahamson, Janet | 9,982 | 12,648 | 12,152 | 19,391 | 54,173 | 2,439 | 4,013 | 65% |
| 216398 | Amsterdam Community Cancer Program | 81501 | Abrahamson, Janet | 4,877 | 25,606 | 34,596 | 19,629 | 84,709 | - | 11,333 | 1000% |
| 216596 | Capital District Hematology-Oncology Asso | 81501 | Abrahamson, Janet | 17,484 | 38,853 | 36,911 | 55,416 | 148,664 | 3,885 | 27,546 | 609% |
| 216598 | The Albany Regional Cancer Center | 81501 | Abrahamson, Janet | 24,573 | 24,345 | 14,859 | 15,254 | 79,032 | 11,925 | 6,531 | -45% |
| 231414 | Riverview Cancer Care Medical Associates | 81501 | Abrahamson, Janet | 1,943 | 4,381 | 8,267 | 1,943 | 16,533 | 1,943 | - | -100% |
| 231672 | Northeastern New York Regional Cancer Ca | 81501 | Abrahamson, Janet | 38,936 | 62,558 | 55,738 | 38,566 | 195,798 | 7,543 | 7,555 | 0% |
| 274985 | Northeastern New York Regional Cancer Ca | 81501 | Abrahamson, Janet | 5,601 | 4,381 | 5,601 | 9,693 | 25,276 | - | - | 0% |
| 226724 | Catskill Community Cancer Program | 81503 | Forman, Art | 7,543 | 7,771 | 3,162 | 1,219 | 19,695 | 1,219 | 3,266 | 168% |
| 278584 | Cavell Cancer Treatment Center | 81503 | Forman, Art | 24,800 | 18,476 | 33,335 | 31,128 | 107,740 | 8,267 | 17,823 | 116% |
| 233112 | Interlakes Oncology and Hematology | 81504 | Sgroi, Kristen | - | - | - | 4,013 | 4,013 | - | - | 0% |
| 233113 | Interlakes Oncology and Hematology, P.C. | 81504 | Sgroi, Kristen | - | - | - | - | - | - | 1,259 | 100% |
| 233114 | Interlakes Oncology and Hematology | 81504 | Sgroi, Kristen | 23,312 | 15,541 | 7,771 | 7,834 | 54,458 | 11,656 | 6,020 | -48% |
| 233115 | Interlakes Oncology and Hematology | 81504 | Sgroi, Kristen | 5,828 | - | - | 2,439 | 8,267 | 1,943 | - | -100% |
| 219638 | Berkshire Hematology Oncology, P.C. | 81608 | Federico, Tony | 48,153 | 65,906 | 40,879 | 52,366 | 207,304 | 13,371 | 21,089 | 58% |
| 225556 | Berkshire Hematology Oncology | 81608 | Federico, Tony | 25,255 | 3,162 | 4,877 | 8,538 | 41,832 | 7,771 | - | -100% |
| **81000** | **Region TOTAL:** | | | **$ 246,057** | **$ 294,335** | **$ 271,519** | **$ 277,679** | **$ 1,089,590** | **$ 73,904** | **$ 108,953** | **47%** |
| 216466 | West Texas Cancer Center | 82101 | Jordan, Elizabeth | 5,828 | 18,476 | 20,646 | 15,230 | 60,180 | - | 10,544 | 1000% |
| 230174 | Allison Cancer Center | 82101 | Jordan, Elizabeth | 32,571 | 42,511 | 31,351 | 13,195 | 119,628 | 10,209 | 21,324 | 109% |
| 214942 | Texas Oncology, P.A. | 82102 | Smith, Vicki | 5,105 | 18,972 | 5,828 | 12,280 | 42,184 | 5,105 | 4,013 | -21% |
| 214948 | Texas Oncology, P.A. | 82102 | Smith, Vicki | 37,717 | 27,962 | 43,772 | 51,184 | 160,634 | 8,763 | 23,064 | 163% |
| 216780 | Texas Oncology, P.A. Dba: North Texas Re | 82102 | Smith, Vicki | 29,677 | 32,612 | 37,221 | 29,113 | 128,623 | 7,047 | 20,106 | 185% |
| 217044 | Texas Oncology, P.A. Dba: Texoma Region | 82102 | Smith, Vicki | 23,808 | 16,037 | 20,646 | 12,383 | 72,875 | 8,990 | 1,259 | -86% |
| 217060 | Texas Oncology, P.A. Dba: Paris Regional ( | 82102 | Smith, Vicki | 5,105 | 17,525 | 16,306 | 32,797 | 71,733 | - | 14,086 | 1000% |
| 226289 | Texas Oncology, P.A. | 82102 | Smith, Vicki | 18,972 | 19,241 | 13,144 | 4,013 | 55,370 | 8,990 | 2,007 | -78% |
| 227706 | Texoma Cancer Center of Denison | 82102 | Smith, Vicki | 3,885 | - | 1,943 | - | 5,828 | 1,943 | - | -100% |
| 214943 | Texas Oncology, P.A. | 82103 | Robinson, Shawn | - | - | - | - | - | - | - | 0% |
| 214955 | Tyler Cancer Center/Texas Oncology, P.A. | 82103 | Robinson, Shawn | 103,767 | 81,902 | 69,027 | 39,009 | 293,705 | 31,351 | 23,331 | -26% |
| 219689 | Texas Cancer Center - Mesquite | 82103 | Robinson, Shawn | 31,165 | 41,106 | 23,622 | 20,275 | 116,169 | 7,316 | 7,791 | 6% |
| 219691 | Longview Cancer Center | 82103 | Robinson, Shawn | 39,019 | 30,484 | 24,387 | 42,510 | 136,399 | 13,413 | 17,629 | 31% |
| 225864 | Texas Oncology, P.A. | 82103 | Robinson, Shawn | - | - | 1,943 | - | 1,943 | - | - | 0% |
| 226290 | Texas Oncology, P.A. | 82103 | Robinson, Shawn | 68,758 | 74,855 | 75,805 | 114,526 | 333,943 | 12,152 | 41,901 | 245% |
| 228607 | Texas Oncology, P.A. - Sammons Cancer C | 82103 | Robinson, Shawn | 118,523 | 130,324 | 126,666 | 113,483 | 488,997 | 9,486 | 22,860 | 141% |
| 230982 | Texas Cancer Center - South Dallas | 82103 | Robinson, Shawn | 29,181 | 59,127 | 42,821 | 43,463 | 174,593 | 14,095 | 7,791 | -45% |
| 285894 | Texas Oncology, P.A. Corsica | 82103 | Robinson, Shawn | - | - | - | - | - | - | 3,266 | 500% |
| 233017 | Texas Oncology, P.A. | 82104 | Kyle, Steven | 9,755 | 27,962 | 32,343 | 44,817 | 114,877 | 1,219 | 2,007 | 65% |
| 233672 | Texas Oncology | 82104 | Kyle, Steven | 2,439 | - | - | - | 2,439 | 2,439 | - | -100% |
| 234553 | Texas Oncology, P.A. | 82104 | Kyle, Steven | 1,219 | 1,219 | 6,324 | 3,162 | 11,925 | - | - | 0% |
| 224941 | Southwestern New Mexico Oncology Llc | 82105 | Granillo, Raul | 43,545 | 9,755 | 27,239 | 23,312 | 103,850 | 13,371 | - | -100% |
| 234966 | El Paso Cancer Treatment Center East - Te | 82105 | Granillo, Raul | 34,327 | 19,737 | 15,810 | 9,590 | 79,464 | 13,144 | 3,266 | -75% |
| 275087 | El Paso Cancer Treatment Center | 82105 | Granillo, Raul | 6,820 | 14,363 | 6,820 | 8,866 | 36,870 | 4,381 | 4,525 | 3% |

*YTD sales are Net Sales through Jan. 31.
**Growth is 2001 YTD sales versus 2000 YTD sales.

Data Source: Chargeback + Direct Sales

2/8/2001
B. Hazelton
US Oncology 1_01.xls

# US Oncology Contracted Customers

## Net Chargeback and Direct Sales

By ACIS

| ACIS | Account Name | Terr# | PSR Name | Q100 | Q200 | Q300 | Q400 | 2000 TOTAL | 2000 YTD* | 2001 YTD* | Growth** |
|------|-------------|-------|----------|------|------|------|------|-----------|-----------|-----------|----------|
| 214237 | Capital District Hematology-Oncology Assoc | 81501 | Abrahamson, Janet | 7,771 | 10,705 | 13,371 | 10,249 | 42,096 | 1,943 | 2,518 | 30% |
| 214958 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 1,219 | 3,162 | 3,658 | 5,105 | 13,144 | - | - | 0% |
| 216783 | Texas Cancer Center - Fort Worth | 82106 | Knautz, Geoff | - | 9,713 | 1,943 | 3,949 | 15,605 | - | - | 0% |
| 216804 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 1,943 | - | - | - | 1,943 | - | - | 0% |
| 217023 | Texas Oncology, P.A. Dba: Mid-Cities Onco | 82106 | Knautz, Geoff | 1,219 | - | 2,439 | 1,259 | 4,917 | 1,219 | 3,266 | 168% |
| 221172 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 30,401 | 36,456 | 48,608 | 22,972 | 138,436 | 10,705 | 8,538 | -20% |
| 225619 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 19,923 | 9,713 | - | - | 29,636 | 11,656 | - | -100% |
| 225761 | Texas Oncology, P.A. Dba: Mid-Cities Onco | 82106 | Knautz, Geoff | 3,658 | 6,820 | 29,987 | 9,777 | 50,243 | 3,658 | 4,013 | 10% |
| 226060 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 22,589 | 33,563 | 63,467 | 7,771 | 127,389 | 13,599 | - | -100% |
| 226292 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 10,209 | 2,439 | 7,543 | 6,097 | 26,288 | 5,105 | 3,778 | -26% |
| 231998 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | - | - | - | - | - | - | - | 0% |
| 232264 | Texas Cancer Center South | 82106 | Knautz, Geoff | 19,695 | 26,019 | 53,258 | 19,199 | 118,172 | 7,771 | 15,069 | 94% |
| 232967 | Texas Cancer Center | 82106 | Knautz, Geoff | 9,755 | 6,820 | 9,982 | 13,863 | 40,420 | 2,439 | 2,518 | 3% |
| 235196 | Texas Oncology | 82106 | Knautz, Geoff | - | - | 1,219 | 1,259 | 2,479 | - | - | 0% |
| 235499 | Texoma Cancer Center | 82106 | Knautz, Geoff | 33,294 | 40,114 | 30,359 | 25,323 | 129,090 | 9,713 | 13,796 | 42% |
| 282164 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | - | 31,083 | 27,693 | 27,094 | 85,869 | - | 9,797 | 1000% |
| 285951 | Texas Oncology P.A. of Denton | 82106 | Knautz, Geoff | - | - | - | 3,266 | 3,266 | - | - | 0% |
| 220086 | Cancer Care Associates - Integris Baptist C | 82107 | Hampton, Jeanne | 38,626 | 67,766 | 111,000 | 71,070 | 288,462 | 1,943 | 22,072 | 1036% |
| 224525 | Cancer Care Associates - Norman Campus | 82107 | Hampton, Jeanne | 15,810 | 18,476 | 17,753 | 38,754 | 90,792 | 4,381 | - | -100% |
| 225309 | Cancer Care Associates -  Mercy Campus | 82107 | Hampton, Jeanne | 10,478 | 18,021 | 16,575 | 30,484 | 75,559 | 5,601 | 7,791 | 39% |
| 233111 | Cancer Care Associates - Shawnee Campu | 82107 | Hampton, Jeanne | 7,771 | 9,486 | 13,599 | 15,669 | 46,524 | 3,885 | - | -100% |
| 234875 | Cancer Care Associates - Duncan Campus | 82107 | Hampton, Jeanne | - | 6,324 | 13,867 | 13,499 | 33,690 | - | - | 0% |
| 278590 | Cancer Care Associates - Hefner Pointe Ca | 82107 | Hampton, Jeanne | 100,192 | 119,164 | 97,753 | 140,319 | 457,428 | 23,353 | 46,426 | 99% |
| 281088 | Cancer Care Associates - Integris Southwe | 82107 | Hampton, Jeanne | 41,375 | 45,033 | 58,177 | 43,979 | 188,564 | 6,324 | 12,827 | 103% |
| 281648 | Cancer Care Associates - Ardmore Campus | 82107 | Hampton, Jeanne | 35,051 | 31,930 | 39,928 | 46,663 | 153,572 | 20,915 | 16,328 | -22% |
| 217034 | Cancer Care Associates | 82108 | Schwier, Jason | 30,669 | 35,960 | 29,450 | 62,398 | 158,477 | 1,219 | 15,581 | 1178% |
| 228549 | Cancer Care Associates - Stillwater | 82108 | Schwier, Jason | 4,381 | 6,324 | 9,486 | 1,219 | 21,411 | - | 2,518 | 100% |
| 228605 | Cancer Care Associates - Bartlesville | 82108 | Schwier, Jason | - | 1,219 | 5,828 | 5,956 | 13,003 | - | 4,013 | 200% |
| 233821 | Cancer Care Associates - Enid | 82108 | Schwier, Jason | 7,047 | 3,885 | 3,658 | 723 | 15,314 | 1,943 | - | -100% |
| 234872 | Cancer Care Associates | 82108 | Schwier, Jason | 8,990 | - | - | - | 8,990 | 3,885 | - | -100% |
| 278591 | Cancer Care Associates - Mingo | 82108 | Schwier, Jason | 10,478 | 13,371 | 19,695 | 21,949 | 65,494 | 2,439 | 6,020 | 147% |
| 278615 | Cancer Care Associates | 82108 | Schwier, Jason | 7,771 | 25,523 | 22,857 | 56,242 | 112,393 | 3,885 | 6,531 | 68% |
| 281952 | Cca Mcalester | 82108 | Schwier, Jason | 4,381 | 2,439 | - | 6,940 | 13,760 | - | 3,266 | 300% |
| 214951 | Texas Oncology, P.A. | 82109 | Grayson, James | 34,245 | 40,073 | 42,739 | 28,576 | 145,631 | 10,933 | 27,064 | 148% |
| 223441 | Southwest Regional Cancer Center | 82201 | Gonzalez, Alberto | 12,152 | 4,381 | 12,152 | 9,118 | 37,803 | 6,324 | 1,259 | -80% |
| 223545 | Southwest Regional Cancer Center | 82201 | Gonzalez, Alberto | 65,183 | 87,275 | 89,218 | 114,620 | 356,296 | 17,753 | 43,478 | 145% |
| 225629 | Southwest Regional Cancer Center/Central | 82201 | Gonzalez, Alberto | 17,257 | 20,687 | 17,525 | 21,290 | 76,759 | 10,933 | 3,266 | -70% |
| 228554 | Texas Oncology, P.A. | 82201 | Gonzalez, Alberto | 34,782 | 95,583 | 113,253 | 104,388 | 348,007 | 1,943 | 18,570 | 856% |
| 231658 | South Austin Cancer Center | 82201 | Gonzalez, Alberto | 80,414 | 65,100 | 79,422 | 43,937 | 268,872 | 33,521 | 12,039 | -64% |
| 231997 | Texas Oncology, P.A. | 82201 | Gonzalez, Alberto | - | - | - | - | - | - | - | 0% |
| 215023 | South Texas Cancer Center | 82202 | Valladares, Cris | 97,402 | 62,661 | 58,776 | 47,798 | 266,637 | 27,693 | 24,078 | -13% |
| 220087 | Texas Oncology, P.A. Dba: Valley Oncology | 82202 | Valladares, Cris | 8,267 | 26,247 | 24,573 | 42,864 | 101,950 | - | - | 0% |
| 230907 | South Texas Cancer Center | 82202 | Valladares, Cris | 6,324 | 9,982 | 12,917 | 6,452 | 35,674 | 1,943 | 2,518 | 30% |

*YTD sales are Net Sales through Jan. 31.
**Growth is 2001 YTD sales versus 2000 YTD sales.

Data Source: Chargeback + Direct Sales

2/8/2001
B. Hazelton
US Oncology 1_01.xls

# US Oncology Contracted Customers

## Net Chargeback and Direct Sales

By ACIS

| ACIS | Account Name | Terr# | PSR Name | Q100 | Q200 | Q300 | Q400 | 2000 TOTAL | 2000 YTD* | 2001 YTD* | Growth** |
|------|--------------|-------|----------|------|------|------|------|------------|-----------|-----------|----------|
| 214237 | Capital District Hematology-Oncology Asso | 81501 | Abrahamson, Janet | 7,771 | 10,705 | 13,371 | 10,249 | 42,096 | 1,943 | 2,518 | 30% |
| 235271 | Valley Oncology, P.A. | 82202 | Valladares, Cris | - | - | - | - | - | - | - | 0% |
| 235947 | South Texas Cancer Center, Dba: Valley On | 82202 | Valladares, Cris | - | - | - | - | - | - | - | 0% |
| 226474 | Lawrence Foote, M.D. | 82203 | Guin, Larry | 3,885 | 1,219 | 3,162 | 6,492 | 14,758 | - | - | 0% |
| 277662 | Texas Oncology, P.A. | 82203 | Guin, Larry | 19,427 | - | - | - | 19,427 | - | - | 0% |
| 225755 | United States Oncology Dba: Texas Oncolo | 82204 | Badon, Ty | 3,885 | 5,828 | - | 2,504 | 12,218 | - | 5,008 | 500% |
| 230981 | Texas Oncology, P.A. | 82204 | Badon, Ty | 39,349 | 33,025 | 36,911 | 45,064 | 154,349 | 9,713 | 16,052 | 65% |
| 224532 | Philip Cimo, M.D. | 82205 | Rawlins, Kimberly | 2,439 | - | - | - | 2,439 | 2,439 | - | -100% |
| 235270 | Texas Oncology, P.A. | 82205 | Rawlins, Kimberly | 8,039 | 2,439 | 5,601 | - | 16,079 | 4,381 | 1,259 | -71% |
| 226495 | Texas Oncology, P.A. | 82206 | Hendrix, Holley | 67,394 | 67,394 | 50,633 | 60,772 | 246,193 | 10,209 | 3,266 | -68% |
| 230570 | Texas Oncology | 82206 | Hendrix, Holley | 10,705 | 4,877 | 3,658 | 1,219 | 20,460 | 1,943 | - | -100% |
| 234777 | Hemonc Physician Enterprise | 82206 | Hendrix, Holley | 1,943 | 6,820 | - | - | 8,763 | 1,943 | - | -100% |
| 225272 | Texas Oncology P.A. Deke Slayton Cancer | 82206 | Varacek, Timothy | - | - | - | 6,256 | 6,256 | - | 3,778 | 300% |
| 217621 | Oncology for San Antonio | 82207 | Flores, Robert | - | - | - | 3,698 | 3,698 | - | 3,266 | 300% |
| 225669 | Fred M. Massey, M.D., P.A. | 82207 | Flores, Robert | - | - | - | - | - | - | - | 0% |
| 232777 | Texas Oncology, P.A. | 82207 | Flores, Robert | - | - | 6,324 | - | 6,324 | - | - | 0% |
| 278600 | Cancer Care Network of South Texas - Sou | 82207 | Flores, Robert | 10,933 | 8,763 | 4,877 | 7,396 | 31,968 | 5,828 | 1,259 | -78% |
| 215007 | San Antonio Tumor and Blood Clinic | 82208 | Sanchez, Robert | 4,877 | 10,705 | 14,591 | 11,385 | 41,558 | - | 6,097 | 600% |
| 215011 | San Antonio Tumor and Blood Clinic | 82208 | Sanchez, Robert | 51,501 | 132,638 | 10,209 | 64,051 | 258,400 | 20,419 | 13,063 | -36% |
| 219822 | Hematology Oncology Associates | 82208 | Sanchez, Robert | 99,159 | 168,598 | 143,530 | 100,466 | 511,752 | 31,124 | 38,636 | 24% |
| 229054 | Southwest Regional Cancer Center | 82208 | Sanchez, Robert | 25,337 | 18,517 | 3,658 | 11,213 | 58,726 | 3,658 | 7,791 | 113% |
| 231675 | Texas Oncology, P.A. | 82208 | Sanchez, Robert | 22,361 | 11,656 | 19,427 | 23,567 | 77,011 | 11,656 | 8,026 | -31% |
| 233127 | San Antonio Tumor and Blood Clinic | 82208 | Sanchez, Robert | 5,105 | 8,267 | - | - | 13,371 | 1,943 | - | -100% |
| 235273 | Cancer Care Network | 82208 | Sanchez, Robert | 14,818 | 5,828 | 6,324 | 11,036 | 38,006 | 5,105 | 2,007 | -61% |
| 278601 | Cancer Care Network of South Texas - Kerr | 82208 | Sanchez, Robert | 5,105 | 1,943 | 6,324 | 8,370 | 21,742 | 1,219 | 1,259 | 3% |
| 279064 | Texas Oncology, P.A. | 82208 | Sanchez, Robert | 6,324 | 12,648 | 15,314 | 7,898 | 42,184 | 3,885 | - | -100% |
| 281641 | Hematology and Oncology Associates of Sc | 82208 | Sanchez, Robert | - | - | 22,589 | 46,391 | 68,980 | - | 13,298 | 1000% |
| 217620 | Oncology - Hematology Associates of Kans | 82303 | Thomson, Brett | 3,162 | - | 5,105 | 5,892 | 14,158 | 3,162 | 2,007 | -37% |
| 219197 | Oncology-Hematology Clinic of Kansas City | 82303 | Thomson, Brett | 13,867 | 12,648 | - | - | 26,515 | 5,601 | 2,518 | -55% |
| 219198 | Oncology-Hematology Clinic of Kansas City | 82303 | Thomson, Brett | 3,658 | - | 3,658 | - | 7,316 | 1,219 | - | -100% |
| 231957 | Oncology Hematology Associates of Kansa | 82303 | Thomson, Brett | 33,790 | 31,351 | 31,847 | 41,847 | 138,835 | 12,152 | 11,292 | -7% |
| 231959 | Oncology - Hematology Associates of Kans | 82303 | Thomson, Brett | 9,755 | 9,982 | 9,982 | 12,564 | 42,283 | 2,439 | 3,778 | 55% |
| 278574 | Clinical Hematology Oncology - Barry Road | 82303 | Thomson, Brett | 3,885 | 8,990 | 9,713 | 3,202 | 25,790 | - | - | 0% |
| 280919 | Missouri Cancer Associates | 82303 | Thomson, Brett | 9,713 | 19,695 | 7,771 | 5,169 | 42,348 | 3,885 | 2,007 | -48% |
| 285568 | Oncology Hematology Associates | 82305 | Huck, Todd | - | - | - | 3,202 | 3,202 | - | - | 0% |
| 214862 | Missouri Cancer Associates | 82305 | Huck, Todd | 29,140 | 39,349 | 24,800 | 13,971 | 107,260 | 5,828 | 2,007 | -66% |
| 219196 | Oncology - Hematology Associates of Kans | 82305 | Huck, Todd | 3,162 | 11,201 | 3,162 | - | 17,525 | - | - | 0% |
| 233141 | Cliffview Hematology and Oncology, Llc. | 82305 | Huck, Todd | 7,771 | 7,047 | 11,429 | 7,834 | 34,081 | - | 2,007 | 100% |
| 274888 | Missouri Cancer Association | 82305 | Huck, Todd | 14,136 | 14,363 | 24,800 | 10,544 | 63,844 | - | 4,525 | 1000% |
| 216764 | Hertzler Clinic | 82308 | Bullock, John | (214) | 11,429 | 5,105 | 5,892 | 22,211 | (2,156) | 4,013 | -286% |
| 216765 | Cancer Center of Kansas | 82308 | Bullock, John | - | 1,943 | 12,421 | 1,219 | 15,583 | - | 2,007 | 1000% |
| 218671 | Dodge City Medical Center and Cancer Cen | 82308 | Bullock, John | 1,943 | 12,152 | 12,875 | 12,172 | 39,142 | - | 3,266 | 1000% |
| 219321 | Cancer Center of Kansas | 82308 | Bullock, John | 27,280 | 66,133 | 112,757 | 86,645 | 292,815 | - | 21,089 | 1000% |

*YTD sales are Net Sales through Jan. 31.
**Growth is 2001 YTD sales versus 2000 YTD sales.                    Data Source: Chargeback + Direct Sales

2/8/2001
B. Hazelton
US Oncology 1_01.xls

# US Oncology Contracted Customers

## Net Chargeback and Direct Sales

By ACIS

| ACIS | Account Name | Terr# | PSR Name | Q100 | Q200 | Q300 | Q400 | 2000 TOTAL | 2000 YTD* | 2001 YTD* | Growth** |
|------|-------------|-------|----------|------|------|------|------|------------|-----------|-----------|----------|
| 214237 | Capital District Hematology-Oncology Assoc | 81501 | Abrahamson, Janet | 7,771 | 10,705 | 13,371 | 10,249 | 42,096 | 1,943 | 2,518 | 30% |
| 221843 | Cancer Center of Kansas | 82308 | Bullock, John | 3,658 | 4,381 | 7,047 | 3,949 | 19,036 | 1,219 | 2,007 | 65% |
| 228103 | Cancer Center of Kansas | 82308 | Bullock, John | 1,219 | 1,943 | 12,648 | 3,162 | 18,972 | - | 2,007 | 1000% |
| 228488 | Cancer Center of Kansas | 82308 | Bullock, John | 5,828 | 1,943 | - | - | 7,771 | 5,828 | - | -100% |
| 278585 | Cancer Center of Kansas - Sumner | 82308 | Bullock, John | - | - | - | 1,219 | 1,219 | - | - | 0% |
| 278586 | Cancer Center of Kansas - Newton | 82308 | Bullock, John | 2,439 | 3,162 | 3,162 | 2,007 | 10,769 | - | 4,013 | 1000% |
| 281650 | Cck - Eureka | 82308 | Bullock, John | - | - | - | - | - | - | - | 0% |
| 281772 | Cancer Center of Kansas - Kingman | 82308 | Bullock, John | 3,162 | 1,943 | 1,943 | - | 7,047 | 3,162 | - | -100% |
| 285050 | Cancer Center of Kansas | 82308 | Bullock, John | - | - | 3,162 | 5,892 | 9,054 | - | 3,266 | 1000% |
| 226917 | Oncology Associates of Cedar Rapids | 82402 | Severns, Janice | 7,771 | 11,656 | 1,943 | 5,828 | 27,197 | - | 3,266 | 1000% |
| 224020 | Minnesota Oncology Hematology, P.A. | 82404 | Johnson, Vaughn | 23,395 | 32,839 | 18,249 | 6,531 | 81,014 | 4,877 | - | -100% |
| 225383 | Minnesota Oncology Hematology, P.A. | 82404 | Johnson, Vaughn | 10,705 | 27,011 | 58,321 | 48,224 | 144,262 | 3,162 | 9,797 | 210% |
| 235500 | Minnesota Oncology Hematology, P.A. | 82404 | Johnson, Vaughn | 48,649 | 34,059 | 51,584 | 51,186 | 185,478 | 19,468 | 14,598 | -25% |
| 216737 | Minnesota Oncology Hematology, P.A. | 82405 | Carroll, Becki | 23,353 | 9,486 | 10,705 | 9,442 | 52,987 | 5,601 | 3,266 | -42% |
| 216738 | Minnesota Oncology Hematology | 82405 | Carroll, Becki | 7,543 | 11,925 | 17,525 | 14,862 | 51,855 | 6,324 | 6,531 | 3% |
| 232678 | Minnesota Oncology Hematology | 82405 | Carroll, Becki | 4,877 | 3,658 | - | 3,738 | 12,273 | 2,439 | - | -100% |
| 277493 | Minnesota Oncology Hematology, P.A. | 82405 | Carroll, Becki | 3,162 | - | - | - | 3,162 | 1,943 | - | -100% |
| 215053 | Rocky Mountain Cancer Center | 82502 | Adams, Michael | 51,811 | 34,782 | 70,639 | 63,332 | 220,564 | 17,753 | 48,709 | 174% |
| 227597 | Rocky Mountain Cancer Centers | 82502 | Adams, Michael | 3,162 | 3,162 | 9,755 | 21,247 | 37,325 | 1,219 | - | -100% |
| 233107 | Rocky Mountain Cancer Center | 82502 | Adams, Michael | 1,219 | - | 1,219 | 5,169 | 7,607 | - | 2,007 | 1000% |
| 278574 | Rocky Mountain Cancer Center-Northern Co | 82502 | Adams, Michael | 41,106 | 24,077 | 26,743 | 35,344 | 127,270 | 14,363 | 26,361 | 84% |
| 285950 | Rocky Mountain Cancer Care | 82502 | Adams, Michael | - | - | - | 3,266 | 3,266 | - | - | 0% |
| 221863 | Rocky Mountain Cancer Center | 82503 | Hudson, Marshall | 68,117 | 40,651 | 40,693 | 27,462 | 176,923 | 4,877 | 30,139 | 518% |
| 233099 | Childhood Hematology - Oncology Associat | 82503 | Hudson, Marshall | - | - | - | - | - | - | - | 0% |
| 280498 | Childhood Hematology Oncology Associates | 82503 | Hudson, Marshall | 2,439 | 3,658 | - | 3,226 | 9,323 | 1,219 | - | -100% |
| 281774 | Rocky Mountain Cancer Center | 82503 | Hudson, Marshall | 3,162 | - | - | - | 3,162 | - | - | 0% |
| 216662 | Rocky Mountain Cancer Centers-Thornton | 82504 | Keyworth, Claudia | 6,097 | 1,219 | - | 5,272 | 12,588 | - | - | 0% |
| 216664 | Rocky Mountain Cancer Center | 82504 | Keyworth, Claudia | 27,011 | 12,421 | 11,201 | 10,417 | 61,050 | 11,925 | - | -100% |
| 219456 | Rocky Mountain Cancer Center - Englewood | 82504 | Keyworth, Claudia | 14,859 | 29,491 | 39,432 | 43,516 | 127,299 | - | 10,033 | 1000% |
| 226712 | David Link, M.D. | 82504 | Keyworth, Claudia | 1,219 | 6,097 | 10,933 | 12,152 | 30,401 | - | - | 0% |
| 230694 | Rocky Mountain Cancer Center | 82504 | Keyworth, Claudia | 18,745 | 21,142 | 29,409 | 10,209 | 79,505 | 1,219 | - | -100% |
| 231404 | Rocky Mountain Cancer Center - West | 82504 | Keyworth, Claudia | 3,658 | 3,162 | 2,439 | - | 9,259 | - | - | 0% |
| 234876 | St. Vrain Oncology Hematology Group | 82504 | Keyworth, Claudia | 2,439 | 4,877 | 4,381 | - | 11,697 | - | - | 0% |
| 285264 | Rocky Mountain Cancer Center | 82504 | Keyworth, Claudia | - | - | - | 7,436 | 7,436 | - | 4,525 | 1000% |
| 285895 | Rocky Mountain Cancer Center | 82504 | Keyworth, Claudia | - | - | - | 2,007 | 2,007 | - | 17,588 | 1000% |
| 281561 | Little Rock Hematology Oncology Associate | 82603 | McGee, James | 25,751 | 40,796 | 47,843 | 52,092 | 166,481 | - | 4,525 | 1000% |
| 216457 | Arkansas Oncology Associates | 82604 | Parsons, Bradley | 38,213 | 19,737 | 24,118 | 13,140 | 95,207 | 17,753 | 8,302 | -53% |
| 222619 | Arkansas Oncology Clinic | 82604 | Parsons, Bradley | 12,875 | 7,047 | 9,713 | 5,169 | 34,804 | 5,105 | 2,007 | -61% |
| **82000** | **Region TOTAL:** | | | **$ 2,515,415** | **$ 2,850,758** | **$ 2,977,383** | **$ 2,859,472** | **$ 11,203,027** | **$ 707,144** | **$ 954,709** | **35%** |
| 216641 | Willamette Valley Cancer Center | 83102 | Sheehan, Elizabeth | 9,713 | 23,312 | 15,541 | 27,644 | 76,211 | - | 6,020 | 1000% |
| 219413 | Oncology Associates of Oregon in Partnersh | 83102 | Sheehan, Elizabeth | 39,928 | 102,528 | 48,649 | 79,374 | 270,479 | 13,867 | 15,069 | 9% |

*YTD sales are Net Sales through Jan. 31.
**Growth is 2001 YTD sales versus 2000 YTD sales.

Data Source: Chargeback + Direct Sales

2/8/2001
B. Hazelton
US Oncology 1_01.xls

# US Oncology Contracted Customers

## Net Chargeback and Direct Sales

By ACIS

| ACIS | Account Name | Terr# | PSR Name | Q100 | Q200 | Q300 | Q400 | 2000 TOTAL | 2000 YTD* | 2001 YTD* | Growth** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 214237 | Capital District Hematology-Oncology Assoc | 81501 | Abrahamson, Janet | 7,771 | 10,705 | 13,371 | 10,249 | 42,096 | 1,943 | 2,518 | 30% |
| 215316 | Oregon Oncology Hematology Group | 83103 | Palmer, Amy | 3,885 | 19,427 | 15,541 | 9,841 | 48,694 | - | 4,013 | 1000% |
| 215318 | Health First Medical Group, P.C. | 83103 | Palmer, Amy | 17,029 | 26,784 | 28,955 | 37,778 | 110,587 | 1,219 | 4,525 | 271% |
| 216485 | Northwest Cancer Specialists, P.C. | 83103 | Palmer, Amy | 37,717 | 35,505 | 21,865 | 33,388 | 128,476 | 11,429 | 8,026 | -30% |
| 225897 | Hematology Clinic, P.C. | 83103 | Palmer, Amy | 17,980 | 19,509 | 21,948 | 13,532 | 72,970 | - | 5,037 | 1000% |
| 225898 | Northwest Cancer Specialists - Portland Adv | 83103 | Palmer, Amy | 4,877 | - | 3,162 | 3,885 | 11,925 | 2,439 | 4,013 | 65% |
| 227474 | Pacific Northwest Oncology Associates, P.C | 83103 | Palmer, Amy | - | 3,162 | - | - | 3,162 | - | - | 0% |
| 228196 | Hematology Clinic - St. Vincents | 83103 | Palmer, Amy | - | 1,943 | - | - | 1,943 | - | - | 0% |
| 278593 | Pacific Northwest Oncology Associates, P.C | 83103 | Palmer, Amy | 10,478 | 20,460 | 10,478 | 11,173 | 52,589 | - | 18,847 | 1000% |
| 285023 | Northwest Cancer Specialists | 83103 | Palmer, Amy | - | - | 1,219 | - | 1,219 | - | - | 0% |
| 278592 | Hematology Clinic - Willamette Falls | 83104 | Bushnell, David | 6,324 | 11,201 | 4,877 | 6,324 | 28,727 | - | - | 0% |
| 216241 | Puget Sound Cancer Center | 83107 | Tofthagen, Cherie | 122,409 | 102,032 | 130,903 | 126,674 | 482,018 | 43,813 | 5,037 | -89% |
| 224100 | Puget Sound Cancer Center | 83107 | Tofthagen, Cherie | 77,831 | 58,590 | 62,207 | 72,295 | 270,922 | 32,839 | 35,646 | 9% |
| 217069 | Cancer Care Northwest | 83108 | Caterinichio, Teresa | 17,753 | 1,943 | 11,656 | 28,652 | 60,003 | 6,820 | 9,285 | 36% |
| 219473 | Spokane Oncology and Hematology Associa | 83108 | Caterinichio, Teresa | 12,421 | 5,601 | 4,381 | - | 22,403 | 5,601 | 3,266 | -42% |
| 226334 | Spokane Oncology and Hematology Associa | 83108 | Caterinichio, Teresa | 12,648 | 8,763 | 4,381 | 4,997 | 30,789 | 3,162 | 1,259 | -60% |
| 221754 | New Mexico Cancer Care Associates | 83501 | Eagle, Richard | 13,623 | 24,387 | 19,509 | 31,272 | 88,791 | 2,649 | 11,804 | 346% |
| 227098 | Southwest Cancer Clinic - Heather Allen M.I | 83502 | Carlson, Charles | 171,843 | (12,875) | - | - | 158,968 | 14,818 | - | -100% |
| 227291 | Southwest Cancer Clinic | 83502 | Carlson, Charles | - | 258,126 | 317,129 | 263,897 | 839,153 | - | 140,067 | 0% |
| 229619 | Nevada Cancer Center | 83502 | Carlson, Charles | 67,270 | - | - | - | 67,270 | 27,197 | - | -100% |
| 231778 | Southwest Cancer Clinic - Siena Campus | 83502 | Carlson, Charles | 21,411 | 13,867 | 22,361 | 11,036 | 68,676 | 3,162 | 6,531 | 107% |
| 231780 | Southwest Cancer Clinic - West | 83502 | Carlson, Charles | 10,209 | 17,980 | 40,341 | 16,309 | 84,839 | 2,439 | - | -100% |
| 220091 | Canon Medical Clinic | 83504 | Kotecki, Sandra | 1,219 | 1,219 | 2,439 | 4,917 | 9,795 | - | 8,302 | 1000% |
| 223854 | Hematology Associates | 83504 | Kotecki, Sandra | 145,596 | 91,657 | 126,480 | 50,204 | 413,937 | 48,381 | 64,208 | 33% |
| 229395 | Northern Arizona Hematology and Oncology | 83504 | Kotecki, Sandra | 4,877 | 6,097 | 21,411 | 7,898 | 40,283 | 1,219 | 2,007 | 65% |
| 230647 | Northern Arizona Hematology and Oncology | 83504 | Kotecki, Sandra | 17,029 | 27,962 | 25,565 | 22,736 | 93,292 | 23,085 | 15,069 | -35% |
| 226645 | Clinical Hematology-Oncology Associates | 83505 | Hickey, Victoria | 19,509 | 20,233 | 23,167 | 29,543 | 92,453 | 4,877 | 15,110 | 210% |
| 234887 | Hematology Associates | 83505 | Hickey, Victoria | 36,456 | 41,788 | 15,087 | 31,914 | 125,244 | 3,885 | 9,285 | 139% |
| 235063 | Clinical Hematology Oncology Associates, F | 83505 | Hickey, Victoria | 19,241 | 15,851 | 17,794 | 29,442 | 82,328 | 5,601 | 16,093 | 187% |
| 216960 | Arizona Oncology Associates | 83507 | Kaufmann, Brad | 41,106 | 44,495 | 24,800 | 60,938 | 171,339 | 15,087 | 25,102 | 66% |
| 224520 | Hematology and Oncology Physicians, P.C. | 83507 | Kaufmann, Brad | 89,487 | 68,386 | 84,651 | 119,959 | 362,482 | 30,132 | 26,126 | -13% |
| 228722 | Arizona Oncology Associates | 83507 | Kaufmann, Brad | 18,249 | 38,667 | 35,278 | 60,445 | 152,639 | 2,439 | 22,624 | 828% |
| 232961 | Arizona Oncology Associates | 83507 | Kaufmann, Brad | 34,968 | 17,484 | 42,015 | 54,330 | 148,797 | 19,427 | 56,182 | 189% |
| 276235 | Arizona Oncology Associates | 83507 | Kaufmann, Brad | - | - | 2,439 | 1,943 | 4,381 | - | - | 0% |
| 276930 | The Arizona Oncology Associates | 83507 | Kaufmann, Brad | 6,097 | 6,097 | 19,468 | 31,620 | 63,281 | - | 5,037 | 1000% |
| 278565 | Arizona Oncology Associates - Green Valley | 83507 | Kaufmann, Brad | 18,517 | 9,259 | 7,047 | 12,752 | 47,575 | 3,658 | - | -100% |
| **83000** | **Region TOTAL:** | | | **$ 1,127,701** | **$ 1,131,438** | **$ 1,232,787** | **$ 1,296,712** | **$ 4,788,638** | **$ 329,245** | **$ 543,589** | **65%** |
| 214455 | Ocala Oncology Center, P.A. | 84101 | Sampl, Timothy | 48,877 | 44,454 | 38,853 | 7,962 | 140,146 | 17,257 | 10,033 | -42% |
| 216194 | North Florida Hematology and Oncology As | 84102 | Hanks, Don | 23,312 | 27,197 | 23,312 | 13,854 | 87,675 | 7,771 | - | -100% |
| 216882 | Hematology-Oncology Associates | 84102 | Hanks, Don | 49,827 | 34,782 | 44,268 | 47,845 | 176,722 | 18,476 | 20,618 | 12% |
| 226137 | Marsland and Sullivan, M.D.S. P.A. | 84102 | Hanks, Don | - | - | 6,097 | 4,013 | 10,110 | - | 5,272 | 1000% |

*YTD sales are Net Sales through Jan. 31.
**Growth is 2001 YTD sales versus 2000 YTD sales.

Data Source: Chargeback + Direct Sales

2/8/2001
B. Hazelton
US Oncology 1_01.xls

# US Oncology Contracted Customers

## Net Chargeback and Direct Sales

By ACIS

| ACIS | Account Name | Terr# | PSR Name | Q100 | Q200 | Q300 | Q400 | 2000 TOTAL | 2000 YTD* | 2001 YTD* | Growth** |
|------|--------------|-------|----------|------|------|------|------|------------|-----------|-----------|----------|
| 214237 | Capital District Hematology-Oncology Asso | 81501 | Abrahamson, Janet | 7,771 | 10,705 | 13,371 | 10,249 | 42,096 | 1,943 | 2,518 | 30% |
| 233770 | Hematology-Oncology Associates - Jackson | 84102 | Hanks, Don | 10,478 | 15,087 | 19,964 | 14,791 | 60,320 | 2,439 | - | -100% |
| 278577 | Hematology Oncology Associates | 84102 | Hanks, Don | 8,267 | 13,599 | 8,990 | 3,949 | 34,804 | 4,381 | - | -100% |
| 227088 | Medical Initiatives, Inc. | 84107 | O'Brien, Michael | 241,324 | 406,079 | 330,418 | 325,866 | 1,303,687 | 84,568 | 192,041 | 127% |
| 234642 | Mid Atlantic Consultants in Hematology Onc | 84201 | Burnette, Steven | 1,943 | - | 1,219 | 7,647 | 10,809 | - | 1,259 | 100% |
| 216413 | Asheville Hematology and Oncology | 84202 | Hoke, III, Forney | 12,875 | 10,705 | 23,353 | 12,792 | 59,726 | 3,885 | 6,531 | 68% |
| 233661 | Regional Hematology Oncology Clinic - Dur | 84204 | King, Neal | - | 1,219 | 8,763 | 1,943 | 11,925 | - | 4,013 | 1000% |
| 278588 | Raleigh Hematology Oncology Clinic - Cary | 84204 | King, Neal | 6,820 | 1,219 | 4,877 | 2,439 | 15,355 | 3,658 | 3,778 | 3% |
| 280801 | Raleigh Hematology Oncology | 84204 | King, Neal | - | 1,219 | 1,219 | 3,658 | 6,097 | - | 3,266 | 1000% |
| 214395 | Piedmont Hematology Oncology Associates | 84205 | Hillman, J. Reggie | 17,071 | 24,345 | 37,531 | 16,564 | 95,511 | 10,974 | - | -100% |
| 216637 | Triad Hematology Oncology Associates | 84205 | Hillman, J. Reggie | 8,267 | 3,658 | 24,614 | 11,054 | 47,593 | 2,439 | 2,518 | 3% |
| 229080 | Piedmont Gyn Oncology | 84205 | Hillman, J. Reggie | - | 3,658 | 15,851 | 13,652 | 33,161 | - | 2,518 | 1000% |
| 216632 | Virginia Oncology | 84207 | Nicolato, Jamie | 13,599 | 16,037 | 65,637 | 40,792 | 136,065 | 1,943 | 16,052 | 726% |
| 217128 | Hematology-Oncology Consultants of Tidev | 84207 | Nicolato, Jamie | 6,324 | 7,543 | 8,267 | 12,855 | 34,989 | - | - | 0% |
| 223951 | Williamsburg Hematology Oncology | 84207 | Nicolato, Jamie | 29,140 | 27,197 | 7,771 | - | 64,108 | 1,943 | - | -100% |
| 228279 | Hematology-Oncology Consultants of Tidev | 84207 | Nicolato, Jamie | 15,087 | 25,565 | 17,525 | 22,657 | 80,833 | 5,105 | 8,026 | 57% |
| 234898 | Virginia Oncology Associates | 84207 | Nicolato, Jamie | 9,486 | 14,591 | 11,429 | - | 35,505 | 3,162 | - | -100% |
| 278602 | Mid Atlantic Consultants in Hematology Onc | 84207 | Nicolato, Jamie | 84,423 | 130,861 | 114,824 | 132,988 | 463,097 | 30,401 | 23,607 | -22% |
| 278604 | Mid Atlantic Consultants in Hematology Onc | 84207 | Nicolato, Jamie | 7,047 | 9,486 | 17,257 | 19,471 | 53,260 | 3,885 | 2,007 | -48% |
| 282178 | Mid Atlantic Consultants and Hematology O | 84207 | Nicolato, Jamie | - | 6,324 | 3,162 | 11,188 | 20,674 | - | - | 0% |
| 219856 | Raleigh Hematology Oncology Associates | 84209 | Stutts, Randy | 31,579 | 40,796 | 30,359 | 51,020 | 153,754 | 23,808 | 12,039 | -49% |
| 231881 | Greenville Cancer Centers - Seneca | 84307 | Jones, Norman | - | - | 1,943 | 1,259 | 3,202 | - | - | 0% |
| 232743 | Cancer Center of Carolinas | 84307 | Jones, Norman | - | - | - | - | - | - | - | 0% |
| 278599 | Cancer Centers of the Carolinas | 84307 | Jones, Norman | 20,687 | 3,885 | 7,771 | 6,820 | 39,163 | 9,259 | 6,020 | -35% |
| 280917 | Cancer Centers of Carolinas | 84307 | Jones, Norman | 36,270 | 39,659 | 29,181 | 28,937 | 134,047 | 15,810 | 6,296 | -60% |
| 281951 | Cancer Centers of the Carolinas | 84307 | Jones, Norman | 1,943 | 1,943 | 3,658 | 12,512 | 20,055 | - | 10,073 | 1000% |
| 214502 | South Florida Oncology Hematology | 84402 | Zelden, Paul | 19,427 | 17,484 | 27,197 | 59,965 | 124,073 | 11,656 | - | -100% |
| 232632 | South Florida Oncology Hematology | 84402 | Zelden, Paul | 51,088 | 33,067 | 43,503 | 60,098 | 187,756 | 6,820 | 21,089 | 209% |
| 221387 | Myo Min and Myo Thant, M.D.'s | 84501 | Tjan, Michelle | 3,885 | - | 25,296 | 12,432 | 41,614 | 3,885 | 13,063 | 236% |
| 214340 | Minford, Koutrelakos, and Knight, M.D.S | 84502 | Brandes, Seth | 15,541 | 6,324 | 18,290 | 23,005 | 63,160 | 3,885 | - | -100% |
| 221702 | Maryland Oncology | 84502 | Brandes, Seth | 5,105 | 20,419 | 15,314 | 7,279 | 48,116 | 1,943 | 1,259 | -35% |
| 225494 | Sam Zygler, M.D., P.A. | 84502 | Brandes, Seth | 13,867 | 5,828 | - | 1,219 | 20,915 | 8,763 | 9,285 | 6% |
| 225893 | Flavio Kruter, M.D. | 84502 | Brandes, Seth | 35,505 | 36,683 | 35,009 | 59,979 | 167,177 | 13,867 | 14,322 | 3% |
| 227945 | Schwartz, Barr, Burrell and Malik, M.D.'s | 84504 | Endler, Edward (Ned) | 3,162 | 2,439 | 1,219 | 1,219 | 8,039 | - | 1,259 | 100% |
| 275947 | Myo Min and Myo Thant, M.D.'s | 84505 | Wells, Brian | 5,105 | 8,535 | 3,658 | - | 17,298 | - | 2,518 | 1000% |
| 227087 | Loudoun Cancer Care Center | 84506 | McLucas, Beatrice | - | 4,877 | 4,877 | 2,479 | 12,233 | - | - | 0% |
| 232361 | Fairfax-Prince William Hematology-Oncolog | 84506 | McLucas, Beatrice | 130,469 | 41,458 | 21,948 | 27,224 | 221,099 | 40,238 | 7,555 | -81% |
| 214323 | Schwartz, Barr and Silver, P.C. | 84507 | Bragg, Deborah | 1,943 | 1,219 | 1,219 | - | 4,381 | 1,943 | - | -100% |
| 275055 | Schwartz, Barr, Burrell and Malik, M.D.'s | 84507 | Bragg, Deborah | 5,601 | 1,219 | 7,316 | 6,176 | 20,312 | 1,219 | 2,518 | 107% |
| 226820 | Medical Center East Cancer Center/ Birmin | 84601 | Eddins, J. Patrick | 6,324 | 5,105 | - | - | 11,429 | 1,219 | - | -100% |
| 276102 | Gadsden Regional Cancer Center | 84601 | Eddins, J. Patrick | 9,612 | 18,103 | 9,957 | - | 37,671 | 2,649 | - | -100% |
| 216707 | Birmingham Hematology-Oncology | 84606 | Gunter, Nancy | 38,853 | 42,739 | 9,713 | - | 91,305 | 17,484 | - | -100% |
| 230613 | Birmingham Hematology Oncology | 84606 | Gunter, Nancy | 15,851 | 10,974 | 9,755 | - | 36,580 | 1,219 | - | -100% |

*YTD sales are Net Sales through Jan. 31.
**Growth is 2001 YTD sales versus 2000 YTD sales.

Data Source: Chargeback + Direct Sales

2/8/2001
B. Hazelton
US Oncology 1_01.xls

# US Oncology Contracted Customers

## Net Chargeback and Direct Sales

By ACIS

| ACIS | Account Name | Terr# | PSR Name | Q100 | Q200 | Q300 | Q400 | 2000 TOTAL | 2000 YTD* | 2001 YTD* | Growth** |
|------|--------------|-------|----------|------|------|------|------|-----------|-----------|-----------|----------|
| 214237 | Capital District Hematology-Oncology Asso | 81501 | Abrahamson, Janet | 7,771 | 10,705 | 13,371 | 10,249 | 42,096 | 1,943 | 2,518 | 30% |
| 235362 | Birmingham Hematology-Oncology | 84606 | Gunter, Nancy | 2,439 | 4,381 | - | - | 6,820 | - | - | 0% |
| 236229 | Birmingham Hematology Oncology | 84606 | Gunter, Nancy | 1,943 | 1,219 | - | - | 3,162 | 1,943 | - | -100% |
| 236284 | Birmingham Hematology-Oncology Associa | 84606 | Gunter, Nancy | 40,796 | 63,384 | 50,509 | - | 154,689 | 9,713 | - | -100% |
| 285031 | Medical Initiatives Inc. | 84606 | Gunter, Nancy | - | - | 158,926 | 162,953 | 321,879 | - | 37,141 | 1000% |
| | | | | | | | | | | | |
| **84000** | **Region TOTAL:** | | | **$ 1,091,160** | **$ 1,236,567** | **$ 1,351,822** | **$ 1,252,556** | **$ 4,932,104** | **$ 379,609** | **$ 445,977** | **17%** |
| | | | | | | | | | | | |
| 229431 | Oncology Hematology Association | 85102 | Cover, Bruce | 1,219 | 1,943 | 1,219 | - | 4,381 | 1,219 | - | -100% |
| 231657 | Oncology-Hematology Association | 85102 | Cover, Bruce | - | - | - | - | - | - | - | 0% |
| 232035 | Oncology/Hematology Association - Johnsto | 85102 | Cover, Bruce | 15,810 | 17,257 | 26,019 | 13,579 | 72,665 | 6,324 | 4,525 | -28% |
| 275286 | Oncology Hematology Association | 85102 | Cover, Bruce | 14,859 | 56,689 | 15,087 | 6,428 | 93,062 | - | 1,259 | 100% |
| 277075 | Oncology Hematology Association, P.C. - S | 85102 | Cover, Bruce | 2,439 | 9,259 | 3,162 | 1,943 | 16,802 | - | - | 0% |
| 278597 | Oncology Hematology Association, P.C. - G | 85102 | Cover, Bruce | - | - | - | - | - | - | - | 0% |
| 281745 | Oncology Hematology Association | 85102 | Cover, Bruce | 6,324 | 1,943 | 3,885 | - | 12,152 | - | - | 0% |
| 235786 | Oncology Hematology Associates, P.C. - F | 85103 | Arnstein, Kenneth | 13,599 | - | 12,875 | 4,013 | 30,487 | 7,771 | 2,007 | -74% |
| 278598 | Oncology Hematology Associates, P.C. - N | 85103 | Arnstein, Kenneth | 34,596 | 34,782 | 44,268 | 40,754 | 154,400 | 16,079 | 19,594 | 22% |
| 281089 | Oncology Hematology Associates | 85103 | Arnstein, Kenneth | 3,885 | - | 1,943 | 3,949 | 9,777 | 1,943 | 2,518 | 30% |
| 219163 | Oncology-Hematology Associates, P.C. - W | 85104 | Romano, Jeffrey | 3,162 | 5,828 | 19,427 | 7,834 | 36,251 | 1,219 | 2,007 | 65% |
| 231941 | Shadyside Medical Associates | 85104 | Romano, Jeffrey | - | - | 6,324 | 34,600 | 40,924 | - | - | 0% |
| 216206 | Oncology-Hematology Associates, P.C. | 85105 | Nedzesky, Michael | 283,547 | 268,501 | 277,719 | 241,335 | 1,071,102 | 102,135 | 73,554 | -28% |
| 226603 | Oncology-Hematology Associates, P.C. | 85105 | Nedzesky, Michael | 8,535 | 11,925 | 13,413 | - | 33,873 | 2,439 | - | -100% |
| 229350 | Medical Group Associates | 85105 | Nedzesky, Michael | 3,162 | - | - | - | 3,162 | 3,162 | - | -100% |
| 230065 | Oncology-Hematology Associates, P.C. - B | 85105 | Nedzesky, Michael | - | 7,047 | 8,990 | 23,759 | 39,796 | - | 10,544 | 1000% |
| 230085 | Oncology-Hematology Associates, P.C. | 85105 | Nedzesky, Michael | 11,656 | 9,713 | 11,429 | 5,105 | 37,903 | 1,943 | 5,272 | 171% |
| 230308 | Oncology-Hematology Associates | 85105 | Nedzesky, Michael | 19,427 | 8,039 | 8,535 | 9,614 | 45,615 | 3,885 | 3,266 | -16% |
| 278595 | Oncology-Hematology Associates, P.C. - Cr | 85105 | Nedzesky, Michael | - | - | 4,381 | - | 4,381 | - | 2,007 | 100% |
| 278596 | Oncology-Hematology Associates, P.C. - Ol | 85105 | Nedzesky, Michael | - | - | - | - | - | - | 4,013 | 400% |
| 216639 | Oncology-Hematology Associates | 85106 | Sherer, Stephen | 77,914 | 76,467 | 89,384 | 36,024 | 279,788 | 19,241 | 35,452 | 84% |
| 235317 | Medical Associates of Southwest Virginia | 85106 | Sherer, Stephen | 6,097 | 8,535 | 23,126 | 21,689 | 59,447 | 2,439 | 1,259 | -48% |
| 281647 | Oncology Hematology Associates of Southw | 85106 | Sherer, Stephen | 4,877 | 7,316 | - | 1,943 | 14,136 | 2,439 | - | -100% |
| 229787 | Dayton Oncology Hematology Consultants | 85306 | Sherman, Gary | 39,887 | 56,957 | 28,913 | 55,751 | 181,507 | 3,658 | - | -100% |
| 235450 | Dayton Oncology Hematology Consultants - | 85306 | Sherman, Gary | - | - | - | - | - | - | - | 0% |
| 278589 | Dayton Oncology Hematology Consultants - | 85306 | Sherman, Gary | 10,974 | - | 2,439 | 1,219 | 14,632 | 2,439 | - | -100% |
| 214819 | Hematology Oncology Associates | 85401 | Bachir, Olga | 12,421 | 28,231 | 57,412 | 61,684 | 159,747 | 3,162 | 6,020 | 90% |
| 219517 | Hematology/Oncology Associates | 85401 | Bachir, Olga | 5,828 | 10,705 | 13,640 | 6,176 | 36,350 | - | - | 0% |
| 229298 | Hematology Oncology Associates - Oak Pai | 85401 | Bachir, Olga | - | - | 1,943 | 1,219 | 3,162 | - | - | 0% |
| 229646 | Medical Hematology Oncology Associates | 85401 | Bachir, Olga | 40,837 | 25,296 | 22,403 | 20,419 | 108,955 | 7,771 | 8,026 | 3% |
| 214805 | North Suburban Medical Consultants | 85404 | Arriazola, Pamela | 13,599 | 3,885 | 5,828 | 7,111 | 30,423 | 3,885 | 2,007 | -48% |
| 216909 | North Shore Hematology and Oncology Ass | 85404 | Arriazola, Pamela | 63,054 | 67,125 | 47,699 | 37,655 | 215,534 | 12,421 | 28,644 | 131% |
| 217078 | Hematology-Oncology Associates | 85406 | Epperson, Mark | 4,877 | 3,658 | 2,439 | 2,518 | 13,492 | - | - | 0% |
| 217105 | Northwest Medical Specialists | 85406 | Epperson, Mark | 85,518 | 54,209 | 60,037 | 50,601 | 250,365 | 28,417 | 19,318 | -32% |
| 275503 | Northwest Medical Specialists | 85409 | Reinle, Michael | 3,885 | 7,543 | - | 1,943 | 13,371 | - | 1,259 | 100% |

*YTD sales are Net Sales through Jan. 31.
**Growth is 2001 YTD sales versus 2000 YTD sales.

Data Source: Chargeback + Direct Sales

2/8/2001
B. Hazelton
US Oncology 1_01.xls

## US Oncology Contracted Customers

### Net Chargeback and Direct Sales

By ACIS

| ACIS | Account Name | Terr# | PSR Name | Q100 | Q200 | Q300 | Q400 | 2000 TOTAL | 2000 YTD* | 2001 YTD* | Growth** |
|------|--------------|-------|----------|------|------|------|------|-----------|-----------|-----------|----------|
| 214237 | Capital District Hematology-Oncology Assoc | 81501 | Abrahamson, Janet | 7,771 | 10,705 | 13,371 | 10,249 | 42,096 | 1,943 | 2,518 | 30% |
| 285145 | Hematology Oncology Association of Illinois | 85409 | Reinle, Michael | - | - | 1,219 | 14,414 | 15,633 | - | 13,298 | 1000% |
| 218165 | Oncology-Hematology Associates - South | 85507 | Higgs, Debra | 13,599 | 9,713 | 3,885 | 9,841 | 37,038 | 3,885 | - | -100% |
| 218167 | Oncology-Hematology Associates | 85507 | Higgs, Debra | 38,853 | 64,108 | 56,337 | 74,715 | 234,013 | 3,885 | 18,059 | 365% |
| 228102 | Oncology and Hematology Associates | 85507 | Higgs, Debra | 5,828 | 3,885 | 3,885 | 5,892 | 19,490 | - | - | 0% |
| 229449 | Oncology Hematology Associates | 85507 | Higgs, Debra | - | 5,828 | - | - | 5,828 | - | - | 0% |
| 284928 | Oncology and Hematology Associates | 85507 | Higgs, Debra | - | - | 15,541 | 5,956 | 21,497 | - | - | 0% |
| **85000** | **Region TOTAL:** | | | **$ 850,268** | **$ 866,388** | **$ 894,805** | **$ 809,681** | **$ 3,421,141** | **$ 241,759** | **$ 263,906** | **9%** |
| | **US ONCOLOGY TOTAL:** | | | **$ 5,830,601** | **$ 6,379,486** | **$ 6,728,315** | **$ 6,496,099** | **$ 25,434,501** | **$ 1,731,660** | **$ 2,317,134** | **34%** |

*YTD sales are Net Sales through Jan. 31.

**Growth is 2001 YTD sales versus 2000 YTD sales.

Data Source: Chargeback + Direct Sales

# US Oncology Contracted Customer Product Mix

By ACIS

| Acis # | Account Name | Terr # | PSR Name | 300 mcg Product Total | | | 480 mcg Product Total | | | % 480 mcg |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2000 Total | 2000 YTD* | 2001 YTD* | 2000 Total | 2000 YTD* | 2001 YTD* | |
| 214237 | Capital District Hematology-Oncology Associa | 81501 | Abrahamson, Janet | 9 | 0 | 2 | 16 | 1 | 0 | 0% |
| 214239 | Quinmed, Inc., Dba: Riverview Cancer Care N | 81501 | Abrahamson, Janet | 14 | 2 | 0 | 19 | 0 | 2 | 100% |
| 216398 | Amsterdam Community Cancer Program | 81501 | Abrahamson, Janet | 63 | 0 | 9 | 4 | 0 | 0 | 0% |
| 216596 | Capital District Hematology-Oncology Associa | 81501 | Abrahamson, Janet | 0 | 0 | 0 | 76 | 2 | 11 | 100% |
| 216598 | The Albany Regional Cancer Center | 81501 | Abrahamson, Janet | 36 | 5 | 2 | 18 | 3 | 2 | 50% |
| 231414 | Riverview Cancer Care Medical Associates | 81501 | Abrahamson, Janet | 4 | 0 | 0 | 6 | 1 | 0 | 0% |
| 231672 | Northeastern New York Regional Cancer Care | 81501 | Abrahamson, Janet | 82 | 3 | 6 | 49 | 2 | 0 | 0% |
| 274985 | Northeastern New York Regional Cancer Care | 81501 | Abrahamson, Janet | 11 | 0 | 0 | 6 | 0 | 0 | 0% |
| 226724 | Catskill Community Cancer Program | 81503 | Forman, Art | 5 | 1 | 1 | 7 | 0 | 1 | 50% |
| 278584 | Cavell Cancer Treatment Center | 81503 | Forman, Art | 32 | 2 | 3 | 35 | 3 | 7 | 70% |
| 233112 | Interlakes Oncology and Hematology | 81504 | Sgroi, Kristen | 0 | 0 | 0 | 2 | 0 | 0 | 0% |
| 233113 | Interlakes Oncology and Hematology, P.C. | 81504 | Sgroi, Kristen | 0 | 0 | 1 | 0 | 0 | 0 | 0% |
| 233114 | Interlakes Oncology and Hematology | 81504 | Sgroi, Kristen | 0 | 0 | 0 | 28 | 6 | 3 | 100% |
| 233115 | Interlakes Oncology and Hematology | 81504 | Sgroi, Kristen | 2 | 0 | 0 | 3 | 1 | 0 | 0% |
| 219638 | Berkshire Hematology Oncology, P.C. | 81608 | Federico, Tony | 69 | 3 | 4 | 63 | 5 | 8 | 67% |
| 225556 | Berkshire Hematology Oncology | 81608 | Federico, Tony | 7 | 0 | 0 | 17 | 4 | 0 | 0% |
| **81000** | **Region TOTAL:** | | | **334** | **16** | **28** | **349** | **28** | **34** | **55%** |
| 216466 | West Texas Cancer Center | 82101 | Jordan, Elizabeth | 11 | 0 | 2 | 24 | 0 | 4 | 67% |
| 230174 | Allison Cancer Center | 82101 | Jordan, Elizabeth | 15 | 2 | 1 | 52 | 4 | 10 | 91% |
| 214942 | Texas Oncology, P.A. | 82102 | Smith, Vicki | 9 | 1 | 0 | 16 | 2 | 2 | 100% |
| 214948 | Texas Oncology, P.A. | 82102 | Smith, Vicki | 58 | 4 | 12 | 46 | 2 | 3 | 20% |
| 216780 | Texas Oncology, P.A. Dba: North Texas Regic | 82102 | Smith, Vicki | 48 | 1 | 8 | 36 | 3 | 5 | 38% |
| 217044 | Texas Oncology, P.A. Dba: Texoma Regional | 82102 | Smith, Vicki | 7 | 1 | 1 | 33 | 4 | 0 | 0% |
| 217060 | Texas Oncology, P.A. Dba: Paris Regional Ca | 82102 | Smith, Vicki | 31 | 0 | 8 | 17 | 0 | 2 | 20% |
| 226289 | Texas Oncology, P.A. | 82102 | Smith, Vicki | 23 | 1 | 0 | 14 | 4 | 1 | 100% |
| 227706 | Texoma Cancer Center of Denison | 82102 | Smith, Vicki | 0 | 0 | 0 | 3 | 1 | 0 | 0% |
| 214943 | Texas Oncology, P.A. | 82103 | Robinson, Shawn | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 214955 | Tyler Cancer Center/Texas Oncology, P.A. | 82103 | Robinson, Shawn | 43 | 5 | 1 | 124 | 13 | 11 | 92% |
| 219689 | Texas Cancer Center - Mesquite | 82103 | Robinson, Shawn | 52 | 6 | 3 | 27 | 0 | 2 | 40% |
| 219691 | Longview Cancer Center | 82103 | Robinson, Shawn | 111 | 11 | 14 | 0 | 0 | 0 | 0% |
| 225864 | Texas Oncology, P.A. | 82103 | Robinson, Shawn | 0 | 0 | 0 | 1 | 0 | 0 | 0% |
| 226290 | Texas Oncology, P.A. | 82103 | Robinson, Shawn | 27 | 2 | 3 | 154 | 5 | 19 | 86% |
| 228607 | Texas Oncology, P.A. - Sammons Cancer Cer | 82103 | Robinson, Shawn | 140 | 3 | 7 | 163 | 3 | 7 | 50% |
| 230982 | Texas Cancer Center - South Dallas | 82103 | Robinson, Shawn | 60 | 2 | 3 | 52 | 6 | 2 | 40% |
| 285894 | Texas Oncology P.A. Corsica | 82103 | Robinson, Shawn | 0 | 0 | 1 | 0 | 0 | 1 | 50% |
| 233017 | Texas Oncology, P.A. | 82104 | Kyle, Steven | 30 | 1 | 0 | 40 | 0 | 1 | 100% |
| 233672 | Texas Oncology | 82104 | Kyle, Steven | 2 | 2 | 0 | 0 | 0 | 0 | 0% |
| 234553 | Texas Oncology, P.A. | 82104 | Kyle, Steven | 5 | 0 | 0 | 3 | 0 | 0 | 0% |
| 224941 | Southwestern New Mexico Oncology Llc | 82105 | Granillo, Raul | 31 | 3 | 0 | 34 | 5 | 0 | 0% |
| 234966 | El Paso Cancer Treatment Center East - Texa | 82105 | Granillo, Raul | 38 | 6 | 1 | 17 | 3 | 1 | 50% |
| 275087 | El Paso Cancer Treatment Center | 82105 | Granillo, Raul | 19 | 2 | 2 | 7 | 1 | 1 | 33% |
| 214958 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 6 | 0 | 0 | 3 | 0 | 0 | 0% |
| 216783 | Texas Cancer Center - Fort Worth | 82106 | Knautz, Geoff | 0 | 0 | 0 | 8 | 0 | 0 | 0% |

*YTD is through Jan 31.

f/n: US Oncology 1_01.xls, Vial

Data Source: Chargeback + Direct Sales

2/9/2001

B. Hazelton

# US Oncology Contracted Customer Product Mix

By ACIS

| Acis # | Account Name | Terr # | PSR Name | 300 mcg Product Total | | | 480 mcg Product Total | | | % 480 mcg |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2000 Total | 2000 YTD* | 2001 YTD* | 2000 Total | 2000 YTD* | 2001 YTD* | |
| 216804 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 0 | 0 | 0 | 1 | 0 | 0 | 0% |
| 217023 | Texas Oncology, P.A. Dba: Mid-Cities Oncolo | 82106 | Knautz, Geoff | 4 | 1 | 1 | 0 | 0 | 1 | 50% |
| 221172 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 24 | 4 | 2 | 56 | 3 | 3 | 60% |
| 225619 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 2 | 0 | 0 | 14 | 6 | 0 | 0% |
| 225761 | Texas Oncology, P.A. Dba: Mid-Cities Oncolo | 82106 | Knautz, Geoff | 30 | 3 | 0 | 7 | 0 | 2 | 100% |
| 226060 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 28 | 0 | 0 | 48 | 7 | 0 | 0% |
| 226292 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 12 | 1 | 3 | 6 | 2 | 0 | 0% |
| 231998 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 232264 | Texas Cancer Center South | 82106 | Knautz, Geoff | 36 | 0 | 4 | 38 | 4 | 5 | 56% |
| 232967 | Texas Cancer Center | 82106 | Knautz, Geoff | 25 | 2 | 2 | 5 | 0 | 0 | 0% |
| 235196 | Texas Oncology | 82106 | Knautz, Geoff | 2 | 0 | 0 | 0 | 0 | 0 | 0% |
| 235499 | Texoma Cancer Center | 82106 | Knautz, Geoff | 18 | 0 | 1 | 55 | 5 | 6 | 86% |
| 282164 | Texas Oncology, P.A. | 82106 | Knautz, Geoff | 8 | 0 | 3 | 39 | 0 | 3 | 50% |
| 285951 | Texas Oncology P.A. of Denton | 82106 | Knautz, Geoff | 1 | 0 | 0 | 1 | 0 | 0 | 0% |
| 220086 | Cancer Care Associates - Integris Baptist Can | 82107 | Hampton, Jeanne | 13 | 0 | 0 | 140 | 1 | 11 | 100% |
| 224525 | Cancer Care Associates - Norman Campus | 82107 | Hampton, Jeanne | 23 | 2 | 0 | 32 | 1 | 0 | 0% |
| 225309 | Cancer Care Associates -  Mercy Campus | 82107 | Hampton, Jeanne | 41 | 3 | 3 | 13 | 1 | 2 | 40% |
| 233111 | Cancer Care Associates - Shawnee Campus | 82107 | Hampton, Jeanne | 3 | 0 | 0 | 22 | 2 | 0 | 0% |
| 234875 | Cancer Care Associates - Duncan Campus | 82107 | Hampton, Jeanne | 10 | 0 | 0 | 11 | 0 | 0 | 0% |
| 278590 | Cancer Care Associates - Hefner Pointe Cam | 82107 | Hampton, Jeanne | 112 | 8 | 5 | 164 | 7 | 20 | 80% |
| 281088 | Cancer Care Associates - Integris Southwest | 82107 | Hampton, Jeanne | 84 | 2 | 7 | 44 | 2 | 2 | 22% |
| 281648 | Cancer Care Associates - Ardmore Campus | 82107 | Hampton, Jeanne | 84 | 6 | 5 | 26 | 7 | 5 | 50% |
| 217034 | Cancer Care Associates | 82108 | Schwier, Jason | 51 | 1 | 6 | 49 | 0 | 4 | 40% |
| 228549 | Cancer Care Associates - Stillwater | 82108 | Schwier, Jason | 8 | 0 | 2 | 6 | 0 | 0 | 0% |
| 228605 | Cancer Care Associates- Bartlesville | 82108 | Schwier, Jason | 1 | 0 | 0 | 6 | 0 | 2 | 100% |
| 233821 | Cancer Care Associates - Enid | 82108 | Schwier, Jason | 3 | 0 | 0 | 6 | 1 | 0 | 0% |
| 234872 | Cancer Care Associates | 82108 | Schwier, Jason | 1 | 0 | 0 | 4 | 2 | 0 | 0% |
| 278591 | Cancer Care Associates - Mingo | 82108 | Schwier, Jason | 20 | 2 | 0 | 21 | 0 | 3 | 100% |
| 278615 | Cancer Care Associates | 82108 | Schwier, Jason | 23 | 0 | 2 | 43 | 2 | 2 | 50% |
| 281952 | Cca Mcalester | 82108 | Schwier, Jason | 8 | 0 | 1 | 2 | 0 | 1 | 50% |
| 214951 | Texas Oncology, P.A. | 82109 | Grayson, James | 2 | 1 | 0 | 73 | 5 | 12 | 100% |
| 223347 | Southwest Regional Cancer Center | 82201 | Gonzalez, Alberto | 7 | 2 | 1 | 15 | 2 | 0 | 0% |
| 223545 | Southwest Regional Cancer Center | 82201 | Gonzalez, Alberto | 98 | 5 | 17 | 121 | 6 | 11 | 39% |
| 225629 | Southwest Regional Cancer Center/Central Te | 82201 | Gonzalez, Alberto | 26 | 1 | 1 | 23 | 5 | 1 | 50% |
| 228554 | Texas Oncology, P.A. | 82201 | Gonzalez, Alberto | 71 | 0 | 2 | 134 | 1 | 8 | 80% |
| 231658 | South Austin Cancer Center | 82201 | Gonzalez, Alberto | 16 | 2 | 0 | 128 | 16 | 6 | 100% |
| 231997 | Texas Oncology, P.A. | 82201 | Gonzalez, Alberto | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 215023 | South Texas Cancer Center | 82202 | Valladares, Cris | 11 | 2 | 0 | 130 | 13 | 12 | 100% |
| 220087 | Texas Oncology, P.A. Dba: Valley Oncology C | 82202 | Valladares, Cris | 32 | 0 | 0 | 32 | 0 | 0 | 0% |
| 230907 | South Texas Cancer Center | 82202 | Valladares, Cris | 18 | 0 | 2 | 7 | 1 | 0 | 0% |
| 235271 | Valley Oncology, P.A. | 82202 | Valladares, Cris | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 235947 | South Texas Cancer Center, Dba: Valley Onc | 82202 | Valladares, Cris | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 226474 | Lawrence Foote, M.D. | 82203 | Guin, Larry | 4 | 0 | 0 | 5 | 0 | 0 | 0% |
| 277662 | Texas Oncology, P.A. | 82203 | Guin, Larry | 0 | 0 | 0 | 10 | 0 | 0 | 0% |
| 225755 | United States Oncology Dba: Texas Oncology | 82204 | Badon, Ty | 0 | 0 | 0 | 6 | 0 | 2 | 100% |

# US Oncology Contracted Customer Product Mix

By ACIS

| Acis # | Account Name | Terr # | PSR Name | 300 mcg Product Total | | | 480 mcg Product Total | | | % 480 mcg |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2000 Total | 2000 YTD* | 2001 YTD* | 2000 Total | 2000 YTD* | 2001 YTD* | |
| 230981 | Texas Oncology, P.A. | 82204 | Badon, Ty | 2 | 0 | 0 | 78 | 5 | 8 | 100% |
| 224532 | Philip Cimo, M.D. | 82205 | Rawlins, Kimberly | 2 | 2 | 0 | 0 | 0 | 0 | 0% |
| 235270 | Texas Oncology, P.A. | 82205 | Rawlins, Kimberly | 10 | 2 | 1 | 2 | 1 | 0 | 0% |
| 226495 | Texas Oncology, P.A. | 82206 | Hendrix, Holley | 99 | 2 | 1 | 64 | 4 | 1 | 50% |
| 230570 | Texas Oncology | 82206 | Hendrix, Holley | 12 | 0 | 0 | 3 | 1 | 0 | 0% |
| 234777 | Hemonc Physician Enterprise | 82206 | Hendrix, Holley | 4 | 0 | 0 | 2 | 1 | 0 | 0% |
| 225272 | Texas Oncology P.A. Deke Slayton Cancer Ce | 82206 | Varacek, Timothy | 5 | 0 | 3 | 0 | 0 | 0 | 0% |
| 217621 | Oncology for San Antonio | 82207 | Flores, Robert | 3 | 0 | 1 | 0 | 0 | 1 | 50% |
| 225669 | Fred M. Massey, M.D., P.A. | 82207 | Flores, Robert | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 232777 | Texas Oncology, P.A. | 82207 | Flores, Robert | 2 | 0 | 0 | 2 | 0 | 0 | 0% |
| 278600 | Cancer Care Network of South Texas - South | 82207 | Flores, Robert | 15 | 0 | 1 | 7 | 3 | 0 | 0% |
| 215007 | San Antonio Tumor and Blood Clinic | 82208 | Sanchez, Robert | 18 | 0 | 3 | 10 | 0 | 1 | 25% |
| 215011 | San Antonio Tumor and Blood Clinic | 82208 | Sanchez, Robert | 20 | 4 | 4 | 120 | 8 | 4 | 50% |
| 219822 | Hematology Oncology Associates | 82208 | Sanchez, Robert | 35 | 8 | 2 | 241 | 11 | 18 | 90% |
| 229054 | Southwest Regional Cancer Center | 82208 | Sanchez, Robert | 40 | 3 | 3 | 5 | 0 | 2 | 40% |
| 231675 | Texas Oncology, P.A. | 82208 | Sanchez, Robert | 4 | 0 | 0 | 37 | 6 | 4 | 100% |
| 233127 | San Antonio Tumor and Blood Clinic | 82208 | Sanchez, Robert | 3 | 0 | 0 | 5 | 1 | 0 | 0% |
| 235273 | Cancer Care Network | 82208 | Sanchez, Robert | 4 | 1 | 0 | 17 | 2 | 1 | 100% |
| 278601 | Cancer Care Network of South Texas - Kerrvil | 82208 | Sanchez, Robert | 5 | 1 | 1 | 8 | 0 | 0 | 0% |
| 279064 | Texas Oncology, P.A. | 82208 | Sanchez, Robert | 9 | 0 | 0 | 16 | 2 | 0 | 0% |
| 281641 | Hematology and Oncology Associates of Sout | 82208 | Sanchez, Robert | 5 | 0 | 1 | 32 | 0 | 6 | 86% |
| 217620 | Oncology - Hematology Associates of Kansas | 82303 | Thomson, Brett | 2 | 1 | 0 | 6 | 1 | 1 | 100% |
| 219197 | Oncology-Hematology Clinic of Kansas City | 82303 | Thomson, Brett | 9 | 3 | 2 | 8 | 1 | 0 | 0% |
| 219198 | Oncology-Hematology Clinic of Kansas City - . | 82303 | Thomson, Brett | 6 | 1 | 0 | 0 | 0 | 0 | 0% |
| 231957 | Oncology Hematology Associates of Kansas C | 82303 | Thomson, Brett | 24 | 2 | 1 | 56 | 5 | 5 | 83% |
| 231959 | Oncology - Hematology Associates of Kansas | 82303 | Thomson, Brett | 25 | 2 | 3 | 6 | 0 | 0 | 0% |
| 278578 | Clinical Hematology Oncology - Barry Road | 82303 | Thomson, Brett | 2 | 0 | 0 | 12 | 0 | 0 | 0% |
| 280919 | Missouri Cancer Associates | 82303 | Thomson, Brett | 6 | 0 | 0 | 18 | 2 | 1 | 100% |
| 214862 | Missouri Cancer Associates | 82305 | Huck, Todd | 13 | 0 | 0 | 47 | 3 | 1 | 100% |
| 219196 | Oncology - Hematology Associates of Kansas | 82305 | Huck, Todd | 8 | 0 | 0 | 4 | 0 | 0 | 0% |
| 233141 | Cliffview Hematology and Oncology, Llc. | 82305 | Huck, Todd | 4 | 0 | 0 | 15 | 0 | 1 | 100% |
| 274888 | Missouri Cancer Association | 82305 | Huck, Todd | 25 | 0 | 2 | 17 | 0 | 1 | 33% |
| 285568 | Oncology Hematology Associates | 82305 | Huck, Todd | 1 | 0 | 0 | 1 | 0 | 0 | 0% |
| 216764 | Hertzler Clinic | 82308 | Bullock, John | 4 | 0 | 0 | 9 | -1 | 2 | 100% |
| 216765 | Cancer Center of Kansas | 82308 | Bullock, John | 8 | 0 | 0 | 3 | 0 | 1 | 100% |
| 218671 | Dodge City Medical Center and Cancer Cente | 82308 | Bullock, John | 8 | 0 | 1 | 15 | 0 | 1 | 50% |
| 219321 | Cancer Center of Kansas | 82308 | Bullock, John | 64 | 0 | 4 | 110 | 0 | 8 | 67% |
| 221843 | Cancer Center of Kansas | 82308 | Bullock, John | 6 | 1 | 0 | 6 | 0 | 1 | 100% |
| 228103 | Cancer Center of Kansas | 82308 | Bullock, John | 6 | 0 | 0 | 6 | 0 | 1 | 100% |
| 228488 | Cancer Center of Kansas | 82308 | Bullock, John | 0 | 0 | 0 | 4 | 3 | 0 | 0% |
| 278585 | Cancer Center of Kansas - Sumner | 82308 | Bullock, John | 1 | 0 | 0 | 0 | 0 | 0 | 0% |
| 278586 | Cancer Center of Kansas - Newton | 82308 | Bullock, John | 4 | 0 | 0 | 3 | 0 | 2 | 100% |
| 281650 | Cck - Eureka | 82308 | Bullock, John | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 281728 | Cancer Center of Kansas - Kingman | 82308 | Bullock, John | 1 | 1 | 0 | 3 | 1 | 0 | 0% |
| 285050 | Cancer Center of Kansas | 82308 | Bullock, John | 1 | 0 | 1 | 4 | 0 | 1 | 50% |

# US Oncology Contracted Customer Product Mix
By ACIS

| Acis # | Account Name | Terr # | PSR Name | 300 mcg Product Total | | | 480 mcg Product Total | | | % 480 mcg |
|--------|-------------|--------|----------|------------|-----------|-----------|------------|-----------|-----------|-----------|
| | | | | 2000 Total | 2000 YTD* | 2001 YTD* | 2000 Total | 2000 YTD* | 2001 YTD* | |
| 226917 | Oncology Associates of Cedar Rapids | 82402 | Severns, Janice | 0 | 0 | 1 | 14 | 0 | 1 | 50% |
| 224020 | Minnesota Oncology Hematology, P.A. | 82404 | Johnson, Vaughn | 36 | 4 | 0 | 19 | 0 | 0 | 0% |
| 225383 | Minnesota Oncology Hematology, P.A. | 82404 | Johnson, Vaughn | 35 | 1 | 3 | 52 | 1 | 3 | 50% |
| 235500 | Minnesota Oncology Hematology, P.A. | 82404 | Johnson, Vaughn | 67 | 8 | 10 | 53 | 5 | 1 | 9% |
| 216737 | Minnesota Oncology Hematology, P.A. | 82405 | Carroll, Becki | 21 | 3 | 1 | 14 | 1 | 1 | 50% |
| 216738 | Minnesota Oncology Hematology | 82405 | Carroll, Becki | 20 | 2 | 2 | 14 | 2 | 2 | 50% |
| 232678 | Minnesota Oncology Hematology | 82405 | Carroll, Becki | 10 | 2 | 0 | 0 | 0 | 0 | 0% |
| 277493 | Minnesota Oncology Hematology, P.A. | 82405 | Carroll, Becki | 1 | 0 | 0 | 1 | 1 | 0 | 0% |
| 215053 | Rocky Mountain Cancer Center | 82502 | Adams, Michael | 93 | 5 | 10 | 55 | 6 | 18 | 64% |
| 227597 | Rocky Mountain Cancer Centers | 82502 | Adams, Michael | 27 | 1 | 0 | 2 | 0 | 0 | 0% |
| 233107 | Rocky Mountain Cancer Center | 82502 | Adams, Michael | 3 | 0 | 0 | 2 | 0 | 1 | 100% |
| 278574 | Rocky Mountain Cancer Center-Northern Colo | 82502 | Adams, Michael | 34 | 7 | 5 | 44 | 3 | 10 | 67% |
| 285950 | Rocky Mountain Cancer Care | 82502 | Adams, Michael | 1 | 0 | 0 | 1 | 0 | 0 | 0% |
| 221863 | Rocky Mountain Cancer Center | 82503 | Hudson, Marshall | 84 | 4 | 8 | 38 | 0 | 10 | 56% |
| 233099 | Childhood Hematology - Oncology Associates | 82503 | Hudson, Marshall | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 280498 | Childhood Hematology Oncology Associates | 82503 | Hudson, Marshall | 6 | 1 | 0 | 1 | 0 | 0 | 0% |
| 281774 | Rocky Mountain Cancer Center | 82503 | Hudson, Marshall | 1 | 0 | 0 | 1 | 0 | 0 | 0% |
| 216662 | Rocky Mountain Cancer Centers-Thornton | 82504 | Keyworth, Claudia | 7 | 0 | 0 | 2 | 0 | 0 | 0% |
| 216664 | Rocky Mountain Cancer Center | 82504 | Keyworth, Claudia | 26 | 5 | 0 | 15 | 3 | 0 | 0% |
| 219456 | Rocky Mountain Cancer Center - Englewood | 82504 | Keyworth, Claudia | 78 | 0 | 0 | 16 | 0 | 5 | 100% |
| 226712 | David Link, M.D. | 82504 | Keyworth, Claudia | 9 | 0 | 0 | 10 | 0 | 0 | 0% |
| 230694 | Rocky Mountain Cancer Center | 82504 | Keyworth, Claudia | 19 | 1 | 0 | 29 | 0 | 0 | 0% |
| 231404 | Rocky Mountain Cancer Center - West | 82504 | Keyworth, Claudia | 6 | 0 | 0 | 1 | 0 | 0 | 0% |
| 234876 | St. Vrain Oncology Hematology Group | 82504 | Keyworth, Claudia | 8 | 0 | 0 | 1 | 0 | 0 | 0% |
| 285264 | Rocky Mountain Cancer Center | 82504 | Keyworth, Claudia | 6 | 0 | 2 | 0 | 0 | 1 | 33% |
| 285895 | Rocky Mountain Cancer Center | 82504 | Keyworth, Claudia | 0 | 0 | 6 | 1 | 0 | 5 | 45% |
| 281561 | Little Rock Hematology Oncology Associates | 82603 | McGee, James | 7 | 0 | 2 | 81 | 0 | 1 | 33% |
| 216457 | Arkansas Oncology Associates | 82604 | Parsons, Bradley | 54 | 5 | 5 | 15 | 6 | 1 | 17% |
| 222619 | Arkansas Oncology Clinic | 82604 | Parsons, Bradley | 3 | 1 | 0 | 16 | 2 | 1 | 100% |
| **82000** | **Region TOTAL:** | | | **2913** | **185** | **227** | **3917** | **248** | **330** | **59%** |
| 216641 | Willamette Valley Cancer Center | 83102 | Sheehan, Elizabeth | 0 | 0 | 0 | 39 | 0 | 3 | 100% |
| 219413 | Oncology Associates of Oregon in Partnership | 83102 | Sheehan, Elizabeth | 114 | 5 | 4 | 67 | 4 | 5 | 56% |
| 215316 | Oregon Oncology Hematology Group | 83103 | Palmer, Amy | 0 | 0 | 0 | 25 | 0 | 2 | 100% |
| 215318 | Health First Medical Group, P.C. | 83103 | Palmer, Amy | 65 | 1 | 2 | 16 | 0 | 1 | 33% |
| 216485 | Northwest Cancer Specialists, P.C. | 83103 | Palmer, Amy | 30 | 3 | 0 | 47 | 4 | 4 | 100% |
| 225897 | Hematology Clinic, P.C. | 83103 | Palmer, Amy | 47 | 0 | 4 | 8 | 0 | 0 | 0% |
| 225898 | Northwest Cancer Specialists - Portland Adver | 83103 | Palmer, Amy | 5 | 2 | 0 | 3 | 0 | 2 | 100% |
| 227474 | Pacific Northwest Oncology Associates, P.C. - | 83103 | Palmer, Amy | 1 | 0 | 0 | 1 | 0 | 0 | 0% |
| 228196 | Hematology Clinic - St. Vincents | 83103 | Palmer, Amy | 0 | 0 | 0 | 1 | 0 | 0 | 0% |
| 278593 | Pacific Northwest Oncology Associates, P.C. - | 83103 | Palmer, Amy | 35 | 0 | 7 | 5 | 0 | 5 | 42% |
| 285023 | Northwest Cancer Specialists | 83103 | Palmer, Amy | 1 | 0 | 0 | 0 | 0 | 0 | 0% |
| 278592 | Hematology Clinic - Willamette Falls | 83104 | Bushnell, David | 14 | 0 | 0 | 6 | 0 | 0 | 0% |
| 216241 | Puget Sound Cancer Center | 83107 | Tofthagen, Cherie | 210 | 20 | 4 | 114 | 10 | 0 | 0% |

*YTD is through Jan 31.

f/n: US Oncology 1_01.xls, Vial

Data Source: Chargeback + Direct Sales

2/9/2001

B. Hazelton

# US Oncology Contracted Customer Product Mix

By ACIS

| Acis # | Account Name | Terr # | PSR Name | 300 mcg Product Total | | | 480 mcg Product Total | | | % 480 mcg |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2000 Total | 2000 YTD* | 2001 YTD* | 2000 Total | 2000 YTD* | 2001 YTD* | |
| 224100 | Puget Sound Cancer Center | 83107 | Tofthagen, Cherie | 59 | 11 | 6 | 102 | 10 | 14 | 70% |
| 217069 | Cancer Care Northwest | 83108 | Caterinichio, Teresa | 9 | 4 | 1 | 25 | 1 | 4 | 80% |
| 219473 | Spokane Oncology and Hematology Associate | 83108 | Caterinichio, Teresa | 12 | 3 | 1 | 4 | 1 | 1 | 50% |
| 226334 | Spokane Oncology and Hematology Associate | 83108 | Caterinichio, Teresa | 14 | 1 | 1 | 7 | 1 | 0 | 0% |
| 221754 | New Mexico Cancer Care Associates | 83501 | Eagle, Richard | 58 | 2 | 3 | 9 | 0 | 4 | 57% |
| 227098 | Southwest Cancer Clinic - Heather Allen M.D. | 83502 | Carlson, Charles | 30 | 1 | 0 | 63 | 7 | 0 | 0% |
| 227291 | Southwest Cancer Clinic | 83502 | Carlson, Charles | 123 | 0 | 22 | 353 | 0 | 56 | 72% |
| 229619 | Nevada Cancer Center | 83502 | Carlson, Charles | 1 | 0 | 0 | 34 | 14 | 0 | 0% |
| 231778 | Southwest Cancer Clinic - Siena Campus | 83502 | Carlson, Charles | 18 | 1 | 2 | 24 | 1 | 2 | 50% |
| 231780 | Southwest Cancer Clinic - West | 83502 | Carlson, Charles | 12 | 2 | 0 | 36 | 0 | 0 | 0% |
| 220091 | Canon Medical Clinic | 83504 | Kotecki, Sandra | 8 | 0 | 5 | 0 | 0 | 1 | 17% |
| 223854 | Hematology Associates | 83504 | Kotecki, Sandra | 96 | 11 | 0 | 152 | 18 | 32 | 100% |
| 229395 | Northern Arizona Hematology and Oncology A | 83504 | Kotecki, Sandra | 17 | 1 | 0 | 10 | 0 | 1 | 100% |
| 230647 | Northern Arizona Hematology and Oncology A | 83504 | Kotecki, Sandra | 30 | 3 | 4 | 29 | 10 | 5 | 56% |
| 226645 | Clinical Hematology-Oncology Associates | 83505 | Hickey, Victoria | 74 | 4 | 12 | 1 | 0 | 0 | 0% |
| 234887 | Hematology Associates | 83505 | Hickey, Victoria | 18 | 0 | 1 | 53 | 2 | 4 | 80% |
| 235063 | Clinical Hematology Oncology Associates, P.C | 83505 | Hickey, Victoria | 56 | 3 | 8 | 7 | 1 | 3 | 27% |
| 216960 | Arizona Oncology Associates | 83507 | Kaufmann, Brad | 41 | 6 | 4 | 62 | 4 | 10 | 71% |
| 224520 | Hematology and Oncology Physicians, P.C. | 83507 | Kaufmann, Brad | 111 | 4 | 8 | 116 | 13 | 8 | 50% |
| 228722 | Arizona Oncology Associates | 83507 | Kaufmann, Brad | 56 | 2 | 10 | 43 | 0 | 5 | 33% |
| 232961 | Arizona Oncology Associates | 83507 | Kaufmann, Brad | 5 | 0 | 0 | 73 | 10 | 28 | 100% |
| 276235 | Arizona Oncology Associates | 83507 | Kaufmann, Brad | 2 | 0 | 0 | 1 | 0 | 0 | 0% |
| 276930 | The Arizona Oncology Associates | 83507 | Kaufmann, Brad | 28 | 0 | 4 | 15 | 0 | 0 | 0% |
| 278565 | Arizona Oncology Associates - Green Valley | 83507 | Kaufmann, Brad | 23 | 3 | 0 | 10 | 0 | 0 | 0% |
| **83000** | **Region TOTAL:** | | | **1423** | **93** | **113** | **1561** | **111** | **200** | **64%** |
| 214455 | Ocala Oncology Center, P.A. | 84101 | Sampl, Timothy | 16 | 3 | 0 | 62 | 7 | 5 | 100% |
| 216194 | North Florida Hematology and Oncology Asso | 84102 | Hanks, Don | 0 | 0 | 0 | 45 | 4 | 0 | 0% |
| 216882 | Hematology-Oncology Associates | 84102 | Hanks, Don | 55 | 4 | 10 | 56 | 7 | 4 | 29% |
| 226137 | Marsland and Sullivan, M.D.S, P.A. | 84102 | Hanks, Don | 5 | 0 | 1 | 2 | 0 | 2 | 67% |
| 233770 | Hematology-Oncology Associates - Jacksonvi | 84102 | Hanks, Don | 35 | 2 | 0 | 9 | 0 | 0 | 0% |
| 278577 | Hematology Oncology Associates | 84102 | Hanks, Don | 3 | 2 | 0 | 16 | 1 | 0 | 0% |
| 227088 | Medical Initiatives, Inc. | 84107 | O'Brien, Michael | 179 | 12 | 33 | 556 | 36 | 75 | 69% |
| 234642 | Mid Atlantic Consultants in Hematology Oncol | 84201 | Burnette, Steven | 4 | 0 | 1 | 3 | 0 | 0 | 0% |
| 216413 | Asheville Hematology and Oncology | 84202 | Hoke, III, Forney | 17 | 0 | 2 | 20 | 2 | 2 | 50% |
| 233661 | Regional Hematology Oncology Clinic - Durha | 84204 | King, Neal | 5 | 0 | 0 | 3 | 0 | 2 | 100% |
| 278588 | Raleigh Hematology Oncology Clinic - Cary | 84204 | King, Neal | 11 | 3 | 3 | 1 | 0 | 0 | 0% |
| 280801 | Raleigh Hematology Oncology | 84204 | King, Neal | 5 | 0 | 1 | 0 | 0 | 1 | 50% |
| 214395 | Piedmont Hematology Oncology Associates, F | 84205 | Hillman, J. Reggie | 54 | 9 | 0 | 15 | 0 | 0 | 0% |
| 216637 | Triad Hematology Oncology Associates | 84205 | Hillman, J. Reggie | 31 | 2 | 2 | 5 | 0 | 0 | 0% |
| 229080 | Piedmont Gyn Oncology | 84205 | Hillman, J. Reggie | 27 | 0 | 2 | 0 | 0 | 0 | 0% |
| 216632 | Virginia Oncology | 84207 | Nicolato, Jamie | 25 | 0 | 0 | 54 | 1 | 8 | 100% |
| 217128 | Hematology-Oncology Consultants of Tidewat | 84207 | Nicolato, Jamie | 11 | 0 | 0 | 11 | 0 | 0 | 0% |
| 223951 | Williamsburg Hematology Oncology | 84207 | Nicolato, Jamie | 0 | 0 | 0 | 33 | 1 | 0 | 0% |

*YTD is through Jan 31.

f/n: US Oncology 1_01.xls, Vial

Data Source: Chargeback + Direct Sales

2/9/2001

B. Hazelton

# US Oncology Contracted Customer Product Mix
By ACIS

| Acis # | Account Name | Terr # | PSR Name | 300 mcg Product Total | | | 480 mcg Product Total | | | % 480 mcg |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2000 Total | 2000 YTD* | 2001 YTD* | 2000 Total | 2000 YTD* | 2001 YTD* | |
| 228279 | Hematology-Oncology Consultants of Tidewat | 84207 | Nicolato, Jamie | 31 | 1 | 0 | 22 | 2 | 4 | 100% |
| 234898 | Virginia Oncology Associates | 84207 | Nicolato, Jamie | 10 | 1 | 0 | 12 | 1 | 0 | 0% |
| 278602 | Mid Atlantic Consultants in Hematology Oncol | 84207 | Nicolato, Jamie | 166 | 9 | 6 | 133 | 10 | 8 | 57% |
| 278604 | Mid Atlantic Consultants in Hematology Oncol | 84207 | Nicolato, Jamie | 10 | 0 | 0 | 21 | 2 | 1 | 100% |
| 282178 | Mid Atlantic Consultants and Hematology Onc | 84207 | Nicolato, Jamie | 4 | 0 | 0 | 8 | 0 | 0 | 0% |
| 219856 | Raleigh Hematology Oncology Associates | 84209 | Stutts, Randy | 3 | 2 | 0 | 77 | 11 | 6 | 100% |
| 231881 | Greenville Cancer Centers - Seneca | 84307 | Jones, Norman | 1 | 0 | 0 | 1 | 0 | 0 | 0% |
| 232743 | Cancer Center of Carolinas | 84307 | Jones, Norman | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 278599 | Cancer Centers of the Carolinas | 84307 | Jones, Norman | 13 | 6 | 0 | 12 | 1 | 3 | 100% |
| 280917 | Cancer Centers of Carolinas | 84307 | Jones, Norman | 49 | 5 | 5 | 38 | 5 | 0 | 0% |
| 281951 | Cancer Center of the Carolinas | 84307 | Jones, Norman | 13 | 0 | 8 | 2 | 0 | 0 | 0% |
| 214502 | South Florida Oncology Hematology | 84402 | Zelden, Paul | 2 | 0 | 0 | 62 | 6 | 0 | 0% |
| 232632 | South Florida Oncology Hematology | 84402 | Zelden, Paul | 42 | 4 | 4 | 69 | 1 | 8 | 67% |
| 221387 | Myo Min and Myo Thant, M.D.'s | 84502 | Tjan, Michelle | 18 | 0 | 4 | 10 | 2 | 4 | 50% |
| 214340 | Minford, Koutrelakos, and Knight, M.D.S | 84502 | Brandes, Seth | 26 | 0 | 0 | 16 | 2 | 0 | 0% |
| 221702 | Maryland Oncology | 84502 | Brandes, Seth | 9 | 0 | 1 | 19 | 1 | 0 | 0% |
| 225494 | Sam Zygler, M.D., P.A. | 84502 | Brandes, Seth | 6 | 4 | 1 | 7 | 2 | 4 | 80% |
| 225893 | Flavio Kruter, M.D. | 84502 | Brandes, Seth | 36 | 5 | 5 | 63 | 4 | 4 | 44% |
| 227945 | Schwartz, Barr, Burrell and Malik, M.D.'s | 84504 | Endler, Edward (Ned) | 5 | 0 | 1 | 1 | 0 | 0 | 0% |
| 275947 | Myo Min and Myo Thant, M.D.'s | 84505 | Wells, Brian | 11 | 0 | 2 | 2 | 0 | 0 | 0% |
| 227087 | Loudoun Cancer Care Center | 84506 | McLucas, Beatrice | 10 | 0 | 0 | 0 | 0 | 0 | 0% |
| 232361 | Fairfax-Prince William Hematology-Oncology | 84506 | McLucas, Beatrice | 181 | 33 | 6 | 0 | 0 | 0 | 0% |
| 214323 | Schwartz, Barr and Silver, P.C. | 84507 | Bragg, Deborah | 2 | 0 | 0 | 1 | 1 | 0 | 0% |
| 275055 | Schwartz, Barr, Burrell and Malik, M.D.'s | 84507 | Bragg, Deborah | 15 | 1 | 2 | 1 | 0 | 0 | 0% |
| 226820 | Medical Center East Cancer Center/ Birmingh | 84601 | Eddins, J. Patrick | 3 | 1 | 0 | 4 | 0 | 0 | 0% |
| 276102 | Gadsden Regional Cancer Center | 84601 | Eddins, J. Patrick | 28 | 2 | 0 | 0 | 0 | 0 | 0% |
| 216707 | Birmingham Hematology-Oncology | 84606 | Gunter, Nancy | 0 | 0 | 0 | 47 | 9 | 0 | 0% |
| 230613 | Birmingham Hematology-Oncology | 84606 | Gunter, Nancy | 30 | 1 | 0 | 0 | 0 | 0 | 0% |
| 235362 | Birmingham Hematology-Oncology | 84606 | Gunter, Nancy | 4 | 0 | 0 | 1 | 0 | 0 | 0% |
| 236229 | Birmingham Hematology-Oncology | 84606 | Gunter, Nancy | 1 | 0 | 0 | 1 | 1 | 0 | 0% |
| 236284 | Birmingham Hematology-Oncology Associates | 84606 | Gunter, Nancy | 1 | 0 | 0 | 79 | 5 | 0 | 0% |
| 285031 | Medical Initiatives Inc. | 84606 | Gunter, Nancy | 52 | 0 | 4 | 132 | 0 | 16 | 80% |
| 84000 | **Region TOTAL:** | | | **1265** | **112** | **104** | **1732** | **125** | **157** | **60%** |
| 229431 | Oncology Hematology Association | 85102 | Cover, Bruce | 2 | 1 | 0 | 1 | 0 | 0 | 0% |
| 231657 | Oncology-Hematology Association | 85102 | Cover, Bruce | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 232035 | Oncology/Hematology Association - Johnstow | 85102 | Cover, Bruce | 18 | 2 | 2 | 26 | 2 | 1 | 33% |
| 275286 | Oncology Hematology Association | 85102 | Cover, Bruce | 38 | 0 | 1 | 24 | 0 | 0 | 0% |
| 277075 | Oncology Hematology Association, P.C. - Son | 85102 | Cover, Bruce | 9 | 0 | 0 | 3 | 0 | 0 | 0% |
| 278597 | Oncology Hematology Association, P.C. - Gre | 85102 | Cover, Bruce | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 281745 | Oncology Hematology Association | 85102 | Cover, Bruce | 2 | 0 | 0 | 5 | 0 | 0 | 0% |
| 235786 | Oncology Hematology Association, P.C. - Frar | 85103 | Arnstein, Kenneth | 1 | 0 | 0 | 15 | 4 | 1 | 100% |
| 278598 | Oncology Hematology Associates, P.C. - New | 85103 | Arnstein, Kenneth | 64 | 10 | 6 | 39 | 2 | 6 | 50% |
| 281089 | Oncology Hematology Associates | 85103 | Arnstein, Kenneth | 0 | 0 | 2 | 5 | 1 | 0 | 0% |

*YTD is through Jan 31.

f/n: US Oncology 1_01.xls, Vial

Data Source: Chargeback + Direct Sales

2/9/2001

B. Hazelton

## US Oncology Contracted Customer Product Mix
By ACIS

| Acis # | Account Name | Terr # | PSR Name | 300 mcg Product Total | | | 480 mcg Product Total | | | % 480 mcg |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2000 Total | 2000 YTD* | 2001 YTD* | 2000 Total | 2000 YTD* | 2001 YTD* | |
| 219163 | Oncology-Hematology Associates, P.C. - Was | 85104 | Romano, Jeffrey | 1 | 1 | 0 | 18 | 0 | 1 | 100% |
| 231941 | Shadyside Medical Associates | 85104 | Romano, Jeffrey | 12 | 0 | 0 | 13 | 0 | 0 | 0% |
| 216206 | Oncology-Hematology Associates, P.C. | 85105 | Nedzesky, Michael | 283 | 28 | 14 | 372 | 35 | 27 | 66% |
| 226603 | Oncology-Hematology Associates, P.C. | 85105 | Nedzesky, Michael | 23 | 2 | 0 | 3 | 0 | 0 | 0% |
| 229350 | Medical Group Associates | 85105 | Nedzesky, Michael | 1 | 1 | 0 | 1 | 1 | 0 | 0% |
| 230065 | Oncology-Hematology Associates, P.C. - Bea | 85105 | Nedzesky, Michael | 2 | 0 | 2 | 19 | 0 | 4 | 67% |
| 230085 | Oncology-Hematology Associates, P.C. | 85105 | Nedzesky, Michael | 4 | 0 | 1 | 17 | 1 | 2 | 67% |
| 230308 | Oncology Hematology Association | 85105 | Nedzesky, Michael | 15 | 0 | 1 | 14 | 2 | 1 | 50% |
| 278595 | Oncology-Hematology Associates, P.C. - Cran | 85105 | Nedzesky, Michael | 2 | 0 | 0 | 1 | 0 | 1 | 100% |
| 278596 | Oncology-Hematology Associates, P.C. - Ohic | 85105 | Nedzesky, Michael | 0 | 0 | 0 | 0 | 0 | 2 | 100% |
| 216639 | Oncology-Hematology Associates | 85106 | Sherer, Stephen | 143 | 11 | 17 | 54 | 3 | 7 | 29% |
| 235317 | Medical Associates of Southwest Virginia | 85106 | Sherer, Stephen | 23 | 2 | 1 | 16 | 0 | 0 | 0% |
| 281647 | Oncology Hematology Associates of Southwes | 85106 | Sherer, Stephen | 10 | 2 | 0 | 1 | 0 | 0 | 0% |
| 229787 | Dayton Oncology Hematology Consultants | 85306 | Sherman, Gary | 62 | 3 | 0 | 54 | 0 | 0 | 0% |
| 235450 | Dayton Oncology Hematology Consultants | 85306 | Sherman, Gary | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 278589 | Dayton Oncology Hematology Consultants - M | 85306 | Sherman, Gary | 12 | 2 | 0 | 0 | 0 | 0 | 0% |
| 214819 | Hematology/Oncology Associates | 85401 | Bachir, Olga | 62 | 1 | 0 | 43 | 1 | 3 | 100% |
| 219517 | Hematology/Oncology Associates | 85401 | Bachir, Olga | 17 | 0 | 0 | 8 | 0 | 0 | 0% |
| 229298 | Hematology Oncology Associates - Oak Park | 85401 | Bachir, Olga | 1 | 0 | 0 | 1 | 0 | 0 | 0% |
| 229646 | Medical Hematology Oncology Associates | 85401 | Bachir, Olga | 32 | 0 | 0 | 36 | 4 | 4 | 100% |
| 214805 | North Suburban Medical Consultants | 85404 | Arriazola, Pamela | 1 | 0 | 0 | 15 | 2 | 1 | 100% |
| 216909 | North Shore Hematology and Oncology Assoc | 85404 | Arriazola, Pamela | 87 | 7 | 10 | 56 | 2 | 8 | 44% |
| 217078 | Hematology-Oncology Associates | 85406 | Epperson, Mark | 11 | 0 | 0 | 0 | 0 | 0 | 0% |
| 217105 | Northwest Medical Specialists | 85406 | Epperson, Mark | 39 | 1 | 1 | 104 | 14 | 9 | 90% |
| 275503 | Northwest Medical Specialists | 85409 | Reinle, Michael | 3 | 0 | 1 | 5 | 0 | 0 | 0% |
| 285145 | Hematology Oncology Association of Illinois | 85409 | Reinle, Michael | 3 | 0 | 1 | 6 | 0 | 6 | 86% |
| 218165 | Oncology-Hematology Associates - South | 85507 | Higgs, Debra | 0 | 0 | 0 | 19 | 2 | 0 | 0% |
| 218167 | Oncology-Hematology Associates | 85507 | Higgs, Debra | 0 | 0 | 0 | 120 | 2 | 9 | 100% |
| 228102 | Oncology and Hematology Associates | 85507 | Higgs, Debra | 0 | 0 | 0 | 10 | 0 | 0 | 0% |
| 229449 | Oncology-Hematology Associates | 85507 | Higgs, Debra | 0 | 0 | 0 | 3 | 0 | 0 | 0% |
| 284928 | Oncology and Hematology Associates | 85507 | Higgs, Debra | 0 | 0 | 0 | 11 | 0 | 0 | 0% |
| **85000** | **Region TOTAL:** | | | **983** | **74** | **60** | **1138** | **78** | **93** | **61%** |
| | **US ONCOLOGY TOTAL:** | | | **6918** | **480** | **532** | **8697** | **590** | **814** | **60%** |

# Exhibit 8

## 2005 USON Aranesp Market Share

| | WAC Dollars | | Market Share | |
|---|---|---|---|---|
| | **Aranesp** | **Procrit** | **Aranesp** | **Procrit** |
| Jan-04 | $22,610,920 | $5,864,330 | 79.4% | 20.6% |
| Feb-04 | $24,726,927 | $4,580,627 | 84.4% | 15.6% |
| Mar-04 | $30,430,560 | $5,193,821 | 85.4% | 14.6% |
| Apr-04 | $29,689,282 | $4,332,352 | 87.3% | 12.7% |
| May-04 | $33,103,805 | $4,316,651 | 88.5% | 11.5% |
| Jun-04 | $35,414,617 | $4,198,726 | 89.4% | 10.6% |
| Jul-04 | $30,503,952 | $3,830,389 | 88.8% | 11.2% |
| Aug-04 | $37,950,134 | $4,186,864 | 90.1% | 9.9% |
| Sep-04 | $36,478,174 | $3,618,598 | 91.0% | 9.0% |
| Oct-04 | | | #DIV/0! | #DIV/0! |
| Nov-04 | | | #DIV/0! | #DIV/0! |
| Dec-04 | | | #DIV/0! | #DIV/0! |
| **Total** | **$280,908,371** | **$   40,122,357** | **87.50%** | **12.5%** |

 **US Oncology**

**Aranesp Market Share Summary**

For Period:   **Jan-05**

| | | | | | | Dollars | | Market Share ($) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | **ARANESP** | **PROCRIT** | **Aranesp** |
| | | | | | | 22,610,920 | 5,864,330 | **79.4%** |
| | | | | | | Grand Total | **$28,475,250** | |
| Parent | Account | Region | Heading | Street | | Aranesp | Procrit | Mkt Share % |
| AR - Arkansas Oncology Associates Total | | Central | | | | $208,901 | $52,014 | 80% |
| IL - Hematology Oncology Associates of Illinois Total | | Central | | | | $333,985 | $39,846 | 89% |
| IL - NW Medical Specialists Total | | Central | | | | $324,928 | $8,533 | 97% |
| IN - Central Indiana Cancer Centers Total | | Central | | | | $293,059 | $14,100 | 95% |
| MN - Minnesota Oncology Hematology Total | | Central | | | | $662,929 | $191,146 | 78% |
| MO - Arch Medical Services, Inc. Total | | Central | | | | $219,154 | $51,272 | 81% |
| MO - Missouri Cancer Associates Total | | Central | | | | $121,752 | $22,780 | 84% |
| MO - Missouri Hematology Oncology Total | | Central | | | | $417,374 | $144,250 | 74% |
| OH - Dayton Oncology Hematology Total | | Central | | | | $187,541 | $27,380 | 87% |
| TX - CCNST Gynecologic Oncology Division Total | | Central | | | | $33,322 | $0 | 100% |
| TX - CCNST Hematology Oncology Associates of South TX Division Total | | Central | | | | $336,975 | $143,284 | 70% |
| TX - CCNST San Antonio Tumor & Blood Clinic Total | | Central | | | | $580,992 | $161,958 | 78% |
| USON - Corporate Total | | Central | | | | $20 | -$1,410 | 0% |
| | | **Central Total** | | | | **$3,720,911** | **$855,153** | **81%** |
| FL - Cancer Centers of Florida Total | | East | | | | $169,342 | $60,845 | 74% |
| FL - Florida Cancer Institute Total | | East | | | | $566,894 | $249,614 | 69% |
| FL - South Florida Oncology Hematology Consultants Total | | East | | | | $56,390 | $153,451 | 27% |
| MD - Flavio Kruter, M.D. Total | | East | | | | $164,045 | $25,970 | 86% |
| MD - Maryland Oncology Hematology, P.A. Total | | East | | | | $305,106 | $68,548 | 82% |
| NC - Asheville Hematology & Oncology Associates Total | | East | | | | $85,440 | $19,589 | 81% |
| NC - Durham Regional Hematology Oncology - Durham Total | | East | | | | $305,021 | $42,739 | 88% |
| NC - Raleigh Hematology Oncology Associates Total | | East | | | | $408,830 | $55,800 | 88% |
| NY - (MA) Berkshire Hematology Oncology Total | | East | | | | $262,215 | $48,729 | 84% |
| NY - New York Hematology Oncology Associates Total | | East | | | | $499,736 | $171,520 | 74% |
| NY - Pharmacy - Hudson Total | | East | | | | $0 | $1,781 | 0% |
| NY - Rochester Total | | East | | | | $216,078 | $86,225 | 71% |
| PA - Venango Oncology Hematology Association Total | | East | | | | $176,006 | $59,064 | 75% |
| SC - Cancer Center of the Carolinas Total | | East | | | | $692,918 | $12,466 | 98% |
| VA - Fairfax-Prince William Hematology-Oncology Total | | East | | | | $255,466 | $103,808 | 71% |
| VA - Oncology and Hematology Associates of SW VA, Inc. Total | | East | | | | $398,150 | $135,973 | 75% |
| VA - Virginia Oncology Associates Total | | East | | | | $1,049,202 | $602,441 | 64% |
| | | **East Total** | | | | **$5,610,844** | **$1,898,563** | **75%** |
| ARIZONA LEGAL PC Total | | West | | | | $643,107 | $132,608 | 83% |
| COLORADO LEGAL PC Total | | West | | | | $686,083 | $80,219 | 90% |
| NV - Comprehensive Cancer Centers of Nevada Total | | West | | | | $648,490 | $32,054 | 95% |
| OK - Cancer Care Associates Total | | West | | | | $649,771 | $380,954 | 63% |
| OR - Northwest Cancer Specialists Total | | West | | | | $790,918 | $237,034 | 77% |
| OR - Oncology Associates of Oregon Total | | West | | | | $166,608 | $5,342 | 97% |
| TX - Texas Oncology PA Total | | West | | | | $5,063,344 | $1,322,097 | 79% |
| WA - Spokane Oncology/Hematology Association Total | | West | | | | $116,198 | $16,027 | 88% |
| WA - Washington Cancer Centers Total | | West | | | | $296,818 | $30,942 | 91% |
| | | **West Total** | | | | **$9,061,337** | **$2,237,879** | **80%** |
| AR - Little Rock Hematology Associates Total | | SL | | | | $257,174 | $76,872 | 77% |
| CA - Alice C. Reier, MD Total | | SL | | | | $15,379 | $0 | 100% |
| CA - Buenaventura Medical Group, Inc. Total | | SL | | | | $5,126 | $0 | 100% |
| CA - Camino Medical Group Total | | SL | | | | $173,698 | $7,123 | 96% |
| CA - Cancer Associates of Monterey Peninsula - Monterey | Total | SL | | | | $225,903 | $23,150 | 91% |
| CA - Facey Medical Foundation Total | | SL | | | | $75,187 | $1,781 | 98% |
| CA - Larry G. Strieff, MD Total | | SL | | | | $10,253 | $3,562 | 74% |
| CA - Sacramento Center for Hematology & Medical Oncology Total | | SL | | | | $150,802 | $31,725 | 83% |
| CA - Valley Medical Oncology Consultants Total | | SL | | | | $152,083 | $85,813 | 64% |
| FL - Melbourne Internal Medicine Associates Total | | SL | | | | $13,670 | $0 | 100% |
| IA - Iowa Cancer Care Total | | SL | | | | $132,518 | $1,781 | 99% |
| ID - Oncology Hematology Specialists Total | | SL | | | | $39,302 | $0 | 100% |
| IL - Advanced Care & Treatment Medical Group, SC - Rockford | Total | SL | | | | $124,571 | $3,562 | 97% |
| IL - Edwards Kaplan, MD & Associates Total | | SL | | | | $70,061 | $0 | 100% |
| IL - Midwest Center for Hematology/Oncology, SC - Joliet Total | | SL | | | | $56,390 | $1,781 | 97% |
| IL - Progressive Care Total | | SL | | | | $44,429 | $0 | 100% |
| MD - Associates in Oncology-Hematology Total | | SL | | | | $331,507 | $29,132 | 92% |
| MD - Hematology-Oncology Consultants Total | | SL | | | | $249,485 | $82,810 | 75% |
| MN - Mankato Clinic, Ltd - Mankato Total | | SL | | | | $21,702 | $15,656 | 58% |
| MO - Hannibal Clinic, Inc. - Hannibal | Total | SL | | | | $22,044 | $3,896 | 85% |
| MO - Robert Carter MD, PC Total | | SL | | | | $14,525 | $16,696 | 47% |
| MT - Great Falls Clinic Total | | SL | | | | $44,002 | $15,954 | 73% |
| NC - Piedmont Hematology Oncology Associates Total | | SL | | | | $582,188 | $49,418 | 92% |
| NE - Midlands Regional Cancer Center Total | | SL | | | | $7,690 | $0 | 100% |
| NE - Oncology Hematology West Total | | SL | | | | $150,118 | $184,832 | 45% |
| NM - New Mexico Cancer Care Associates P.C. Total | | SL | | | | $124,400 | $0 | 100% |
| NV - Alpine Hematology Total | | SL | | | | $41,011 | $16,325 | 72% |
| OK - Cancer Treatment Center of Oklahoma - Midwest City Total | | SL | | | | $56,390 | $39,178 | 59% |
| SC - Cancer Treatment Center Total | | SL | | | | $39,302 | $0 | 100% |
| TN - Crossville Medical Oncology Total | | SL | | | | $31,613 | $33,762 | 48% |
| TN - Midsouth Cancer Center Total | | SL | | | | $31,186 | $0 | 100% |
| TX - CTOA LEGAL PC Total | | SL | | | | $761,099 | $119,850 | 86% |
| WA - Medical Oncology Associates Total | | SL | | | | $20,933 | $0 | 100% |
| WV - Beckley Oncology Associates | Total | SL | | | | $121,581 | $9,572 | 93% |
| WV - Greenbrier Oncology Clinic Total | | SL | | | | $20,506 | $18,106 | 53% |
| | | **SL Total** | | | | **$4,217,828** | **$872,735** | **83%** |
| | | **USON Total** | | | | **$22,610,920** | **$5,864,330** | **79%** |

US Oncology

**Aranesp Market Share Summary**

For Period:   **Feb-05**

| | | | | | Dollars | | Market Share ($) |
|---|---|---|---|---|---|---|---|
| | | | | | ARANESP | PROCRIT | Aranesp |
| | | | | | 24,726,927 | 4,580,627 | 84.4% |
| | | | | | Grand Total | $29,307,553 | |

| Parent | Account | Region | Heading | Street | Aranesp | Procrit | Mkt Share % |
|---|---|---|---|---|---|---|---|
| Arch Medical Services, Inc. | Total | Central | | | $193,522 | $45,559 | 81% |
| Arkansas Oncology Associates, P.A. | Total | Central | | | $228,552 | $64,406 | 78% |
| Cancer Care Network of South Texas, P.A. | Total | Central | | | $1,042,539 | $238,261 | 81% |
| Central Indiana Cancer Centers | Total | Central | | | $318,264 | $4,230 | 99% |
| Dayton Oncology & Hematology, P.A. | Total | Central | | | $204,629 | $26,409 | 89% |
| Hematology Oncology Associates of Illinois, L.L.C. | Total | Central | | | $439,503 | $40,128 | 92% |
| Kansas City Oncology & Hematology Group, LLC | Total | Central | | | $451,722 | $48,008 | 90% |
| Minnesota Oncology Hematology, P.A. | Total | Central | | | $650,711 | $137,831 | 83% |
| Missouri Cancer Associates | Total | Central | | | $106,971 | $29,866 | 78% |
| Northwest Medical Specialists, P.C. | Total | Central | | | $257,943 | $0 | 100% |
| | | **Central Total** | | | $3,894,355 | $634,700 | 86% |
| Asheville Hematology & Oncology Associates, P.A. | Total | East | | | $98,256 | $17,808 | 85% |
| Berkshire Hematology Oncology, P.C. | Total | East | | | $285,284 | $8,162 | 97% |
| Cancer Centers of Florida, P.A. | Total | East | | | $238,976 | $18,847 | 93% |
| Cancer Centers of North Carolina | Total | East | | | $672,413 | $13,505 | 98% |
| Cancer Centers Of The Carolinas | Total | East | | | $660,878 | $14,246 | 98% |
| Durham Regional Hematology Oncology | Total | East | | | $324,672 | $42,739 | 88% |
| Fairfax-Northern Virginia Hematology-Oncology, P.C. | Total | East | | | $332,362 | $19,886 | 94% |
| Flavio Kruter, M.D., P.A. | Total | East | | | $147,042 | $17,066 | 90% |
| Florida Cancer Institute, P.A. | Total | East | | | $726,240 | $212,144 | 77% |
| Interlakes Oncology Hematology, P.C. | Total | East | | | $107,740 | $72,720 | 60% |
| Maryland Oncology Hematology, P.A. | Total | East | | | $295,537 | $98,466 | 75% |
| New York Oncology Hematology, P.C. | Total | East | | | $801,256 | $154,825 | 84% |
| Oncology & Hematology Associates Of Southwest Virginia, Inc. | Total | East | | | $363,974 | $145,211 | 71% |
| South Florida Oncology and Hematology Consultants | Total | East | | | $208,474 | $88,079 | 70% |
| Venango Oncology Hematology Association | Total | East | | | $194,803 | $69,973 | 74% |
| Virginia Oncology Associates | Total | East | | | $1,470,421 | $369,791 | 80% |
| | | **East Total** | | | $6,928,328 | $1,363,469 | 84% |
| Arizona Oncology Associates, P.C. | Total | West | | | $1,152,842 | $113,981 | 91% |
| Cancer Care Associates | Total | West | | | $707,443 | $257,260 | 73% |
| Cancer Care Northwest, P.S. | Total | West | | | $98,427 | $14,246 | 87% |
| Comprehensive Cancer Centers of Nevada | Total | West | | | $589,023 | $14,246 | 98% |
| Northwest Cancer Specialists, P.C. | Total | West | | | $666,518 | $204,504 | 77% |
| Oncology Associates of Oregon, P.C. | Total | West | | | $143,112 | $0 | 100% |
| Rocky Mountain Cancer Centers, LLP | Total | West | | | $771,694 | $107,897 | 88% |
| Texas Oncology, P.A. | Total | West | | | $5,536,166 | $1,183,136 | 82% |
| Washington Cancer Centers, P.C. | Total | West | | | $294,255 | $22,409 | 93% |
| | | **West Total** | | | $9,959,482 | $1,917,678 | 84% |
| Advanced Care & Treatment Medical Group, SC | | SL | | | $107,654 | $0 | 100% |
| Alice C. Reier, MD | Total | SL | | | $13,670 | $0 | 100% |
| Alpine Hematology - Oncology, P.C. | Total | SL | | | $54,682 | $1,410 | 97% |
| Associates In Oncology-Hematology, PC | | SL | | | $311,429 | $23,819 | 93% |
| Beckley Oncology Associates, Inc. | Total | SL | | | $131,492 | $0 | 100% |
| Cancer Associates Of Monterey Peninsula | Total | SL | | | $242,991 | $35,616 | 87% |
| Cancer Treatment Center Of Oklahoma | Total | SL | | | $51,264 | $48,646 | 51% |
| Central Texas Oncology Associates, P.A. | Total | SL | | | $668,910 | $131,130 | 84% |
| Crossville Medical Oncology | Total | SL | | | $24,350 | $15,656 | 61% |
| Edward Kaplan, MD & Associates | Total | SL | | | $78,605 | $0 | 100% |
| Facey Medical Foundation | Total | SL | | | $89,029 | $0 | 100% |
| Great Falls Clinic | Total | SL | | | $39,302 | $13,416 | 75% |
| Gynecologic Oncology Associates, PA | Total | SL | | | $63,226 | $0 | 100% |
| Hannibal Clinic Operations, LLC | Total | SL | | | $14,610 | $3,562 | 80% |
| Hematology-Oncology Consultants, P.A. | Total | SL | | | $187,968 | $61,884 | 75% |
| Iowa Cancer Care | Total | SL | | | $134,141 | $3,191 | 98% |
| Larry G. Strieff, MD | Total | SL | | | $6,835 | $0 | 100% |
| Little Rock Hematology Oncology Associates, P.A. | Total | SL | | | $231,542 | $59,435 | 80% |
| Mankato Clinic, Ltd | Total | SL | | | $32,552 | $8,904 | 79% |
| Medical Oncology Associates, P.S. | Total | SL | | | $64,080 | $0 | 100% |
| Melbourne Internal Medicine Associates | Total | SL | | | $43,745 | $0 | 100% |
| Midlands Regional Cancer Center, PC | Total | SL | | | $9,398 | $0 | 100% |
| Midwest Center For Hematology/Oncology, SC | Total | SL | | | $61,090 | $0 | 100% |
| New Mexico Cancer Care Associates | Total | SL | | | $109,021 | $0 | 100% |
| Oncology Hematology West, P.C. | Total | SL | | | $204,202 | $144,245 | 59% |
| Oncology-Hematology Specialists, PA | Total | SL | | | $49,555 | $0 | 100% |
| Palo Alto Medical Foundation | Total | SL | | | $150,886 | $4,972 | 97% |
| Piedmont Hematology-Oncology Associates, PLLC | Total | SL | | | $450,867 | $36,953 | 92% |
| Progressive Care, SC | Total | SL | | | $86,465 | $0 | 100% |
| Robert Carter MD, PC | Total | SL | | | $3,418 | $16,325 | 17% |
| Sacramento Center for Hematology & Medical Oncology, Inc. | Total | SL | | | $170,111 | $24,675 | 87% |
| Springfield Clinic Total | | SL | | | $0 | $12,466 | 0% |
| The Midsouth Cancer Center | Total | SL | | | $46,565 | $0 | 100% |
| WVVA Health Care Alliance, P.C. | Total | SL | | | $11,107 | $18,476 | 38% |
| | | **SL Total** | | | $3,944,763 | $664,779 | 86% |
| | | **USON Total** | | | $24,726,927 | $4,580,627 | 84% |

 **US Oncology**

**Aranesp Market Share Summary**

**For Period:  Mar-05**

| | Dollars | | Market Share ($) |
|---|---|---|---|
| | ARANESP | PROCRIT | Aranesp |
| | 30,430,560 | 5,193,821 | 85.4% |
| Grand Total | $35,624,380 | | |

| Parent | | | Account | Region | Heading | Street | Aranesp | Procrit | Mkt Share % |
|---|---|---|---|---|---|---|---|---|---|
| Arch Medical Services, Inc. | Total | | | Central | | | $228,296 | $50,531 | 82% |
| Arkansas Oncology Associates, P.A. | | Total | | Central | | | $236,669 | $71,900 | 77% |
| Cancer Care Network of South Texas, P.A. | | Total | | Central | | | $1,202,055 | $249,688 | 83% |
| Central Indiana Cancer Centers | Total | | | Central | | | $360,898 | $5,640 | 98% |
| Dayton Oncology & Hematology, P.A. | | Total | | Central | | | $232,397 | $44,374 | 84% |
| Hematology Oncology Associates of Illinois, L.L.C. | | Total | | Central | | | $528,104 | $48,343 | 92% |
| Kansas City Oncology & Hematology Group, LLC | | Total | | Central | | | $607,478 | $46,896 | 93% |
| Minnesota Oncology Hematology, P.A. | | Total | | Central | | | $760,758 | $155,603 | 83% |
| Missouri Cancer Associates | Total | | | Central | | | $131,578 | $24,030 | 85% |
| Northwest Medical Specialists, P.C. | Total | | | Central | | | $354,491 | $2,820 | 99% |
| | | | | Central Total | | | $4,642,723 | $699,824 | 87% |
| Asheville Hematology & Oncology Associates, P.A. | | Total | | East | | | $114,490 | $10,685 | 91% |
| Cancer Centers of Florida, P.A. | | Total | | East | | | $328,431 | $50,828 | 87% |
| Cancer Centers of North Carolina | | Total | | East | | | $767,678 | $8,533 | 99% |
| Cancer Centers Of The Carolinas | | Total | | East | | | $810,826 | $12,466 | 98% |
| Durham Regional Hematology Oncology | | Total | | East | | | $481,882 | $32,054 | 94% |
| Fairfax-Northern Virginia Hematology-Oncology, P.C. | | Total | | East | | | $358,848 | $73,979 | 83% |
| Flavio Kruter, M.D., P.A. | | Total | | East | | | $187,114 | $24,487 | 88% |
| Florida Cancer Institute, P.A. | | Total | | East | | | $928,305 | $320,183 | 74% |
| Interlakes Oncology Hematology, P.C. | | Total | | East | | | $122,009 | $59,659 | 67% |
| Maryland Oncology Hematology, P.A. | | Total | | East | | | $313,223 | $111,971 | 74% |
| New York Oncology Hematology, P.C. | | Total | | East | | | $950,178 | $176,826 | 84% |
| Oncology & Hematology Associates Of Southwest Virginia, Inc. | | Total | | East | | | $358,848 | $134,228 | 73% |
| South Florida Oncology and Hematology Consultants | | Total | | East | | | $353,294 | $133,936 | 73% |
| Venango Oncology Hematology Association | | Total | | East | | | $226,416 | $42,295 | 84% |
| Virginia Oncology Associates | Total | | | East | | | $2,029,882 | $441,774 | 82% |
| | | | | East Total | | | $8,331,424 | $1,633,904 | 84% |
| Arizona Oncology Associates, P.C. | Total | | | West | | | $1,633,869 | $94,538 | 95% |
| Cancer Care Associates | Total | | | West | | | $809,971 | $335,542 | 71% |
| Cancer Care Northwest, P.S. | Total | | | West | | | $234,276 | $17,808 | 93% |
| Comprehensive Cancer Centers of Nevada | | Total | | West | | | $649,942 | $16,027 | 98% |
| Northwest Cancer Specialists, P.C. | | Total | | West | | | $811,509 | $244,350 | 77% |
| Oncology Associates of Oregon, P.C. | | Total | | West | | | $185,576 | $1,410 | 99% |
| Rocky Mountain Cancer Centers, LLP | | Total | | West | | | $928,904 | $116,430 | 89% |
| Texas Oncology, P.A. | | Total | | West | | | $6,948,064 | $1,260,464 | 85% |
| Washington Cancer Centers, P.C. | Total | | | West | | | $326,722 | $24,190 | 93% |
| | | | | West Total | | | $12,528,834 | $2,110,759 | 86% |
| Advanced Care & Treatment Medical Group, SC | | Total | | SL | | | $143,539 | $1,781 | 99% |
| Alice C. Reier, MD | | Total | | SL | | | $19,651 | $0 | 100% |
| Alpine Hematology - Oncology, P.C. | | Total | | SL | | | $20,506 | $11,724 | 64% |
| Associates In Oncology-Hematology, PC | | Total | | SL | | | $331,507 | $33,762 | 91% |
| Beckley Oncology Associates, Inc. | | Total | | SL | | | $135,850 | $0 | 100% |
| Buenaventura Medical Group, Inc | | Total | | SL | | | $28,195 | $0 | 100% |
| Cancer Associates Of Monterey Peninsula | | Total | | SL | | | $272,041 | $48,082 | 85% |
| Cancer Treatment Center Of Oklahoma | | Total | | SL | | | $48,701 | $35,052 | 58% |
| Central Texas Oncology Associates, P.A. | | Total | | SL | | | $796,044 | $107,160 | 88% |
| Crossville Medical Oncology | | Total | | SL | | | $68,779 | $1,781 | 97% |
| Edward Kaplan, MD & Associates | | Total | | SL | | | $111,072 | $0 | 100% |
| Facey Medical Foundation | | Total | | SL | | | $65,191 | $3,562 | 95% |
| Great Falls Clinic | Total | | | SL | | | $39,644 | $13,802 | 74% |
| Gynecologic Oncology Associates, PA | | Total | | SL | | | $73,478 | $0 | 100% |
| Hannibal Clinic Operations, LLC | | Total | | SL | | | $25,290 | $8,533 | 75% |
| Hematology-Oncology Consultants, P.A. | | Total | | SL | | | $306,302 | $57,581 | 84% |
| Iowa Cancer Care | Total | | | SL | | | $173,016 | $3,562 | 98% |
| Larry G. Strieff, MD | Total | | | SL | | | $17,088 | $0 | 100% |
| Little Rock Hematology Oncology Associates, P.A. | | Total | | SL | | | $265,718 | $113,898 | 70% |
| Mankato Clinic, Ltd | | Total | | SL | | | $41,182 | $7,123 | 85% |
| Medical Oncology Associates, P.S. | | Total | | SL | | | $79,459 | $0 | 100% |
| Melbourne Internal Medicine Associates | | Total | | SL | | | $29,050 | $0 | 100% |
| Midlands Regional Cancer Center, PC | | Total | | SL | | | $19,651 | $0 | 100% |
| Midwest Center For Hematology/Oncology, SC | | Total | | SL | | | $62,371 | $0 | 100% |
| New Mexico Cancer Care Associates | Total | | | SL | | | $134,055 | $0 | 100% |
| Oncology Hematology West, P.C. | | Total | | SL | | | $275,886 | $140,312 | 66% |
| Oncology-Hematology Specialists, PA | | Total | | SL | | | $57,245 | $0 | 100% |
| Palo Alto Medical Foundation | Total | | | SL | | | $215,478 | $8,533 | 96% |
| Piedmont Hematology-Oncology Associates, PLLC | | Total | | SL | | | $562,622 | $49,345 | 92% |
| Progressive Care, SC | Total | | | SL | | | $123,034 | $0 | 100% |
| Robert Carter MD, PC | Total | | | SL | | | $12,816 | $29,088 | 31% |
| Sacramento Center for Hematology & Medical Oncology, Inc. | | Total | | SL | | | $243,675 | $42,300 | 85% |
| Springfield Clinic Total | | | | SL | | | $30,758 | $22,038 | 58% |
| The Midsouth Cancer Center | | Total | | SL | | | $66,216 | $0 | 100% |
| WVVA Health Care Alliance, P.C. | | Total | | SL | | | $32,467 | $10,314 | 76% |
| | | | | SL Total | | | $4,927,579 | $749,333 | 87% |
| | | | | USON Total | | | $30,430,560 | $5,193,821 | 85% |

**US Oncology**

**Aranesp Market Share Summary**

| | Dollars | | Market Share ($) |
|---|---|---|---|
| | ARANESP | PROCRIT | Aranesp |
| For Period: Apr-05 | 29,689,282 | 4,332,352 | 87.3% |
| | Grand Total | $34,021,634 | |

| Parent | Account | Region | Heading | Street | Aranesp | Procrit | Mkt Share % |
|---|---|---|---|---|---|---|---|
| Arch Medical Services, Inc. | Total | Central | | | $221,717 | $28,493 | 89% |
| Arkansas Oncology Associates, P.A. | Total | Central | | | $234,106 | $75,091 | 76% |
| Cancer Care Network of South Texas, P.A. | Total | Central | | | $1,195,049 | $200,747 | 86% |
| Central Indiana Cancer Centers | Total | Central | | | $358,250 | $2,820 | 99% |
| Dayton Oncology & Hematology, P.A. | Total | Central | | | $189,677 | $25,600 | 88% |
| Hematology Oncology Associates of Illinois, L.L.C. | Total | Central | | | $538,614 | $41,909 | 93% |
| Kansas City Oncology & Hematology Group, LLC | Total | Central | | | $600,131 | $48,379 | 93% |
| Minnesota Oncology Hematology, P.A. | Total | Central | | | $724,360 | $131,486 | 85% |
| Missouri Cancer Associates | Total | Central | | | $117,480 | $22,409 | 84% |
| Northwest Medical Specialists, P.C. | Total | Central | | | $366,708 | $1,410 | 100% |
| | | Central Total | | | $4,546,091 | $578,344 | 89% |
| Asheville Hematology & Oncology Associates, P.A. | Total | East | | | $150,374 | $19,589 | 88% |
| Cancer Centers of Florida, P.A. | Total | East | | | $298,356 | $51,868 | 85% |
| Cancer Centers of North Carolina | Total | East | | | $822,360 | $16,696 | 98% |
| Cancer Centers Of The Carolinas | Total | East | | | $716,842 | $12,466 | 98% |
| Durham Hematology Oncology | Total | East | | | $504,523 | $32,054 | 94% |
| Fairfax-Northern Virginia Hematology-Oncology, P.C. | Total | East | | | $503,669 | -$18,847 | 104% |
| Flavio Kruter, M.D., P.A. | Total | East | | | $187,712 | $1,781 | 99% |
| Florida Cancer Institute, P.A. | Total | East | | | $643,362 | $121,841 | 84% |
| Interlakes Oncology Hematology, P.C. | Total | East | | | $120,300 | $81,290 | 60% |
| Maryland Oncology Hematology, P.A. | Total | East | | | $390,546 | $106,153 | 79% |
| New York Oncology Hematology, P.C. | Total | East | | | $883,535 | $160,520 | 85% |
| Ocala Oncology Center, P.L. | Total | East | | | $154,219 | $104,550 | 60% |
| Oncology & Hematology Associates Of Southwest Virginia, Inc. | Total | East | | | $413,530 | $153,744 | 73% |
| South Florida Oncology and Hematology Consultants | Total | East | | | $451,550 | $154,156 | 75% |
| Venango Oncology Hematology Association | Total | East | | | $387,043 | $0 | 100% |
| Virginia Oncology Associates | Total | East | | | $2,014,417 | $413,276 | 83% |
| | | East Total | | | $8,642,339 | $1,411,136 | 86% |
| Arizona Oncology Associates, P.C. | Total | West | | | $1,264,597 | $99,066 | 93% |
| Cancer Care Associates | Total | West | | | $799,291 | $292,061 | 73% |
| Cancer Care Northwest, P.S. | Total | West | | | $188,993 | $8,904 | 96% |
| Comprehensive Cancer Centers of Nevada | Total | West | | | $660,964 | $30,274 | 96% |
| Northwest Cancer Specialists, P.C. | Total | West | | | $770,412 | $209,549 | 79% |
| Oncology Associates of Oregon, P.C. | Total | West | | | $169,598 | $0 | 100% |
| Rocky Mountain Cancer Centers, LLP | Total | West | | | $827,914 | $76,804 | 92% |
| Texas Oncology, P.A. | Total | West | | | $6,652,356 | $985,438 | 87% |
| Washington Cancer Centers, P.C. | Total | West | | | $922,461 | $23,819 | 92% |
| | | West Total | | | $11,626,587 | $1,725,914 | 87% |
| Advanced Care & Treatment Medical Group, SC | Total | SL | | | $102,357 | $0 | 100% |
| Alice C. Reier, MD | Total | SL | | | $23,923 | $0 | 100% |
| Alpine Hematology - Oncology, P.C. | Total | SL | | | $37,594 | $0 | 100% |
| Ashland-Bellefonte Cancer Center Total | | SL | | | $51,264 | $0 | 100% |
| Associates In Oncology-Hematology, PC | | SL | | | $362,693 | $28,790 | 93% |
| Beckley Oncology Associates, Inc. | Total | SL | | | $102,272 | $0 | 100% |
| Buenaventura Medical Group, Inc | Total | SL | | | $10,253 | $0 | 100% |
| Cancer Associates Of Monterey Peninsula | Total | SL | | | $264,351 | $26,712 | 91% |
| Cancer Treatment Center Of Oklahoma | Total | SL | | | $38,448 | $51,643 | 43% |
| Central Texas Oncology Associates, P.A. | Total | SL | | | $824,838 | $78,960 | 91% |
| Crossville Medical Oncology | Total | SL | | | $65,362 | $0 | 100% |
| Edward Kaplan, MD & Associates | Total | SL | | | $95,693 | $0 | 100% |
| Facey Medical Foundation | Total | SL | | | $66,900 | $3,562 | 95% |
| Great Falls Clinic | Total | SL | | | $31,784 | $12,022 | 73% |
| Gynecologic Oncology Associates, PA | Total | SL | | | $78,605 | $0 | 100% |
| Hannibal Clinic Operations, LLC | Total | SL | | | $23,325 | $7,457 | 76% |
| Hematology-Oncology Consultants, P.A. | Total | SL | | | $334,925 | $64,704 | 84% |
| Highlands Cancer Center Total | | SL | | | $34,176 | $0 | 100% |
| Iowa Cancer Care | Total | SL | | | $165,754 | $0 | 100% |
| Larry G. Strieff, MD | Total | SL | | | $13,670 | $1,781 | 88% |
| Little Rock Hematology Oncology Associates, P.A. | Total | SL | | | $253,757 | $64,406 | 80% |
| Mankato Clinic, Ltd | Total | SL | | | $58,270 | $3,562 | 94% |
| Medical Oncology Associates, P.S. | Total | SL | | | $55,536 | $0 | 100% |
| Melbourne Internal Medicine Associates | Total | SL | | | $19,138 | $13,505 | 59% |
| Midlands Regional Cancer Center, PC | Total | SL | | | $12,816 | $0 | 100% |
| Midwest Center For Hematology/Oncology, SC | Total | SL | | | $73,478 | $0 | 100% |
| New Mexico Cancer Care Associates | Total | SL | | | $115,686 | $0 | 100% |
| Oncology Hematology West, P.C. | Total | SL | | | $274,860 | $152,407 | 64% |
| Oncology-Hematology Specialists, PA | Total | SL | | | $61,517 | $0 | 100% |
| Palo Alto Medical Foundation | Total | SL | | | $204,115 | $6,752 | 97% |
| Piedmont Hematology-Oncology Associates, PLLC | Total | SL | | | $551,259 | $19,886 | 97% |
| Progressive Care, SC | Total | SL | | | $125,768 | $0 | 100% |
| Robert Carter MD, PC | Total | SL | | | $16,661 | $28,717 | 37% |
| Sacramento Center for Hematology & Medical Oncology, Inc. | Total | SL | | | $223,853 | $20,445 | 92% |
| Springfield Clinic, LLP | Total | SL | | | $20,334 | $27,046 | 43% |
| The Midsouth Cancer Center | Total | SL | | | $49,128 | $0 | 100% |
| WVVA Health Care Alliance, P.C. | Total | SL | | | $29,904 | $4,601 | 87% |
| | | SL Total | | | $4,874,265 | $616,959 | 89% |
| | | USON Total | | | $29,689,282 | $4,332,352 | 87% |



**Aranesp Market Share Summary**

**For Period:  May-05**

| | | | | | | Dollars | | Market Share ($) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | ARANESP | PROCRIT | Aranesp |
| | | | | | | $33,103,805 | $4,316,651 | 88.5% |
| | | | | | | Grand Total | $37,420,456 | |
| Parent | Account | Region | Heading | Street | City | Aranesp | Procrit | Mkt Share % |
| Arch Medical Services, Inc. | | Central | | | | $282,550 | $16,027 | 95% |
| Arkansas Oncology Associates, P.A. | | Central | | | | $272,554 | $59,064 | 82% |
| Cancer Care Network of South Texas, P.A. | | Central | | | | $1,313,811 | $168,593 | 89% |
| Central Indiana Cancer Centers | | Central | | | | $240,428 | $5,640 | 98% |
| Dayton Oncology & Hematology, P.A. | | Central | | | | $236,669 | $42,593 | 85% |
| Hematology Oncology Associates of Illinois, L.L.C. | | Central | | | | $680,530 | $66,151 | 91% |
| Kansas City Cancer Centers Total | | Central | | | | $489,486 | $36,655 | 93% |
| Minnesota Oncology Hematology, P.A. | | Central | | | | $790,491 | $144,991 | 85% |
| Missouri Cancer Associates | | Central | | | | $152,083 | $23,819 | 86% |
| Northwest Medical Specialists, P.C. | | Central | | | | $447,364 | $6,011 | 99% |
| | | **Central Total** | | | | **$4,905,965** | **$569,544** | **90%** |
| Asheville Hematology & Oncology Associates, P.A. | | East | | | | $143,539 | $23,150 | 86% |
| Cancer Centers of Florida, P.A. | | East | | | | $320,314 | $82,439 | 80% |
| Cancer Centers of North Carolina | | East | | | | $894,557 | $13,876 | 98% |
| Cancer Centers Of The Carolinas | | East | | | | $788,184 | $12,466 | 98% |
| Durham Regional Hematology Oncology | | East | | | | $534,000 | $42,739 | 93% |
| Fairfax-Northern Virginia Hematology-Oncology, P.C. | | East | | | | $480,173 | $0 | 100% |
| Flavio Kruter, M.D., P.A. | | East | | | | $197,110 | $5,342 | 97% |
| Florida Cancer Institute, P.A. | | East | | | | $676,171 | $150,704 | 82% |
| Interlakes Oncology Hematology, P.C. | | East | | | | $151,742 | $103,662 | 59% |
| Maryland Oncology Hematology, P.A. | | East | | | | $539,041 | $81,770 | 87% |
| New York Oncology Hematology, P.C. | | East | | | | $1,029,039 | $201,071 | 84% |
| Northwestern Connecticut Onc/Hema. Assoc. Total | | East | | | | $142,258 | $60,474 | 70% |
| Ocala Oncology Center, P.L. | | East | | | | $215,309 | $138,239 | 61% |
| Oncology & Hematology Associates Of Southwest Virginia, Inc. | | East | | | | $431,472 | $115,308 | 79% |
| South Florida Oncology and Hematology Consultants | | East | | | | $426,346 | $136,124 | 76% |
| Venango Oncology Hematology Association | | East | | | | $396,442 | $0 | 100% |
| Virginia Oncology Associates | | East | | | | $2,483,910 | $313,523 | 89% |
| | | **East Total** | | | | **$9,849,606** | **$1,480,887** | **87%** |
| Arizona Oncology Associates, P.C. | | West | | | | $1,670,779 | $121,104 | 93% |
| Cancer Care Associates | | West | | | | $1,033,397 | $281,449 | 79% |
| Cancer Care Northwest, P.S. | | West | | | | $221,717 | $14,246 | 94% |
| Comprehensive Cancer Centers of Nevada | | West | | | | $659,170 | $21,370 | 97% |
| Northwest Cancer Specialists, P.C. | | West | | | | $787,415 | $162,757 | 83% |
| Oncology Associates of Oregon, P.C. | | West | | | | $221,717 | $1,410 | 99% |
| Rocky Mountain Cancer Centers, LLP | | West | | | | $894,300 | $113,500 | 89% |
| Texas Oncology, P.A. | | West | | | | $7,386,799 | $861,148 | 90% |
| Washington Cancer Centers, P.C. | | West | | | | $324,757 | $18,847 | 95% |
| | | **West Total** | | | | **$13,200,050** | **$1,595,832** | **89%** |
| Advanced Care & Treatment Medical Group, SC | | SL | | | | $120,470 | $1,781 | 99% |
| Alice C. Reier, MD | | SL | | | | $23,923 | $0 | 100% |
| Alpine Hematology - Oncology, P.C. | | SL | | | | $51,264 | $0 | 100% |
| Ashland-Bellefonte Cancer Center Total | | SL | | | | $42,720 | $0 | 100% |
| Associates In Oncology-Hematology, PC | | SL | | | | $300,749 | $26,639 | 92% |
| Beckley Oncology Associates, Inc. | | SL | | | | $92,446 | $0 | 100% |
| Buenaventura Medical Group, Inc | | SL | | | | $16,661 | $5,342 | 76% |
| Cancer Associates Of Monterey Peninsula | | SL | | | | $282,721 | $46,301 | 86% |
| Cancer Treatment Center Of Oklahoma | | SL | | | | $79,459 | $39,178 | 67% |
| Central Texas Oncology Associates, P.A. | | SL | | | | $893,446 | $64,860 | 93% |
| Crossville Medical Oncology | | SL | | | | $96,547 | $0 | 100% |
| Edward Kaplan, MD & Associates | | SL | | | | $105,946 | $282 | 100% |
| Facey Medical Foundation | | SL | | | | $72,624 | $5,624 | 93% |
| Great Falls Clinic | | SL | | | | $31,100 | $3,191 | 91% |
| Gynecologic Oncology Associates, PA | | SL | | | | $63,226 | $0 | 100% |
| Hannibal Clinic Operations, LLC | | SL | | | | $27,341 | $6,752 | 80% |
| Hematology-Oncology Consultants, P.A. | | SL | | | | $252,902 | $38,363 | 87% |
| Iowa Cancer Care | | SL | | | | $149,264 | $1,781 | 99% |
| Larry G. Strieff, MD | | SL | | | | $6,835 | $0 | 100% |
| Little Rock Hematology Oncology Associates, P.A. | | SL | | | | $404,131 | $69,378 | 85% |
| Mankato Clinic, Ltd | | SL | | | | $65,191 | $3,562 | 95% |
| Medical Oncology Associates, P.S. | | SL | | | | $72,111 | $0 | 100% |
| Melbourne Internal Medicine Associates | | SL | | | | $17,088 | $17,808 | 49% |
| Midlands Regional Cancer Center, PC | | SL | | | | $17,942 | $0 | 100% |
| Midwest Center For Hematology/Oncology, SC | | SL | | | | $52,973 | $0 | 100% |
| New Mexico Cancer Care Associates | | SL | | | | $127,134 | $0 | 100% |
| Oncology Hematology West, P.C. | | SL | | | | $304,679 | $190,175 | 62% |
| Oncology-Hematology Specialists, PA | | SL | | | | $52,973 | $0 | 100% |
| Palo Alto Medical Foundation | | SL | | | | $221,373 | $10,314 | 96% |
| Piedmont Hematology-Oncology Associates, PLLC | | SL | | | | $569,201 | $40,144 | 93% |
| Progressive Care, SC | | SL | | | | $107,654 | $7,123 | 94% |
| Robert Carter MD, PC | | SL | | | | $23,069 | $34,060 | 40% |
| Sacramento Center for Hematology & Medical Oncology, Inc. | | SL | | | | $241,710 | $26,790 | 90% |
| Springfield Clinic, LLP | | SL | | | | $62,200 | $25,970 | 71% |
| The Midsouth Cancer Center | | SL | | | | $76,042 | $0 | 100% |
| WVVA Health Care Alliance, P.C. | | SL | | | | $23,069 | $4,972 | 82% |
| | | **SL Total** | | | | **$5,148,184** | **$670,388** | **88%** |
| | | **USON Total** | | | | **$33,103,805** | **$4,316,651** | **88%** |

 **US Oncology**

**Aranesp Market Share Summary**

**For Period:   Jun-05**

| | | | | | | Dollars | | Market Share ($) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | **ARANESP** | **PROCRIT** | **Aranesp** |
| | | | | | | **$35,414,617** | **$4,198,726** | **89.4%** |
| | | | | | | Grand Total | **$39,613,343** | |

| Parent | Account | Region | Headi ng | Street | City | Aranesp | Procrit | Mkt Share % |
|---|---|---|---|---|---|---|---|---|
| Arch Medical Services, Inc. Total | | Central | | | | $357,566 | $3,191 | 99% |
| Arkansas Oncology Associates, P.A. Total | | Central | | | | $284,942 | $47,340 | 86% |
| Cancer Care Network of South Texas, P.A. Total | | Central | | | | $1,329,361 | $188,138 | 88% |
| Central Indiana Cancer Centers Total | | Central | | | | $342,956 | $8,460 | 98% |
| Dayton Oncology & Hematology, P.A. Total | | Central | | | | $281,098 | $23,077 | 92% |
| Hematology Oncology Associates of Illinois, L.L.C. Total | | Central | | | | $593,124 | $53,967 | 92% |
| Kansas City Cancer Centers Total | | Central | | | | $703,428 | $61,884 | 92% |
| Minnesota Oncology Hematology, P.A. Total | | Central | | | | $912,841 | $191,590 | 83% |
| Missouri Cancer Associates Total | | Central | | | | $229,577 | $3,562 | 98% |
| Northwest Medical Specialists, P.C. Total | | Central | | | | $438,820 | $4,601 | 99% |
| | | **Central Total** | | | | **$5,473,714** | **$585,809** | **90%** |
| Asheville Hematology & Oncology Associates, P.A. Total | | East | | | | $152,083 | $33,835 | 82% |
| Cancer Centers of Florida, P.A. Total | | East | | | | $248,032 | $73,164 | 77% |
| Cancer Centers of North Carolina Total | | East | | | | $992,386 | $27,010 | 97% |
| Cancer Centers Of The Carolinas Total | | East | | | | $814,243 | $14,246 | 98% |
| Durham Regional Hematology Oncology Total | | East | | | | $607,906 | $32,054 | 95% |
| Fairfax-Northern Virginia Hematology-Oncology, P.C. Total | | East | | | | $485,897 | $0 | 100% |
| Flavio Kruter, M.D., P.A. Total | | East | | | | $178,228 | $1,781 | 99% |
| Florida Cancer Institute, P.A. Total | | East | | | | $752,469 | $103,662 | 88% |
| Interlakes Oncology Hematology, P.C. Total | | East | | | | $189,848 | $89,786 | 68% |
| Maryland Oncology Hematology, P.A. Total | | East | | | | $461,034 | $52,609 | 90% |
| New York Oncology Hematology, P.C. Total | | East | | | | $1,283,394 | $267,166 | 83% |
| Northwestern Connecticut Onc/Hema. Assoc. Total | | East | | | | $179,680 | $41,627 | 81% |
| Ocala Oncology Center, P.L. Total | | East | | | | $166,608 | $114,420 | 59% |
| Oncology & Hematology Associates Of Southwest Virginia, Inc. T | | East | | | | $465,648 | $112,117 | 81% |
| South Florida Oncology and Hematology Consultants Total | | East | | | | $416,947 | $128,593 | 76% |
| Venango Oncology Hematology Association Total | | East | | | | $549,379 | $0 | 100% |
| Virginia Oncology Associates Total | | East | | | | $2,164,023 | $307,141 | 88% |
| | | **East Total** | | | | **$10,107,806** | **$1,399,213** | **88%** |
| Arizona Oncology Associates, P.C. Total | | West | | | | $1,157,285 | $154,944 | 88% |
| Cancer Care Associates Total | | West | | | | $1,248,706 | $212,515 | 85% |
| Cancer Care Northwest, P.S. Total | | West | | | | $191,813 | $14,246 | 93% |
| Comprehensive Cancer Centers of Nevada Total | | West | | | | $721,370 | $30,274 | 96% |
| Northwest Cancer Specialists, P.C. Total | | West | | | | $951,204 | $168,449 | 85% |
| Oncology Associates of Oregon, P.C. Total | | West | | | | $214,027 | $0 | 100% |
| Rocky Mountain Cancer Centers, LLP Total | | West | | | | $988,114 | $90,324 | 92% |
| Texas Oncology, P.A. Total | | West | | | | $7,784,522 | $950,823 | 89% |
| Washington Cancer Centers, P.C. Total | | West | | | | $313,052 | $20,628 | 94% |
| | | **West Total** | | | | **$13,570,091** | **$1,642,203** | **89%** |
| Advanced Care & Treatment Medical Group, SC Total | | SL | | | | $156,184 | $1,781 | 99% |
| Alice C. Reier, MD Total | | SL | | | | $34,176 | $0 | 100% |
| Alpine Hematology - Oncology, P.C. Total | | SL | | | | $29,050 | $1,410 | 95% |
| Ashland-Bellefonte Cancer Center Total | | SL | | | | $93,984 | $0 | 100% |
| Associates In Oncology-Hematology, PC Total | | SL | | | | $434,206 | $30,200 | 93% |
| Beckley Oncology Associates, Inc. Total | | SL | | | | $103,126 | $0 | 100% |
| Buenaventura Medical Group, Inc Total | | SL | | | | $21,787 | $3,562 | 86% |
| Cancer Associates Of Monterey Peninsula Total | | SL | | | | $326,039 | $32,054 | 91% |
| Cancer Treatment Center Of Oklahoma Total | | SL | | | | $117,053 | $30,274 | 79% |
| Central Texas Oncology Associates, P.A. Total | | SL | | | | $1,015,369 | $71,910 | 93% |
| Crossville Medical Oncology Total | | SL | | | | $90,566 | $1,781 | 98% |
| Edward Kaplan, MD & Associates Total | | SL | | | | $134,995 | $1,781 | 99% |
| Facey Medical Foundation Total | | SL | | | | $79,032 | $9,008 | 90% |
| Great Falls Clinic Total | | SL | | | | $62,542 | $11,651 | 84% |
| Gynecologic Oncology Associates, PA Total | | SL | | | | $117,907 | $0 | 100% |
| Hannibal Clinic Operations, LLC Total | | SL | | | | $30,588 | $5,423 | 85% |
| Hematology-Oncology Consultants, P.A. Total | | SL | | | | $328,517 | $44,447 | 88% |
| Iowa Cancer Care Total | | SL | | | | $146,017 | $1,781 | 99% |
| Larry G. Strieff, MD Total | | SL | | | | $11,962 | $0 | 100% |
| Little Rock Hematology Oncology Associates, P.A. Total | | SL | | | | $623,712 | $22,780 | 96% |
| Mankato Clinic, Ltd Total | | SL | | | | $62,542 | $5,483 | 92% |
| Medical Oncology Associates, P.S. Total | | SL | | | | $87,149 | $0 | 100% |
| Melbourne Internal Medicine Associates Total | | SL | | | | $30,758 | $0 | 100% |
| Midlands Regional Cancer Center, PC Total | | SL | | | | $12,816 | $0 | 100% |
| Midwest Center For Hematology/Oncology, SC Total | | SL | | | | $63,226 | $0 | 100% |
| New Mexico Cancer Care Associates Total | | SL | | | | $146,956 | $1,781 | 99% |
| Oncology Hematology West, P.C. Total | | SL | | | | $369,870 | $186,613 | 66% |
| Oncology-Hematology Specialists, PA Total | | SL | | | | $66,643 | $0 | 100% |
| Palo Alto Medical Foundation Total | | SL | | | | $220,861 | $10,685 | 95% |
| Piedmont Hematology-Oncology Associates, PLLC Total | | SL | | | | $603,206 | $29,459 | 95% |
| Progressive Care, SC Total | | SL | | | | $112,097 | $5,342 | 95% |
| Robert Carter MD, PC Total | | SL | | | | $25,205 | $23,077 | 52% |
| Sacramento Center for Hematology & Medical Oncology, Inc. Tota | | SL | | | | $277,167 | $23,265 | 92% |
| Springfield Clinic, LLP Total | | SL | | | | $60,662 | $5,640 | 91% |
| The Midsouth Cancer Center Total | | SL | | | | $61,944 | $0 | 100% |
| Tri-State Medical Center Total | | SL | | | | $32,467 | $0 | 100% |
| WVVA Health Care Alliance, P.C. Total | | SL | | | | $72,624 | $10,314 | 88% |
| | | **SL Total** | | | | **$6,263,006** | **$571,502** | **92%** |
| | | **USON Total** | | | | **$35,414,617** | **$4,198,726** | **89%** |

 US Oncology

**Aranesp Market Share Summary**

**For Period:   Jul-05**

|  |  |  | Dollars | Market Share ($) |
|---|---|---|---|---|
|  |  |  | ARANESP | PROCRIT | Aranesp |
|  |  |  | $30,503,952 | $3,830,389 | 88.8% |
|  |  |  | Grand Total | $34,334,341 |  |

| Parent | Account | Region | Heading | Street | City | Aranesp | Procrit | Mkt Share % |
|---|---|---|---|---|---|---|---|---|
| Arch Medical Services, Inc. Total |  | Central |  |  |  | $218,299 | $2,820 | 99% |
| Arkansas Oncology Associates, P.A. Total |  | Central |  |  |  | $275,544 | $50,160 | 85% |
| Cancer Care Network of South Texas, P.A. Total |  | Central |  |  |  | $1,223,501 | $104,224 | 92% |
| Central Indiana Cancer Centers Total |  | Central |  |  |  | $322,621 | $7,050 | 98% |
| Dayton Oncology & Hematology, P.A. Total |  | Central |  |  |  | $243,504 | $13,134 | 95% |
| Hematology Oncology Associates of Illinois, L.L.C. Total |  | Central |  |  |  | $497,602 | $52,682 | 90% |
| Kansas City Cancer Centers Total |  | Central |  |  |  | $522,380 | $51,497 | 91% |
| Minnesota Oncology Hematology, P.A. Total |  | Central |  |  |  | $737,262 | $114,122 | 87% |
| Missouri Cancer Associates Total |  | Central |  |  |  | $186,686 | $0 | 100% |
| Northwest Medical Specialists, P.C. Total |  | Central |  |  |  | $328,175 | $1,410 | 100% |
|  |  | **Central Total** |  |  |  | **$4,555,576** | **$397,099** | **92%** |
| Asheville Hematology & Oncology Associates, P.A. Total |  | East |  |  |  | $112,781 | $28,493 | 80% |
| Cancer Centers of Florida, P.A. Total |  | East |  |  |  | $284,771 | $73,906 | 79% |
| Cancer Centers of North Carolina Total |  | East |  |  |  | $716,842 | $25,229 | 97% |
| Cancer Centers of The Carolinas Total |  | East |  |  |  | $711,288 | $14,246 | 98% |
| Durham Regional Hematology Oncology Total |  | East |  |  |  | $494,698 | $16,027 | 97% |
| Fairfax-Northern Virginia Hematology-Oncology, P.C. Total |  | East |  |  |  | $494,698 | $9,943 | 98% |
| Flavio Kruter, M.D., P.A. Total |  | East |  |  |  | $174,127 | $7,123 | 96% |
| Florida Cancer Institute, P.A. Total |  | East |  |  |  | $681,640 | $127,998 | 84% |
| Interlakes Oncology Hematology, P.C. Total |  | East |  |  |  | $114,234 | $79,138 | 59% |
| Maryland Oncology Hematology, P.A. Total |  | East |  |  |  | $474,534 | $64,229 | 88% |
| New York Oncology Hematology, P.C. Total |  | East |  |  |  | $996,145 | $167,606 | 86% |
| Northwestern Connecticut Onc/Hema. Assoc. Total |  | East |  |  |  | $212,318 | $3,562 | 98% |
| Ocala Oncology Center, P.L. Total |  | East |  |  |  | $207,192 | $116,942 | 64% |
| Oncology & Hematology Associates Of Southwest Virginia, Inc. Total |  | East |  |  |  | $389,179 | $108,185 | 78% |
| South Florida Oncology and Hematology Consultants Total |  | East |  |  |  | $322,109 | $84,888 | 79% |
| Venango Oncology Hematology Association Total |  | East |  |  |  | $358,848 | $3,562 | 99% |
| Virginia Oncology Associates Total |  | East |  |  |  | $2,028,686 | $304,352 | 87% |
|  |  | **East Total** |  |  |  | **$8,774,088** | **$1,235,429** | **88%** |
| Arizona Oncology Associates, P.C. Total |  | Southwest |  |  |  | $1,215,384 | $132,535 | 90% |
| Cancer Care Associates Total |  | Southwest |  |  |  | $1,153,013 | $193,000 | 86% |
| Rocky Mountain Cancer Centers, LLP Total |  | Southwest |  |  |  | $869,523 | $87,556 | 91% |
| Texas Oncology, P.A. Total |  | Southwest |  |  |  | $6,569,480 | $777,952 | 89% |
|  |  | **Southwest Total** |  |  |  | **$9,807,400** | **$1,191,043** | **89%** |
| Cancer Care Northwest, P.S. Total |  | West |  |  |  | $247,434 | $12,466 | 95% |
| Comprehensive Cancer Centers of Nevada Total |  | West |  |  |  | $579,967 | $37,397 | 94% |
| Northwest Cancer Specialists, P.C. Total |  | West |  |  |  | $798,608 | $143,696 | 85% |
| Oncology Associates of Oregon, P.C. Total |  | West |  |  |  | $196,512 | $0 | 100% |
| Washington Cancer Centers, P.C. Total |  | West |  |  |  | $270,759 | $18,476 | 94% |
|  |  | **West Total** |  |  |  | **$2,093,280** | **$212,035** | **91%** |
| Advanced Care & Treatment Medical Group, SC Total |  | SL |  |  |  | $104,408 | $0 | 100% |
| Alice C. Reier, MD Total |  | SL |  |  |  | $34,603 | $0 | 100% |
| Alpine Hematology - Oncology, P.C. Total |  | SL |  |  |  | $47,846 | $1,410 | 97% |
| Ashland-Bellefonte Cancer Center Total |  | SL |  |  |  | $68,352 | $0 | 100% |
| Associates In Oncology-Hematology, PC Total |  | SL |  |  |  | $303,739 | $30,200 | 91% |
| Beckley Oncology Associates, Inc. Total |  | SL |  |  |  | $124,913 | $0 | 100% |
| Buenaventura Medical Group, Inc Total |  | SL |  |  |  | $14,952 | $1,781 | 89% |
| Cancer Associates Of Monterey Peninsula Total |  | SL |  |  |  | $261,104 | $40,958 | 86% |
| Cancer Treatment Center Of Oklahoma Total |  | SL |  |  |  | $108,936 | $24,931 | 81% |
| Central Texas Oncology Associates, P.A. Total |  | SL |  |  |  | $762,637 | $63,450 | 92% |
| Crossville Medical Oncology Total |  | SL |  |  |  | $85,867 | $0 | 100% |
| Edward Kaplan, MD & Associates Total |  | SL |  |  |  | $88,858 | $5,342 | 94% |
| Facey Medical Foundation Total |  | SL |  |  |  | $54,511 | $7,792 | 87% |
| Great Falls Clinic Total |  | SL |  |  |  | $40,926 | $13,432 | 75% |
| Gynecologic Oncology Associates, PA Total |  | SL |  |  |  | $66,643 | $0 | 100% |
| Hannibal Clinic Operations, LLC Total |  | SL |  |  |  | $42,293 | $3,191 | 93% |
| Hematology-Oncology Consultants, P.A. Total |  | SL |  |  |  | $272,554 | $33,762 | 89% |
| Highlands Cancer Center Total |  | SL |  |  |  | $8,544 | $0 | 100% |
| Iowa Cancer Care Total |  | SL |  |  |  | $117,224 | $0 | 100% |
| Larry G. Strieff, MD Total |  | SL |  |  |  | $13,670 | $0 | 100% |
| Little Rock Hematology Oncology Associates, P.A. Total |  | SL |  |  |  | $521,184 | $29,532 | 95% |
| Mankato Clinic, Ltd Total |  | SL |  |  |  | $48,872 | $8,904 | 85% |
| Medical Oncology Associates, P.S. Total |  | SL |  |  |  | $83,902 | $0 | 100% |
| Melbourne Internal Medicine Associates Total |  | SL |  |  |  | -$5,126 | $217,858 | -2% |
| Midlands Regional Cancer Center, PC Total |  | SL |  |  |  | $21,787 | $0 | 100% |
| Midwest Center For Hematology/Oncology, SC Total |  | SL |  |  |  | $61,517 | $0 | 100% |
| New Mexico Cancer Care Associates Total |  | SL |  |  |  | $123,802 | $1,781 | 99% |
| Oncology Hematology West, P.C. Total |  | SL |  |  |  | $325,441 | $163,463 | 67% |
| Oncology-Hematology Specialists, PA Total |  | SL |  |  |  | $61,517 | $0 | 100% |
| Palo Alto Medical Foundation Total |  | SL |  |  |  | $244,528 | $8,533 | 97% |
| Piedmont Hematology-Oncology Associates, PLLC Total |  | SL |  |  |  | $631,145 | $49,716 | 93% |
| Robert Carter MD, PC Total |  | SL |  |  |  | $46,138 | $13,505 | 77% |
| Sacramento Center for Hematology & Medical Oncology, Inc. Total |  | SL |  |  |  | $224,878 | $19,035 | 92% |
| Springfield Clinic, LLP Total |  | SL |  |  |  | $56,219 | $43,444 | 56% |
| The Midsouth Cancer Center Total |  | SL |  |  |  | $72,624 | $0 | 100% |
| Tri-State Medical Center Total |  | SL |  |  |  | $17,088 | $0 | 100% |
| Valley Internal Medicine, Inc. P.S. Total |  | SL |  |  |  | $95,436 | $4,601 | 95% |
| WVVA Health Care Alliance, P.C. Total |  | SL |  |  |  | $20,078 | $8,162 | 71% |
|  |  | **SL Total** |  |  |  | **$5,273,610** | **$794,783** | **87%** |
|  |  | **USON Total** |  |  |  | **$30,503,952** | **$3,830,389** | **89%** |

**US Oncology**

**Aranesp Market Share Summary**

**For Period:  Aug-05**

| | | Dollars | | Market Share ($) |
|---|---|---|---|---|
| | | ARANESP | PROCRIT | Aranesp |
| | | $37,950,134 | $4,186,864 | 90.1% |
| | | Grand Total | $42,136,998 | |

| Parent | Account | Region | Heading | Street | City | Aranesp | Procrit | Mkt Share % |
|---|---|---|---|---|---|---|---|---|
| Arch Medical Services, Inc. Total | | Central | | | | $347,314 | $1,410 | 100% |
| Arkansas Oncology Associates, P.A. Total | | Central | | | | $338,342 | $43,408 | 89% |
| Cancer Care Network of South Texas, P.A. Total | | Central | | | | $1,441,971 | $149,368 | 91% |
| Central Indiana Cancer Centers Total | | Central | | | | $313,992 | $5,640 | 98% |
| Dayton Oncology & Hematology, P.A. Total | | Central | | | | $264,437 | $14,915 | 95% |
| Hematology Oncology Associates of Illinois, L.L.C. Total | | Central | | | | $608,247 | $46,598 | 93% |
| Kansas City Cancer Centers Total | | Central | | | | $609,614 | $81,770 | 88% |
| Minnesota Oncology Hematology, P.A. Total | | Central | | | | $950,008 | $173,855 | 85% |
| Missouri Cancer Associates Total | | Central | | | | $224,109 | $1,781 | 99% |
| Northwest Medical Specialists, P.C. Total | | Central | | | | $405,413 | $0 | 100% |
| | | **Central Total** | | | | **$5,503,447** | **$518,744** | **91%** |
| Asheville Hematology & Oncology Associates, P.A. Total | | East | | | | $157,210 | $53,351 | 75% |
| Cancer Centers of Florida, P.A. Total | | East | | | | $331,592 | $91,343 | 78% |
| Cancer Centers of North Carolina Total | | East | | | | $1,086,797 | $14,915 | 99% |
| Cancer Centers Of The Carolinas Total | | East | | | | $833,467 | $7,123 | 99% |
| Durham Regional Hematology Oncology Total | | East | | | | $634,392 | $17,808 | 97% |
| Fairfax-Northern Virginia Hematology-Oncology, P.C. Total | | East | | | | $601,498 | $9,943 | 98% |
| Flavio Kruter, M.D., P.A. Total | | East | | | | $186,772 | $3,562 | 98% |
| Florida Cancer Institute, P.A. Total | | East | | | | $864,737 | $108,038 | 89% |
| Interlakes Oncology Hematology, P.C. Total | | East | | | | $156,526 | $99,693 | 61% |
| Maryland Oncology Hematology, P.A. Total | | East | | | | $544,594 | $72,198 | 88% |
| New York Oncology Hematology, P.C. Total | | East | | | | $1,104,995 | $240,141 | 82% |
| Northwestern Connecticut Onc/Hema. Assoc. Total | | East | | | | $251,621 | $1,781 | 99% |
| Ocala Oncology Center, P.L. Total | | East | | | | $399,176 | $79,248 | 83% |
| Oncology & Hematology Associates Of Southwest Virginia, Inc. Total | | East | | | | $546,389 | $116,347 | 82% |
| South Florida Oncology and Hematology Consultants Total | | East | | | | $341,333 | $85,259 | 80% |
| Venango Oncology Hematology Association Total | | East | | | | $433,181 | $6,382 | 99% |
| Virginia Oncology Associates Total | | East | | | | $2,461,610 | $401,016 | 86% |
| | | **East Total** | | | | **$10,935,890** | **$1,408,147** | **89%** |
| Arizona Oncology Associates, P.C. Total | | Southwest | | | | $1,551,846 | $108,858 | 93% |
| Cancer Care Associates Total | | Southwest | | | | $1,611,398 | $216,077 | 88% |
| Rocky Mountain Cancer Centers, LLP Total | | Southwest | | | | $1,132,080 | $100,742 | 92% |
| Texas Oncology, P.A. Total | | Southwest | | | | $8,275,888 | $808,372 | 91% |
| | | **Southwest Total** | | | | **$12,571,213** | **$1,234,049** | **91%** |
| Cancer Care Northwest, P.S. Total | | West | | | | $337,146 | $16,027 | 95% |
| Comprehensive Cancer Centers of Nevada Total | | West | | | | $702,317 | $39,178 | 95% |
| Northwest Cancer Specialists, P.C. Total | | West | | | | $1,040,830 | $173,933 | 86% |
| Oncology Associates of Oregon, P.C. Total | | West | | | | $188,822 | $0 | 100% |
| Washington Cancer Centers, P.C. Total | | West | | | | $325,014 | $18,847 | 95% |
| | | **West Total** | | | | **$2,594,129** | **$247,985** | **91%** |
| Advanced Care & Treatment Medical Group, SC Total | | SL | | | | $136,704 | $1,781 | 99% |
| Alice C. Reier, MD Total | | SL | | | | $31,186 | $0 | 100% |
| Alpine Hematology - Oncology, P.C. Total | | SL | | | | $51,264 | $4,230 | 92% |
| Ashland-Bellefonte Cancer Center Total | | SL | | | | $17,088 | $0 | 100% |
| Associates In Oncology-Hematology, PC Total | | SL | | | | $435,915 | $27,010 | 94% |
| Beckley Oncology Associates, Inc. Total | | SL | | | | $104,151 | $0 | 100% |
| Buenaventura Medical Group, Inc Total | | SL | | | | $48,701 | $12,800 | 79% |
| Cancer Associates Of Monterey Peninsula Total | | SL | | | | $297,673 | $35,616 | 89% |
| Cancer Treatment Center of Oklahoma Total | | SL | | | | $160,627 | $21,370 | 88% |
| Central Texas Oncology Associates, P.A. Total | | SL | | | | $1,024,426 | $559,220 | 65% |
| Crossville Medical Oncology Total | | SL | | | | $95,693 | $6,382 | 94% |
| Edward Kaplan, MD & Associates Total | | SL | | | | $148,666 | $0 | 100% |
| Facey Medical Foundation Total | | SL | | | | $93,899 | $8,533 | 92% |
| Great Falls Clinic Total | | SL | | | | $32,467 | $5,306 | 86% |
| Gynecologic Oncology Associates, PA Total | | SL | | | | $35,885 | $3,562 | 91% |
| Hannibal Clinic Operations, LLC Total | | SL | | | | $52,802 | $13,252 | 80% |
| Hematology-Oncology Consultants, P.A. Total | | SL | | | | $351,586 | $39,475 | 90% |
| Highlands Cancer Center Total | | SL | | | | $8,544 | $0 | 100% |
| Iowa Cancer Care Total | | SL | | | | $160,628 | $7,123 | 96% |
| Larry G. Strieff, MD Total | | SL | | | | $13,670 | $0 | 100% |
| Little Rock Hematology Oncology Associates, P.A. Total | | SL | | | | $552,797 | $25,970 | 96% |
| Mankato Clinic, Ltd Total | | SL | | | | $69,463 | $3,562 | 95% |
| Medical Oncology Associates, P.S. Total | | SL | | | | $122,094 | $0 | 100% |
| Melbourne Internal Medicine Associates Total | | SL | | | | $8,544 | $183,986 | 4% |
| Midlands Regional Cancer Center, PC Total | | SL | | | | $24,350 | $0 | 100% |
| Midwest Center For Hematology/Oncology, SC Total | | SL | | | | $58,099 | $0 | 100% |
| New Mexico Cancer Care Associates Total | | SL | | | | $162,592 | $0 | 100% |
| Oncology Hematology West, P.C. Total | | SL | | | | $352,354 | $193,366 | 65% |
| Oncology-Hematology Specialists, PA Total | | SL | | | | $70,915 | $0 | 100% |
| Palo Alto Medical Foundation Total | | SL | | | | $285,795 | $11,724 | 96% |
| Piedmont Hematology-Oncology Associates, PLLC Total | | SL | | | | $649,771 | $53,419 | 92% |
| Robert Carter MD, PC Total | | SL | | | | $8,544 | $3,191 | 73% |
| Sacramento Center for Hematology & Medical Oncology, Inc. Total | | SL | | | | $307,157 | $12,690 | 96% |
| Springfield Clinic, LLP Total | | SL | | | | $77,750 | $0 | 100% |
| The Midsouth Cancer Center Total | | SL | | | | $95,266 | $0 | 100% |
| Tri-State Medical Center Total | | SL | | | | $4,272 | $0 | 100% |
| Valley Internal Medicine, Inc. P.S. Total | | SL | | | | $164,216 | $41,183 | 80% |
| WVVA Health Care Alliance, P.C. Total | | SL | | | | $29,904 | $3,191 | 90% |
| | | **SL Total** | | | | **$6,345,456** | **$777,938** | **89%** |
| | | **USON Total** | | | | **$37,950,134** | **$4,186,864** | **90%** |


**US Oncology**

**Aranesp Market Share Summary**

For Period:  **Sep-05**

| | | | | | | | Dollars | | Market Share ($) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | ARANESP | PROCRIT | Aranesp |
| | | | | | | | **$36,478,174** | **$3,618,598** | **91.0%** |
| | | | | | | | Grand Total | **$40,096,772** | |
| Parent | Account | Region | Heading | Street | City | | Aranesp | Procrit | Mkt Share % |
| Arch Medical Services, Inc. Total | | Central | | | | | $295,622 | $2,820 | 99% |
| Arkansas Oncology Associates, P.A. Total | | Central | | | | | $282,379 | $45,893 | 86% |
| Cancer Care Network of South Texas, P.A. Total | | Central | | | | | $1,528,265 | $148,292 | 91% |
| Central Indiana Cancer Centers Total | | Central | | | | | $305,362 | $4,230 | 99% |
| Dayton Oncology & Hematology, P.A. Total | | Central | | | | | $287,933 | $9,572 | 97% |
| Hematology Oncology Associates of Illinois, L.L.C. Total | | Central | | | | | $662,929 | $44,076 | 94% |
| Kansas City Cancer Centers Total | | Central | | | | | $585,094 | $89,860 | 87% |
| Minnesota Oncology Hematology, P.A. Total | | Central | | | | | $855,596 | $161,389 | 84% |
| Missouri Cancer Associates Total | | Central | | | | | $214,284 | $0 | 100% |
| Northwest Medical Specialists, P.C. Total | | Central | | | | | $453,943 | $4,601 | 99% |
| | | **Central Total** | | | | | **$5,471,407** | **$510,733** | **91%** |
| Asheville Hematology & Oncology Associates, P.A. Total | | East | | | | | $164,045 | $52,609 | 76% |
| Cancer Centers of Florida, P.A. Total | | East | | | | | $389,521 | $109,448 | 78% |
| Cancer Centers of North Carolina Total | | East | | | | | $1,035,106 | $20,257 | 98% |
| Cancer Centers Of The Carolinas Total | | East | | | | | $786,475 | $14,246 | 98% |
| Durham Regional Hematology Oncology Total | | East | | | | | $579,283 | $21,370 | 96% |
| Fairfax-Northern Virginia Hematology-Oncology, P.C. Total | | East | | | | | $603,377 | $8,533 | 99% |
| Flavio Kruter, M.D., P.A. Total | | East | | | | | $199,588 | $3,562 | 98% |
| Florida Cancer Institute, P.A. Total | | East | | | | | $838,080 | $94,904 | 90% |
| Interlakes Oncology Hematology, P.C. Total | | East | | | | | $115,259 | $82,997 | 58% |
| Maryland Oncology Hematology, P.A. Total | | East | | | | | $511,273 | $63,665 | 89% |
| New York Oncology Hematology, P.C. Total | | East | | | | | $1,008,106 | $236,723 | 81% |
| Northwestern Connecticut Onc/Hema. Assoc. Total | | East | | | | | $222,144 | $1,781 | 99% |
| Ocala Oncology Center, P.L. Total | | East | | | | | $278,534 | $57,805 | 83% |
| Oncology & Hematology Associates of Southwest Virginia, Inc. Total | | East | | | | | $482,309 | $99,281 | 83% |
| South Florida Oncology and Hematology Consultants Total | | East | | | | | $411,394 | $96,685 | 81% |
| Venango Oncology Hematology Association Total | | East | | | | | $425,491 | $8,162 | 98% |
| Virginia Oncology Associates Total | | East | | | | | $2,286,032 | $278,795 | 89% |
| | | **East Total** | | | | | **$10,336,017** | **$1,250,826** | **89%** |
| Arizona Oncology Associates, P.C. Total | | Southwest | | | | | $1,365,416 | $119,323 | 92% |
| Cancer Care Associates Total | | Southwest | | | | | $1,599,864 | $169,478 | 90% |
| Rocky Mountain Cancer Centers, LLP Total | | Southwest | | | | | $1,078,594 | $84,047 | 93% |
| Texas Oncology, P.A. Total | | Southwest | | | | | $7,817,245 | $702,692 | 92% |
| | | **Southwest Total** | | | | | **$11,861,120** | **$1,075,540** | **92%** |
| Cancer Care Northwest, P.S. Total | | West | | | | | $271,186 | $23,150 | 92% |
| Comprehensive Cancer Centers of Nevada Total | | West | | | | | $629,693 | $42,739 | 94% |
| Northwest Cancer Specialists, P.C. Total | | West | | | | | $1,018,787 | $149,185 | 87% |
| Oncology Associates of Oregon, P.C. Total | | West | | | | | $195,658 | $0 | 100% |
| Washington Cancer Centers, P.C. Total | | West | | | | | $277,765 | $15,656 | 95% |
| | | **West Total** | | | | | **$2,393,089** | **$230,731** | **91%** |
| Advanced Care & Treatment Medical Group, SC Total | | SL | | | | | $115,515 | $1,781 | 98% |
| Alice C. Reier, MD Total | | SL | | | | | $33,322 | $0 | 100% |
| Alpine Hematology - Oncology, P.C. Total | | SL | | | | | $47,846 | $7,123 | 87% |
| Ashland-Bellefonte Cancer Center Total | | SL | | | | | $68,352 | $0 | 100% |
| Associates In Oncology-Hematology, PC Total | | SL | | | | | $375,509 | $18,106 | 95% |
| Beckley Oncology Associates, Inc. Total | | SL | | | | | $117,138 | $0 | 100% |
| Buenaventura Medical Group, Inc Total | | SL | | | | | $30,758 | $6,593 | 82% |
| Cancer Associates Of Monterey Peninsula Total | | SL | | | | | $300,920 | $35,616 | 89% |
| Cancer Treatment Center Of Oklahoma Total | | SL | | | | | $173,016 | $5,342 | 97% |
| Central Texas Oncology Associates, P.A. Total | | SL | | | | | $843,207 | $66,270 | 93% |
| Crossville Medical Oncology Total | | SL | | | | | $93,984 | $6,752 | 93% |
| Edward Kaplan, MD & Associates Total | | SL | | | | | $126,451 | $3,562 | 97% |
| Facey Medical Foundation Total | | SL | | | | | $95,095 | $2,115 | 98% |
| Great Falls Clinic Total | | SL | | | | | $44,087 | $3,562 | 93% |
| Gynecologic Oncology Associates, PA Total | | SL | | | | | $88,858 | $8,162 | 92% |
| Hannibal Clinic Operations, LLC Total | | SL | | | | | $47,419 | $6,499 | 88% |
| Hematology-Oncology Consultants, P.A. Total | | SL | | | | | $290,923 | $45,857 | 86% |
| Highlands Cancer Center Total | | SL | | | | | $17,088 | $0 | 100% |
| Iowa Cancer Care Total | | SL | | | | | $130,382 | $0 | 100% |
| Larry G. Strieff, MD Total | | SL | | | | | $20,506 | $0 | 100% |
| Little Rock Hematology Oncology Associates, P.A. Total | | SL | | | | | $541,690 | $33,464 | 94% |
| Mankato Clinic, Ltd Total | | SL | | | | | $51,948 | $0 | 100% |
| Medical Oncology Associates, P.S. Total | | SL | | | | | $221,888 | $0 | 100% |
| Melbourne Internal Medicine Associates Total | | SL | | | | | $24,265 | $0 | 100% |
| Midlands Regional Cancer Center, PC Total | | SL | | | | | $16,661 | $0 | 100% |
| Midwest Center For Hematology/Oncology, SC Total | | SL | | | | | $46,138 | $0 | 100% |
| New Mexico Cancer Care Associates Total | | SL | | | | | $120,897 | $0 | 100% |
| Oncology Hematology West, P.C. Total | | SL | | | | | $300,236 | $181,642 | 62% |
| Oncology-Hematology Specialists, PA Total | | SL | | | | | $60,662 | $0 | 100% |
| Palo Alto Medical Foundation Total | | SL | | | | | $294,852 | $9,943 | 97% |
| Piedmont Hematology-Oncology Associates, PLLC Total | | SL | | | | | $725,129 | $44,956 | 94% |
| Pronger Smith Medical Care Total | | SL | | | | | $263,155 | $0 | 100% |
| Sacramento Center for Hematology & Medical Oncology, Inc. Total | | SL | | | | | $294,341 | $25,380 | 92% |
| Springfield Clinic, LLP Total | | SL | | | | | $69,206 | $0 | 100% |
| The Medical Associates Clinic, P.C. Total | | SL | | | | | $35,885 | $423 | 99% |
| The Midsouth Cancer Center Total | | SL | | | | | $53,400 | $0 | 100% |
| Tri-State Medical Center Total | | SL | | | | | $36,312 | $0 | 100% |
| Valley Internal Medicine, Inc. P.S. Total | | SL | | | | | $158,918 | $32,650 | 83% |
| WVVA Health Care Alliance, P.C. Total | | SL | | | | | $40,584 | $4,972 | 89% |
| | | **SL Total** | | | | | **$6,416,542** | **$550,769** | **92%** |
| | | **USON Total** | | | | | **$36,478,174** | **$3,618,598** | **91%** |